**KASOWITZ BENSON TORRES LLP**

*Attorneys for Cairn Capital*
*Investment Funds ICAV*
*for its sub fund Cairn Capstone*
*Special Opportunities Fund*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No.: 2:20-bk-15015-BR |
| TEMERITY TRUST MANAGEMENT, LLC, | Chapter 11 |
| Debtor. | **NOTICE OF MOTION AND MOTION FOR (I) ORDER APPOINTING TRUSTEE PURSUANT TO 11 U.S.C. § 1104(A), OR, ALTERNATIVELY, (II) ORDER GRANTING RELIEF FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF BRANDON KUFRIN AND ANDREW K. GLENN IN SUPPORT THEREOF** |
| | Hearing Date: July 21, 2020 |
| | Time: 10:00 a.m. |
| | Courtroom: 1668 |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, DEBTOR AND ITS COUNSEL, THE UNITED STATES TRUSTEE, AND OTHER INTERESTED PARTIES:**

    **PLEASE TAKE NOTICE THAT** on July 21, 2020 at 10:00 a.m., Cairn Capital

Investment Funds ICAV, for its sub fund Cairn Capstone Special Opportunities Fund ("Cairn"),

1    will move the Court for (i) order appointing a trustee pursuant to 11 U.S.C. § 1104(a), or,

2    alternatively, (ii) order granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d) (the

3    "Motion").

4         **PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Notice of

5    Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed

6    Declarations of Andrew K. Glenn and Brandon Kufrin, supporting statements, arguments and

7    representations of counsel who will appear at the hearing on the Motion, the record in this case,

8    and any other evidence properly brought before the Court in all other matters of which this Court

9    may properly take judicial notice.

10         **PLEASE TAKE FURTHER NOTICE** that pursuant to Rule 9013-1(f) of the Local

11    Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California

12    (the "Local Bankruptcy Rules"), a party opposing or responding to the Motion must file and serve

13    the response (the "Response") on Cairn and the United States Trustee not later than fourteen (14)

14    days before the date designated for hearing.  The Response must be a complete written statement

15    of all reasons in opposition to the Motion or in support thereof, declarations and copies of all

16    evidence on which the responding party intends to rely, and any responding memorandum of

17    points and authorities.

18         **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-

19    1(h), failure to file and serve a timely objection to the Motion may be deemed by the Court to be

20    consent to the relief requested herein.

21

22               *[Remainder of page intentionally left blank]*

23

24

25

26

27

28

1 | Dated: June 19, 2020

2

3 | **KASOWITZ BENSON TORRES LLP**

4

5 | /s/ *Andrew R.J. Muir*
Andrew R.J. Muir
101 California Street, Suite 3000

6 | San Francisco, California  94111
Telephone: (415) 421-6140

7 | Facsimile:  (415) 398-5030
Email:  amuir@kasowitz.com

8

9 | Andrew K. Glenn (*pro hac vice* application
pending)

10 | Shai Schmidt (*pro hac vice* application pending)
1633 Broadway

11 | New York, New York 10019
Telephone:  (212) 506-1700

12 | Facsimile:  (212) 506-1800
Email:       aglenn@kasowitz.com

13 |              sschmidt@kasowitz.com

14

15 | *Attorneys for Cairn Capital Investment Funds ICAV,
for its sub fund Cairn Capstone Special*

16 | *Opportunities Fund*

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.     THE PARTIES ......................................................................................................... 2

II.    SADLEIR'S PREPETITION FRAUDULENT SCHEMES ......................................... 3

       A.    Sadleir's Fraud on BlackRock ................................................................... 4

       B.    Sadleir's Fraud on the Paycheck Protection Program ................................ 6

III.   CAIRN'S CLAIMS AGAINST THE DEBTOR AND LIEN ON THE
       PROPERTY ........................................................................................................... 7

       A.    The Credit Agreement and Promissory Note .............................................. 7

       B.    The Guaranty ............................................................................................. 7

       C.    The Borrower Breaches the Credit Agreement ........................................... 8

       D.    The Debtor Defaults on the Guaranty and Cairn Commences a
            Foreclosure Action ................................................................................. 10

RELIEF REQUESTED ..................................................................................................... 11

JURISDICTION ............................................................................................................... 11

ARGUMENT .................................................................................................................... 11

I.     THE COURT SHOULD APPOINT A TRUSTEE PURSUANT TO SECTION
       1104(A) OF THE BANKRUPTCY CODE ............................................................. 11

       A.    Cause Exists to Appoint a Trustee Under Section 1104(a)(1) ................... 14

       B.    Appointment of a Trustee Is in the Best Interests of Creditors and the
            Bankruptcy Estate Under Section 1104(a)(2) ......................................... 17

II.    ALTERNATIVELY, THE COURT SHOULD LIFT THE AUTOMATIC
       STAY TO ALLOW CAIRN TO COMPLETE THE FORECLOSURE ....................... 18

       A.    The Court Should Lift the Automatic Stay for "Cause" Under Section
            362(d)(1) ............................................................................................... 18

       B.    Relief from Stay Is Also Justified Under § 362(d)(2) ............................... 21

CONCLUSION ................................................................................................................. 23

Kasowitz Benson
Torres LLP
Attorneys at Law
Los Angeles

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*In re Am. Res., Ltd.*,
   54 B.R. 245 (Bankr. D. Haw. 1985)..................................................................14

*In re Avila*,
   311 B.R. 81 (Bankr. N.D. Cal. 2004).................................................................19

*Baldino v. Wilson (In re Wilson)*,
   116 F.3d 87 (3d Cir. 1997)................................................................................19

*In re Bibo, Inc.*,
   76 B.R. 256 (9th Cir. 1996)..............................................................................13

*In re Big3D, Inc.*,
   Case No. 08-16768, 2009 WL 9085556 (Bankr. E.D. Cal. Aug. 28, 2009),
   *aff'd*, 438 B.R. 214 (B.A.P. 9th Cir. 2010) .......................................................19

*In re BLX Grp., Inc.*,
   419 B.R. 457 (Bankr. D. Mont. 2009) ...............................................................18

*In re Briarwood Capital, LLC*,
   Case No. 10-02677, 2010 WL 2884949 (Bankr. S.D. Cal. July 19, 2010)...............14, 18

*In re Brotman Med. Ctr., Inc.*,
   2008 WL 8444797 (B.A.P. 9th Cir. Aug. 15, 2008) ...........................................19

*In re Chevy Devco*,
   78 B.R. 585 (Bankr. C.D. Cal. 1987).................................................................20

*In re Clinton Centrifuge, Inc.*,
   85 B.R. 980 (Bankr. E.D. Pa. 1988)...................................................................17

*In re Colo.-Ute Elec. Ass'n, Inc.*,
   120 B.R. 164 (Bankr. D. Colo. 1990) ................................................................13

*Commodity Futures Trading Comm'n v. Weintraub*,
   471 U.S. 343 (1985)...........................................................................................12

*In re Conejo Enters., Inc.*,
   96 F.3d 346 (9th Cir. 1996)...............................................................................19

*In re Davis*,
   Case No. 09-10198, 2010 WL 2640587 (Bankr. E.D.N.C. June 29, 2010)...........13

*In re DB Capital Holdings, LLC*,
   454 B.R. 804 (Bankr. D. Colo. 2011) ................................................................20

*Delaney-Morin v. Day (In re Delaney-Morin)*,
   304 B.R. 365 (B.A.P. 9th Cir. 2003)..................................................................19

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

*In re Duvar Apt., Inc.*,
     205 B.R. 196 (B.A.P. 9th Cir. 1996) .................................................................. 20, 21

*In re Edwards*,
     454 B.R. 100 (B.A.P. 9th Cir. 2011) ........................................................................ 19

*In re Eurospark Indus., Inc.*,
     424 B.R. 621 (Bankr. E.D.N.Y. 2010) ..................................................................... 16

*In re Gundrum*,
     509 B.R. 155 (Bankr. S.D. Ohio 2014) ..................................................................... 20

*In re H.T. Pueblo Props., LLC*,
     Case No. 11-24718, 2011 WL 6962754 (Bankr. D. Colo. Dec. 30, 2011) ................ 20

*In re Helionetics*,
     70 B.R. 433 (Bankr. C.D. Cal. 1987) ........................................................................ 22

*In re Intercat, Inc.*,
     247 B.R. 911 (Bankr. S.D. Ga. 2000) ........................................................... 12, 15, 17

*In re Keystone Camera Prods. Corp.*,
     126 B.R. 177 (Bankr. D.N.J. 1991) ........................................................................... 21

*In re Klein/Ray Broad.*,
     100 B.R. 509 (B.A.P. 9th Cir. 1987) ......................................................................... 12

*La Jolla Mortg. Fund v. Rancho El Cajon Assocs.*,
     18 B.R. 283 (Bankr. S.D. Cal. 1982) ........................................................................ 21

*In re Madison Mgmt.*,
     137 B.R. 275 (Bankr. N.D. Ill. 1992) ................................................................. 13, 14

*In re Marvel Entm't Grp., Inc.*,
     140 F.3d 463 (3d Cir. 1998) ............................................................................... 12, 13

*Meadowbrook Inv'rs' Grp. v. Thirtieth Place, Inc. (In re Thirtieth Place, Inc.)*,
     30 B.R. 503 (B.A.P. 9th Cir. 1983) ........................................................................... 21

*In re Nautilus of N.M., Inc.*,
     83 B.R. 784 (Bankr. D.N.M. 1988) ........................................................................... 12

*In re Okla. Ref. Co.*,
     838 F.2d 1133 (10th Cir. 1988) .................................................................. 13, 14, 15, 17

*In re Sharon Steel Corp.*,
     871 F.2d 1217 (3d Cir. 1989) .................................................................................... 13

*Stewart v. Gurley*,
     745 F.2d 1194 (9th Cir. 1984) ................................................................................... 21

*Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers, Inc.)*,
     171 B.R. 71 (B.A.P. 9th Cir. 1994) ........................................................................... 22

*In re SunCruz Casinos, LLC,*
    298 B.R. 821 (Bankr. S.D. Fla. 2003) ............................................................... 13, 17

*In re Swedeland Dev. Grp., Inc.,*
    16 F.3d 552 (3d Cir. 1994) ....................................................................................... 22

*In re Tel-Net Haw., Inc.,*
    105 B.R. 594 (Bankr. D. Haw. 1989) ............................................................... 16, 17

*Tradex Corp. v. Morse,*
    339 B.R. 823 (D. Mass. 2006) ................................................................................. 15

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forrest Assocs., Ltd.,*
    484 U.S. 365 (1988) ................................................................................................. 22

*In re V. Savino Oil & Heating Co.,*
    99 B.R. 518 (Bankr. E.D.N.Y. 1989) ..................................................................... 12

**Statutes**

11 U.S.C. § 362(d) ........................................................................................... *passim*

11 U.S.C. § 362(g) ............................................................................................ 19, 22

11 U.S.C. § 1104(a) ......................................................................................... *passim*

28 U.S.C. § 157 ...................................................................................................... 11

28 U.S.C. § 1334 .................................................................................................... 11

28 U.S.C. § 1408 .................................................................................................... 11

28 U.S.C. § 1409 .................................................................................................... 11

**Other Authorities**

https://www.justice.gov/usao-cdca/pr/hollywood-executive-arrested-federal-fraud-
    charges-allege-he-pocketed-money-covid-19 ........................................................ 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

Cairn Capital Investment Funds ICAV, for its sub fund Cairn Capstone Special Opportunities Fund ("Cairn"), a secured creditor of the Debtor,[1] hereby respectfully submits its Memorandum of Points and Authorities in support of its *Motion for (I) Order Appointing Trustee Pursuant to 11 U.S.C. § 1104(a), or, Alternatively, (II) Order Granting Relief From Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Motion").[2]

### PRELIMINARY STATEMENT[3]

This is a paradigmatic case for the appointment of a Chapter 11 trustee to protect stakeholders and the integrity of the bankruptcy process. The Debtor's manager, William Sadleir, caused the Debtor to commence this case with the intent of hindering Cairn from exercising its right as a secured lender to foreclose on its collateral – the house in which Mr. Sadleir and his spouse (the Debtor's owner) live rent-free – following the maturity of loans owed to Cairn and continuing events of default. Mr. Sadleir – who has been purportedly designated as the Debtor's sole authorized agent – has complete control over the Debtor. For the reasons set forth herein, he should be removed from management.

In recent months, criminal and civil complaints filed in New York and this District by the U.S. Attorney, the Federal Bureau of Investigation and the Securities and Exchange Commission have revealed egregious acts of fraud by Mr. Sadleir. These authorities concluded that Mr. Sadleir had repeatedly committed fraud on one of his affiliated companies' investors, including by forging that investor's signature to release a lien, and creating fake identities and sham companies to make false representations to the investor concerning the use of its funds. Perhaps even more troubling, Mr. Sadleir was not deterred when the defrauded investor filed a lawsuit

---

[1] All references in this Motion to Cairn shall be deemed to include, as the context may require, its investment manager, Cairn Capital Limited.

[2] The *Declaration of Brandon Kufrin in Support of Cairn's Motion for (I) Order Appointing Trustee Pursuant to 11 U.S.C. § 1104(a), or, Alternatively, (II) Order Granting Relief From Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Kufrin Declaration" or "Kufrin Decl.") and the *Declaration of Andrew K. Glenn in Support of Cairn's Motion for (I) Order Appointing Trustee Pursuant to 11 U.S.C. § 1104(a), or, Alternatively, (II) Order Granting Relief From Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Glenn Declaration" or "Glenn Decl.") are being filed concurrently herewith.

[3] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them below.

1    against him and obtained a court order ousting him as the manager of the companies involved.

2    Instead, as recently revealed in an additional criminal complaint filed against Mr. Sadleir, he

3    allegedly committed fraud on the federal government and JPMorgan Chase by filing a false

4    application for a $1.7 million loan under the Paycheck Protection Program on the false pretense

5    that such PPP loan proceeds were to support business activities at one or more of his affiliated

6    companies, and then siphoned the proceeds to pay for personal expenses.  Mr. Sadleir was

7    indicted and arrested on these charges.

8        Section 1104(a) of the Bankruptcy Code mandates the appointment of a trustee for "cause,

9    including fraud [and] dishonesty . . . either before or after the commencement of the case[.]"

10    Here, because **three independent official inquiries** have found that the Debtor's current manager

11    has repeatedly committed fraud against various parties, the conclusion is clear.  Mr. Sadleir

12    cannot be trusted to serve as a fiduciary for the Debtor's estate and a trustee should be appointed.

13    Moreover, Mr. Sadleir and his spouse are inherently and irreconcilably conflicted.  Mr. Sadleir

14    caused the commencement of this case to avert a foreclosure of Cairn's mortgage on his and his

15    spouse's personal residence, which is owned by the Debtor, but for which they apparently pay no

16    rent.  Neither Mr. Sadleir nor his spouse can be charged with acting as a fiduciary with respect to

17    the disposition of this asset.  Nor can they be expected to investigate and pursue claims that the

18    Debtor may have against them in connection with their personal use of the asset rent-free.

19        Alternatively, if the Court does not appoint a trustee, cause exists to grant Cairn relief

20    from the stay under Section 362(d) of the Bankruptcy Code and allow it to complete the

21    foreclosure on the property securing the mortgage granted to Cairn.  The Debtor has no

22    operations and no money with which to prosecute the Chapter 11 Case, it has no need for this

23    mortgaged property to consummate a reorganization, and it has no equity in the mortgaged

24    property.  As such, the Debtor cannot adequately protect Cairn's interests as the Bankruptcy Code

25    requires.  Therefore, and as further explained below, relief from the stay is warranted.

26                        **BACKGROUND**

27    **I.    THE PARTIES**

28        1.    The debtor in this chapter 11 case (the "Chapter 11 Case"), Temerity Trust

1   Management, LLC (the "Debtor"), is an entity exclusively managed and controlled by William

2   Sadleir ("Sadleir") pursuant to the Consent and Agreement of the Sole Member of Temerity Trust

3   Management, LLC to Commence Chapter 11 Bankruptcy Proceeding.  *See* Docket No. 17 at 31

4   ("Sadleir . . . is empowered and directed, without further action, to direct the Bankruptcy Case and

5   is designated and authorized to act as a 'Responsible Individual' or 'Authorized Agent' for the

6   Company[.]").  The Debtor was formed in 2015 and is currently owned by Sadleir's wife, Hanan

7   Kadadu ("Kadadu"), who is the sole member of the Debtor.  *See id.* at 25; Glenn Decl., Exhibit D

8   at 4.

9       2.      The Debtor is not operating any business and has no funds.  *See* Statement of

10  Financial Affairs [Docket No. 17 at 18] (listing gross revenue from business as "none"); Schedule

11  A/B: Assets – Real and Personal Property [Docket No. 17 at 9] (cash, cash equivalents and

12  financial assets valued at $0).  The Debtor has no accounts receivable, inventory of any kind,

13  equipment, intangible assets or intellectual property.  *See id.*

14      3.      Sadleir was the chairman and chief executive officer of the Debtor's indirect

15  subsidiary Aviron Pictures LLC, a film production and distribution company based in Los

16  Angeles, California ("Aviron Pictures"), and oversaw its operations from circa 2015 until circa

17  December 2019.  *See* Glenn Decl., Exhibit D at 3.  Sadleir and Aviron Pictures operated through

18  multiple related legal entities (collectively, the "Aviron Entities").  *See id.*

19      4.      As described in detail below, Cairn is a secured creditor of the Debtor by virtue of a

20  loan Cairn extended to one of the Aviron Entities, which the Debtor unconditionally and

21  irrevocably guaranteed on a secured basis.

22  **II.     SADLEIR'S PREPETITION FRAUDULENT SCHEMES**

23      5.      Recent federal criminal complaints filed against Sadleir in New York and

24  California, for which he has been arrested, as well as a Securities and Exchange Commission (the

25  "SEC") complaint and a civil lawsuit filed against him, reveal that Sadleir is a serial fraudster who

26  should not be allowed to act as a fiduciary for the Debtor's creditors or maintain any control of the

27  Debtor.

28

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1

      **A.**     **Sadleir's Fraud on BlackRock**

2

    6.     On December 17, 2019, BlackRock Multi-Sector Income Trust ("BlackRock")

3 filed a complaint in the Supreme Court of the State of New York (the "BlackRock Complaint")

4 against Sadleir, Aviron Pictures and certain other Aviron Entities, alleging a long history of acts

5 of fraud, dishonesty and willful misconduct, including, among other things, fraudulent

6 misrepresentations, forgery of signature pages and invoices, and the intentional and improper

7 release of certain liens by Sadleir and those Aviron Entities, in which BlackRock had invested

8 (the "BlackRock Litigation").[4]  On December 20, 2019, the New York court granted BlackRock's

9 request for a preliminary injunction and ordered the removal of Sadleir from his position at

10 Aviron Pictures and Aviron Capital, LLC, permitting BlackRock to select a replacement manager

11 for those entities.[5]  The BlackRock Litigation is in its early stages and discovery has not yet

12 commenced.[6]

13

    7.     The severity of Sadleir's fraud on BlackRock was further revealed in a criminal

14 complaint filed against Sadleir by the U.S. Attorney in the Southern District of New York on May

15 18, 2020 (the "Criminal Complaint").  The Criminal Complaint includes three counts:  (i) wire

16 fraud – advertising scheme; (ii) wire fraud – UCC scheme; and (iii) aggravated identity theft –

17 UCC scheme.[7]  *See* Glenn Decl., Exhibit D at 1-2.  As described in the Criminal Complaint,

18 Sadleir participated in two long-running fraudulent schemes relating to an approximately $75

19 million investment made by BlackRock in certain Aviron Entities.  *See id.* at 4.

20

    8.     In one of the schemes, Sadleir allegedly misappropriated millions of dollars in

21 funds from Aviron Entities that had been invested by BlackRock.  *See id.*  Sadleir represented to

22 BlackRock that this money had been invested by Aviron Entities in pre-paid media credits with

23 the advertising placement company MediaCom Worldwide, LLC ("MediaCom"), which is a

24 subsidiary of the advertising and media agency GroupM Worldwide Inc. ("GroupM Worldwide").

25 *See id.*  Instead, Sadleir, using the bank account for a sham entity he had created, illicitly

26

    [4]     A true and correct copy of the BlackRock Complaint is attached as **Exhibit A** to the Glenn Declaration.

27     [5]     A true and correct copy of the preliminary injunction is attached as **Exhibit B** to the Glenn Declaration.
    [6]     A true and correct copy of a Stipulation and Order concerning discovery in the BlackRock Litigation, dated

28 May 20, 2020, is attached as **Exhibit C** to the Glenn Declaration.
    [7]     A true and correct copy of the Criminal Complaint is attached as **Exhibit D** to the Glenn Declaration.

1   transferred out of Aviron Entities over $25 million of those funds.  *See id.*  Specifically, according

2   to the Criminal Complaint, Sadleir created a sham company called GroupM Media Services, LLC

3   (the "Sham GroupM LLC") designed to appear as if it were the legitimate entity, GroupM

4   Worldwide, and a corresponding bank account in the name of that sham entity.  *See id.* at 4-5.

5   Kadadu (Sadleir's spouse) was listed with the California Secretary of State as Sham GroupM

6   LLC's agent for service of process.  *See id.* at 7.  Sadleir allegedly used a significant portion of

7   those illicitly transferred funds for his personal benefit, including to purchase a private residence

8   in Beverly Hills, where Sadleir and Kadadu apparently live rent-free (and which, as described

9   below, was used as collateral to secure the Guaranty (as defined below)).  *See id.* at 5.

10          9.       Sadleir then falsely represented to BlackRock that the Aviron Entities had

11   purchased an approximately $27 million balance in pre-paid media credits with MediaCom that

12   were available to promote future Aviron films, and pledged a portion of those credits to

13   BlackRock as collateral for additional loans, when in fact the claimed credits did not exist due to

14   Sadleir's misappropriation.  *See id.*  As part of these false representations, Sadleir also allegedly

15   created a fake identity of a purported New York-based female employee of the Sham GroupM

16   LLC named "Amanda Stevens" who corresponded with a representative of BlackRock, ensuring

17   BlackRock that the Aviron Entities had an approximately $27 million balance in pre-paid media

18   credits with the Sham GroupM LLC.  *See id.*  Sadleir himself allegedly posed as Amanda Stevens

19   when engaging in email exchanges with a representative from BlackRock.  *See id.*

20          10.      In another fraudulent scheme, Sadleir allegedly engineered the illicit and

21   fraudulent sale of assets worth an estimated $3 million that secured BlackRock's loans to Aviron

22   Entities.  *See id.*  BlackRock had secured its investment in Aviron Entities by, among other

23   means, obtaining UCC liens in 2017 and 2018 on certain intellectual property and other assets

24   relating to Aviron Entities' films.  *See id.*  In 2019, Sadleir allegedly used the forged signatures of

25   at least one of BlackRock's portfolio managers on forms UCC-3 to release BlackRock's UCC

26   liens on certain of these secured assets in order to sell or obtain financing against them without

27   BlackRock's consent, thus depriving BlackRock of its collateral on outstanding loans, on which

28   Aviron Entities ultimately defaulted.  *See id.*

11.     On May 22, 2020, the SEC filed a complaint against Sadleir in the United States

District Court for the Southern District of New York for alleged violations of the anti-fraud

provisions of the Securities Act and the Exchange Act, largely based on the same facts depicted in

the Criminal Complaint (the "<u>SEC Complaint</u>").[8]  The SEC investigation is continuing and may

reveal additional acts of fraud.  *See* Glenn Decl., Exhibit E at 1.

### B.     Sadleir's Fraud on the Paycheck Protection Program

12.     On May 21, 2020, the Federal Bureau of Investigation (the "<u>FBI</u>") filed a criminal

complaint against Sadleir in the District Court for the Central District of California alleging (i) wire

fraud; (ii) bank fraud; (iii) false statements to a financial institution; and (iv) false statements to the

Small Business Administration (the "<u>PPP Criminal Complaint</u>").[9]  *See* Glenn Decl., Exhibit F at 1.

13.     According to the PPP Criminal Complaint, in or about April 2020, Sadleir

submitted three applications for loans to JPMorgan Chase, N.A. ("<u>JPMC</u>") on behalf of three

Aviron Entities through the Paycheck Protection Program established by the Coronavirus Aid,

Relief, and Economic Security Act.  *See id.* at 3.  JPMC approved the loans, and Sadleir received

a total of over $1.7 million in funds as a result of these loans.  *See id.*  Sadleir allegedly obtained

the loans by making false representations about each entity's payroll expenses, their number of

respective employees, the operational status of the companies, and how the loan proceeds would

be spent.  *See id.*  Sadleir allegedly intended to use at least some of the funds for personal and

other prohibited expenses, and immediately upon receiving the funds a significant amount was

diverted to Sadleir's personal accounts and used for personal expenses, including purchases made

at a movie theater and a liquor store.  *See id.* at 3, 13.  Kadadu was also implicated in the PPP

Criminal Complaint, which alleged that Sadleir had used some of the illicitly obtained funds to

repay a $40,114.94 debt on Kadadu's American Express card, which included charges at clothing

stores.  *See id.* at 13.  The Debtor disclosed on June 15, 2020 – in its dilatory filing of schedules

supporting the petition – that the Debtor's counsel was paid a retainer from Kadadu's American

Express account.  *See* Docket No. 17 at 27.

---

[8]     A true and correct copy of the SEC Complaint and press release in connection therewith are attached as
**Exhibit E** to the Glenn Declaration.
[9]     A true and correct copy of the PPP Criminal Complaint is attached as **Exhibit F** to the Glenn Declaration.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

14.     On May 22, 2020, the United States Attorney's Office announced that Sadleir had

been arrested on the charges included in the PPP Criminal Complaint.[10]

## III.   CAIRN'S CLAIMS AGAINST THE DEBTOR AND LIEN ON THE PROPERTY

### A.     The Credit Agreement and Promissory Note

15.     Before any of the foregoing schemes came to light, Cairn agreed to extend a loan to

one of the Aviron Entities, Aviron 1703, LLC (the "Borrower") pursuant to a Credit, Security,

Guaranty and Pledge Agreement, dated October 1, 2018 (the "Credit Agreement"), and a

Promissory Note, dated October 1, 2018 (the "Note").[11]  *See* Kufrin Decl. ¶ 3.  Pursuant to these

documents, Cairn loaned the Borrower up to $22,400,000 in aggregate principal balance of loan

obligations for purposes of financing of certain distribution activities in respect of the motion

picture entitled "Serenity" and certain other limited uses in connection therewith (the "Loan").  *See*

*id.* ¶ 4.  The Credit Agreement is secured by the Credit Party Collateral (as that term is defined in

the Credit Agreement), consisting of certain personal property of the Borrower and certain

personal property of certain other Aviron Entities.  *See id.* ¶ 5.  The Note is likewise secured by

personal property, consisting of certain personal property of the Borrower.  *See id.*  The scheduled

maturity date of the Loan was December 15, 2019 (the "Scheduled Maturity Date").  *See id.*

### B.     The Guaranty

16.     Separately, Cairn entered into a Guaranty, dated October 1, 2018 (the "Guaranty"),

with the Debtor.[12]  *See* Kufrin Decl. ¶ 6.  Pursuant to this Guaranty, the Debtor "irrevocably and

unconditionally" guaranteed the "full and punctual payment" of the Loan made to the Borrower.

*See id.*  In addition to Sadleir's execution of the Guaranty as the Debtor's sole manager, Kadadu

also endorsed the Guaranty by signing as a "Confirmed by" party.  The Guaranty is secured by a

Deed of Trust and Assignment of Rents, Fixture Filing, Security Agreement and Environmental

Indemnity (the "Deed of Trust"), dated as of October 8, 2019, which encumbers certain real

property commonly known and addressed as 9135 Hazen Drive, Los Angeles, CA 90210 (the

---

[10]     *See* https://www.justice.gov/usao-cdca/pr/hollywood-executive-arrested-federal-fraud-charges-allege-he-pocketed-money-covid-19.

[11]     True and correct copies of the Credit Agreement and Note are attached as **Exhibit A** to the Kufrin Declaration.

[12]     A true and correct copy of the Guaranty is attached as **Exhibit B** to the Kufrin Declaration.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1    "Property").[13]  *See id.* ¶ 7.  The Property was purchased by the Debtor for approximately

2    $13,500,000 on or around August 28, 2017.  *See id.* ¶ 8.  According to the Debtor's schedules,

3    there are no other liens or encumbrances on the Property other than a statutory lien in connection

4    with delinquent property tax payments.  *See* Schedule D: Creditors Who Have Claims Secured by

5    Property [Docket No. 17 at 10-11].  Cairn would not have extended the Loan without the Guaranty

6    or the inclusion of the Property in the collateral securing the Guaranty.  *See* Kufrin Decl. ¶ 8.

7    **C.**    **The Borrower Breaches the Credit Agreement**

8    17.    On February 14, 2019, Cairn sent the Borrower a Notice of Defaults and

9    Reservation of Rights, identifying a number of non-monetary defaults under the Credit Agreement,

10   including, among others, at least one default not capable of cure.[14]  The Borrower failed to cure all

11   of the defaults that were capable of cure.  *See* Kufrin Decl. ¶ 10.  On April 2, 2019, Cairn sent the

12   Borrower an Acceleration and Demand Notice accelerating the Loan and declaring all

13   outstanding loan obligations due and immediately payable (the outstanding payment obligations

14   under the Credit Agreement from time to time, as of the applicable determination date, the

15   "Outstanding Loan Obligations").[15]  The Borrower still failed to cure all of the defaults that were

16   capable of cure.  *See id.* ¶ 11.  Moreover, on or around the same time as Cairn's delivery of the

17   Notice of Defaults and Reservation of Rights and the Acceleration and Demand Notice, Cairn

18   learned of additional defaults under the Credit Agreement (including at least one default not

19   capable of cure) occurring as early as January 2019, including the impermissible diversion of

20   certain proceeds of Cairn's collateral for payment of expenses related to certain other Aviron

21   Entities' films (as per Sadleir's own written admission) (the "Diversion of Proceeds") and the

22   Borrower's alteration and manipulation (which the Borrower attempted to conceal) of purported

23   third-party reporting that it provided to Cairn to induce a credit extension under the Loan (the

24

25

26   ---
     [13]    A true and correct copy of the Deed of Trust is attached as **Exhibit C** to the Kufrin Declaration.

27   [14]    A true and correct copy of the February 14, 2019 Notice of Defaults is attached as **Exhibit D** to the Kufrin
     Declaration.

28   [15]    A true and correct copy of the April 2, 2019 Acceleration and Demand Notice is attached as **Exhibit E** to
     the Kufrin Declaration.

1  "Reporting Manipulation).[16]  *See id.*

2        18.      On May 24, 2019, Cairn entered into a letter agreement (the "Letter Agreement")

3  with Sadleir, the Debtor, the Borrower and certain other Aviron Entities (collectively, the "Sadleir

4  Letter Agreement Parties"), pursuant to which Cairn agreed to refrain until July 31, 2019 (if

5  certain conditions were met) from enforcing certain of its rights under the Credit Agreement and

6  the Guaranty if the Sadleir Letter Agreement Parties paid $3,000,000 to Cairn by July 15, 2019 as

7  partial repayment of the Loan.  *See* Kufrin Decl., Exhibit G ¶¶ 1(c), 2(d).[17]  Cairn received the

8  payment as provided under the Letter Agreement.  *See* Kufrin Decl. ¶ 13.  On May 31, 2019, Cairn

9  entered into a settlement agreement (the "Settlement Agreement") with Sadleir and certain Aviron

10  Entities (not including the Borrower or the Debtor among others) (the "Sadleir Settlement

11  Parties"), pursuant to which Cairn agreed to waive certain claims against the Sadleir Settlement

12  Parties in connection with the Diversion of Proceeds and the Reporting Manipulation.[18]  Cairn did

13  not release any claims related to the Diversion of Proceeds and Reporting Manipulation, or any

14  other claims under the Credit Agreement and the Guaranty, against the Borrower, the Debtor and

15  certain other Aviron Entities.  *See* Kufrin Decl., Exhibit H ¶ 1(b).

16        19.      Although under the Letter Agreement Cairn was permitted to enforce the full

17  extent of its rights under the Credit Agreement starting on August 1, 2019, it generally refrained

18  from doing so for an additional period of approximately four-and-a-half months, which gave the

19  Borrower the opportunity to repay the Outstanding Loan Obligations by the Scheduled Maturity

20  Date following representations made by Sadleir or his agents that a repayment of the Loan would

21  occur.  *See* Kufrin Decl. ¶ 15.  The Borrower, however, failed to repay in full the Outstanding

22  Loan Obligations by the Scheduled Maturity Date.  *See id.*  On December 18, 2019, Cairn sent the

23  Borrower a Demand for Payment, noting that, despite the acceleration of the Loan on April 2,

24  2019, the Borrower had further failed to repay the Outstanding Loan Obligations by the

25

26  ---

27  [16]      A true and correct copy of Sadleir's e-mail to Cairn acknowledging the impermissible diversion of certain
proceeds of Cairn's collateral for payment of expenses related to certain other Aviron Entities' films is attached as
**Exhibit F** to the Kufrin Declaration.

28  [17]      A true and correct copy of the Letter Agreement is attached as **Exhibit G** to the Kufrin Declaration.
[18]      A true and correct copy of the Settlement Agreement is attached as **Exhibit H** to the Kufrin Declaration.

Scheduled Maturity Date.[19]  Cairn apprised the Borrower that the Outstanding Loan Obligations

at the time were not less than $16,230,747.68, with default interest and other amounts of

indemnified liabilities continuing to accrue.  *See id.*  As of the date hereof, the Borrower owes

Outstanding Loan Obligations in an amount not less than $14,724,332, with default interest and

other indemnified expenses continuing to accrue.  *See id.* ¶ 16.[20]

**D.    The Debtor Defaults on the Guaranty and Cairn Commences
a Foreclosure Action**

20.    The Borrower's continuing events of default under the Credit Agreement and

continuing failure to repay in full the Outstanding Loan Obligations triggered the Debtor's

repayment obligation under the Guaranty.  *See* Kufrin Decl. ¶ 17.  On May 1, 2019, Cairn sent the

Debtor a Demand Notice for payment of the Outstanding Loan Obligations in accordance with

the Guaranty.[21]  The Debtor failed to pay the Outstanding Loan Obligations.  *See id.* ¶ 18.  On

May 9, 2019, Cairn sent the Debtor a Default Notice for failure to pay the Outstanding Loan

Obligations pursuant to its demand.[22]  The Debtor failed to cure its default within ten days, which

gave rise to an Event of Default (as defined in the Guaranty) and permitted Cairn to declare an

Event of Default under the Deed of Trust and (among other things) cause the Property to be sold.

*See id.* ¶ 19.

21.    On January 6, 2020, Cairn sent the Debtor a Second Demand Notice, informing

the Debtor of the Borrower's continued failure to repay the Outstanding Loan Obligations on the

Scheduled Maturity Date and once again demanding the payment thereof by the Debtor.[23]  Cairn

further apprised the Debtor that if total payment of the Outstanding Loan Obligations was not

made by January 13, 2020, then Cairn would exercise its rights under the Guaranty and Deed of

---

[19]    A true and correct copy of the December 18, 2019 Demand for Payment is attached as **Exhibit I** to the Kufrin Declaration.

[20]    The Debtor's schedules indicate that the Debtor owes Cairn $14,341,996.  *See* Schedule D: Creditors Who Have Claims Secured by Property [Docket No. 17 at 10].  That statement is incorrect.

[21]    A true and correct copy of the May 1, 2019 Demand Notice is attached as **Exhibit J** to the Kufrin Declaration.

[22]    A true and correct copy of the May 9, 2019 Default Notice is attached as **Exhibit K** to the Kufrin Declaration.

[23]    A true and correct copy of the January 6, 2020 Second Demand Notice is attached as **Exhibit L** to the Kufrin Declaration.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

Trust to the full extent necessary including (among other things) causing the Property to be sold. *See id.* ¶ 20.

22.     In light of the Debtor's continuing default under the Guaranty, Cairn initiated a non-judicial foreclosure sale, with a sale of the Property by a trustee scheduled for June 2, 2020. *See id.* ¶ 21.  On June 1, 2020, however, Sadleir caused the Debtor to commence the Chapter 11 Case, which has prevented Cairn from completing the sale of the Property.  *See id.*

## RELIEF REQUESTED

23.     By this Motion, Cairn seeks entry of an order appointing a trustee pursuant to Section 1104(a) of the Bankruptcy Code.[24]  In the alternative, if the Court does not appoint a trustee, Cairn seeks entry of an order granting it relief from the automatic stay pursuant to Section 362(d) of the Bankruptcy Code to allow it to proceed with the foreclosure on its collateral.

## JURISDICTION

24.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and this Court has subject matter jurisdiction to enter findings of fact and conclusions of law and a final judgment.  The statutory predicates for the relief sought herein are Sections 1104(a) and 362(d) of the Bankruptcy Code.

## ARGUMENT

I.     **THE COURT SHOULD APPOINT A TRUSTEE PURSUANT TO SECTION 1104(A) OF THE BANKRUPTCY CODE**

25.     Section 1104(a) of the Bankruptcy Code directs the Court, upon the motion of a party in interest, to order appointment of a chapter 11 trustee on either of the following grounds:

> 1)  **for cause, including fraud, dishonesty**, incompetence, or gross mismanagement of the affairs of the debtor by current management, **either before or after the commencement of the case**, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

---

[24]     If the Court orders that a trustee be appointed, Cairn would be willing to set aside funds (*e.g.*, from proceeds of the sale of the Property), in a reasonable amount to be determined following consultation and negotiation with the trustee, to (i) pay the fees and costs of the trustee; and (ii) provide a recovery to the Debtor's unsecured creditors.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

2)   if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a) (emphasis added).

26.     The usual presumption in favor of allowing a debtor's management to remain in the case vanishes completely when management does not or cannot perform its fiduciary duties. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'") (quoting *Wolf v. Weinstein*, 372 U.S. 633, 651 (1963)).

27.     As a corollary of the foregoing, "[w]hen a debtor in possession is incapable of performing [its fiduciary duty to preserve estate assets for the benefit of creditors] a trustee is properly appointed." *In re Nautilus of N.M., Inc.*, 83 B.R. 784, 789 (Bankr. D.N.M. 1988). "The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this respect, section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee." *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (quoting *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989)); *see also In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000) ("[T]he appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served."); *Savino Oil*, 99 B.R. at 525 ("Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession.").

28.     If cause exists to order the appointment of a trustee under Section 1104(a)(1) of the Bankruptcy Code, the Court has no discretion and must order the appointment of a chapter 11 trustee. *See* 11 U.S.C. § 1104(a) (stating that "the court *shall* order the appointment of a trustee") (emphasis added); *In re Klein/Ray Broad.*, 100 B.R. 509, 511 (B.A.P. 9th Cir. 1987) ("Under

Section 1104 a trial court 'shall' appoint a trustee for 'cause' or 'in the best interest of the creditors.'"); *In re Okla. Ref. Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("Once the court has found that cause exists under § 1104, it has no discretion but must appoint a trustee.") (citation omitted).

29.     "The clearest examples [where appointment of a trustee is warranted] are those in which the debtor or its managers have engaged in serious fraud or dishonesty, or have grossly mismanaged the business." *In re Davis*, Case No. 09-10198, 2010 WL 2640587, at *2 (Bankr. E.D.N.C. June 29, 2010). Indeed, under the express language of Section 1104(a)(1), fraud or dishonesty committed by current management – *either pre- or post-petition* – mandate the appointment of a trustee. *See In re Bibo, Inc.*, 76 F.3d 256, 258 (9th Cir. 1996) ("The fraud demonstrated here elicited action from the judge even though the creditors' committee attorney had not raised the issue. No doubt it was because of situations like this, where appointment is highly desirable to prevent looting of the estate, and the judge is the first to comprehend its necessity, that Congress gave bankruptcy judges the power to do so.").

30.     Incompetence and mismanagement are additional grounds for appointment of a trustee for "cause" under Section 1104(a)(1). *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989). Additionally, a court will appoint a trustee where the evidence shows a "lack of [evenhandedness] in dealings with insiders or affiliated entities vis-a-vis other creditors." *In re SunCruz Casinos, LLC*, 298 B.R. 821, 830 (Bankr. S.D. Fla. 2003).[25]

31.     Even where there is no "cause" under Section 1104(a)(1), Section 1104(a)(2) allows appointment of a trustee where it is in "the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). Among the factors to be considered under Section 1104(a)(2) are:  (1) the trustworthiness of the debtor; (2) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (3) the

---

[25]     Section 1104(a)(1)'s list of grounds constituting cause is not an exclusive list. The language "or similar cause" in section 1104(a)(1) encompasses a wide range of conduct, and the determination of "cause" must be made on a case-by-case basis. *Sharon Steel*, 871 F.2d at 1226; *see also Marvel*, 140 F.3d at 472 (upholding lower court's appointment of a trustee where acrimony between debtor and its creditors rose to the level of "cause"); *In re Colo.- Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 174 (Bankr. D. Colo. 1990) (court "need not find any of the enumerated wrongs in the statute to find cause to appoint a trustee"); *In re Madison Mgmt.*, 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992) ("lack of confidence in the debtor's management may constitute cause") (citations omitted).

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1   confidence – or lack thereof – of the business community and of the creditors in present

2   management; and (4) the benefits derived by the appointment of a trustee, balanced against the

3   cost of the appointment.  *In re Briarwood Capital, LLC*, Case No. 10-02677, 2010 WL 2884949,

4   at *2 (Bankr. S.D. Cal. July 19, 2010); *see also Madison Mgmt.*, 137 B.R. at 282 (same).

5          A.      **Cause Exists to Appoint a Trustee Under Section 1104(a)(1)**

6          32.     Sadleir's repeated acts of fraud depicted in the Criminal Complaint, the SEC

7   Complaint, the PPP Criminal Complaint and the BlackRock Complaint paint a troubling picture

8   of a person who cannot be trusted to serve as a fiduciary for the Debtor's creditors.  The fraud and

9   dishonesty exhibited by Sadleir plainly constitute "cause" under Section 1104(a) and mandate the

10  appointment of a trustee.

11         33.     *In re American Resources, Ltd.*, 54 B.R. 245 (Bankr. D. Haw. 1985) is instructive.

12  There, creditors moved the court to appoint a trustee pursuant to Section 1104(a) of the

13  Bankruptcy Code after two executives of the debtor had been put under a federal criminal

14  indictment for conspiracy, mail fraud and wire fraud, alleging that those executives had received

15  proceeds of illegal loans.  *Id.* at 246.  The court granted the motion, reasoning that the

16  "independent inquiry by the federal grand jury [among other bodies] has . . . found substantial

17  basis in the facts to support the concerns expressed by the creditors who seek appointment of a

18  trustee."  *Id.* at 247.  Appointment of a trustee under Section 1104(a) was warranted, the court

19  found, because "[t]o engage in illegal loans . . . involve[s] fraud, dishonesty or gross

20  mismanagement. . . .  And, where management operate a company for their 'own personal benefit

21  and not for the benefit of the (companies) over which they had control,' that management should

22  be replaced."  *Id.*

23         34.     Courts in other circuits have similarly held that a trustee must be appointed where

24  the debtor's current management is subject to pending criminal charges and ongoing

25  investigations by governmental authorities.  *See Okla. Ref.*, 838 F.2d at 1136 n.2 (affirming

26  bankruptcy court's decision to appoint a trustee, reasoning that "[c]ase law . . . supports lenders'

27  claims that debtor's effort to manage the company was impeded by the existence of at least four

28  criminal cases pending against either the debtor's president . . . or some of the affiliated

1   companies."); *Tradex Corp. v. Morse*, 339 B.R. 823, 834-35 (D. Mass. 2006) (affirming

2   bankruptcy court's decision to appoint a trustee in light of "[t]he existence of a grand jury

3   investigation and civil suits pursuing allegations relating to [the debtor's president and sole

4   shareholder's] business actions[.]").

5         35.     Here, **three independent inquiries** by the U.S. Attorney, the FBI and the SEC

6   concluded that Sadleir, apparently with Kadadu's assistance, had committed fraud and other

7   financial crimes on various parties, including the federal government, BlackRock and JPMC.

8   Sadleir – whom Kadadu purported to designate as the Debtor's "Authorized Agent"[26] – has shown

9   that he is not fit to serve as a steward of the Debtor's estate and act as a fiduciary for its creditors.

10   Moreover, it is highly improbable that Sadleir can properly administer the affairs of the Debtor

11   when he must defend himself in two separate federal criminal actions and a civil complaint by the

12   SEC.  Sadleir will be further distracted by the need to defend himself in the BlackRock Litigation,

13   which is in its early stages with discovery yet to commence.  *See Okla. Ref.*, 838 F.2d at 1136 n.2.

14   Furthermore, investigations are continuing and can lead to further actions and claims against

15   Sadleir and Kadadu.[27]  The Court should appoint a trustee for this reason alone.

16         36.     Moreover, Sadleir's acts of fraud are unlikely to cease without the Court's

17   intervention.  Most glaringly, far from being deterred following his removal from management at

18   two Aviron Entities after his fraud on BlackRock had been revealed, Sadleir went on to commit

19   fraud on the federal government by filing a false application under the Paycheck Protection

20   Program, exploiting the ongoing pandemic.  The Court should protect the Debtor's estate – as

21   well as the integrity of the bankruptcy process – from additional acts of fraud, forgery and other

22   financial crimes.

23         37.     Furthermore, Sadleir's dealings with Cairn reflect flagrant dishonesty, constituting

24   an additional cause to appoint a trustee.  *See Intercat*, 247 B.R. at 922 (trustee appointed where the

25

26   [26]     *See* Docket No. 17 at 31.

27   [27]     As described above, Sadleir currently has exclusive authority to manage the Debtor in the Chapter 11 Case.
Even if Kadadu had any authority over the Debtor's affairs, however, her apparent participation in Sadleir's
fraudulent schemes would warrant the appointment of a trustee for the same reasons that Sadleir must be removed

28   from management.  Moreover, Kadadu's recent decision to grant Sadleir full control over the Debtor notwithstanding
his fraudulent actions further demonstrates that Kadadu cannot be trusted to serve in any fiduciary capacity.

1    debtor's president and CEO "engaged in dishonest or incompetent conduct" by producing

2    inaccurate reports to the creditor-movant). As described in detail above, the Borrower, under

3    Sadleir's sole management and control, permitted the improper diversion of certain proceeds of

4    Cairn's collateral for payment of expenses related to certain other Aviron Entities' films (as per

5    Sadleir's own written admission), and altered and manipulated purported third-party reporting that

6    it provided to Cairn to induce a credit extension under the Loan (which the Borrower attempted to

7    conceal).[28]  *See* Kufrin Decl. ¶ 11.

8         38.    Sadleir must be removed from the Debtor's management for the additional reason

9    that he and Kadadu have substantial and irreconcilable conflicts of interest with the Debtor. It is

10    well established that "conflicting interests preclude the proper and effective operations of [the]

11    Debtor and dictate the appointment of an impartial trustee." *In re Tel-Net Haw., Inc.*, 105 B.R.

12    594, 595 (Bankr. D. Haw. 1989). Here, Sadleir caused the filing of the Chapter 11 Case to avert a

13    foreclosure of Cairn's mortgage on Sadleir and Kadadu's personal residence owned by the

14    Debtor, but for which they apparently pay no rent. That Sadleir and Kadadu are hopelessly

15    conflicted is beyond cavil. On the one hand, Sadleir is charged with acting as a fiduciary with

16    respect to the disposition of the Property. On the other hand, he and Kadadu are apparently using

17    the asset for free (and they have been for years) at the Debtor's expense (during part of such time

18    Cairn's collateral position has been deteriorating as statutory liens are accruing for delinquent

19    property tax payments). *See* Docket No. 17 at 11. This is yet another reason neither Sadleir nor

20    Kadadu should be permitted to exercise control over the Debtor's assets. *See In re Eurospark*

21    *Indus., Inc.*, 424 B.R. 621, 629 (Bankr. E.D.N.Y. 2010) ("It is well established that courts may

22    appoint a chapter 11 trustee where a debtor-in-possession's management has a conflict of interest

23    that interferes with its ability to fulfill its fiduciary duties to the estate.").

24         39.    The fact that Sadleir and Kadadu have caused the Debtor to allow them to reside in

25    the Property rent-free serves as an additional cause to appoint a trustee. Far from displaying

26    "[e]venhandedness . . . in dealings with insiders . . . vis-à-vis other creditors," Sadleir and Kadadu

27

28
_____
[28]    As described above, Cairn did not release any claims related to the Diversion of Proceeds or Reporting
Manipulation, or any other claims under the Credit Agreement and the Guaranty, against the Borrower, the Debtor and
certain other Aviron Entities. *See* Kufrin Decl., Exhibit H ¶ 1(b).

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1  have engaged in self-dealing and exploited the Property to the detriment of Cairn.  *See SunCruz*

2  *Casinos*, 298 B.R. at 830.  Significantly, a portion of any rent paid on the Property would have

3  been used to pay overdue property taxes, which have eroded Cairn's secured position in its

4  collateral.  *See* Kufrin Decl. ¶ 24.  Sadleir and Kadadu's self-dealing with the Debtor and their

5  failure to pay rent is the epitome of "dishonesty" under Section 1104(a)(1).  *See Okla. Ref.*, 838

6  F.2d at 1136 ("[A] history of transactions with companies affiliated with the debtor company is

7  sufficient cause for the appointment of a trustee where the best interests of the creditors

8  require."); *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988) ("There are a

9  [plethora] of decisions justifying the appointment of a trustee, pursuant to 11 U.S.C. § 1104(a)(1),

10  because of questionable business dealings between a debtor corporation and a related, nondebtor

11  entity.").

12       40.    Relatedly, neither Sadleir nor Kadadu can be expected to investigate and

13  potentially pursue – as a fiduciary must – claims that the Debtor may have against them stemming

14  from their personal use of the Property for no apparent consideration.  *See Tel-Net Haw.*, 105

15  B.R. at 595 (trustee appointed because "[current manager] may be liable for prepetition payments

16  by Debtor of certain liabilities which [manager] had guaranteed that constitutes preferential

17  transfers."); *Intercat*, 247 B.R. at 922 (trustee appointed where current president and CEO "has

18  not suggested that he is or will be capable of pursuing the aggressive, independent investigation

19  of all the transactions in issue, or that he will prosecute litigation to recover assets, or sue for the

20  damages sustained by the debtor").

21       41.    For all the foregoing independent reasons, the Court should appoint a trustee for

22  "cause" pursuant to Section 1104(a)(1).

23     **B.    Appointment of a Trustee Is in the Best Interests of Creditors and the
             Bankruptcy Estate Under Section 1104(a)(2)**
24

25       42.    The Court should appoint a trustee for the additional, independent reason that such

26  an appointment would be in the best interests of creditors.

27       43.    Naturally, there is no confidence in present management by the business

28  community or creditors (nor should there be); Sadleir is clearly not trustworthy.  Furthermore,

1    because the Debtor has no meaningful business to run, the estate would not benefit from current

2    management's institutional knowledge.  *See* Kufrin Decl. ¶ 22.  As such, the benefits derived

3    from the appointment of a trustee easily outweigh the cost of the appointment.  Those

4    considerations serve as additional grounds for appointing a trustee under Section 1104(a)(2).  *See*

5    *Briarwood Capital*, 2010 WL 2884949, at *2.

6         44.    The Court should appoint a trustee for the additional reason that eliminating the

7    conflicts of interest between Sadlier, Kadadu and the Debtor in connection with the Property

8    would clearly benefit the Debtor's creditors.  *In re BLX Group, Inc.*, 419 B.R. 457 (Bankr. D.

9    Mont. 2009) is instructive.  There, the debtor's director and president resided in one of the real

10   properties the debtor owned.  *Id.* at 472.  After the debtor had filed for bankruptcy, a creditor

11   moved to appoint a trustee pursuant to Section 1104(a)(2).  *Id.* at 471-72.  The court granted the

12   motion, concluding that it was "in the best interests of all creditors to eliminate the insider

13   circumstances and conflicts of interest created as a result of [insider's] interest in [the relevant

14   property.]"  *Id.* at 472.  The court reasoned that "putting [the insider] in charge of any debtor-in-

15   possession financing at [this] juncture would be ill-advised" because the insider should not be

16   allowed to control any spending related to the property in which she lived.  *Id.*  Here, the Court

17   should not allow Sadleir or Kadadu to exercise control over the Property because their personal

18   interests in connection therewith are irremediably at odds with the interests of the Debtor's estate.

19        45.    In light of the foregoing, the Court should appoint a trustee pursuant to either

20   prong of Section 1104(a) of the Bankruptcy Code.

21   **II.    ALTERNATIVELY, THE COURT SHOULD LIFT THE AUTOMATIC STAY
         TO ALLOW CAIRN TO COMPLETE THE FORECLOSURE**

22

23       **A.    The Court Should Lift the Automatic Stay for "Cause"
              Under Section 362(d)(1)**

24        46.    Section 362(d)(1) of the Bankruptcy Code provides that the automatic stay shall be

25   lifted for cause, including the lack of adequate protection, after notice and a hearing.  11 U.S.C.

26   § 362(d)(1).  Section 362(d)(1) provides in relevant part:

27            On request of a party in interest and after notice and a hearing, the
             court shall grant relief from the stay provided under subsection (a) of

28

1

2

this section, such as by terminating, annulling, modifying, or conditioning such stay –

3

(1) for cause, **including the lack of adequate protection of an interest in property of such party in interest** . . .

4

5

11 U.S.C. § 362(d)(1) (emphasis added).

6        47.      Section 362(g) of the Bankruptcy Code provides that in a hearing on relief from

7    the stay, the party opposing relief has the burden on all issues (other than the question of the

8    debtor's equity in property), *including the issue of adequate protection.* 11 U.S.C. § 362(g). *See*

9    *In re Big3D, Inc.*, Case No. 08-16768, 2009 WL 9085556, at *2 (Bankr. E.D. Cal. Aug. 28,

10   2009), *aff'd*, 438 B.R. 214 (B.A.P. 9th Cir. 2010) ("Ordinarily in a motion for relief from stay, the

11   debtor has the burden of proof regarding the issue of adequate protection.").

12       48.      The term "cause" reflects a flexible standard, taking into account the particular

13   facts and circumstances of the particular issue before the court. *See In re Conejo Enters., Inc.*, 96

14   F.3d 346, 352 (9th Cir. 1996) (noting that "[c]ause has no clear definition and is determined on a

15   case-by-case basis") (internal citations and quotations omitted); *In re Brotman Med. Ctr., Inc.*,

16   2008 WL 8444797, at *5 (B.A.P. 9th Cir. Aug. 15, 2008) (same); *Delaney-Morin v. Day (In re*

17   *Delaney-Morin)*, 304 B.R. 365, 369 (B.A.P. 9th Cir. 2003) (same) (citation omitted); *Baldino v.*

18   *Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997) (noting that section 362(d)(1) "does not

19   define 'cause,' leaving courts to consider what constitutes cause based on the totality of the

20   circumstances in each particular case.").

21       49.      "The bankruptcy court generally has broad discretion in granting relief from stay

22   for cause under § 362(d)." *In re Edwards*, 454 B.R. 100, 107 (B.A.P. 9th Cir. 2011). "Exercising

23   discretion in determining cause for stay relief requires the balancing of hardships and

24   consideration of totality of the circumstances." *In re Avila*, 311 B.R. 81, 83-84 (Bankr. N.D. Cal.

25   2004) (citing *In re Kennedy*, 165 B.R. 488, 490 (Bankr. W.D. Wash. 1994)).

26

27

28

50.    With respect to secured creditors, the purpose of providing adequate protection under Section 362(d)(1) is to:

> insure that a creditor receives the value for which it bargained prebankruptcy. Adequate protection is, essentially, protection for the creditor to assure its collateral is not depreciating or diminishing in value and is evaluated on a case-by-case basis . . . . The erosion, or threatened erosion, of a secured creditor's position "may be shown through evidence of declining property values, the increasing amount of the secured debt through interest accruals or otherwise, the nonpayment of taxes or other senior liens, failure to insure the property, failure to maintain the property, or other factors that may jeopardize the creditor's present position."

*In re DB Capital Holdings, LLC*, 454 B.R. 804, 816-17 (Bankr. D. Colo. 2011) (granting relief from stay) (citations omitted); *see also In re Gundrum*, 509 B.R. 155, 162 (Bankr. S.D. Ohio 2014) ("[A]n offer of adequate protection based on the speculative possibility that the funds will materialize simply does not constitute adequate protection.") (citations omitted); *In re H.T. Pueblo Props., LLC*, Case No. 11-24718, 2011 WL 6962754, at *8 (Bankr. D. Colo. Dec. 30, 2011) ("[T]he Debtor's projections are overly optimistic and speculative, and not based on the Debtor's recent past and present performance. Such projections cannot demonstrate adequate protection pursuant to § 361."); *In re Chevy Devco*, 78 B.R. 585, 589 (Bankr. C.D. Cal. 1987) (finding that potential success is not sufficient for purposes of adequate protection; "the facts show that success is more fantasy than expectation.").

51.    Courts have also held that filing a bankruptcy petition in bad faith constitutes the requisite cause to lift the automatic stay. *See, e.g.*, *In re Duvar Apt., Inc.*, 205 B.R. 196, 200 (B.A.P. 9th Cir. 1996) (citing *In re Walter*, 108 B.R. 244, 247 (Bankr. C.D. Cal. 1989)).

52.    In the instant case, the Debtor has no money or operations to fund the administration of this case or the preservation or disposition of the Property, and no prospect of proposing a viable plan. Further, as shown below, there is no evidence that the Debtor has any equity in the Property. The Debtor filed for bankruptcy on the eve of foreclosure in order to utilize the automatic stay as a delay tactic, preventing a sale of the Property. Cairn's interests in the Property are at risk of immediate diminution in value, including erosion of Cairn's secured

1  position by the continued accrual of default interest, other charges and penalties with respect to

2  overdue property taxes, which have already given rise to statutory liens.  *See* Docket No. 17 at 11.

3  Under these circumstances, there is no adequate protection and good "cause" exists to lift the

4  automatic stay under section 362(d)(1) of the Bankruptcy Code to allow Cairn to exercise its state

5  law rights.

6       53.     Relatedly, the Debtor filed its bankruptcy case (in essence, a two-party dispute), to

7  improperly frustrate Cairn's exercise of its foreclosure rights and remedies and improperly exert

8  leverage over Cairn – and not to properly rehabilitate and reorganize.  As such, the bankruptcy

9  case was filed in bad faith and the automatic stay should be lifted for such other cause as well.[29]

10 *See Duvar*, 205 B.R. at 200 ("The existence of bad faith in commencing a bankruptcy case

11 constitutes cause for granting relief from the stay pursuant to § 362(d)."); *Meadowbrook Inv'rs'*

12 *Grp. v. Thirtieth Place, Inc. (In re Thirtieth Place, Inc.)*, 30 B.R. 503, 506 (B.A.P. 9th Cir. 1983)

13 ("Where a petition is filed to subvert the legitimate rights of creditors in the absence of any

14 reasonable expectations that the debtor can successfully reorganize, there is no basis for access to

15 Chapter 11 and the protective machinery of the automatic stay.").

16      **B.**     **Relief from Stay Is Also Justified Under § 362(d)(2)**

17      54.     Section 362(d)(2) of the Bankruptcy Code provides that the automatic stay may be

18 terminated, annulled, modified or conditioned upon a finding that the debtor does not have equity

19 in the subject property and such property is not necessary to an effective reorganization.

20      55.     An "equity analysis" pursuant to section 362(d)(2) requires a determination of

21 whether a debtor has any interest above the value of all liens.  *Stewart v. Gurley*, 745 F.2d 1194,

22 1195 (9th Cir. 1984); *La Jolla Mortg. Fund v. Rancho El Cajon Assocs.*, 18 B.R. 283, 289-90

23 (Bankr. S.D. Cal. 1982).  In determining whether there is an excess of security so as to constitute

24 equity, courts must decide whether the collateral should be valued on a going concern or

25 liquidation basis.  *See, e.g.*, *In re Keystone Camera Prods. Corp.*, 126 B.R. 177, 184 (Bankr.

26 D.N.J. 1991).

27      56.     In Chapter 11 cases where there is no reasonable prospect of a reorganization,

28

---

[29]    Cairn reserves its right to seek dismissal of the Chapter 11 Case, including on the basis of a bad-faith filing.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

liquidation value is the more appropriate method for valuing collateral and determining whether the debtor has any equity in the collateral. *See id.* at 184-85 (holding that liquidation value is appropriate where debtor ceased operations and attempted to revive itself through financing secured by priming lien); *In re Helionetics*, 70 B.R. 433, 439 (Bankr. C.D. Cal. 1987) (stating that although going concern value is appropriate when there is reason to believe a reorganization will be successful, other circumstances may warrant a different result).

57.    Sadleir purports to have attempted to refinance the mortgage for months, apparently with no success. *See* Kufrin Decl. ¶ 25. Upon information and belief, the only parties credibly interested in financing the mortgaged property in recent months have sought to acquire the mortgage at a significant discount. *See id.* Indeed, the most recent third-party appraisal of the property prepared for Cairn indicates that the Property's value is much lower than the total indebtedness owed to Cairn and secured by the mortgage, in the amount of not less than $14,724,332 with default interest and other indemnified expenses continuing to accrue. *See id.* Accordingly, the Debtor does not have any equity in the Property.

58.    Once the Debtor's lack of equity in the Property is demonstrated, the burden shifts to the Debtor to prove that the Property is necessary for an effective reorganization. *See* 11 U.S.C. § 362(g)(2); *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 557 (3d Cir. 1994). In determining whether the Property is necessary to the Debtor's reorganization, the Court must look to whether the Debtor has a reasonable probability of successfully reorganizing within a reasonable time. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forrest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988); *Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers, Inc.)*, 171 B.R. 71, 75 (B.A.P. 9th Cir. 1994) (debtor must prove that a proposed plan "is not patently unconfirmable and has a realistic chance of being confirmed").

59.    Here, the Debtor cannot meet its burden because there is no reasonable prospect that the Debtor will be able to propose a viable plan in this case. The Debtor is not operating any business and has no funds. And even if there were a viable plan, the Property is not a business asset and would not be necessary to any reorganized business. Accordingly, Cairn is entitled to

relief from the stay under Section 362(d)(2) of the Bankruptcy Code.[30]

## **CONCLUSION**

For all the reasons set forth above, Cairn requests that the Court (i) enter an order appointing a trustee pursuant to 11 U.S.C. § 1104(a); or, alternatively, if the Court does not appoint a trustee, (ii) enter an order granting Cairn relief from automatic stay pursuant to 11 U.S.C. § 362(d) to complete the sale of the Property in accordance with Cairn's rights under state law; and (iii) grant such other and further relief as the Court deems necessary and appropriate.

Dated: June 19, 2020

KASOWITZ BENSON TORRES LLP

/s/ *Andrew R.J. Muir*
Andrew R.J. Muir
101 California Street, Suite 3000
San Francisco, California  94111
Telephone:    (415) 421-6140
Facsimile:    (415) 398-5030
Email: amuir@kasowitz.com

Andrew K. Glenn (*pro hac vice* application pending)
Shai Schmidt (*pro hac vice* application pending)
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800
Email:  aglenn@kasowitz.com
        sschmidt@kasowitz.com

*Attorneys for Cairn Capital Investment Funds ICAV,
for its sub fund Cairn Capstone Special
Opportunities Fund*

---

[30]    Cairn reserves the right to seek relief from the stay under Section 362(d)(3) if the Chapter 11 Case is determined to be a single asset real estate case.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

**DECLARATION OF ANDREW K. GLENN IN SUPPORT OF CAIRN'S
MOTION FOR (I) ORDER APPOINTING TRUSTEE PURSUANT TO
11 U.S.C. § 1104(A), OR, ALTERNATIVELY, (II) ORDER GRANTING
RELIEF FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D)**

5       I, Andrew K. Glenn, being duly sworn, state the following:

6       1.      I am a partner at the law firm of Kasowitz Benson Torres LLP, counsel for Cairn

7 Capital Investment Funds ICAV ("Cairn") in the Chapter 11 Case.[1]

8       2.      I make this declaration to present the Court with the attached documents in

9 connection with Cairn's *Motion for (I) Order Appointing Trustee Pursuant to 11 U.S.C.*

10 *§ 1104(a), or, Alternatively, (II) Order Granting Relief From Automatic Stay Pursuant to*

11 *11 U.S.C. § 362(d)* (the "Motion").

12       3.      Attached hereto as **Exhibit A** is a true and correct copy of the BlackRock

13 Complaint, filed with the Supreme Court of the State of New York, County of New York, on

14 December 17, 2019.

15       4.      Attached hereto as **Exhibit B** is a true and correct copy of the *Order Granting*

16 *Preliminary Injunction*, dated December 20, 2019, in the BlackRock Litigation.

17       5.      Attached hereto as **Exhibit C** is a true and correct copy of the *Stipulation and*

18 *Order*, dated May 20, 2020, in the BlackRock Litigation.

19       6.      Attached hereto as **Exhibit D** is a true and correct copy of the Criminal Complaint,

20 filed in the United States District Court for the Southern District of New York on May 18, 2020.

21       7.      Attached hereto as **Exhibit E** is a true and correct copy of the SEC Complaint,

22 filed with the United States District Court for the Southern District of New York on May 22,

23 2020, and the press release in connection therewith.

24

25

26

Kasowitz Benson
Torres LLP
Attorneys at Law
Los Angeles

27

28

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion (as defined below).

8.      Attached hereto as **_Exhibit F_** is a true and correct copy of the PPP Criminal Complaint, filed with the United States District Court for the Central District of California on May 21, 2020.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 19th day of June in New York, New York.

/s/ *Andrew K. Glenn*
Andrew K. Glenn

# GLENN DECLARATION

# EXHIBIT "A"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

BLACKROCK MULTI-SECTOR INCOME
TRUST,

                     Plaintiff,

       - against -

AVIRON GROUP, LLC, AVIRON CAPITAL,
LLC, AVIRON PICTURES, LLC, AVIRON 1701,
LLC, AVIRON 1702, LLC, AVIRON 1705, LLC,
AVIRON 1706, LLC, AVIRON 1801, LLC, MAA
RELEASING, LLC, AVIRON RELEASING, LLC,
and WILLIAM SADLEIR,

                 Defendants.

-----------------------------------------------------------------x

**COMMERCIAL DIVISION**
Index No. 657496/2019

Plaintiff designates New York County as
the place of trial. The basis of venue is
C.P.L.R. § 501.

**SUMMONS**

TO THE ABOVE NAMED DEFENDANTS:

       YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve

a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's attorney within 20 days after service of this summons, exclusive of

the day of service (or within 30 days after service is complete if this summons is not personally

delivered to you within the State of New York); and in case of your failure to appear or answer,

judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
    December 17, 2019

Respectfully submitted,

SIDLEY AUSTIN LLP

By:

Nicholas P. Crowell
Charlotte K. Newell
Alexander B. Porter
ncrowell@sidley.com
cnewell@sidley.com
alex.porter@sidley.com
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Plaintiff BlackRock Multi-Sector Income Trust*

TO:

Aviron Group, LLC
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801, County of New Castle

Aviron Capital, LLC
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801, County of New Castle

Aviron Pictures, LLC
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801, County of New Castle

Aviron 1701, LLC
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801, County of New Castle

Aviron 1702, LLC
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801, County of New Castle

2

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1
INDEX NO. 567496/2019
RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document        Page 36 of 365

Aviron 1705, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, Delaware 19904, County of Kent

Aviron 1706, LLC
c/o Cogency Global Inc.
850 New Burton Road, Suite 201
Dover, Delaware 19904, County of Kent

Aviron 1801, LLC
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801, County of New Castle

MAA Releasing, LLC
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801, County of New Castle

Aviron Releasing, LLC
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801, County of New Castle

William Sadleir
9135 Hazen Drive
Beverly Hills, CA 90210

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x

BLACKROCK MULTI-SECTOR INCOME
TRUST,

                Plaintiff,

  - against -

AVIRON GROUP, LLC, AVIRON CAPITAL,
LLC, AVIRON PICTURES, LLC, AVIRON 1701,
LLC, AVIRON 1702, LLC, AVIRON 1705, LLC,
AVIRON 1706, LLC, AVIRON 1801, LLC, MAA
RELEASING, LLC, AVIRON RELEASING, LLC,
and WILLIAM SADLEIR,

                Defendants.

------------------------------------------------------------x

**COMMERCIAL DIVISION**

Index No.  657496/2019

**COMPLAINT**

Plaintiff BlackRock Multi-Sector Income Trust, by its attorneys, Sidley Austin

LLP, as and for its Complaint in this action alleges as follows based upon its personal knowledge

and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1.      This emergency action for preliminary and permanent injunctive relief and

declaratory judgment arises out of Defendants' fraud and gross mismanagement of the Aviron

Entities (as defined below), and the resulting grave threat to the value of Plaintiff's investment in

the Aviron Entities.

2.      Plaintiff BlackRock Multi-Sector Income Trust (the "Fund") is a non-

diversified, closed-end mutual fund. The Fund's goal is to deliver attractive risk-adjusted returns

to its investors.

3.      Defendants Aviron Group, LLC ("Aviron Group"), Aviron Capital, LLC

("Aviron Capital"), Aviron Pictures, LLC ("Aviron Pictures"), Aviron Releasing, LLC ("Aviron

Releasing"), Aviron 1701, LLC ("Aviron 1701"), Aviron 1702, LLC ("Aviron 1702"), Aviron

1705, LLC ("Aviron 1705"), Aviron 1706, LLC ("Aviron 1706"), Aviron 1801, LLC ("Aviron

1801"), and MAA Releasing, LLC ("MAA"), presumably together with other related "Aviron"

subsidiaries and affiliates (collectively, the "Aviron Entities"), acquire, market, and distribute

theatrical films in North America.

4.    Upon information and belief, Aviron Group is (i) the parent company of the

Aviron Entities and (ii) the legal and beneficial owner of 100% of the equity of Aviron Capital,

Aviron Pictures, and Aviron Releasing (and is thus the "Sole Member" of each). Section 10(b) of

the LLC Agreements for each of Aviron Capital and Aviron Pictures provide that the Sole Member

of each entity may remove the Manager of each entity "at any time" and "for any reason or no

reason."

5.    Upon information and belief, Aviron Group, Aviron Capital, and Aviron

Pictures, in turn (whether directly or indirectly) own 100% of the equity of several special purpose

entities, which are allegedly created in tandem with each planned or purported film in which the

Aviron Entities invest. Plaintiff understands that these include (i) Aviron 1701, (ii) Aviron 1702,

(iii) Aviron 1705, (iv) Aviron 1706, (v) Aviron 1801, and (vi) MAA (collectively the "Special

Purpose Entities"). Sadleir is the Manager of each of the Special Purpose Entities. Each of the

Special Purpose Entities owns the rights and title to licensing fees from motion pictures that are

pledged to the Fund. Certain of the Special Purpose Entities are listed as debtors on the Fraudulent

Amendments, as defined herein.

6.    William Sadleir owns (whether directly or indirectly) and manages the

Aviron Entities. Sadleir is the President of Aviron Group, and purportedly Chairman and CEO of

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1

INDEX NO. 567496/2019

RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR   Doc 25   Filed 06/19/20   Entered 06/19/20 19:11:23   Desc
Main Document    Page 39 of 365

Aviron Pictures.[1]  Sadleir and an affiliated entity, Temerity Trust Management, LLC ("Temerity"),

own 100% of the equity of the Aviron Entities' parent, Aviron Group.  Upon information and

belief, Temerity is Sadleir's personal, private wealth management vehicle, jointly owned or

controlled, directly or indirectly, by Sadleir and/or his wife.

       7.     Upon information and belief, the following chart illustrates the structure of

the Aviron Entities:



8.     The Fund's relationship with the Aviron Entities began in 2015 under a

Credit and Security Agreement between the Fund, as lender, and Aviron Capital, as borrower (as

amended, the "Credit Agreement") and an Equity Pledge Agreement (as amended, "the Pledge

Agreement") and various related agreements.  In short, under those agreements the Fund agreed

to extend Aviron Capital credit for the financing of the distribution of motion pictures.  The credit

---

[1] *See* http://avironpictures.com/#team.

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1
INDEX NO. 567496/2019
RECEIVED NYSCEF: 12/17/2019
Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document    Page 40 of 365

extended was secured by, among other things, Aviron Group's pledge of 100% of the equity in Aviron Capital and Aviron Pictures (which in turn own many of the Special Purpose Entities through ownership of each of their outstanding equity) as collateral, as well as Aviron Group's voting rights in those two entities should an Event of Default occur. As is customary, the collateral pledge was perfected by the filing of UCC-1 financing statements against Aviron Group in the office of the Secretary of State of the State of Delaware.

9.      In 2017, the Fund and Aviron Capital entered into a $75,000,000 Note Purchase and Security Agreement (as amended, the "NPA") to refinance the financing arrangements under the Credit Agreement and provide capacity to finance the distribution of additional motion pictures. Via subsequent letter agreements entered in March 2019 (the "Funding Agreements," as defined below), the Fund also agreed to further finance the distribution of another motion picture.

10.      Aviron Group's pledge of its equity in Aviron Capital and Aviron Pictures remained in place to secure the obligations under the NPA and the Funding Agreements. Aviron Capital further agreed in the NPA that the Fund's "Collateral" would "include all of the Issuer's right, title, and interest in and to," among other things, "100% of the equity interests issued by each Qualifying Picture SPV now owned or hereafter acquired by" Aviron Capital. Aviron Capital's obligations under the NPA and the Funding Agreements are also secured by other specific collateral, including Aviron Capital's "right, title, and interest" in specific revenue streams from certain motion pictures. These arrangements were likewise perfected by the filing of UCC-1 financing statements against certain of the Aviron Entities in the office of the Secretary of State of the State of Delaware.

4

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1

INDEX NO. 567496/2019

RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document    Page 41 of 365

11.     The Aviron Entities have since failed to meet their obligations to the Fund. As the Fund notified Aviron Group in July 2019, various identified Events of Default (as defined in the NPA, and including among other things a failure to repay the Fund as agreed) have occurred under the NPA and the Funding Agreements.   Those Events of Default have not been waived or corrected and are continuing.   As a result, the Fund has the right to, among other things, control Aviron Group's 100% equity stake in each of Aviron Capital and Aviron Pictures pursuant to the Pledge Agreement.

12.     The situation has since worsened severely.   The Fund recently discovered that the Aviron Entities have purported to sell or otherwise finance several of the motion picture rights or related receivables that were pledged as collateral to the Fund.   These actions were facilitated by the Aviron Entities' filing of fourteen UCC-3 amendments that operated to delete the purportedly sold or financed collateral from the Fund's documented, perfected collateral (the "Fraudulent Amendments").   Any such filing, however, would require an authorized release from the Fund, indicating that its lien is released and that UCC-3 amendments could be filed.   The Fund has not authorized or consented to these filings, nor authorized or consented to these recent sales of collateral.

13.     In investigating this conduct, Plaintiff's counsel contacted Defendants' transaction counsel and requested copies of any such purported releases.   Defendants' transaction counsel provided five such alleged releases, all purporting to date from July 2019 (the "Fraudulent Releases").   As outlined in the contemporaneously filed Affidavits of Randy Robertson and Mark Volosov, these documents are forgeries.   It appears that Sadleir, the Aviron Entities' officers or employees, and/or their agents copied and pasted signature pages from prior agreements among

5

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1

INDEX NO. 567496/2019

RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document        Page 42 of 365

the parties onto these documents to create the appearance that the Fund approved the Fraudulent Releases.

14.    In a recent phone call with the Fund's advisers, Sadleir confirmed as much, saying that he "f---d up" and had effectuated the Fraudulent Amendments by recycling signature pages from prior transactions with the Fund on the Fraudulent Releases—a remarkable admission of fraud.

15.    The Fund's recent investigation suggests that Sadleir resorted to fraud for his own self-serving ends. In connection with a separate litigation alleging fraud against Sadleir, it appears that Sadleir agreed to a $2.7 million judgment against himself on July 15, 2019, *the same day* that many of the Fraudulent Amendments were filed with the Delaware Secretary of State.

16.    As a result of this fraudulent conduct and the multiple Events of Default that have occurred, on December 16, 2019 Plaintiff informed Defendants that it was exercising its rights under the Pledge Agreement to step into the shoes of Aviron Group and install the manager of its choice, Amir Agam, at Aviron Capital and Aviron Pictures (and, in turn, the Special Purpose Entities). But Defendants have not acknowledged the Fund's right to do so.

17.    Defendants' ongoing wrongful conduct violates the law and their agreements with the Fund. The Fund has been and will continue to be harmed by Defendants' conduct, and therefore seeks immediate relief from this Court to clarify the Fund's rights and compel Defendants to comply with the terms of the parties' agreements.

18.    If injunctive relief is not granted and Sadleir continues to purport to be in control of the Aviron Entities, then the Fund's bargained-for contractual rights to (i) control 100% of the equity of Aviron Capital and Aviron Pictures, (ii) consequently replace Sadleir as Manager at Aviron Capital and Aviron Pictures with Amir Agam (and, in turn, the Special Purpose Entities)

6

with immediate effect to prevent further fraud and mismanagement, and (iii) collect on the Aviron

Entities' outstanding debt through other collateral will be negated. Worse still, the Fund's pledged

collateral may well continue to be fraudulently conveyed by the time of final judgment. These

losses cannot be adequately measured or compensated by money damages. Immediate injunctive

relief is the only remedy available that will ensure the stabilization of the Aviron Entities' financial

status, preserve the value of the pledged collateral, and thus protect the investment made on behalf

of the Fund's investors.

**THE PARTIES AND RELEVANT NON-PARTIES**

19.    Plaintiff is a Delaware statutory trust which operates as a closed-end mutual

fund and which trades on the New York Stock Exchange. Non-party BlackRock Advisors, LLC

("the Advisor") acts as the Trust's investment advisor. The Advisor has its principal place of

business in New York, New York and is responsible for, among other things, the management of

the Fund's portfolio. The Advisor has retained non-parties BlackRock Financial Management,

Inc. and BlackRock Investment Management, LLC to serve as the Trust's sub-advisers (the "Sub-

advisers"). The Sub-advisers have their principal places of business in New York, New York, and

perform the actual day-to-day investment management of the Fund. This includes negotiating the

transactions relevant to this action.

20.    Defendant Aviron Group, LLC, is a Delaware limited liability company

with its principal place of business in Los Angeles, California.

21.    Defendant Aviron Capital, LLC, is a Delaware limited liability company

with its principal place of business in Los Angeles, California.

22.    Defendant Aviron Pictures, LLC, is a Delaware limited liability company

with its principal place of business in Los Angeles, California.

7

23.    Defendant Aviron Releasing, LLC, is a Delaware limited liability company with its principal place of business in Los Angeles, California.

24.    Defendant Aviron 1701, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

25.    Defendant Aviron 1702, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

26.    Defendant Aviron 1705, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

27.    Defendant Aviron 1706, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

28.    Defendant Aviron 1801, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

29.    Defendant MAA Releasing, LLC, is a Delaware limited liability company with its principal place of business in Los Angeles, California.

30.    Defendant William Sadleir is a domiciliary of Beverly Hills, California.

31.    Sadleir also is or purports to be (i) President of Aviron Group; (ii) Manager, Chairman, and Chief Executive Officer of Aviron Capital; (iii) Manager of Aviron Pictures, and (iv) Manager of each of the Special Purpose Entities.

32.    Upon information and belief, Sadleir largely operates the Aviron Entities as a single business out of a single office in Beverly Hills, California. Sadleir is the direct or indirect owner of the entities (either individually or though his family trust), and is or was the designated "Manager" of each. Sadleir has thus exercised domination and control over these purportedly separate entities, which he in fact treats as one, and has used to defraud the Fund.

8

## JURISDICTION AND VENUE

33.     Jurisdiction is proper in this Court as to the Aviron Entities because (i) Aviron Group, LLC consented to the jurisdiction of this Court pursuant to Section 23(b) of the Pledge Agreement it entered with Plaintiff on October 20, 2015 and (ii) Aviron Capital did the same pursuant to Section 9.08 of the NPA it entered with Plaintiff on July 17, 2017. Each of the Pledge Agreement and the NPA provide that Aviron Group and Aviron Capital, respectively, "irrevocably and unconditionally submits, for itself *and its property*, to the exclusive jurisdiction of . . . the Supreme Court of the State of New York sitting in New York county . . . in any action or proceeding arising out of or relating to this Pledge Agreement or any other Loan Document or the transactions contemplated hereby . . . ." (the "New York Forum Provisions").

34.     Jurisdiction is also proper in this Court pursuant to CPLR 302(a)(1) because Sadleir and the Aviron Entities each transact business within New York and this action arises out of such business.

35.     Jurisdiction is also proper as to Sadleir and the Aviron Entities pursuant to CPLR 302(a)(3)(i) and 302(a)(3)(ii) because they have committed a tortious act without the state causing injury to Plaintiff within New York, and upon information and belief (i) regularly do or solicit business in New York and derive substantial revenue from services rendered in New York, and (ii) expect or reasonably should have expected the act to have consequences in the state and derive substantial revenue from interstate or international commerce.

36.     Venue is proper in this Court pursuant to CPLR 501, because of the New York Forum Provisions.

# FACTUAL  BACKGROUND

## *2015:  The Fund First Contracts With the Aviron Entities.*

37.     On October 20, 2015, Aviron  Capital  and the Fund entered  into the Credit

Agreement,  pursuant  to which  the Fund made  available  to Aviron  Capital  a senior  secured  credit

facility  to assist  its funding  of prints,  advertising,  marketing  and promotion  for certain  feature-

length  motion  pictures.

38.     On October 20, 2015, Aviron  Group  and the Fund also entered  into the

Pledge Agreement.   Sadleir  signed  the Pledge  Agreement  on behalf  of Aviron  Group.

39.     Pursuant  to the terms  of the Pledge  Agreement,  Aviron  Group  pledged  its

ownership  of certain  Pledged  Collateral  to the Fund, including  100% of the "equity  interests  issued

by" each of Aviron  Capital  and Aviron  Pictures.[2]  This pledge  was made to "induce  [the Fund] to

. . . extend  credit  to" Aviron  Group.   Section  4(g) of the Pledge  Agreement  further  warranted  that

"[t]here  are no restrictions  upon the voting  rights  associated  with, or upon the transfer  of, any of

the Pledged  Collateral"  (*i.e.,* the equity  of Aviron  Capital  and Aviron  Pictures).

---

[2]     Section  1 of the Pledge  Agreement  defines  Pledged  Collateral  as "(i) all Pledged  LLC
Interests  now owned  or hereafter  acquired  by the [Aviron  Group],  and all options  and warrants
for the purchase  of the Pledged  LLC Interests  now or hereafter  held  in the name  of the [Aviron  Group],
(ii) any certificates  representing  such Pledged  LLC Interests,  and (iii) all dividends,  cash, warrants,
rights,  options,  instruments,  investment  property  and other property  or proceeds  from time to time
received,  receivable  or otherwise  distributed  in respect  of or in exchange  for any or all of the
Pledged  LLC Interests."   The Pledged  LLC Interests  are itemized  on Schedule  1 to the Pledge
Agreement  as follows:

OWNERSHIP OF PLEDGED LLC INTERESTS

| Grantor | Pledged Subsidiary | Percentage of Pledged Interests |
| --- | --- | --- |
| Aviron Group, LLC | Aviron Capital, LLC | 100% |
| Aviron Group, LLC | Aviron Pictures, LLC | 100% |

10

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document    Page 47 of 365

40.    The Fund filed a UCC-1 financing statement against the Pledged Collateral that same day.

41.    All defined terms in the Pledge Agreement, including "Event of Default," were agreed to have "the same meaning" as defined in the 2015 Credit Agreement.[3]

42.    Pursuant to Section 6 of the Pledge Agreement, "[a]t such time as an Event of Default shall have occurred and be continuing," and following "written notice from" the Fund to Aviron Group, the Fund may "*exercise all voting powers pertaining to the Pledged Collateral*," including the right to "***exercise, or direct*** [Aviron Group] *as to the exercise of all voting, consent, managerial, election, and other membership rights with respect to the applicable Pledged Collateral.*"

43.    Thus, upon an Event of Default under the NPA (as defined therein), the Fund is permitted to step into the shoes of Aviron Group as it pertains to the "voting, consent, managerial, election, and other membership rights" associated with the equity of Aviron Capital and Aviron Pictures.

### *2017: The Fund Invests $75 Million in the Aviron Entities Via a Note Purchase Agreement*

44.    On July 17, 2017, Aviron Capital and the Fund entered into the NPA through which the Fund provided a term loan in the amount of $75,000,000 in return for Aviron Capital simultaneously providing a broadly defined "security interest" in

> all of the Issuer's right, title and interest, whether now existing or hereafter acquired or arising, in and to the following, including, without limitation, relating to each motion picture in which the Issuer or a Qualifying Picture SPV may have rights (including, without limitation, each Qualifying Picture) and each Qualifying Picture SPV: all goods, accounts, Records, instruments, intercompany obligations, contract rights, partnership, joint venture and other equity interests, documents, chattel paper, general intangibles, goodwill, equipment, machinery, inventory,

---

[3]    As outlined below, this was later revised via an omnibus amendment to instead reference definitions in the NPA.

11

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document    Page 48 of 365

investment property, copyrights, trademarks, insurance proceeds, cash, deposit accounts (including the Interest and Guarantee Fee Reserve Account and the Capital Collection Account and any proceeds thereof, products thereof or income therefrom, further including, without limitation, all of the Issuer's right, title and interest in and to all other personal property, tangible and intangible, wherever located or situated and whether now owned, presently existing or hereafter acquired or created (such assets, collectively, the "Collateral").

45.    Section 4.01 of the NPA further provided that Collateral included, among other things:

(i) 100% of the equity interests issued by each Qualifying Picture SPV[4] now owned or hereafter acquired by the Issuer, consisting of all economic rights, including without limitation all rights to share in the profits and losses of each such Qualifying Picture SPV and all rights to receive distributions of the assets of such Qualifying Picture SPV, and all governance rights, including without limitation all rights to vote, consent to action and otherwise participate in the management of such Qualifying Picture SPV,

(ii) all options and warrants for the purchase of such equity interests now or hereafter held in the name of the Issuer,

(iii) any certificates representing such equity interests, and

(iv) all dividends, cash, warrants, rights, options, instruments, investment property and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such equity interests (the foregoing being the "Pledged Equity Interests") . . . .

46.    The NPA contained a number of additional requirements regarding "Pledged Collateral," *i.e.,* the Pledged Equity Interests. This included informing the Fund as necessary so that the Fund could "take steps to perfect its security interest" in those equity positions as appropriate (*e.g.*, as new subsidiaries were formed).

47.    Consequently, and consistent with the NPA, UCC-1 financing statements were filed for the benefit of the Fund and against Aviron Capital and the other "Credit Parties," to

---

[4]    Qualifying Picture SPV is defined in the NPA to mean "each Subsidiary of [Aviron Capital] formed for the purpose of entering into a Producer Agreement with respect to a Qualifying Picture."

secure the Fund's Collateral, as appropriate. These documents thus served to perfect the security interests granted by Aviron Capital and its affiliates to secure all loans and advances to, and all debts, liabilities, obligations, covenants, and duties of Aviron Capital arising under the NPA (including the $75,000,000 investment).

48.    In Section 7.03 of the NPA, Aviron Capital also agreed to a number of "negative covenants," which prohibited it or any Credit Party taking certain actions "until the debt repayment date" without the Fund's written consent. The first listed item reflects Aviron Capital's commitment to not:

> Sale of Assets; Liens.  (i) Sell, assign (by operation of law or otherwise) or otherwise transfer, or grant any option with respect to, or create, incur, assume or suffer to the extent any Lien (other than Permitted Liens) upon or with respect to any of the Collateral, or any interest thereon, whether now owned or hereafter acquired, or (ii) assign any right to receive any income in respect of the Collateral, or sign or file under the Laws of any jurisdiction, a financing statement . . . or other similar document covering any of the foregoing that names [Aviron Capital] as debtor, other than those in favor of the [Fund] under this Agreement and the other Facility Documents, or sign any security agreement authorizing any lenders or other Persons thereunder to file such financing statement or other similar document covering any of the foregoing.

49.    Aviron Capital agreed to other negative covenants under Section 7.03 of the NPA that are pertinent here. These include agreements to not:

> Amendment, Cancellation or Termination of Documents.  (i) Make or permit to be made by any Person any material amendment, modification to or cancellation or termination of any of the Transaction Documents[5] to which it is a party or by which its assets are bound (or under which it has rights as a third-party beneficiary), or waive any default under or any breach of any term or condition of any of the Transaction Documents to which it is a party or by which its assets are bound (or under which it has rights as a third-party beneficiary), without the prior written consent of the Noteholder; or (ii) upon the occurrence and during the continuance of a Potential Event

---

[5]    Transaction Documents is defined to include "all other agreements, instruments, and documents . . . now or hereafter made under, pursuant to, or in connection with the foregoing or any other aspect of the transactions contemplated by the foregoing."

13

of Default or Event of Default, exercise any material remedies available to Issuer or any other Credit Party under the Transaction Documents to which it is a party (or under which it has rights as a third-party beneficiary), without the prior written consent of the Noteholder.

Violation of Laws. Take any action (or omit to take any action) otherwise permitted by this Agreement which would cause the performance of any of the Transaction Documents or Facility Documents, to which it is a party, to violate any Law, rule or regulation or require an order, consent, permit or approval to be obtained from any governmental authority which has not been obtained.

50.    On July 17, 2017, the Fund, Aviron Group, and certain of its affiliates also entered into the Omnibus Amendment No. 1. As pertinent here, this agreement provided that "[a]ll references to 'Credit Agreement' in the Subject Agreements," including the Pledge Agreement, "shall be replaced with 'Note Purchase Agreement.'"

51.    Thus, under the Pledge Agreement, Events of Default are those as defined in the NPA.

### 2019:  The Fund Invests Additional Amounts

52.    On March 22, 2019, the Fund, Aviron Capital, Sadleir, and Temerity entered into a letter agreement whereby the Fund agreed to advance $6 million to fund the distribution of a motion picture titled *AFTER* (the "March 22 Letter Agreement").

53.    In the event that the outstanding principal amount of the $6 million loan, along with its accrued unpaid interest, was not paid by its maturity date, the parties agreed that "such failure shall be deemed an Event of Default under the Note Purchase Agreement."

54.    The maturity date for the loan advanced under the March 22 Letter Agreement was June 12, 2019. The outstanding principal of the loan was not paid by that date, and remains unpaid. An Event of Default thus occurred on June 12, 2019 and continues to occur.

14

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
INDEX NO. 567496/2019

NYSCEF DOC. NO. 1   Case 2:20-bk-15015-BR   Doc 25   Filed 06/19/20   Entered 06/19/20 19:11:23   Desc
RECEIVED NYSCEF: 12/17/2019
Main Document   Page 51 of 365

55.     On March 25, 2019, the same parties entered into a similar letter agreement whereby the Fund agreed to advance an additional $4 million for the distribution of *AFTER* (the "March 25 Letter Agreement," and together with the March 22 Letter Agreement, the "Funding Agreements").   The terms of the March 25 Letter Agreement mirror in all respects pertinent here those of the March 22 Letter Agreement.

56.     The maturity date for the loan advanced under the March 25 Letter Agreement was also June 12, 2019. The outstanding principal was not paid by that date, and remains unpaid. This failure constitutes a second Event of Default that occurred on June 12, 2019 and continues to occur.

### *July 2019:  The Fund Notifies the Aviron Entities of Multiple Events of Default.*

57.     On July 9, 2019,[6] the Fund informed Aviron Capital by letter that multiple Events of Default had occurred (the "July Default Letter") including, for example:

- the above-outlined failure to repay the amounts owed in connection with the Funding Agreements by their Maturity Date;

- the failure to timely deliver certain required financial information associated with the motion pictures titled *A Private War, AFTER* and, *The Informer* as required pursuant to the NPA;

- the failure to obtain the prior written consent of the Fund to establish a Capital Collection Account[7] other than the account held at East West Bank as provided in the NPA;

---

[6]     The Default Letter is dated July 1, 2019 but was sent on July 9, 2019.

[7]     Pursuant to the NPA, the Capital Collection Account (the "CCA") is an identified account where Aviron Capital receives payments from its film distribution activities.   Those payments in turn come out of controlled accounts held by a third-party payment agent— referred to as "FCAM" —whose role is to direct film payment streams among the various parties with rights in the film.   The CCA is also the account into which the Fund deposited loan proceeds under the NPA and the Funding Agreements.   Section 2.02(b) of the NPA

15

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1

INDEX NO. 567496/2019

RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document         Page 52 of 365

- opening of an account other than the Capital Collection Account and the withdrawal or usage of amounts on deposit without the Fund's prior written consent;

- the failure to make the payments required on each Settlement Date—the 10th of each month—from the Capital Collection Account as provided in the NPA, a failure once attempted to be cured, then breached in the immediately following payment period;

- the failure of the amount on deposit in the Interest and Guarantee Fee Reserve Account to equal the Interest and Guarantee Fee Reserve Required Amount, as defined in the NPA for more than one calendar quarter—in other words, the failure of Aviron Capital to have on deposit in an agreed-upon account the estimated interest for the prescribed time period on the aggregate outstanding principal amount of the loan under the NPA, together with the fees assessed by the financial guarantee provider in support of the obligations thereunder; and

- the failure of Aviron Capital to obtain a Financial Guarantee Replacement by April 15, 2019, as defined in and required by the NPA and amendments 4 and 5 thereto.

58.    The July Default Letter expressly confirmed that it did not constitute a consent or waiver to the Events of Default, or otherwise operate to amend or modify any of the parties' agreements.

59.    Defendants neither remedied these myriad Events of Default, nor formally responded to the July Default Letter.

---

requires that the CCA be subject to a deposit control account agreement ("DACA"), which allows the Fund to take control of the account and have full visibility upon an Event of Default.  In 2018, Aviron moved almost all of its accounts from East West Bank to First Republic Bank and failed to put a DACA in place over the CCA.  That failure was itself an Event of Default under the NPA.

16

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1

INDEX NO. 567496/2019

RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document    Page 53 of 365

60.    Thus, numerous Events of Default have occurred and are continuing to occur, in flagrant breach of the parties' agreements.

### *Late 2019: The Fund Discovers Apparent Fraud at the Aviron Entities*

61.    As outlined above, the Fund filed numerous UCC-1 financing statements pertaining to the collateral securing its agreements with the Aviron Entities, including the Credit Agreement, the Pledge Agreement, and the NPA.

62.    The Fund has recently become aware of events that suggest fraudulent— and illegal—activity connected to the Aviron Entities and Sadleir which has purportedly removed the Fund's perfected security interest in certain collateral.

63.    Various Aviron Entities have recently purported to sell or finance several of the motion picture rights that were collateralized to the Fund. These actions were only made possible by the Aviron Entities' (or their agents') filing of fourteen fraudulent UCC-3 amendments with the Delaware Secretary of State, starting in July 2019, that operated to delete the purportedly sold or financed collateral from the Fund's documented list of collateral. Any such UCC-3 amendment could only be filed with the authorization of the secured party: the Fund. Such consent is typically documented through a signed, executed release.

64.    The UCC-3 amendments each identify the Fund as the "Secured Party of Record authorizing" each amendment which purported to delete from the Fund's collateral covered by such underlying UCC-1 financing statements the property described in such UCC-3 amendments. The Fund did not authorize the amendments, rendering them fraudulent.

65.    The Fund has likewise never consented to these purported sales or financings of its collateral. Upon information and belief, the Aviron Entities, through Sadleir, filed the Fraudulent Amendments, or caused them to be filed, to effectuate these changes and create the

17

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1

INDEX NO. 567496/2019

RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document    Page 54 of 365

appearance that the applicable Aviron Entities could sell or finance the collateral it had pledged to the Fund.

66.    The Fund's recent investigation suggests that Sadleir, the Aviron Entities, and/or their agents resorted to outright fraud to achieve these objectives.

67.    Plaintiff's counsel contacted Defendants' transaction counsel and requested copies of the purported releases that would have been necessary to effectuate filing any of the Fraudulent Amendments.

68.    Defendants' transaction counsel provided five such documents—the Fraudulent Releases—which all purport to date from July 2019 and reflect signatures of the Fund's advisers authorizing a release of the Fund's lien on certain perfected collateral.

69.    As outlined in the contemporaneously filed Affidavits of Randy Robertson and Mark Volosov, those documents are forgeries.  None of the Fraudulent Releases were executed by Mr. Robertson in July 2019.

70.    It appears that to create the Fraudulent Releases, Sadleir and/or his agents copied and pasted Mr. Robertson's signature from prior agreements between the Fund and Defendants onto the Fraudulent Releases.

71.    To date, the Fund has identified what appear to be three such copied and pasted signatures, as outlined below.

72.    For example, Mr. Robertson's purported signature for the Fund's partial release of its security interest in the motion picture *The Strangers: Prey at Night*, purportedly dated July 12, 2019 appears below on the left.  That signature appears to have been copied from Mr. Robertson's authentic signature from the February 21, 2019 Amendment Five to the Note Purchase Agreement which appears below on the right.

18

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1

INDEX NO. 567496/2019

RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document    Page 55 of 365

**Forged (Copied) Signature**          **Source Authentic Signature**

73.    Similarly, Mr. Robertson's purported signature for the Fund's partial release of its security interest in the motion picture *My All American*, purportedly dated July 12, 2019 appears below on the left.  That signature appears to have been copied from Mr. Robertson's authentic signature from the 2015 Credit Agreement, which appears below on the right.

**Forged (Copied) Signature**          **Source Authentic Signature**

74.    Finally, Mr. Robertson's purported signature for the Fund's partial release of its security interest in the HBO licensing agreement for the motion picture *The Strangers: Prey at Night*, purportedly dated July 17, 2019 appears below on the left.  That signature appears to have been copied from Mr. Robertson's authentic signature from the October 19, 2016 Amendment One to the Credit and Security Agreement, which appears below on the right.

**Forged (Copied) Signature**          **Source Authentic Signature**

19

75.    Upon information and belief, Sadleir and/or others working with him provided the Fraudulent Releases to the filers of the Fraudulent Amendments in order to create the appearance that the Fund had authorized the filing of UCC-3 amendments.

76.    Upon information and belief, Sadleir was motivated to undertake this fraudulent activity to benefit himself.

77.    For example, on July 15, 2019—the same day that many of the Fraudulent Amendments were filed—Sadleir stipulated to a $2.7 million judgment.

78.    In late October 2019, the Fund discovered the Fraudulent Amendments. In response to the Fund's counsel's inquiries, on October 24, 2019, Louis Spoto, Aviron Capital's General Counsel, asserted that he had "not reviewed the individual UCC-3s" but that "for sure Blackrock [sic] knew what it was doing and why." Sadleir responded on October 25, 2019 that he was the "best contact for now to discuss the license sales," and that he would "pull together funds flow you asked for" and that "[w]e'll get this cleaned up."

79.    Those statements reflect an effort to prevent the Fund from discovering the Fraudulent Amendments.

80.    Sadleir and Spoto then declined to respond to repeated requests for (i) evidence that the Fund consented to the releases, (ii) information as to where the funds flowed from any purported sales of the collateral, and (iii) who they understood had reviewed and consented to the Fraudulent Amendments at the Fund, given that Defendants' filings with the Delaware Secretary of State claim that the Fund approved them.

81.    On November 25, 2019, Sadleir finally spoke with a representative from the Fund's Sub-advisers. During their phone call, Sadleir admitted that he "f----d up," conceding that

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM

NYSCEF DOC. NO. 1

Case 2:20-bk-15015-BR   Doc 25   Filed 06/19/20   Entered 06/19/20 19:11:23   Desc
Main Document   Page 57 of 365

INDEX NO. 567496/2019

RECEIVED NYSCEF: 12/17/2019

he engaged in fraudulent activity in connection with the Fraudulent Releases and Fraudulent Amendments.

82.     Later that same day, a representative from the Fund's Sub-advisers sent Sadleir an email that asked him to "share as promptly as possible the documents utilized to facilitate the sale of assets . . .and the detailed funds received and the allocation of the same." Sadleir never responded to those requests.

83.     On December 2, 2019,[8] the Fund sent a letter to the Aviron Entities (the "December Default Letter") describing again these fraudulent actions and also noting that the defaults identified in the July Default Letter "continue unwaived," and thus that "Events of Default have occurred and are continuing under the NPA."

84.     Specifically, the December Default Letter informed the Aviron Entities of the Fund's understanding that they had "fraudulently filed or instructed, directed or otherwise permitted Paul Hastings LLP [Defendants' transaction counsel] or other agents or representatives of the Credit Parties to file UCC-3 amendments to certain of the NPA Financing Statements . . . to delete the Specific Collateral from the collateral covered by such NPA Financing Statements."

85.     That same letter instructed Sadleir and many of the Aviron Entities[9] to, among other things, "immediately cease making any modifications of any kind to any of the NPA Financing Statements" and again requested any evidence that the Fund released its interest in the collateral.

---

[8]     The December Default Letter is dated December 3, but was mailed on December 2 and arrived on December 3.

[9]     The December Default Letter was addressed to Aviron Group, Aviron Capital, Aviron Pictures, Aviron Releasing, Aviron 1702, Aviron 1705, and MAA, all at the attention of Sadleir.

21

86.     Neither Sadleir, nor any officer or employee of any of the Aviron Entities responded to the December Default Letter.

87.     Instead, Sadleir responded by email, sharing plans to further sell the Fund's pledged collateral to repay certain of Sadleir's attorneys' fees (and thereafter, allegedly, pay the Fund). Sadleir further explained that he planned travel to Doha, Qatar on December 13, 2019, to close "a new credit facility for Aviron Funding, LLC, that will be the vehicle for Aviron's future slate of 35 films and from which we expect to purchase from Aviron Capital certain assets, such as media, to reduce the NPA principal balance." As of the date of this filing, it does not appear that Aviron Funding, LLC exists.[10]

88.     On December 16, 2019, the Fund sent Aviron Group, Aviron Capital, Aviron Pictures, and Sadleir a letter notifying them, among other things, that the Fund was exercising its right pursuant to the Pledge Agreement to "exercise, or direct Aviron Group as to the exercise of all voting, consent, managerial, election and other membership rights with respect to the applicable Pledged Collateral" (the "December 16 Letter"). Further, the letter made clear that, pursuant to the Pledge Agreement and the LLC Agreements, the Fund was removing Sadleir as Manager of Aviron Pictures, Aviron Capital, and appointing Amir Agam to fill the position at each entity. Mr. Agam is a Senior Managing Director in the Corporate Finance & Restructuring practice at FTI Consulting and has significant experience serving in interim corporate positions overseeing operational or financial turnarounds. The December 16 Letter requested a response by 5 P.M. Pacific Time on December 16, 2019.

---

[10]     This is per a search on the Delaware Division of Corporations webpage (the jurisdiction in which Sadleir has chosen to incorporate the other Aviron entities of which the Fund is aware). *See* Division of Corporations, Search Page (last searched December 17, 2019), *available at* https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx.

22

89.     Defendants' transaction counsel responded shortly after the close of business on December 16 merely to confirm receipt. Defendants have not recognized Mr. Agam as the Manager of Aviron Capital and Aviron Pictures. Even should they, their fraud requires that any such conciliatory act should be disregarded.

## COUNT I – DECLARATORY JUDGMENT

90.     Plaintiff repeats each of the allegations above as if fully set forth herein.

91.     On October 20, 2015, Aviron Group, LLC and the Fund entered into the Pledge Agreement whereby the Aviron Group affirmed it was the legal and beneficial owner of 100% of the equity interests issued by each of Aviron Capital and Aviron Pictures. The Pledge Agreement is a valid, binding and enforceable agreement entered into by the Fund and Aviron Group, LLC, as amended by the Omnibus Amendment No. 1, agreed on July 17, 2017.

92.     In order to induce the Fund to extend credit, Aviron Group pledged its equity interest in Aviron Capital and Aviron Pictures to the Fund and warranted that "there are no restrictions upon the voting rights associated with, or upon the transfer of, any of the Pledged Collateral."

93.     Section 6 of the Pledge Agreement, as amended, provides that upon an Event of Default, Aviron Group's voting power pertaining to the Pledged Collateral (100% of the equity in Aviron Capital and Aviron Pictures) shall cease, granting the Fund the power to "exercise all voting powers pertaining to the Pledged Collateral, including the right to … *direct the Grantor* [Aviron Group] *as to the exercise of all voting, consent, managerial, election, and other membership rights with respect to the applicable Pledged Collateral.*"

94.     In the July Default Letter, the Fund notified Aviron Capital that it had permitted multiple Events of Default to occur, as defined in the NPA. The Aviron Entities were

23

further informed in the December Default Letter that the Events of Default identified in the July

Default Letter are continuing and have not been waived. These Events of Default triggered Section

6 of the Pledge Agreement thus allowing the Fund to "*exercise . . . all voting, consent, managerial,*

*election, and other membership rights with respect to the applicable Pledged Collateral*" – *i.e.*,

exercise all voting power pertaining to the equity of Aviron Capital and Aviron Pictures as Sole

Member under those entities' LLC Agreements. The Fund exercised this right via proper notice

(the December 16 Letter).

95.     Further, Section 10(b) of the Aviron Capital and Aviron Pictures LLC

Agreements, and Section 10(b) of the LLC Agreements of the Special Purpose Entities, provide

that "[t]he Sole Member may remove the Manager [Sadleir] for any reason or no reason at any

time in its sole and absolute discretion. Any vacancy occurring for any reason in the position of

Manager may be filled by the Sole Member."

96.     In its December 16 Letter, the Fund also validly noticed that it would

immediately exercise Aviron Group's voting rights as to Aviron Capital and Aviron Pictures to

remove and place Sadleir as Manager of Aviron Capital and Aviron Pictures.

97.     As outlined above, the Fund has the power to control 100% of the equity in

Aviron Capital and Aviron Pictures and replace Sadleir as its Manager. The Fund anticipates that

Amir Agam (the "Replacement Manager") will immediately notice the removal of Sadleir as

Manager of the Special Purpose Entities, as appropriate pursuant to their respective LLC

Agreements.

98.     As a result of the foregoing, the Fund is entitled to an order adjudging,

declaring, and decreeing that:

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1
INDEX NO. 567496/2019
RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document        Page 61 of 365

a.  Pursuant to the Pledge Agreement, the NPA, the Funding Agreements, and the LLC Agreements of Aviron Capital, Aviron Pictures, and the Special Purpose Entities, effective December 16, 2019:

   i.  Aviron Group's right to act as Sole Member of Aviron Capital and Aviron Pictures pursuant to the Pledge Agreement and LLC Agreements immediately ceased and has been supplanted by the Fund's right to exercise *"all voting, consent, managerial, election, and other membership rights with respect"* over the equity of Aviron Capital and Aviron Pictures;

   ii.  The Fund validly noticed and exercised the voting rights of Aviron Group to replace Sadleir as the Manager of Aviron Capital with the Replacement Manager;

   iii.  The Fund validly noticed and exercised the voting rights of Aviron Group to replace Sadleir as the Manager of Aviron Pictures with the Replacement Manager; and

   iv.  The Replacement Manager has the authority to exercise managerial control regarding Special Purpose Entities that are subsidiaries of Aviron Capital or Aviron Pictures.

b.  Defendants and those acting in concert with or on behalf of them have no right to interfere with or frustrate the Fund's exercise of its rights regarding its perfected security interests, granted by the Defendants to secure the Obligations set forth in the Pledge Agreement and the NPA, as applicable.

25

99.    An actual and justiciable controversy exists between the parties concerning control of Aviron Group, Aviron Pictures, and Aviron Capital. Defendants have not acknowledged the Fund's replacement manager. A declaratory judgment issued by a court in the proper forum will settle the rights and obligations of the parties under the Agreements.

## COUNT II – PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

100.    Pending the declaratory judgement sought herein, and in light of Defendants' failure to acknowledge the Fund's replacement manager, the Fund is entitled to preliminary and permanent injunctive relief.

101.    No other remedies at law are adequate to address the harm to the Fund if Sadleir were to continue in his refusal to step down as Manager from Aviron Capital and Aviron Pictures, and/or continue to represent to the Aviron Entities' officers and employees or third parties that he has the right to act for Aviron Capital, Aviron Pictures, and/or the Special Purpose Entities.

102.    The Fund and its investors have suffered and will continue to suffer irreparable harm that cannot be adequately compensated through monetary damages as a direct and proximate result of Sadleir's and the Aviron Entities' refusal to relinquish control of Aviron Capital and Aviron Pictures, compounded further by Defendants' apparently fraudulent conduct. Consequently, the balance of equities are in the Fund's favor.

103.    The Fund is entitled to injunctive relief as to Defendants (each expressly defined to include their respective employees, managers, officers, directors, parents, subsidiaries, affiliates, agents, attorneys, and any persons acting with or in concert with them), preliminarily enjoining them from the following, unless expressly otherwise authorized in writing by the Replacement Manager:

26

a.  Sadleir and Aviron Group from acting by member consent, or directing the voting, consent, managerial, election or other membership rights agreements connected to the equity of Aviron Capital or Aviron Pictures;

b.  Sadleir and Aviron Group from contesting the right of the Replacement Manager to control and direct all management and operations of Aviron Capital and Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities, as that term is defined in the Complaint);

c.  Sadleir and Aviron Group from controlling, or purporting to control, the day-to-day conduct, operation, and management of Aviron Capital and Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities, as that term is defined in the Complaint);

d.  Sadleir and Aviron Group from acting as or holding themselves out to anyone as the Manager of or otherwise controlling Aviron Capital and Aviron Pictures (or any of any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities);

e.  Sadleir and Aviron Group from withdrawing or transferring any funds from any accounts in the names of Aviron Capital or Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities);

f.  Sadleir and Aviron Group from refusing to relinquish all property, books, records, or other assets of the Aviron Capital or Aviron Pictures (or any of

27

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1

INDEX NO. 567496/2019

RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR   Doc 25   Filed 06/19/20   Entered 06/19/20 19:11:23   Desc
Main Document        Page 64 of 365

their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities);

g. Sadleir and Aviron Group from filing any litigation (including any bankruptcy proceeding) on behalf of or affecting the rights of Aviron Capital or Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities);

h. Sadleir and Aviron Group from issuing new debt, executing any loans, or pledging any assets as collateral on behalf of Aviron Capital and Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities); and

i. Sadleir and Aviron Group from interfering with or frustrating the Fund's exercise of its rights with respect to any collateral Defendants have pledged to the Fund.

## COUNT THREE – FRAUDULENT CONCEALMENT

104. Plaintiff repeats each of the allegations above as if fully set forth herein.

105. The Fund learned in October 2019 that Defendants filed fourteen Fraudulent UCC-3 Amendments with the Delaware Department of State that deleted the purportedly sold or financed collateral from the Fund's documented list of collateral, in direct contravention of the NPA. Defendants could have only effectuated this filing by creation of the Fraudulent Releases.

106. Defendants and their employees did not disclose this material information to the Fund at any time, contrary to the mandates of the parties' Agreements, including the covenants listed in Section 7.03 of the NPA (*e.g.*, covenant in subsection (n) to not make or allow

28

FILED: NEW YORK COUNTY CLERK 12/17/2019 04:14 PM
NYSCEF DOC. NO. 1

INDEX NO. 567496/2019

RECEIVED NYSCEF: 12/17/2019

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc
Main Document    Page 65 of 365

"any material amendment, modification to or cancellation or termination of any of the Transaction Documents . . . without the prior written consent" of the Fund).

107.    Defendants otherwise omitted material information in their discussions with the Fund's attorneys on October 24, 2019 and October 25, 2019, including that "for sure Blackrock [sic] knew what it was doing and why," that Sadleir would "pull together funds flow you asked for" and that "[w]e'll get this cleaned up." Defendants and their employees and agents intended for the Fund to rely on those statements.

108.    Defendants continued to omit material information as to its fraudulent conduct by refusing to respond to repeated inquiries from the Fund's counsel.

109.    The Fund justifiably relied on Defendants' non-disclosures to their substantial detriment.

110.    Defendants had a duty to disclose their fraudulent actions related to the Fund's perfected security interest in the collateral, compounded by their otherwise partial, ambiguous, and/or misleading statements required additional disclosure to avoid misleading the Fund, especially given that Defendants' fraudulent actions were particularly within the knowledge of the Defendants and given that Defendants took action to delay the Fund's discovery of the fraud.

111.    Sadleir exercises domination and control over the Aviron Entities, which operate as one and which Sadleir has used to defraud Plaintiff.

112.    As a direct and proximate result of Defendants' fraudulent concealment, the Fund has been harmed in an amount to be determined at trial.

## COUNT FOUR – FRAUD

113.    Plaintiff repeats each of the allegations above as if fully set forth herein.

114.    Defendants filed the Fraudulent Amendments as outlined in Exhibit II to Volosov Ex. 51, and created the Fraudulent Releases.  Defendants also made false statements to the Fund's attorneys on October 24, 2019 and October 25, 2019 as to its fraudulent UCC-3 amendments and sale of the collateral, including that "for sure Blackrock [sic] knew what it was doing and why," that Sadleir would "pull together funds flow you asked for" and that "[w]e'll get this cleaned up."

115.    Defendants knew those statements to be false, and intended for the Fund to rely on those statements so as to perpetuate and further Defendants' fraud.

116.    The Fund justifiably relied on Defendants' misrepresentations to its substantial detriment.

117.    Sadleir exercises domination and control over the Aviron Entities, which operate as one and which Sadleir has used to defraud Plaintiff.

118.    As a direct and proximate result of Defendants' fraud, the Fund has been harmed in an amount to be determined at trial.

30

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

1. An order adjudging, declaring, and decreeing that Plaintiff is entitled to declaratory and injunctive relief as set forth above;

2. An order in favor of Plaintiff as to its fraudulent concealment and fraud claims;

3. Monetary damages in an amount to be determined at trial, but estimated to exceed $3,000,000;

4. That Plaintiff be awarded all pre-judgment interest allowable by law;

5. That Plaintiff be awarded its costs and attorneys' fees as allowable by law; and

6. Granting such other and further relief as the Court deems just and proper.

Dated:     New York, New York            Respectfully submitted,
           December 17, 2019

                                         SIDLEY AUSTIN LLP

                                         Nicholas P. Crowell
                                          ncrowell@sidley.com
                                         Charlotte K. Newell
                                          cnewell@sidley.com
                                         Alexander B. Porter
                                          alex.porter@sidley.com
                                         787 Seventh Avenue
                                         New York, New York 10019
                                         (212) 839-5300
                                         (212) 839-5599 (fax)

                                         *Attorneys for Plaintiff*
                                         *BlackRock Multi-Sector Income Trust*

31

# GLENN DECLARATION

# EXHIBIT "B"

At IAS Part 61 of the Supreme Court of the State of New York, held in and for the County of New York, at the Courthouse located at 60 Centre Street, New York, New York, on this 19th day of December, 2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

BLACKROCK MULTI-SECTOR INCOME TRUST,

                Plaintiff,

    - against -

AVIRON GROUP, LLC, AVIRON CAPITAL, LLC, AVIRON PICTURES, LLC, AVIRON 1701, LLC, AVIRON 1702, LLC, AVIRON 1705, LLC, AVIRON 1706, LLC, AVIRON 1801, LLC, MAA RELEASING, LLC, AVIRON RELEASING, LLC, and WILLIAM SADLEIR,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

:  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :

**COMMERCIAL DIVISION**
Index No. 657496/2019

(Ostrager, J.)

**ORDER GRANTING**
**PRELIMINARY INJUNCTION**
re Mot. Seq. 001

UPON reading and filing (1) the Complaint in this action; (2) BlackRock Multi-Sector Income Trust's (the "Fund") Memorandum of Law in Support of Its Order to Show Cause for Injunctive Relief with *Ex Parte* Temporary Restraining Order; (3) the Affidavit of Mark Volosov in support of such Order to Show Cause, sworn to on December 16, 2019, and the exhibits attached thereto; (4) the Affidavit of Randy Robertson in support of such Order to Show Cause, sworn to on December 16, 2019, and the exhibits attached thereto; and (5) the Emergency Affirmation of Nicholas P. Crowell, Esq., in support of such Order to Show Cause, sworn to on December 17, 2019, and the exhibits attached thereto, all filed on December 17, 2019 and sufficient cause appearing therefore, and;

WHEREAS the Court entered an *ex parte* temporary restraining order on December 17, 2019 which the Court ordered was returnable at the IAS Part 61 at the Courthouse at 60 Centre Street, Room 232, New York, New York, on the 19th day of December at 9:30 a.m.;

WHEREAS on December 18, 2019 Plaintiff filed affidavits of service of the Court's December 17 temporary restraining order pertaining to all Defendants;

WHEREAS Defendants did not appear before the Court on the 19th day of December at 9:30 a.m.; *and the Court having granted Plaintiff's motion on the record on December 19, 2019, now*

**It IS HEREBY ORDERED,** that Defendants Aviron Group, LLC ("Aviron Group"), Aviron Capital, LLC ("Aviron Capital"), Aviron Pictures, LLC ("Aviron Pictures"), Aviron Releasing, LLC ("Aviron Releasing"), Aviron 1701, LLC ("Aviron 1701"), Aviron 1702, LLC ("Aviron 1702"), Aviron 1705, LLC ("Aviron 1705"), Aviron 1706, LLC ("Aviron 1706"), Aviron 1801, LLC ("Aviron 1801"), and MAA Releasing, LLC ("MAA"), (collectively, the "Aviron Entities"), and Defendant William Sadleir, (each expressly defined to include their respective employees, managers, officers, directors, parents, subsidiaries, affiliates, agents, attorneys, and any persons acting with or in concert with them, as appropriate), are preliminarily enjoined, unless expressly otherwise authorized in writing by Amir Agam (the "Replacement Manager"), from acting as, allowing or permitting, or taking any action, direct or indirect, so as to allow or enable:

    a.  Sadleir and Aviron Group from acting by member consent, or directing the voting, consent, managerial, election or other membership rights agreements connected to the equity of Aviron Capital or Aviron Pictures;

    b.  Sadleir and Aviron Group from contesting the right of the Replacement Manager to control and direct all management and operations of Aviron

2

FILED: NEW YORK COUNTY CLERK 12/20/2019 01:12 PM
INDEX NO. 657496/2019

NYSCEF DOC. NO. 31

Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc

RECEIVED NYSCEF: 12/20/2019

Main Document        Page 71 of 365

Capital and Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities, as that term is defined in the Complaint);

c. Sadleir and Aviron Group from controlling, or purporting to control, the day-to-day conduct, operation, and management of Aviron Capital and Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities, as that term is defined in the Complaint);

d. Sadleir and Aviron Group from acting as or holding themselves out to anyone as the Manager of or otherwise controlling Aviron Capital and Aviron Pictures (or any of any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities);

e. Sadleir and Aviron Group from withdrawing or transferring any funds from any accounts in the names of Aviron Capital or Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities);

f. Sadleir and Aviron Group from refusing to relinquish all property, books, records, or other assets of Aviron Capital or Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities);

g. Sadleir and Aviron Group from filing any litigation (including any bankruptcy proceeding) on behalf of or affecting the rights of Aviron

3

FILED: NEW YORK COUNTY CLERK 12/20/2019 01:12 PM INDEX NO. 657496/2019

NYSCEF DOC. NO. 31    Case 2:20-bk-15015-BR    Doc 25    Filed 06/19/20    Entered 06/19/20 19:11:23    Desc    RECEIVED NYSCEF: 12/20/2019

Main Document    Page 72 of 365

Capital or Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities);

h.  Sadleir and Aviron Group from issuing new debt, executing any loans, or pledging any assets as collateral on behalf of Aviron Capital and Aviron Pictures (or any of their wholly or majority owned subsidiaries, including as appropriate the Special Purpose Entities); and

i.  Sadleir and Aviron Group from interfering with or frustrating the Fund's exercise of its rights with respect to any collateral Defendants have pledged to the Fund.

**IT IS FURTHER ORDERED**, that Plaintiff shall post an undertaking in the amount of $500,000 within ten (10) business days; *of entry of this Order*

**IT IS FURTHER ORDERED**, that within three (3) business days Plaintiff shall cause delivery of this order upon the Aviron Entities' registered agents and upon Defendant Sadleir at his email address (wsadleir@aviron.com), overnight mail to his place of business and residence (9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212 and 9135 Hazen Drive, Beverly Hills, CA 90210, respectively) as well a *courtesy* copy via email to the Aviron Entities' transaction counsel (who has not appeared in this action), Nigel Pearson of Paul Hastings LLP.

*All parties or their counsel to appear in Room 232 for a preliminary conference on February 11, 2020 at 9:30 a.m.*

E N T E R :

BARRY R. OSTRAGER
JSC

4

# GLENN DECLARATION

# EXHIBIT "C"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------x

BLACKROCK MULTI-SECTOR INCOME )     **COMMERCIAL DIVISION**
TRUST,                        )
                             )     Index No. 657496/2019
      Plaintiff,    )
                             )     Hon. Barry R. Ostrager
  - against -           )
                             )     **STIPULATION AND [PROPOSED]**
AVIRON GROUP, LLC, AVIRON CAPITAL, )  **ORDER**
LLC, AVIRON PICTURES, LLC, AVIRON 1701, )
LLC, AVIRON 1702, LLC, AVIRON 1705, LLC, )
AVIRON 1706, LLC, AVIRON 1801, LLC, MAA )
RELEASING, LLC, AVIRON RELEASING, LLC, )
and WILLIAM SADLEIR,         )
                             )
      Defendants.   )
                             )

---------------------------------------------------------------x

      WHEREAS Plaintiff BlackRock Multi-Sector Income Trust ("BlackRock") has filed and

served a Complaint (NYSCEF No. 1) in this action (the "Action") against Aviron Group, LLC,

Aviron Capital, LLC, Aviron Pictures, LLC, Aviron 1701, LLC, Aviron 1702, LLC, Aviron

1705, LLC, Aviron 1706, LLC, Aviron 1801, LLC, MAA Releasing, LLC, Aviron Releasing,

LLC, and William Sadleir (the "Aviron Defendants");

      WHEREAS on January 27, 2020 the undersigned parties filed a Stipulation Extending

Time to Respond to Complaint that extended the time within which Defendant William Sadleir

may file a motion relating to, answer, or otherwise respond to the Complaint up to and including

February 7, 2020;

      WHEREAS on February 7, 2020 the undersigned parties filed a Stipulation Extending

Time to Respond to Complaint that extended the time within which Defendant William Sadleir

may file a motion relating to, answer, or otherwise respond to the Complaint up to and including

February 28, 2020;

WHEREAS on February 26, 2020 the undersigned parties filed a Stipulation Extending

Time to Respond to Complaint that extended the time within which Defendant William Sadleir

may file a motion relating to, answer, or otherwise respond to the Complaint up to and including

April 1, 2020;

WHEREAS the Preliminary Conference Order so ordered on February 11, 2020

(NYSCEF No. 94) provided for discovery deadlines in this Action:

WHEREAS on March 25, 2020 the undersigned parties entered into a Stipulation to

extend all discovery deadlines by 30 days from the dates provided in the Preliminary Conference

Order in light of COVID-19 and to extend the time within which Defendant William Sadleir may

respond to the Complaint up to and including April 30, 2020;

WHEREAS on April 30, 2020, due to COVID-19, Defendant William Sadleir could not

efile his answer due to the Administrative Orders then in effect, but forwarded a copy of his

Answer to the Complaint by email to counsel for Plaintiff on May 1, 2020, and thereafter efiled

his Answer to the Complaint on May 7, 2020, during the first week when the NYSCEF system

began accepting filings in non-essential pending cases;

WHEREAS the Stipulating Parties have conferred and agreed to extend all discovery

deadlines in this Action by 90 days (except to the extent such newly calculated deadlines fall on

a Saturday or Sunday, in which case the deadline shall be the following Monday), from the dates

provided in light of COVID-19 and delays in discovery related to the same;

IT IS FURTHER STIPULATED AND AGREED that all discovery deadlines in this

Action be extended by 90 days as follows: responses to demand for document production and

interrogatories to be served by July 27, 2020; initial document production to occur by July 27,

2020; completion of all document production by August 13, 2020; depositions to take place on or

before September 28, 2020; end date for all disclosure to occur on November 2, 2020; and note

of issue to be filed on or before November 30, 2020.

A Status Conference is scheduled for September 9, 2020 at 9:30 a.m.

Dated: May 19, 2020

New York, New York

SIDLEY AUSTIN LLP

By:
   Nicholas P. Crowell
   Charlotte K. Newell
   Alexander B. Porter
   787 Seventh Avenue
   New York, NY 10019
   Tel: (212) 839-5300

*Attorneys for Plaintiff BlackRock Multi-
Sector Income Trust*

MCDERMOTT, PIERRO, MANDERY &
MANDERY, LLP

By:
   Melanie Mandery
   Robert McDermott
   3075 Veterans Highway, Suite 260
   Ronkonkoma, NY 11779
   Tel: (631) 414-0094

*Attorney for Defendant William Sadleir*

SO ORDERED

_____
BARRY R. OSTRAGER, J.S.C.
                J.S.C.

# GLENN DECLARATION

# EXHIBIT "D"

Approved:  _____
           JARED LENOW
           Assistant United States Attorney

Before:    HONORABLE KEVIN NATHANIEL FOX
           United States Magistrate Judge
           Southern District of New York

# 20 MAG 5114

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>WILLIAM SADLEIR,<br><br>            Defendant. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 2, 1028A, and 1343<br><br>COUNTY OF OFFENSE: NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

     DANIEL MARDAKHAYEV, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

## COUNT ONE
### (Wire Fraud – Advertising Scheme)

     1.  From at least in or about 2016, up to and including in or about March 2020, in the Southern District of New York and elsewhere, WILLIAM SADLEIR, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SADLEIR, who was the chairman and chief executive officer of Aviron Pictures, LLC (together with its affiliated entities, "Aviron"), misappropriated millions of dollars in investor funds from Aviron for his own personal use through fraud and deceit, including through the use of a sham company he created to carry out the scheme.

     (Title 18, United States Code, Sections 1343 & 2.)

## COUNT TWO
### (Wire Fraud – UCC Scheme)

2.   In or about 2019, in the Southern District of New York and elsewhere, WILLIAM SADLEIR, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SADLEIR caused the forging of the signature of one of the managers of an investment fund (the "Fund") that invested in Aviron on documents used to remove liens on Aviron assets that secured loans made by the Fund to Aviron, and SADLEIR then sold the Aviron assets without the Fund's consent.

(Title 18, United States Code, Sections 1343 & 2.)

## COUNT THREE
### (Aggravated Identity Theft – UCC Scheme)

3.   In or about 2019, in the Southern District of New York and elsewhere, WILLIAM SADLEIR, the defendant, willfully and knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, SADLEIR possessed, used, and transferred the name of another person in connection with the wire fraud scheme charged in Count Two of this Complaint.

(Title 18, United States Code, Section 1028A.)

The bases for my knowledge and for the foregoing charge are, in part and among other things, as follows:

4.   I have been a Special Agent with the FBI since 2019.  I am currently assigned to a squad within the New York Division responsible for investigating violations of federal securities laws and related offenses.  I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals.  Because this affidavit is being submitted for the limited purpose of

establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation. Where
the contents of documents and the actions, statements and
conversations of others are reported herein, they are reported in
substance and in part, unless noted otherwise.

## RELEVANT ENTITIES AND INDIVIDUALS

5.   From my review of documents from the Fund, financial
institutions, the State of Delaware, and an escrow company, as
well as public filings and other publicly-available information,
and from speaking with one of the individuals currently responsible
for managing Aviron Pictures, LLC, I have learned the following,
in substance and in part:

a.   The Fund is a publicly-traded, closed-end
investment fund.  Shares in the Fund trade on the New York Stock
Exchange.  As of in or about December 2019, the Fund had
approximately $649.1 million in assets.  The Fund was managed by
an investment adviser (the "Investment Adviser") whose principal
place of business is New York, New York.  The Investment Adviser
is registered as such with the United States Securities and
Exchange Commission (the "SEC").  The Investment Adviser in turn
utilized several other SEC-registered investment advisers (the
"Sub-Advisers"), which also have their principal places of
business in New York, New York, to perform the day-to-day
management of the Fund's investments, including investments
relating to Aviron.

b.   WILLIAM SADLEIR, the defendant, was the chairman
and chief executive officer of Aviron Pictures, LLC, and oversaw
its operations, from in or about 2015 until in or about December
2019.

c.   At all times relevant to this Complaint, Aviron
Pictures, LLC, was a film production and distribution company based
in Los Angeles, California and formed under the laws of Delaware.
Aviron Pictures, LLC was founded in or about 2015, and participated
in the distribution of a number of films in the United States,
including *My All American* (2015), *Kidnap* (2017), *The Strangers:
Prey at Night* (2018), *A Private War* (2018), *Destination Wedding*
(2018), *Serenity* (2019), and *After* (2019).  SADLEIR and Aviron
Pictures, LLC operated through multiple related legal entities
also based in Los Angeles, California, and formed under the laws
of Delaware, including Aviron Capital, LLC, Aviron Releasing, LLC,
Aviron 1601, LLC, MAA Releasing, LLC, and Aviron Group, LLC, among

3

other entities (collectively referred to herein as "Aviron").[1]
Aviron Group formally operated as a holding company for Aviron
Pictures, Aviron Capital, and Aviron Releasing.

       d.   Temerity Trust Management, LLC ("Temerity Trust")
was an entity controlled and used by SADLEIR to hold his ownership
interests in Aviron Group, among other things.  SADLEIR also used
Temerity Trust to establish a sham entity used in furtherance of
the fraudulent scheme charged in Count One, and to purchase real
estate using the proceeds of that scheme.  According to the Limited
Liability Company Agreement for Temerity Trust, SADLEIR's spouse
(the "Spouse") formed Temerity Trust under the laws of the State
of Delaware on or about October 14, 2015, and at or about the time
of its formation the Spouse was its sole member.[2]  As of at least
in or about 2017, SADLEIR held himself out as the Managing Member
of Temerity Trust.

       e.   An individual referred to herein as the "Aviron IT
Employee" was an information technology specialist employed by
Aviron from at least in or about 2017 through in or about April
2020.

## OVERVIEW OF THE FRAUDULENT SCHEMES

    6.   As set forth below, WILLIAM SADLEIR, the defendant,
participated in two fraudulent schemes (together, the "Schemes")
relating to an approximately $75 million investment made by the
Fund in Aviron.

    7.   In one of the schemes (the "Advertising Scheme"),
WILLIAM SADLEIR, the defendant, misappropriated millions of
dollars in funds from Aviron that had been invested in Aviron by
the Fund.  SADLEIR represented to the Fund that this money had
been invested by Aviron in pre-paid media credits[3] with the
advertising placement company MediaCom Worldwide, LLC
("MediaCom"), which is a subsidiary of the advertising and media
agency GroupM Worldwide Inc. ("GroupM Worldwide").  Instead,
SADLEIR, using the bank account for a sham entity he had created,
illicitly transferred out of Aviron over $25 million of those
funds.  Specifically, SADLEIR created a sham New York-based company

---

[1] When discussed individually herein, each of these entities is
referred to without the "LLC" aspect of its legal title.

[2] The Spouse was also employed by Aviron.

[3] Pre-paid media credits, also referred to as "up fronts," are
advance payments for media advertising that can be redeemed for
specific media advertising at a later time.

called GroupM Media Services, LLC (the "Sham GroupM LLC") designed
to appear as if it was the legitimate entity, GroupM
Worldwide, and a corresponding bank account in the name of that sham entity.
SADLEIR then used a significant portion of those illicitly
transferred funds for his personal benefit, including to purchase
a private residence in Beverly Hills for approximately $14 million.
SADLEIR then falsely represented to the Fund that Aviron had
purchased an approximately $27 million balance in pre-paid media
credits with MediaCom that were available to promote future Aviron
films, and pledged a portion of those credits to the Fund as
collateral for additional loans, when in fact the claimed credits
did not exist due to SADLEIR's misappropriation.  As part of these
false representations, SADLEIR also created a fake identity of a
purported New York-based female employee of the Sham GroupM LLC
named "Amanda Stevens" who corresponded with a representative of
the Fund, ensuring the Fund that Aviron had an approximately $27
million balance in pre-paid media credits with the Sham GroupM
LLC.   In fact, SADLEIR himself posed as Amanda Stevens when
engaging in email exchanges with a representative from the Fund.

8.    In the other scheme (the "UCC Scheme"), WILLIAM SADLEIR,
the defendant, engineered the illicit and fraudulent sale and
refinancing of assets worth an estimated $3 million that secured
the Fund's loans to Aviron.  The Fund had secured its investment
in Aviron by, among other means, obtaining UCC liens in 2017 and
2018 on certain intellectual property and other assets relating to
Aviron's films.  In 2019, SADLEIR used the forged signature of one
of the Fund's portfolio managers ("Manager-1")[4] on releases to
remove the Fund's UCC liens on certain of these secured assets in
order to sell or refinance them without the Fund's consent, thus
depriving the Fund of its collateral on outstanding loans, loans
on which Aviron ultimately defaulted.

## THE ADVERTISING SCHEME

### Background

9.    From reviewing documents provided by the Fund, a bank
headquartered in New York, New York ("Bank-A"), a bank
headquartered in Pasadena, California ("Bank-B"), GroupM Worldwide
and MediaCom, and an escrow company that assisted WILLIAM SADLEIR,
the defendant, in his purchase of residential property (the "Escrow
Company"), I have learned the following, in substance and in part:

_____

[4] Manager-1 was a Managing Director at one of the Sub-Advisers.

a.   Aviron Pictures and MediaCom entered into a Master Services Agreement made effective as of on or about August 1, 2015 (the "2015 MediaCom Agreement"), which included a provision providing for the pre-purchase of discounted media by Aviron Pictures from MediaCom and its affiliate GroupM Worldwide. MediaCom and GroupM Worldwide are both based in New York, New York.

b.   On or about October 20, 2015, the Fund agreed to extend credit to Aviron Capital, a financing affiliate of Aviron Pictures, to finance prints, advertising, marketing, and promotion of feature-length motion pictures pursuant to a credit and security agreement (the "Credit Agreement").  The Credit Agreement provided for an initial loan of $12 million to finance the distribution of the film *My All American*, among other things, and further provided that the Fund may provide subsequent loans to finance additional films.  The Credit Agreement also gave the Fund a security interest in intellectual property and other assets relating to *My All American*.  SADLEIR signed the Credit Agreement in his capacity as the Manager of Aviron Capital.  On the same date, October 20, 2015, Aviron Group, which owned all equity in Aviron Capital and Aviron Pictures, separately agreed to pledge its equity interests in those wholly owned subsidiaries as collateral for the Fund's extension of credit to Aviron Capital (the "Equity Pledge Agreement"). SADLEIR signed that agreement in his capacity as President of Aviron Group.

c.   Also on or about October 20, 2015, the Fund wired approximately $12 million to an Aviron Capital account at Bank-B with account number ending in 5748 ("Aviron Capital Bank Account-1").  At the time, SADLEIR was one of the individuals with signatory authority over Aviron Capital Account-1.

d.   On or about October 7, 2016, a certificate of formation for the Sham GroupM LLC was filed in Delaware.  According to the Limited Liability Company Agreement for the Sham GroupM LLC, its Manager was SADLEIR and its sole member was Temerity Trust (whose Manager was listed as the Spouse).

e.   On or about October 18, 2016, SADLEIR opened an account at Bank-A in the name of the Sham GroupM LLC with account number ending in 8082 (the "Sham GroupM Bank Account").  Statements for the Sham GroupM Bank Account were mailed to the same address on Wilshire Boulevard in Los Angeles, California as account statements for Aviron.

f.   On or about October 19, 2016, the Credit Agreement was amended to provide for, among other things, the financing of

6

an additional film, *Drunk Parents*.[5]  The amendment provided that the entity Aviron 1601, LLC could serve as the direct borrower for certain funds provided by the Fund in connection with *Drunk Parents*.  SADLEIR signed the amendment in his capacity as the Manager of Aviron Capital and the Manager of Aviron 1601.

g.  On or about October 20, 2016, a Statement of Information for the Sham GroupM LLC was filed with the California Secretary of State, listing the entity's place of organization as Delaware, its Manager as "William K. Sadleir," and its agent for service of process as the Spouse.

h.  On or about January 12, 2017, Aviron Pictures, the Fund, and MediaCom entered into a letter agreement providing, in substance and in part, that, upon request, unused funds from media pre-purchases would be refunded to the Fund (or to Aviron, with the Fund's consent).  SADLEIR signed the agreement in his capacity as Manager of Aviron Pictures.

## SADLEIR's Use of the Sham GroupM LLC
## to Misappropriate Investor Funds

10.  From reviewing materials provided by the Fund, Bank-A, Bank-B, GroupM Worldwide and MediaCom, and the Escrow Company, I have learned the following, in substance and in part:

a.  On or about February 24, 2017, the Fund wired approximately $21 million to an account in the name of Aviron 1601, LLC, at Bank-B, with account number ending in 8642 (the "Aviron 1601 Bank Account"), pursuant to the Credit Agreement.  At the time, WILLIAM SADLEIR, the defendant, was one of the individuals with signatory authority over the Aviron 1601 Bank Account.  Per agreement with the Investment Adviser, monthly statements for the Aviron 1601 Bank Account were sent to both Aviron and the Investment Adviser.  Three days later, on or about February 27, 2017, SADLEIR caused $12,134,000 to be wired from the Aviron 1601 Bank Account to the Sham GroupM Bank Account.  From reviewing bank statements for the Sham GroupM Bank Account, the only expenditure I was able to locate that appeared to relate to media or advertising purchases or expenses was one $150,000 cashier's check drawn on the account on or about March 20, 2017 that was made out to "MEDIACOM" from "Aviron Pictures" for the film *Drunk Parents*.[6]

---

[5] Aviron Pictures ultimately did not serve as the distributor for *Drunk Parents*.

[6] It does not appear that the Sham GroupM LLC's name would have

Many of the other expenditures reflected in that account include what appear to be personal expenditures by SADLEIR, such as the following:

       i.  A $420,000 wire transfer on or about June 21, 2017 to the Escrow Company for a down payment on a residence in Beverly Hills (the "Beverly Hills Residence") that SADLEIR agreed to purchase on or about June 16, 2017 through Temerity Trust for approximately $14 million.

       ii.  Thousands of dollars in other expenditures in connection with SADLEIR's purchase of the Beverly Hills Residence, such as a wire of approximately $35,000 on or about September 21, 2016 to an interior design firm and checks totaling approximately $1,776 for chimney inspectors in or about the summer of 2017.

       iii.  An approximately $27,000 wire transfer on or about September 19, 2017 to a private jet charter company.

       iv.  An approximately $127,000 payment to Tesla Motors on or about October 11, 2017. From reviewing SADLEIR's Department of Motor Vehicles records, I have learned that he currently owns a 2017 Tesla Model X.

       b.  On or about July 17, 2017, the Fund and Aviron Capital entered into a note purchase and security agreement (the "2017 Note Purchase Agreement") to refinance the credit arrangements under their earlier agreements and to provide capacity to finance the distribution of additional movies by Aviron, including *Kidnap*. The 2017 Note Purchase Agreement increased the amount of credit extended by the Fund to $75 million. The agreement also gave the Fund a security interest in certain intellectual property and other assets relating to the films *My All American*, *Drunk Parents*, *Kidnap*, and potential future Aviron films. SADLEIR signed the agreement in his capacity as Manager of Aviron Capital. Also on or about July 17, 2017, the Fund entered into an omnibus amendment agreement with Aviron Group, Aviron Pictures, and MAA Releasing, providing, among other things, and in substance and in part, that all references to the Credit Agreement in the Equity Pledge Agreement would be replaced by references to the 2017 Note Purchase Agreement, and affirming that the Equity Pledge Agreement would remain in effect. SADLEIR signed the

---

been printed on this cashier's check. Rather, the bank records indicate that it would have appeared to have been a check from Aviron Pictures.

amendment in his capacity as Manager of Aviron Group, Aviron Pictures, and MAA Releasing.

c.    On or about July 18, 2017, the Fund wired $40,629,615.63 to Aviron Capital Bank Account-1. Also on or about July 18, 2017, SADLEIR sent an email from a particular Aviron email address ("Sadleir Aviron Email Account-1") to a representative of Bank-B, stating, in substance and in part, that "Aviron Capital should be receiving an incoming wire from [the Fund] today in the amount of 40,696,615.63 to its collection account, number ending in 5748," and providing instructions for the transfer of some of those funds.  A portfolio manager for the Fund ("Manager-2")[7], and others, were copied on the email.  A portion of those funds appears to have been misappropriated by SADLEIR to pay for the purchase of the Beverly Hills Residence through the following series of transfers:

i.    On or about August 10, 2017, approximately $9,475,000 was wired from Aviron Capital Bank Account-1 to an Aviron Capital account at Bank-A with account number ending in 3036 ("Aviron Capital Bank Account-2").  At the time, SADLEIR was one of the individuals with signatory authority over Aviron Capital Bank Account-2.  Approximately two months later, on or about October 11, 2017, an additional approximately $4,250,642 was wired from Aviron Capital Bank Account-1 to Aviron Capital Bank Account-2.

ii.    On or about October 16, 2017, approximately $13,525,000 was transferred from Aviron Capital Bank Account-2 to the Sham GroupM Bank Account.

iii.    On or about October 17, 2017, approximately $13,515,156.60 was wired from the Sham GroupM Bank Account to the Escrow Company to pay for the Beverly Hills Residence.  The nominal purchaser of the Beverly Hills Residence was Temerity Trust, but SADLEIR executed the purchase and escrow documents for the Beverly Hills Residence as the Managing Member of, and Authorized Signor for, Temerity Trust, and the Escrow Company that facilitated the purchase dealt directly with SADLEIR as a representative of Temerity Trust.  For example, in a June 21, 2017 email, a representative of the Escrow Company emailed SADLEIR at Sadleir Aviron Email Account-1, and said, in substance and in part, "Hello Mr. Sadleir: Attached please find opening escrow paperwork for your purchase [of the Beverly Hills Residence]."

---

[7] Manager-2 was a Director at one of the Sub-Advisers.

### SADLEIR's Continued Misrepresentations Concerning the Sham GroupM LLC to Secure Additional Investment Funds

11.  From reviewing materials provided by the Fund, including emails, an audio recording, and other materials; documents provided by Bank-A; and documents from GroupM Worldwide and MediaCom, as well as from speaking with a representative of GroupM Worldwide, I have learned the following, in substance and in part:

a.  On or about March 12, 2019, WILLIAM SADLEIR, the defendant, sent an email to Manager-2 purporting to detail the substantial pre-paid media credit assets held by Aviron Pictures' financing affiliate, Aviron Capital.  The email attached the 2015 MediaCom Agreement and documents "reflecting the payments to GroupM Media Services," and stated:

> Some of the payments were wired from other banks, and the payments Aviron Capital made were bank account transfers since GroupM banks at [Bank-A], as do we. . . .  I'll track down and forward the emails that detail how to have our own media planning company coordinate with GroupM's media traffic desk to apply our banked national television media towards specific television campaigns for films being released by Aviron Pictures.

The signature block for SADLEIR's email included a cellphone number ending in 6969 (the "Sadleir Cellphone Number").  One of the attached documents was an accounting spreadsheet that purports to reflect a total of $28,597,000 in pre-paid media credits purchased by Aviron Capital between in or about November 2016 and in or about January 2018.

b.  On or about March 15, 2019, Manager-2 sent an email to SADLEIR at another Aviron email address ("Sadleir Aviron Email Account-2"), copying Manager-1, and stating, in substance and in part, that the Fund needed resolution about whether $10 million of Aviron Capital's unused pre-paid media credits could be relied on as collateral for potential additional loans from the Fund.  On or about March 18, 2019, SADLEIR responded to Manager-2 from Sadleir Aviron Email Account-2, copying Manager-1, stating, in substance and in part, "we have confirmation from GroupM that the national television media that was banked remains available to Aviron Pictures to use on future Aviron films, regardless of the fact that we no longer use MediaCom (a GroupM company) as our advertising agency."  Manager-2 in turn responded to SADLEIR at Sadleir Aviron Email Account-2, copying Manager-1, stating, in substance and in part, "[w]ithout receiving something in writing from Group M, we have little certainty that they would take

direction from us. Perhaps, you could share a contact at the comp[any [sic] and we would be glad to speak to them." SADLEIR replied to Manager-2 from Sadleir Aviron Email Account-2, copying Manager-1, stating, in substance and in part, "GroupM wouldn't take direction from you because the contract is exclusively with Aviron Pictures. But, we'd take direction for you."

c.   On or about March 22, 2019 and on or about March 25, 2019, the Fund, SADLEIR, Aviron Capital, and Temerity Trust signed agreements providing for the extension of an additional $10 million in loan funds for use in connection with the film *After*. Under these agreements, SADLEIR and Temerity Trust pledged their entire membership interests in Aviron Group to secure the loans from the Fund, with the entities owned by Aviron Group listed as including Aviron Pictures; Aviron Releasing; and Aviron Capital and its wholly owned subsidiaries, including MAA Releasing, LLC, Aviron 1601, LLC, Aviron 1701, LLC, Aviron 1702, LLC, Aviron 1704, LLC, Aviron 1705, LLC, Aviron 1706, LLC, and Aviron 1801, LLC. Aviron Capital agreed to use unused pre-paid media credits with "Group M, the parent of Mediacom" as collateral for the $10 million in loans. SADLEIR was a signatory to those agreements on his own behalf, and also in his capacity as Manager of both Aviron Capital and Temerity Trust.

d.   Between on or about March 25 and on or about March 26, 2019, the Fund wired a total of approximately $10 million to an Aviron Capital account at Bank-A with account number ending in 0956 ("Aviron Capital Account-3"). At the time, SADLEIR was one of the individuals with signatory authority over Aviron Capital Account-3.

e.   In a letter dated July 1, 2019 (but actually sent on or about July 9, 2019), the Fund notified Aviron Capital, in substance and in part, that Aviron Capital was in default on its loan payments and other obligations.

f.   On or about September 16, 2019, an individual in the finance and accounting department at Aviron Pictures sent an email to Manager-2, copying SADLEIR at Sadleir Aviron Email Account-2, stating, in substance and in part, that the email was attaching documents constituting the "backup given to the CPAs for the $28,522,000 in Prepaid Media." Those documents included, among other things, purported MediaCom forms showing the pre-purchase of approximately $27 million in media for Aviron, with instructions that funds for the pre-purchase of media be wired to the Sham GroupM Bank Account. Four separate such forms, each bearing SADLEIR's signature, memorialize the following approximate purported purchase amounts on or about the following dates:

11

       i.       October 18, 2016: $2,557,800

      ii.       December 13, 2016: $460,000

     iii.       February 17, 2017: $12,134,200

      iv.       October 10, 2017: $13,525,000[8]

12. Based on my discussion with a representative of MediaCom, I have learned that these purchases never took place, and that in or about September 2019 Aviron did not have a pre-paid media balance with MediaCom or GroupM Worldwide.

### SADLEIR's Use of the Fake "Amanda Stevens" Identity to Deceive the Fund into Continuing its Support of Aviron

*Sadleir Directs the Establishment of the Sham Company's Web Presence and the "Amanda Stevens" Email Account*

13. From reviewing materials provided by the Fund, GroupM Worldwide and MediaCom, telephone service providers T-Mobile, Axion Communications ("Axion"), and Bandwidth.com, and internet domain name registrar and website hosting and email service provider GoDaddy.com, LLC ("GoDaddy"), as well as from speaking with a representative of Axion and reviewing publicly available content on the internet, I have learned the following, in substance and in part:

    a.   The domain name "groupm-ms.com" was registered with GoDaddy using a GoDaddy customer account (the "GoDaddy Account") on or about November 12, 2019. The administrator of the GoDaddy Account (the "GoDaddy Account Administrator") identified themselves to GoDaddy as "William Sadleir," residing at the Beverly Hills Residence, and having the email address groupmms212@gmail.com (the "GroupM Gmail Address") and the Sadleir Cellphone Number. The name "William Sadleir" was also provided as the technical, administrative, and billing contact for the GoDaddy Account, and the domain and email hosting fees for groupm-ms.com were paid for with an American Express card in the name of "William Sadleir" with account number ending in 2000. However, as discussed below, based on my review of customer service audio recordings and phone records, it appears that the GoDaddy Account Administrator was actually the Aviron IT Employee, who established and

---

[8] No bank wiring information was listed on the October 10, 2017 form.

administered the GoDaddy Account for WILLIAM SADLEIR, the
defendant.

       b.    The email address "a.stevens@groupm-ms.com" (the
"Stevens Email Account") was also established through the GoDaddy
Account on or about November 12, 2019.  The purported user of the
Stevens Email Account was listed as "Amanda Stevens" and as being
located in the United States.  However, as discussed in greater
detail below, based on my review of IP records, it appears that
SADLEIR was actually the user of the Stevens Email Account after
it was established by the Aviron IT Employee.

       c.    There is currently no website content hosted at the
internet URL www.groupm-ms.com.  However, from reviewing
historical internet content available at a website that preserves
archives of webpages, I was able to review content for that
website, and a screen capture of that content is posted below:



d.    For the sake of contrast, a screen capture[9] of the legitimate website for GroupM Worldwide, located at the URL www.groupm.com, is depicted below:



e.    Also on or about November 12, 2019, the same day the Stevens Email Account was established, the Aviron IT Employee contacted a representative of Axion ("Axion Representative-1") both by telephone (with a number ending in 2155, hereinafter the "Aviron IT Employee Cellphone Number")[10] and through email (using the GroupM Gmail Address) about establishing a voicemail account on Axion's network that would have a 212 area code.  As discussed above, both MediaCom and its parent company GroupM Worldwide are based in New York, New York, and the 212 area code is associated with that area.  Axion's customer service system automatically recorded a series of telephone calls from the Aviron IT Employee on or about November 12, 2019.  During one of those calls, in substance and in part, the Aviron IT Employee stated that he had a "dilemma" for which he needed a "solution," that he needed to set up a number with a 212 area code and a voicemail box, and that he did not need the 212 number to be capable of placing outgoing calls.  Axion Representative-1 noted that he did not have any 212 numbers available for purchase, but that the Aviron IT Employee could try purchasing a 212 number from another provider and

---

[9] This screen capture was taken on or about March 8, 2020.
[10] In T-Mobile records, the subscriber for the Aviron IT Employee Cellphone Number is listed as the Aviron IT Employee, although with a different spelling of his first name.

Case 1:20-mj-05114-UA   Document 1-1   Filed 05/18/20   Page 15 of 12

transferring it to Axion to set up a voicemail box.  The Aviron IT Employee replied, in substance and in part, "I got to talk to my boss about this and then I will, I will hit you back up."  In a subsequent call on the same day, the Aviron IT Employee informed Axion Representative-1, in substance and in part, that the Aviron IT Employee was able to purchase a 212 number from another service provider, and began arranging to have that number "ported" (*i.e.*, transferred) to the Axion network.  Toll records show that the Sadleir Cellphone Number and the Aviron IT Employee Cellphone Number exchanged calls on or about November 12, 2019 after the Aviron IT Employee Cellphone Number contacted Axion and stated that he needed "to talk to my boss about this," as reflected in the table below:

| Time[11] | Caller | Recipient | Duration |
|---|---|---|---|
| 10:57 a.m. | Aviron IT Employee | Axion[12] | 5:29 |
| 1:35 p.m. | Aviron IT Employee | Axion | 1:20 |
| 3:33 p.m. | Aviron IT Employee | Axion | 3:25 |
| 3:39 p.m. | Aviron IT Employee | Axion | 3:33 |
| 4:23 p.m. | SADLEIR | Aviron IT Employee | 3:02 |
| 4:26 p.m. | Aviron IT Employee | SADLEIR | 1:15 |

      f.    On or about November 13, 2019, the Aviron IT Employee emailed Axion Representative-1 from the GroupM Gmail Address, in substance and in part, "can you setup the email [for the account] to the following and make the name Amanda instead of Eddie please. a.stevens@groupm-ms.com".  Axion Representative-1 replied to the GroupM Gmail Address, in substance and in part, "Email address updated. The name on the extension isn't used for anything, so I just left it as Eddie so if you call in the guys can find it easier."  On or about the same day, the GoDaddy Account Administrator set up a two-factor authentication protocol for the GoDaddy Account with a cellphone number ending in 2155 (the "2155 Authentication Number"), pursuant to which the user of the account would be required to provide an authentication number texted to that cellphone number in addition to using a standard password to make certain changes to the account.  GoDaddy account records do not list the first six digits of the 2155 Authentication Number, but, as noted above, the Aviron IT Employee Cellphone Number also ends in 2155, and thus they appear to be the same phone number. Further, I have compared Axion customer service audio recordings of the Aviron IT Employee with GoDaddy customer service audio

---

[11] All times listed in this Complaint are in Pacific Standard Time unless otherwise noted.

[12] From reviewing documents provided by Axion, I learned Axion's office telephone number, which ends in 1414.

recordings of the GoDaddy Account Administrator, and based on that comparison the Aviron IT Employee appears to be the GoDaddy Account Administrator.  Thus, it appears that SADLEIR enlisted the Aviron IT Employee in establishing a website for the Sham GroupM LLC and an email account and voicemail box for "Amanda Stevens."

### *Sadleir Uses the "Amanda Stevens" Email Account to Deceive the Portfolio Manager*

g.  On or about November 13, 2019, SADLEIR, using Sadleir Aviron Email Account-2, sent an email to the Stevens Email Account, copying Manager-2, and stating, in substance and in part, "Dear Ms. Stevens: I understand you are likely the person who can validate the available media balance on account for Aviron Pictures.  Aviron participated in the up-fronts in late 2016 and again in 2017, but has not yet applied the media towards marketing campaigns for our films.  Can you please send me an accounting of the Aviron Pictures media balance, along with information about how it can be used, including possible refunds, and the equivalent gross rating points associated with the purchased media?"  The Stevens Email Account responded to SADLEIR at Sadleir Aviron Email Account-2, copying Manager-2, on or about November 14, 2019, and stating, in substance and in part, "Mr. Sadleir: We changed our tracking systems earlier this year.  To facilitate my search and provide the information that you're requesting, please tell me who is (or was) Aviron Picture's media agency of record when the media purchases were made?  Sincerely, Amanda."  The signature block for that email is reproduced below:



The phone number listed in that signature block, (212) 299-4768, is hereinafter referred to as the Stevens Phone Number.

h. On or about November 14, 2019, the Aviron IT Employee sent an email from his gmail account (the "Aviron IT Employee Gmail Address") to Axion Representative-1 with paperwork for transferring the Stevens Phone Number from another service provider to the Axion network. That document identified the existing billing contact information for the Stevens Phone Number as "William Sadleir" at the Beverly Hills Residence.[13]

i. On or about November 15, 2019, the Stevens Email Account sent an email to SADLEIR at Sadleir Aviron Email Account-2, copying Manager-2, stating the following, in substance and in part:

> The summary balance report for Aviron is attached. There remains a credit of $27,650,000 in total unused media purchases. Except for $250,000 for print in 2017, all of the media was purchased through the Up-front process for years 2017 and 2018. Unused media purchased in conjunction with broadcast Up-fronts is refundable only the participation year, and then only with a 90-day advance notice. . . . Finally, although the media credits are generally not transferable to other clients, we have worked creatively in past situations to help recover value for a client when their media requirements change.

SADLEIR responded to the Stevens Email Account on or about November 22, 2019 from Sadleir Aviron Email Account-2, copying Manager-2, stating, in substance and in part, "can you please provide some times you might be available for a call with me and my colleague, [Manager-2], to review the possible options that you mention in your last paragraph in the email below?" The Stevens Email Account responded to SADLEIR at Sadleir Aviron Email Account-2, copying Manager-2, "I'm away for the Thanksgiving holiday until December 2 but can speak with you and [Manager-2] upon my return, if necessary." Manager-2 replied to the Stevens Email Account, also including SADLEIR at Sadleir Aviron Email Account-2, "Hi Amanda, Thank you for the response. Can we proceed with setting up a time to discuss upon your return."

j. Also on or about November 15, 2019, the Aviron IT Employee sent an email from the Aviron IT Employee Gmail Address

---

[13] From reviewing documents provided by Google, I have learned, in substance and in part, that the account holder for the Aviron IT Employee Gmail Address is the Aviron IT Employee and that the phone number provided by that account holder for account authentication and recovery purposes is the Aviron IT Employee Cellphone Number.

to Axion Representative-1 stating, in substance and in part, "Can you please change the VM e-mail name to Amanda. Please....." Axion Representative-1 responded, in substance and in part, "It's already set to a.stevens@groupm-ms.com. Do you need me to change something else?" The Aviron IT Employee replied, in substance and in part, "Just the name that show's up when a VM message is e-mailed to that address. It say[s] Eddie."

k.     The Stevens Phone Number was assigned to the Axion telephone network between on or about November 15, 2019 and on or about March 6, 2020.  During that time frame, the Stevens Phone Number did not place any outgoing calls.

l.     On or about December 3, 2019, the Stevens Email Account emailed Manager-2 and SADLEIR at Sadleir Aviron Email Account-2, in substance and in part, "[Manager-2]: I followed up yesterday with my colleague who is pulling together the media details that Mr. Sadlier [sic] requested.  He should have it completed by tomorrow.  It's our busiest time of year, so please excuse the delay."

m.     On or about December 16, 2019, the Fund sent a letter to SADLEIR, Aviron Pictures, Aviron Capital, and Aviron Group, asserting that the Fund would exercise its rights to collateral under the loan and security agreements between the Fund and those entities to take ownership of Aviron Pictures and Aviron Capital and replace SADLEIR as Manager of those entities.

n.     On or about December 17, 2019, the Fund filed a lawsuit against SADLEIR and Aviron in New York Supreme Court, seeking, among other things, to have SADLEIR removed from his positions at Aviron Pictures and Aviron Capital.  The lawsuit was initially filed on an *ex parte* basis, and sought a temporary restraining order, which was granted on the same day the lawsuit was filed.

o.     The next day, on or about December 18, 2019, the Fund served a copy of the temporary restraining order on SADLEIR and Aviron.

p.     On or about December 19, 2019, the Fund's request for a preliminary injunction removing SADLEIR from his position at Aviron Pictures and Aviron Capital was granted, and the Fund was permitted to select a replacement Manager for those entities.

q.     On or about January 6, 2020, GoDaddy records show a login to the Stevens Email Account from an IP Address registered to SADLEIR at the Beverly Hills Residence (the "Sadleir IP

18

Address").[14] The Sadleir IP Address also logged in to the Stevens Email Account on or about January 20, 21, 22, 23, 24, 27, 28, 29, 30, and February 17.

r. On or about January 16, 2020, the replacement Manager for Aviron Pictures and Aviron Capital selected by the Fund (the "Replacement Manager"), sent an email to the Stevens Email Account, stating, in substance and in part, "Hi Amanda, I just left you a voice mail. I'm the new manager of Aviron Pictures. . . . I'd like to talk to you about the pre-paid media contract summary, attached." The Stevens Email Account responded, in substance and in part, "My authorized contact at Aviron is Mr. Sadleir [sic]. Can you either have him confirm by email that you are now the authorized representative of Aviron Pictures or provide some other evidence upon which I can rely in responding to you. Also, I'm on maternity leave, but working from home. If you can please email the questions you have, I'll do my best to provide answers as quickly as possible."

s. On or about January 22, 2020, the Stevens Email Account sent an email to the Replacement Manager, stating, in substance and in part, "I received your voicemail message. Please send me an email with any questions, and I'll do my best to respond as quickly as possible. Thank you, Amanda". The Replacement Manager responded, in substance and in part, "We're requesting full refund of the unused portion of the pre-paid media. It's likely best to talk to you directly to discuss the process and timing." The Stevens Email Account replied, in substance and in part, "We have already discussed this subject with Mr. Sadlier [sic] at considerable length. I suggest you confer with him. . . . I provided a general accounting to Mr. Sadlier [sic] of the possible 'credits' that may be available at the various networks."

t. On or about January 29, 2020, SADLEIR, using Sadleir Aviron Email Account-2, sent an email to the Stevens Email Account asking, in substance and in part, for an updated pre-paid media credits report. On or about January 30, the Stevens Email Account responded to SADLEIR at Sadleir Aviron Email Account-2, adding the Replacement Manager as a recipient for the email and attaching a list of media credits purportedly belonging to Aviron that totaled approximately $27,650,000, and stating, in substance and in part, "[w]hen you're ready to use the credits, simply have your Agency of Record contact me, preferably with a media plan, and we'll notify the various media companies." The Replacement Manager responded on or about February 4, 2020, dropped SADLEIR from the email chain and added others, and asked, in substance and

---

[14] GoDaddy does not possess IP login data for earlier dates.

in part, for additional documentation concerning Aviron's pre-paid media credits.  The Replacement Manager also noted that "neither Mr. Sadleir nor any other person or entity has the authority to direct you how to use those credits except for me/Aviron Pictures LLC."

u.  On or about January 30, 2020, counsel for Aviron Pictures sent a letter to the Stevens Email Account, stating, in substance and in part, "demand is hereby made for a refund to Aviron for unused Pre-Paid Media in an amount of at least $27.65 million."

v.  On or about February 6, 2020, the Stevens Email Account sent an email to the Replacement Manager, copying others, and stating, in substance and in part, "I will be sending a reply later today to the letter we received from Aviron's attorney." The Replacement Manager responded the next day, on or about February 7, stating, in substance and in part, that he had not yet received the reply letter, and asking for confirmation of the email address of GroupM Worldwide's general counsel (the "GroupM Worldwide General Counsel").

w.  On or about February 7, 2020, outside counsel for Aviron Pictures sent a letter to the GroupM Worldwide General Counsel, copying "Amanda Stevens" and others, and, in substance and in part, reiterating a demand for a refund of Aviron Pictures' pre-paid media credits.  The letter also noted that "[a] copy of our letter, dated January 30, 2020, to your colleague Amanda Stevens on this matter is attached hereto."

x.  On or about February 8, 2020, the Stevens Email Account sent an email to the Replacement Manager, copying SADLEIR at Sadleir Aviron Email Account-2, counsel for Aviron, an associate of the Replacement Manager, and Manager-2, and stating, in substance and in part, "This is in response to the demand for a refund notice that we received from Aviron Picture's attorney, dated January 30, 2020. We are not aware of any previous requests by Aviron for a refund, as claimed in [Aviron's counsel]'s letter. Nonetheless, it is our position that no refunds will be made by GroupM Media Services or any of the associated media companies and that only media credits remain available to Aviron."

y.  On or about February 24, 2020, the GroupM Worldwide General Counsel sent an email from her email address, ending in "@groupm.com," to outside counsel for Aviron Pictures, stating, in substance and in part, "I acknowledge receipt of your letter dated 7 February 2020. Please note my correct contact details.  I note that you have sent the letter to an Amanda Stevens, I have no

record of such a person so please do let me know if you have received any response.  I will look into this matter with the agency concerned and revert to you as soon as possible."

z.   On or about February 25, 2020, a call placed to the Stevens Phone Number was directed to a voicemail box, which played the following recorded message, in substance and in part, in what appears to be a woman's voice: "Hi, this is Amanda Stevens at GroupM Media Services.  I'm either on a call or away from my desk. Please leave your name, number, and a brief message, and I'll get back to you.  Thank you."

aa.   On or about February 28, 2020, the GoDaddy Account Administrator (who, as discussed above, appears to be the Aviron IT Employee) deleted the mailbox for the Stevens Email Account. Also on that date, SADLEIR and the Aviron IT Employee exchanged a series of calls, and shortly thereafter the Aviron IT Employee called Axion, as detailed in the table below:

| Date/Time | Caller | Recipient | Duration |
|---|---|---|---|
| 1:55 p.m. | SADLEIR | Aviron IT Employee | No connect. |
| 1:55 p.m. | Aviron IT Employee | SADLEIR | 0:03 |
| 1:57 p.m. | Aviron IT Employee | SADLEIR | 5:37 |
| 2:11 p.m. | Aviron IT Employee | SADLEIR | 1:09 |
| 2:33 p.m. | Aviron IT Employee | Axion | 2:44 |

Axion's customer service system automatically recorded the telephone conversation between the Aviron IT Employee and an Axion representative ("Axion Representative-2") on or about February 28, 2020.  During that call, the Aviron IT Employee requested, in substance and in part, that Axion "cancel" the Stevens Phone Number and "just let it be a dead end."

bb.   On or about March 2, 2020, at approximately 10:23 a.m., the Aviron IT Employee Cellphone Number placed an approximately 10-minute phone call to the Sadlier Cellphone Number.  Approximately one hour after that call, between 11:22 a.m. and 11:29 a.m., GoDaddy records show that the GoDaddy Account Administrator cancelled his account registration and hosting of the domain groupm-ms.com.  Less than one hour later, at approximately 12:09 p.m., the Aviron IT Employee Cellphone Number placed a call to a GoDaddy customer service line.  The Aviron IT Employee Cellphone Number then placed two calls to Axion over the

21

course of the next several hours.  The following table details
this series of phone calls:

| Date/Time   | Caller              | Recipient  | Duration |
|-------------|---------------------|------------|----------|
| 10:23 a.m.  | Aviron IT Employee  | SADLEIR    | 10:08    |
| 12:09 p.m.  | Aviron IT Employee  | GoDaddy[15]| 8:22     |
| 12:58 p.m.  | Aviron IT Employee  | Axion      | 0:25     |
| 1:34 p.m.   | Aviron IT Employee  | Axion      | 4:54     |

From my review of Axion customer service recordings from on or
about March 2, 2020, I learned, in substance and in part, that in
the first phone call to Axion listed in the table above, the Aviron
IT Employee asked to speak with Axion Representative-1, but was
informed by Axion Representative-2 that Axion Representative-1 was
not in the office at the time.  In the second phone call, the
Aviron IT Employee asked Axion Representative-2, in substance and
in part, whether Axion had a means of looking up information about
a particular phone number to "see where it goes to," and claimed
that his question related to a call the Aviron IT Employee had
received from someone trying to serve legal documents on one of
his relatives regarding a debt.  Axion Representative-2 responded
that Axion previously used a particular website to look up
information about phone numbers, but that website was taken down.

          cc.     On or about March 4, 2020, the Aviron IT Employee
contacted the GoDaddy customer service line about the GoDaddy
Account, with customer service notes being made in the account's
electronic file between approximately 12:54 p.m. and 1:07 p.m.
Phone records show an approximately 28 minute call from the Aviron
IT Employee Cellphone Number to GoDaddy at or about 12:38 p.m. on
the same day.  The latter half of the ensuing call between the
Aviron IT Employee and a GoDaddy customer service representative
was recorded by GoDaddy.  In the beginning of the call, according
to GoDaddy customer service notes, the Aviron IT Employee stated,
in substance and in part, that the Aviron IT Employee had deleted
his domain with GoDaddy but that the Aviron IT Employee's account
information was still accessible on a GoDaddy internet domain
registration database.  As discussed above, that user account
information would have included the name "William Sadleir."[16]  A

---

[15] According to GoDaddy's website, (480) 463-8390 is one of the
numbers for its sales and support team.

[16] From reviewing documents provided by GoDaddy, I know that the
GoDaddy Account's user contact information was shielded by a
privacy service from on or about November 12, 2019 to on or about
March 2, 2020.  However, that information became visible on public

GoDaddy representative informed the Aviron IT Employee, who the
GoDaddy representative referred to as "William," in substance and
in part, that it takes time for user information to be removed
completely from GoDaddy's domain registration database, and "it is
true that your name is still there, but don't you worry. Like I
said, we will be able to make it disappear within this day."

   dd.    The next day, on or about March 5, 2020, the Aviron
IT Employee Cellphone Number placed a call to the Sadleir Cellphone
Number that lasted for approximately two minutes and 17 seconds.

   ee.    On or about March 7, 2020, the Aviron IT Employee
contacted the GoDaddy customer service line again about the GoDaddy
Account, with customer service notes being made in the customer
file between approximately 3:03 p.m. and 3:25 p.m.  Phone records
show an approximately 31 minute call from the Aviron IT Employee
Cellphone Number to GoDaddy at or about 2:53 p.m. on the same day.
The ensuing call between the Aviron IT Employee and a GoDaddy
customer service representative was recorded by GoDaddy.  On that
call, the Aviron IT Employee identified himself as "William," and
provided a customer number, PIN number, and a separate number
texted to the Aviron IT Employee(at the 2155 Authentication Number,
which as discussed above appears to be the Aviron IT Employee
Cellphone Number) during the call as part of a two-factor
authentication process.  The Aviron IT Employee stated, in
substance and in part, that his account information was still
accessible on a GoDaddy internet domain registration database
despite multiple requests to remove it, and that "I'm a very
private person and this was a venture I was going to do that I
decided not to and I'd like for it to be removed."  The GoDaddy
customer service representative responded, in substance and in
part, that the account information would be removed from GoDaddy's
internet domain registration database that day.

   ff.    Three days later, on or about March 10, 2020, the
Aviron IT Employee Cellphone Number placed a call to the Sadleir
Cellphone Number that lasted for approximately two minutes and
seventeen seconds.

   14.    From speaking with a representative of GroupM Worldwide
(the "Legitimate GroupM Representative"), I have learned, in
substance and in part, that the Sham GroupM LLC is not associated
in any way with GroupM Worldwide, and that neither the Stevens

---

internet domain registration databases when the GoDaddy Account
Administrator cancelled various account features, including a
privacy feature, when he deleted his domain registration on or
about March 2, 2020.

Email Account nor the Stevens Phone Number have ever been used by a GroupM Worldwide employee. Further, based on a review of records for employees in the United States, the Legitimate GroupM Representative has found no record of any GroupM Worldwide employee named "Amanda Stevens."

15. Based on the foregoing, it appears that the Sham GroupM LLC was created by WILLIAM SADLEIR, the defendant, to misappropriate funds that SADLEIR claimed were provided to GroupM Worldwide, that "Amanda Stevens" is a fake identity created at SADLEIR's direction, that the "Amanda Stevens" identity as well as the Stevens Email Account and domain groupm-ms.com were created at SADLEIR's direction to conceal and further SADLEIR's efforts to misappropriate investor funds, and that SADLEIR himself posed as Amanda Stevens when engaging in email exchanges with a representative from the Fund.

## THE UCC SCHEME

16. From reviewing documents provided by the Fund, including emails, contracts, affidavits and other documents filed in court by the Fund, and other materials, and documents provided by the Delaware Secretary of State, I have learned the following, in substance and in part:

   a. In or about 2017 and 2018, certain UCC filings were made in Delaware to secure the Fund's loans to Aviron. Specifically, those UCC filings secured the Fund's loan with certain intellectual property and other assets relating to the films *My All American*, *Drunk Parents*, *Kidnap*, *The Strangers: Prey at Night*, *Destination Wedding*, and potential future Aviron films.

   b. As discussed above, at least as early as on or about July 9, 2019, the Fund notified Aviron that it had defaulted on its loan payment obligations to the Fund.

   c. On or about July 15, 2019 and on or about September 16, 2019, a law firm representing Aviron arranged for the electronic filing of a total of approximately fourteen UCC amendments with the Delaware Secretary of State representing that the Fund consented to the deletion of its security interest in certain intellectual property and other assets that served as collateral for the Fund's loans to Aviron (the "Fraudulent UCC Filings"). Specifically, on or about July 15, 2019, an individual in the law firm's Los Angeles office filed a total of eleven UCC amendments relating to the Fund's secured interests in *My All American*, *Kidnap*, *The Strangers: Prey at Night*, and *Destination Wedding*, and on or about September 16, 2019, an individual in the

law firm's Manhattan office filed a total of three UCC amendments
relating to the Fund's secured interests in *The Strangers: Prey at
Night*. These UCC amendments allowed Aviron to sell or refinance
several of the movie rights that served as collateral for the
Fund's loans to Aviron. However, the Fund never in fact consented
to the Fraudulent UCC Filings or to the deletion of UCC liens on
the collateral set forth in those filings, and the representations
made to that effect in the filings were false. As set forth below,
the Fraudulent UCC filings appear to have been made based on
releases that contained forged signatures from a representative of
the Fund.[17]

      d.   The Fund has estimated that the assets sold or
refinanced by WILLIAM SADLEIR, the defendant, and Aviron as a
result of the Fraudulent UCC Filings were worth approximately $3
million.

      e.   On or about October 22, 2019, outside counsel for
the Fund sent an email to Aviron's general counsel at the time
(the "Former Aviron General Counsel"), copying several other
lawyers for the Fund, stating, in substance and in part, that lien
searches on behalf of the Fund had revealed several UCC filings
"releasing collateral" and that "We're trying to piece this all
together. We're familiar with the release for Strangers and
Destination Wedding (attached) but not the others or when/how [the
Fund] authorized the amendments. Can you give me a call to walk
me through this or let me know who I can contact at [Aviron's
outside counsel]?" The Former Aviron General Counsel responded on
or about October 24, 2019, copying, among others, SADLEIR, and
stated, in substance and in part, that he had "not reviewed" the
Fraudulent UCC filings but that counsel for the Fund were "fully
involved" and "may even have commented on the very UCCs about which
you are inquiring – so for sure [the Fund] knew what it was doing
and why."

      f.   On or about October 25, 2019, outside counsel for
the Fund sent another email to the Former Aviron General Counsel,
copying several other lawyers at the Fund, again inquiring about
the Fraudulent UCC filings and asking, in substance and in part,
"[w]ho is the best contact to discuss this with? Do you know who
at or on behalf of [the Fund] approved the UCC-3s?" SADLEIR
responded to that email (for which SADLEIR was not a recipient)
using Sadleir Aviron Email Account-2, without copying anyone else,

---

[17] The releases themselves do not appear to have been filed with
the Secretary of State's Office, but rather provided to counsel
for Aviron, who then filed the UCC amendments based on the
releases.

stating, in substance and in part, "I'm probably the best contact for now to discuss the license sales," and, in a later email sent the same day, that SADLEIR would "pull together funds flow you asked for" and that "[w]e'll get this cleaned up."

g.    On or about November 25, 2019, Manager-2 spoke with SADLEIR by phone.  During that call, SADLEIR stated, in substance and in part, that SADLEIR sold certain motion picture rights—to which the Fund had perfected security interests pursuant to the 2017 Note Agreement—to a third party (the "Third Party Buyer"), and that SADLEIR had done so to pay the outstanding liabilities of Aviron.  When Manager-2 informed SADLEIR that SADLEIR needed the Fund's approval to do so, SADLEIR admitted that he had "f----d up" and had taken the Fund's signature pages from an unrelated transaction to effectuate the fraudulent sale.  After this phone call, also on or about November 25, 2019, Manager-2 sent SADLEIR an email asking him, in substance and in part, to "share as promptly as possible the documents utilized to facilitate the sale of assets to the Third Party Buyer and the detailed funds received and the allocation of the same."  SADLEIR never responded to this email.

h.    On or about December 12, 2019, Los Angeles-based outside counsel for Aviron sent an email to Chicago-based outside counsel for the Fund attaching five purported signed releases from the Fund that supported the filing of the Fraudulent UCC Filings (the "Fraudulent Releases").  The Fraudulent Releases were dated between on or about July 12, 2019 and on or about July 17, 2019, related to interests in the films *My All American*, *Kidnap*, *The Strangers: Prey at Night*, and *Destination Wedding*.  Each of those releases bears the purported signature of Manager-1.

i.    As discussed above, on or about December 16, 2019, the Fund sent a letter to SADLEIR, Aviron Pictures, Aviron Capital, and Aviron Group, asserting that the Fund would exercise its rights to collateral under the loan and security agreements between the Fund and those entities to take ownership of Aviron Pictures and Aviron Capital and replace SADLEIR as Manager of those entities. The following day, on or about December 17, 2019, the Fund filed a lawsuit against SADLEIR and Aviron in New York Supreme Court, seeking, among other things, to have SADLEIR removed from his positions at Aviron Pictures and Aviron Capital.

j.    I have reviewed an affidavit signed by Manager-1, and filed in New York Supreme Court in connection with the Fund's lawsuit against SADLEIR and Aviron, in which Manager-1 stated, in substance and in part, that he did not sign the Fraudulent Releases or authorize them.  Manager-1's signatures on those documents

26

appear to have been created by copying Manager-1's signature from other documents and pasting it on the Fraudulent Releases.

WHEREFORE, deponent prays that an arrest warrant be issued for WILLIAM SADLEIR, the defendant, and that SADLEIR be imprisoned or bailed, as the case may be.


s/ Daniel Mardakhayev
ByKNF,USMJ

_____

DANIEL MARDAKHAYEV
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Attested to before me by reliable electronic means this
18th day of May, 2020

*Kevin Nathaniel Fox*

_____

HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# GLENN DECLARATION

# EXHIBIT "E"

SEC.gov | SEC Charges Owner of Film Distribution Company with Defrauding Publicly ...    Page 1 of 2

Press Release

---

# SEC Charges Owner of Film Distribution Company with Defrauding Publicly Traded Fund

**FOR IMMEDIATE RELEASE**
**2020-122**

*Washington D.C., May 22, 2020* — The Securities and Exchange Commission today announced charges against William Sadleir, the owner of a film distribution company, for defrauding a publicly traded fund of at least $13.8 million.

The SEC alleges that BlackRock Multi-Sector Income Trust (BIT), a registered closed-end management investment company, invested approximately $75 million in Aviron Group LLC, a film distribution company founded, owned, and operated by Sadleir. The complaint alleges that Sadleir represented that the investments would be used to support the company's distribution of films. Contrary to these representations, Sadleir allegedly used a sham company as a vehicle to fraudulently divert and misappropriate BIT funds and issued fake invoices seeking BIT funds for services that were never provided. Sadleir allegedly used the funds to pay personal expenses, including his purchase, furnishing, and renovation of a Beverly Hills mansion.

"When private companies and individuals solicit or accept investments, including from investment companies, they must comply with the federal securities laws," said Adam S. Aderton, Co-Chief of the Enforcement Division's Asset Management Unit. "We allege that Sadleir raided millions from BIT and its investors, and rather than using those funds for investment purposes he spent them lavishly on himself."

The SEC's complaint, filed in federal court in Manhattan, charges Sadleir with violating the antifraud provisions of the federal securities laws and seeks disgorgement of ill-gotten gains, civil penalties, and permanent injunctive relief.

In a parallel action, the U.S. Attorney's Office for the Southern District of New York today filed criminal charges against Sadleir.

The SEC's investigation, which is continuing, is being conducted by Salvatore Massa, Vincent T. Hull, and Brian Fitzpatrick of the Asset Management Unit, and Dugan Bliss and Kerri L. Palen of the New York Regional Office. The case was supervised by Andrew Dean of the Asset Management Unit. The SEC's litigation will be led by Mr. Bliss and Mr. Massa. The SEC appreciates the assistance of the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation.

###

## Related Materials

- SEC Complaint

Case 1:20-cv-03997-GK   Document 1   Filed 05/22/20   Page 1 of 13

**Andrew Dean**
**Dugan Bliss**
**Salvatore Massa**
**Vincent Hull**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**212-336-0971 (Bliss)**
**blissd@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | <u>**COMPLAINT**</u> |
| **Plaintiff,** | **20 Civ. 3997** |
| **-against-** | |
| **WILLIAM SADLEIR,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

      Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant William Sadleir ("Defendant" or "Sadleir"), alleges as follows:

**SUMMARY**

      1.     This is a securities fraud case in which Sadleir engaged in a longstanding scheme to misappropriate millions of dollars from a publicly traded investment company known as BlackRock Multi-Sector Income Trust ("BIT"), using a sham company and forged signatures.

      2.     Sadleir was the owner and founder of Aviron Group, LLC, which was the parent of several film distribution and related companies (collectively with parent, "Aviron"). BIT invested approximately $75 million net in Aviron's film distribution business through two notes, which were securities, issued in 2015 and 2017, respectively. In 2017, Sadleir fraudulently

diverted over approximately $25 million to a sham company he owned and operated. Sadleir falsely represented to BIT that the sham company was affiliated with a legitimate media company performing work to market and promote Aviron's business. Sadleir also misappropriated for his personal use at least approximately $13.8 million of BIT's invested funds. Sadleir used the misappropriated money to support his lavish lifestyle, including cash withdrawals and the purchases of a luxury car and a mansion in Beverly Hills. Then, in 2019, Sadleir forged BIT personnel signatures to authorize the release of collateral BIT valued at approximately $3 million that it had secured to protect its interest in the notes.

## VIOLATIONS

3. By virtue of the foregoing conduct and as alleged further herein, Defendant has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

4. Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

6. The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Defendant to disgorge all ill-gotten gains he received as a result of the violations

alleged here and to pay prejudgment interest thereon; (c) ordering Defendant to pay civil money

penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section

21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendant from directly or

indirectly, including, but not limited to through any entity he owns or controls, participating in

the issuance, offer, or sale of any security, provided, however, that such injunction shall not

prevent Defendant from purchasing or selling securities for his own personal account; and

(e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Securities Act Section

22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

8.      Defendants, directly and indirectly, have made use of the means or

instrumentalities of interstate commerce or of the mails in connection with the transactions, acts,

practices, and courses of business alleged herein.

9.      Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)]

and Exchange Act Section 27 [15 U.S.C. § 78aa].  BIT conducts business operations in this

District, is advised by BlackRock Advisors, LLC in this District, is traded on the New York

Stock Exchange in this District, and many of the acts, practices, transactions, and courses of

business involving BIT's investments in Sadleir's company Aviron occurred in this District.

## DEFENDANT

10.     **Sadleir**, age 66, a resident of Beverly Hills, California, was the founder of Aviron

Group, LLC, a holding company engaged in the film distribution business.  Sadleir owned and

controlled Aviron Group, LLC and its subsidiaries until December 19, 2019, when he was

removed from most of the subsidiaries for defaulting on a BIT note.

Case 1:20-cv-03997-GCR Document 1-20 Filed 05/22/19 Page 4 of 15

## OTHER RELEVANT ENTITIES

11.     **BIT** is a Delaware statutory trust traded on the New York Stock Exchange that

operates as a registered closed-end management investment company and is advised by

BlackRock Advisors, LLC and related entities.  BIT invests in loans and other debt instruments

to generate income.  BIT's shares are publicly traded and may be purchased by retail investors.

12.     **Aviron Group, LLC** is a Delaware limited liability company based in Beverly

Hills, California that is owned and was founded by Sadleir.  Aviron Group, LLC is a holding

company with several subsidiaries engaged in the business of film distribution that were solely

owned and controlled by Sadleir, and in some cases by a trust controlled by Sadleir.  In

approximately December 19, 2019, Sadleir lost control of many of Aviron Group LLC's

subsidiaries.

13.     **GroupM Media Services, LLC** is a Delaware limited liability company

established by Sadleir in October 2016 that served as a vehicle for Sadleir to misappropriate BIT

funds.  The entity's name bears a close resemblance to one of the world's largest advertising

media companies.

## FACTS

## I.     BIT INVESTS IN SADLEIR'S COMPANY AVIRON

14.     From October 2015 until April 2019, BIT invested approximately $75 million net

in Sadleir's company Aviron through two notes and related agreements.  For Aviron, the purpose

of the notes and related agreements was to raise money to finance Aviron's efforts to distribute

specific films.  Generally, a film distributor markets films to get them into theaters and onto

streaming services and receives revenue from those sources.  For BIT, the purpose of its

investment was to profit in the form of interest payments and capital appreciation from Aviron

Case 1:20-cv-03997-GK   Document 1-1   Filed 06/22/20   Page 9 of 13

warrants.

### A.    The First Note

15.    On October 20, 2015 Aviron and BIT entered into the first note, also known as

the credit and security agreement (the "First Note").  The First Note operated as a secured credit

facility to provide funding to support Aviron's efforts to distribute specific films and provided

BIT warrants in Aviron.  The First Note had a 15% interest rate.  Under the terms of the First

Note, all principal and interest were due in one year, and Aviron was required to make quarterly

interest payments.  The First Note contained a number of restrictions on Aviron's use of the BIT

proceeds including a prohibition against engaging in affiliate transactions.  The First Note

provided BIT the option to extend the maturity of the note for an additional four years.  An

extension would have the effect of extending the due date for Aviron to repay the principal.

Aviron's revenue streams and associated rights to, or property of, the films acted as collateral

under the First Note.  Aviron and Sadleir also could not use the investments for activities

unrelated to film distribution.  The First Note defined any funding provided by BIT as an

"investment."  As part of the agreement, BIT also obtained warrants it could exercise for LLC

interests in Aviron.  The terms of the warrants allowed BIT to acquire a specified share class of

LLC interests in Aviron.  BIT could acquire the LLC interests for $1,000 per unit.  The number

of units available for exercise was determined by a formula that was derived in part on how

much money BIT invested in Aviron and did not have an expiration.

16.    In addition to the collateral identified in the First Note, Sadleir agreed – in a

separate agreement executed the same day as the First Note – to pledge Aviron's LLC interests

in two subsidiaries "to induce [BIT] to . . . extend credit" to Aviron (the "Pledge").  In the event

of a default, the First Note and Pledge permitted BIT to acquire Aviron's interest in the two

Case 1:20-cv-03997-GBD Document 1-20 Filed 05/22/19 Page 19 of 15

subsidiaries. Consistent with the First Note and the Pledge, and to protect its interest, BIT filed

UCC liens on all of the collateral from both agreements: the film distribution rights and

properties, as well as the LLC interests of the two Aviron subsidiaries.

17. The First Note provided for an initial investment by BIT of $12 million, which

occurred in October 2015, after which Aviron was required under the First Note to make

additional written representations for any additional investment. Those representations included

an assurance that the funds would be used in connection with a specified film project and that

Aviron had not defaulted on any of the terms of the First Note.

18. BIT extended the one-year term of the First Note on October 19, 2016 and

ultimately provided $21 million in additional funding for film distribution projects pursuant to

the First Note as extended. The extension also kept the terms of the Pledge in place.

### B. The Second Note

19. On July 17, 2017 Aviron and BIT entered into the second note, which replaced

the First Note, and was also known as the note purchase and security agreement (the "Second

Note"). The Second Note increased the total investment amount that BIT made available to

Aviron, up to $75 million. The Second Note had a term of three years, but provided that BIT

could enter into one or two one-year extensions. Aviron's outstanding debt under the First Note

was rolled into the Second Note. As a result, the $75 million in funding available under the

Second Note included the outstanding balance of the First Note. The interest rate of the Second

Note varied: Aviron was required to pay 15% interest on pre-existing debt from the investments

under the First Note, which at that that time totaled approximately $11.6 million. For new

investments, the interest rate was 5%. The agreement required Aviron to make quarterly interest

payments and the principal was due by the maturity of the note. BIT eventually invested

approximately $50.6 million in new money under the Second Note.

20. The Second Note reiterated that its purpose was to fund Aviron's efforts to distribute films. As additional collateral for its investments, Aviron granted rights to LLC interests in additional subsidiaries that were to be established to hold the rights to subsequent films. Contemporaneous with the Second Note, BIT and Sadleir amended the Pledge so that it remained in effect with respect to the Second Note. In addition, BIT maintained its rights to the Aviron warrants from the First Note and extension, and increased the number of Aviron units available to BIT under the warrants.

21. The Second Note also required Sadleir and Aviron to comply with certain conditions in order to receive investments unless BIT expressly waived that provision. For example, Aviron and Sadleir could not sell collateralized assets for which BIT had effected a lien pursuant to the First Note, Second Note, and Pledge. Aviron and Sadleir also could not enter into affiliated transactions or use the investments for activities unrelated to film distribution.

22. The Second Note, like the First Note, allowed BIT to transfer its interest in the note to others. The Second Note incorporated additional language on transferability that acknowledged that the Second Note was a security under the Securities Act. In particular, the Second Note states that it is not registered and that BIT meets the requirements of the "accredited investor" definition in Rule 501 of Regulation D of the Securities Act for purposes of the transaction with Aviron.

23. In April 2019, BIT invested $10 million in Aviron under the Second Note to fund its distribution efforts for a specified film, which was memorialized in two letter agreements (the "Letter Agreements") that were executed the prior month. The Letter Agreements did not change the terms of the Second Note, but rather supplemented them. The Letter Agreements

required repayment of the $10 million in investments within sixty days after the specified film's release. As collateral for the Letter Agreements, Sadleir pledged LLC interests in 11 Aviron entities: Aviron Group, LLC and ten subsidiaries.

## II. SADLEIR MISAPPROPRIATES BIT ASSETS USING A SHAM COMPANY

24. By no later than October 2016, Sadleir began a scheme to defraud BIT by fraudulently diverting and misappropriating a portion of its investments. Sadleir used a substantial portion of the diverted funds for himself and to support his lavish lifestyle.

### A. Sadleir Uses GroupM Media Services, LLC to Misappropriate Funds

25. In October 2016, Sadleir formed GroupM Media Services, LLC which he used as a vehicle to misappropriate BIT funds. The entity's name bears a close resemblance to GroupM, which describes itself as one of the world's leading media investment companies. An affiliate company of GroupM had an ongoing business relationship with Aviron to provide media services. Sadleir, either directly or through others at his direction, established a corporate website for his sham entity purporting to provide media services, obtained a New York phone number, and obtained an email address for a fictitious individual named Amanda Stevens purporting to work for the entity. Through this deceptive conduct and numerous misrepresentations to BIT, Sadleir intentionally sought to deceive BIT into thinking that GroupM Media Services, LLC was affiliated with the legitimate company with a similar name and that at one point had provided similar services to Aviron.

26. Sadleir created fake documents dated as of December 2016, February 2017, and October 2017, purporting to be invoices directed to his company Aviron, and requesting payment be made to his sham company GroupM Media Services, LLC for purported marketing credits or services from a legitimate company affiliated with the real GroupM. Those purported invoices

diverted more than $25 million to Sadleir's sham company and were fraudulent: Sadleir's

GroupM Media Services, LLC did not provide any marketing credits or services to Aviron. And

the invoices, which Sadleir signed, falsely represented that they were from "a GroupM

company," when in fact the fake documents were from Sadleir and directed payment to his sham

company's bank account.

27. Relying on the fake December 2016 and February 2017 invoices, BIT authorized

Aviron to release funds to GroupM Media Services, LLC. Aviron appears to have released the

funds reflected in the fake October 2017 invoice without BIT's prior knowledge or authorization.

Specifically, Sadleir's fraudulent invoices claimed to support the following payments to GroupM

Media Services, LLC, as described in Table 1:

**Table 1: Fraudulent Payments to GroupM Media Services, LLC
As Reflected In Fake Invoices**

| Invoice Date | Invoice Paid Date | Invoice Amount (Stated and Paid) |
|---|---|---|
| December 13, 2016 | January 13, 2017 | **$460,000** |
| February 17, 2017 | February 27, 2017 | **$12.1 million** |
| October 10, 2017 | October 16, 2017 | **$13.5 million** |

28. The payment BIT authorized in connection with the fake December 2016 invoice

had been previously released from the account of another third party who provided Aviron with

financing. BIT funds reimbursed Aviron for the payment. The payment BIT authorized in

connection with the fake February 2017 invoice was paid from an Aviron entity account to

Sadleir's GroupM Media Services, LLC after receiving proceeds from BIT. And the payment in

connection with the fake October 2017 invoice was paid to GroupM Media Services, LLC from

an Aviron entity account using at least $9 million from BIT proceeds.

29.     In an effort to further perpetrate and conceal his fraud, Sadleir made several

misrepresentations to BIT concerning his sham company GroupM Media Services, LLC and

these fake invoices.  After Sadleir shared the first GroupM Media Services, LLC invoice with

BIT, on December 22, 2016 Sadleir e-mailed BIT's portfolio manager, asked him to authorize

payment, and falsely conveyed that the fake invoice was, in fact, from the real GroupM, which

he described as "the largest advertising media company in the world[.]"  On January 5 and 11,

2017 Sadleir twice again asked BIT's portfolio manager by e-mail to authorize payment of the

first fake invoice and again conveyed that the payment would go to the real GroupM for media

services work.  These representations were false: the fake invoice fraudulently directed payment

to Sadleir's GroupM Media Services, LLC, not the real GroupM.  Rather, Sadleir diverted or

misappropriated the funds.

30.     Sadleir made similar misrepresentations concerning the February 17, 2017

invoice.  On February 17 and 23, 2017 Sadleir e-mailed BIT personnel requesting payment of the

second fake invoice and again conveyed that the payment would go to the real GroupM for

media services work.  These representations were false for the same reasons: the fake invoice

fraudulently directed payment to Sadleir's GroupM Media Services, LLC, not the real GroupM.

Rather, Sadleir diverted or misappropriated the funds.

31.     Months after the payments were made pursuant to the fake invoices, Sadleir

continued his efforts to conceal his fraud.  On several occasions including on at least June 19,

2018, March 12, 2019, and September 16, 2019, Sadleir or Aviron personnel acting at his

direction e-mailed BIT personnel and conveyed that the payments were made to the real GroupM

and that the real GroupM had provided or would provide in the future certain media services

work to Aviron.  And from at least November 2019 through February 2020, this concealment

continued with e-mails from the fictitious Amanda Stevens (created by Sadleir) at GroupM

Media Services, LLC, which were sent to BIT or agents of BIT.  These e-mails also falsely

claimed that Aviron had over $27 million in media credits with GroupM.  In fact, the real

GroupM did not have a relationship with Aviron during the time of any of these e-mails and

Aviron did not have any pending credits or services owed from the real GroupM.

32.     Sadlier misappropriated at least the majority of funds obtained through his sham

company and used the proceeds for purposes unrelated to film distribution.  Instead, he used

them to fund his lavish lifestyle.  Among other things, Sadleir used the misappropriated funds to:

purchase a $14 million mansion in Beverly Hills (approximately $4 million of the purchase

amount may have been sourced from Aviron-related revenue); spend nearly $3 million to

remodel Aviron's offices; pay himself and his wife over $350,000; pay $254,000 to settle a legal

dispute; buy a $127,000 Tesla; and spend about $109,000 on home furnishings and remodeling.

33.     Sadlier's deceptive conduct, misrepresentations, and omissions, including as

described herein, were material: a reasonable investor would have wanted to know that his or her

investment and related collateral was being fraudulently diverted and misappropriated.

## II.    SADLEIR MISAPPROPRIATES BIT COLLATERAL

34.     As described above, Sadleir's fraudulent diversion and misappropriation of funds

that were intended to benefit the Aviron entities, some of which served as collateral to BIT,

meant that Sadleir was also devaluing BIT's collateral.  In addition, in approximately July 2019,

Sadleir continued his scheme to misappropriate BIT assets, this time using a new strategy:

forging BIT personnel signatures to fraudulently release liens on Aviron assets, and reselling

those assets to third parties.

35.     In March 2019 Sadleir had requested additional funding from BIT for a new film

distribution project.  Pursuant to the Second Note, Sadleir and BIT entered into the Letter

Agreements that totaled $10 million in proceeds to be made available for such purposes under

that note.  Shortly after the agreements were executed, BIT transferred $10 million to Aviron in

April 2019.

36.     To protect its interests in that collateral, BIT filed liens on the specified assets in

Delaware under the Uniform Commercial Code ("UCC").  BIT filed multiple liens with each one

defining a set of distinct assets—such as the revenue streams and rights to distribute a particular

film.  Under the First Note and Second Note, Aviron and Sadleir could not unilaterally release

the liens, but rather required BIT to consent to such a release.

37.     During July 2019, Sadleir drafted at least five fake agreements between BIT and

Aviron for which he forged the signatures of the BIT portfolio manager.  These forged

agreements enabled Sadleir to have fourteen UCC amendments filed to remove BIT's liens on

Aviron's film distribution revenue streams.  These amendments further enabled Sadleir to

misappropriate collateral valued by BIT at approximately $3 million that he may have re-sold or

attempted to re-sell to third parties.

38.     By October 2019, BIT learned about the unauthorized UCC amendments to the

liens, which led to a confrontation with Sadleir.  In a phone call on November 25, 2019 with BIT

personnel, when confronted about the unauthorized amendments and forgeries, Sadleir admitted

he had "fucked up."

39.     Sadleir's deceptive conduct, misrepresentations, and omissions, including as

described herein, were material: a reasonable investor would have wanted to know that his or her

investment and related collateral was being fraudulently diverted and misappropriated.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

40.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 39.

41.     Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

42.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

43.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 39.

44.     Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one

or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

45.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

### III.

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently prohibiting Defendant from directly or indirectly, including, but not limited

to through any entity he owns or controls, participating in the issuance, offer, or sale of any

security, provided, however, that such injunction shall not prevent Defendant from purchasing or

selling securities for his own personal account; and

### V.

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
      May 22, 2020

                  s/Dugan Bliss
                  Andrew Dean
                  Dugan Bliss
                  Salvatore Massa
                  Vincent Hull
                  Attorneys for Plaintiff
                  SECURITIES AND EXCHANGE COMMISSION
                  New York Regional Office
                  Brookfield Place
                  200 Vesey Street, Suite 400
                  New York, New York 10281-1022
                  212-336-0971 (Bliss)
                  blissd@sec.gov

# GLENN DECLARATION

# EXHIBIT "F"

AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

05/21/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ____DM____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

May 21, 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ____MR____ DEPUTY

| United States of America | |
| v. | Case No.   2:20-mj-02326 |
| WILLIAM SADLEIR, | |
| Defendant | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of April 30, 2020 through May 5, 2020, in the County of Los Angeles in the Central

District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344(2) | Bank Fraud |
| 18 U.S.C. § 1014 | False Statements to a Financial Institution |
| 15 U.S.C. § 645(a) | False Statements to the Small Business Administration |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Nathan Cherney*
*Complainant's signature*

_____
Nathan Cherney, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    _____5/21/20_____        _____
*Judge's signature*

City and state:   Los Angeles, California        Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, Nathan Cherney, being duly sworn, declare and state as follows:

### I.  **INTRODUCTION**

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2018.  I am currently assigned to a Complex Financial Crime squad of the FBI's Los Angeles Field Office, which is responsible for investigating corporate and securities fraud, including mail fraud, wire fraud, securities fraud, and insider trading.

2.   Since becoming an FBI Special Agent in 2018, I have received approximately 19 weeks of formal training at the FBI Training Academy in Quantico, Virginia, in financial analysis, interviewing, surveillance, and other investigative techniques. In June 2019, I also attended a multi-day Securities Industry Essentials formal training sponsored by the FBI Economics Crimes Unit.  At this training, I received formal training essential to securities industry markets, regulatory agencies and their functions, and prohibited practices.  Before joining the FBI, I performed numerous financial audits while employed as an auditor at a public accounting firm for approximately three years.  I participated in many aspects of the audits including, but not limited to, procedures for fraud detection, financial analysis, and reviews of accounting and bank records.  I received approximately eight weeks of formal training from the accounting firm including, but not limited to, fraud, accounting

principles, financial analysis, and auditing principles.  I hold a Bachelor of Arts degree in Economics from the University of Michigan and a Master of Science in Accounting from Michigan State University.  I am currently a Certified Public Accountant in the state of California.

3.    In addition to my formal training and personal experience, I have learned from and worked alongside numerous senior FBI agents with years of experience in various criminal investigations including, but not limited to, corporate and securities fraud, mail fraud, wire fraud, securities fraud, and insider trading.  Throughout my experiences with these senior agents, I have received guidance, training, and hands-on experience in various investigative techniques including, but not limited to, interviewing, surveillance, financial analysis, and other investigative techniques, including with respect to the identification and tracing of illicit proceeds.

## II. PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, WILLIAM SADLEIR ("SADLEIR") for violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344(2) (Bank Fraud), 18 U.S.C. § 1014 (False Statements to a Financial Institution), 15 U.S.C. § 645(a) (False Statements to the Small Business Administration), and 18 U.S.C. 1957 (transactional money laundering).

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

2

witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

### III. __SUMMARY OF PROBABLE CAUSE__

6.  Until recently, SADLEIR operated a film production
company called Aviron Pictures, LLC ("Aviron Pictures") and its
related entities, all of which are based in Los Angeles,
California.  In or about April 2020, SADLEIR submitted three
applications for loans to JPMorgan Chase, N.A. ("JPMC") on
behalf of three of the Aviron entities -- Aviron Group, LLC
("Aviron Group"), Aviron Licensing, LLC ("Aviron Licensing"),
and Aviron Releasing, LLC dba Regatta ("Aviron Releasing") --
through the Paycheck Protection Program established by the
Coronavirus Aid, Relief, and Economic Security Act.  JPMC
approved the loans, and SADLEIR received a total of over $1.7
million in funds as a result of these loans.  SADLEIR obtained
the loans by making false representations about each entity's
payroll expenses, their number of respective employees, the
operational status of the companies, and how the loan proceeds
would be spent.  In fact, SADLEIR intended to use at least some
of the funds for personal and other prohibited expenses, and
immediately upon receiving the funds a significant amount was
diverted to SADLEIR's personal accounts and used for personal
expenses.

3

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7.    Based on witness interviews I have conducted, my
review of documents obtained from third parties, reports of
interviews conducted by other law enforcement officers,
conversations with other law enforcement officers, and publicly
filed documents, I know the following:

### A.    The Paycheck Protection Program

8.    The Coronavirus Aid, Relief, and Economic Security
("CARES") Act is a federal law enacted in or around March 2020
and designed to provide emergency financial assistance to the
millions of Americans who are suffering the economic effects
caused by the COVID-19 pandemic.  One source of relief provided
by the CARES Act was the authorization of up to $349 billion in
forgivable loans to small businesses for job retention and
certain other expenses, through a program referred to as the
Paycheck Protection Program ("PPP").  In or around April 2020,
Congress authorized over $300 billion in additional PPP funding.

9.    In order to obtain a PPP loan, a qualifying business
must submit a PPP loan application, which is signed by an
authorized representative of the business.  The PPP loan
application requires the business (through its authorized
representative) to acknowledge the program rules and make
certain affirmative certifications in order to be eligible to
obtain the PPP loan.  One such certification requires the
applicant (through its authorized representative) to affirm that
"[t]he [PPP loan] funds will be used to retain workers and
maintain payroll or make mortgage payments, lease payments, and

4

utility payments; I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges."  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

10.  A business's PPP loan application is received and processed, in the first instance, by a participating financial institution, then transmitted, for further review, to the Small Business Administration ("SBA") to assess the applicant's eligibility.  If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies.

11.  PPP loan proceeds must be used by the business on certain permissible expenses -- payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses at least 75% of the PPP loan proceeds on payroll expenses.

**B.    SADLEIR and the Aviron Entities**

12.    Based on my review of law enforcement databases and public source documents, I know that SADLEIR is an experienced executive in the film industry who lives in Beverly Hills.  In 2015, he founded Aviron Pictures, a Los Angeles-based film production company that, according to its website, "specializes in the acquisition, marketing, and wide release distribution of talent and story-driven theatrical films in North America."

13.    From my review of publicly available filings with the California Secretary of State ("CA SOS"), I know that SADLEIR is affiliated with several entities with the name Aviron.  For example, SADLEIR is listed with the CA SOS as the manager of both Aviron Licensing and Aviron Releasing.

14.    According to counsel for Aviron Pictures, SADLEIR was formerly in control of Aviron Pictures but was terminated from all managerial roles at Aviron Pictures in approximately December 2019.  According to J.B., the Vice President of Finance for Aviron Pictures, who also manages payroll, SADLEIR did not retain any involvement in the day-to-day operations of the film production business of Aviron Pictures after December 2019.

15.    Law enforcement officers asked J.B. and counsel for Aviron Pictures whether either was aware of any ongoing operations carried out by Aviron Group, Aviron Licensing, and Aviron Releasing.  Neither was aware of any active operations.

16.    SADLEIR retains signing authority over various bank accounts associated with certain of the Aviron entities.  JPMC records show that SADLEIR maintains a number of bank accounts

with JPMC, both personal accounts and business accounts related
to the Aviron entities.  For example:

a.    SADLEIR is a signatory to a JPMC business
checking account in the name of Aviron Group ending in 3760 (the
"Aviron Group JPMC account").  The only other signatory to this
account is J.B., who, according to publicly filed documents with
the CA SOS, is the Vice President of Finance for Aviron Group.

b.    SADLEIR is a signatory to a JPMC business
checking account in the name of Aviron Licensing ending in 6567
(the "Aviron Licensing JPMC account").  J.B. is the only other
signatory to this account.

c.    SADLEIR is a signatory to a JPMC business
checking account in the name of Aviron Releasing ending in 2786
(the "Aviron Releasing JPMC account").  J.B. is the only other
signatory to this account.

d.    SADLEIR has a JPMC personal checking account with
his wife, Hanan Kadadu ("Kadadu"), ending in 8832 (the "8832
Personal JPMC account").  SADLEIR and Kadadu are the only
signatories to this account.

17.  Based on my training and experience and publicly
available information regarding JPMC, I know that JPMC is a
financial institution, as that term is defined in 18 U.S.C.
§ 20, that is insured by the Federal Deposit Insurance
Corporation and is based in New York, New York.

**C.    SADLEIR Submits Three Materially False Applications to JPMC for PPP Loans on Behalf of the Aviron Entities**

18.    From loan documents provided by JPMC and the SBA, I know that in or around April 2020, SADLEIR submitted three applications for PPP loans to JPMC, each requesting funds for a different Aviron entity, and each was received by the SBA:

a.    First, SADLEIR applied for a loan in the name of Aviron Licensing, claiming that Aviron Licensing had average monthly payroll expenses of $224,418 and a total of 33 employees.  The application listed SADLEIR as the principal and listed SADLEIR's home address in Beverly Hills as the loan mailing address.[1]  As proof of Aviron Licensing's payroll expenses, SADLEIR provided an IRS Form W-3, purporting to show wage and taxes for Aviron Pictures for tax year 2019.

b.    Second, SADLEIR applied for a loan in the name of Aviron Releasing, claiming that Aviron Releasing had average monthly payroll expenses of $224,418 and a total of 33 employees (the same numbers used in the Aviron Licensing application). The application listed SADLEIR as the principal and listed SADLEIR's home address in Beverly Hills as the loan mailing address.  As proof of Aviron Releasing's payroll expenses, SADLEIR provided an IRS Form W-3, purporting to show wage and taxes for Aviron Pictures for tax year 2019.  This was the same IRS Form W-3 that SADLEIR submitted in support of Aviron Licensing's application.

---

[1] I know that this is SADLEIR's home address based on documents provided to me by Granite Escrow showing that SADLEIR and Kadadu purchased this home in 2017 in the name of their trust, Temerity Trust Management, LLC.

c.    Third, SADLEIR applied for a loan in the name of
Aviron Group, claiming that Aviron Group had average monthly
payroll expenses of $236,250 and a total of 33 employees (the
same number of employees SADLEIR used in the Aviron Licensing
and Aviron Releasing applications).  The application listed
SADLEIR as the principal and listed SADLEIR's home address in
Beverly Hills as the loan mailing address.  As proof of Aviron
Group's payroll expenses, SADLEIR submitted what appears to be a
list of employees at Aviron Group and Aviron Pictures.  The
document was not dated.

19.  I have reviewed additional certifications SADLEIR made
on and submitted with each loan application package (and which
were required by the SBA).  Among other things, SADLEIR
certified the following:

a.    SADLEIR certified that each entity "was in
operation on February 15, 2020 and had employees for whom the
Applicant paid salaries and payroll taxes or paid independent
contractors."

b.    SADLEIR also again certified that "the funds will
be used to retain workers and maintain payroll or make mortgage
interest payments, lease payments, and utility payments."

20.  Based on witness interviews and a review of the
documentation SADLEIR submitted with the three loan
applications, there is probable cause to believe these
certifications were false.

a.    SADLEIR submitted the same 2019 Aviron Pictures
W-3 as proof of payroll expense to support separate loan

9

applications in two different entities' names: Aviron Licensing and Aviron Releasing.  For the third application, in Aviron Group's name, SADLEIR submitted a list of employees and their purported salaries.  The list claimed that many of the employees in question were employed by Aviron Pictures, the same entity whose W-3 SADLEIR submitted in support of the other two applications.

b.    J.B. and counsel for Aviron Pictures informed law enforcement that Aviron Pictures has never applied for PPP loans.

c.    Former employees of Aviron Pictures and J.B. informed law enforcement that at least 50 percent of Aviron Pictures employees were laid off in or about January 2020 and all remaining employees but just a few have been laid off since due to a forced restructuring.  Former employees of Aviron Pictures and J.B informed law enforcement that, by February 15, 2020, Aviron Pictures had far fewer than 33 employees.

d.    The laid-off Aviron Pictures employees include G.F., I.L., and C.H. The names of all three employees appear on the employee list SADLEIR submitted in support of his payroll expense claim on the Aviron Group loan application.  However, in or around May 2020, G.F., I.L, and C.H. each separately confirmed to law enforcement that they were not employees of Aviron Group, Aviron Licensing, or Aviron Releasing as of February 15, 2020, and that they have not been asked to return to Aviron Pictures as employees or been told that their

employment may be restored.  I.L. and C.H. are now employed elsewhere.

**D.   JPMC Initially Funds the Loans Based on the Information Provided by Sadleir**

21.  Based on the information provided by SADLEIR, JPMC approved the loans that SADLEIR applied for in the names of Aviron Group, Aviron Releasing, and Aviron Licensing.

22.  On or about May 1, 2020, JPMC funded the PPP loans, wiring the approved funds to the respective Aviron JPMC accounts, for a total of approximately $1,712,715:

a.   JPMC wired approximately $561,045 into the Aviron Licensing JPMC account.  The balance in the Aviron Licensing JPMC account the day before this deposit (April 30, 2020) was approximately $330.52, meaning that virtually all funds in the account after the deposit were from the PPP loan.

b.   JPMC wired approximately $590,625 into the Aviron Group JPMC account.  The balance in the Aviron Group JPMC account the day before this deposit (April 30, 2020) was approximately $27, meaning that virtually all funds in the account after the deposit were from the PPP loan.

c.   JPMC wired approximately $561,045 into the Aviron Releasing JPMC account.  The balance in the Aviron Group JPMC account the day before this deposit (April 30, 2020) was approximately $17.35, meaning that virtually all funds in the account after the deposit were from the PPP loan.

23.  J.B. told law enforcement that she recalled seeing the May 1, 2020 deposit of PPP loan funds into the Aviron Releasing

11

JPMC account, which she regularly checks as part of her duties at Aviron Pictures.  She reported that, the same day, she called SADLEIR about the deposit.  According to J.B., on the call, SADLEIR confirmed that he was aware of the deposit.  J.B. also told law enforcement that about one month before the deposit, SADLEIR called her and asked for Aviron Pictures' payroll information.  J.B. told law enforcement that she did not provide the payroll information to SADLEIR because she did not have it.

**E.   SADLEIR Uses the PPP Loan Funds for Personal Expenses**

24.   After these funds were deposited into the Aviron Group, Aviron Licensing, and Aviron Releasing JPMC accounts, records and information provided by JPMC show that SADLEIR did not use these funds for the business expenses allowed under the PPP but rather used a substantial portion of the funds to pay his and his wife's personal expenses.

25.   On or about May 1, 2020, the day the loan funds were deposited in the three JPMC accounts in each of the applicant-entities' names, all of the loan funds -- more than approximately $1.7 million -- were consolidated into the Aviron Group JPMC account.  As discussed above, supra ¶ 22.b, because the balance in this account the day before this transfer was approximately $27, the funds in the Aviron Group JPMC account were almost exclusively composed of the PPP loan funds for the three Aviron entities.

26.   On or about the next day, May 2, 2020, $966,000 was transferred from the Aviron Group JPMC account into the 8832 Personal JPMC account.  Prior to this transfer, the 8832

12

Personal JPMC account had approximately $349.05 in funds, meaning that virtually all funds in the account after the deposit were from the PPP loans that had been funneled into the Aviron Group JPMC account.

27.   Between approximately May 2, 2020, and May 5, 2020, a significant portion of the funds in the 8832 Personal JPMC account, which was composed almost entirely of the PPP loan funds transferred from the Aviron Group JPMC account, was used to pay for various personal and other expenses via interstate wires, contrary to the representations in the loan applications that the funds would be used for the specified business expenses allowed under the PPP.  The expenditures included the following:

a.   On or about May 4, 2020, approximately $67,295.25 was paid to American Express.  Records from American Express show that, on or about May 2, 2020, there was a payment of approximately $26,180.31 made on an American Express credit card in SADLEIR's name and a payment of approximately $40,114.94 made on an American Express credit card in Kadadu's name.  Both of these credit cards appear to be personal credit cards.  For example, the statements of the credit card in SADLEIR's name include charges at the Apple.com record store, the movie theater Arclight Hollywood, and the wine and liquor store Wally's in Beverly Hills, among other expenses.  Similarly, the statements of the credit card in Kadadu's name include charges at clothing stores and various PayPal charges, among other expenses.

b.   On or about May 4, 2020, a payment of approximately $20,510.10 was sent to Bank of America VISA.  Bank

13

of America records show that this payment was for a Bank of America credit card account in SADLEIR's name.  The statements for this credit card in the months leading up to this payment show what appear to be personal expenses, such as purchases at the Disney Store, CVS Pharmacy, and the Los Angeles-based restaurant Spago.

        c.   On or about May 4, 2020, SADLEIR sent two wire transfers for a total of approximately $69,117.10 to the law firm of Antoni Albus LLP for "SADLEIR INVOICES" and "SADLEIR RETAINER."

        d.   On or about May 5, 2020, approximately $40,000 was paid to U.S. Bank, N.A.  U.S. Bank records show that this payment was for a car loan in SADLEIR's name.  This payment was reversed on the basis that JPMC had implemented a freeze on the 8832 Personal JPMC account by this date.

        e.   SADLEIR incurred other non-payroll expenses between approximately May 1, 2020 and May 5, 2020, including at restaurants such as Eataly.

28.  J.B. informed law enforcement that Sadleir has never provided Aviron Pictures with PPP loan funds for its payroll expenses.  As described above, the government has interviewed three former Aviron Pictures employees, G.F., I.L, and C.H., laid off before February 15, 2020, and whom SADLEIR listed as employees in support of the Aviron Group loan application.  Each told law enforcement that they have never been asked to return to Aviron Pictures or any other Aviron entity.

**F.   SADLEIR Emails JPMC After JPMC Freezes His Accounts
and Acknowledges the Purpose of the PPP Loans**

29.   Based on documents provided by JPMC, I know that JPMC placed a hold on the Aviron Group, Aviron Licensing, and Aviron Releasing JPMC accounts on or about May 5, 2020, and a hold on the 8832 Personal JPMC account on or about May 7, 2020, to prevent SADLEIR from dissipating the funds from these accounts. The current balances of these accounts are as follows:

a.   The current balance of the Aviron Group JPMC account is approximately $662,038.14.

b.   The current balance of the Aviron Licensing JPMC account is $0.

c.   The current balance of the Aviron Releasing JPMC account is approximately $17.

d.   The current balance of the 8832 Personal JPMC account is approximately $497,988.

30.   On or about May 7, 2020, SADLEIR emailed D.M.E., an employee of JPMC, in reference to a call SADLEIR had with D.M.E. the day before in which D.M.E. informed SADLEIR that "Aviron's corporate bank accounts, as well as my wife and my personal bank accounts, have been put on hold by Chase."   SADLEIR then wrote:

> The Aviron PPP loans were reviewed by Chase, submitted to and approved by the SBA, and funded last Friday. **As required to satisfy the SBA loan forgiveness provisions, we were prepared and ready to hire full-time employees this week to engage in film acquisition and production (Aviron Licensing), in film marketing and administration (Aviron Group), and in film distribution (Aviron Releasing), all employment restored before the required June 30, 2020 deadline.** (emphasis added).   Chase's actions have impaired our ability to satisfy these requirements and has potentially damaged our business viability.

15

I would appreciate the benefit of being able to explain how we intended to also finance, through the pledge of personal assets, including our home, Aviron's revived operations so that not only would employment be restored, but long-term viability of the companies be sustained beyond the June 30, 2020 period.

We, along with our attorney—copied here, would appreciate a reply today, along with the contact information of the Chase officer reviewing the PPP loans, so that we can immediately remedy the harm caused Chase's misinformed and inappropriate actions.

* * * *

31.  Based on the above information, there is probable cause to believe that SADLEIR made material false statements to JPMC and the SBA in the PPP loan applications submitted on behalf of three Aviron entities and that he improperly used the PPP funds he acquired through these loans from JPMC for personal expenses rather than for the business expenses for which the loan applications certified they would be used.

//

//

//

//

//

//

//

//

//

//

//

//

## V. <u>CONCLUSION</u>

32.   For all the reasons described above, there is probable cause to believe that SADLEIR violated 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344(2) (Bank Fraud), 18 U.S.C. § 1014 (False Statements to a Financial Institution), 15 U.S.C. § 645(a) (False Statements to the Small Business Administration), and 18 U.S.C. § 1957.

/s/
_____
Nathan Cherney, Special Agent
Federal Bureau of
Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 21st day of May,
2020.

_____
HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

17

DocuSign Envelope ID: 9636B48B-497E-49A8-9DEC-7582721C643B

**DECLARATION OF BRANDON KUFRIN IN SUPPORT OF CAIRN'S
MOTION FOR (I) ORDER APPOINTING TRUSTEE PURSUANT TO
11 U.S.C. § 1104(A), OR, ALTERNATIVELY, (II) ORDER GRANTING
<u>RELIEF FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D)</u>**

I, Brandon Kufrin, being duly sworn, state the following:

1.      I am a senior portfolio manager at Cairn Capital Limited, investment manager to Cairn Capital Investment Funds ICAV (alone or together, as the context may require, "<u>Cairn</u>").  In my capacity with Cairn, I am generally familiar with Cairn's business and operations.

2.      I submit this declaration (the "<u>Declaration</u>") in my capacity with Cairn and on Cairn's behalf in support of Cairn's *Motion for (I) Order Appointing Trustee Pursuant to 11 U.S.C. § 1104(a), or, Alternatively, (II) Order Granting Relief From Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "<u>Motion</u>").  Capitalized terms not defined herein have the meanings used in the Motion.  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of Cairn's books and records, relevant documents and other information prepared or collected by Cairn's employees, agents and/or advisors, or my opinion based on my experience with Cairn.  In making my statements based on my review of Cairn's books and records, relevant documents and other information prepared or collected by Cairn's employees, agents and advisors, I have relied upon these persons accurately recording, preparing or collecting any such documentation and other information.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion.  I am authorized to submit this Declaration in support of Cairn's Motion.

**<u>The Credit Agreement and Promissory Note</u>**

3.      Cairn extended a loan to Aviron 1703, LLC (the "<u>Borrower</u>") pursuant to a Credit, Security, Guaranty and Pledge Agreement, dated October 1, 2018 (the "<u>Credit Agreement</u>"), and a Promissory Note, dated October 1, 2018 (the "<u>Note</u>").  True and correct copies of the Credit Agreement and the Note are attached hereto as **<u>Exhibit A</u>**.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

4.  Pursuant to the Credit Agreement and the Note, Cairn loaned the Borrower up to $22,400,000 in aggregate principal balance of loan obligations for purposes of financing of certain distribution activities in respect of the motion picture entitled "Serenity" and certain other limited uses in connection therewith (the "Loan").

5.  The Credit Agreement is secured by the Credit Party Collateral (as that term is defined in the Credit Agreement), consisting of certain personal property of the Borrower and certain personal property of certain other Aviron Entities.  The Note is likewise secured by personal property, consisting of certain personal property of the Borrower.  The scheduled maturity date of the Loan was December 15, 2019 (the "Scheduled Maturity Date").

**The Guaranty**

6.  Separately, Cairn entered into a Guaranty, dated October 1, 2018 ("Guaranty"), with Temerity Trust Management, LLC (the "Debtor").  Pursuant to this Guaranty, the Debtor "irrevocably and unconditionally" guaranteed the "full and punctual payment" of the Loan made to the Borrower.  In addition to Sadleir's execution of the Guaranty as the Debtor's sole manager, Sadleir's wife, Ms. Hanan Kadadu ("Kadadu"), also endorsed the Guaranty by signing as a "Confirmed by" party.  A true and correct copy of the Guaranty is attached hereto as **Exhibit B**.

7.  The Guaranty is secured by a Deed of Trust and Assignment of Rents, Fixture Filing, Security Agreement and Environmental Indemnity ("Deed of Trust"), dated as of October 8, 2019, which encumbers certain real property commonly known and addressed at 9135 Hazen Drive, Los Angeles, CA 90210 (the "Property").  A true and correct copy of the Deed of Trust is attached hereto as **Exhibit C**.

8.  Cairn understands that the Property was purchased by the Debtor for approximately $13,500,000 on or around August 28, 2017.  Cairn would not have extended the Loan without the Guaranty or the inclusion of the Property in the collateral securing the Guaranty.

**The Borrower Breaches the Credit Agreement**

9.  On February 14, 2019, Cairn sent the Borrower a Notice of Defaults and Reservation of Rights, identifying a number of non-monetary defaults under the Credit Agreement, including, among others, at least one default not capable of cure.  A true and correct copy of the

1    February 14, 2019 Notice of Defaults is attached hereto as **Exhibit D**.

2        10.    The Borrower failed to cure all of the defaults that Cairn determined were capable

3    of cure.  On April 2, 2019, Cairn sent the Borrower an Acceleration and Demand Notice

4    accelerating the Loan and declaring all outstanding loan obligations due and immediately payable

5    (the outstanding payment obligations under the Credit Agreement from time to time, as of the

6    applicable determination date, the "Outstanding Loan Obligations").  A true and correct copy of

7    the April 2, 2019 Acceleration and Demand Notice is attached hereto as **Exhibit E**.

8        11.    The Borrower still failed to cure all of the defaults that Cairn determined were

9    capable of cure.  Moreover, on or around the same time as Cairn's delivery of the Notice of

10   Defaults and Reservation of Rights and the Acceleration and Demand Notice, Cairn learned of

11   additional defaults under the Credit Agreement (including at least one default not capable of cure)

12   occurring as early as January 2019, including the impermissible diversion of certain proceeds of

13   Cairn's collateral for payment of expenses related to certain other Aviron Entities' films (as per

14   Sadleir's own written admission) (the "Diversion of Proceeds") and the Borrower's alteration and

15   manipulation (which the Borrower attempted to conceal) of purported third-party reporting that it

16   provided to Cairn to induce a credit extension under the Loan (the "Reporting Manipulation").  A

17   true and correct copy of Sadleir's e-mail to Cairn acknowledging the impermissible diversion of

18   certain proceeds of Cairn's collateral for payment of expenses related to certain other Aviron

19   Entities' films is attached hereto as **Exhibit F**.

20       12.    On May 24, 2019, Cairn entered into a letter agreement (the "Letter Agreement")

21   with Sadleir, the Debtor, the Borrower and certain other Aviron Entities (collectively, the "Sadleir

22   Letter Agreement Parties"), pursuant to which Cairn agreed to refrain until July 31, 2019 (if

23   certain conditions were met) from enforcing certain of its rights under the Credit Agreement and

24   the Guaranty if the Sadleir Letter Agreement Parties paid $3,000,000 to Cairn by July 15, 2019 as

25   partial repayment of the Loan.  A true and correct copy of the Letter Agreement is attached hereto

26   as **Exhibit G**.

27       13.    Cairn received the payment as provided under the Letter Agreement.

28       14.    On May 31, 2019, Cairn entered into a settlement agreement (the "Settlement

- 3 -

DocuSign Envelope ID: 9636B49B-497E-49A8-8DEC-7582721BB43B

1    Agreement") with Sadleir and certain Aviron Entities (not including the Borrower or the Debtor

2    among others) (the "Sadleir Settlement Parties"), pursuant to which Cairn agreed to waive certain

3    claims against the Sadleir Settlement Parties in connection with the Diversion of Proceeds and the

4    Reporting Manipulation.  Cairn did not release any claims related to the Diversion of Proceeds and

5    Reporting Manipulation, or any other claims under the Credit Agreement and the Guaranty,

6    against the Borrower, the Debtor and certain other Aviron Entities.  A true and correct copy of the

7    Settlement Agreement is attached hereto as **Exhibit H**.

8         15.    Although under the Letter Agreement Cairn was permitted to enforce the full

9    extent of its rights under the Credit Agreement starting on August 1, 2019, it generally refrained

10   from doing so for an additional period of approximately four-and-a-half months, which gave the

11   Borrower the opportunity to repay the Outstanding Loan Obligations by the Scheduled Maturity

12   Date following representations made by Sadleir or his agents that a repayment of the Loan would

13   occur.  The Borrower, however, failed to repay in full the Outstanding Loan Obligations by the

14   Scheduled Maturity Date.  On December 18, 2019, Cairn sent the Borrower a Demand for

15   Payment, noting that, despite the acceleration of the Loan on April 2, 2019, the Borrower had

16   further failed to repay the Outstanding Loan Obligations by the Scheduled Maturity Date.  Cairn

17   apprised the Borrower that the Outstanding Loan Obligations at the time were not less than

18   $16,230,747.68, with default interest and other amounts of indemnified liabilities continuing to

19   accrue.  A true and correct copy of the December 18, 2019 Demand for Payment is attached

20   hereto as **Exhibit I**.

21        16.    As of the date hereof, the Borrower owes Outstanding Loan Obligations in an

22   amount not less than $14,724,332 with default interest and other indemnified expenses continuing

23   to accrue.

24   **The Debtor Defaults on the Guaranty and Cairn Commences a Foreclosure Action**

25        17.    The Borrower's continuing events of default under the Credit Agreement and

26   continuing failure to repay in full the Outstanding Loan Obligations triggered the Debtor's

27   repayment obligation under the Guaranty.  On May 1, 2019, Cairn sent the Debtor a Demand

28   Notice for payment of the Outstanding Loan Obligations in accordance with the Guaranty.  A true

and correct copy of the May 1, 2019 Demand Notice is attached hereto as **Exhibit J**.

18.     The Debtor failed to pay the Outstanding Loan Obligations.  On May 9, 2019, Cairn sent the Debtor a Default Notice for failure to pay the Outstanding Loan Obligations pursuant to its demand.  A true and correct copy of the May 9, 2019 Default Notice is attached hereto as **Exhibit K**.

19.     The Debtor failed to cure its default within ten days, which Cairn determined gave rise to an Event of Default (as defined in the Guaranty) and permitted Cairn to declare an Event of Default under the Deed of Trust and (among other things) cause the Property to be sold.

20.     On January 6, 2020, Cairn sent the Debtor a Second Demand Notice, informing the Debtor of the Borrower's continued failure to repay the Outstanding Loan Obligations on the Scheduled Maturity Date and once again demanding the payment thereof by the Debtor.  Cairn further apprised the Debtor that if total payment of the Outstanding Loan Obligations was not made by January 13, 2020, then Cairn would exercise its rights under the Guaranty and Deed of Trust to the full extent necessary including (among other things) causing the Property to be sold. A true and correct copy of the January 6, 2020 Second Demand Notice is attached hereto as **Exhibit L**.

21.     In light of the Debtor's continuing default under the Guaranty, Cairn initiated a non-judicial foreclosure sale, with a sale of the Property by a trustee scheduled for June 2, 2020. On June 1, 2020, however, Sadleir apparently caused the Debtor to commence the Chapter 11 Case, which has prevented Cairn from completing the sale of the Property.

**The Debtor, Sadleir and the Property**

22.     As reflected in the Debtor's schedules, the Debtor has no meaningful business to run.  As such, Cairn believes that the Debtor's creditors would not benefit from Sadleir's institutional knowledge if he were to remain in control of the Debtor.

23.     Sadleir and Kadadu have apparently resided in the Property for years rent-free and at the Debtor's expense.

24.     Cairn's interests in the Property are at risk of immediate diminution in value, including erosion of Cairn's secured position by the continued accrual of default interest under

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1    the Credit Agreement, other charges and penalties with respect to overdue property taxes, which,

2    according to the Debtor's schedules, have already given rise to a statutory lien.

3        25.    I understand that Sadleir purports to have attempted to refinance the mortgage on

4    the Property for months, apparently with no success.  I understand that the only parties credibly

5    interested in financing the mortgaged property in recent months have sought to acquire the

6    mortgage at a significant discount.  Indeed, the most recent third-party appraisal of the property

7    prepared for Cairn indicates that the Property's value is much lower that the total indebtedness

8    owed to Cairn and secured by the mortgage, in the amount of not less than $14,724,332 with

9    default interest and other indemnified expenses continuing to accrue.  Accordingly, it is Cairn's

10    understanding that the Debtor does not have any equity in the Property.

11

12        I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

13    and correct.

14        Executed this 19th day of June 2020 in London, UK.

15

16

17        Brandon Kufrin
        Senior Portfolio Manager,
        Cairn Capital Limited

18

19

20

21

22

23

24

25

26

27

28

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

- 6 -

# KUFRIN DECLARATION

# EXHIBIT "A"

EXECUTION VERSION

**CREDIT, SECURITY, GUARANTY**

**AND PLEDGE AGREEMENT**

among

**AVIRON 1703, LLC**

a Delaware limited liability company

as Borrower,

**THE OTHER CREDIT PARTIES REFERRED TO HEREIN**

as Credit Parties,

and

**CAIRN CAPITAL INVESTMENT FUNDS ICAV**
for its sub fund Cairn Capstone Special Opportunities Fund

as Lender

**Dated as of October 1, 2018**

*Serenity*

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS.................................................................................. 1
   1.1    Defined Terms .......................................................................... 1
   1.2    Approval ................................................................................ 26
   1.3    Miscellaneous ...................................................................... 26

ARTICLE 2 AMOUNT AND TERMS OF LOAN ............................................... 27
   2.1    Commitment to Lend ............................................................ 27
   2.2    Advance Procedure .............................................................. 27
   2.3    Lender' Advances ................................................................ 28

ARTICLE 3 INTEREST, FEES, OTHER CHARGES AND COMPENSATION ..... 28
   3.1    Interest.................................................................................. 28
   3.2    Maximum Rate...................................................................... 29
   3.3    Default Interest..................................................................... 29
   3.4    Loan Fee................................................................................ 29
   3.5    Contingent Compensation; Distribution Fee ........................ 30
   3.6    Right of First Refusal........................................................... 30
   3.7    Right of Last Refusal............................................................ 31
   3.8    Breach of Section 3.6 or Section 3.7..................................... 33
   3.9    Continuing Obligations ....................................................... 33

ARTICLE 4 PAYMENTS AND REPAYMENTS .................................................. 33
   4.1    Repayment of Loans ............................................................ 33
   4.2    Mandatory Prepayments ...................................................... 33
   4.3    Voluntary Prepayments........................................................ 33
   4.4    Payments and Computations................................................. 34
   4.5    Lender Costs ........................................................................ 34
   4.6    Apportionment, Application and Reversal of Payments........ 34
   4.7    Indemnity for Returned Payments ....................................... 34
   4.8    Books and Records; Monthly Statements ............................ 35

ARTICLE 5 LENDING CONDITIONS ............................................................... 35
   5.1    Conditions Precedent to Initial Advance ............................. 35
   5.2    Conditions Precedent to all Advances .................................. 38
   5.3    Post-Closing Conditions ...................................................... 39

ARTICLE 6 RELEASE AND DISTRIBUTION ................................................... 39
   6.1    P & A Budget; Domestic General Theatrical Release Plan; Screenplay
         and Film ............................................................................... 39
   6.2    Initial Domestic General Theatrical Release ........................ 40
   6.3    Film Element Changes.......................................................... 40
   6.4    Contingent Compensation; Fees .......................................... 40
   6.5    Performance and Amendment of Agreements, Etc................ 40
   6.6    Enforcement of Agreements ................................................ 41
   6.7    Related Agreements .............................................................. 42

ARTICLE 7 COLLATERAL ................................................................................... 42
    7.1    Grant of Lien ........................................................................................ 42
    7.2    Perfection and Protection of the Lender's Lien ................................... 43
    7.3    Assignment of Rights Only................................................................... 43
    7.4    Jurisdiction of Organization; Chief Office; Distribution Activities; and
          Physical Properties.............................................................................. 44
    7.5    Title to and Liens on Collateral .......................................................... 44
    7.6    Access and Examination ...................................................................... 44
    7.7    Attorney-in-Fact.................................................................................. 45
    7.8    The Lender's Rights, Duties and Liabilities ........................................ 47
    7.9    Authority to Collect ............................................................................ 47
    7.10  Copyrights........................................................................................... 48
    7.11  Control of Laboratory Materials ......................................................... 48
    7.12  Reinstatement...................................................................................... 49
    7.13  Third-Party Subsequent Film Financiers ............................................ 49
    7.14  Miscellaneous ..................................................................................... 49

ARTICLE 8 GUARANTY OF GUARANTORS ..................................................... 49
    8.1    Guaranty.............................................................................................. 49
    8.2    No Impairment of Guaranty, etc. ........................................................ 51
    8.3    Continuation and Reinstatement, etc. ................................................. 51
    8.4    Limitation on Guaranteed Amount, etc. .............................................. 52

ARTICLE 9 BOOKS, RECORDS; FINANCIAL REPORTING; AND NOTICES.................. 52
    9.1    Books and Records .............................................................................. 52
    9.2    Financial Information........................................................................... 53
    9.3    Certain Film Specific Information ....................................................... 54
    9.4    Notice of Certain Events ..................................................................... 54

ARTICLE 10 GENERAL REPRESENTATIONS AND WARRANTIES ................................. 55
    10.1  Authorization, Validity and Enforceability.......................................... 55
    10.2  Validity and Priority of Liens .............................................................. 56
    10.3  Organization and Qualification ........................................................... 56
    10.4  Financial Statements ........................................................................... 56
    10.5  Solvency............................................................................................... 56
    10.6  Ownership of Equity Interests, Subsidiaries, etc. ............................... 56
    10.7  Rights in the Film and Collateral ........................................................ 57
    10.8  Required Payments .............................................................................. 58
    10.9  Litigation............................................................................................. 58
    10.10 No Defaults ......................................................................................... 58
    10.11 ERISA ................................................................................................. 58
    10.12 Taxes ................................................................................................... 59
    10.13 Margin Stock; Investment Company; and Public Utility Holding
          Company .............................................................................................. 59
    10.14 Fictitious Names ................................................................................. 59
    10.15 Pledged Securities............................................................................... 59
    10.16 Compliance with Laws ........................................................................ 60
    10.17 No Material Adverse Change................................................................ 60

ii

| | | |
|---|---|---|
| 10.18 | Disclosure | 60 |
| 10.19 | Material Agreements | 60 |
| 10.20 | Brokers | 60 |
| 10.21 | Exemption from California Constitutional Usury Provisions | 60 |
| 10.22 | Survival of Warranties | 61 |

**ARTICLE 11 AFFIRMATIVE AND NEGATIVE COVENANTS** ... 61

| | | |
|---|---|---|
| 11.1 | Taxes and Other Liabilities | 61 |
| 11.2 | Keeping of Books and Accounts | 61 |
| 11.3 | Legal Rights and Facilities | 61 |
| 11.4 | Compliance | 62 |
| 11.5 | Maintenance | 62 |
| 11.6 | Insurance | 62 |
| 11.7 | Related Agreements | 63 |
| 11.8 | Approvals | 63 |
| 11.9 | Indebtedness | 63 |
| 11.10 | P & A Cost Funding | 63 |
| 11.11 | Performance of Obligations | 64 |
| 11.12 | Subsidiaries | 64 |
| 11.13 | Dissolution and Sale of Assets | 64 |
| 11.14 | Use of Proceeds | 64 |
| 11.15 | Transactions with Credit Party Affiliates | 64 |
| 11.16 | Limitation on Fundamental Changes | 64 |
| 11.17 | Liens | 65 |
| 11.18 | Negative Pledge | 65 |
| 11.19 | Bank Accounts | 65 |
| 11.20 | Business Activities | 65 |
| 11.21 | Ownership of Distribution Rights | 66 |
| 11.22 | Restricted Payments | 66 |
| 11.23 | Further Assurances | 66 |
| 11.24 | Chain of Title | 66 |
| 11.25 | Universal Agreement | 66 |
| 11.26 | Section 365 of the Revised Bankruptcy Code | 66 |

**ARTICLE 12 PLEDGE** ... 66

| | | |
|---|---|---|
| 12.1 | Pledge | 66 |
| 12.2 | Covenant | 66 |
| 12.3 | Remedies upon Default | 67 |
| 12.4 | Application of Proceeds of Sale and Cash | 68 |
| 12.5 | Securities Act, etc. | 68 |
| 12.6 | Continuation and Reinstatement | 69 |
| 12.7 | Termination | 69 |

**ARTICLE 13 EVENTS OF DEFAULT; REMEDIES** ... 69

| | | |
|---|---|---|
| 13.1 | Events of Default | 69 |
| 13.2 | Remedies | 72 |
| 13.3 | Cumulative Remedies; No Prior Recourse to Collateral | 75 |
| 13.4 | Failure or Indulgence Not Waiver | 75 |

iii

13.5    Performance of Obligations ............................................................... 75
ARTICLE 14 TERM AND TERMINATION ............................................................... 76
14.1    Termination ............................................................................................ 76
ARTICLE 15 MISCELLANEOUS ............................................................................. 76
15.1    Severability ............................................................................................ 76
15.2    Governing Law ...................................................................................... 76
15.3    Jurisdiction ............................................................................................ 77
15.4    Reference Provision .............................................................................. 77
15.5    Taxes ...................................................................................................... 80
15.6    Notices .................................................................................................... 81
15.7    Waiver of Notice .................................................................................... 82
15.8    Successors and Assigns ......................................................................... 82
15.9    Indemnification ...................................................................................... 82
15.10   Assignments and Participations ............................................................ 83
15.11   USA Patriot Act Notice ......................................................................... 85
15.12   Final Agreement, Waivers and Amendments ........................................ 85
15.13   Counterparts .......................................................................................... 85
15.14   Section Headings ................................................................................... 86

iv

## CREDIT, SECURITY, GUARANTY
## AND PLEDGE AGREEMENT

This Credit, Security, Guaranty and Pledge Agreement, dated as of October 1, 2018 (as amended, modified, supplemented, replaced or restated from time to time, this "Agreement"), is entered into by and among Aviron 1703, LLC, a Delaware limited liability company (the "Borrower"), each of the other Credit Parties hereinafter identified and Cairn Capital Investment Funds ICAV, for its sub fund Cairn Capstone Special Opportunities Fund (the "Lender").

### RECITALS

This Agreement is being entered into in reference to the following facts:

A.    The Borrower has requested that the Lender make loans to the Borrower up to the aggregate principal amount of Twenty Two Million Four Hundred Thousand Dollars ($22,400,000) for the purpose of financing the acquisition of distribution rights in, and the cost of releasing in theaters before paying audiences in the United States, the motion picture entitled "*Serenity*".

B.    The Lender is willing to make the Loans to the Borrower upon the terms and conditions herein contained and in consideration of the agreements, representations and warranties of the Credit Parties hereinafter set forth.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1    Defined Terms. Initially capitalized terms used herein shall have the following meanings:

"Account Control Agreement" means (i) the account control agreement, dated as of the date hereof, among the Borrower, SFD, Aviron Finance, Aviron Licensing, the Collection Account Manager and the Collection Account Bank, in form and substance acceptable to the Lender; and (ii) any other deposit account control agreement, in form and substance acceptable to the Lender, among a depository bank, any of the Credit Parties, and the Lender with respect to any other deposit account related to the Film (other than the Exhibitor Account), in form and substance acceptable to the Lender, as each may be amended, restated, modified, supplemented, renewed or replaced from time to time. Each such Account Control Agreement shall include the agreement and acknowledgement of each of the parties thereto that, as applicable, the Borrower, Aviron Finance and Aviron Licensing, have granted or shall be granted, respectively, and shall have a first priority security interest in the applicable account and all funds standing to the credit thereof at any time or times, which security interest shall be irrevocably and unconditionally assigned by Aviron Finance and Aviron Licensing to the Lender for security pursuant to the applicable Account Control Agreement Assignment and this Agreement.

"<u>Account Control Assignment Agreement</u>" means an assignment of all of the rights, titles and interests of the Borrower, Aviron Finance and Aviron Licensing in, to and under any Account Control Agreement, in form and substance acceptable to the Lender, as each such Account Control Assignment Agreement may be amended, restated, modified, supplemented, renewed or replaced from time to time.

"<u>Accrued PIK Interest</u>" has the meaning assigned thereto in <u>Subsection 3.1(a)(ii)</u> hereof.

"<u>Act</u>" has the meaning assigned thereto in <u>Section 15.11</u> hereof.

"<u>Affiliate</u>" means, as to any Person, any other Person who directly or indirectly, controls, is controlled by, or is under common control with such Person and any officer, director, member, managing member, manager or other executive of such Person or such other Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract, or otherwise.

"<u>Agreement</u>" has the meaning assigned thereto in the introductory section above.

"<u>Amazon</u>" means Amazon Digital Services, LLC, a Delaware limited liability company and each Affiliate thereof that signs the Amazon Distribution Agreement.

"<u>Amazon Assigned Receipts</u>" means any and all amounts payable or paid by Amazon

to or for the benefit of any of the Credit Parties or for any the account of any Credit Party with regard to the Film pursuant to the Amazon Distribution Agreement including, without limitation, such amounts as are directly deposited into the Collection Account.

"<u>Amazon Distribution Agreement</u>" means the Subscription Video-On-Demand Master License Agreement, dated as of July 23, 2018, by and between Amazon and Aviron Pictures, and any SVOD Deal Addendum (as such term is defined in the Amazon Distribution Agreement) related to the Film in connection therewith, as amended, restated, modified, supplemented, renewed or replaced from time to time; <u>provided</u> that any such amendment, restatement, modification, supplement, renewal or replacement that could reasonably be anticipated to adversely affect the amount or time of payment of the Assigned Receipts shall require the consent of the Lender.

"<u>Amazon Payment Direction</u>" means an irrevocable and unconditional authorization and direction to pay executed and delivered by each applicable Credit Party and Amazon pursuant to which Amazon is directed and agrees to pay the Amazon Assigned Receipts to the Collection Account, in form and substance approved by the Lender.

"<u>Applicable Law</u>" means all provisions of statutes, rules, regulations and orders of a Governmental Authority applicable to the Person in question, all guidelines and directives (whether or not having the force of law) of any Governmental Authority and all orders and decrees of all courts and arbitrators in proceedings or actions in which the Person in question is a party.

2

"Assigned Receipts" collectively means the Amazon Assigned Receipts, the Universal Assigned Receipts and whatever is acquired or paid to or derived by or payable directly or indirectly pursuant to any Subdistribution Agreement or any proceeds thereof, any Exhibitor Agreement or any proceeds thereof, or otherwise on account of the lease, licensing, exchange, distribution, exhibition, exploitation or other disposition of the Film or the Distribution Rights including, without limitation, all money, royalties, fees, commissions, charges, payments, proceeds of any letter of credit, advances, income, investments, profit, Exhibitor Receipts and other forms of payment.

"Attorney Costs" means all reasonable and documented fees of Reed Smith LLP, the external legal counsel engaged by the Lender to negotiate and close the Loan evidenced by this Agreement, and any related reasonable and documented out-of-pocket disbursements, filing, courier, messenger, copying, and other similar expenses incurred by such counsel.

"Authorized Officer" means a secretary, president, manager, managing member, Chief Executive Officer, Chief Financial Officer or Chief Operating Officer of a Person.

"Available Commitment" means, at any date of determination, an amount equal to: (a) the Total Commitment; minus (b) the aggregate amount of all Advances made to or on behalf of the Borrower hereunder.

"Aviron Finance" means Aviron Finance, LLC, a Delaware limited liability company.

"Aviron Licensing" means Aviron Licensing, LLC, a Delaware limited liability company.

"Aviron Releasing Assignment" means each "Assignment Agreement" dated as the date hereof between Aviron Releasing, LLC, a Delaware limited liability company, and Aviron Licensing, in connection with the assignment of rights related to the Film under the Universal Agreement and the Amazon Agreement, respectively, from Aviron Releasing, LLC to Aviron Licensing, as amended, restated, modified, supplemented, renewed or replaced from time to time, each in form and substance approved by the Lender.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. §§ 101 et seq.).

"Borrower" has the meaning assigned thereto on page 1 hereof.

"Borrowing Certificate" means a certificate substantially in the form attached hereto as Exhibit A.

"Broker's Fee" means $250,000 payable by the Borrower to PDL.

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banks in Los Angeles, California are required or permitted to be closed.

"Capital Lease" means any lease of any property (whether real, personal or mixed) by a Person as lessee which, in accordance with GAAP, is or should be accounted for as a capital

3

lease on the balance sheet of such Person, and the amount of obligations in respect of a Capital Lease shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Borrower free and clear of all Liens (other than Liens created under the Loan Documents in favor of the Lender):

(a)    readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)    commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 90 days from the date of acquisition thereof; and

(c)    Investments classified in accordance with GAAP as current assets of Borrower in money market investment programs registered under the Investment Company Act of 1940 that are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

"CCP" has the meaning assigned thereto in Section 15.4(a) hereof.

"Chain of Title Documents" means the documents listed in Schedule 1.1 attached hereto.

"Change of Control" means that: (a) Temerity no longer has at least beneficial ownership, directly or indirectly, of at least 80% of the outstanding Equity Interests of each of the Credit Parties; or (b) William K. Sadleir (or such other Person as may be approved by the Lender in its sole and absolute discretion) no longer is the sole Manager of each the Credit Parties.

"Claim" has the meaning assigned thereto in Section 15.4(a) hereof.

"Claim Date" has the meaning assigned thereto in Section 15.4(a) hereof.

"Closing Date" means the date that all conditions precedent set forth in Sections 5.1 and 5.2 hereof are satisfied or waived.

LEGAL_US_W # 95804807.17

"Code" means the United States Internal Revenue Code, as amended from time to time.

"Collateral" collectively means (i) the Credit Party Collateral and (ii) all other property that is from time to time subject to any of the Liens granted in favor of the Lender pursuant to any of the Fundamental Documents.

"Collateral Proceeds" means all proceeds of the Collateral, including whatever is acquired or paid to or derived by or payable directly or indirectly to any Credit Party on account of the sale, lease, licensing, exchange, distribution, exhibition, exploitation or other disposition of the Film or any other Collateral including, without limitation, money, royalties, fees, commissions, charges, payments, rebates, discounts, refunds and credits, proceeds of any letter of credit, advances, income, profit and other forms of payment, proceeds of any casualty insurance for any of the Collateral, the proceeds of any tax incentives derived from the Film and all Assigned Receipts.

"Collection Account" means the bank account no. 80006521332 held and maintained in the name of Stichting Freeway Custody Serenity Domestic at the Collection Account Bank, at 111 Pine Street, San Francisco, California 94111, Attention: Agnes Viszoki, ABA Number 321081669, Swift Code FRBBUS6S, Reference: *Serenity*, or any other bank account from time to time, approved by the Lender. The Collection Account at all times shall be subject to an Account Control Agreement and related Account Control Agreement Assignment.

"Collection Account Bank" means First Republic Bank, or any other Bank at which the Collection Account is maintained from time to time, approved by the Lender.

"Collection Account Management Agreement" or "CAMA" means the Collection Account Management Agreement, dated as of October 1, 2018, entered into by and among the Collection Account Manager, the Collection Account Trustee, the Borrower, Aviron Finance, Aviron Licensing and SFD, in form and substance approved by the Lender, as amended, modified, supplemented, replaced or restated from time to time.

"Collection Account Management Agreement Assignment" means the Collection Account Management Agreement Assignment, dated as of October 1, 2018, entered into by and among the Collection Account Manager, the Collection Account Trustee, the Borrower, Aviron Finance, Aviron Licensing and the Lender, satisfactory to the Lender, as amended, modified, supplemented, replaced or restated from time to time. Notwithstanding anything to the contrary in the Collection Account Management Agreement, the Collection Account Management Agreement Assignment shall require that the Collection Account Manager specially disburse funds directly to the Lender from the Collection Account at each and any time that there is Fifty Thousand Dollars ($50,000) or more on deposit therein within three (3) Business Days after each date upon which said threshold amount is reached but not more than one (1) such special disbursement shall be made during any single calendar week.

"Collection Account Manager" or "FCAM" means Freeway CAM, B.V., a company registered under the laws of The Netherlands, or any other Person acting in that capacity under the Collection Account Management Agreement from time to time, approved by the Lender.

5

"Collection Account Trustee" or "FCustody" means Stichting Freeway Custody, a foundation registered under the laws of The Netherlands.

"Completion Guarantor" means Film Finances, Inc., a California corporation.

"Consolidated Subsidiaries" means, with respect to any Person at any time, all Subsidiaries of such Person which are required or permitted to be consolidated with such Person for financial reporting purposes in accordance with GAAP then in effect.

"Contingent Compensation" has the meaning assigned thereto in Section 3.5 hereof.

"Contingent Compensation Obligations" means all obligations owing to the Lender arising under Section 3.5 hereof.

"Copyright Mortgage and Assignment" means each Copyright Mortgage and Assignment, dated concurrently herewith, made by the Credit Parties in favor of the Lender, in form and substance approved by the Lender, suitable for filing in the United States Copyright Office, as such document may be amended, restated, modified, supplemented, renewed or replaced from time to time with the approval of the Lender.

"Court" has the meaning assigned thereto in Subsection 15.4(a) hereof.

"Credit Party" means the Borrower and each Guarantor.

"Credit Party Collateral" means (A) with respect to the Borrower and Aviron Finance, all of such Credit Party's right, title and interest in and to all personal property, tangible and intangible, wherever located or situated and whether now owned, presently existing or hereafter acquired or created, excluding only such Credit Party's Equity Interest in an SPV (other than the Equity Interests in the Borrower, which are included in the "Credit Party Collateral") and, prior to any distribution thereof to the holder of the Equity Interests therein, the assets of an SPV, but including, without limitation, all goods, accounts, instruments, intercompany obligations, contract rights, partnership and joint venture interests, documents, chattel paper, general intangibles, goodwill, equipment, machinery, inventory, investment property, copyrights, trademarks, trade names, insurance policies (including key man policies, if any), insurance proceeds, cash and Cash Equivalents, Liens (including, but not limited to, any Lien granted or to be granted by SFD in favor of such Credit Party, including the lien created by a Copyright Mortgage and Assignment, dated as of June 15, 2017, filed for recordation in the U.S. Copyright Office on August 28, 2018, and UCC-1 Financing Statement filed with the Delaware Secretary of State on August 28, 2018, 18-76666083419, each with SFD as "Debtor" in favor of the Borrower as "Secured Party"), and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings or negotiable instruments which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or necessary assignment whether now owned or hereafter acquired, deposit accounts, letter of credit rights, the Pledged Securities and other securities, all amounts on deposit in the Collection Account, and any proceeds of, or any products or income from, any of the foregoing, further including but not limited to, all of such Credit Party's right, title and interest in and to the Film, the scenario, screenplay or script upon which the Film is based, all of the properties thereof, tangible and

6

intangible, and all domestic copyrights and all other rights therein and thereto, of every kind and character, whether now or hereafter in existence, and whether or not in possession of such Credit Party, including and without limiting the foregoing language, and such Credit Party's right, title and interest in and to each and all of the following particular rights and properties (in each case wherever located and to the extent they are now owned, presently existing or hereafter created or acquired by such Credit Party):

 (i) all scenarios, screenplays, teleplays and/or scripts at every stage thereof;

 (ii) all common law and/or statutory copyright and other rights in all literary and other properties (hereinafter collectively referred to as the "Literary Property") which form the basis of the Film and/or which are or will be incorporated into the Film, all component parts of the Film consisting of the Literary Property, all motion picture, television program or other rights in and to the story, all treatments of said story and the Literary Property, together with all preliminary and final screenplays used and to be used in connection with the Film, and all other literary material upon which the Film is based or from which it is adapted;

 (iii) all rights for all media in and to all music and musical compositions used and to be used in the Film, if any, including, each without limitation, all rights to record, re-record, produce, reproduce or synchronize all of such music and musical compositions, including, without limitation, reuse fees, royalties and all other amounts payable with respect to said music and musical compositions;

 (iv) all tangible personal property relating to the Film, including, without limitation, all exposed film, developed film, positives, negatives, prints, positive prints, answer prints, magnetic tapes and other digital or electronic storage media, special effects, preparing materials (including interpositives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements), sound tracks, cutouts, trims and any and all other physical properties of every kind and nature relating to the Film whether in completed form or in some state of completion, and all masters, duplicates, drafts, versions, variations and copies of each thereof, in all formats whether on film, videotape, disk or otherwise and all music sheets and promotional materials relating to the Film (collectively, the "Physical Properties");

 (v) all collateral, allied, subsidiary and merchandising rights appurtenant or related to the Film including, without limitation, the following rights: all rights to produce remakes, spin-offs, sequels or prequels to the Film based upon the Film, the Literary Property or the theme of the Film and/or the text or any part of the Literary Property; all rights throughout the world to broadcast, transmit and/or reproduce by means of television (including commercially sponsored, sustaining and subscription or "pay" television) or by streaming video or by other means over the internet or any other open or closed physical or wireless network or by any process analogous to any of the foregoing, now known or hereafter devised, the Film or any remake, spin-off, sequel or prequel to the Film; all rights to produce primarily for television or similar use, a motion picture or series of motion pictures, by use of film or any other recording device or medium now known or hereafter devised, based upon the Film, the Literary Property or any part thereof, including, without limitation, based upon any script, scenario or the like used in the Film; all merchandising rights including, without limitation, all rights to use, exploit and

7

license others to use and exploit any and all commercial tie-ups of any kind arising out of or connected with the Literary Property, the Film, the title or titles of the Film, the characters of the Film and/or the literary properties and/or the names or characteristics of said characters and including further, without limitation, any and all commercial exploitation in connection with or related to the Film, any remake, spin-off, sequel or prequel thereof and/or the literary properties;

(vi)    all statutory copyrights, domestic and foreign, obtained or to be obtained on the Film, together with any and all copyrights obtained or to be obtained in connection with the Film or any underlying or component elements of the Film, including, in each case without limitation, all copyrights on the property described in subparagraphs "(i)" through "(v)" inclusive, of this definition, together with the right to copyright (and all rights to renew or extend such copyrights, if applicable) and the right to sue in the name of such Credit Party for past, present and future infringements of copyright with respect to the property described in subparagraphs "(i)" through "(v)" inclusive, of this definition;

(vii)    all insurance policies and completion bonds connected with the Film and all proceeds which may be derived therefrom;

(viii)    all rights to distribute, sell, rent, license the exhibition of and otherwise exploit and turn to account the Film in all media (whether now known or hereafter developed), the Physical Properties, the motion picture, television program or other rights in and to the story and/or other literary material upon which the Film is based or from which it is adapted, and the music and musical compositions used or to be used in the Film;

(ix)    any and all sums, claims, proceeds, money, products, profits or increases, including money profits or increases (as those terms are used in the UCC or otherwise) or other property obtained or to be obtained from the distribution, exhibition, sale or other uses or dispositions of the Film or any part of or rights in or to the Film in all media (whether now known or hereafter developed), including, without limitation, all sums, claims, proceeds, profits, products and increases, whether in money or otherwise, from a sale and leaseback or other sale, rental or licensing of the Film and/or any of the elements of the Film including, without limitation, from collateral, allied, subsidiary and merchandising rights, and further including, without limitation, all monies held in the Collection Account;

(x)    the dramatic, nondramatic, stage, television, radio and publishing rights, title and interest in and to the Film, and the right to obtain copyrights and renewals of copyrights therein, if applicable;

(xi)    the name or title of the Film and all rights of such Credit Party to the use thereof, including, without limitation, rights protected pursuant to trademark, service mark, unfair competition and/or any other applicable statutes, common law, or other rule or principle of law;

(xii)    any and all contract rights and/or chattel paper which may arise in connection with the Film;

(xiii)    all accounts and/or other rights to payment which such Credit Party presently owns or which may arise in favor of such Credit Party in the future in connection with

8

the Film, including, without limitation, any refund or rebate in connection with a completion bond or otherwise, any refund, rebate, discount or credit in connection with any item of P & A Costs, any and all refunds in connection with any VAT or value added tax, all accounts and/or rights to payment due from Persons in connection with the distribution and/or exploitation of the Film, or from the exploitation of any and all of the collateral, allied, subsidiary, merchandising and other rights in connection with the Film, including tax refunds and tax rebates received in connection with tax incentives and Net Proceeds;

(xiv)    any and all "general intangibles" (as that term is defined in the UCC) not elsewhere included in this definition, exclusive of the Equity Interests in an SPV, but including, without limitation, any and all general intangibles consisting of any right to payment which may arise in connection with the distribution or exploitation of any of the rights set out herein, and any and all general intangible rights in favor of such Credit Party for services or other performances by any third parties, including actors, writers, directors, individual producers and/or any and all other performing or nonperforming artists in any way connected with the Film, any and all general intangible rights in favor of such Credit Party relating to licenses of sound or other equipment, or licenses for any photograph or photographic or other processes, and any and all general intangibles related to the distribution or exploitation of the Film including general intangibles related to or which grow out of the exhibition of the Film and the exploitation of any and all other rights in the Film set out in this definition;

(xv)    any and all "goods," including, without limitation, "inventory" (as such terms are defined in the UCC) which may arise in connection with the Film, which goods are owned by such Credit Party pursuant to any distribution agreement or otherwise;

(xvi)    all and each of the rights, regardless of denomination, which arise in connection with the acquisition, creation, production, completion of production, delivery, distribution, or other exploitation of the Film including, without limitation, any and all rights in favor of such Credit Party, the ownership or control of which are or may become necessary or desirable, in the reasonable opinion of the Lender to distribute and otherwise exploit the Film;

(xvii)    any and all documents issued by any pledge holder or bailee with respect to the Film or any Physical Properties (whether or not in completed form) with respect thereto;

(xviii)    any and all deposit accounts established by such Credit Party with respect to the Film;

(xix)    any and all rights of such Credit Party under any agreement with respect or relating to the distribution of the Film;

(xx)    any and all rights of such Credit Party under contracts relating to the production or acquisition of the Film or otherwise, including, but not limited to, all such contracts which have been delivered to the Lender pursuant to this Agreement;

(xxi)    any and all security granted in favor of such Credit Party in or related to the Film including, without limitation, any rights to payment or other rights relating to the Film;

9

(xxii)  any rebates, discounts, credits, refunds, grants or other similar benefits relating to the Film; and

(xxiii)  all accessions and additions to, substitutions for, and replacements, products and proceeds any of the foregoing including, without limitation, proceeds of any insurance policies and claims against third Persons with respect to the foregoing;

(B)  with respect to Aviron Licensing, (i) the Exhibitor Receipts on deposit in the Exhibitor Account and (ii) all of Aviron Licensing's right, title and interest in and to all personal property, tangible and intangible, wherever located or situated and whether now owned, presently existing or hereafter acquired or created, in connection with the Film (excluding any deposit accounts), including, without limitation, all goods, accounts, instruments, intercompany obligations, contract rights, partnership and joint venture interests, documents, chattel paper, general intangibles, goodwill, equipment, machinery, inventory, investment property, copyrights, trademarks, trade names, insurance policies (including key man policies, if any), insurance proceeds, cash and Cash Equivalents, Liens (including, but not limited to, any Lien granted or to be granted by SFD in favor of Aviron Licensing), and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings or negotiable instruments which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or necessary assignment whether now owned or hereafter acquired, letter of credit rights, securities, and any proceeds of, or any products or income from, any of the foregoing, in each case in connection with the Film, further including but not limited to, all of Aviron Licensing's right, title and interest in and to the Film, the scenario, screenplay or script upon which the Film is based, all of the properties thereof, tangible and intangible, and all domestic copyrights and all other rights therein and thereto, of every kind and character, whether now or hereafter in existence, and whether or not in possession of Aviron Licensing;

(C)  with respect to Aviron Finance, the Subsequent Aviron Film Excess Proceeds to which the Lender is entitled hereunder; and

(D)  with respect to Temerity, the Temerity Guaranty Collateral.

"Debtor" means each of the Borrower, each Guarantor and those Persons that from time to time own any of the Pledged Securities.

"Default" means any event or condition which, with notice, the passage of time, the happening of any other condition or event, or any combination thereof, would constitute an Event of Default.

"Default Rate" has the meaning given to that term in Section 3.3 hereof.

"Delivery" means "Essential Delivery" and "Full Delivery" (as such terms are defined in the Distribution Agreement.

"Delivery Items" means the "Delivery Items" and all other materials required to be delivered to the Borrower under the Distribution Agreement.

"Distribution Agreement" means the SFD Distribution Agreement.

10

"Distribution Fee Participation" has the meaning given to that term in Subsection 3.5(b) hereof.

"Distribution Fees Assignment Agreement" means the "Assignment Agreement" dated as of the date hereof by and between Aviron Finance and Aviron Licensing with respect to the Film, as amended, restated, modified, supplemented, renewed or replaced from time to time.

"Distribution Rights" means all of the "Distribution Rights" granted and to be granted to the Borrower pursuant to the Distribution Agreement, or otherwise, or to the Borrower or any other Credit Party pursuant to any other agreement, document or instrument.

"Distribution Term" has the meaning assigned thereto in the Distribution Agreement.

"Distributor" means Aviron 1703, LLC, a Delaware limited liability company.

"Dollars" and "$" means lawful money of the United States of America.

"Domestic General Theatrical Release" means the initial general theatrical release of the Film in the Domestic Territory, concurrently on no less than two thousand (2,000) screens, in accordance with the Domestic General Theatrical Release Plan.

"Domestic General Theatrical Release Date" means the date on which the Film is required to be initially theatrically generally released in the Domestic Territory pursuant to the Distribution Agreement, and in accordance with the Domestic General Theatrical Release Plan, in any event not later than: (a) the latest permitted release date in the Distribution Agreement; or (b) January 25, 2019, unless otherwise approved in writing by the Lender.

"Domestic General Theatrical Release Plan" means the plan for the initial Domestic General Theatrical Release of the Film and expenditure of the P & A Budget in accordance with Exhibit B attached hereto.

"Domestic Territory" means the "Distribution Territory," as such term is defined in the Distribution Agreement.

"Drawdown Schedule" means the schedule for the disbursement of certain Advances to the Borrower as follows: (a) the Initial Advance as and when hereinafter provided, in the amount of Twelve Million Dollars ($12,000,000); (b) on October 22, 2018, in the amount of Five Million Dollars ($5,000,000); and (c) provided that the Tracking Standard has been satisfied, as hereinafter provided, on a Business Day selected by the Borrower, and of which the Borrower has provided notice to the Lender in accordance with Section 2.2 hereof, so long as such date is not earlier than one (1) week after the date upon which the Lender and the Borrower confirm in writing that such satisfaction has occurred, in the amount of Three Million Dollars ($3,000,000).

"Equipment" means all machinery, electrical and electronic components, equipment, fixtures, furniture, office machinery, vehicles, trailers, implements and other tangible personal property of every kind and description now owned or hereafter acquired by the Credit Parties and all goods of like kind or type hereafter acquired by the Credit Parties in substitution or

11

replacement thereof, and all additions and accessions thereto, wherever any of the foregoing is located.

"Equity Interests" means shares of the capital stock, partnership interests, membership interests or other ownership units in a limited liability company, beneficial interests in a trust or other equity interests in any Person or any warrants, options or other rights to acquire such interests.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended (or any successor statute).

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Credit Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means: (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of a Credit Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal, within the meaning of Title IV of ERISA, by a Credit Party or any ERISA Affiliate from a Multiemployer Plan or receipt by a Credit Party or any ERISA Affiliate of notification that a Multiemployer Plan is in reorganization, within the meaning of Title IV of ERISA; (d) the filing of a notice of intent to terminate or the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or, to the best knowledge of such Credit Party, any Multiemployer Plan; (g) the determination that any Pension Plan or Multiemployer Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA or contributions due but not delinquent under the Pension Funding Rules, upon such Credit Party or any ERISA Affiliate.

"Event of Default" has the meaning specified in Article 13 hereof.

"Excluded Taxes" means any Tax imposed on or with respect to the Lender or required to be withheld or deducted from a payment due to the Lender, which Tax (i) would not be due from the Lender if the Lender were domiciled or regularly conducting a trade or business in the United States or (ii) is imposed on, or measured by net income (however denominated, including franchise Taxes, branch profit Taxes and gross receipt Taxes), in each case, as a result of the Lender being organized under the laws of, or having its principal office located in, the jurisdiction imposing such Tax (or any political subdivision thereof).

12

"Exhibitor" means each Person authorized by any Credit Party, directly or indirectly, to exhibit the Film in motion picture theaters in the Domestic Territory.

"Exhibitor Account" means the bank account no. 332996567 owned and maintained in the name of Aviron Licensing at the Exhibitor Account Bank, ABA Number 021000021, Swift Code CHASUS33, or any other bank account from time to time, approved by the Lender. The Exhibitor Account at all times shall be in the name and under the sole control of Aviron Licensing.

"Exhibitor Account Bank" means JPMorgan Chase Bank, N.A.

"Exhibitor Agreement" means each agreement pertaining to the Film with an Exhibitor that operates more than one (1) motion picture theater pursuant to which such Exhibitor is authorized to exhibit the Film in motion picture theaters in the Domestic Territory as any such document may be amended, restated, modified, supplemented, renewed or replaced from time to time.

"Exhibitor Receipts" collectively means whatever is acquired or paid to or derived by or payable directly or indirectly by any Exhibitor for or in connection with the exhibition of the Film or any proceeds thereof including, without limitation, all money, royalties, fees, commissions, charges, payments, proceeds of any letter of credit, advances, income, investments, profit and other forms of payment.

"Film" means the color, full-length, motion picture, cinematographic film and photoplay based on the Screenplay, entitled *Serenity* (by whatever title such motion picture is now or may hereafter become known), including the sound records thereof, as well as trailers and clips thereof, produced by means of any photographic, electronic, mechanical or other processes or devices now or hereafter known, invented, used or contemplated, by which photographs, films, drawings, images or other visual reproductions or representations are or may be printed, imprinted, recorded or otherwise preserved on film, tape or any other material of any description (whether translucent or not) for later projection, exhibition or transmission by any means or media now known or hereafter devised, in such manner that the same are or appear to be in motion or in sequence on a screen, mirror, tube or other medium or device, whether or not accompanied by sound record.

"Financial Statements" means the financial statements of the Parent and each of the Credit Parties as required to be provided to the Lender in accordance with Section 10.4 hereof.

"Fundamental Documents" means this Agreement, the Note, each Laboratory Access Agreement, the Amazon Agreement, the Universal Agreement, the Distribution Agreement, the Power of Attorney, the Security Documents, the Temerity Guaranty and Temerity Guarantor Documents, the Collection Account Management Agreement, the Collection Account Management Agreement Assignment, the Payment Directions, each Aviron Releasing Assignment, the Exhibitor Agreements, the Chain-of-Title Documents, the License Agreement, the Funding Agreement, the Distribution Fees Assignment Agreement, and all other agreements, instruments and documents heretofore, now or hereafter evidencing, securing, guaranteeing or

13

otherwise relating to the Loan Obligations, the Collateral, the Lender's Liens in the Collateral or any other aspect of the transactions contemplated by this Agreement, and any other ancillary documentation which is required to be or is otherwise executed by any Credit Party and delivered to the Lender in connection with this Agreement or any of the documents listed above, as any of the foregoing may be amended, restated, modified, supplemented, renewed or replaced from time to time with the approval of the Lender.

"Funding Agreement" means the Funding Agreement dated as of the date hereof by and between Aviron Finance and the Borrower with respect to the Film, as amended, restated, modified, supplemented, renewed or replaced from time to time.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time consistently applied (except for accounting changes in response to FASB releases, or other authoritative pronouncements).

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantor" means Temerity, Aviron Licensing and Aviron Finance.

"Guaranty" means, as to any Person, any direct or indirect obligation of such Person guaranteeing or intended to guarantee any Indebtedness, Capital Lease, dividend or other monetary obligation ("primary obligation") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, or (b) to advance or supply funds for the purchase or payment of any such primary obligation, or (c) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or (d) to purchase property, securities or services, in each case, primarily for the purpose of assuring the performance by the primary obligor of any such primary obligation; provided, however, the term Guaranty shall not include endorsements for collection or collections for deposit, in either case in the ordinary course of business. The amount of any Guaranty shall be deemed to be an amount equal to the lesser of (x) the stated or determinable amount of the primary obligation in respect of which such Guaranty is made (or, if the amount of such primary obligation is not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder)), or (y) the stated maximum liability under such Guaranty.

"Indebtedness" means (without double counting), at any time and with respect to any Person, (a) indebtedness of such Person for borrowed money (whether by loan or the issuance and sale of debt securities) or for the deferred purchase price of property or services purchased (other than (x) amounts constituting trade payables (payable within one hundred twenty (120) days or such longer terms as may be customary in the industry), or (y) any purchase price

14

adjustment, earn out or deferred payment of a similar nature incurred in connection with an acquisition (but only to the extent that no payment has at the time become due and payable pursuant to such purchase price adjustment, earn out or deferred payment obligation), (b) obligations of such Person in respect of letters of credit, acceptance facilities, or drafts or similar instruments issued or accepted by banks and other financial institutions for the account of such Person, (c) obligations of such Person under Capital Leases and any financing lease involving substantially the same economic effect, (d) deferred payment obligations of such Person resulting from the adjudication or settlement of any litigation to the extent not already reflected as a current liability on the balance sheet of such Person, and (e) indebtedness of others of the type described in clauses (a) through (d) hereof which such Person has (i) directly or indirectly assumed or guaranteed in connection with a Guaranty, or (ii) secured by a Lien on the assets of such Person, whether or not such Person has assumed such indebtedness.

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Fundamental Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial Advance" has the meaning assigned thereto in Section 5.1 hereof.

"Initial Theatrical Release Version" has the meaning assigned thereto in Subsection 6.1(a) hereof.

"Instrument of Assumption and Joinder" means an Instrument of Assumption and Joinder substantially in the form of Exhibit C attached hereto.

"Interest PIK Date" means the first Business Day of each month.

"Interest Rate" means the Loan Interest Rates and the Loan Default Interest Rate set forth in Section 3 hereof.

"Investment" means any stock, evidence of indebtedness or other securities of any Person, any loan, advance, contribution of capital, extension of credit or commitment therefor (including the Guaranty of loans made to others, but excluding current trade and customer accounts receivable arising in the ordinary course of business and payable in accordance with customary trading terms in the ordinary course of business), any purchase of (a) any Equity Interests of another Person, or (b) any business or undertaking of any Person or any commitment to make any such purchase, or any other investment.

"Laboratory" means (i) Foto-Kem Industries, Inc., (ii) Schedule 2, Ltd., (iii) Post Haste Digital Inc., and (iv) any other laboratory, sound, post-production, or other similar facility, which has been approved by the Lender and that has been engaged to perform transfers, telecine, or other services for the Film or holds at any time any original or duplicate materials or elements of the Film.

"Laboratory Access Agreement" means a letter or other form of agreement among (a) a Laboratory holding any Physical Properties or other elements (including data backups of work in progress) of the Film to which any Credit Party has the right of access, (b) such Credit Party and (c) the Lender and any other applicable Persons, substantially in the form of Exhibit D attached

15

hereto or other form approved by the Lender, which permits the Lender to control, to the exclusion of the Credit Parties, the access of the Credit Parties to any of the Laboratory Materials held by that Laboratory upon the issuance of a notice to the Laboratory.as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Laboratory Materials" means all physical elements of the Film, including all negatives, duplicate negatives, fine grain prints, soundtracks, positive prints (cutouts and trims excepted), and sound, all video formats (including PAL/NTSC), and other physical properties in connection with the Film and the trailer for the Film, exposed film and tape, developed film, positives, negatives, prints, answer prints, special effects, Laboratory Materials (including interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised) soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims, non-analog recordings and tapes, including without limitation, any video digital recordings and HDTV format recordings, and any and all other physical properties of every kind and nature relating to the Film in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof, at any time or times owned or controlled by any of the Credit Parties.

"Lender Advance(s)" has the meaning assigned thereto in Subsection 2.2(d) hereof.

"Lender" means the Lender and each other Person that becomes a "Lender" in accordance with this Agreement and their respective successors and assigns.

"Lender Payment Direction" means an irrevocable and unconditional authorization and direction to pay executed and delivered by each Credit Party to the Collection Account Manager as to the payment of the Lender's Share of Net Proceeds in form and substance approved by the Lender.

"Lender's Share of Net Proceeds" means 20% of 100% of the Net Proceeds to which the Borrower shall become entitled to pursuant to the Distribution Agreement.

"Lender Termination Date" means the earliest to occur of: (a) the Maturity Date; (b) the date the credit facility provided hereunder is terminated by the Lender pursuant to Section 14.1 hereof; and (c) the date this Agreement is otherwise terminated by the Lender as permitted under this Agreement.

"Lender Transactional Costs" means: (a) all Attorney Costs and all other all reasonable, documented and actual out-of-pocket costs and expenses (including but not limited to consultancy fees, information service costs, travel costs and accommodation costs), and out-of-pocket court costs for the use of any electronic system and any other Internet or extranet based site, incurred by the Lender in connection with the negotiation, preparation and filing of this Agreement, the other Fundamental Documents and the other agreements and documents referred to herein; provided that the aggregate amount of such Lender Transactional Costs shall not exceed One Hundred Thousand Dollars ($100,000); and (b) all Title Insurance Costs.

16

"License Agreement" means the License Agreement dated as of the date hereof by and between Aviron Licensing and the Borrower with respect to the Film, as amended, restated, modified, supplemented, renewed or replaced from time to time.

"Lien" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute, or contract, and including without limitation, a security interest, charge, claim, or lien arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, agreement, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes, or other security device or arrangement of any kind or nature whatsoever (including, without limitation, any financing or similar statement or notice filed under the UCC, as in effect from time to time in the relevant jurisdiction, or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"Loan Default Interest" has the meaning assigned thereto in Section 3 hereof.

"Loan Default Interest Rate" has the meaning assigned thereto in Section 3 hereof.

"Loan Fee" is the amount of Two Million Four Hundred Thousand Dollars ($2,400,000) which shall be deemed earned immediately on the Closing Date and shall not be subject to refund, in whole or in part, for any reason whatsoever.

"Loan Interest" has the meaning assigned thereto in Section 3 hereof.

"Loan Interest Rate" has the meaning assigned thereto in Section 3 hereof.

"Loan Obligations" collectively means all present and future loans, fees, advances, liabilities, obligations, covenants, duties, and indebtedness owing by any Credit Party or any other Person arising under this Agreement or any of the other Fundamental Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect (including, without limitation, those acquired by assignment from others), absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including, without limitation, all principal, interest, charges, expenses, fees, outside attorneys' fees and filing fees; provided that, for the avoidance of doubt, the term "Loan Obligations" shall exclude (i) the Contingent Compensation Obligations, (ii) the Distribution Fee Participation, (iii) the ROFR Right and (iv) the ROLR Right.

"Loans" means the loans and Advances provided for in Article 2 hereof.

"Material Adverse Effect" shall mean a material and adverse effect on: (a) the business, operations, assets, liabilities (actual or contingent), prospects, or financial condition, of (i) the Borrower or (ii) the other Credit Parties (taken as a whole); (b) the ability of (i) the Borrower or (ii) the other Credit Parties (taken as a whole) to perform their obligations under any of the Fundamental Documents to which they are a party; (c) the legality, validity, binding effect or enforceability against t h e Borrower or any other Credit Party of any Fundamental Document to which it is a party; or (d) the validity or perfection or priority of any Lien in favor of the

17

Lender on any material portion of the Collateral or on the aggregate value of the Collateral or on the validity or enforceability of the rights, remedies or benefits available to the Lender under any of the Fundamental Documents.

"Material Agreement" has the meaning assigned thereto in Section 10.20 hereof.

"Maturity Date" means the earlier of December 15, 2019 or such other date as the Loans shall be due and payable in accordance with this Agreement or any other Fundamental Document.

"Maximum Legal Rate" has the meaning assigned thereto in Section 3.2 hereof.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Credit Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including a Credit Party or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Proceeds" has the meaning assigned to such term in the Distribution Agreement.

"NRG" means National Research Group.

"Note(s)" means a Note, issued by the Borrower in favor of the Lender, as amended, modified, supplemented or restated from time to time.

"Notice to Insurer" means that certain Notice to Insurer of even date herewith executed by the applicable Credit Parties and the Lender and directed to the insurer(s) for the errors and omissions policy for the Film, in the form attached hereto as Exhibit "E."

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

"Parent" means Temerity Trust Management, LLC, a Delaware limited liability company.

"P & A Budget" means the P & A Budget for the Film, dated as of September 26, 2018, in the amount of $28,077,496 inclusive of the amount of the Purchase Price ($4,250,000), the Lender Transactional Costs and the Broker's Fee, attached hereto as Exhibit F.

"P & A Costs" means all direct, out-of-pocket costs and expenses relating to prints, advertising, marketing and promotion of the Film and certain other costs specified in the P & A Budget in connection with Distributor's initial theatrical release of the Film in the Domestic Territory, net of all credits, rebates, refunds and discounts, including any and all laboratory and

18

other discounts (whether volume or otherwise) which the Borrower is obligated to provide under the Distribution Agreement or otherwise provides (to the extent actually expended by the Borrower or any Affiliate thereof with third Persons that are not in any way Affiliates of the Borrower or any other Credit Party), and is thereafter entitled to recoup or retain from the proceeds of the Film, in connection with the theatrical release of the Film in the Domestic Territory.

"Participant Register" has the meaning assigned thereto in Subsection 15.10(c) hereof.

"Participating Lender" has the meaning assigned thereto in Subsection 15.10(b) hereof.

"Payment Account" means the Lender controlled bank account no. 671850400001, account name BANA LONDON GCAS CASH, held and maintained in the name of Cairn Capstone Special Opportunities Fund at the Payment Account Bank, IBAN 6550660591, Swift Code BOFAUS3N, Reference: *Serenity* or any other account designated by the Lender to which funds disbursed from the Collection Account to or for the benefit of Lender are to be deposited.

"Payment Account Bank" means Bank of America N.A. Global Custody and Agency Services, or any other Bank at which the Payment Account is maintained from time to time, as designated by the Lender.

"Payment Direction" means each of the Amazon Payment Direction, the Universal Payment Direction, the Lender Payment Direction and any other authorization and direction to pay executed and delivered by a Credit Party, a Subdistributor or other Person obligated to pay any Assigned Receipts and the Lender, each in form and substance approved by the Lender.

"PBGC" means the Pension Benefit Guaranty Corporation and any successor thereto performing similar functions.

"PDL" means Preferred Development Limited, a company organized under the laws of England and Wales.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan), other than a Multiemployer Plan, that is maintained or is contributed to by a Credit Party and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Permitted Liens" means: (a) the Liens granted to the Lender under this Agreement and the other Fundamental Documents; (b) the Lien of each Laboratory provided for or referred to in any Laboratory Access Agreement, provided such Lien (i) occurs in the ordinary course of making materials for the Domestic General Theatrical Release of the Film, (ii) is for an

19

aggregate amount which does not at any time exceed the sum of $50,000 and (iii) is security for amounts that, at the time the Lien is granted, are not yet due and payable or are being contested in good faith; (c) mechanics, workmen's, materialman's and repairmen's liens; provided (i) such liens arise from claims arising in the ordinary course of business, and (ii) such liens for an aggregate amount which does not at any time exceed the sum of $25,000, and (iii) arise from claims which are not in default or are being contested in good faith; (d) Liens in favor of unions and guilds having jurisdiction over the production of the Film, (e) Liens in favor of the Completion Guarantor, and (f) solely in connection with Aviron Finance and Aviron Licensing, any Lien in favor of any Third-Party Subsequent Film Financier on the property of Aviron Finance or Aviron Licensing that constitutes the  distribution rights, and the proceeds thereof, derived from the distribution of any Subsequent Aviron Film for the purpose of securing advances made by said Third-Party Subsequent Film Financier to pay the purchase price for the acquisition of said distribution rights, and P & A Costs for the general domestic theatrical release of, said Subsequent Aviron Film(s). The foregoing shall not constitute an acknowledgment by the Lender that any of the rights of the third Persons referred to therein are equal or senior to the rights of the Lender under this Agreement or the other Fundamental Documents and the parties hereto do not intend by the inclusion of references to various third party agreements in this definition or otherwise to create any third party beneficiary rights herein or under any of the agreements which incorporate this definition by reference.

"Person" means any natural person, corporation, partnership, joint venture, association, trust or unincorporated organization or any other legal entity, or a nation, state, government entity or any agency or political subdivision thereof.

"Physical Properties" shall have the meaning given to such term in paragraph "(iv)" of the definition of Collateral herein.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of a Credit Party or any such Plan to which such Credit Party is required to contribute on behalf of any of its employees.

"Pledged Collateral" means the Pledged Securities and any proceeds (as defined in Section 9102(a)(64) of the UCC) including cash proceeds (as defined in Section 91029102(a)(9) of the UCC) of the Pledged Securities.

"Pledged Securities" means all of the issued and outstanding capital stock, partnership interests, membership interests, beneficial interests or other Equity Interests of or in the Borrower and all other Equity Interests now owned or hereafter acquired by any Guarantor in the Borrower, whether now owned or hereafter acquired.

"Pledgor" means each Person that from time to time owns any of the Pledged Securities.

"Potential Financiers" has the meaning assigned thereto in Subsection 3.7(b) (i) hereof.

"Power of Attorney" means the Power of Attorney, dated as of the date hereof, executed by the Credit Parties in favor of the Lender, pursuant to which each of the Credit Parties has respectively appointed the Lender as its attorney-in-fact with respect to the Collateral, as amended, restated, modified, supplemented, renewed or replaced from time to time.

20

"Purchase Price" means the "Minimum Guarantee" as defined in the Distribution Agreement equal to $4,250,000.

"Referee" has the meaning assigned thereto in Subsection 15.4 hereof.

"Register" has the meaning assigned thereto in Subsection 15.10(b) hereof.

"Registered Loan" has the meaning assigned thereto in Subsection 15.10(d).

"Registrar" has the meaning assigned thereto in Subsection 15.10(d). "Regulation T," "Regulation U" and "Regulation X" means Regulations T, U and X, respectively, of the FRB as each is from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, shareholders, members, directors, officers, employees, agents, trustees, administrators, managers, advisors, agents and other representatives of such Person and of such Person's Affiliates.

"Replacement SVOD Subdistribution Agreement" has the meaning assigned thereto in Subsection 3.6(b) hereof.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Restricted Payment" means (a) any distribution, cash dividend or other direct or indirect payment on account of any Equity Interest in any Credit Party, (b) any redemption or other acquisition, re-acquisition or retirement by a Credit Party of any Equity Interests in any Credit Party or any Affiliate thereof, now or hereafter outstanding, (c) any payment made by any Credit Party to retire, or obtain the surrender of, any outstanding warrants, puts or options or other rights to purchase or otherwise acquire any Equity Interest in any Credit Party or any Affiliate thereof, now or hereafter outstanding, (d) any payment by a Credit Party of principal of, premium, if any, or interest on, any redemption, purchase, retirement, defeasance, sinking fund or similar payment with respect to, any Subordinated Debt, (e) any advance, loan or extension of credit by a Credit Party to any other Person, and (f) any payment of any kind to or for the benefit of an Affiliate of the a Credit Party (including, without limitation, any payment to an owner of an Equity Interest, or any Affiliate whether on account of sales commissions, salary subsidies, profit or similar participations or payments, overhead expenses or cost reimbursement, for any sales or distribution services with respect to any motion picture or other production, whether or not resulting in revenues for a Credit Party); provided that, the definition of "Restricted Payment" shall not include any payments made by Aviron Finance and its Subsidiaries (other than the Borrower) or Aviron Licensing to any Third-Party Subsequent Film Financier in connection with any Third-Party Subsequent Financings for the financing provided to pay the purchase price for the acquisition of distribution rights, and P & A Costs with respect to, such Subsequent Aviron Film(s).

"ROFR Holder" has the meaning assigned thereto in Subsection 3.6(a) hereof.

LEGAL_US_W # 95804807.17

"ROFR Notification Date" has the meaning assigned to such term in Section 3.6(b) hereof.

"ROFR Right Exercise Election" has the meaning assigned thereto in Subsection 3.6(c) hereof.

"ROFR Right Exercise Election Period" has the meaning assigned thereto in Subsection 3.6(c) hereof.

"ROFR Rights" has the meaning assigned thereto in Subsection 3.6(a) hereof.

"ROFR Term" has the meaning assigned thereto in Subsection 3.6(d) hereof.

"ROLR Film" means each of the first five (5) feature length theatrical motion pictures (including those currently entitled *Three Seconds, After* and *The War With Grandpa* or any replacement for any such motion picture), each of which is intended to be generally theatrically released in the United States by Aviron Licensing or, if approved by the Lender, by an Affiliate of Aviron Licensing, after the Domestic General Theatrical Release of the Film, in so-called "wide release" (i.e. not less than seven hundred fifty (750) films simultaneously).

"ROLR Holder" has the meaning assigned thereto in Subsection 3.7(a) hereof.

"ROLR Match Notice" has the meaning assigned thereto in Subsection 3.7(b) hereof.

"ROLR Right" has the meaning assigned thereto in Subsection 3.7(a) hereof.

"Screenplay" means the original screenplay entitled *Serenity*, dated June 29, 2016, written by Steven Knight, and all versions and variations thereof in existence at any time, including, without limitation, those registered in the United States Copyright Office in the name of Mr. Knight as copyright claimant as follows: (a) January 10, 2017, Document Number PAu 003847794; (b) January 10, 2017, Document Number PAu 003861744 under the title *Serenity: This Small Dark Look*; (c) January 10, 2017, Document Number PA 0002046604 under the title *Serenity: This Small Dark Look*; and (d) February 9, 2018, Document Number TX 00008503094.

"Secured Party" means the Lender.

"Security Documents" means each Copyright Mortgage and Assignment, the Temerity Guaranty Documents, the Laboratory Access Agreements, the Laboratory Access Assignment Agreements, the Account Control Agreements, the Account Control Assignment Agreements, the Collection Account Management Agreement Assignment, the UCC financing statements and each other financing statement, authorization letter, security agreement, mortgage, charge or assignment agreement respectively entered into by any Credit Party, or any other Person in favor of the Lender, in connection with the Film or the other Collateral, as any such document amended, restated, modified, supplemented, renewed or replaced from time to time.

"SFD" means Serenity Financing and Distribution LLC, a California limited liability company.

22

"SFD Distribution Agreement" means the Distribution Agreement, dated as of June 15, 2017, between SFD and the Borrower, as such document may be amended, restated, modified, supplemented, renewed or replaced from time to time with the approval of the Lender.

"Solvent" shall mean, with respect to any Person on a particular date, that on such Date: (a) the fair value of the assets of such Person exceeds its liabilities, including contingent liabilities; (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liabilities of such Person or its debts as they become absolute and matured; (c) the remaining capital of such Person is not unreasonably small to conduct its business; and (d) such Person will not have incurred debts and does not have the present intent to incur debts beyond its ability to pay such debts as they mature. In computing the amount of contingent liabilities of any Person on any date, such liabilities shall be computed at the amount that, in the judgment of the Lender, in light of all facts and circumstances existing at such time, represents the amount of such liabilities that reasonably can be expected to become actual or matured liabilities.

"SPV" means a Subsidiary the Equity Interests of which are wholly owned by Aviron Finance and which is a special purpose entity the sole purpose and business of which is to acquire the right to distribute, and to distribute, in the United States a single motion picture and with respect to which no other Credit Party at any time has or will have any obligation or liability of any kind whatsoever.

"Subdistribution Agreement" means: (i) the Universal Agreement; (ii) the Amazon Agreement; and (iii) such other subdistribution and license agreements with respect to the distribution and exploitation of the Film by any means and in any medium as may be entered into by the Borrower or any other Credit Party with the approval of the Lender, as any such document may be amended, restated, modified, supplemented, renewed or replaced from time to time with the approval of the Lender.

"Subdistributor" means any Person, other than the Borrower, that is a party to a Subdistribution Agreement.

"Subordinated Debt" means any Indebtedness of any Credit Party that is subordinated to the Loan Obligations that (a) does not require cash payments prior to the Maturity Date, (b) does not require any mandatory principal amortization or have a maturity date, in each case, prior to the first anniversary of the Maturity Date, (c) does not have any financial covenant, (d) does not have any covenants or events of default that are more restrictive than those contained herein, and (e) has subordination provisions satisfactory to the Lender.

"Subsequent Aviron Film" means each feature length motion picture intended for domestic general theatrical release in the United States, in so-called "wide release" (i.e. not less than seven hundred fifty (750) screens simultaneously), with respect to which any of Aviron Finance, Aviron Licensing or any of their respective Subsidiaries acquires any distribution rights, other than the motion picture entitled *A Private War*.

"Subsequent Aviron Film Costs" has the meaning assigned thereto in the definition of Subsequent Aviron Film Excess Proceeds.

23

"Subsequent Aviron Film Excess Proceeds" means the proceeds from the distribution or exploitation of any Subsequent Aviron Film which is payable to Aviron Finance, Aviron Licensing or any of their respective Subsidiaries in excess only of the amount thereof: (i) contractually required to be, and actually, paid to the Third-Party Subsequent Film Financier of the applicable Subsequent Aviron Film(s) in consideration for: (a) the purchase price for the acquisition of the distribution rights to said Subsequent Aviron Film(s) (excluding any portion thereof that may be calculated with reference to the performance of said Subsequent Aviron Film(s)); and (b) the P & A Costs paid by Aviron Finance or Aviron Licensing to initially release said Subsequent Aviron Film(s) in theatrical distribution in the U.S.; and (ii) other customary costs contractually required to be, and actually, paid from said proceeds only in respect of the applicable Subsequent Aviron Film(s) (e.g. applicable guild residuals, broker's fees, talent bonuses, collection account management fees, licensor payments) (the "Subsequent Aviron Film Other Costs").

"Subsequent Film" has the meaning assigned thereto in Subsection 3.7(a) hereof.

"Subsequent Film Distribution Rights" means the theatrical distribution rights in the United States to a Subsequent Film comparable to, and no less extensive than, the Distribution Rights.

"Subsequent Film Financing" has the meaning assigned thereto in Subsection 3.7(a) hereof.

"Subsidiary" means with respect to any Person, any corporation, association, joint venture, partnership or other Person (whether now existing or hereafter organized) of which at least a majority of the voting stock or other ownership interests therein having ordinary voting power for the election of directors (or the equivalent) is, at the time as of which any determination is being made, owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"SVOD Receivables" has the meaning assigned thereto in Subsection 3.6(a) hereof.

"SVOD Rights" has the meaning assigned thereto in Subsection 3.6(a) hereof.

"Taxes" means any and all present or future taxes, levies, imposts, duties (including stamp duties), deductions, withholdings or similar charges (including ad valorem charges) imposed by any Governmental Authority, including any interest, additions to taxes or penalties applicable thereto.

"Temerity" means Temerity Trust Management, LLC, a Delaware limited liability company.

"Temerity Guaranty" means the Guaranty to be executed and delivered by Temerity concurrently herewith substantially in the form of Exhibit G attached hereto.

24

"Temerity Guaranty Collateral" means the real property and related collateral described in the Temerity Guaranty Documents.

"Temerity Guaranty Documents" means the Temerity Guaranty, the Deed of Trust, Assignment of Rents, Fixture Filing Security Agreement and Environmental Indemnity, in the form of Exhibit H attached hereto, and all other documents and instruments to be executed and delivered by Temerity in favor of the Lender.

"Termination Notice" means the notice issued by the Lender to the Credit Parties stating that all of the Loan Obligations have been indefeasibly repaid in full in cash and the commitment of the Lender to make Advances hereunder has terminated.

"Third-Party Subsequent Film Financier" means any Person that is not an Affiliate of any Credit Party that provides any Third-Party Subsequent Financing.

"Third-Party Subsequent Financing" means any financing provided by a Third-Party Subsequent Film Financier for financing the acquisition of distribution rights in, and/or the cost of releasing in theaters before paying audiences in the United States, any Subsequent Aviron Film.

"Threshold Amount" means $250,000.

"Title Insurance Costs" means all fees, costs and expenses of the Person providing title insurance for the benefit of the Lender in connection with the Temerity Guaranty Collateral, not in excess of Ten Thousand Dollars ($10,000)..

"Total Commitment" means an aggregate amount up to Twenty Two Million Four Hundred Thousand Dollars ($22,400,000).equal to the sum of:(a) Seventeen Million Dollars ($17,000,000); plus (b) so long as the Tracking Standard has been satisfied, Three Million Dollars ($3,000,000); plus (c) the amount of the Loan Fee; provided, however, that if the Tracking Standard has not been satisfied, the amount provided for in clause (b) hereof shall be made available to the Borrower, if at all, in the Lender's sole and absolute discretion.

"Tracking Standard" means as such time as both of the following conditions have been satisfied: (a) the simple arithmetic average of three (3) distinct observations of NRG's "First Choice" rating metric for the Film, each occurring consecutively no sooner than 3.5 weeks prior to the Domestic General Theatrical Release Date and no later than 2.5 weeks prior to the Domestic General Theatrical Release Date, is equal to "3" or greater; and (b) the simple arithmetic average of three (3) distinct observations of NRG's "Total Awareness" rating metric, each occurring consecutively no sooner than 3.5 weeks prior to the Domestic General Theatrical Release Date and no later than 2.5 weeks prior to the Domestic General Theatrical Release Date, is equal to "50" or greater.

"UCC" means the Uniform Commercial Code – Secured Transactions (or any other successor statute) of the State of California or of any other state the laws of which are required by Section 9301-9306 thereof to be applied in connection with the issue of perfection of Liens.

"Universal" means Universal Studios Home Entertainment, LLC.

25

"Universal Agreement" means the Universal – Aviron Pictures, LLC Deal Terms Exclusive Home Entertainment Distribution Services Agreement, dated as of August 20, 2015, by and between Universal and Aviron Pictures, as amended, restated, modified, supplemented, renewed or replaced from time to time; provided that any such amendment, restatement, modification, supplement, renewal or replacement that could reasonably be anticipated to adversely affect the amount or time of payment of the Assigned Receipts shall require the consent of the Lender.

"Universal Assigned Receipts" means any and all amounts payable or paid by Universal to or for the benefit of any of the Credit Parties or for any of the Credit Parties' account with regard to the Film pursuant to the Universal Agreement including, without limitation, such amounts as are directly deposited into the Collection Account.

"Universal Payment Direction" means an irrevocable and unconditional authorization and direction to pay executed and delivered by each applicable Credit Party and Universal pursuant to which Universal is directed and agrees to pay the Universal Assigned Receipts to the Collection Account, in form and substance approved by the Lender.

"USA Patriot Act" means the USA Patriot Act (Title III of Pub. L. 107 56 (signed into law October 26, 2001)) as amended, and the rules and regulations thereunder and any successors thereto.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

1.2    Approval. The words "approval" and "approved" as used herein with reference to an approval right granted  to the Lender means that the Lender shall have the right in the Lender's sole discretion to approve or to withhold approval of the subject matter with respect to which the approval is required.

1.3    Miscellaneous.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Fundamental Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations. Wherever any provision in any Fundamental Document refers to the knowledge (or an analogous phrase) of any Credit Party, such words are intended to signify that such Person has actual knowledge of a particular fact or circumstance or that such Person, if it had exercised reasonable diligence, would have known of such fact or circumstance.

26

## ARTICLE 2
## AMOUNT AND TERMS OF LOAN

2.1    <u>Commitment to Lend</u>.

(a)    Subject to satisfaction or waiver of all the terms and conditions of this Agreement, including the applicable conditions precedent in <u>Article 5</u>, the Lender agrees, upon the request of the Borrower made from time to time during the period from the Closing Date to the Lender Termination Date, to make loans (each of which is hereinafter referred to as an "<u>Advance</u>") to the Borrower for the sole purpose of paying the amounts permitted under <u>Subsection 2.2(a)</u> hereof, in an amount not to exceed (except with respect to any Lender Advances) the Available Commitment; <u>provided</u>, <u>however that</u>, except as hereinafter expressly set forth, no Advances will be made if a Default or Event of Default exists.

(b)    If the sum of the outstanding Advances made pursuant to this <u>Section 2.1</u> exceeds at any time, as applicable, the Available Commitment, the Lender may refuse to make or otherwise restrict the making of Advances on such terms as the Lender may determine until such excess has been eliminated. Any portion of the Total Commitment that is borrowed and repaid may not be re-borrowed.

2.2    <u>Advance Procedure</u>.

(a)    Advance requests shall be made in accordance with the Drawdown Schedule, and consistent with the Domestic General Theatrical Release Plan and the P & A Budget, or as otherwise approved by the Lender, and in accordance with the provisions of this <u>Subsection 2.2(a)</u>. Whenever the Borrower desires an Advance, the Borrower shall deliver to the Lender a Borrowing Certificate, signed by an Authorized Officer of the Borrower no later than 5:00 p.m. (Pacific time) three (3) Business Days before the requested funding date; <u>provided</u>, <u>however that</u>: the Lender shall not have any obligation to make Advances if the outstanding Loan Obligations exceed (or would exceed pursuant to such Advance) the Total Commitment on any particular date.

(b)    Each Borrowing Certificate shall specify: (i) the requested funding date (which shall be a Business Day); (ii) the aggregate amount of the requested Loans; and (iii) the purpose for which each such requested Loan is to be expended. Any Borrowing Certificate made pursuant to <u>Subsection 2.2(a)</u> shall be irrevocable and the Borrower shall be bound to borrow the funds requested therein in accordance therewith.

(c)    The Lender shall make each such Loan available to the Borrower in the amount of such Loan in same day funds (except for any part thereof paid by the Lender to third Persons or to the Lender as permitted hereunder or under any of the Fundamental Documents).

(d)    Subject to the limitations set forth in the provisos contained in this <u>Subsection 2.2</u>, the Lender is hereby authorized by the Borrower, from time to time in the Lender's discretion: (i) after the occurrence of a Default or an Event of Default; or (ii) at any time that any of the other applicable conditions precedent set forth in Article 5 have not been satisfied, to make Advances to the Borrower which the Lender, in its reasonable business judgment, deems necessary or desirable (A) to preserve or protect the Collateral or any portion

27

thereof, (B) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Loan Obligations, or (C) to pay any other amount chargeable to the Borrower pursuant to the terms of this Agreement (any of the Advances described in this <u>Subsection 2.2(d)(i)</u> being hereinafter referred to as "<u>Lender Advances</u>"). The Lender Advances shall be secured by the Collateral, shall constitute Advances and Loan Obligations hereunder, and shall be added to the outstanding principal balance of the Loans. The Lender shall notify the Borrower in writing of the Lender Advance, which notice shall include a description of the purpose of the Lender Advance; <u>provided</u>, <u>however</u>, that any failure to provide any such notice shall not constitute a breach hereunder by the Lender and shall not affect the Borrower's obligation to repay all Lender Advances in accordance with this Agreement.

(e)     The Lender shall record in the Register the principal amount of the Advances owing to the Lender, including the Lender Advances, from time to time. In addition, the Lender is authorized to note the date and amount of each payment or prepayment of principal of the Lender's Loans in its books and records, including computer records. The Lender's books and records constitute rebuttably presumptive evidence, absent manifest error, of the accuracy of the information contained therein.

(f)     Subject to the terms of this Agreement, the Lender shall be obligated to make Advances hereunder only for the purposes and in the amounts and at the times specified in this Agreement and the proceeds thereof shall not be available for any other purpose other than: (A) the payment of P & A Costs substantially in accordance with, but not in excess of, the P & A Budget and the Domestic General Theatrical Release Plan up to an aggregate amount which shall not exceed the Total Commitment; and (B) the payment of the Lender Transactional Costs and the Broker's Fee.

2.3     <u>Lender' Advances</u>.   The Lender shall be deemed to have made Advances in accordance with Section 2.2 hereof on behalf of the Borrower and the Lender may apply the proceeds of such Advances as follows: if a Default or Event of Default shall have occurred and is continuing, the Lender may make Advances up to the amount of the Available Commitment and pay the proceeds thereof directly to the Persons providing rights, services, facilities, locations and materials in connection with the domestic theatrical release of the Film. The Borrower hereby consents and agrees to the payment of such proceeds directly to such Persons and that such Advances shall constitute Loans hereunder.

## ARTICLE 3
## INTEREST, FEES, OTHER CHARGES AND COMPENSATION

3.1     <u>Interest</u>.

(a)     All outstanding Loan Obligations shall bear interest on the unpaid principal amount thereof (including, to the extent permitted by law, on interest thereon not paid when due) from and after the date that occurs six (6) months after the Closing Date (the "<u>Interest PIK Start Date</u>") until paid in full in cash as hereinafter provided:

(i)     From and after the Interest PIK Start Date, the outstanding principal amount of the Loans hereunder shall bear interest at a rate of one percent (1%) per

28

month (or prorated for any portion thereof) (the "Loan Interest Rate") until the Loan Obligations are paid in full ("Loan Interest"). Loan Interest shall accrue on the first day of each month with respect to the outstanding principal balance of the Loans hereunder on the last day of the immediately preceding month.

(ii)    All Loan Interest and Loan Default Interest shall be payable in kind (the "Accrued PIK Interest"). Any Accrued PIK Interest on any Interest PIK Date shall be capitalized and added to the outstanding principal amount of the Loans hereunder on the first day of each month (inclusive of any amount theretofore added pursuant to this sentence). For the purposes of this Agreement and the other Fundamental Documents, the amounts capitalized pursuant to this Section 3.1(a) shall thereafter bear interest in accordance with this Section as such amounts shall constitute a portion of the Loans hereunder.

3.2    Maximum Rate. No provision of this Agreement or the Note shall be deemed to establish or require the payment of interest of a rate in excess of the maximum rate permitted by Applicable Law (the "Maximum Legal Rate"). If the interest required to be paid under this Agreement or any Note exceeds the Maximum Legal Rate, the interest required to be paid hereunder or under such Note shall be automatically reduced to the Maximum Legal Rate. If any interest paid exceeds then applicable Interest Rate, the excess of such interest over the maximum amount of interest permitted to be charged shall be deemed to reduce the accrued and unpaid fees and expenses due to the under this Agreement, if any; then to reduce the accrued and unpaid interest, if any, with respect to the Loans made hereunder; and then to reduce principal of the Loan; the balance of any excess interest remaining after the application of the foregoing and the issuance of the Termination Notice shall be refunded to the Borrower. Each of the Credit Parties acknowledges and agrees that the Interest Rate applicable to the Loan Obligations hereunder is subject to and covered by the usury exceptions provided for in Section 25118(e)(1) of the California Corporations Code, as amended from time to time.

3.3    Default Interest. From and after the Interest PIK Start Date, if any Event of Default shall occur and remain uncured, the interest rate on all outstanding Loan Obligations shall be increased to a rate of two percent (2%) per month (or prorated for any portion thereof) (the "Loan Default Interest Rate"). Interest calculated at the Loan Default Interest Rate shall accrue from the later of (x) the Interest PIK Start Date (if an Event of Default has occurred and is continuing) and (y) the date of the respective Event of Default, to and including the date such Event of Default ceases to exist (the "Loan Default Interest"). The provision, or reliance thereon by the Lender, or the payment by the Borrower and the acceptance by the Lender of any interest at the Loan Default Interest Rate shall not be deemed to be a waiver of any Event of Default or of any of the Lender's rights and remedies at law, in equity or hereunder. The Lender shall endeavor to notify the Borrower after the imposition of the Loan Default Interest Rate to the Loan Obligations pursuant to the foregoing; provided, however, that any failure to do so shall not constitute a breach of this Agreement.

3.4    Loan Fee. On the Closing Date, the Lender shall be entitled to charge the Loan Fee which shall constitute an Advance and shall be capitalized,  added to the outstanding principal amount of the Loans hereunder on the Closing Date and deemed to be fully earned and non-refundable in whole or in part. For the purposes of this Agreement and the other Fundamental Documents, the amounts capitalized pursuant to this Section 3.4 shall thereafter

29

bear interest in accordance with Section 3.1 as such amounts shall constitute a portion of the Loans hereunder.

3.5    Contingent Compensation; Distribution Fee.

(a)    As additional consideration to the Lender to enter into this Agreement and to make any Loan hereunder, the Lender shall be entitled to receive, and the Credit Parties hereby irrevocably and unconditionally assign to the Lender, the Lender's Share of Net Proceeds (the "Contingent Compensation"), without defense, setoff, counterclaim, recoupment or reduction for any reason whatsoever, by disbursement from the Collection Account pursuant to the Lender Payment Direction. The Contingent Compensation shall accrue to the Lender *pro rata* and *pari passu* with the accrual of the Net Proceeds to the Borrower pursuant to the Distribution Agreement and the CAMA.

(b)    As additional consideration to the Lender to enter into this Agreement and to make any Loan hereunder, the Lender shall be entitled to receive an amount equal to the lesser of: (i) twenty five percent (25%) of the "Distribution Fee" (as that term is defined in the Distribution Agreement); or (ii) Three Hundred Fifty Thousand Dollars ($350,000) (the "Distribution Fee Participation"), without defense, setoff, counterclaim, recoupment or reduction for any reason whatsoever, by disbursement from the Collection Account pursuant to the Lender Payment Direction. The Distribution Fee Participation shall accrue to the Lender *pro rata* and *pari passu* with the "Distribution Fee" accrued to Aviron Licensing (or any Related Party).

(c)    If the Collection Account Management Agreement is in effect, the Lender shall be paid the Contingent Compensation and the Distribution Fee Participation pursuant to the Collection Account Management Agreement Assignment or a separate Payment Direction among the Lender, the Credit Parties and the Collection Account Manager, in form and substance satisfactory to the Lender. If the Collection Account Management Agreement is not in effect, the Credit Parties shall account for and pay the Contingent Compensation and the Distribution Fee Participation to the Lender, with payment made directly to the Lender Payment Account or otherwise as the Lender may instruct in writing, not less frequently than quarterly by the tenth (Business Day following the last Business Day of each quarter.

(d)    The rights and obligations of the Lender and the Credit Parties, respectively, under this Section shall be continuing and remain in full force and effect notwithstanding the occurrence of the Lender Termination Date or the repayment of the Loan Obligations.

3.6    Right of First Refusal.

(a)    Until the earlier of (x) the expiration of the ROFR Right Exercise Election Period without a ROFR Right Exercise Election from the Lender and (y) the expiration of the ROFR Term, (i) the Lender or its designee that is another fund and/or managed account to which Cairn Capital Limited (or any of its Affiliates) provides investment management or advisory services (as applicable, the "ROFR Holder") shall have the exclusive right, on the terms and conditions set forth in this Section, to acquire from the Credit Parties all amounts payable (the "SVOD Receivables") for the licensing and exploitation of the SVOD rights to the Film (as

30

LEGAL_US_W # 95804807.17

"SVOD" is defined in the Amazon Agreement, the "SVOD Rights") which are, or at any time may be, subject to the Amazon Agreement or to any Replacement SVOD Subdistribution Agreement (the "ROFR Right").

(b)    The Credit Parties shall notify in writing the ROFR Holder promptly: (A) of the date upon which the SVOD Deal Addendum (as defined in the Amazon Agreement) for the Film has been executed and delivered by Amazon and the applicable Credit Party and the Film has been fully delivered to Amazon in accordance with the Amazon Agreement; or (B) if the SVOD Rights to the Film for any reason are not subject to the Amazon Agreement, of the date upon which the applicable Subdistribution Agreement with a Person other than Amazon pursuant to which all or substantially all of the first cycle SVOD Rights are licensed to or acquired by said Person (a "Replacement SVOD Subdistribution Agreement") has been executed and delivered by the applicable Subdistributor and the applicable Credit Party (an accurate and complete copy of which concurrently has been delivered to the Lender) and the Film has been fully delivered to said Subdistributor in accordance with said Subdistribution Agreement (the applicable such date the "ROFR Notification Date").

(c)    At any time during the period commencing on the ROFR Notification Date and ending on the date thirty (30) days thereafter (the "ROFR Right Exercise Election Period"), the ROFR Holder shall have the right to notify the Credit Parties in writing of its election to exercise the ROFR Right (the "ROFR Right Exercise Election "); provided that if the ROFR Right Exercise Election Period has terminated without such ROFR Right Exercise Election being made then such ROFR Right shall automatically be terminated.

(d)    If the ROFR Holder makes a ROFR Right Exercise Election , then at any time during the period commencing on the date of the ROFR Right Exercise Election and ending on the date thirty (30) days thereafter (the "ROFR Term"), the ROFR Holder and the applicable Credit Parties shall negotiate in good faith the terms and conditions of an acquisition by the ROFR Holder from the Credit Parties of any or all SVOD Receivables; provided that the purchase price for said SVOD Receivables shall be calculated in the same manner (e.g. at the same discount rate) as the purchase price that Cairn Special Opportunities Credit Master Fund Limited paid to acquire the SVOD Receivables of the motion pictures entitled *Destination Wedding* and *Strangers: Prey At Night*.

(e)    On the date that is the last day of the ROFR Term, if the ROFR Holder and the applicable Credit Parties have not consummated the acquisition of the SVOD Receivables to the Film as herein provided, the ROFR Right shall automatically terminate.

(f)    Subject to the termination of the ROFR Right as provided in this Section, the ROFR Right shall be continuing and remain in full force and effect notwithstanding repayment of the Loan Obligations.

3.7    Right of Last Refusal.

(a)    The Lender or its Affiliate designee (as applicable, the "ROLR Holder") shall have the exclusive right of last refusal (the "ROLR Right") to provide P&A (including

31

minimum guarantee) and receivables financing (the "Subsequent Film Financing") for all of the ROLR Films (each, a "Subsequent Film").

(b)    Before but not later than the delivery of the ROLR Match Notice (as defined in clause (c) below), for each ROLR Film, the Credit Parties shall provide the Lender with all relevant details then available or known to the Credit Parties (or thereafter becomes known or available to the Credit Parties during the seven (7) Business Day period after receipt of a ROLR Match Notice by the ROLR Holder) or otherwise made available to the applicable Potential Financier (as defined in clause (c) immediately below) relating to the ROLR Film, including, without limitation, the title, estimated negative cost, copyright owner, producer(s), principal cast, director, screen writer, subject matter, distribution and subdistribution agreements pertaining thereto, minimum guarantee and deposit paid or payable, anticipated P & A budget and projected receivables from the exploitation of the applicable distribution rights thereto and accurate and complete copies of all existing documents pertaining thereto, and any additional information as the Lender may reasonably request.

(c)    The Credit Parties (other than the Borrower) shall have the right to approach and negotiate with other potential Subsequent Film financiers (none of which may be an Affiliate of any Credit Party) (each, a "Potential Financier") for the Subsequent Film Financing of any or all of the ROLR Films.  Before concluding a binding agreement with a Potential Financier for a ROLR Film, the Credit Parties shall give written notice thereof to the ROLR Holder (a "ROLR Match Notice"), which notice shall include all of the terms and conditions of the Subsequent Film Financing Offer from the applicable Potential Financier (accompanied by an accurate and complete written or email confirmation thereof by such Potential Financier).

(d)    The ROLR Holder shall have seven (7) Business Days after receipt of a ROLR Match Notice to accept the terms and conditions contained in the ROLR Match Notice.

(i)    If the ROLR Holder accepts the terms and conditions contained in the ROLR Match Notice, the applicable parties shall be deemed to have entered into a binding, valid and enforceable agreement upon those terms and conditions.  At all times, the terms and conditions to be met by the ROLR Holder shall be terms and conditions that may be met as easily by one (1) Person as another and shall be expressed in cash and no other non-cash consideration.  If the Credit Parties (other than the Borrower) and the ROLR Holder are deemed to have entered into an agreement, as hereinabove provided, they shall execute and deliver to each other a written agreement consistent therewith at the request of either party to the transaction.

(ii)    If the ROLR Holder does not accept in writing the terms and conditions contained in the ROLR Match Notice within said seven (7) Business Day period, (a) the Credit Parties (other than the Borrower) (or any Affiliate of a Credit Party (other than the Borrower)) shall be free to enter into binding agreements with the Potential Financier in accordance with the terms and condition set forth in the ROLR Match Notice, and (b) the ROLR Films that were the subject of the ROLR Match Notice shall no longer be subject to the rights of the Lender hereunder other than the Lender's rights to be paid Subsequent Aviron Film Excess Proceeds as provided hereunder.

LEGAL_US_W # 95804807.17

3.8    Breach of Section 3.6 or Section 3.7. The Credit Parties acknowledge and agree that: (a) Section 3.6 and Section 3.7 hereof are each material inducements to the Lender to enter into this Agreement and to make Loans hereunder; (b) it would be impossible or impractical to ascertain the exact amount of the damages caused as a result of the breach thereof; (c) the Lender shall be entitled to recover from the Credit Parties liquidated damages for any willful breach (other than any such breach in which the Borrower reasonably believes in its good faith business judgment that it has complied (or attempted to substantially comply) with the provisions of Section 3.6 or Section 3.7 hereof, as applicable) in an amount equal to Five Hundred Thousand Dollars ($500,000); provided that, in connection with Section 3.7 hereof, the Credit Parties actually secure the Subsequent Film Financing for the applicable ROLR Film; the liquidated damages herein provided are reasonable under the circumstances known at the time that this Agreement is entered into; and (d) notwithstanding the foregoing, the Lender shall be entitled to recover not less than its actual damages subject to proof. Nothing in this Section or otherwise, or the exercise of the Lender's rights hereunder, shall constitute a waiver or release of any of the Lender's rights or remedies under this Agreement or any other Fundamental Document.

3.9    Continuing Obligations. The obligations of the Credit Parties under Sections 3.5, 3.6 and 3.7 hereof shall be continuing and remain in full force and effect notwithstanding the repayment of the Loans.

## ARTICLE 4
## PAYMENTS AND REPAYMENTS

4.1    Repayment of Loans. The Borrower shall repay the outstanding principal balance of the applicable Loans and all other applicable Loan Obligations in full, plus all accrued but unpaid interest thereon, in Dollars on the Maturity Date or such earlier date as specified herein.

4.2    Mandatory Prepayments. The Borrower shall apply to payment of the Loan Obligations (without any penalty, premium or interest discounts based on prepayment) by the following amounts, as and when received by any Credit Party unless otherwise indicated: (a) all Collateral Proceeds; (b) all amounts payable to the Borrower or any other Credit Party under or pursuant to the Collection Account Management Agreement including, without limitation, as a result of the Assignment of the Account Control Agreement; (c) any insurance proceeds to the extent and as provided in Section 11.6 hereof; (d) if at any time the aggregate amount of all Advances (excluding the Lender Advances) made hereunder exceeds the aggregate amount of the Total Commitment, by an amount equal to such excess; (e) if at any time the then outstanding Advances to be used to pay for the P & A Costs exceeds the Available Commitment, by an amount equal to such excess; and (f) as otherwise provided hereunder. Subject to the terms of Section 4.6, the Lender shall have sole discretion as to the application of any payments to the Loan Obligations. The Borrower and any Credit Party shall have the right to pay any mandatory prepayment due under this Section 4.2.

4.3    Voluntary Prepayments. Upon at least one (1) Business Day prior notice to the Lender, the Borrower may at its option prepay the Loan Obligations in whole or in part. Once such notice of prepayment has been given, the principal amount of the Loan(s) specified in such notice shall become due and payable on the date specified in the notice. All prepayments shall

33

include payment of accrued interest on the principal amount prepaid and shall be applied to payment of interest before application to principal.

4.4    <u>Payments and Computations</u>.

(a)    All payments to be made by the Borrower shall (i) not be subject to, and shall be paid by the Borrower free and clear of, any offset, counterclaim or defense whatsoever, and (ii) shall be made free and clear of, and without deduction for, any and all Taxes; irrespective of any claim which the Borrower or any other Credit Party may have against the Lender. Except as otherwise expressly provided herein, all payments made by the Borrower shall be made to the Lender by direct deposit or wire transfer to the Payment Account for the benefit of Lender.  All payments shall be made in Dollars and in immediately available funds, no later than 1:00 p.m. (Pacific Time) on the day specified herein. Any payment received later than 1:00 p.m. shall be deemed to have been received on the following Business Day.

(b)    Whenever any payment is due on a day other than a Business Day, such payment shall be made on the following Business Day, without being subject to the assessment of a late charge, and such extension of time shall be included in the computation of interest or fees thereon, as the case may be.

4.5    <u>Lender Costs</u>.  The Lender Transactional Costs and the Broker's Fee shall be advanced to the Borrower by the Lender as part of the Initial Advance. Any other costs, fees, expenses, reimbursement obligations in connection with fees, and other sums payable hereunder, that are incurred after the Closing Date and in connection with any Loan shall be paid by the Borrower to the Lender, on demand, in cash or, at the election of the Lender, in its sole and absolute discretion, the amount or any part thereof designated by the Lender shall be added to the Loan Obligations and accrue interest from the date thereof at the Loan Default Interest Rate. The Lender will give the Borrower notice of any Advance under this Section 4.5; provided, however, that any failure to do so shall not relieve the Borrower of any of its Loan Obligations with respect thereto.

4.6    <u>Apportionment, Application and Reversal of Payments</u>.  All payments shall be remitted to the Lender as herein provided. All payments not constituting payment of specific fees and all Collateral Proceeds received by the Lender shall be applied, subject to the provisions of this Agreement, as follows: until such time as the Lender issues the Termination Notice, with respect to all Collateral Proceeds: <u>first</u>, to pay any fees, expense reimbursements or indemnities then due to the Lender from the Borrower with respect to the Loan; <u>second</u>, to pay interest due in respect of all Loans; <u>third</u>, to pay or prepay principal of the Loans; and fourth, to the payment of any other Loan Obligations.

4.7    <u>Indemnity for Returned Payments</u>.  If, after receipt of any payment of, or proceeds applied to the payment of, all or any part of the Loan Obligations, the Lender is for any reason compelled to surrender such payment or proceeds to any Person, because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Loan Obligations or part thereof intended to be satisfied shall be revived and continue and this Agreement shall continue in full force as if such payment or proceeds had not

34

been received by the Lender, and the Borrower shall be liable to pay to the Lender, and hereby does indemnify and hold the Lender and its Related Parties harmless for, the amount of such payment or proceeds surrendered. The provisions of this Section 4.7 shall be and remain effective notwithstanding any contrary action which may have been taken by the Lender or any of its Related Parties in reliance upon such payment or application of proceeds, and any such contrary action so taken shall be without prejudice to the Lender's or any such Person's rights under this Agreement and shall be deemed to have been conditioned upon such payment or application of proceeds having become final and irrevocable. The provisions of this Section 4.7 shall survive the termination of this Agreement.

4.8    Books and Records; Monthly Statements.  The Register kept by the Lender and the Lender's books and records showing the Loan Obligations and the transactions pursuant to this Agreement and the other Fundamental Documents shall be admissible in any action or proceeding arising therefrom, and shall, absent manifest error, constitute rebuttably presumptive proof thereof, irrespective of whether any Loan Obligation is also evidenced by a promissory note or other instrument. The Lender will provide to the Borrower a monthly statement of Loans, payments, and other transactions pursuant to this Agreement. Such statement shall be deemed correct, accurate, and binding on the Borrower and an account stated (except for reversals and reapplications of payments made as provided in Section 4.6 and corrections of errors discovered by the Lender), unless the Borrower notifies the Lender in writing to the contrary within thirty (30) days after such statement is received by the Borrower, absent manifest error. If the Borrower gives the Lender a timely written notice of objections, then only the items to which exception is expressly made will be considered to be disputed by the Borrower.

## ARTICLE 5
## LENDING CONDITIONS

The obligation of the Lender to enter into this Agreement and the other Fundamental Documents and to make any Advance hereunder shall be subject to the applicable conditions of this Article 5 being satisfied at the time thereof.

5.1    Conditions Precedent to Initial Advance.  The obligation of the Lender to make the initial Advance hereunder (the "Initial Advance") is subject to the conditions precedent set forth in this Section 5.1 and in Section 5.2 below having been satisfied in a manner approved by the Lender and its counsel.

(a)    Fully executed documentation, including the Chain-of-Title Documents, evidencing that the applicable Credit Parties have acquired all rights necessary to distribute and otherwise exploit the Film, and in the underlying and included Literary Property, throughout the Domestic Territory during the Distribution Term including, without limitation, the rights which are or will be the subject of the Distribution Agreement and the Subdistribution Agreements, and that Essential Delivery has occurred without objection by any Person, shall have been received by the Lender;

(b)    All appropriate documents evidencing the registration of the Film for copyright in the United States Copyright Office in the name of SFD as the sole copyright owner thereof, and the applicable Credit Parties' rights in and to the Film and the underlying Literary

35

Property, have been duly submitted to and accepted for registration and recordation, as applicable, in the United States Registrar of Copyrights, accompanied by the required filing fees, or if not yet submitted, are ready to be submitted, and if accompanied by the required fees, will be so accepted, shall have been received by the Lender;

(c)      All appropriate documents requiring the signature or authorization of any Credit Party or other Person evidencing the Lender's Liens in the Collateral have been duly executed, acknowledged and delivered to the Lender (including delivery of such documents the release of which to the Lender is conditioned upon payment of the "Minimum Guarantee" as defined in and pursuant to the Distribution Agreement) for filing, registration and recordation in all appropriate governmental offices including, without limitation, Companies House, the United States Registrar of Copyrights and the Delaware or other applicable Secretary of State;

(d)      The Lender shall have received UCC, copyright, title and other searches approved by it indicating that no other filings, encumbrances or transfers (other than Permitted Liens) with regard to the Collateral are of record in any jurisdiction in which it shall be necessary or desirable for the Lender to make a UCC or other similar filing in order to provide the Lender with perfected Liens in the Collateral, and such searches do not reveal an interest of any Person which is contrary to the rights and priority of the Lender's Liens granted to the Lender hereunder or under any other Fundamental Document (other than Permitted Liens);

(e)      The Lender shall have received executed copies of each of this Agreement and the other Fundamental Documents (other than any Exhibitor Agreement that has not been executed as of the Closing Date), together with all exhibits, attachments and supplementary documents which are not elsewhere identified in this Section 5.1 or in Section 5.2 all in form and substance approved by the Lender, and executed by all parties thereto when the nature of such items so requires;

(f)      On or before the Closing Date: (i) the Lender shall have received in escrow pending only the closing of the transaction contemplated hereby, UCC-3 and other applicable financing statement terminations and/or amendments, copyright security agreement and/or mortgage terminations and/or amendments and/or other agreements or documents for each of the Liens of other Persons related to the Collateral including, but not limited to, those Liens described on Schedule 5.1(f) attached hereto, which confirm or evidence that, upon payment of the Purchase Price and the required filing, registration or recording fees, all such Liens in respect of any of the Collateral shall be irrevocably and unconditionally released and terminated;

(g)      Each Credit Party shall have performed and complied with all covenants, agreements and conditions contained herein and the other Fundamental Documents which are required to be performed or complied with by such Credit Party (as applicable) before or on the Closing Date and all representations and warranties made hereunder and in the other Fundamental Documents shall be true and correct as of the Closing Date as if made on such date;

(h)      No Default or Event of Default shall exist on the Closing Date, or would exist after giving effect to the Initial Advance to be made on such date;

36

(i)     The Credit Parties shall have paid (or the initial Borrowing Certificate shall provide for payment from the proceeds of the Initial Advance) all accrued but unpaid Lender Transactional Costs, the Title Insurance Costs, the Broker's Fee and all other fees and expenses of the Lender incurred in connection with any of the Fundamental Documents due hereunder to the Lender and to the other applicable Persons on or prior to the Closing Date;

(j)     There shall exist no action, suit, investigation, litigation or proceeding affecting any Credit Party pending or threatened before any court, governmental agency, or arbitrator that might reasonably be expected to have a Material Adverse Effect upon the business, operations, property, prospects or condition (financial or otherwise) of any Credit Party or upon the creditworthiness of any Credit Party or that purport to affect the legality, validity, or enforceability of this Agreement or any other Fundamental Document or the consummation of the transactions contemplated hereby and, upon request, the Lender shall have received a certificate signed by an Authorized Officer of each of the Credit Parties to such effect;

(k)     The Collection Account Management Agreement shall have been executed and delivered by all parties thereto and the Collection Account shall have been established and the Collection Account Management Agreement Assignment shall have been executed and delivered by all parties thereto other than the Lender;

(l)     The Lender shall be satisfied that the Available Commitment as of the Closing Date (without giving effect to any requested, but unfunded, Advances, as of the Closing Date) is sufficient to fund the aggregate amount of the unfunded balance, if any, of the P & A Budget to be funded with Loans as of the Closing Date;

(m)     The Lender shall be satisfied that the P & A Budget includes provisions for all expenses necessary for the Domestic General Theatrical Release of the Film in accordance with the terms of the Domestic General Theatrical Release Plan and each Distribution Agreement and Subdistribution Agreement;

(n)     Receipt and satisfactory review by the Lender of all information required to complete the Lender's know your customer ("KYC") process;

(o)     The ownership, legal and tax status of the Credit Parties is acceptable to the Lender;

(p)     The Lender shall be satisfied that all required consents and approvals have been obtained with respect to the transactions contemplated hereby from all Governmental Authorities with jurisdiction over the business and activities of each Credit Party, and from any other Person whose consent or approval the Lender in its reasonable discretion deems necessary to the transactions contemplated hereby, except for any such consents or approvals the failure of which to obtain could not reasonably be expected to result in a Material Adverse Effect upon the business, operations, property, prospects or condition (financial or otherwise) of any Credit Party or upon the creditworthiness of any Credit Party;

(q)     The Lender shall be satisfied that the transactions contemplated hereby and by the other Fundamental Documents will not: (i) violate any provision of Applicable Law, or any order of any court or other agency of the United States of America or any state thereof

37

applicable to any Credit Party, or any of their respective properties or assets, or (ii) conflict with, or result in a default, breach or right of termination or acceleration under, any material agreement to which any Credit Party is a party, other than such as could not reasonably be expected to result in a Material Adverse Effect upon the business, operations, property, prospects or condition (financial or otherwise) of any Credit Party or upon the creditworthiness of any Credit Party;

(r)     The Lender shall be satisfied that the Credit Parties, other than the Borrower, and third party vendors and service providers to Aviron Licensing, have provided (or will provide) to the Borrower subordinated financing and deferred payment arrangements in connection with the Domestic General Theatrical Release of the Film and the Domestic General Theatrical Release Plan in an amount not less than Eight Million Dollars ($8,000,000), all subject and subordinate to the Indebtedness hereunder, approved by the Lender in its sole and absolute discretion; provided, however, that any trade credit which is unsecured and not evidenced by a promissory note is deemed approved by the Lender; and

(s)     The Lender shall have received such other documents as the Lender may reasonably request in order to effect fully the purposes of this Agreement and the other Fundamental Documents.

The acceptance by the Borrower of the Initial Advance shall be deemed to be a representation and warranty made by the Borrower to the effect that all of the conditions to the making of the Initial Advance set forth in this Section 5.1 and in Section 5.2 have been satisfied, with the same effect as delivery to the Lender of a certificate signed by an Authorized Officer of the Borrower, dated the date of the Initial Advance, to such effect.

5.2     Conditions Precedent to all Advances.  The obligation of any Lender to make each Advance hereunder, including the Initial Advance, shall be subject to the further conditions precedent that on and as of the date of any such extension of credit:

(a)     The Lender shall have received a duly executed Borrowing Certificate as and when required pursuant to Section 2.2;

(b)     The following statements shall be true, and the acceptance by the Borrower of any extension of credit shall be deemed to be a statement to the effect set forth in clauses (i) and (ii), with the same effect as the delivery to the Lender of a certificate signed by an Authorized Officer of the Borrower, dated the date of such extension of credit, stating that:

(i)     The representations and warranties of each Credit Party contained in this Agreement and the other Fundamental Documents are correct in all material respects on and as of the date of such extension of credit as though made on and as of such date (except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); and

(ii)     No event has occurred and is continuing, or would result from such extension of credit, which constitutes a Default or an Event of Default

38

(c)     The Lender shall have received such other approvals, opinions or documents as the Lender may reasonably request;

(d)     No order, judgment or decree of any Governmental Authority and no law, rule or regulation applicable to the Lender shall purport by its terms to enjoin, restrain or otherwise prohibit the making of such Loan;

(e)     Since the Closing Date, there shall have occurred no material adverse change in the property, business, operations, or condition (financial or otherwise) or prospects of any Credit Party, Amazon or Universal; and

(f)     The Lender shall have received such other customary documentation as the Lender may reasonably request.

The acceptance by the Borrower of any Advances made hereunder shall be deemed to be a representation and warranty made by the Borrower to the effect that all of the applicable conditions to the making of such Advances set forth in this Section 5.2 have been satisfied, with the same effect as delivery to the Lender of a certificate signed by an Authorized Officer of the Borrower, dated the date of such Advance, to such effect.

5.3     Post-Closing Conditions.  The Credit Parties shall timely and fully satisfy each of the conditions, and comply with each of the obligations, described on Schedule 5.3 attached hereto.

## ARTICLE 6
## RELEASE AND DISTRIBUTION

The Credit Parties hereby warrant, represent, covenant and agree, as applicable, as follows:

6.1     P & A Budget; Domestic General Theatrical Release Plan; Screenplay and Film. Each of the Credit Parties represents and warrants that:

(a)     True and complete copies of the P & A Budget and the Domestic General Theatrical Release Plan have been furnished to the Lender and a copy of the final edited version of the Film for initial Domestic General Theatrical Release (the "Initial Theatrical Release Version") has been made available to the Lender for screening in such format and by such device(s) as the Lender has requested;

(b)     Each of the Credit Parties and any other Person having approval rights with respect thereto have approved the P & A Budget, the Domestic General Theatrical Release Plan, and Initial Theatrical Release Version and all other elements thereof with respect to which they have approval rights under the Fundamental Documents; and

(c)     The P & A Budget includes provisions for all expenses necessary for the initial Domestic General Theatrical Release in accordance with the Domestic General Theatrical Release Plan and the terms of the Distribution Agreement, each Subdistribution Agreement and each Exhibitor Agreement.

39

6.2    <u>Initial Domestic General Theatrical Release.</u>

(a)    The Borrower shall release the Film in the Domestic Territory: (i) on not less than one (1) screen in a first run motion picture theater no later than January 25, 2019; and (ii) no later than the Domestic General Theatrical Release Date substantially in accordance with the P & A Budget and the Domestic General Theatrical Release Plan and Initial Theatrical Release Version, and in a manner consistent with the provisions of the Distribution Agreement and each Subdistribution Agreement.

(b)    The Credit Parties shall not make or permit to be made any substantial changes, modifications or revisions to the P & A Budget or the Domestic General Theatrical Release Plan, other than the expenditure of funds in excess of the P & A Budget, without the express written authorization of the Lender (which shall not be unreasonably withheld, conditioned or delayed), and promptly shall notify and consult with the Lender with respect to all other changes, modifications or revisions thereto (other than immaterial changes, modifications and revisions).  The Credit Parties shall notify and, fully consult with, the Lender prior to incurring any commitment or expenditure of funds in excess of the P & A Budget and, in any event, no such commitment or expenditure shall be secured by any Credit Party Collateral, without the approval of the Lender.

(c)    The Credit Parties shall cause the theatrical distribution of the Film to strictly conform to all requirements of the Distribution Agreement, each Subdistribution Agreement and each Exhibitor Agreement.

6.3    <u>Film Element Changes.</u>  Except as permitted by the terms of the Distribution Agreement and the Subdistribution Agreements, the Credit Parties shall not make, agree to make, or permit to be made any variation or modification in any of the elements of the Film.

6.4    <u>Contingent Compensation; Fees.</u>  The Credit Parties shall not enter into or assume any agreement to pay any Person from the Collateral Proceeds any profit participations, deferred compensation, contingent compensation, whether computed on the basis of the Collateral Proceeds, net receipts or Net Proceeds from exploitation of the Film (other than to the Lender hereunder), bonuses of any kind (other than a residuals set-aside and "box office bonuses" that are subject to the terms and conditions of the Collection Account Management Agreement), amounts deposited into the Collection Account or otherwise (whether in a fixed amount or computed on a percentage basis) (other than a residuals set-aside and "box office bonuses" that are subject to the terms and conditions of the Collection Account Management Agreement), unless all such payments are subordinated and subject to the rights and Liens of the Lender under the Fundamental Documents, and the Credit Parties shall not pay (and shall not allow the payment of) any such payments from the Collateral Proceeds (other than to the Lender hereunder) until all Loan Obligations have been indefeasibly satisfied in full and the Lender's commitment to make Advances hereunder has been terminated. The Lender shall not have any obligation to pay any such payment to any Person.

6.5    <u>Performance and Amendment of Agreements, Etc.</u>

40

(a)    The Credit Parties shall supervise and monitor the performance of and payments by each Subdistributor and Exhibitor. Each Credit Party shall fully perform all of its respective obligations under the Distribution Agreement, the Subdistribution Agreements and the other Fundamental Documents, in each case, to which it is a party, and shall enforce all of its rights and remedies thereunder as it deems appropriate in its reasonable business judgment; provided, however, that the Credit Parties shall not take any action or fail to take any action with respect to any of the foregoing, in each case, which would or might result in a waiver or other loss of any material right or remedy of any Credit Party thereunder.

(b)    Without limiting the generality of the foregoing, the Credit Parties shall effect Delivery of the Film to each Subdistributor in accordance with each applicable Subdistribution Agreement and to each Exhibitor in accordance with each Exhibitor Agreement. Under no circumstances shall the Lender be obligated to effect delivery of the Film to any Person.

(c)    The Credit Parties shall not, without the Lender's prior written approval, modify, amend, supplement, compromise, satisfy, release, terminate or discharge the Distribution Agreement, any Subdistribution Agreement or any other Fundamental Document to which any Credit Party is a party, any collateral securing the same, any Person liable directly or indirectly with respect thereto, or any agreement relating to such agreements or the collateral therefor, in each case if the effect of such modification, amendment, supplement, compromise, satisfaction, release, termination or discharge could reasonably be expected to adversely affect the amount or time of payment of the Assigned Receipts or any other sum payable to the Lender hereunder (other than any amount or time of payment related to any other motion picture (including any Subsequent Aviron Film) and the proceeds thereof). Without limiting the generality of the foregoing, the Credit Parties shall not, without the Lender's prior written consent, amend or modify in any way the amount or payment due date(s) or the conditions of payment of any of the Collateral Proceeds. ANY SUCH AMENDMENT WITHOUT THE LENDER'S PRIOR WRITTEN APPROVAL IS NULL AND VOID AB INITIO.

6.6    Enforcement of Agreements.

(a)    The Credit Parties shall notify the Lender in writing, promptly after any of the Credit Parties becomes aware thereof, of any event or fact which could give rise to a breach of the Distribution Agreement, any Subdistribution Agreement or any other Fundamental Document to which any Credit Party is a party, and shall diligently pursue its rights and remedies arising therefrom and promptly report to the Lender on all further developments with respect thereto.

(b)    Until all Loan Obligations have been indefeasibly paid and performed in full and the Lender's commitment to make Advances hereunder has been terminated, the Credit Parties shall, at their own expense, collect and take all appropriate legal action necessary to enforce collection, of all payments, receipts and revenues constituting Collateral Proceeds, as and when due, which may be owing by any Person under the Distribution Agreement, any Subdistribution Agreement or pursuant to any other agreement entered into by any Credit Party with respect to the Collateral (including, but not limited to, the benefit of any rebate, discount, credit or refund of any item of P & A Costs), and shall remit all sums so collected directly to the

41

Collection Account in accordance with Section 7.9 hereof and, in the case of Exhibitors, to the Exhibitor Account in accordance with Section 7.9 hereof. Without limiting the generality of the foregoing, other than payments owing from the Exhibitors of the Film as provided in Section 7.9 hereof, all such payments, receipts and revenues shall be remitted directly to the Collection Account pursuant to irrevocable and unconditional notices of assignment or directions to pay, each approved by the Lender. If any of the Credit Parties fails after the Lender's demand to pursue diligently any right or remedy under any such agreement, or if an Event of Default then exists, the Lender may directly enforce such rights and remedies in its own or the applicable Credit Party's name and may enter into such settlements or other agreements with respect thereto as the Lender may determine appropriate in its sole and absolute discretion.

(c)    In any suit, proceeding, arbitration proceeding, reference proceeding or other action brought by the Lender under or in connection with the Distribution Agreement, any Subdistribution or any other Fundamental Document for any sum owing thereunder or to enforce any provision thereof, the Credit Parties shall indemnify and hold the Lender and its Related Parties harmless from and against all expense, loss or damage suffered by reason of any defense, setoff, counterclaims, recoupment, or reduction of liability whatsoever of any obligor thereunder arising out of a breach by any Credit Party of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing from any Credit Party to or in favor of such obligor or its successors.

6.7    Related Agreements. Each of the Credit Parties represents and warrants that: (a) it has obtained and has delivered, or will deliver or cause to be delivered, to the Lender as of the Closing Date an accurate and complete fully executed copy of the Distribution Agreement, each Subdistribution Agreement and each other agreement, document or instrument related to any of the Collateral (including any Exhibitor Agreement in effect on the Closing Date); (b) each of the foregoing agreements, documents and instruments has been (or, as of the Closing Date, will have been) duly executed and delivered by all parties thereto and be in full force and effect, and all are and will be valid, binding, subsisting and enforceable against the Credit Parties that are party thereto in accordance with their respective terms; (c) the Film is and will be a "Qualifying Picture" or otherwise qualified under the terms of each Subdistribution Agreement (whether or not by way of the execution and delivery of any addendum thereto or amendment thereof or otherwise); and (d) any Lien granted or to be granted to any Subdistributor thereunder is and shall be subject and subordinate at all times and in all events to the Liens of the Lender in and to the Collateral pursuant to this Agreement or any other Fundamental Document, in such form and with such substance as the Lender may approve in its sole and absolute discretion.

## ARTICLE 7
## COLLATERAL

7.1    Grant of Lien. As security for all of the Loan Obligations, the Borrower and each of the other Credit Parties grants to the Lender a continuing security interest in, Lien on, and right of set-off against, all of their respective right, title and interest in or to the Collateral including, without limitation, their respective right, title and interest in, to and under the Distribution Agreement, the Subdistribution Agreements, each Exhibitor Agreement and all other agreements, documents and instruments relating to the Film under which the Borrower or any other Credit Party has any rights, including without limitation, rights to receive payments

42

thereunder and all other rights to receive film rentals, license fees, distribution fees, profit shares, royalties and other amounts of every description and in all of the Pledged Securities.

    7.2   <u>Perfection and Protection of the Lender's Lien</u>.  The Credit Parties shall at their expense, perform all steps requested by the Lender at any time to perfect, maintain, protect, and enforce the Lender's Liens in the Collateral, including, without limitation (as applicable): (a) executing, filing, recording, and refiling such financing statements, continuation statements, amendments, copyright mortgages, form CO's, and copyright assignments, and (b) taking such other steps as the Lender may deem necessary or appropriate and wherever required or permitted by law in order to perfect or preserve the Lender's Liens in the Collateral. The Credit Parties shall do such further acts and things and execute and deliver to the Lender such additional conveyances, assignments, agreements, and instruments as the Lender may reasonably require or deem advisable to carry into effect the purposes of this Agreement or to better assure and confirm to the Lender its rights, powers, and remedies hereunder. The Credit Parties appoints the Lender as each of the Credit Parties' attorney-in-fact, to: (a) file or record financing statements and amendments thereto (including filing such statements and amendments by electronic means with or without a signature as authorized or required by Applicable Law or filing procedures), form CO's, copyright mortgages, copyright assignments, and any other documents in all appropriate governmental offices, including the United States Registrar of Copyrights, accompanied by the required filing fees, relative to all or any part of the Collateral; (b) take all other steps necessary or desirable in the Lender's judgment to perfect, protect, enforce, preserve, or continue the Liens in the Collateral granted herein or in any of the other Fundamental Documents to the Lender without the signature of the applicable Credit Party where permitted by law; and (c) do such further acts and things and execute such additional conveyances, assignments, agreements, and instruments consistent herewith as the Lender may reasonably require or deem advisable to carry into effect the purposes of this Agreement or to better assure and confirm to the Lender its rights, powers, and remedies hereunder. The Lender shall provide the Credit Parties with a copy of each document executed by the Lender pursuant to the power of attorney set forth in this section; provided, however, that the Lender's failure to provide any such document to the Credit Parties shall not be deemed a breach hereunder.

    7.3   <u>Assignment of Rights Only</u>.  The Lender shall have under this Agreement and the other Fundamental Documents an assignment of and Liens on only the benefits of and rights under the Distribution Agreement, the Subdistribution Agreements, the Exhibitor Agreements and the other Collateral, and shall not assume any obligations or duties thereunder. All such obligations and duties of any Credit Party thereunder shall be and remain enforceable only against such Credit Party (as applicable) and shall not be enforceable against the Lender. Notwithstanding any provision hereof to the contrary, each Credit Party (as applicable) shall at all times remain liable to observe and perform their respective duties and obligations under the Distribution Agreement, the Subdistribution Agreements, the Exhibitor Agreements and the other agreements included in the Collateral, and the Lender's exercise of any of its rights with respect to the Collateral shall not release any Credit Party from any of such duties and obligations. The Lender shall not be obligated to perform or fulfill any Credit Party's respective duties or obligations under the Distribution Agreement, the Subdistribution Agreements, the Exhibitor Agreements or any other agreement included in the Collateral or to make any payment thereunder, or to make any inquiry as to the nature or sufficiency of any payment or property received by it thereunder or the sufficiency of performance by any party thereunder, or to present

43

or file any claim, or to take any action to collect or enforce any performance, any payment of any amounts, or any delivery of any property.

7.4    <u>Jurisdiction of Organization; Chief Office; Distribution Activities; and Physical Properties</u>.  The Credit Parties represent and warrant to the Lender that the each of the Credit Parties' chief executive office, its books and records, and the Physical Properties are located at the address for each of the Credit Parties specified in <u>Section 15.6</u> hereof and/or at Laboratories in accordance with <u>Section 7.11</u> hereof, and the jurisdiction of organization of each of the Credit Parties is Delaware. Each of the Credit Parties covenants and agrees that if: (a) the jurisdiction of its organization, or the title or titles of the Film or the name, or any trade name of the Credit Parties is to be changed or modified in any manner, (b) any of the Credit Parties proposes to acquire or use a new trade name, (c) the chief executive office of any of the Credit Parties is to be relocated to a place other than its present address as stated in <u>Section 15.6</u> hereof, or (d) there is proposed to be a change in location or name of any Laboratory, special effects studio, sound studio, other processing or storage entity or any sound studio, other processing or storage entity or any bailee which holds, or which is expected to process, any original negative, sound, optical or other special effects material owned or controlled by any Credit Party including, without limitation, the final, complete composite master negative of the Film, <u>then</u> the Credit Parties shall notify the Lender thereof in writing and, prior to making any such change or modification, shall execute and deliver to the Lender such further documents and do such other acts and things as the Lender may reasonably request in order to carry out the purposes of this Agreement, including, without limitation, the execution and delivery of financing statements, amendments, copyright assignments and mortgages, and Laboratory Access Agreements, necessary or desirable to continue and/or perfect the Lender's Liens in the Collateral.

7.5    <u>Title to and Liens on Collateral</u>.

(a)    Each of the Credit Parties represents and warrants to the Lender that: (i) all of the Collateral is and will continue to be owned by the Credit Parties free and clear of all Liens, except for Permitted Liens; (ii) the Lender's Liens in the Collateral will not be subject to any prior Lien, except those Permitted Liens that the Lender has agreed have priority over its Liens on the Collateral, if any; and (iii) the Credit Parties will not (and shall cause the other Credit Parties to not) sell, offer to sell, hypothecate or otherwise dispose of, or create, suffer or incur any additional Lien on, any Collateral, or any part thereof or interest therein, at any time, except for Permitted Liens or with the prior written consent of the Lender, not to be unreasonably withheld insofar as the Subsequent Aviron Films are concerned, or as otherwise expressly permitted in this Agreement or the other Fundamental Documents.

(b)    The Credit Parties will appear in, contest and defend against any action or proceeding purporting to affect title to or any other interest in any portion of the Collateral, or the rights or powers of the Lender, their respective successors or assigns, or the right or interest of the Lender, legal or beneficial, in any portion of the Collateral; and will pay all reasonable and documented out-of-pocket costs and expenses, including such costs of evidence of title and such fees of outside counsel, in any such action or proceeding in which the Lender may appear.

7.6    <u>Access and Examination</u>.  The Lender shall have the right at all reasonable times and upon ten (10) Business Days' prior notice to the applicable Credit Party (and at any time

44

when a Default or Event of Default exists) to examine, audit, make extracts from or copies of and inspect any and all of each Credit Party's respective books, records and files relating to the Collateral and discuss a Credit Party's affairs with its officers and management. The Credit Parties further agree that the Lender shall have access, at all times, to any and all of a Credit Party's computer hardware or software, whether maintained by such Credit Party, or third Persons on such Credit Party's behalf, which pertains to or reflect, such records. At such time or times as the Lender may reasonably request, the Credit Parties will, at such Credit Parties' sole cost and expense, prepare a list or lists in such form as shall be approved by the Lender, certified by an Authorized Officer of each Credit Party (as applicable) describing in such detail as the Lender shall require, the Collateral, and specifying the location of such Collateral and each Credit Party's records pertaining thereto and permit the Lender to inspect such Collateral or any part thereof at such place as the Collateral may be held or located or at such other reasonable place.

    7.7    <u>Attorney-in-Fact</u>. Each Credit Party hereby constitutes and appoints the Lender as its true and lawful attorney-in-fact, in its place and stead and with full power of substitution, either in the Lender's own name or in the name of any of the Credit Parties to do any and all of the following from and after the occurrence and during the continuation of an Event of Default:

        (a)    Endorse any notes, checks, drafts, money orders, or other evidences of payment payable to the Credit Parties relating to the Collateral that may come into the possession of the Lender and obtain, take possession of, substitute the Lender or any designee of the Lender for the Credit Parties as the owner of, or signatory on, and otherwise apply in any manner, all deposit accounts, cash or Cash Equivalents, instruments and general intangibles of, relating to or derived from the Film or any other Collateral, and all proceeds thereof, including, but not limited to, interest, chattel paper, notes, certificates, writings, distributions, dividends, profits, rights, benefits, premiums and other payments and rights to payment, held by any Person for or in the name of each of the Credit Parties;

        (b)    Enforce all of the Credit Parties' rights under and pursuant to all agreements with respect to the Collateral including, without limitation, the Distribution Agreement, the Subdistribution Agreements and the Exhibitor Agreements, all for the sole benefit of the Lender, and to enter into such other agreements as may be necessary or appropriate for the distribution and exploitation of the Film in the Domestic Territory;

        (c)    Enter into and perform such agreements as may be necessary in order to carry out the terms, covenants, and conditions of this Agreement, the Distribution Agreement, the Subdistribution Agreements, the Exhibitor Agreements and the other agreements included in the Collateral and the other Fundamental Documents that are required to be observed or performed by the Credit Parties;

        (d)    Execute such other and further mortgages, pledges, and assignments of the Collateral as the Lender may reasonably require solely for the purpose of protecting, maintaining, or enforcing the Liens respectively granted to the Lender by this Agreement and/or the other Fundamental Documents;

45

(e)    Lease, license, sell or otherwise dispose of any Credit Party's rights in or to the Film, and/or such distribution rights in and to the Film and such rights therein as have not been disposed of by or on behalf of the Credit Parties (or to engage others to do so with the costs and expenses thereof to be recoupable by the Lender as provided herein);

(f)    Renegotiate the Distribution Agreement, the Subdistribution Agreements, the Exhibitor Agreements, the other Fundamental Documents and such other agreements with respect to which the Lender has a Lien pursuant to the terms hereof and the other Fundamental Documents as the Lender in its sole and exclusive discretion deems proper;

(g)    Require, demand, collect, receive, settle, adjust, compromise and give acquittances and receipts for the payment of any and all money payable pursuant to the Distribution Agreement, the Subdistribution Agreements, the Exhibitor Agreements or such other agreements included in the Collateral and such licenses and agreements as the Lender may enter into as aforesaid;

(h)    File any claims and/or proofs of claim, to commence, maintain or discontinue any actions, suits or other proceedings deemed by the Lender advisable for the purpose of collecting or enforcing payment of any such money;

(i)    Execute, deliver, file and/or record any and all such instruments, agreements or documents, and do all things as may be necessary or desirable to carry out the purposes of this Agreement;

(j)    Apply any Collateral Proceeds or any receipts so derived from the Lender's exercise of this power-of-attorney to the Loan Obligations as herein provided;

(k)    Settle, compromise, prosecute or defend any action, claim or proceeding with respect thereto and to sell, assign, pledge, transfer and make any agreement respecting, or otherwise deal with, the same;

(l)    Obtain and effect delivery of the Film, as applicable, in accordance with the Distribution Agreement, the Subdistribution Agreements and the Exhibitor Agreements;

(m)    Endorse any notes, checks, money orders, or other evidences of payment relating to any of the Collateral that may come into possession of the Lender; process, submit, and execute any documents necessary to redeem or otherwise receive proceeds in respect thereof; and execute such other and further mortgages, pledges, assignments in respect thereof as the Lender may reasonably require solely for the purpose of protecting, maintaining and enforcing the Liens respectively granted to the Lender under this Agreement and/or the other Fundamental Documents; and

(n)    Do any and all other acts reasonably necessary and proper to carry out the intent of this Agreement and the other Fundamental Documents;

provided, however, that nothing herein contained shall be construed as requiring or obligating the Lender to make any demand, or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or notice or take any action with respect to

46

any of the Collateral or the money due or to become due thereunder or the property covered thereby, and no action taken or omitted to be taken by the Lender with respect to any of the Collateral shall give rise to any defense, counterclaim or setoff in favor of the Credit Parties or to any claim or action against the Lender. None of the Lender or its attorneys will be liable for any acts or omissions or for any error of judgment or mistake of fact or law, except those arising out of the willful misconduct or gross (but not mere) negligence of the Lender or its attorneys. Except for such willful misconduct or gross (but not mere) negligence, each of the Credit Parties ratifies and confirms all acts taken by the Lender as such attorney-in-fact or its substitutes by virtue of this power of attorney. This power, being coupled with an interest, is irrevocable until this Agreement has been terminated and the Loan Obligations have been fully and indefeasibly satisfied. The Lender shall provide the Credit Parties with a copy of each document executed by the Lender on the Credit Parties' behalf pursuant to the power of attorney set forth in this section; provided, however, that the Lender's inadvertent failure to provide any such document to the Credit Parties shall not be deemed a breach hereunder.

7.8    The Lender's Rights, Duties and Liabilities. Except for consequences arising out of the willful misconduct, intentional acts or gross (but not mere) negligence by the Lender and/or its attorneys, the Credit Parties assume all responsibility and liability arising from or relating to the use, sale or other disposition of the Collateral and neither the Lender, nor any of its officers, directors, employees or agents shall be liable or responsible in any way for the safekeeping of any of the Collateral, or for any loss or damage thereto, or for any diminution in the value thereof, or for any act of default of any carrier, forwarding agency or other person whomsoever, all of which shall be at the Credit Parties' sole risk. The Loan Obligations shall not be affected by any failure of the Lender to take any steps to perfect the Lender's Liens or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral, except as a consequence of the willful misconduct, intentional acts or gross (but not mere) negligence by the Lender and/or its attorneys, release the Credit Parties from any of the Loan Obligations. Upon the occurrence and continuation of an Event of Default, the Lender may (but shall not be required to), without notice to or consent from the Credit Parties, sue upon or otherwise collect, extend the time for payment of, modify or amend the terms of, compromise or settle for cash, credit, or otherwise upon any terms, grant other indulgences, extensions, renewals, compositions, or releases, and take or omit to take any other action with respect to the Collateral, any security therefor, any agreement relating thereto, any insurance applicable thereto, or any Person liable directly or indirectly in connection with any of the foregoing, without discharging or otherwise affecting the liability of the Credit Parties for the Loan Obligations or under this Agreement, any other Fundamental Document.

7.9    Authority to Collect.

(a)    The Credit Parties shall take all actions reasonably necessary or appropriate to cause all Collateral Proceeds to be paid: (i) directly by the Distributor, each Subdistributor and each other obligor thereof to, as appropriate, the Collection Account; (ii) in the case of Exhibitor Receipts directly to the Exhibitor Account; (iii) in the case of Subsequent Aviron Film Excess Proceeds to the Payment Account; or (iv) otherwise to the Lender. Aviron Licensing exclusively shall enter into each Exhibitor Agreement, shall own and control the Exhibitor Account, shall cause all Exhibitor Receipts to be paid directly by each Exhibitor only into the Exhibitor Account, without cross-collateralization, defense, setoff or counterclaim

47

unrelated to the Film and, at any time when there is at least Twenty Five Thousand Dollars ($25,000) on deposit therein attributable to the Film, shall cause the Exhibitor Account to be swept no less frequently than every other Business Day, by the close of business on each applicable Business Day, so that all such funds on deposit therein attributable to the Film are deposited in the Collection Account on the next Business Day. At all other times, Aviron Licensing shall cause the Exhibitor Account to be swept on the first Business Day of each week for the immediately preceding week unless already swept on the last Business Day of that week as herein provided. Aviron Licensing shall provide the Lender with direct online "read-only" access to the Exhibitor Account and all information pertaining thereto and statements of account thereof not less robust than as is available to Aviron Licensing from the date of the initial Domestic General Theatrical Release of the Film to the date that is six (6) months after such initial release date and resumed from the date that the Film is theatrically re-released in the Domestic Territory until three (3) months thereafter. When received by the Lender, Collateral Proceeds shall be applied by the Lender to the repayment of the Loan Obligations. All collections of any Collateral Proceeds received directly or indirectly by any Credit Party or any of their respective Affiliates or the Lender, or in any other account to which such collections are deposited, shall be the sole property of the Lender and subject to the Lender's sole control.

(b)      If, notwithstanding a Credit Party's direction to pay all Collateral Proceeds in accordance with <u>Section 7.9(a)</u>, any Collateral Proceeds, including sums paid by the Distributor under the Distribution Agreement or by any Subdistributor under any Subdistribution Agreement or by any Exhibitor under any Exhibitor Agreement or otherwise are paid by the applicable obligor thereof directly to any Credit Party, or to any of their Affiliates or any other Person, <u>then</u> the Credit Parties shall (and shall direct any other applicable Persons) to: (i) hold in trust all of such receipts that it receives; and (ii) promptly remit such receipts in the form received directly, as appropriate, to the Collection Account or to the Lender not later than the date that is two (2) Business Days following the day of its receipt thereof. To the extent possible, the Credit Parties shall not commingle any of the Collateral Proceeds with its funds or the funds of any other Person.

7.10    <u>Copyrights</u>. Prior to the Closing Date, the Credit Parties shall take, or cause to be taken, any and all actions necessary to register the Film for copyright in the name of SFD for the United States in conformity with the laws of the United States, and contemporaneously therewith the Credit Parties shall execute and record: (a) an assignment or other instrument of transfer satisfactory to the Lender of all of the Distribution Rights under the Distribution Agreement in favor of the Distributor; (b) a Copyright Mortgage and Assignment (or an amendment to the applicable Copyright Mortgage and Assignment) and power of attorney in favor of the Lender, granting to the Lender a Lien thereon for the purpose of securing the Loan Obligations; and (c) an assignment to the Lender of each Lien at any time granted to or held by any Credit Party in the Film or any of the Collateral, for the purpose of securing the Loan Obligations; each satisfactory to the Lender and immediately shall deliver to the Lender written evidence of any and all such copyright registrations, recordations, mortgages and assignments.

7.11    <u>Control of Laboratory Materials</u>. The Credit Parties shall deliver to the Lender a fully executed Laboratory Access Agreement for each Laboratory which holds or controls any Laboratory Material. The Credit Parties shall not deliver or deposit any of the Laboratory Materials in any other film or sound laboratory without first obtaining and delivering to the

48

Lender a fully executed Laboratory Access Agreement. No print, preprint, sound or other Laboratory Materials shall be deposited at any Laboratory or maintained at any place without the prior written consent of the Lender and compliance with the requirements of this Section 7.11.

7.12    Reinstatement. This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Credit Parties or any other Person for liquidation or reorganization, should the Credit Parties or any other Person become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of any of the Credit Party's or any other Person's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Loan Obligations, or any part thereof, is, pursuant to Applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligor of the Loan Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Loan Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

7.13    Third-Party Subsequent Film Financiers. The Lender covenants and agrees that if any Permitted Liens are granted in favor of any Third-Party Subsequent Film Financier in connection with any Subsequent Film Financing, the Lien of such Third-Party Subsequent Film Financier shall be prior to the Lien of the Lender in connection with any such Subsequent Aviron Film(s) solely as it relates to the proceeds of the exploitation of the distribution rights to the applicable motion picture(s) until the applicable distribution rights acquisition financing provided by said financier has been repaid in full; provided, that the Lender and the applicable Third-Party Subsequent Film Financier shall enter into an intercreditor agreement with regard to any such shared collateral and proceeds thereof on mutually satisfactory terms, conditions and limitations as are customary in the industry.

7.14    Miscellaneous. The Lender may execute any of its duties hereunder by or through agents or employees and shall be entitled to advice of counsel concerning all matters pertaining to its duties hereunder. Neither the Lender nor any of its respective officers, directors, employees, agents or counsel shall be liable for any action lawfully taken or omitted to be taken by it or them hereunder or in connection herewith, except for its or their own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

## ARTICLE 8
## GUARANTY OF GUARANTORS

8.1    Guaranty.

(a)    Each Guarantor unconditionally and irrevocably guarantees to the Lender the due and punctual payment by, and performance of, the Loan Obligations (including interest accruing on and after the filing of any petition in bankruptcy or of reorganization of the obligor whether or not post filing interest is allowed in such proceeding). Each Guarantor further agrees that the Loan Obligations may be increased, extended or renewed, in whole or in part, without

49

notice or further assent from it (except as may be otherwise required herein), and it will remain bound upon this Guaranty notwithstanding any extension or renewal of any Loan Obligation.

(b)      Each Guarantor waives presentment to, demand for payment from and protest to, as the case may be, any Credit Party or any other guarantor of any of the Loan Obligations, and also waives notice of acceptance, notice of any Loans or Advances, notice of protest for nonpayment, notice of acceleration and notice of intent to accelerate. The obligations of each Guarantor hereunder shall not be affected by: (i) the failure of the Lender to assert any claim or demand or to enforce any right or remedy against the Borrower or any Guarantor or any other guarantor under the provisions of this Agreement or any other agreement or otherwise; (ii) any extension or renewal of any provision hereof or thereof; (iii) the failure of the Lender to obtain the consent of any Guarantor with respect to any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of this Agreement, the Notes or any other agreement; (iv) the release, exchange, waiver or foreclosure of any security held by the Lender for the Loan Obligations or any of them; (v) the failure of the Lender to exercise any right or remedy against any other Guarantor or any other guarantor of the Loan Obligations; (vi) any incapacity, bankruptcy, reorganization, liquidation, dissolution or receivership proceeding or case by or against any Credit Party, or any change in the legal existence, structure, ownership or control of any Credit Party (including any of the foregoing arising from any merger, consolidation, amalgamation, reorganization or similar transaction); or (vii) the release or substitution of any Guarantor or any other guarantor of the Loan Obligations. Without limiting the generality of the foregoing or any other provision hereof (including, without limitation, Sections 15.2 and 15.3 hereof, it being the specific intent of the parties that the choice of law provision in Section 15.2 hereof is to apply to this Agreement), to the extent permitted by Applicable Law, each Guarantor hereby expressly waives any and all benefits which might otherwise be available to it under California Civil Code Sections 2799, 2809, 2810, 2815, 2819, 2820, 2821, 2822, 2825, 2838, 2839, 2845, 2848, 2849, 2850, 2899 and 3433.

(c)      Each Guarantor further agrees that this Guaranty is a continuing guaranty, shall secure the Loan Obligations and any ultimate balance thereof, notwithstanding that the Borrower or other Persons may from time to time satisfy the Loan Obligations in whole or in part and thereafter incur further Loan Obligations, and that this Guaranty constitutes a guaranty of performance and of payment when due and not just of collection, and waives any right to require that any resort be had by the Lender to any security held for payment of the Loan Obligations or to any balance of any deposit, account or credit on the books of the Lender in favor of the Borrower or any Guarantor, or to any other Person.

(d)      Each Guarantor hereby expressly assumes all responsibilities to remain informed of the financial condition of the Borrower and the Guarantors and any other guarantors of the Loan Obligations and any circumstances affecting the ability of the Borrower to perform under this Agreement.

(e)      Each Guarantor's obligations under the Guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Loan Obligations, the Notes or any other instrument evidencing any Loan Obligations, or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance relating to the Loan Obligations which might otherwise constitute a defense to this Guaranty. The make no

50

representation or warranty with respect to any such circumstances and have no duty or responsibility whatsoever to any Guarantor in respect to the management and maintenance of the Loan Obligations or any collateral security for the Loan Obligations.

(f)    Each Guarantor waives any defense to performance and any right to be exonerated hereunder provided by Sections 2819, 2822, or 2825 of the California Civil Code, or otherwise, arising by reason of:  the impairment or suspension of the Lender's rights or remedies against the Borrower; the alteration by the Lender of the Loan Obligations; any discharge of the Loan Obligations by operation of law as a result of the Lender's intervention or omission; or the acceptance by the Lender of anything in partial satisfaction of the Loan Obligations, and any and all rights of subrogation, reimbursement, indemnification, and contribution.

(g)    Each Guarantor waives any defense arising by reason of or deriving from (i) any claim or defense based upon an election of remedies by the Lender; or (ii) any election by the Lender under Bankruptcy Code Section 1111(b) to limit the amount of, or any collateral securing, its claim and any and all rights and defenses, pursuant to Section 2856 of the California Civil Code or otherwise, of such Guarantor arising out of an election of remedies by the Lender, even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed such Guarantor's rights of subrogation and reimbursement against the Borrower.

8.2    No Impairment of Guaranty, etc.  The obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (except payment and performance in full of the Loan Obligations), including, without limitation, any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Loan Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by the failure of the Lender to assert any claim or demand or to enforce any remedy under this Agreement or any other agreement, by any waiver or modification of any provision hereof or thereof, by any default, failure or delay, willful or otherwise, in the performance of the Loan Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of such Guarantor or would otherwise operate as a discharge of such Guarantor as a matter of law, unless and until the Loan Obligations are paid in full in cash and each of the Lender's commitments has terminated.

8.3    Continuation and Reinstatement, etc.

(a)    Each Guarantor further agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Loan Obligation is rescinded or must otherwise be restored by the Lender or the Lender upon the bankruptcy or reorganization of the Borrower or a Guarantor, or otherwise. In furtherance of the provisions of this Article 8, and not in limitation of any other right which the Lender  may have at law or in equity against the Borrower, a Guarantor or any other Person by virtue hereof, upon failure of the Borrower to pay any Loan Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice or otherwise, each Guarantor

51

hereby promises to and will, upon receipt of written demand by the Lender, forthwith pay or cause to be paid to the Lender in cash an amount equal to the unpaid amount of such unpaid Loan Obligations with accrued but unpaid interest thereon from the due date at the Default Rate, and thereupon the Lender shall assign such Loan Obligation, together with all security interests, if any, then held by the Lender in respect of such Loan Obligation, to the Guarantor or Guarantors making such payment; such assignment to be subordinate and junior to the rights of the Lender with regard to amounts payable by the Borrower in connection with the remaining unpaid Loan Obligations and to be *pro tanto* to the extent to which the Loan Obligation in question was discharged by the Guarantor making such payments.

(b)     All rights of each Guarantor against the Borrower, arising as a result of the payment by such Guarantor of any sums to the Lender hereunder by way of right of subrogation or otherwise, shall in all respects be subordinated and junior in right of payment to, and shall not be exercised by such Guarantor until the payment in full in cash of all the Loan Obligations and termination of each Lender's commitment. If any amount shall be paid to such Guarantor for the account of the Borrower (and such payment is not explicitly permitted to be made to such Guarantor under any provision of any Fundamental Document, then such amount shall be held in trust for the benefit of the Lender, segregated from such Guarantor's own assets, and shall forthwith be paid to the Lender to be credited and applied to the Loan Obligations, whether matured or unmatured.

8.4     <u>Limitation on Guaranteed Amount, etc.</u>  Notwithstanding any other provision of this <u>Article 8</u> the amount guaranteed by each Guarantor hereunder shall be limited to the extent, if any, required so that its obligations under this <u>Article 8</u> shall not be subject to avoidance under Section 548 of the Bankruptcy Code or to being set aside or annulled under any Applicable Law relating to fraud on creditors. In determining the limitations, if any, on the amount of any Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation or contribution which such Guarantor may have under this Article 8, any other agreement or Applicable Law shall be taken into account.

## ARTICLE 9
## BOOKS, RECORDS; FINANCIAL REPORTING; AND NOTICES

The Credit Parties each covenant and agree that, until such time as the Loan Obligations have been fully and indefeasibly repaid and the Lender's commitment to make Advances under this Agreement has been terminated:

9.1     <u>Books and Records.</u>

(a)     The Credit Parties shall each maintain a system of accounting established and administered in accordance with GAAP and keep adequate records and books of account in which complete entries in accordance with such accounting principles will be made.

(b)     The Credit Parties shall each maintain at all times correct and complete books and records with respect to the Collateral which are as complete and comprehensive as those customarily maintained by non-public theatrical motion picture companies in the motion picture industry in the United States, including all books, records, contracts, production notes

52

and all other information and data of every kind relating to the Film, the Collateral, and the distribution or exploitation thereof.

9.2    Financial Information. The Credit Parties each covenant and agree that, until such time as the Loan Obligations have been fully and indefeasibly repaid and the Lender's commitment to make Advances under this Agreement has been terminated, the Credit Parties shall:

(a)    Within (i) sixty (60) days after the end of each fiscal year of the Parent and each of the Credit Parties (commencing with the fiscal year ending December 31, 2017), the unaudited balance sheet of each of the Parent and each of the Credit Parties as at the end of, and the related statements (in the case of the Credit Parties such statements shall be consolidated) of income, members' equity and cash flows for, such fiscal year; and (ii) within sixty (60) days after the end of each of the first three (3) fiscal quarters of each fiscal year commencing with the fiscal quarter ending September 30, 2018, the unaudited balance sheet of each of the Parent and each of the Credit Parties and the related unaudited statements of income, partners' capital and cash flows for, such fiscal quarter, and for the portion of the fiscal year through the end of such fiscal quarter; in each case together with a certificate signed by an Authorized Officer of the Parent and each of the Credit Parties to the effect that such Financial Statements, while not examined by independent public accountants, reflect, in the opinion of each such Person, all adjustments necessary to present fairly in all material respects the financial position of each such applicable Person as at the end of each such fiscal year and  each such fiscal quarter and the results of operations for the applicable fiscal year and applicable fiscal quarter then ended in conformity with generally recognized accounting standards customarily followed by non-public distribution companies in the motion picture industry in the United States, subject to normal year-end audit adjustments and the absence of footnotes;

(b)    Simultaneously with the delivery of the statements referred to in Section 9.2(a) above, a certificate of an Authorized Officer of the Parent, in form and substance reasonably satisfactory to the Lender stating whether or not such Authorized Officer has knowledge, after due inquiry, of any condition or event which would constitute an Event of Default or Default and, if so, specifying each such condition or event, the nature thereof and any action taken or proposed to be taken with respect thereto;

(c)    Promptly upon written request therefor, deliver any information reasonably requested by the Lender under or in connection with the USA Patriot Act;

(d)    Provide prompt notice of the failure by the Distributor, any Subdistributor or any Exhibitor to deliver to any Credit Party entitled to the receipt thereof any payment or accounting statement (and underlying information) for the Film by the date required for the delivery thereof under the applicable Distribution Agreement, Subdistribution Agreement or Exhibitor Agreement;

(e)    From time to time such additional information regarding the financial condition or business of the Parent and its Consolidated Subsidiaries (including, but not limited to, any Credit Party), the Film or any other material agreement in connection with the Film or the Collateral, as the Lender may reasonably request in writing; and

53

(f)    Permit representatives of the Lender to have access to and to examine its Physical Properties, books and records relating to the Collateral during business hours and with reasonable notice to the applicable Credit Party and shall furnish to the Lender, at such Credit Parties' expense, such other information relating to the affairs of any Credit Party as the Lender reasonably may request from time to time.

9.3    Certain Film Specific Information.

Without limiting the generality of the foregoing, the Credit Parties shall, at any time when any Loan Obligations remain unpaid or not performed hereunder, supply the Lender promptly, or cause the Lender to be promptly supplied, with the following:

(a)    Upon the request of the Lender, a copy of the P & A Budget showing the then current status of each item of P & A Cost thereon, and the amount thereof incurred or expended to date, not less complete than, and in the same form, as supplied to any Credit Party, Subdistributor or other Person including the amount and terms of any and all rebates, discounts, credits and refunds available to any Credit Party or any Affiliate in connection therewith and the disposition of the amount thereof;

(b)    Immediately upon receipt thereof, which shall be no less frequently than three (3) times each week commencing three (3) weeks prior to the initial Domestic General Theatrical Release of the Film, a copy of each tracking report received by any Credit Party from NRG;

(c)    A report of the performance of the Film as exploited by the Distributor and each Subdistributor including, but not limited to, then current Rentrak and similar reports regarding the domestic theatrical performance of the Film (which, in any event, the Credit Parties shall deliver to the Lender daily during the first three (3) weeks, and thereafter weekly by the first Business Day of each week for the immediately preceding week during the first sixty (60) days, after the initial Domestic General Theatrical Release of the Film) in the same form as supplied to any other Credit Party, the Distributor or any other Person; and

(d)    Within five (5) Business Days after being sent or received by any Credit Party, copies of all invoices and other correspondence between any Credit Party and any Subdistributor concerning or mentioning the payment of any portion of the Assigned Receipts.

9.4    Notice of Certain Events.    The Credit Parties shall each promptly notify the Lender in writing of the following matters: (a) any Event of Default or Default; (b) any default under any of the Distribution Agreement, the Subdistribution Agreements and any other Fundamental Document or agreement material to the business, financial condition or results of operations of any Credit Party to which any Credit Party is a party or by which any Credit Party may be bound; (c) immediately after becoming aware thereof, any pending or threatened action, suit, proceeding, or counterclaim by any Person, or any pending or threatened investigation by a Governmental Authority, which action, suit, proceeding, counterclaim or investigation seeks damages in excess of $100,000 (which amount shall not be fully covered by insurance), or which may otherwise materially and adversely affect the Collateral, the repayment of the Loan Obligations, the Lender's rights under the Fundamental Documents, or any Credit Party's property, business, operations, or condition (financial or otherwise) or otherwise result in a

54

Default or an Event of Default; and (d) immediately after becoming aware thereof, any pending or threatened strike, work stoppage, unfair labor practice claim, or other labor dispute affecting any Credit Party and in a manner which could reasonably be expected to materially and adversely affect the Collateral, the repayment of the Loan Obligations, the Lender's rights under the Fundamental Documents, or any Credit Party's property, business, operations, or condition (financial or otherwise) or otherwise result in a Default or an Event of Default.

## ARTICLE 10
## GENERAL REPRESENTATIONS AND WARRANTIES

The Credit Parties each warrants and represents to the Lender and (except with respect to any representation or warranty which is stated to be made as of a specific date which shall be deemed repeated as of such date), each Credit Party shall be deemed to have repeated each such representation and warranty on each date that any of the Loan Obligations remains outstanding or this Agreement is in effect, as follows.

10.1    Authorization, Validity and Enforceability.

(a)    Each of the Credit Parties has the power and authority to execute, deliver and perform this Agreement and the other Fundamental Documents, to incur the Loan Obligations, to grant to the Lender Liens upon and in the Credit Party Collateral, and in the case of the Guarantors, guaranty the Loan Obligations. Each of the Credit Parties has taken all necessary action (including without limitation, obtaining approval of its members if necessary) to authorize its execution, delivery, and performance of this Agreement and the other Fundamental Documents to which it is a party. No consent, approval, or authorization of, or declaration or filing with, any governmental authority, and no consent of any other Person, is required in connection with any of the Credit Parties' execution, delivery and performance of this Agreement and the other Fundamental Documents to which it is a party, except for those already duly obtained.

(b)    This Agreement and the other Fundamental Documents to which each of the Credit Parties is a party have been duly executed and delivered by each of the Credit Parties, and constitute the legal, valid and binding obligation of each of the Credit Parties, enforceable against it in accordance with its terms without defense, setoff or counterclaim, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally and by general principles of equity.

(c)    Each of the Credit Parties' execution, delivery, and performance of this Agreement and the other Fundamental Documents to which it is a party do not and will not conflict with, or constitute a violation or breach of, or constitute a default under, or result in the creation or imposition of any Lien upon the property of any of the Credit Parties by reason of the terms of: (i) any contract, mortgage, lease, agreement, indenture, or instrument to which each of the Credit Parties is a party or which is binding upon it or its assets, (ii) any judgment, law, statute, rule or governmental regulation applicable to any of the Credit Parties or its assets, or (iii) the articles of organization or the operating agreement of any of the Credit Parties.

55

10.2    Validity and Priority of Liens.  The provisions of this Agreement and the other Fundamental Documents create legal and valid Liens on the Credit Party Collateral in favor of the Lender and such Liens shall constitute valid first priority perfected and continuing Liens on all the Credit Party Collateral, having priority over all other Liens on the Credit Party Collateral, except Permitted Liens, securing all the Loan Obligations, and enforceable against the Credit Parties and all third Persons, upon: (a) the filing of the appropriate UCC-1 financing statements with the Secretary of State of Delaware; (b) the filing of the Copyright Mortgage and Security Agreement with the U.S. Registrar of Copyrights; (c) the delivery of any certificated Pledged Securities with appropriate stock powers (or any comparable document for non-corporate entities to the extent certificated) duly executed in blank to the Lender and the Lender has taken possession or control of such Pledged Securities; (d) the execution and delivery of any applicable Account Control Agreement; and (f) the payment of all applicable filing fees for the documents referenced in the preceding clauses "(a)" and "(b)".  Other than the Liens granted by SFD and by the Collection Account Manager, the Credit Parties have no other Liens granted by third parties in the Film or any products or proceeds thereof.

10.3    Organization and Qualification.  The Borrower and each other Credit Party: (a) is duly formed and organized and validly existing in good standing under the laws of the State of Delaware; (b) is qualified to do business in the State of Delaware, (c) is qualified to do business as a foreign limited liability company and is in good standing in each jurisdiction in which the failure to so qualify or be in good standing could reasonably be expected to have a Material Adverse Effect on such Person's property, business, operations, prospects or condition (financial or otherwise); and (d) has all requisite power and authority to conduct its business and to own its property. Each of the Borrower and the other Credit Parties has a valid, binding, subsisting and enforceable limited liability company agreement and no such Person has adopted or issued, and there does not exist, any series of limited liability company interests.

10.4    Financial Statements.  All financial statements, information, and other historical financial data furnished by the Credit Parties to the Lender in connection with the Credit Parties' application for credit hereunder, if any, are, in all material respects, accurate and correct, and such financial statements, information, and other historical financial data have been prepared in accordance with appropriate accounting principles and accurately represent the financial condition of the Person to whom such statements relate as of the date thereof.

10.5    Solvency.  Each of the Credit Parties is Solvent prior to and after giving effect to the Loans on the Closing Date and shall remain Solvent during the term hereof.

10.6    Ownership of Equity Interests, Subsidiaries, etc.

(a)    Attached hereto as Schedule 10.6(a) is an accurate and complete list as of the Closing Date of each Credit Party showing, as to each: (i) the jurisdiction of formation; (ii) the authorized capitalization; (iii) the number of Equity Interests outstanding; and (iv)the ownership of its Equity Interests.

(b)    Except as set forth on Schedule 10.6(b) attached hereto or as otherwise expressly permitted by this Agreement with respect to an SPV, as of the Closing Date: (i) no Credit Party owns any voting stock, Equity Interest or other beneficial interest, directly or

56

indirectly, in any Person; and (ii) no Credit Party is a general or limited partner in any partnership or a participant in a joint venture.

10.7    Rights in the Film and Collateral.

(a)    On and after the Closing Date, the Borrower shall own all rights in the Film and in the other Collateral necessary to enable the Borrower and each other Credit Party having any rights therein to fully perform all of their respective obligations, representations, warranties and agreements under this Agreement and the other Fundamental Documents, and no other Person shall own or control any of the Distribution Rights in or to the Film other than the Subdistributors. Other than the Credit Parties, no Affiliate of any Credit Party has, or has any right to acquire, directly or indirectly, any right, title or interest in or to the Film or any other Collateral including, without limitation, any of the Collateral Proceeds. No Credit Party, or any Affiliate of a Credit Party, has or will have any right, title or interest in or to any proceeds of the Film other than pursuant to the Collection Account Management Agreement.

(b)    The applicable Credit Parties have acquired, now own and will own until the indefeasible satisfaction of all Loan Obligations and the termination of the Lender's commitment to make Advances under this Agreement, subject only to those rights granted or to be granted pursuant to the Subdistribution Agreements: (i) all right, title and interest, including rights under copyright in and to the Distribution Rights; (ii) all right, title and interest necessary to distribute, exhibit and otherwise exploit the Film in the Domestic Territory including, without limitation, all necessary or appropriate rights in the literary, musical or other property or ideas (including the Literary Property) used therein; (iii) the right to exhibit the Film throughout the Domestic Territory in theaters, on television, by means of video cassettes and videodisks or in any other media or manner, by any means now known or unknown, and (iv) the right to exploit ancillary rights in and to the Film in the Domestic Territory to the extent granted or to be granted pursuant to the Distribution Agreement, subject only to payment of necessary performing rights fees in respect of the music in the Film. The agreements pursuant to which the rights in and to the Film have been or will be acquired by the Credit Parties are accurately and completely described in Schedule 10.7(b) attached hereto.

(c)    To the knowledge of the Credit Parties, all material or matter used in or in connection with the Film, including dialogue, characters, titles, episodes and events, shall be original and owned by or licensed to the copyright owner of the Film and licensed exclusively to the Borrower pursuant to the Distribution Agreement for exploitation in the Domestic Territory under the terms and conditions of the Distribution Agreement, or in the public domain, and will not infringe any copyrights, statutory or common law, or constitute a libel, slander or invasion of privacy of any Person, or otherwise infringe on or violate the rights or any other Person whomsoever, in any fashion whatsoever.

(d)    There are and will be no agreements relating to music rights in connection with the Film unless such agreement grants all rights with respect thereto for such media and/or duration as such rights are required under the Distribution Agreement, the Subdistribution Agreements and/or the Exhibitor Agreements. The Credit Parties shall deliver (or cause to be delivered) all such agreements to the Lender for its review (but not approval) upon the Lender's request.

57

10.8   <u>Required Payments</u>.  All rents, royalties and other amounts due and payable by any Credit Party under contracts, leases, license agreements and other documents and instruments relating to the Collateral including, without limitation, contracts, leases or agreements relating to the Literary Property, the services of all Persons rendering services in connection with the Film, and the furnishing of goods, services, processing, equipment and materials used in connection with the Film have been paid if due, or will be paid when due, if by reason of nonpayment thereof the value of any part of the Collateral or the Liens of the Lender therein may be impaired, and no Credit Party is in default under any such contract, lease, license agreement or other document or instrument so that such impairment has now occurred.

10.9   <u>Litigation</u>.   There are no actions, suits or proceedings pending or, to the knowledge of any of the Credit Parties, threatened against or affecting any Person or before any court or governmental agency, arbitrator or instrumentality, domestic or foreign, relating to the Screenplay, the Film, the Distribution Agreement, the Subdistribution Agreements or any other Fundamental Document or rights therein or thereto or otherwise, which if determined adversely to any Person would have a Material Adverse Effect on the Collateral or the financial condition, other properties or operations of any Credit Party, or which would have a Material Adverse Effect on the rights and Liens of the Lender granted to the Lender hereunder and under the other Fundamental Documents.

10.10   <u>No Defaults</u>.

(a)   No Credit Party is in default under (as applicable) any Material Agreement, the Distribution Agreement, the Subdistribution Agreements or any other Fundamental Document, in each case to which it is a party.

(b)   <u>Schedule 10.10(b)</u> attached hereto is a true and complete listing as of the date hereof of: (i) all credit agreements, indentures, notes and other agreements related to any indebtedness for borrowed money of any Credit Party, other than the Fundamental Documents; (ii) all joint ventures to which a Credit Party is a party; (iii) all agreements or other arrangements pursuant to which any Credit Party has granted a Lien to any Person other than the Fundamental Documents; and (iv) all co-financing agreements and other contractual arrangements (other than the Fundamental Documents) entered into by any Credit Party or by which any Credit Party is bound which arrangements are material to any Credit Party including, but not limited to, Guaranties. The Credit Parties have delivered or made available to the Lender a true and complete copy of each such agreement (or, if not yet executed, the most recent draft) including all exhibits and schedules.  For purposes of this <u>Section</u>, a contract, agreement or arrangement shall be deemed "material" if any Credit Party reasonably expects that any Credit Party would, pursuant to the terms thereof: (A) recognize future revenues in excess of $250,000; (B) incur liabilities or obligations in excess of $250,000; or (C) likely suffer damages or losses in excess of $250,000 by reason of the breach or termination thereof (each, a "<u>Material Agreement</u>").

10.11   <u>ERISA</u>.  No Credit Party nor any member of a controlled group of corporations (as defined in Section 1563 of the Code), nor any trade or businesses which are under common control with any Credit Party (as provided in Section 414(c) of the Code) nor any member of any affiliated service group of any Credit Party (as provided in Section 414(m) of the Code) now has, nor will they have prior to the indefeasible repayment in full of the Loan Obligations and the

58

termination of each of the Lender's commitment to make Advances hereunder, any plan subject to Title IV of the Employee Retirement Income Security Act of 1974, as amended, or any such plan to which any Credit Party, any member of a "controlled group" or affiliated service group, or any trade or business under common control with any Credit Party (as aforesaid) is required to contribute on behalf of its employees.

10.12  Taxes.  Each Credit Party has filed all tax returns and other reports which it was required by law to file on or prior to the date hereof and has paid all taxes, assessments, fees, and other governmental charges, and penalties and interest, if any, against it or its property, income, or franchise, that are due and payable (except to the extent that (a) any such taxes, assessments, fees, and other governmental charges, and penalties and interest are diligently contested in good faith by appropriate proceedings and proper reserves are established on the books of such Credit Party as provided in generally recognized accounting standards, and (b) a stay of enforcement of any Liens arising from the nonpayment thereof when due is in effect).

10.13  Margin Stock; Investment Company; and Public Utility Holding Company.  The Borrower shall use the proceeds of the Loan to pay the direct acquisition cost of the Film pursuant to the Distribution Agreement, and the P & A Costs for the Film in accordance with the Domestic General Theatrical Release Plan, and the other fees, costs and sums expressly identified herein, and for no other purpose. The Credit Parties are not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States), and no part of the proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock. None of the Credit Parties is an "investment company" nor an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended (15 U.S.C. §§80(a)(l), et seq.). None of the Credit Parties is a "holding company" or a "subsidiary company" of a "holding company" or an affiliate of a "holding company" within the meaning of the Public Utility Holding Company Act of 1935, as amended.

10.14  Fictitious Names.  Except as disclosed on Schedule 10.14 attached hereto, no Credit Party has done business, is doing business or intends to do business other than under its full legal name including, without limitation, under any trade name or other "doing business as" name.

10.15  Pledged Securities.

(a)    Article 7 of this Agreement creates, in favor of the Lender, a valid, binding and enforceable security interest in, and Lien upon, all right, title and interest of the Pledgors in the Pledged Collateral and constitutes a fully perfected first and prior security interest and Lien upon all right, title and interest of the Pledgors in such Pledged Collateral, provided, that on or before such date, the definitive instruments representing all certificated Pledged Securities (if any) shall have been delivered to the Lender (and the Lender has taken possession or control of such certificated Pledged Securities), accompanied by undated stock powers (or any comparable documents for non-corporate entities to the extent certificated), duly endorsed or executed in blank by the appropriate Pledgor as required under Section 10.1 hereof.

59

(b)    (i) All of the Pledged Securities are duly authorized, validly issued, fully paid and non-assessable, and are owned and held by the Pledgors (as applicable), free and clear of any Liens, other than those created pursuant to this Agreement and other Permitted Liens, and there are no restrictions on the transfer of the Pledged Securities other than as a result of this Agreement or applicable securities laws and the regulations promulgated thereunder; (ii) the Pledged Securities are owned by the Persons specified on Schedules 10.15(a) and (b) attached hereto; and (iii) except as set forth on said Schedules, there are no outstanding rights, warrants, options, conversion or similar rights currently outstanding with respect to, and no agreements to purchase or otherwise acquire, any shares of the capital stock or other Equity Interests of any issuer of any of the Pledged Securities; and there are no securities or obligations of any kind convertible into any shares of the capital stock or other Equity Interests of any issuer of any of the Pledged Securities.

10.16    Compliance with Laws.    No Credit Party is in violation of any Applicable Law or any order, writ, injunction, decree, rule or regulation of any Governmental Authority binding upon such Credit Party, except for such violations which in the aggregate could not reasonably be expected to have a Material Adverse Effect on any such Person.  The borrowings hereunder, the intended use of the proceeds of the Loans and any other transactions contemplated hereby will not violate any Applicable Law.

10.17    No Material Adverse Change.    No material adverse change has occurred in the property, business, operations, condition (financial or otherwise) or prospects of any Credit Party since January 1, 2018.

10.18    Disclosure.    Neither this Agreement nor any document or statement furnished to the Lender by or on behalf of any Credit Party contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements contained herein or therein not misleading.

10.19    Material Agreements.    The Credit Parties have furnished to the Lender copies of all Material Agreements, indentures, and other material instruments, relating to the Film, or pursuant to which any Credit Party has incurred or may be obligated, whether directly or indirectly, for Indebtedness.

10.20    Brokers.    Other than PDL, none of the Credit Parties has any obligation or liability to any broker, finder, introducer or other Person arising out of or in connection with this Agreement or the transactions contemplated hereby.  The Borrower shall be solely responsible, and the Lender shall have no responsibility, obligation or liability, for payment of any fee, commission or other obligation or liability to or for the benefit of PDL or any Affiliate.

10.21    Exemption from California Constitutional Usury Provisions.    The Loans aggregate at least Three Hundred Thousand Dollars ($300,000). The Borrower's ultimate parent has total assets in excess of Two Million Dollars ($2,000,000). None of the proceeds of the Loans will be used for personal, family or household purposes. No Credit Party is an individual, a revocable trust having one (1) or more individuals as trustors or a partnership in which, at the time of issuance of the Note, one (1) or more individuals are general partners within the meaning of Section 25118(e)(1) of the California Corporations Code. The Borrower and each Credit

60

Party, by reason of its own business and financial experience or that of its professional advisors, could reasonably be assumed to have the capacity to protect their own interests (within the meaning of Section 25118(f) and (g) of the California Corporations Code) in connection with this Agreement and the transactions contemplated hereby. The sole manager of the Borrower has had prior business relationships with the Lender's asset manager or one (1) or more of the asset manager's officers, principals or managing directors.

10.22 <u>Survival of Warranties</u>.    All covenants, agreements, representations and warranties made under this Agreement or in any of the other Fundamental Documents shall survive the execution and delivery of this Agreement, the making of the Loans hereunder, and the execution and delivery of the Note(s) and shall continue in full force and effect until the full and indefeasible payment and performance of all the Loan Obligations and the termination of each of the Lender's commitment to make Advances under this Agreement.

**ARTICLE 11**
**AFFIRMATIVE AND NEGATIVE COVENANTS**

Each of the Credit Parties covenants to the Lender that so long as any of the Loans remain outstanding or this Agreement is in effect, as follows.

11.1    <u>Taxes and Other Liabilities</u>.    The Credit Parties shall pay and discharge, before the same become delinquent and before penalties accrue thereon, all taxes, assessments and governmental charges upon or against such Credit Party or upon such Credit Party's income or profits or upon any of such Credit Party's properties, and all such Credit Party's other liabilities at any time existing, except to the extent and so long as: (a) the same are being contested in good faith and by appropriate proceedings in such manner as not to cause any Material Adverse Effect upon such Credit Party's financial condition or the loss of any right of redemption from any sale thereunder; and (b) such Credit Party shall have set aside on its books reserves (segregated to the extent required by generally accepted accounting principles) adequate with respect thereto; and further to pay all governmental charges or taxes (except income, franchise or other similar taxes on the Lender) at any time payable or ruled to be payable in respect of the existence, execution or delivery of this Agreement or the other Fundamental Documents by reason of any existing or hereafter enacted federal or state statute.

11.2    <u>Keeping of Books and Accounts</u>.    The Credit Parties shall keep complete, proper and separate accounts, books of record and account, including a record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the operation of such Credit Party's business, all in accordance with generally recognized accounting standards customarily followed by non-public distribution companies in the motion picture industry in the United States, in each case to the extent necessary to enable the Credit Parties to comply with the periodic reporting requirements of this Agreement.

11.3    <u>Legal Rights and Facilities</u>.    The Credit Parties shall maintain and preserve such Credit Party's legal existence and all rights, privileges, franchises and other authority necessary for the conduct of its business.

61

11.4    Compliance. The Credit Parties shall comply with all laws, rules and regulations relating to, and shall pay prior to delinquency all license fees, registration fees, taxes, guild or union pension, health and welfare payments, supplemental market, reuse and other required payments and assessments, and all other charges including, without limitation, non-governmental levies or assessments, which may be levied upon or assessed against, or which may become a Lien on, the ownership, operation, possession, maintenance, exploitation, exhibition or use of, the Collateral, or which create or may create a Lien upon the Collateral, or any part thereof. The Credit Parties shall pay (or cause to be paid) prior to delinquency (i) all required guild or union residual payments and (ii) such other payments to third Persons assumed by any Credit Party if proceeds of the Film otherwise pledged to the Lender are to be used to pay for such payments before the Loan Obligations have been paid in full if and only as may be approved by the Lender in its sole and absolute discretion (such as so-called "box office bonuses" and "deferments").

11.5    Maintenance. Each of the Credit Parties shall maintain the Collateral and any other material properties, Equipment and facilities in good order and repair, conduct its business in an orderly manner without interruption and refrain from any material change in the nature of its business.

11.6    Insurance.

(a)    At all times, at its sole cost and expense, the Credit Parties shall maintain insurance against loss or damage to the Collateral with responsible and reputable insurance companies or associations approved by the Lender in such amounts and covering such risks as are usually carried by companies engaged in similar businesses and owning similar property in the same general area as the area in which such property is located including, general liability insurance, worker's compensation insurance and property insurance covering the Laboratory Materials and materials manufactured therefrom all to the extent, and in amounts, consistent with customary industry standards.

(b)    Without limiting the generality of the foregoing, the Credit Parties shall: (i) maintain errors and omissions insurance, covering, among other things, the legal liability and defense of each Credit Party against lawsuits alleging the unauthorized use of title, format, ideas, characters, plots, plagiarism, copyright infringement and unfair competition; and (ii) protect against alleged libel, slander, defamation of character and invasion of privacy. The errors and omissions policy shall be in a minimum amount of $3,000,000 per occurrence and $5,000,000 in the aggregate, with a deductible of not more than $50,000, and a period of coverage of not less than three (3) years (plus such longer periods as such coverage is required to be in effect pursuant to the Distribution Agreement or any Subdistribution Agreement); and (ii) comprehensive general liability insurance covering it against, among other things, for all claims for bodily injury, personal injury or property damage including, without limitation, coverage for all non-owned and hired vehicles with a minimum liability limits of $1,000,000.

(c)    All such insurance policies covering the Collateral shall name one or more of the Credit Parties as named insureds and shall name the Lender as additional insured without the Lender being liable for premiums or other costs or expenses. All such casualty insurance policies, within ten (10) Business Days after the Closing Date, shall be amended and endorsed in customary form to make the Lender a loss payee thereunder with respect to any casualty to any

62

tangible personal property related to the Film, and such endorsements shall be delivered to the Lender.

(d)     At least thirty (30) days prior to the expiration of each such policy, the Credit Parties shall furnish the Lender with evidence approved by the Lender of the payment of premium and the reissuance of a policy continuing insurance in force as required by this Agreement. All such policies or certificates shall contain a provision that such policies will not be canceled or materially amended, which term shall include any reduction in the scope or limits of coverage, without at least thirty (30) days' prior written notice by such insurer to the Lender. If the Credit Parties fail to provide, maintain, keep in force or deliver and furnish to the Lender the policies of insurance required by this Section 11.6, then the Lender may, but shall not be obligated to, procure such insurance or single interest insurance for such risks covering the Lender's interest, and the Credit Parties will pay all premiums thereon promptly upon demand by the Lender, together with interest thereon at the Default Rate from the date of expenditure by the Lender until reimbursement by the Credit Parties.

(e)     The Credit Parties shall observe and comply with the material requirements of all policies of insurance required to be maintained hereunder and shall so perform and satisfy the requirements thereof so that the insurance policies are at all times in full force and effect.

(f)     Upon request by the Lender, the Credit Parties shall furnish the Lender a certificate of an Authorized Officer of the Credit Parties containing a detailed list of the insurance policies of any Credit Party required by or referred to in this Section 11.6 then outstanding and in force.

11.7    Related Agreements.  The Credit Parties shall perform and observe, all material agreements, covenants, representations and warranties of such Person under (as applicable) the Distribution Agreement, the Subdistribution Agreements, the Exhibitor Agreements and any other document or agreement entered into by any such Person in connection with or related to the delivery or exploitation of the Film.

11.8    Approvals.  The Credit Parties shall obtain, from time to time, all material approvals, permits and consents necessary to allow each Credit Party to remit payments to the Lender, the Collection Account or the Payment Account from any and all appropriate Governmental Authorities having jurisdiction thereof.

11.9    Indebtedness.  The Credit Parties shall not incur any Indebtedness, other than pursuant to or as expressly permitted by this Agreement, unless such Indebtedness is for trade payables arising in the ordinary course of business, which is not evidenced by a promissory note or similar document or instrument and unsecured.

11.10   P & A Cost Funding.  The Borrower shall fund or cause to be funded all P & A Costs in the P & A Budget for the Film in connection with the Domestic General Theatrical Release thereof in accordance with the Domestic General Theatrical Release Plan and as may be required by the Distribution Agreement, any Subdistribution Agreement or any Exhibitor Agreement.  Not later than February 15, 2019, subject to the proviso immediately below, the

63

Borrower shall have paid in cash, or incurred the expense of, all such P & A Costs in the P & A Budget including, but not limited to, for goods and services provided by third parties unrelated to, and not Affiliates of, any of the Credit Parties; provided that the Borrower shall be permitted to pay in cash, or incur the expense of, such P & A Costs in an amount not to exceed $500,000 on or prior to March 25, 2019.

11.11  Performance of Obligations.  The Credit Parties shall duly observe and perform all material terms of each of the Distribution Agreement, Subdistribution Agreements, Exhibitor Agreements and all agreements that are included in the chain of title for the Film to which a Credit Party is a party or as to which any Credit Party has succeeded to any rights or assumed any obligation or liability and all other material agreements with respect to the exploitation of the Film to which a Credit Party is a party or as to which any Credit Party has assumed any obligation or liability and shall diligently protect and enforce the rights of any Credit Party under all such agreements in a manner consistent with prudent business judgment.

11.12  Subsidiaries.  Promptly following the creation or acquisition of a Subsidiary other than an SPV (but in any event prior to commencement of operations of such Subsidiary), each  applicable Credit Party shall cause such Subsidiary to deliver to the Lender: (a) an Instrument of Assumption and Joinder duly executed by such Subsidiary; and (b) an appropriate UCC-1 financing statement naming such Subsidiary as debtor and the Lender as the secured party; and (c) accurate and complete copies of the organizational documents of such Subsidiary.

11.13  Dissolution and Sale of Assets.  The Credit Parties shall not wind up, liquidate or dissolve such Credit Party's affairs.  The Borrower shall not sell, lease, license, transfer, or otherwise dispose of or grant an interest in any of the Collateral or any of its other properties or assets (including, but not limited to, any accounts receivable or any rights or claims associated therewith).  No Credit Party shall change its legal or trade name.

11.14  Use of Proceeds.  The Borrower shall not use the proceeds of any Loan made by the Lender hereunder for any purpose or thing other than the items set forth in Subsection 2.2(a) hereof.

11.15  Transactions with Credit Party Affiliates.  The Credit Parties shall not, except as previously approved in writing by the Lender, effect any transaction with Affiliates of the Credit Parties on a basis less favorable to the Credit Parties than would be the case if such transaction had been effected with a non-Affiliate.  Other than the Credit Parties or any SPV, no Affiliate of any Credit Party shall have, or at any time acquire, directly or indirectly, in or to any right, title or interest in or to the Film or any Collateral Proceeds.

11.16  Limitation on Fundamental Changes.  The Credit Parties shall not: (a) enter into any merger or consolidation with any other Person; (b) adopt a plan of division, or amend its limited liability company agreement to permit said Credit Party, to divide into two (2) or more limited liability companies; (c) adopt or permit to exist, or amend its limited liability company agreement to permit the issuance or existence of, any series of limited liability company interests; (d) liquidate, wind-up or dissolve; (e) sell, convey, transfer, assign, lease, abandon or otherwise dispose (including in a sale and leaseback) of, in one (1) transaction or in a series of transactions, voluntarily or involuntarily, assets (tangible or intangible (including but not limited to sale, assignment, discount or other disposition of accounts, contract rights, chattel paper or

64

general intangibles with or without recourse) constituting all or substantially all of its assets and properties; or (f) acquire all or substantially all of the assets constituting a business, division, branch or other unit of operation of any Person.

11.17   Liens.  (a) The Credit Parties shall not directly or indirectly create, incur or suffer to exist, and shall promptly discharge or cause to be discharged, any Lien on or with respect to the Collateral, other than Permitted Liens, and (b) the Credit Parties shall defend the Collateral against any and all Liens howsoever arising, other than Permitted Liens, and in any event defend against any attempted foreclosure in respect of the Collateral (other than a foreclosure by the Lender under this Agreement or any of the other Security Documents).  Concurrently herewith and after the Closing Date, (a) the Borrower shall assign to the Lender all Liens granted (or hereafter granted) to the Borrower with respect to any part of the Collateral including, but not limited to, any Lien granted or to be granted by SFD in favor of the Borrower and (b) Aviron Licensing and Aviron Finance shall assign to the Lender all Liens granted (or hereafter granted) to either such Person with respect to any part of the Credit Party Collateral in relation to the Film.

11.18   Negative Pledge.  The Credit Parties shall not enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of the Collateral, other than with any Third-Party Subsequent Film Financier pertaining solely to the Subsequent Aviron Film(s) for which said Third-Party Subsequent Film Financier provides Third-Party Subsequent Financing or as expressly permitted by this Agreement or the other Fundamental Documents.

11.19   Bank Accounts.  The Credit Parties shall not open or maintain any bank account with respect to any Collateral Proceeds other than the Collection Account, the Exhibitor Account and any bank account owned by Aviron Finance that does not contain any proceeds from the Film.  The Credit Parties shall not permit any deposit account control agreement to be in effect with respect to the Exhibitor Account.  The Credit Parties shall notify the Lender promptly upon the establishment of any other bank or deposit account with respect to any Collateral Proceeds and, in the case of any replacement account for the Exhibitor Account, shall provide the Lender with direct online "read-only" access to such account as would otherwise be provided under Section 7.9(a) hereof for the Exhibitor Account.

11.20   Business Activities.  The Credit Parties shall not engage in any business activity other than: (a) those relating to the acquisition, distribution and other exploitation of the Film and any activities customarily incidental thereto; (b) performing its respective obligations under the Fundamental Documents to which it is a party and under all other agreements related to any of the foregoing activities with respect to the Film; (c) as it relates to Aviron Finance and Aviron Licensing, business activities related to the ownership and operation of SPVs and distribution of pictures substantially consistent with their respective business activities conducted for the Borrower in relation to the Film as permitted hereunder; (d) as it relates to Aviron Licensing in connection with the Film, providing distribution services to the Borrower in connection with the Domestic General Theatrical Release of the Film, the execution of, performance under and enforcement of all Exhibitor Agreements for the theatrical exhibition of the Film (including the collection of all Exhibitor Receipts) and such other activities as contemplated under the License Agreement related to the Film; and (e) those activities described in Exhibit J attached hereto.

11.21  <u>Ownership of Distribution Rights</u>.  Until the Lender Termination Date, except as approved by the Lender, the Borrower shall, at all times, own all of the Distribution Rights in and to the Film, subject only to the Subdistribution Agreements.

11.22  <u>Restricted Payments</u>.  The Credit Parties shall not make any Restricted Payments.

11.23  <u>Further Assurances</u>.  The Credit Parties shall, at any time or from time to time upon the request of the Lender, execute and deliver such further documents and do such other acts and things as the Lender may reasonably request in order to effect fully the purposes of this Agreement and the other Fundamental Documents and to provide for the payment and performance of the Loan Obligations.

11.24  <u>Chain of Title</u>.  The Credit Parties shall promptly provide to the Lender an accurate and complete copy of any Certificate of Recordation that is received by any Credit Party from the United States Copyright Office for any Chain of Title Document.

11.25  <u>Universal Agreement</u>.  The Credit Parties shall promptly provide to the Lender after effectiveness thereof an accurate and complete copy of any amendment, restatement, modification, supplement, renewal or replacement of the Universal Agreement.

11.26  <u>Section 365 of the Revised Bankruptcy Code</u>.  If any bankruptcy, insolvency, reorganization, liquidation or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against SFD, and the Distribution Agreement is rejected pursuant to Section 365 of the Revised Bankruptcy Code, the Credit Parties shall take all actions necessary or appropriate to preserve the rights of the Borrower under Section 365(n) of the Revised Bankruptcy Code with respect to the Distribution Agreement, including, making a request for non-interference under Section 365(n)(3) of the Revised Bankruptcy Code.

## ARTICLE 12
## PLEDGE

12.1  <u>Pledge</u>.  Each Pledgor, as security for the due and punctual payment of the Loan Obligations (including interest accruing on and after the filing of any petition in bankruptcy or of reorganization of the Borrower whether or not post filing interest is allowed in such proceeding) in the case of the Borrower, and as security for its obligations hereunder in the case of a Pledgor other than the Borrower, grants, pledges, hypothecates, assigns, transfers, sets over, conveys and delivers to the Lender  a first priority security interest in all Pledged Collateral now owned or hereafter acquired by it.  The Pledgors shall deliver to the Lender the definitive instruments (if any) representing all Pledged Securities, accompanied by undated stock powers (or any comparable documents for non-corporate entities to the extent certificated), duly endorsed or executed in blank by the appropriate Pledgor, and such other instruments or documents relating thereto as the Lender or its counsel shall reasonably request.  The initial Pledged Securities are listed on <u>Schedule 12.1</u> hereto.

12.2  <u>Covenant</u>.  Each Pledgor covenants that as the owner of Equity Interests in each of its respective Subsidiaries it will not take any action to allow any additional shares of common stock, preferred stock or other Equity Interests of any of such Subsidiaries or any securities convertible or exchangeable into common or preferred stock or other Equity Interests of such

66

Subsidiaries to be issued, or grant any options or warrants, unless all of such securities are pledged to the Lender as security for the Loan Obligations and, if applicable, such Pledgor's obligations as a Guarantor hereunder.

12.3   Remedies upon Default.   If an Event of Default shall have occurred and be continuing, the Lender may sell the Pledged Securities, or any part thereof, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Lender shall deem appropriate subject to the terms hereof or as otherwise provided in the UCC. The Lender shall be authorized at any such sale (if the Lender deems it advisable to do so) to restrict to the full extent permitted by Applicable Law the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Pledged Securities for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale, the Lender shall have the right to assign, transfer, and deliver to the purchaser or purchasers thereof the Pledged Securities so sold. Each such purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Pledgor. The Lender shall give the Pledgors ten (10) days' prior written notice of any such public or private sale, or sale at any broker's board or on any such securities exchange, or of any other disposition of the Pledged Securities. Such notice, in the case of public sale, shall state the time and place for such sale and, in the case of sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Pledged Securities, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Lender may fix and shall state in the notice of such sale. At any such sale, the Pledged Securities, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Lender may (in its sole and absolute discretion) determine. The Lender shall not be obligated to make any sale of the Pledged Securities if it shall determine not to do so, regardless of the fact that notice of sale of the Pledged Securities may have been given. The Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case the sale of all or any part of the Pledged Securities is made on credit or for future delivery, the Pledged Securities so sold shall be retained by the Lender until the sale price is paid by the purchaser or purchasers thereof, but the Lender shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Pledged Securities so sold and, in case of any such failure, such Pledged Securities may be sold again upon like notice. At any sale or sales made pursuant to this Section, the Lender may bid for or purchase, free from any claim or right of whatever kind, including any equity of redemption, of the Pledgors, any such demand, notice, claim, right or equity being hereby expressly waived and released, any or all of the Pledged Securities offered for sale, and may make any payment on the account thereof by using any claim for moneys then due and payable to the Lender or any other consenting Secured Party by any Credit Party as a credit against the purchase price; and the Lender, upon compliance with the terms of sale, may hold, retain and dispose of the Pledged Securities without further accountability therefor to any Pledgor or any third party (other than the Lender). The Lender shall in any such sale make no representations or warranties with respect to the Pledged Securities or any part thereof, and shall not be chargeable with any of the obligations or liabilities of the Pledgors with respect thereto. Each Pledgor hereby agrees that (i) it will indemnify and hold the Lender and its Related Parties

67

harmless from and against any and all claims with respect to the Pledged Securities asserted before the taking of actual possession or control of the Pledged Securities by the Lender pursuant to this Agreement, or arising out of any act of, or omission to act on the part of, any Person prior to such taking of actual possession or control by the Lender (whether asserted before or after such taking of possession or control), or arising out of any act on the part of any Pledgor, its agents or Affiliates before or after the commencement of such actual possession or control by the Lender, but excluding therefrom all claims with respect to the Pledged Securities resulting from (x) the gross negligence or willful misconduct of the Lender as finally determined by a court of competent jurisdiction in a non-appealable decision or an appealable decision that has not been appealed within the time period required or (y) any claims with respect to the Pledged Securities asserted against an indemnified party by a Credit Party in which such Credit Party is the prevailing party, and (ii) the Lender and its Related Parties shall have no liability or obligation arising out of any such claim except for acts of willful misconduct or gross negligence of such Person, as finally determined by a court of competent jurisdiction in a non-appealable decision or an appealable decision that has not been appealed within the time period required.   As an alternative to exercising the power of sale herein conferred upon it, the Lender may proceed by a suit or suits at law or in equity to foreclose upon the Collateral and Pledged Securities under this Agreement and to sell the Pledged Securities, or any portion thereof, pursuant to a judgment or decree of a court or courts having competent jurisdiction.

12.4    Application of Proceeds of Sale and Cash.   The proceeds of sale of the Pledged Securities sold pursuant to this Section shall be applied by the Lender as follows:

(a)    First, to the payment of all reasonable and documented out-of-pocket costs and expenses paid or incurred by the Lender in connection with such sale, including, without limitation, all court costs and the reasonable and documented fees and out-of-pocket expenses of counsel for the Lender in connection therewith, and the payment of all reasonable and documented out-of-pocket costs and expenses paid or incurred by the Lender in enforcing this Agreement or in any other Fundamental Document, in realizing or protecting any Collateral and in enforcing or collecting any Loan Obligation, any Contingent Compensation Obligation or any guaranty thereof, including, without limitation, such court costs and attorney's fees and expenses incurred by the Lender in connection therewith; and

(b)    Then, to the payment in full of the Loan Obligations in accordance with this Agreement;

provided, however, that the Lender may in its discretion apply funds comprising the proceeds of sale of the Pledged Securities to take such actions or make such payments as the Lender reasonably believes is necessary or advisable in order to enhance or preserve the value of the Collateral.   Any amounts remaining after such payment in full shall be remitted to the appropriate Pledgor or as a court of competent jurisdiction may otherwise direct.

12.5    Securities Act, etc.   In view of the position of each Pledgor in relation to the Pledged Securities pledged by it, or because of other present or future circumstances, a question may arise under the Securities Act of 1933, as amended, as now or hereafter in effect, or any similar statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being hereinafter called the "Federal Securities Laws"), with respect to any Disposition of the Pledged Securities permitted hereunder.   Each Pledgor

68

understands that compliance with the Federal Securities Laws may very strictly limit the course of conduct of the Lender if the Lender were to attempt to dispose of all or any part of the Pledged Securities, and may also limit the extent to which or the manner in which any subsequent transferee of any Pledged Securities may dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Lender in any attempt to dispose of all or any part of the Pledged Securities under applicable Blue Sky or other state securities laws, or similar laws analogous in purpose or effect. Under Applicable Law, in the absence of an agreement to the contrary, the Lender may perhaps be held to have certain general duties and obligations to a Pledgor to make some effort towards obtaining a fair price even though the Loan Obligations may be discharged or reduced by the proceeds of a sale at a lesser price. Each Pledgor waives to the fullest extent permitted by Applicable Law any such general duty or obligation to it, and the Pledgors and/or the Credit Parties will not attempt to hold the Lender responsible for selling all or any part of the Pledged Securities at an inadequate price, even if the Lender shall accept the first offer received or does not approach more than one possible purchaser. Without limiting the generality of the foregoing, the provisions of this Section would apply if, for example, the Lender were to place all or any part of the Pledged Securities for private placement by an investment banking firm, or if such investment banking firm purchased all or any part of the Pledged Securities for its own account, or if the Lender placed all or any part of the Pledged Securities privately with a purchaser or purchasers.

12.6    Continuation and Reinstatement. Each Pledgor further agrees that its pledge hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Loan Obligation is rescinded or must otherwise be restored by any Secured Party upon the bankruptcy or reorganization of any Pledgor or otherwise.

12.7    Termination. The pledge referenced herein shall terminate when all of the Loan Obligations have been fully and paid in cash and performed and the commitment of the Lender to make Advances shall have terminated, at which time the Lender (at the sole expense of the Pledgors) shall promptly assign and deliver to the appropriate Pledgor, or to such Person or Persons as such Pledgor shall designate, against receipt, such of the Pledged Securities (if any) as shall not have been sold or otherwise applied by the Lender pursuant to the terms hereof and shall still be held by it hereunder, together with appropriate instruments of reassignment and release. Any such reassignment shall be free and clear of all Liens, arising by, under or through the Lender but shall otherwise be without recourse upon or warranty by the Lender and at the expense of the Pledgors.

## ARTICLE 13
## EVENTS OF DEFAULT; REMEDIES

13.1    Events of Default. It shall constitute an event of default ("Event of Default") if any one or more of the following shall occur for any reason:

      (a)    Failure of the Borrower to pay the principal of or interest on any of the Loan Obligations when the same becomes due, whether upon demand or otherwise;

      (b)    Failure by the Borrower to pay any fees, expenses, or any other Loan Obligation not otherwise specified in the foregoing clause "(a)" within five (5) Business Days following the date such item is due, whether upon demand or otherwise;

(c)     Any representation or warranty made by any of the Credit Parties in this Agreement or in any of the other Fundamental Documents, in each case to which it is a party, any financial statement, or any report furnished by any Credit Party at any time to the Lender, shall prove to be untrue in any material respect as of the date on which made or furnished;

(d)     Failure of any Credit Party to comply with any other covenant on its part to be performed under this Agreement or any of the other Fundamental Documents, in each case to which it is a party, and such failure if capable of cure is not cured within ten (10) Business Days after the earliest of the knowledge of, or any written notice is given to, such Credit Party of such failure;

(e)     Failure of any Credit Party, any Subdistributor or any other Person party to a Fundamental Document to perform or observe any material agreement, covenant, representation or warranty under (as applicable) any of the Fundamental Documents, in each case to which any such Person is a party, or any other document or agreement entered into by any such Person in connection with or related to the Film, and such failure if capable of cure is not cured within thirty (30) Business Days after the earliest of the knowledge of, or any written notice is given to, such Person of such failure;

(f)     Any Credit Party or any predecessor-in-interest to any Credit Party with respect to the Film shall become insolvent; or admit in writing its inability to pay its debts as they mature; or make an assignment for the benefit of creditors; or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or if such receiver or trustee otherwise shall be appointed; or bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by any Credit Party or any such Person;

(g)     Any final, non-appealable money judgment, writ or warrant of attachment, reference proceeding award or similar process shall be entered or filed against any Credit Party or any material portion of its assets, or any Credit Party enters into any settlement agreement with respect to any litigation or reference proceeding, in an aggregate amount greater than Two Hundred Fifty Thousand Dollars ($250,000) (after taking into account the amount, if any, covered by independent third-party insurance) which shall remain unvacated, unbonded or unstayed for a period of thirty (30) days; an involuntary bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted against any Credit Party, Universal or Amazon, and such proceeding shall not be dismissed within thirty (30) days after its commencement, or an order for relief against any such Person shall have been entered in such proceeding, or any order, judgment or decree shall be entered against any such Person decreeing its dissolution or division, provided that the Lender shall not be obligated to extend any Loans to the Borrower during such period; or

(h)     A bankruptcy, insolvency, reorganization, liquidation or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against any Credit Party or, in the case of SFD, if any bankruptcy proceeding shall be instituted by or against SFD and (I) the Distribution Agreement is rejected pursuant to Section 365 of the Revised Bankruptcy Code and (II) the order granting such rejection (or any related order entered

70

in the applicable proceeding) does not preserve the rights of the Borrower under Section 365(n) of the Revised Bankruptcy Code with respect to the Distribution Agreement; or

(i)     Any sale or agreement to sell, any material portion of (i) the Borrower's Credit Party Collateral or (ii) any Credit Party's interest in the Film (including any Proceeds thereof), which is not rescinded or otherwise prevented, and which is not otherwise expressly permitted by this Agreement or in any of the other Fundamental Documents, without the Lender's approval, which shall not be unreasonably withheld;

(j)     Any of the following occurring which would have a Material Adverse Effect on the Lender's rights or remedies hereunder, this Agreement or any other Fundamental Document or any other instrument delivered hereunder or thereunder shall at any time after its execution and delivery and for any reason cease to be in full force and effect, or shall be declared to be null and void, or the validity or enforceability thereof shall be contested by any party thereto other than the Lender, or any party other than the Lender shall deny that it has any further obligation under this Agreement or any other Fundamental Document or any other instrument delivered hereunder or thereunder, and such event is not cured within three (3) Business Days after notice thereof by the Lender to the Credit Parties;

(k)     Any of the following occurring which would have a Material Adverse Effect on the Lender's rights or remedies hereunder, any Credit Party, Universal or Amazon fails to, or fails to confirm in writing, upon request by the Lender, that it will perform or observe any material covenant or agreement contained in any of the Fundamental Documents, in each case to which such Person is a party and, if capable of cure, such event is not cured within three (3) Business Days after the earliest of the knowledge of, or any written notice is given to, such Person of such failure;

(l)     Any Guaranty of any portion of the Loan Obligations shall be determined to be ineffective, terminated, revoked, or declared void or invalid;

(m)     A Material Adverse Effect on any Credit Party or Universal shall occur;

(n)     (i) Any of the Security Documents shall for any reason, other than to the extent expressly consented to or authorized in writing by the Lender, not be or shall cease to be in full force and effect or shall be declared null and void or any of the Security Documents shall not give or shall cease to give the Lender the Liens, rights, powers and privileges purported to be created thereby in favor of the Lender, superior to and prior to the rights of all third Persons and subject to no other Liens (except to the extent constituting a Permitted Lien), or (ii) the validity or enforceability of the Liens granted, to be granted, or purported to be granted, by any of the Security Documents shall be contested by any other Person;

(o)     Any other Event of Default occurs and such event is not cured within ten (10) Business Days of the earlier of (1) any Credit Party receiving notice of the occurrence of any such event, and (2) an officer or manager of a Credit Party obtaining knowledge of the occurrence of any such event; provided that, irrespective of such cure period listed in this clause, any such Event of Default must be cured before the date that is sixty (60) days prior to the Maturity Date;

71

(p)    (i) failure by any Credit Party or ERISA Affiliate to make any contributions required to be made to a Plan subject to Title IV of ERISA or Multiemployer Plan, (ii) any failure to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or section 302 of ERISA) shall occur with respect to any Plan (whether or not waived), (iii) the present value of all benefits under all Plans subject to Title IV of ERISA (based on those assumptions used to fund such Plans) exceeds, in the aggregate, as of the last annual valuation date applicable thereto, the actuarial value of the assets of such Plans allocable to such benefits, (iv) any Credit Party or ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan, or that a Multiemployer Plan is in reorganization or is being terminated, (v) a Reportable Event with respect to a Plan shall have occurred, (vi) the withdrawal by any Credit Party or ERISA Affiliate from a Plan during a plan year in which it was a substantial employer (within the meaning of Section 4001(a)(2) or 4062(e) of ERISA), (vii) the termination of a Plan, or the filing of a notice of intent to terminate a Plan, under Section 4041(c) of ERISA, (viii) the institution of proceedings to terminate, or the appointment of a trustee with respect to, a Plan by the PBGC, (ix) any other event or condition which could constitute grounds under Section 4042(a) of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or (x) the imposition of a Lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA as to any Credit Party or ERISA Affiliate, in each case to the extent that any of the foregoing would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect upon the Borrower or any other Credit Party;

(q)    (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Credit Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC that either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect, or (ii) the Credit Parties or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan and any Credit Party becomes subject to liability in an aggregate amount in excess of the Threshold Amount then, in every such event (other than an event specified in clause (g) or (h) above) and at any time thereafter during the continuance of such event, the Lender may take any or all of the following actions, at the same or different times: (x) terminate forthwith the Lender's commitment to make Advances under this Agreement and/or (y) declare the principal of and the interest on the Loans and the Notes and all other amounts payable hereunder or thereunder to be forthwith due and payable, whereupon the same shall become and be forthwith due and payable, without presentment, demand, protest, notice of acceleration or other notice of any kind, all of which are hereby expressly waived, anything in this Agreement or in the Note to the contrary notwithstanding;

(r)    A Change of Control occurs; or

(s)    An "Event of Default" occurs under any of the other Fundamental Documents.

13.2    Remedies.

72

(a)     If an Event of Default exists, the Lender may, in its discretion, without notice to or demand on the Credit Parties, restrict the amount of or refuse to make Advances. If an Event of Default exists, the Lender may, in its discretion, do one or more of the following in addition to the actions described in the preceding sentence, at any time or times and in any order, without notice to or demand on the Credit Parties: (i) terminate the Lender's commitment to make Advances under this Agreement; (ii) declare any or all Loan Obligations to be immediately due and payable; and (iii) pursue its other rights and remedies under the Fundamental Documents and Applicable Law.  The foregoing shall not be construed to limit the discretion of the Lender to take any actions described above at any other time.

(b)     If any Event of Default exists the Lender shall have, in addition to all other rights of the Lender hereunder and/or any other Fundamental Document, the rights and remedies of a secured party under the UCC. The Lender may require the Credit Parties to assemble the Collateral and make it available to the Lender at a place or places to be designated by the Lender.

(c)     If any Event of Default exists the Lender may, in its sole discretion, in its name or in the name of the applicable Credit Party, or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to, any of the Collateral, but shall be under no obligation so to do, or the Lender may extend the time of payment, arrange for payment in installments, or otherwise modify the term of, or release, any of the Collateral, without thereby incurring responsibility to, or discharging or otherwise affecting the liability of, the Credit Parties. The Lender will not be required to take any steps to preserve any rights against prior parties to the Collateral. If the Credit Parties fail to make payment or take any action required under any of the Fundamental Documents to which it is a party, the Lender may make such payments and take all such actions as the Lender deems necessary to protect the Lender's Lien in the Collateral and the value thereof. The Lender is hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, and contest or compromise any Liens which the Lender believes appear to be equal to, prior to or superior to the Lien of the Lender in the Collateral.

(d)     If any Event of Default exists the Lender may, without notice or demand or legal process, enter upon any premises, or wherever any portion of the Collateral may be, and take possession of the Collateral together with all additions and accessories thereto, demand and receive such possession from any person who has possession thereof, remove, keep and store the Collateral or any portion thereof, or put a custodian in charge thereof, and take such other measures as it may deem reasonably necessary or proper for the care or protection thereof.

(e)     If any Event of Default exists, the Lender may, with or without taking possession thereof, sell, lease, license, or cause to be sold, or otherwise disposed of, at such price or prices as the Lender shall in its sole and absolute discretion so determine, and for cash or on credit or for future delivery, without assumption of any credit risk, and in a commercially reasonable manner, all or any portion of the Collateral, at any public or private disposition thereof, without demand of performance or notice of intention to sell or of time or place of sale; provided, however, that unless the Collateral in the Lender's possession is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Lender

73

shall give the Credit Parties notice of the time and place of any public disposition thereof or of the time after which any private disposition thereof is to be made. The requirement of notice shall be met if notice of disposition is delivered or mailed, by registered mail, postage prepaid, to the Credit Parties as set forth in Section 15.6 hereof or such other address as the Credit Parties may by notice have furnished the Lender in writing for such purpose, at least ten (10) days prior to the time of such disposition. Each acquirer at any such disposition (including, if applicable, the Lender) shall hold the property acquired absolutely free from any claim or right of whatever kind including any equity of redemption and each of the Credit Parties hereby waives (to the extent permitted by law) all rights of redemption, stay and/or appraisal which it now has or may have at any time in the future under any rule of law or statute now existing or hereafter enacted. Any public or private disposition of the Collateral or any part thereof shall be held at such time or times within ordinary business hours and at such place or places as the Lender may fix in the notice of disposition. At any such disposition, the Collateral, or any portion thereof, to be disposed of may be disposed of in one lot as an entirety or in separate parcels, as the Lender may (in its sole discretion) determine and, if permitted by law, the Lender may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness) for and purchase the Collateral or any portion thereof for the account of the Lender. The Lender shall not be obligated to make any disposition of the whole or any part of the Collateral if it shall determine not to do so, regardless of the fact that notice of disposition of the Collateral may have been given. The Lender may by announcement at the time and place fixed for disposition, without prior notice or publication, adjourn any public or private disposition of the Collateral or cause the same to be adjourned from time to time, and such disposition may, without further notice, be made at the time and place to which the same was so adjourned. In case a disposition of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Lender until the sale price is paid by the purchaser or purchasers thereof, but the Lender shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so disposed of and, in case of any such failure, such Collateral may be sold again upon like notice.

(f)     Any Laboratory which has possession of any of the Collateral is hereby constituted and appointed by the Credit Parties as pledgeholder for the Lender. If any Event of Default exists the Lender may authorize each such pledgeholder to sell all or any portion of the Collateral upon the order and direction of the Lender, and the Credit Parties hereby waive any and all claims for damages, or otherwise, for any action taken by such pledgeholder.]

(g)     If any Event of Default exists the Lender shall be entitled to the appointment of a receiver to take possession of all or any portion of the Collateral and to exercise such powers as the court shall confer upon the receiver. Each of the Credit Parties, to the fullest extent permitted by law, hereby waive notice and the right to receive notice of any application by the Lender for such appointment; provided, however, that, notwithstanding any such application or appointment, the Lender shall be entitled to apply, without notice to the Credit Parties, any cash or cash items constituting Collateral in the possession of the Lender to payment of the Loan Obligations.

(h)     Upon any disposition of any item of Collateral by the Lender hereunder (whether by virtue of the power of attorney herein granted, pursuant to judicial process or otherwise), the receipt of the Lender or the officer making the disposition shall be a sufficient

74

discharge to the purchaser or purchasers of such item or items of Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

(i)      If any Event of Default exists the Lender is hereby authorized, at any time any Event of Default has occurred and is continuing, without notice to the Credit Parties (any such notice being expressly waived by the Credit Parties), to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, any certificate of deposit, and any other indebtedness at any time owing by the Lender to or for the credit or the account of any of the Credit Parties against any and all of the Loan Obligations, irrespective of whether or not the Lender shall have made any demand under this Agreement, the Note or any other Fundamental Document. The Lender agrees promptly to notify the Credit Parties after any such setoff and application. The rights of the Lender under this Subsection 12.2(i) are in addition to other rights and remedies (including, without limitation, other rights of setoff) which the Lender may have.

13.3    Cumulative Remedies; No Prior Recourse to Collateral. The enumeration herein of the Lender's rights and remedies is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies that the Lender may have under the UCC or other Applicable Law. The Lender shall have the right, in its sole discretion, to determine which rights and remedies are to be exercised and in which order. The exercise of one right or remedy shall not preclude the exercise of any others, all of which shall be cumulative. The Lender may, without limitation, proceed directly against the Credit Parties to collect the Loan Obligations without any prior recourse to the Collateral.

13.4    Failure or Indulgence Not Waiver. No failure or delay on the part of the Lender or any holder of any Note in the exercise of any power, right, remedy or privilege under this Agreement, the Note(s) or any of the other Fundamental Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right, remedy or privilege preclude any other or further exercise thereof or of any other right, power, remedy or privilege. All rights and remedies existing under this Agreement, the Note(s) and the other Fundamental Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

13.5    Performance of Obligations. If any Credit Party shall fail to do any act or thing which it has covenanted to do hereunder, under any other Fundamental Document, or if any representation or warranty of any Credit Party under any such agreement shall be breached, the Lender may (but shall not be obligated to), perform such act or thing on behalf of the applicable Credit Party or cause it to be done or remedy any such breach, and there shall be added to the liabilities of the Credit Parties secured hereunder the cost or expense incurred by the Lender in so doing, and any and all amounts expended by the Lender in taking any such action shall be repayable to it upon demand being made to the Credit Parties therefor and shall bear interest at the rate of interest then applicable to the Loans made to the Borrower hereunder from and including the date advanced to the date of repayment.

75

## ARTICLE 14
## TERM AND TERMINATION

14.1    Termination.

(a) The Lender may terminate this Agreement with notice to the Credit Parties upon the occurrence of an Event of Default. This Agreement shall also terminate when all Loan Obligations have been fully and indefeasibly paid and performed and the Lender's commitment to make Advances under this Agreement has been terminated. Upon the effective date of termination, all Loan Obligations shall become immediately due and payable in full. Notwithstanding such termination, the Credit Parties shall remain bound by all of the terms and conditions of this Agreement until the Loan Obligations have been indefeasibly paid in full in cash.

(b) Upon the indefeasible payment in full of all Loan Obligations and the termination of the Lender's commitment to make Advances under this Agreement, the Lender shall, at the Credit Parties' request and expense, (i) assign and deliver to each Credit Party, and each Credit Party shall provide a receipt for, all Collateral in which the Lender shall have any interest hereunder or which shall then be held by the Lender or in its possession and, if requested by any Credit Party, the Lender shall execute and deliver to such Credit Party, at the Credit Parties' expense, for filing in each office in which any financing statement relative to the Collateral, or any part thereof, shall have been filed, termination statements under the UCC and a quitclaim and assignment of the Lender's rights under each Copyright Mortgage and Assignment releasing the Lender's Lien therein, and any other similar acts that are reasonably requested by any Credit Party (including, without limitation, the termination and release, as applicable, of the Account Control Agreement, the Account Control Agreement Assignment, the Collection Account Control Agreement, the Collection Account Control Agreement Assignment, the Temerity Guaranty Documents, the Guaranty under Article 8 hereof and the pledge of the Pledged Collateral under Article 12 hereof), and (ii) provide written notice to Universal, Amazon, any other Subdistributors and any Laboratory (if applicable) of such repayment and termination and the termination of the Lender's interest in the Film, in each case all without recourse upon or warranty by the Lender and at the sole cost and expense of the Credit Parties.

## ARTICLE 15
## MISCELLANEOUS

15.1    Severability. In case any provision of this Agreement, the Note or of any other Fundamental Document shall be invalid, illegal or unenforceable in any jurisdiction then, as to such jurisdiction only, such provision shall to the extent of such prohibition or unenforceability be deemed severed from the remainder of such agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

15.2    Governing Law. This Agreement and the other Fundamental Documents and all other documents provided for therein and the rights and obligations of the parties thereto shall be governed by and construed and enforced in accordance with, the laws of the state of California without reference to its conflict or choice of law principles.

15.3   <u>Jurisdiction</u>.  Except as otherwise provided in <u>Section 15.4</u> hereof, any legal action or proceeding with respect to this Agreement, the other Fundamental Documents or any other agreement, document or other instrument executed in connection herewith or therewith, or any action or proceeding to execute or otherwise enforce any judgment obtained against the Credit Parties or any of its properties, may be brought in the courts of the state of California in Los Angeles County, California, or in the federal courts of the United States for the Central District of California, as the Lender may elect, provided always that suit also may be brought in the courts of any country or place where the Credit Parties or any of its assets may be found, and, by execution and delivery of this Agreement, the Credit Parties irrevocably submit to each such jurisdiction. The Credit Parties irrevocably waive any objection which it may now or hereafter have to the venue of any suit, action or proceeding, arising out of or relating to this Agreement, the other Fundamental Documents or any other agreement, document or other instrument executed in connection herewith brought in the courts of the state of California in Los Angeles County, California, or in the federal courts of the United States for the Central District of California, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

15.4   <u>Reference Provision</u>.

(a)    All controversies, claims, disputes, causes of action and counterclaims, including any claim based on or arising from an alleged tort, (each, a "<u>Claim</u>") arising out of or relating to this Agreement or any other agreement, document or other instrument contemplated hereby, which Claim is not settled within ten (10) calendar days after the date on which any party gives written notice to all other parties to this Agreement that a Claim exists (the "<u>Claim Date</u>") shall be resolved pursuant to the provisions for reference and trial by referee (without jury) set forth in Section 638 <u>et seq.</u> of the California Code of Civil Procedure (the "<u>CCP</u>"), or their successor sections. The reference proceeding herein contemplated shall be the exclusive remedy for the resolution of any Claim (including, but not limited to, whether or not any Claim is subject to reference hereunder). Except as set forth above, each of the parties hereby absolutely, irrevocably and unconditionally waives (i) its rights to initiate any legal proceedings against the other party(ies) in any court or jurisdiction other than the Superior Court of Los Angeles (the "<u>Court</u>") and (ii) trial by jury with respect to any Claim. The referee ("<u>Referee</u>") shall be a retired Judge of the Court selected by mutual agreement of the parties, and if they cannot so agree within thirty (30) days after the Claim Date, the Referee shall be promptly selected by the Presiding Judge of the Court (or his or her representative). A request for appointment of a referee may be heard on an ex parte or expedited basis, and the parties agree that irreparable harm would result if ex parte relief is not granted. Pursuant to CCP § 170.6, each party shall have one peremptory challenge to the Referee selected by the Presiding Judge of the Court (or his or her representative). The Referee shall be appointed to sit as a temporary judge, with all of the powers of a temporary judge, as authorized by law, and upon selection should take and subscribe to the oath of office as provided for in Rule 244 of the California Rules of Court (or any subsequently enacted Rule). The parties agree that time is of the essence in conducting the reference proceeding. Accordingly, the Referee shall (a) be requested to set the matter for hearing within sixty (60) days after the date of selection of the Referee, (b) try any and all issues of law or fact and report a statement of decision upon them, if possible, within ninety (90) days of the Claim Date and (c) report a statement of decision within twenty (20) days after the matter has been submitted for decision. Any decision rendered by the Referee shall be final, binding and

77

conclusive and judgment shall be entered pursuant to CCP § 644 in any court in the state of California having jurisdiction. Any party may apply for a reference proceeding at any time after ten (10) days following the Claim Date, by filing a petition for a hearing or trial. All discovery permitted by this Agreement shall be completed no later than fifteen (15) days before the first hearing date established by the Referee. The Referee may extend such period if a party refuses to provide requested discovery for any reason whatsoever, including, without limitation, legal objections raised to such discovery or unavailability of a witness due to absence or illness. No party shall be entitled to "priority" in conducting discovery. Depositions may be taken by either party upon seven (7) days written notice, and request for production or inspection of documents shall be responded to within ten (10) days after service. All disputes relating to discovery which cannot be resolved by the parties shall be submitted to the Referee whose decision shall be final and binding upon the parties. Pending appointment of the Referee as provided herein, the Court is empowered to issue temporary or provisional remedies, as appropriate. Subject to the Referee's power to require the losing party to pay all fees and expenses, the fees and expenses of the Referee shall be borne equally by the parties.

(b) Except as expressly set forth in this Agreement, the Referee shall determine the manner in which the reference proceeding is conducted including the time and place of all hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding. All proceedings and hearings conducted before the Referee, except for trial, shall be conducted without a court reporter except that when any party so requests, a court reporter will be used at any hearing conducted before the Referee. The party making such a request shall have the obligation to arrange for and pay for the court reporter. Subject to the Referee's power to require the losing party to pay all costs, the costs of the court reporter at the trial shall be borne equally by the parties.

(c) The Referee shall be required to determine all issues in accordance with existing case law and the statutory laws of the state of California. The rules of evidence applicable to proceedings at law in the state of California shall be applicable to the reference proceeding. The Referee shall be empowered to enter equitable as well as legal relief, to provide all temporary or provisional remedies and to enter equitable orders that shall be binding upon the parties. The Referee shall issue a single judgment at the close of the reference proceeding which shall dispose of all of the claims of the parties that are the subject of the reference. The parties hereto expressly reserve the right to contest or appeal from the final judgment or any appealable order or appealable judgment entered by the Referee. The parties hereto expressly reserve the right to findings of fact, conclusions of laws, a written statement of decision, and the right to move for a new trial or a different judgment, which new trial, if granted, is also to be a reference proceeding under this provision.

(d) The Referee's decision shall provide for payment by the losing party (i.e., the party or parties against whom the decision is rendered) of the fees and costs incurred in connection with said proceeding, as well as the outside attorneys' fees and costs incurred by the prevailing parties (i.e., all parties to the proceeding other than the losing party).

(e) If the enabling legislation which provides for appointment of a Referee is repealed (and no successor statute is enacted), any dispute between the parties that would otherwise be determined by the reference procedure herein described shall be resolved and

78

determined by arbitration. The arbitration shall be conducted by a retired judge of the Court, in accordance with the California Arbitration Act, § 1280 through § 1294.2 of the CCP as amended from time to time. The limitations with respect to discovery as set forth hereinabove shall apply to any such arbitration proceeding.

(f)     Nothing in this section shall prejudice the right of the Lender to exercise its non-judicial foreclosure rights and remedies in respect of the Collateral, or prejudice the right of either party to obtain provisional relief or other equitable remedies as shall otherwise be available judicially pending reference of a dispute to a Referee as provided in this Section.

(g)     THE PARTIES RECOGNIZE AND AGREE THAT ALL CLAIMS RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY A REFEREE AND NOT BY A JURY. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER OWN CHOICE, EACH PARTY KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, AGREES THAT THIS REFERENCE PROVISION WILL APPLY TO ANY CLAIM BETWEEN OR AMONG THEM ARISING OUT OF OR IN ANY WAY RELATED TO, THIS AGREEMENT, THE LOAN OBLIGATIONS OR THE OTHER FUNDAMENTAL DOCUMENTS.

(h)     Service of Process.   Service of process in any reference or other proceeding (including proceedings to judicially confirm any reference award) may be made in the manner provided in Section 15.6 hereof and shall be deemed effective as provided therein. Each of the parties hereto waives application of the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

(i)     Waiver of Jury Trial, Etc.   THE BORROWER, THE OTHER CREDIT PARTIES AND THE LENDER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY. THE BORROWER FURTHER WAIVES ANY RIGHTS OF SETOFF, AND THE RIGHT TO IMPOSE COUNTERCLAIMS (OTHER THAN THOSE RIGHTS OF SETOFF AND COUNTERCLAIMS ARISING SOLELY AND DIRECTLY FROM THE FILM OR THIS AGREEMENT) IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT, THE OTHER FUNDAMENTAL DOCUMENTS, THE LOAN OBLIGATIONS OR THE COLLATERAL, OR ANY INSTRUMENT OR DOCUMENT DELIVERED PURSUANT HERETO OR THERETO, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING, BETWEEN THE BORROWER OR ANY OTHER CREDIT PARTY AND THE LENDER).   The parties hereto prefer that any dispute between them to be resolved pursuant to litigation be subject to a jury trial waiver as set forth in this Section 15.4.

(j)     Waiver With Respect to Damages.   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO PARTY SHALL ASSERT, AND EACH PARTY HEREBY WAIVES, ANY CLAIMS AGAINST THE OTHER PARTY, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS AND ADVISORS, ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING

79

OUT OF, IN CONNECTION WITH, AS A RESULT OF, OR OTHERWISE RELATING TO THIS AGREEMENT, ANY OTHER FUNDAMENTAL DOCUMENTS OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, REGARDLESS OF THE FORM OF ACTION AND WHETHER OR NOT SUCH DAMAGES WERE FORESEEABLE OR CONTEMPLATED.

(k)    Expenses and Fees.  The Credit Parties shall pay in cash all reasonable, documented and actual out-of-pocket costs and expenses, including reasonable and documented attorneys' fees incurred by the Lender after the Closing Date in connection with any action requested by any Credit Party to be performed by the Lender in connection with any of the Fundamental Documents and, from and after the occurrence of an Event of Default, all other reasonable, documented and actual out-of-pocket costs and expenses, including reasonable and documented attorneys' fees and out-of-pocket court costs incurred by the Lender in connection with this Agreement, the other Fundamental Documents and the Film, including, without limitation, reasonable and documented costs and expenses of preserving and protecting the Collateral, costs and expenses (including reasonable and documented outside attorney's fees and out-of-pocket disbursements) paid or incurred to obtain payment of the Loan Obligations, enforce the Lender's Liens, sell or otherwise realize upon the Collateral and otherwise enforce the provisions of the Fundamental Documents or to defend any claims made or threatened against the Lender arising out of the transactions contemplated hereby, and in connection with the enforcement of the rights of the Lender thereunder or in connection with the realization upon any Collateral.

(l)    Any and all payments (including payments of principal, interest and all fees) by the Credit Parties hereunder shall be made free and clear of and without deduction for any Taxes (other than Excluded Taxes). If the Credit Parties, the Distributors or any other Person shall be required by law to deduct any Indemnified Taxes from or in respect of any sum payable hereunder to the Lender, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 15.4) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Credit Parties shall make such deductions and (iii) the Credit Parties shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with Applicable Law.

15.5    Taxes.

(a)    In addition, the Credit Parties shall pay any and all Other Taxes.

(b)    The Credit Parties will indemnify the Lender for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable under this Section 15.5) paid by the Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally asserted. This indemnification shall be made within thirty (30) days from the date the Lender makes written demand therefor. The Lender shall, at the time of any written demand for indemnification under this subsection (b),

80

provide to the Credit Parties a receipt for, or other evidence of the payment of, the Indemnified Taxes for which indemnification is sought.

(c)     Within thirty (30) days after the date of any payment of Indemnified Taxes, the Credit Parties will furnish to the Lender, at its address referred to in <u>Section 15.6</u>, the original or a certified copy of a receipt evidencing payment thereof.

(d)     Without prejudice to the survival of any other agreement of the Credit Parties hereunder, the agreements and obligations of the Credit Parties contained in this <u>Section 15.5</u> shall survive the payment in full of principal and interest hereunder.

(e)     The parties do not intend to form a partnership for United States federal income tax purposes in connection with the transactions contemplated by this Agreement.

(f)     The Lender shall deliver to the Borrower an executed copy of Internal Revenue Service Form W-8BEN-E establishing an exemption from U.S. federal withholding Tax pursuant to the "interest" article of an income tax treaty to which the United States is a party and with respect to any other applicable payments under any Fundamental Document, executed Internal Revenue Service Forms W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty. If the Lender claims the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, the Lender shall deliver to the Borrower a certificate to the effect that the Lender is not a "bank" within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code.

15.6    <u>Notices</u>. Except as otherwise expressly provided herein, in order to be effective under the terms hereof, any notice, request, consent, waiver, approval, demand or other communication provided for hereunder to be given shall be (i) in writing, (ii) sent to the address of the recipient as specified herein, and (iii) delivered by hand, by nationally recognized overnight courier (e.g., FedEx, UPS or DHL), by facsimile, or by electronic transmission in either a Tagged Image Format File ("<u>TIFF</u>") or Portable Document Format ("<u>PDF</u>") (or, with respect to an approval or consent, by electronic transmission without an attachment being required). Any such writing so addressed and delivered shall be deemed to have been received by the party to which sent on the day of delivery if delivered by hand, or one (1) Business Day after being sent by facsimile (with confirmation of successful transmission issued by sender's facsimile machine) or by TIFF or PDF electronic transmission (with confirmation of successful transmission issued by sender's email system, and provided that no subsequent delivery failure notification is issued by the sender's email system), or one (1) Business Day after being sent by nationally recognized overnight courier, and shall be addressed to the parties hereto, as the case may be, at their respective addresses:

To the Credit Parties:

c/o Aviron Finance, LLC
9100 Wilshire Blvd. Suite 800E
Beverly Hills, CA 90212

81

Attention: William Sadleir
Email: wsadleir@aviron.com

With a courtesy copy to:

Paul Hastings LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Attention: Mickey Mayerson, Esq. and Nigel Pearson
Fax No.:  (310) 620-5865; (310) 620-5832
E-mail: mickeymayerson@paulhastings.com; nigelpearson@paulhastings.com

To the Lender:

Cairn Capital Investment Funds ICAV
c/o Cairn Capital Limited
27 Knightsbridge
London SW1X 7LY
United Kingdom
Attention: Cairn Legal / Private Credit / Brandon Kufrin / Chris Cottrell
Email: Cairn_Legal@cairncapital.com; Private.Credit.Info@cairncapital.com;
brandon.kufrin@cairncapital.com; Chris.Cottrell@cairncapital.com

With a courtesy copy to:

Reed Smith LLP
1901 Avenue of the Stars, Suite 600
Los Angeles, California 90067
Attention:  Michael S. Sherman, Esq. and Moshe Kupietzky, Esq.
Email: msherman@reedsmith.com and mkupietzky@reedsmith.com

15.7    Waiver of Notice.  Unless otherwise expressly provided herein, each of the Credit Parties waives presentment, protest and notice of demand or dishonor and protest as to any instrument, as well as any and all other notices to which it might otherwise be entitled.   No notice to or demand on the Credit Parties which the Lender may elect to give shall entitle the Credit Parties to any or further notice or demand in the same, similar or other circumstances.

15.8    Successors and Assigns.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns, and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that none of the Credit Parties may assign its rights or delegate its duties hereunder or any interest herein without the prior written consent of the Lender and any such purported assignment or delegation shall be null and void.

15.9    Indemnification.  The Credit Parties shall, at all times, defend and indemnify and hold the Lender and its Related Parties harmless from and against any and all liabilities, claims, demands, causes of action, losses, damages, settlements, judgments or recoveries resulting from any alleged or actual breach of the warranties, agreements or covenants made by the Credit

82

Parties herein, and from any suit or proceeding of any kind or nature whatsoever against the arising from or connected with the transactions contemplated by this Agreement, the other Fundamental Documents or any of the documents, instruments or agreements to be executed pursuant hereto or any of the rights and properties assigned to the Lender hereunder, and from any suit or proceeding that the Lender may, in the good faith exercise of their business judgment, reasonably deem necessary or advisable to institute against any other person or the Credit Parties for any reason whatsoever to protect the rights of the Lender hereunder or under the other Fundamental Documents, or any rights otherwise granted to the Lender , including outside attorneys' fees and costs and expenses incurred by the Lender , all of which shall be charged to and paid by the Credit Parties and shall be secured by the Collateral hereunder; provided, however, the Credit Parties shall have no obligation under this Section 15.9 with respect to any such event resulting from the Lender's gross negligence or willful misconduct.

15.10  <u>Assignments and Participations</u>.

(a)     The Lender shall have the right at any time to assign to any other Person all or any portion of its rights and obligations under this Agreement without the consent of the Borrower or any other Credit Party; <u>provided</u> that the rights under <u>Sections 3.6</u> and <u>3.7</u> hereof may only be assigned to another fund and/or managed account to which Cairn Capital Limited (or any of its Affiliates) provides investment management or advisory services. Upon such assignment, the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it, have the rights and obligations of the Lender hereunder and, to the extent that rights and obligations hereunder have been assigned by the Lender, the Lender shall  relinquish its rights and be released from its obligations under this Agreement (and, in the case of an assignment covering all or the remaining portion of the assigning Lender's rights and obligations under this Agreement, the assigning Lender shall cease to be a party hereto but shall have the  benefit of this Agreement with respect to facts and circumstances occurring prior to the date of such assignment). The assigning Lender shall execute any amendment, amendment and restatement and/or any other promissory note, document and agreement that may be necessary to effectuate such an assignment, including an amendment to this Agreement and any other Fundamental Document to provide for multiple lenders and an administrative agent to act on behalf of such lenders. Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by the L e n d e r of a participation in such rights and obligations in accordance with <u>Subsection 15.10(c)</u>.

(b)     The Lender shall maintain at its address set forth in <u>Section 15.6</u> a copy of the assignment delivered to the Borrower and its and books and records, including computer records, in which it shall record the names and addresses of the Lender and the commitment of, and principal amount of the Loans owing to, the Lender from time to time (the "<u>Register</u>"). The entries in the Register shall constitute rebuttably presumptive evidence, absent manifest error subject to the Borrower's right to review under <u>Section 4.8</u>, of the accuracy of the information contained therein, and the Borrower and the Lender may treat each Person the name of which is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.

83

(c)     The Lender may at any time, without the consent of the Borrower or any other Credit Party, grant participations in all or any part of its rights and obligations under this Agreement to one (1) or more other Persons (each, a "Participating Lender"); provided, however, that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Lender shall remain the holder of the Note for all purposes under this Agreement, (iv) the Borrower and the other Credit Parties shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement and the other Fundamental Documents. Any agreement or instrument pursuant to which the Lender sells a participation, at the Lender's election in its sole and absolute discretion, shall provide that the Lender retains the sole right to enforce this Agreement and the other Fundamental Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Fundamental Document. In connection with any participation pursuant to this Subsection, the Lender may provide on a confidential basis, to any prospective Participating Lender, such information pertaining to the Borrower or any other Credit Party as the Lender may deem appropriate. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)     The Borrower hereby acknowledges and makes the Note a registered obligation for United States withholding tax purposes. The Lender, as the Borrower's non-fiduciary agent for this purpose, shall be the registrar for the Note (if any) (the "Registrar") with full powers of substitution. If the Registrar becomes unable or unwilling to act as registrar under this Agreement, the Borrower shall reasonably designate a successor Registrar. The Registrar shall maintain, or cause to be maintained, a register for the recordation of the names and addresses of the Lender and any assignee of all or any portion of the Lender's interest in, and the principal amount outstanding of, the Loan (and stated interest accrued but unpaid thereon) (the "Registered Loan") held by the Lender and each assignee from time to time. The Borrower, the Lender and each such assignee shall treat each Person whose name is recorded in the Register as a "Lender" hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice. A Registered Loan (and the registered Note evidencing the same, if any) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered Note, if any, shall expressly so provide), which registration the Registrar shall effect immediately upon receipt of assignment documentation. Any assignment or sale of all or part of such Registered Loan (and the registered Note evidencing the same, if any) may be

84

effected only by registration of such assignment or sale on the Register, together with the surrender of the registered Note evidencing the same, if any, duly endorsed (or accompanied by a written instrument of assignment or sale duly executed) by the holder of such registered Note, if any, whereupon, at the request of the designated assignee(s) or transferee(s), one (1) or more new registered Notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).  Prior to the registration of assignment or sale of any Registered Loan (and the registered Note evidencing the same, if any), Borrower shall treat the Person in whose name such Registered Loan (and the registered Note evidencing the same, if any) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

15.11   <u>USA Patriot Act Notice</u>.  The Lender notifies the Credit Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "<u>Act</u>"), the Lender is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow the Lender to identify the Credit Parties in accordance with the Act.

15.12   <u>Final Agreement, Waivers and Amendments</u>.

(a)   This Agreement and the other Fundamental Documents are intended by the Credit Parties and the Lender to be the final, complete, and exclusive expression of the agreement by and among them. This Agreement and the other Fundamental Documents supersede any and all prior oral or written agreements relating to the subject matter hereof.

(b)   No amendment or modification of any provision of this Agreement or any other Fundamental Document shall be effective without the written agreement of the Lender and the Credit Parties affected thereby, and no termination or waiver of any provision of this Agreement, or consent to any departure by the Credit Parties therefrom, shall in any event be effective without the written concurrence of the Lender, which concurrence the Lender shall have the right to grant or withhold at its sole and absolute discretion.

(c)   Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Credit Parties in any case shall entitle the Credit Parties to any other or further notice or demand in similar or other circumstances. Any amendment, modification, waiver or consent effected in accordance with this <u>Section 15.12</u> shall be binding on the Lender and, if signed by the Credit Parties, on the Credit Parties.

15.13   <u>Counterparts</u>.  This Agreement and the other Fundamental Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument, respectively. Delivery of an executed counterpart of this Agreement or any of the other Fundamental Documents by facsimile or by electronic transmission in either TIFF or PDF format shall be equally effective as delivery of a manually executed counterpart thereof. Any party delivering an executed counterpart of this Agreement or any of the other Fundamental Documents by facsimile, TIFF or PDF shall also deliver a manually executed counterpart

85

thereof, but failure to do so shall not affect the validity, enforceability, or binding effect of this Agreement or any of the other Fundamental Documents and the parties hereby waive any right they may have to object to said treatment.

15.14  <u>Section Headings</u>.  The various headings used in this Agreement are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

*[remainder of page left intentionally blank]*

86

IN WITNESS WHEREOF, the Credit Parties and the Lender have executed this Agreement as of the date first above written.

| "BORROWER" | "LENDER" |
|---|---|
| Aviron 1703, LLC<br><br>_____<br>By: William Sadleir<br>Its: Manager | Cairn Capital Investment Funds ICAV, for its sub fund Cairn Capstone Special Opportunities Fund by Cairn Capital Limited as investment manager<br><br>By: James Starky<br>Its: Chief Legal Officer |
| Aviron Finance, LLC<br><br>_____<br>By: William Sadleir<br>Its: Manager | |
| Aviron Licensing, LLC<br><br>_____<br>By: William Sadleir<br>Its: Manager | |

[Execution Page to the Credit Agreement]

IN WITNESS WHEREOF, the Credit Parties and the Lender have executed this Agreement as of the date first above written.

| "BORROWER" | "LENDER" |
|---|---|
| Aviron 1703, LLC<br><br>*William H. Sadleir*<br>By: William Sadleir<br>Its: Manager | Cairn Capital Investment Funds ICAV, for its sub fund Cairn Capstone Special Opportunities Fund by Cairn Capital Limited as investment manager<br><br>_____<br>By: James Starky<br>Its: Chief Legal Officer |
| Aviron Finance, LLC<br><br>*William H. Sadleir*<br>By: William Sadleir<br>Its: Manager | |
| Aviron Licensing, LLC<br><br>*William H. Sadleir*<br>By: William Sadleir<br>Its: Manager | |

[Execution Page to the Credit Agreement]

## PROMISSORY NOTE

October 1, 2018

**FOR VALUE RECEIVED**, the undersigned, AVIRON 1703, LLC, a Delaware limited liability company (the "Borrower"), promises to pay to the order of CAIRN CAPITAL INVESTMENT FUNDS ICAV for its subfund Cairn Capstone Special Opportunities Fund ("Lender") in lawful money and in immediately available funds, at its offices at 27 Knightsbridge, London SW1X 7LY, United Kingdom, or at such other place as the holder hereof may designate in writing to the Borrower, the principal sum of Twenty Two Million Four Hundred Thousand Dollars ($22,400,000), in lawful money of the United States of America, or if less than the full amount thereof (inclusive of the Loan Fee) has been advanced hereunder, the aggregate unpaid principal balance of this Note (as defined below), and accrued but unpaid interest and other charges thereon calculated in accordance with the Credit Agreement (as defined below).

This Promissory Note (the "Note") is the Note referred to in, and is executed and delivered pursuant to the Credit, Security, Guaranty and Pledge Agreement, dated concurrently herewith (as it may be amended, modified, renewed, replaced, restated or otherwise supplemented from time to time, the "Credit Agreement"), by and among Borrower, Aviron Finance, LLC, a Delaware limited liability company, Aviron Licensing, LLC, a Delaware limited liability company, and Lender. Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the Credit Agreement. Reference is hereby made to the terms and conditions of the Credit Agreement for a more complete statement of the terms and conditions under which the Advances evidenced hereby are made and are to be repaid and, in the event of any inconsistency between the terms of the Credit Agreement and the terms hereof, the terms of the Credit Agreement shall control.

If this Note is not paid in full when due, the Borrower promises to pay all reasonable and documented out-of-pocket third party costs and expenses of collection and reasonable and documented outside attorneys' fees and out-of-pocket expenses and court costs incurred by the holder hereof on account of such collection whether or not suit is filed thereon.

The amounts of, and applicable interest on, all Advances made pursuant hereto (including the Loan Fee), and all amounts paid or repaid on this Note shall be indicated on the Lender's books with respect to this Note and shall constitute, absent manifest error, rebuttably presumptive proof of the amounts and dates of such Advances and the Loan Fee. All payments received hereunder shall be applied in the manner and in the order set forth in the Credit Agreement.

The Borrower hereby authorizes the Lender, at any time and from time to time, without notice, which is hereby expressly waived by the Borrower, and whether or not the Lender shall have declared this Note to be due and payable in accordance with the terms hereof, and whether or not an Event of Default has occurred (a) to set off against,

1

and to appropriate and apply to the payment of, the Borrower's obligations and liabilities under this Note (whether matured or unmatured, fixed or contingent, liquidated or unliquidated), any and all amounts owing by the Lender to the Borrower (whether payable in U.S. dollars or any other currency, whether matured or unmatured, and in the case of deposits, whether general or special (except trust and escrow accounts), time or demand and however evidenced) and (b) pending any such action, to the extent necessary, to hold such amounts as collateral to secure such obligations and liabilities and to return as unpaid for insufficient funds any and all checks and other items drawn against any deposits so held as the Lender, in its sole and absolute discretion, may elect. The Borrower hereby grants to the Lender a security interest in all deposits and accounts maintained with Lender, together with all other personal property of the Borrower (including, without limitation, all money, accounts, deposit accounts, general intangibles, goods, instruments, documents and chattel paper) which, or evidence of which, are now or at any time in the future shall come into the possession or under the control of or be in transit to the Lender or any of its nominees or agents for any purpose, whether or not accepted for the purposes for which it was delivered, to secure the payment of all obligations and liabilities of the Borrower to the Lender under this Note. Every such security interest and right of setoff may be exercised without demand upon or notice to the Borrower. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default without any action of the Lender, although the Lender may enter such setoff on its books and records at a later time.

No failure by the Lender to file, record or otherwise perfect any lien or security interest, nor any improper filing or recording, nor any failure by the Lender to insure or protect any security, nor any other dealing (or failure to deal) with any security by the Lender, shall impair or release the obligations of the Borrower hereunder.

The Borrower irrevocably and unconditionally waives protest, diligence, presentment, demand for payment, notice of default or nonpayment, notice of dishonor and all other demands and notices in connection with the delivery, acceptance, performance and enforcement of this Note, and to the fullest extent permitted by law, all rights to assert any statute of limitations to an action hereunder.

This Note shall be governed by and construed in accordance with the laws of the state of California without reference to choice or conflicts of law principles in the state of California.

*[Signature Page Follows]*

EME_ACTIVE-570544286.2

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date first written above.


AVIRON 1703, LLC

By: William Sadleir
Title: Manager

# KUFRIN DECLARATION

# EXHIBIT "B"

GUARANTY

This Guaranty (the "Guaranty"), dated as of October 1, 2018, is executed and delivered by Temerity Trust Management, LLC, a Delaware limited liability company ("TTM"), in favor of Cairn Capital Investment Funds ICAV for its sub fund Cairn Capstone Special Opportunities Fund ("Lender").  Unless otherwise defined herein, capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Loan Agreement (as defined below).

RECITALS

This Guaranty is entered into in reference to the following facts:

(a)      Aviron 1703, LLC, a Delaware limited liability company ("Borrower"), Aviron Finance, LLC, a Delaware limited liability company ("Finance"), Aviron Licensing, LLC, a Delaware limited liability company ("Licensing", and together with Borrower and Finance, the "Credit Parties") and Lender have entered into a Credit, Security, Guaranty and Pledge Agreement dated as of the date hereof (as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time, the "Loan Agreement"), which Loan Agreement provides, subject to the terms and conditions thereof, for extensions of credit and other financial accommodations to be made by the Lender to or for the benefit of the Borrower, and guaranteed by Finance and Licensing to the extent provided in the Loan Agreement;

(b)      TTM directly or indirectly owns all of the outstanding membership interests of each Credit Party and is interested in the financial success of the Credit Parties and agrees that the Loan Agreement is in the Credit Parties' best interests.  TTM agrees that it has derived and expects to derive substantial direct and indirect economic and other benefits from the Advances and other financial accommodations extended to the Borrower under the Loan Agreement.  At the request of Borrower, TTM has agreed to guaranty the Guaranteed Obligations (as defined below), all as provided herein.  TTM acknowledges that the Lender would not enter into the Loan Agreement and the other Fundamental Documents absent the execution and delivery by TTM to the Lender of this Guaranty; and

(c)      In consideration of the direct and indirect financial and other support and benefits that the Credit Parties have provided, and such direct and indirect financial and other support and benefits as the Credit Parties may in the future provide, to TTM, and in consideration of the increased ability of TTM to receive certain amounts from funds provided to the Borrower pursuant to the Loan Agreement and the flexibility provided by the Loan Agreement for TTM to do so which significantly facilitates the business operations of the Credit Parties and TTM and in order to induce the Lender to enter into the Loan Agreement, and to make the Advances and the other financial accommodations to the Borrower, TTM is willing to guarantee the Guaranteed Obligations under the Loan Agreement and the other Fundamental Documents.

(d)      As collateral security for the full, complete and punctual payment and performance of (i) all of TTM's obligations under this Guaranty, and (ii) all of the Borrower's Loan Obligations, TTM is concurrently herewith executing and delivering to Lender a Deed of Trust and Assignment of Rents, Fixture Filing, Security Agreement and Environmental Indemnity covering the Property ("DoT").

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

## ARTICLE I – DEFINITIONS

1.1     <u>Definitions</u>.  The following initially capitalized terms as used in this Guaranty have the following meanings (any initially capitalized term not otherwise defined herein, shall have the meanings contained in the Loan Agreement):

"<u>Guaranteed Obligations</u>" means the Loan Obligations.

"<u>Property</u>" means the real property located at 9135 Hazen Drive, Beverly Hills, California 90210.

"<u>TTM Event of Default</u>" means any default by TTM in performing its obligations under this Guaranty Agreement; provided that there shall be no TTM Event of Default hereunder if such default is capable of cure and is cured within ten (10) days after the earliest of the knowledge of, or any written notice is given to by the Lender to, TTM of such default.

1.2     <u>Construction</u>.  Unless the context of this Guaranty clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, and the term "including" is not limiting.  The words "hereof," "herein," "hereby," "hereunder," and other similar terms refer to this Guaranty as a whole and not to any particular provision of this Guaranty.  Any reference herein to an agreement includes any and all alterations, amendments, extensions, modifications, renewals, restatements, replacements or supplements thereto or thereof, as applicable.  Neither this Guaranty, nor any uncertainty or ambiguity herein, shall be construed or resolved against Lender or TTM, whether under any rule of construction or otherwise.  This Guaranty has been reviewed by TTM and Lender, and their respective counsel, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of Lender and TTM.

## ARTICLE II– GUARANTY

2.1     <u>Guaranteed Obligations</u>.  TTM irrevocably and unconditionally guarantees to the Lender, as and for TTM's own debt, until final and indefeasible payment thereof has been made, the full and punctual payment of the Guaranteed Obligations.  If, on or after the Maturity Date, the Guaranteed Obligations are greater than $0, then the Lender shall have the right, on such date, to send a notice to TTM demanding payment of the Guaranteed Obligations and setting forth the amount of the Guaranteed Obligations as of such date ( a "<u>Lender Demand Notice</u>"). Within five (5) Business Days of TTM's receipt of the Lender Demand Notice, TTM shall pay, in full, the Guaranteed Obligations set forth in such Lender Demand Notice by depositing an amount equal to the Guaranteed Obligations into the Collection Account and/or any other account specified by the Lender.  TTM hereby agrees that this Guaranty is an absolute, irrevocable and unconditional guaranty of payment and is not a guaranty of collection.  TTM

- 2 -

agrees that its obligations hereunder shall continue in full force and effect until the Guaranteed Obligations are fully and indefeasibly paid in full.

2.1.1  The Guaranteed Obligations shall include all reasonable and documented attorneys' fees of outside counsel incurred by the Lender at any time for any reason in enforcing any of the duties and obligations of TTM under this Guaranty or otherwise incurred by the Lender in any way connected with this Guaranty or the Guaranteed Obligations. All such due and unpaid costs and out-of-pocket expenses shall be payable by TTM as part of the Guaranteed Obligations in accordance with Section 2.1 above. Any reference in this Guaranty to attorneys' fees shall be deemed a reference to the reasonable and documented fees, charges and out-of-pocket costs and expenses of outside counsel of the Lender, whether or not a suit or action is instituted, and to court costs if a suit or action is instituted, and whether such attorney fees or court costs are incurred at the trial court level, on appeal, in a bankruptcy or probate proceeding or otherwise.

2.1.2  The liabilities created by this Guaranty are direct, and are not conditioned upon pursuit by the Lender of any remedy the Lender may have against the Credit Parties or any other Person or any security. The Lender has no obligation to acquire or perfect any lien on or security interest in any asset or assets, whether realty or personal, to secure payment of the Guaranteed Obligations, but TTM is concurrently executing and delivering the DoT to Lender, which Lender is authorized to record with the Los Angeles County Recorder. TTM is not relying upon the Property or any other assets of TTM in which the Lender has or may have a lien or security interest for payment of the Guaranteed Obligations. TTM has entered into this Guaranty because the execution of this Guaranty is a condition precedent to the obligation of the Lender to extend credit or make other financial accommodations to the Borrower in connection with the Loan Agreement and TTM will derive direct and indirect benefits from such extension of credit.

2.1.3  Any and all present and future indebtedness of the Borrower and the other Credit Parties owing to TTM are postponed in favor of and subordinated to payment in full, in cash, of the Guaranteed Obligations. In such regard, no payment shall be made with respect to such indebtedness until the Guaranteed Obligations have been indefeasibly paid in full.

2.1.4  If after receipt of any payment of all or any part of the Guaranteed Obligations, the Lender is for any reason compelled to surrender such payment to any Person because such payment is determined to be void or voidable as a preference, impermissible setoff, or diversion of trust funds or for any other reason (collectively referred to as "Void Payment(s)"), then, to the extent of such Void Payment, the Guaranteed Obligations shall be revived and the obligations under this Guaranty shall be continued in full force and effect without reduction or discharge as if said Void Payments(s) had not been made. This Guarantee shall continue in full force notwithstanding any contrary action taken by the Lender in reliance upon any Void Payments and any such contrary action shall be without prejudice to the Lender's rights under this Guaranty and shall be deemed to have been conditioned upon payment becoming final and irrevocable.

2.2    <u>Primary Obligations</u>.  This Guaranty is a primary and original obligation of TTM, is not merely the creation of a surety relationship, and is an absolute, unconditional, and continuing guaranty of payment which shall remain in full force and effect without respect to future changes in conditions, including any change of law, interest rates, foreign exchange rates or any invalidity or irregularity with respect to the Fundamental Documents.  TTM's obligations hereunder are independent of the obligations of the Credit Parties or any other Person.  A separate action may be brought against TTM whether such action is brought against the Credit Parties or any other Person or whether or not such other Person is joined in such action.  TTM's liability hereunder is immediate and not contingent upon the exercise or enforcement by Lender of whatever remedies it may have against the Credit Parties or any other Person or the enforcement of any lien or realization upon any security Lender may at any time possess.  Any release which may be given by Lender to any Credit Party or any other Person shall not release TTM.  Lender is not obligated to marshal any assets of the Credit Parties or any other Person in favor of TTM or against or in payment of any or all of the Guaranteed Obligations.

2.3    <u>Multiple Guarantors</u>.  TTM is directly, jointly and severally with any other guarantor of the Guaranteed Obligations (or any portion thereof), liable to the Lender under this Guaranty.  The obligations of TTM and any other guarantor of the Guaranteed Obligations shall be several and also joint and may be enforced at the option of the Lender against each severally, any two or more jointly, or some severally and jointly.  The Lender, in its sole discretion, may release any one or more of such guarantors for any consideration which the Lender deems adequate, and may fail or elect not to prove a claim against the estate of any bankrupt, insolvent, incompetent or deceased guarantor, and thereafter, without notice to any other guarantor.  The Lender may extend or renew any part or all of any Guaranteed Obligation and may permit the Credit Parties to incur additional Guaranteed Obligations, without affecting in any manner the unconditional obligations of the remaining guarantor(s).  Any of the foregoing actions by the Lender shall not, however, be deemed to affect any right to contribution which may exist among the guarantors.

### ARTICLE III– WAIVERS; RELEASES

3.1    <u>Waivers</u>.

3.1.1    The obligations of TTM under this Guaranty shall remain in full force and effect without regard to, and shall not be limited, impaired, discharged or affected by, whether or not TTM shall have had notice or knowledge of any of them, any of the following:

(a)    Any waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions of any Fundamental Document.

(b)    Any dissolution, cessation of business, bankruptcy, reorganization, or the like of any Credit Party  and/or any other Person.

(c)      The Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect, including, without limitation, by reason of any lack of validity or enforceability of any Fundamental Document due to the bankruptcy or insolvency of any of the Credit Parties and/or any other Person, or due to the lack of corporate or other authority of any of the Credit Parties and/or any other Person with respect to the Fundamental Documents to which it is party.

3.1.2   TTM, in the broadest and most comprehensive sense, waives any and all claims, rights or defenses that may be asserted by a guarantor or surety against a creditor. Without limiting the foregoing, until all the Guaranteed Obligations have been fully and irrevocably satisfied, TTM expressly, unconditionally and irrevocably waives:

(a)      (i) Notice of acceptance of this Guaranty; (ii) notice of any Advances or other financial accommodations made or extended under the Fundamental Documents or the creation, existence, collection or existence of any Guaranteed Obligations; (iii) notice of the amount of the Guaranteed Obligations, subject, however, to TTM's right to make inquiry of the Lender to ascertain the amount of the Guaranteed Obligations at any reasonable time; (iv) notice of any adverse change in the financial condition of any Credit Party or of any other fact that might increase TTM's risk hereunder; (v) notice of presentment for payment, demand, protest, dishonor and other effort to collect with respect to any Fundamental Document or instrument contemplated thereby and notice thereof under the Fundamental Documents; (vi) notice of any Default or Event of Default; and (vii) all other notices (except, and notwithstanding anything to the contrary contained herein, if such notice is specifically required to be given to TTM hereunder or under the Fundamental Documents) and demands to which TTM might otherwise be entitled.   The Lender may modify the terms of the borrowing, compromise, extension, increase, acceleration, renewal or forbearance of payment of any part or all of any Guaranteed Obligations, and may permit the Borrower to incur additional Guaranteed Obligations, all without notice to TTM and without affecting in any manner the unconditional obligations of TTM under this Guaranty.

(b)      Any right, under Sections 2845 or 2850 of the California Civil Code, or otherwise, to require the Lender to:  (i) proceed against any Person, including the Borrower; (ii) proceed against or exhaust any collateral or security held from the Borrower or any other Person; (iii) pursue any other remedy in the Lender's power; or (iv) make any presentments or demands for performance, or give any notices of nonperformance, protests, notices of protest or notices of dishonor in connection with any obligations or evidence of the Guaranteed Obligations held by the Lender as security, in connection with any other obligations or evidence of the Guaranteed Obligations which constitutes in whole or in part the Guaranteed Obligations guaranteed hereunder or the creation of new or additional Guaranteed Obligations. In this regard, TTM is bound to the payment of all Guaranteed Obligations, whether now existing or hereafter accruing, as fully as if such Guaranteed Obligations were directly owing to Lender by TTM.  TTM waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and indefeasibly paid) of the Credit Parties or by reason of the cessation from any cause whatsoever of the liability of any Credit Party in respect thereof.

(c)      Any defense based upon or arising by reason of (i) any incapacity, disability or other defense of the Borrower or any other Person; (ii) any lack of authority of any officer, director, partner, agent or any other Person acting or purporting to act on behalf of the Borrower or any defect in the formation of the Borrower; (iii) the application by the Borrower of the proceeds of any Guaranteed Obligations unless such application is made in bad faith; (iv) any act or omission by the Lender which directly or indirectly results in or aids in the discharge of the Borrower or any Guaranteed Obligation by operation of law or otherwise; (v) the failure of consideration, breach of warranty, accord and satisfaction with respect to the Guaranteed Obligations or any Fundamental Document, (vi) any modification of the Guaranteed Obligations, in any form whatsoever, including any modification made after effective termination, and including without limitation, the renewal, extension, acceleration or other change in time for payment of the Guaranteed Obligations, or other change in the terms of the Guaranteed Obligations or any part thereof, including increase or decrease of the rate of interest thereon, or (vii) any statute of limitations affecting TTM's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to TTM's liability hereunder with respect to the Guaranteed Obligations.

(d)      Each and every right to assert against the Lender any defense (legal or equitable), set-off, counterclaim, or claim which TTM now or at any time hereafter have against the Borrower or any other party liable to the Lender, and each and every defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor or any other impairment or diminishment in any way of the obligations of TTM under this Guaranty, except as to the Lender's gross negligence or willful misconduct.

(e)      Any defense TTM has to performance under this Guaranty and any right TTM has to be exonerated hereunder provided by Sections 2819, 2822, or 2825 of the California Civil Code, or otherwise, arising by reason of: the impairment or suspension of the Lender's rights or remedies against any Credit Party; the alteration by the Lender of the Guaranteed Obligations; any discharge of the Guaranteed Obligations to the Lender by operation of law as a result of the Lender's intervention or omission; or the acceptance by the Lender of anything in partial satisfaction of the Guaranteed Obligations, and any and all rights of subrogation, reimbursement, indemnification, and contribution.

(f)      Any defense arising by reason of or deriving from (i) any claim or defense based upon an election of remedies by Lender; or (ii) any election by Lender under Bankruptcy Code Section 1111(b) to limit the amount of, or any collateral securing, its claim against TTM.

(g)      Any and all rights and defenses, pursuant to Section 2856 of the California Civil Code or otherwise, of TTM arising out of an election of remedies by the Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed TTM's rights of subrogation and reimbursement against any Credit Party.

3.1.3    Notwithstanding any provision in this Article III or anything else hereunder to the contrary, unless and until all of the Guaranteed Obligations shall have been paid or satisfied, TTM hereby absolutely, unconditionally, knowingly, and expressly waives:  (i) any right of subrogation TTM has or may have as against any Credit Party  or any other Person with respect to the Guaranteed Obligations; (ii) any right to proceed against any Credit Party or any other Person, now or hereafter, for contribution, indemnity, reimbursement, or any other suretyship rights and claims, whether direct or indirect, liquidated or contingent, whether arising under express or implied contract or by operation of law, which TTM may now have or hereafter have as against any Credit Party or any other Person with respect to the Guaranteed Obligations; and (iii) any right to proceed or seek recourse against or with respect to any property or asset of any Credit Party included in the Collateral.

3.2    <u>General Waiver</u>.  WITHOUT LIMITING THE GENERALITY OF ANY OTHER WAIVER OR OTHER PROVISION SET FORTH IN THIS GUARANTY, TTM HEREBY

ABSOLUTELY, KNOWINGLY, UNCONDITIONALLY, AND EXPRESSLY WAIVES AND TTM AGREES NOT TO ASSERT ANY AND ALL BENEFITS OR DEFENSES ARISING DIRECTLY OR INDIRECTLY UNDER ANY ONE OR MORE OF CALIFORNIA CIVIL CODE SECTIONS 2799, 2808, 2809, 2810, 2815, 2819, 2820, 2821, 2822, 2825, 2839, 2845, 2848, 2849, AND 2850, CALIFORNIA UNIFORM COMMERCIAL CODE SECTIONS 3116, 3118, 3119, 3419, 3605, 9610 (other than 9610(b)), 9615, AND 9618 AND CHAPTER 2 OF TITLE 14 OF PART 4 OF DIVISION 3 OF THE CALIFORNIA CIVIL CODE.

3.3    <u>Releases</u>.  Without notice to or by TTM, and without affecting or impairing the obligations of TTM hereunder Lender may, by action or inaction:

3.3.1    compromise, settle, extend the duration or the time for the payment of, or discharge the performance of, or may refuse to or otherwise not enforce this Guaranty, the other Fundamental Documents, or any part thereof, with respect to the Borrower or any other Person;

3.3.2    release TTM, any Credit Party or any other Person or grant other indulgences to TTM, the Borrower or any other Person in respect thereof;

3.3.3    amend or modify in any manner and at any time (or from time to time) any of the Fundamental Documents; or

3.3.4    release or substitute any other guarantor, if any, of the Guaranteed Obligations, or enforce, exchange, release, or waive any security for the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations, or any portion thereof.

3.4    <u>No Election of Remedies</u>.  Lender shall have all of the rights to seek recourse against TTM to the fullest extent provided for herein.  No election by Lender to proceed in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver

of Lender's right to proceed in any other form of action or proceeding or against other Persons unless Lender has expressly waived such right in writing. Specifically, but without limiting the generality of the foregoing, no action or proceeding by Lender under any document or instrument evidencing the Guaranteed Obligations shall serve to diminish the liability of TTM under this Guaranty, except to the extent that Lender finally and unconditionally shall have realized indefeasible payment by such action or proceeding.

3.5    Payments; Application. All payments to be made hereunder by TTM to Lender shall be made in lawful money of the United States of America at the time of payment, shall be made in immediately available funds, and shall be made without deduction (whether for taxes or otherwise) or offset. All payments made by TTM hereunder to Lender shall be applied as follows: first, to all costs and expenses (including reasonable and documented outside attorneys' fees and out-of-pocket expenses, including all such fees and expenses incurred pursuant to proceedings arising under Bankruptcy Code) incurred by Lender in enforcing this Guaranty or in collecting the Guaranteed Obligations; second, to all accrued and unpaid interest, premium, if any, and fees owing to Lender constituting Guaranteed Obligations; and third, to the balance of the Guaranteed Obligations.

3.6    Cumulative Remedies. No remedy under this Guaranty is intended to be exclusive of any other remedy, but each and every remedy shall be cumulative and in addition to any and every other remedy given hereunder, and those provided by law or in equity. No delay or omission by Lender to exercise any right under this Guaranty shall impair any such right nor be construed to be a waiver thereof. No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

**ARTICLE IV– REPRESENTATIONS, COVENANTS AND WARRANTIES**

4.1    Representations and Warranties. TTM hereby represents, covenants and warrants to Lender that:

4.1.1    TTM is a limited liability company and is duly formed and existing under the laws of the jurisdiction of its formation, all as specified in page one hereof, has the power and authority to own properties and assets, and to transact the business in which it is engaged, and is properly licensed, qualified to do business and in good standing in every jurisdiction where the conduct of its business requires it to be so qualified.

4.1.2    The execution, delivery and performance of this Guaranty are within TTM's powers, are not in conflict with the terms of any organizational charter or documents of TTM, and do not result in a breach of or constitute a default under any contract, obligation, indenture or other instrument to which TTM is a party or by which TTM is bound or affected. There is no law, rule or regulation, nor is there any judgment, decree or order of any court or governmental authority binding on TTM which would be contravened by the execution, delivery,

- 8 -

performance or enforcement of this Guaranty and the other Fundamental Documents to which TTM is a party.

4.1.3   TTM has taken all action necessary to authorize the execution and delivery of this Guaranty and the other Fundamental Documents to which TTM is a party, and the consummation of the transactions contemplated hereby and thereby. Upon its execution and delivery by TTM, this Guaranty will constitute legal, valid and binding agreements and obligations of TTM enforceable against TTM in accordance with its terms, except as enforceability may be limited by the bankruptcy, insolvency, fraudulent conveyance, and similar laws and equitable principles affecting the enforcement of creditors' rights generally.

4.1.4   No approval, consent, exemption or other action by, or notice to or filing with, any governmental authority is necessary in connection with the execution, delivery, performance or enforcement of this Guaranty and the other Fundamental Documents to which TTM is a party, except as may have been obtained by TTM and certified copies of which have been delivered to Lender.

4.1.5   TTM is, before and immediately after giving effect to this Guaranty, Solvent.

4.2   Financial Condition of Borrower. (a) TTM is currently informed of the financial condition of the Borrower and of all other circumstances, which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Guaranteed Obligations; and (b) TTM has read and understands the terms and conditions of the Fundamental Documents. TTM will continue to keep itself informed of the Borrower's financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment of the Guaranteed Obligations.

4.3   Understandings With Respect to Waivers and Consents. TTM has either consulted with legal counsel regarding the effect of this Guaranty and the waivers and consents set forth herein or has made an informed decision not to do so. TTM further acknowledges and agrees that TTM's waivers set forth above are made with TTM's full knowledge of its significance and consequences and that under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of said waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective only to the extent permitted by law and shall not affect any other waiver or consent.

4.4   Maximum Liability of TTM. TTM and the Lender hereby confirm that it is the intention of each such Person that this Guaranty and the obligations of TTM hereunder (including the guaranty of the Guaranteed Obligations) not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law to the extent applicable to this Guaranty or such obligations of TTM. To effectuate the foregoing intention, the Lender and TTM hereby irrevocably agree that the

obligations of TTM under this Guaranty at any time shall be limited to the maximum amount as will result in the obligations of TTM under this Guaranty not constituting a fraudulent transfer or conveyance, after giving full effect to TTM's liability under this Guaranty and TTM's rights of subrogation, indemnification or contribution which it may have under any other agreement or applicable law.

4.5     No Liens; No Restricted Payments.  Except for the rights granted to the Lender under this Guaranty or as permitted by the DoT, TTM has not pledged, assigned, sold, granted a Lien in the Property or otherwise conveyed any interest in any of the Property to any Person. TTM has not authorized the filing of and there are no filed financing statements against TTM that include a description of the Property, or any fixtures thereon.  There are no judgment or tax Lien filings against the Property.  Except for the rights granted to the Lender under this Guaranty or as permitted by the DoT, so long as any of the Guaranteed Obligations remain outstanding TTM shall not sell, assign (by operation of Law or otherwise) or otherwise transfer, or grant any option with respect to, or create, incur, assume or suffer to exist any Lien upon or with respect to, any of the Property.

4.6     Negative Pledge.  So long as the Loans remain outstanding, TTM will not cause or permit any Lien to be granted, or suffered to exist, on the Equity Interests of any Credit Party, nor shall TTM sell, or permit to be sold, any of the Equity Interests in any Credit Party.

## ARTICLE V– GENERAL PROVISIONS

5.1     Attorneys' Fees and Costs.   TTM shall pay, on demand, all reasonable and documented outside attorneys' fees (including reasonable and documented outside attorney's fees incurred pursuant to proceedings arising under the Bankruptcy Code) and all other out-of-pocket costs and expenses which may be incurred by Lender in the enforcement of this Guaranty or in any way directly arising out of, or directly consequential to the protection, assertion, or enforcement of the Guaranteed Obligations (or any security therefor), whether or not suit is brought.

5.2     Indemnification.  TTM shall indemnify the Lender, and its successors and assigns, and its members, managers, officers, directors, agents, affiliates and employees (collectively, the "Indemnitees") from and against any third party claim, loss, liability, judgment, cost or expense, including reasonable and documented outside attorneys' fees and out-of-pocket disbursements (collectively, the "Claims"), asserted against, imposed upon, incurred by or caused to any of the Indemnitees, that arise out of or relate to, whether directly or indirectly, any breach by TTM of any of TTM's representations, warranties, covenants or other obligations set forth in this Guaranty; provided that this indemnity shall not, as to any Indemnitee, be available to the extent that any or all of such Claims are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

5.3     Further Assurances.  Each party shall execute and deliver such further documents and do such other acts and things as are reasonably necessary in order to effect fully the purposes of this Guaranty and provide for the payment of the Guaranteed Obligations.

5.4     Notices.  Any notice, request, demand or other communication provided for hereunder to be given shall be in writing and shall be delivered personally, by certified mail, return receipt requested, postage prepaid, or by transmission by a telecommunications device, and shall be effective (a) on the day when personally served, including delivery by overnight mail and courier service, (b) on the third day after its deposit in the United States mail, and (c) on the Business Day of confirmed transmission by telecommunications device, including e-mail. The addresses of the parties hereto (until notice of a change thereof is served as provided in this Section 5.4) shall be as follows:

To TTM:
Temerity Trust Management, LLC
9100 Wilshire Boulevard
Suite 800 – East Tower
Beverly Hills, CA 90212
Attention:  William Sadleir/Hannah Kadadu
Email:  wsadleir@avironpictures.com

To the Lender:
Cairn Capital Investment Funds ICAV for its sub fund Cairn Capstone Special Opportunities Fund
C/O Cairn Capital Limited
27 Knightsbridge
London SW1X 7LY
United Kingdom
Attention: Cairn Legal / Private Credit / Brandon Kufrin / Chris Cottrell
Email: Cairn_Legal@cairncapital.com ;
Private.Credit.Info@cairncapital.com ;
brandon.kufrin@cairncapital.com;
Chris.Cottrell@cairncapital.com

With a copy to:
Paul Hastings LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Attention:  Mickey Mayerson, Esq. and Nigel Pearson, Esq.
Facsimile:  (310) 620-5863
Email:  mickeymayerson@paulhastings.com ;
nigelpearson@paulhastings.com

With a copy to:
Reed Smith LLP
1901 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Attention:  Michael Sherman Esq.
E-mail: msherman@reedsmith.com;
mkupietzky@reedsmith.com

5.5     Books and Records.  Lender's books and records showing the account between Lender and the Borrower shall be admissible in any action or proceeding and shall be binding upon TTM for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof, absent manifest error.

    5.6    <u>Severability of Provisions</u>.  If any provision of this Guaranty is for any reason held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Guaranty.

    5.7    <u>Successors and Assigns</u>.  This Guaranty shall bind the successors and assigns of TTM, and shall inure to the benefit of the successors and assigns of Lender; provided, however, (a) TTM may not assign this Guaranty or delegate any of its duties hereunder without Lender's prior consent and any such prohibited assignment shall be absolutely null and void, and (b) the Lender may sell, assign, transfer, negotiate, or grant participations in all or any part of, or any interest in, the rights and benefits hereunder pursuant to and in accordance with and subject to the provisions of the Loan Agreement.  In connection therewith, the Lender may (after any proposed transferee executes a customary non-disclosure agreement with TTM) disclose all documents and information which the Lender now or hereafter may have relating to TTM, TTM's business, or this Guaranty to any such prospective or actual transferee.

    5.8    <u>Governing Law</u>.  This Guaranty and the rights and obligations of the parties hereto shall be governed by and construed and enforced in accordance with, the laws of the State of California without reference to its conflict or choice of law principles.

    5.9    <u>Judicial Reference</u>.

        (a)    Other than (i) nonjudicial foreclosure and all matters in connection therewith regarding security interests in real or personal property; or (ii) the appointment of a receiver, or the exercise of other provisional remedies (any and all of which may be initiated pursuant to applicable law), each controversy, dispute or claim between the parties arising out of or relating to this Guaranty, which controversy, dispute or claim is not settled in writing within ten (10) days after the "<u>Claim Date</u>" (defined as the date on either TTM or the Lender gives written notice to the other that a controversy, dispute or claim exists), will be resolved pursuant to the provisions for reference and trial by referee (without jury) set forth in Section 638 et <u>seq</u>. of the California Code of Civil Procedure, or their successor section ("<u>CCP</u>"), which shall constitute the exclusive remedy for the settlement of any controversy, dispute or claim concerning this Guaranty, including whether such controversy, dispute or claim is subject to the reference proceeding and except as set forth above, the parties hereby absolutely, irrevocably and unconditionally waive (i) their rights to initiate any legal proceedings against each other in any court or jurisdiction other than the Superior Court in the County where any real property collateral for this Guaranty is located or Los Angeles County if none (the "<u>Court</u>") and (ii) trial by jury with respect to such controversy, dispute or claim.  The referee shall be a retired Judge of the Court selected by mutual agreement of the parties, and if they cannot so agree within thirty (30) days after the Claim Date, the referee shall be promptly selected by the Presiding Judge of the Court (or his or her representative).  A request for appointment for a referee may be heard on an ex-parte or expedited basis, and the parties agree that irreparable harm would result if such ex-parte relief is not granted.  Pursuant to CCP  Section 170.6, each party shall have one peremptory challenge to the referee selected by the Presiding Judge of the Court (or his or her representative).  The referee shall be appointed to sit as a temporary judge, with all of the powers for a temporary judge, as authorized by law, and upon selection should take and subscribe to the

oath of office as provided for in Rule 244 of the California Rules of Court (or any subsequently enacted Rule).    The parties agree that time is of the essence in conducting the reference proceeding.  Accordingly, the referee shall (a) be requested to set the matter for hearing within sixty (60) days after the date of selection of the referee, (b) try any and all issues of law or fact and report a statement of decision upon them, if possible, within ninety (90) days of the Claim Date and (c) report a statement of decision within twenty (20) days after the matter has been submitted for decision.    Any decision rendered by the referee will be final, binding and conclusive and judgment shall be entered pursuant to CCP §644 in any court in the state of California having jurisdiction.  Any party may apply for a reference proceeding at any time after ten (10) days following notice to any other party of the nature of the controversy, dispute or claim, by filing a petition for a hearing and/or trial.  All discovery permitted by this Guaranty shall be completed no later than fifteen (15) days before the first hearing date established by the referee.  The referee may extend such period in the event of a party's refusal to provide requested discovery for any reason whatsoever, including, without limitation, legal objections raised to such discovery or unavailability of a witness due to absence or illness.  No party shall be entitled to "priority" in conducting discovery.  Depositions may be taken by either party upon seven (7) days written notice, and request for production or inspection of documents shall be responded to within ten (10) days after service.  All disputes relating to discovery which cannot be resolved by the parties shall be submitted to the referee whose decision shall be final and binding upon the parties.  Pending appointment of the referee as provided herein, the Superior Court is empowered to issue temporary and/or provisional remedies, as appropriate.  Subject to the referee's power to require the losing party to pay all fees and expenses, the fees and expenses of the referee shall be borne equally by the parties.

(b)    Except as expressly set forth in this Guaranty, the referee shall determine the manner in which the reference proceeding is conducted including the time and place of all hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding.  All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter except that when any party so requests, a court reporter will be used at any hearing conducted before the referee.  The party making such a request shall have the obligation to arrange for and pay for the court reporter.  Subject to the referee's power to require the losing party to pay all costs, the costs of the court reporter at the trial shall be borne equally by the parties.

(c)    The referee shall be required to determine all issues in accordance with existing case law and the statutory laws of the state of California.  The rules of evidence applicable to proceedings at law in the state of California will be applicable to the reference proceeding.  The referee shall be empowered to enter equitable as well as legal relief, to provide all temporary and/or provisional remedies and to enter equitable orders that will be binding upon the parties.  The referee shall issue a single judgment at the close of the reference proceeding which shall dispose of all of the claims of the parties that are the subject of the reference.  The parties hereto expressly reserve the right to contest or appeal from the final judgment or any appealable order or appealable judgment entered by the referee.  The parties hereto expressly reserve the right to findings of fact, conclusions of laws, a written statement of decision, and the

right to move for a new trial or a different judgment, which new trial, if granted, is also to be a reference proceeding under this provision.

(d)     The referee's decision shall provide for payment by the losing party (i.e., the party or parties against whom the decision is rendered) of the fees and costs incurred in connection with said proceeding, as well as the outside attorney's fees and costs incurred by the prevailing parties (i.e., all parties to the proceeding other than the losing party).

(e)     If the enabling legislation which provides for appointment of a referee is repealed (and no successor statute is enacted), any dispute between the parties that would otherwise be determined by the reference procedure herein described will be resolved and determined by arbitration.  The arbitration will be conducted by a retired judge of the Court, in accordance with the California Arbitration Act, §1280 through §1294.2 of the CCP as amended from time to time.  The limitations with respect to discovery as set forth hereinabove shall apply to any such arbitration proceeding.

(f)     Nothing in this section shall prejudice the right of Lender to exercise its non-judicial foreclosure rights and remedies in respect of the Property, or prejudice the right of either party to obtain provisional relief or other equitable remedies as shall otherwise be available judicially pending the resolution of an arbitration proceeding provided in this Section.

(g)     THE PARTIES RECOGNIZE AND AGREE THAT ALL CLAIMS RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY A REFEREE AND NOT BY A JURY.  AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER OWN CHOICE, EACH PARTY KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, AGREES THAT THIS REFERENCE PROVISION WILL APPLY TO ANY CLAIM BETWEEN OR AMONG THEM ARISING OUT OF OR IN ANY WAY RELATED TO, THIS GUARANTY.

5.10   <u>Termination</u>.  This Guaranty shall immediately and automatically terminate and be of no further force and effect upon discharge of the Guaranteed Obligations, and each of them, in full.

5.11   <u>Entire Agreement; Amendments and Waivers</u>.  This Guaranty constitutes the entire agreement between TTM and Lender pertaining to the subject matter contained herein. Any provision of this Guaranty may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the party asserted to be bound thereby, and then such amendment or waiver shall be effective only in the specific instance and specific purpose for which given.

5.12   <u>Counterparts</u>.  This Guaranty may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which

taken together shall constitute one and the same instrument, respectively.  Executed copies of the signature pages of this Guaranty sent by facsimile or transmitted electronically in either Tagged Image Format Files ("TIFF") or Portable Document Format ("PDF") shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment.  A party delivering an executed counterpart of this Guaranty by facsimile, TIFF or PDF also shall deliver a manually executed counterpart of this Guaranty but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Guaranty.

*[the next page is the signature page]*

IN WITNESS WHEREOF, TTM and Lender have each executes and delivered this Guaranty as of the date set forth in the first paragraph hereof.

"TTM"                                          "Lender"

Temerity Trust Management, LLC                 Cairn Capital Investment Funds ICAV for
                                               its sub fund Cairn Capstone Special
                                               Opportunities Fund by Cairn Capital
                                               Limited as investment manager

_____                        _____

By: William Sadleir                            By: James Starky
Its: Sole Manager                              Its: Chief Legal Officer


CONFIRMED:


_____

By: Hanan Kadadu
Its: Sole Member

IN WITNESS WHEREOF, TTM and Lender have each executes and delivered this Guaranty as of the date set forth in the first paragraph hereof.

"TTM"

Temerity Trust Management, LLC

By: William Sadleir
Its: Sole Manager

"Lender"

Cairn Capital Investment Funds ICAV for its sub fund Cairn Capstone Special Opportunities Fund by Cairn Capital Limited as investment manager

_____

By: James Starky
Its: Chief Legal Officer

CONFIRMED:

By: Hanan Kadadu
Its: Sole Member

[Execution Page to Temerity Guaranty]

# KUFRIN DECLARATION

# EXHIBIT "C"

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

**This page is part of your document - DO NOT DISCARD**



# 20181025433

**Pages: 0034**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County, California**

**10/09/18 AT 08:00AM**

| | |
|---|---|
| FEES: | 163.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 150.00 |
| PAID: | 313.00 |



**L E A D S H E E T**



201810090150010

**00015815875**



009390456

**SEQ:
08**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

T72



RECORDER MEMO: This COPY has not been QUALITY ASSURED.

**CHICAGO TITLE COMPANY**
**COMMERCIAL DIVISION**

RECORDING REQUESTED BY:

**CHICAGO TITLE COMPANY**
**COMMERCIAL DIVISION**

AND WHEN RECORDED MAIL TO:

Cairn Capital Investment Funds ICAV
For its sub-fund Cairn Capstone Special
Opportunities Fund
c/o Cairn Capital Limited
27 Knightsbridge
London SW1X 7LY
United Kingdom
Attention; Cairn Legal
Private Credit
Brandon Kufrin / Chris Cottrell

10/09/2018

*20181025433*

**DEED OF TRUST, ASSIGNMENT OF RENTS, FIXTURE FILING,**
**SECURITY AGREEMENT AND ENVIRONMENTAL INDMENITY**

MISC0007 (Rev 10/03/2011)

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

*3*

**RECORDING REQUESTED BY**
**AND WHEN RECORDED MAIL TO:**

**Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund**
c/o Cairn Capital Limited
27 Knightsbridge
London SW1X 7LY
United Kingdom
Attention: Cairn Legal
Private Credit
Brandon Kufrin
Chris Cottrell

**Loan No:**

**APN No: 4388-020-009**

**INSTRUCTIONS TO RECORDER:**
Index this document as

(1) a deed of trust;
(2) an assignment of rents;
(3) a fixture filing;
(4) Security Agreement; and

---

(Space above this line for Recorder's use)

## DEED OF TRUST, ASSIGNMENT OF RENTS, FIXTURE FILING, SECURITY AGREEMENT AND ENVIRONMENTAL INDEMNITY

THIS DEED OF TRUST, ASSIGNMENT OF RENTS, FIXTURE FILING, SECURITY AGREEMENT AND ENVIRONMENTAL INDEMNITY (the "**Deed of Trust**") is made as of October **8**, 2018 by **Temerity Trust Management, LLC**, a Delaware limited liability company (which together with all successors and assigns is referred to collectively as "**Trustor**"), whose principal office address is 9100 Wilshire Blvd., Suite 800E, Beverly Hills, CA 90212, in favor of Chicago Title Company ("**Trustee**"), whose address is: 725 South Figueroa Street, Suite 200, Los Angeles, CA 90017, for the benefit of **Cairn Capital Investment Funds ICAV**, an Irish Collective Asset-management Vehicle, **for its sub-fund Cairn Capstone Special Opportunities Fund**, as beneficiary (collectively, with all successors and assigns is referred to as, "**Lender**"), whose address is c/o Cairn Capital Limited, 27 Knightsbridge, London SW1X 7LY United Kingdom.

### W I T N E S S E T H

(Residence)
EME_ACTIVE-570412529.8

*96931-X23*

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

WHEREAS, Lender has agreed to provide **Aviron 1703, LLC** a Delaware limited liability company ("**1703**"), one or more loans in the aggregate initial principal amount not to exceed **Twenty-Two Million Four Hundred Thousand Dollars ($22,400,000.00)** (the "**Loan**") by and between Lender and Borrower (the "**Note**") and that certain Credit, Security, Guaranty and Pledge Agreement of even date herewith , (the "**Loan Agreement**") and the Borrower has executed and delivered to Lender its Promissory Note in the amount of $22,400,000; and

WHEREAS, Lender is making the Loan in reliance on (i) that certain Guaranty executed by Trustor for the benefit of Lender of even date (which together with all amendments, supplements, restatements and replacements is referred to as the "**Guaranty**") guaranteeing repayment of the Loan when due, and (ii) this Deed of Trust to be executed to secure the Loan, and it is a condition precedent to the making of the Loan by Lender that Trustor execute and deliver this Deed of Trust.

NOW, THEREFORE, to secure the full and timely payment and performance of all Obligations as set forth below and in consideration of the foregoing and other benefits accruing to Borrower and Trustor, the receipt and sufficiency of which are hereby acknowledged, Trustor hereby covenants and agrees with Lender, as follows:

## GRANTING CLAUSES

TRUSTOR IRREVOCABLY GRANTS, CONVEYS, TRANSFERS AND ASSIGNS TO TRUSTEE, IN TRUST, FOR THE USE AND BENEFIT OF LENDER, WITH POWER OF SALE AND RIGHT OF ENTRY AND POSSESSION, all of Trustor's present and future estate, right, title and interest in and to the following described property which may exist now or in the future (collectively, the "**Property**"):

(A)     The real property located in the County of Los Angeles, State of California commonly known and addressed as:

**9135 Hazen Drive, Los Angeles, California** 90210 and more particularly described in <u>Exhibit A</u> attached to this Deed of Trust and incorporated herein by reference (the "**Land**"); and

(B)     All Buildings, Fixtures, Easements, Rents and Profits, Development Rights, Water Rights, and Mineral Rights, including without limitation all present and future Leases relating to the foregoing real property and all guaranties and collateral security and security deposits supporting such Leases (as those terms are defined in Article 1 of this Deed of Trust); and

(C)     All of the following related to the assets specified in (A) and (B) above, (i) Books and Records, plans, specifications, surveys (ii) Insurance Policies, title insurance policies, sales contracts, construction contracts, architectural agreements, engineering contracts, service and maintenance contracts, management contracts, and marketing contracts; (iii) work product arising from any such contract or agreement; (iv) all warranties, guarantees, and other similar contract rights and (v) all other tangible personal property located on or used in connection with the forgoing (excluding only Consumer Goods as defined in the Uniform Commercial Code).

(D)     All tax refunds, condemnation bills, notes, accounts and charges receivable, credits, claims, securities, and documents of all kinds, and all instruments, contract rights, general intangibles, bonds and deposits of the Property and all rights arising in connection with the condemnation of all or any part of the Property.

(E)     All Deposit Accounts and all reserves held by, or for, or in the name of Trustor which hold or account for (i) proceeds from the Loan and/or (ii) funds or proceeds arising from or on account of the Property. The foregoing will include all deposit accounts whether domiciled in the United States or outside of the United States whether held by Lender or by another institution which hold proceeds from the Loan or proceeds of Rents and Profits whether deposited by Trustor, by tenants, or by the any property manager of the Property or otherwise.

(F)     All proceeds arising from or on account of the assets specified in (A), (B) (C) and (D) above.

2

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

5

 (G) All Books and Records relating or incorporating any of the assets specified in (A), (B), (C), (D) and (E) above.

 THIS DEED OF TRUST constitutes (i) a personal property security agreement to the extent that it includes personal property assets hereunder that are not real property assets subject to the applicable real property recording statutes (and Trustor hereby grants Lender a security interest in all such personal property assets to secure the Obligations) and (ii) a Fixture Filing in accordance with the Article 9 of the California Commercial Code.

 THIS DEED OF TRUST SECURES THE FOLLOWING INDEBTEDNESS AND OBLIGATIONS (collectively, the "**Obligations**") in such order of priority as Lender may from time to time elect:

 (1) Payment and performance of Trustor's present and future Indebtedness arising under the Guaranty and this Deed of Trust and any related document executed in connection with the Guaranty and this Deed of Trust by Trustor and all extensions, renewals, modifications, and replacements thereof.

 (2) Performance of all present and future covenants and all other present and future obligations of Trustor arising under the Guaranty and this Deed of Trust and any related document executed in connection with the Guaranty and this Deed of Trust by Trustor and all extensions, renewals, modifications, and replacements thereof.

 (3) Compensation for the breach of any and all present and future representations set forth under the Guaranty and this Deed of Trust and any related document executed in connection with this Deed of Trust by Trustor and all extensions, renewals, modifications, and replacements thereof.

 (4) All future advances pursuant to the Guaranty or this Deed of Trust ("**Future Advances**") to the same extent as if such Future Advances had been made on the date of execution of this Deed of Trust.

 (5) Payment and performance of any and all other indebtedness which may hereafter be owing by Trustor to Lender under the Guaranty or this Deed of Trust, however incurred, including but not limited to; (i) interest, (ii) late fees, (iii) default interest, (iv) attorneys' fees, court costs, witness fees, expert witness fees, collection costs, and costs and expenses incurred by Lender in the preservation and enforcement of its rights and remedies under this Deed of Trust.

 (6) Payment and performance of any other Indebtedness and obligations owed to Lender as the then record owner of the Property may hereafter agree in writing are secured by this Deed of Trust.

 (7) **However this Deed of Trust shall NOT secure (i) the obligations of any person or entity under any Third-party Guaranty or under any third-party Indemnity Agreement executed by Trustor, or (ii) the obligations of Trustor under the Environmental Indemnity under Section 2.3 below which shall remain unsecured under this Deed of Trust)**. A third party "Indemnity Agreement" means any written agreement, other than a Third Party Guaranty, executed by a party other than Trustor which indemnifies Lender or any other person for any loss or obligation arising in connection with this Deed of Trust or under the Loan Agreement.

## ARTICLE 1

## DEFINITIONS

For purposes of this Deed of Trust, the following terms shall have the following definitions:

 **1.1** **Books and Records**. "Books and Records" means all books and records relating to the design, construction, improvement, development, use, ownership, operation, maintenance, repair, lease, taxation or marketing of the Property whether kept in hard copy or electronic form.

3

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

**1.2    Buildings**. "Buildings" means all buildings, structures and other improvements and appurtenances now existing or hereafter located on the Land.

**1.3    Condemnation Claims**. "Condemnation Claims" means all claims, actions, causes of action, demands, liens, rights, judgments, settlements, awards, compensation, and damages of every kind and nature which Trustor now has or which may hereafter accrue against any Person, whether arising in tort, by contract or statute, or in any other manner, which in any way directly or indirectly relate to or arise out of any condemnation of the Property or other taking of the Property for public or quasi-public use by eminent domain or to the transfer of the Property in lieu of condemnation or any such taking.

**1.4    Condemnation Proceeds**. "Condemnation Proceeds" means all proceeds, tangible and intangible property resulting from the payment, collection of, recovery on, or other disposition of any or all of the Condemnation Claims.

**1.5    Covenants and Restrictions**. "Covenants and Restrictions" means all covenants, conditions, restrictions, equitable servitudes, and all other similar matters now or hereafter affecting the Property, including any condominium, planned unit development, or cooperative apartment declaration of covenants, conditions and restrictions, by-laws, articles, rules, and regulations to which Trustor or the Property is subject or bound.

**1.6    Deposit Accounts**. "Deposit Accounts" has the meaning provided in the Uniform Commercial Code adopted by the State of California as the California Commercial Code and includes all checking accounts, deposit accounts, escrow accounts and all other bank accounts whether domiciled in the United States or outside of the United States and whether held by Lender or by another institution and all funds held therein whether deposited by Trustor or by any other person or entity.

**1.7    Development Rights**. "Development Rights" means all existing and future development rights, development credits, air rights, and options of any kind relating to the Property.

**1.8    Easements**. "Easements" means all existing and future easements, rights of way, licenses, and similar rights relating or appurtenant to the Property and all existing and future rights in or to streets, roads, sidewalks, alleys, strips and gores adjoining or used in connection with the Property.

**1.9    Environmental Cleanup**. "Environmental Cleanup" means any response action, remedial action, or removal action, as defined in any Environmental Law.

**1.10    Environmental Condition**. "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

**1.11    Environmental Laws**. "Environmental Laws" means any Governmental Requirements pertaining to health, industrial hygiene, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) as amended (42 USC §§9601–9675); the Resource Conservation and Recovery Act of 1976 (RCRA) (42 USC §§6901–6992k); the Hazardous Materials Transportation Act (49 USC §§5101–5128); the Federal Water Pollution Control Act (33 USC §§1251–1387); the Clean Air Act (42 USC §§7401–7671q); the Toxic Substances Control Act (15 USC §§2601–2692); the Refuse Act (33 USC §§407–426p); the Emergency Planning and Community Right-To-Know Act (42 USC §§11001–11050); the Safe Drinking Water Act (42 USC §§300f–300j); the California Hazardous Waste Treatment Reform Act of 1995 (Stats 1995, ch 638 (SB 1222-Calderon)); the California Unified Hazardous Waste and Hazardous Materials Management Regulatory Program (Stats 1993, ch 418 (SB 1082-Calderon)); the Carpenter-Presley-Tanner Hazardous Substance Account Act (Health & S C §§25300–25395.45); the California Expedited Remedial Action Reform Act of 1994 (Health & S C §§25396–25399.2); and the Porter-Cologne Water Quality Control Act (Water C §§13000–16104).

**1.12    Event of Default**. "Event of Default" means any of the events described in Article 3 of this Deed of Trust.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

**1.13** **Fixtures**. "Fixtures" means all fixtures, machinery, equipment, building materials, appliances, landscaping, systems, built-in furniture, plumbing, electrical, coverings and other commonly recognized fixtures now or hereafter located in, on, attached or affixed to, or used in connection with the Land or the Buildings, including, but not limited to, all HVAC and utility systems; security and access control equipment; water heaters, showers, bathtubs, tanks, pumps, toilets, sinks, pipes, and other plumbing fixtures and equipment; stoves, ranges, refrigerators, dishwashers, and disposals; laundry equipment; engines, motors, generators, boilers, furnaces, and incinerators; wall, window, and floor coverings, including screens, shades, drapes, and awnings; partitions, doors, windows, cabinets, bookcases, and hardware; chandeliers and other light fixtures; trees, plants and other landscaping; and all attachments, substitutions, accessories, accessions, replacements, improvements, and additions to any or all of the foregoing, all of which shall conclusively be deemed to be part of the Land and Buildings and conveyed by this Deed of Trust, whether or not affixed or attached to the Land or the Buildings.

**1.14** **General Partner**. "General Partner" means any Person who is acting as a general partner of a partnership, if applicable.

**1.15** **Governmental Authorities**. "Governmental Authorities" means all governmental or quasi-governmental authorities, boards, bureaus, agencies, commissions, departments, administrative tribunals, and other instrumentalities, judicial and non-judicial authorities, and public utilities having or exercising jurisdiction over Trustor or the Property.

**1.16** **Governmental Permits**. "Governmental Permits" means all permits, approvals, and authorizations now or hereafter issued by all Governmental Authorities for or in connection with the Property, including grading permits, foundation permits, building permits, tentative subdivision map approvals, zone changes, zone variances, conditional use permits, temporary certificates of occupancy, and final certificates of occupancy.

**1.17** **Governmental Requirements**. "Governmental Requirements" means all existing and future laws, ordinances, rules, regulations, orders, and requirements of all Governmental Authorities applicable to Trustor or the Property, including those respecting the design, construction, improvement, development, use, ownership, operation, maintenance, repair, or marketing of the Property.

**1.18** **Guaranty**. "Guaranty" has the meaning specified in the second "Witnesseth" paragraph of this Deed of Trust.

**1.19** **Hazardous Substances**. "Hazardous Substances" means any and all (a) substances defined as "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in CERCLA, RCRA, and the Hazardous Materials Transportation Act (49 USC §§5101–5128), and in the regulations promulgated under those laws; (b) substances defined as "hazardous wastes" in California Health and Safety Code §25117 and in the regulations promulgated under that law; (c) substances defined as "hazardous substances" in California Civil Code §2929.5; (d) substances listed in the United States Department of Transportation Table (49 CFR §172.101 and amendments); (e) substances defined as "medical wastes" in the Medical Waste Management Act (Chapter 6.1 of the California Health and Safety Code); (f) asbestos-containing materials; (g) polychlorinated biphenyl; (h) underground storage tanks, whether empty, filled, or partially filled with any substance; (i) petroleum and petroleum products, including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any such mixture; and (j) such other substances, materials, and wastes that are or become regulated under applicable local, state, or federal law, or that are classified as hazardous or toxic under any Governmental Requirements or that, even if not so regulated, are known to pose a hazard to the health and safety of the occupants of the Property or of real property adjacent to it.

**1.20** **Impositions**. "Impositions" means all (a) Taxes; (b) Insurance Premiums; (c) gas, electricity, water, sewer, and other utility charges which are incurred for the benefit of the Property or which may become a lien against the Property; (d) assessments, charges, and fees imposed pursuant to any Covenants and Restrictions; (e) assessments, charges and fees payable with respect to any Easements, Water Rights or Development Rights; (f) principal, interest, and other amounts payable in connection with any Liens; and (g) such other taxes, charges,

5

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

premiums, assessments and impositions relating to the Property, the payment of which Lender determines to be necessary to protect Lender's security for the Obligations.

**1.21** **Improvements**. "Improvements" means the Buildings and Fixtures, collectively.

**1.22** **Indebtedness**. "Indebtedness" means any and all monetary obligations owed under any agreement including without limitation principal, interest, default interest, late fees, attorneys' fees, court costs, witness fees, expert witness fees, collection costs, and costs and expenses incurred by Lender in the preservation and enforcement of its rights and remedies under this Deed of Trust or other Loan Documents.

**1.23** **Insurance Claims**. "Insurance Claims" means all claims, actions, causes of action, demands, liens, rights, judgments, settlements, awards, compensation, and damages of every kind and nature which Trustor now has or which may hereafter accrue against any Person, whether arising in tort, by contract or statute, or in any other manner, which in any way directly or indirectly relate to or arise under any policy of insurance which Trustor maintains with respect to the Property or which Trustor is required to maintain under this Deed of Trust (collectively, the "Insurance Policies") including without limitation all Insurance Policies under which Lender is the named insured.

**1.24** **Insurance Proceeds**. "Insurance Proceeds" means all proceeds, tangible and intangible property resulting from the payment, collection of, recovery on, or other disposition of any or all of the Insurance Claims.

**1.25** **Insurance Premiums**. "Insurance Premiums" means all premiums and other amounts payable in connection with procuring or maintaining the Insurance Policies.

**1.26** **Leases**. "Leases" means all existing and future rental agreements, leases, licenses, concessions, occupancy agreements, and other similar agreements written or oral affecting the use, occupancy, operation, or management of the Property, including all subleases at any level.

**1.27** **Liens**. "Liens" means all mortgages, deeds of trust, mechanics' liens, and other liens and encumbrances of every kind and nature, other than this Deed of Trust, now or hereafter affecting the Property.

**1.28** **Loan Documents**. "Loan Documents" means the Note, this Deed of Trust (together with any riders), the Guaranty, any other instrument, agreement or document executed by Trustor or any Third-party Guarantors and delivered to Lender at Lender's request in connection with the Loan, and all extensions, renewals, modifications, and replacements of such documents.

**1.29** **Manager**. "Manager" means any Person who is acting as a manager of a limited liability company, including any member who is acting in such capacity.

**1.30** **Mineral Rights**. "Mineral Rights" means all existing and future right, title, and interest in and to all minerals, oil, gas and other hydrocarbon substances in or on the Property.

**1.31** **Person**. "Person" means any natural person or any entity, including any corporation, partnership, joint venture, limited liability company, trust, unincorporated organization, trustee, or Governmental Authority.

**1.32** **Property Claims**. "Property Claims" means all claims, actions, causes of action, demands, liens, rights, judgments, settlements, awards, compensation, and damages of every kind and nature (other than the Insurance Claims and Condemnation Claims) which Trustor now has or which may hereafter accrue against any Person, whether arising in tort, by contract or statute, or in any other manner, which in any way directly or indirectly relate to or arise out of any or all of the following: (a) the Property; (b) any existing or future fact, matter, occurrence, or transaction relating to the Property; or (c) the design, construction, improvement, development, use, ownership, operation, maintenance, repair or marketing of the Property.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

**1.33**    **Property Proceeds**. "Property Proceeds" means all proceeds, tangible and intangible property resulting from the payment, collection of, recovery on, or other disposition of any or all of the Property Claims.

**1.34**    **Rents and Profits**. "Rents and Profits" means all existing and future rents, royalties, issues, profits, proceeds, revenues, income, license fees, bonds and other benefits of the Property and all Leases, including all security deposits and prepaid rent, room or space sales or rentals from the Property; and all other benefits paid or payable for using, leasing, licensing, possessing, occupying, residing in, operating from or otherwise enjoying the Property for any length of time.

**1.35**    **Taxes**. "Taxes" means (a) all taxes, bonds, levies and assessments now or hereafter affecting the Property, including all general and special real and personal property taxes, bonds, and assessments affecting the Property; (b) all other taxes, bonds, levies and assessments which now are or hereafter may become a lien on the Property, including all income, profits, franchise, withholding, and gross receipt taxes; (c) all other charges now or hereafter imposed on or assessed against the Property by any Governmental Authority or arising with respect to the design, construction, improvement, development, use, ownership, operation, maintenance, repair or marketing of the Property; and (d) all taxes, bonds, levies, and assessments now or hereafter imposed by any Governmental Authorities on Trustee or Lender by reason of their respective interests in the Loan Documents, excluding any franchise, estate, inheritance, income, or similar tax imposed on Lender or Trustee.

**1.36**    **Tenants**. "Tenants" means all tenants and occupants of the Property under the Leases.

**1.37**    **Third-party Guarantor**. "Third-party Guarantor" means the Person or Persons (other than Trustor), if any, now or hereafter (i) guaranteeing directly payment of the Note or the obligations or Borrower under the Loan Agreement or (ii) guaranteeing payment or performance of the Guaranty; or (iii) guaranteeing any or all of the other Obligations.

**1.38**    **Third-party Guaranty**. Third-party Guaranty means a guaranty agreement or agreements now or hereafter executed by any Third-party Guarantor, including the guaranties included in the Loan Agreement.

**1.39**    **Water Rights**. "Water Rights" means all existing and future water, water rights (whether riparian, surface or underground, appropriative, decreed or vested or otherwise, and whether or not appurtenant), and all water stock relating to the Property.

## ARTICLE 2

## COVENANTS OF TRUSTOR

**2.1**    **Performance of Secured Obligations**. Trustor shall pay and perform each and all of the Obligations in accordance with their respective terms.

**2.2**    **Preservation of the Property**. Trustor (a) shall maintain the Property in good condition and repair; (b) shall promptly repair and restore in a good and workmanlike manner any part of the Property which may be damaged or destroyed, whether or not any Insurance Proceeds are adequate to pay for the cost of such repair and restoration; (c) shall comply and cause the Property to comply with the provisions of all Insurance Policies; (d) shall comply and cause the Property to comply with all Governmental Requirements; (e) shall comply and cause the Property to comply with all Covenants and Restrictions; (f) shall maintain in effect all Governmental Permits; (g) shall not initiate, join in or consent to any change in the zoning, general plan, specific plan, or any other land use classification affecting the Property or any Covenant or Restriction without the prior written consent of Lender; (h) shall not remove, demolish, improve, add to, or alter the Improvements (excluding non-structural alterations which preserve or increase the value of the Property, alterations required by Governmental Requirements and alterations approved by Lender) or change the character or use of the Property without the prior written consent of Lender; (i) shall not commit or permit any waste respecting the Property or impairment of the Property; (j) shall not abandon the Property; (k) shall not commit or permit any act upon the Property in violation of any Governmental

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

Requirements; (l) shall promptly complete in a good and workmanlike manner, and shall pay, when due, all claims for labor performed and for materials furnished in connection with, Improvements which Trustor commences to construct on the Land and shall not permit any mechanics' lien or materialman's lien to attach to the Property (unless Trustor obtains a discharge and release of any such lien within thirty (30) days); and (m) shall paint, cultivate, irrigate, fertilize, fumigate, prune, maintain and do all other acts, in a timely and proper manner, which from the character or use of the Property may be necessary or appropriate to preserve, protect and maintain the value of the Property.

### 2.3    Environmental Indemnity.

(a)    **Hazardous Substances**.  Trustor shall not cause or knowingly permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Trustor shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property, taking into account the size of the Property and the Improvements (including, but not limited to, Hazardous Substances in consumer products).

(b)    **Notice and Cure**.  Trustor shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Trustor has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance in violation of Environmental Law, and (c) any condition caused by the presence, use or release of a Hazardous Substance in violation of Environmental Law which adversely affects the value of the Property.  If Trustor has actual knowledge, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Trustor shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

(c)    **Indemnity**.  Trustor hereby agrees to indemnify, defend, and hold harmless Lender, its directors, officers, employees, agents, successors, and assigns (collectively, "**Lender Indemnitees**") from and against any loss, damage, cost, expense, or liability directly or indirectly arising from or attributable to the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal, or presence of a Hazardous Substance on, under, or about the Property, or any order, consent decree, or settlement relating to the cleanup of a Hazardous Substance, or any claims of loss, damage, liability, expense, or injury relating to or arising from, directly or indirectly, any disclosure by Lender to anyone of information, whether true or not, relative to a Hazardous Substance or Environmental Law violation, including, without limitation, Attorney Fees. This indemnity shall survive the release of this Deed of Trust (whether by payment of the Indebtedness secured by this Deed of Trust or foreclosure or action in lieu of foreclosure); provided, however, that notwithstanding the foregoing, in the event (i) either (a) the Loan is paid in full or (b) the Loan has been satisfied in connection with an uncontested foreclosure or deed-in-lieu thereof, (ii) Trustor delivers to Lender a current Phase I environmental site assessment with respect to the Property (and a follow up Phase II environmental assessment report if required by the Phase I) (collectively, "**Acceptable Information**"), which concludes that there is no evidence that the Property contains any Hazardous Substances in violation of Environmental Laws and the Property is not subject to any significant risk of contamination from any off-site Hazardous Substances, as determined by Lender Indemnitees in their reasonable and good faith discretion, and (iii) no Event of Default exists and is continuing under this Deed of Trust or under any of the other Loan Documents, Trustor shall be released from its obligations set forth in this Section 2.3(c) on the fifth (5th) anniversary of the date on which items (i)-(iv) above are satisfied.

(d)    **Environmental Audit**.  If Lender has received information indicating a reasonable possibility that Hazardous Substances contamination, use, generation, or storage exists on the Property or other

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

properties in the area of the Property, Lender may request and Trustor shall provide at its sole cost and expense within 45 days after written request by Lender a report from a qualified engineering firm or other qualified consultant acceptable to Lender with respect to an investigation and audit of the Property (environmental audit), which environmental audit report shall be addressed to Lender and based on a thorough review of past and present uses, occupants, ownership, and tenancy of the Property and adjacent properties; soils or test boring reports from the construction of the Property; liaison with any Governmental Authority regarding known or suspected Hazardous Substances contamination, use, generation, or storage on the Property or other properties in the area; review of aerial photographs; and visual site inspection noting unregulated fills, storage tanks or areas, ground discoloration or soil odors; and other investigative methods deemed necessary by the consultant to enable the consultant to report that there is no apparent or likely contamination of the Property by Hazardous Substances, whether such source of contamination is the Property or another property in the area; and Trustor shall, if deemed reasonably necessary to further investigate suspected or likely contamination, provide Lender with supplemental reports by acceptable qualified consultants of the analysis of core drilling or groundwater supplies from the Property, showing no contamination by Hazardous Substances.

     **2.4**    **Insurance**. Trustor shall at all times maintain in full force (a) fire and extended coverage all risk insurance, together with such endorsements as Lender may require, including flood coverage (if the Land is now or hereafter located in an area designated by the Director of the Federal Emergency Management Agency as a flood hazard area and flood insurance is or becomes available through the National Flood Insurance Program); and (b) such other types of insurance as may from time to time be required by Lender. Each of the Insurance Policies, including the amounts, form, coverage, deductibles, insurer and loss payable and cancellation provisions, shall be acceptable to Lender and the insurance company providing coverage must have rating of at least A-V or better in the latest edition of "Best's Insurance Guide," must be licensed to do business in the state in which the property is located, and must be licensed to transact the lines of insurance required in this transaction. On or before the closing of the Loan, Trustor shall provide evidence to Lender of all required insurance hereunder. Further, without limiting any of the terms of this Section, within thirty (30) days of the closing of the Loan, Trustor shall (i) cause the Insurance Policies to name Lender as an additional insured thereunder and to contain a mortgagee's loss payable endorsement acceptable to Lender naming Lender as loss payee and written with liability in an amount equal to the lesser of (x) the original principal amount of the Loan plus any Future Advances and (y) the full replacement cost of the Improvements unless otherwise agreed in writing by Lender; (ii) undertake best efforts to cause each provider of the Insurance Policies to provide Lender written notice, consistent with customary commercial practices of such provider, of any policy modifications or cancelations; and (iii) provide Lender satisfactory evidence of items (i) and (ii) described herein.

     **2.5**    **Insurance Policies**. Upon Lender's request, Trustor shall immediately deliver to Lender the originals of all Insurance Policies together with receipts for the full payment of all Insurance Premiums, and Lender shall have the right to hold such policies as long as any Obligations are outstanding. Lender shall not be liable or responsible for the suitability, adequacy, enforceability, validity, amount, form, or content of any Insurance Policies, the solvency of any insurer, or the collection of any Insurance Proceeds, and Trustor shall at all times have full responsibility for all of such matters. Not later than thirty (30) days prior to the expiration of each of the Insurance Policies, Trustor shall deliver to Lender a policy or policies renewing or extending the expiring Insurance Policies together with written evidence showing payment of the Insurance Premiums for such policies. If Trustor fails to deliver any of the Insurance Policies to Lender in accordance with this Deed of Trust, or if any of the Insurance Policies is canceled, Lender, without notice to or demand upon Trustor, shall have the right to obtain such insurance in such form, content and amount and with such insurer as Lender determines to be necessary or appropriate to protect its interest. Without limiting any other provision of this Deed of Trust, all premiums and other costs and expenses paid or incurred by Lender in connection with Lender's obtaining any Insurance Policies under this Section shall be payable by Trustor to Lender on Lender's demand. Neither Trustee nor Lender shall be obligated to obtain or maintain any policy of insurance with respect to the Property. All Insurance Policies relating to the Property and all unearned Insurance Premiums shall automatically inure to the benefit of and be deemed to be assigned to the grantee of the Property at any judicial or nonjudicial foreclosure sale under this Deed of Trust or by any deed in lieu of foreclosure under this Deed of Trust.

9

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

**2.6**    **Assignment of Insurance Claims and Proceeds.**  To secure the Obligations, Trustor grants, transfers, and assigns to Lender the Insurance Claims and Insurance Proceeds.

**2.7**    **Assignment of Condemnation Claims and Proceeds and Other Claims.**  To secure the Obligations, Trustor grants, transfers, and assigns to Lender the Condemnation Claims, Condemnation Proceeds, Property Claims, and Property Proceeds.

**2.8**    **Payment of Proceeds.**  Trustor shall cause all Insurance Proceeds, Condemnation Proceeds and Property Proceeds (collectively, the "**Proceeds**") to be paid or delivered directly to Lender. Lender shall at all times have the right but not the obligation (a) to demand, collect, accept, receive and give receipts for any and all of the Proceeds; and (b) to direct any Person to pay or deliver any or all of the Proceeds directly to Lender. Nothing contained in this Deed of Trust shall be deemed to obligate Lender to make any inquiry as to the sufficiency of any Proceeds received by Lender. If for any reason Trustor receives any Proceeds, Trustor shall immediately pay, assign, endorse or deliver such Proceeds to Lender in the original form in which received by Trustor and shall not commingle such Proceeds with any of Trustor's other funds or property. Notwithstanding anything stated herein, for any Insurance Claims in which the insurer determines the amount of loss to the Property to be Two Hundred Fifty Thousand Dollars ($250,000) or less, Lender agrees to deliver such Proceeds (in an amount not to exceed Two Hundred Fifty Thousand Dollars ($250,000)) to Trustor within fifteen (15) business days of receipt of Trustor's written confirmation that it will use such Proceeds solely to repair the Property.

**2.9**    **Prosecution and Settlement of Claims.**  Prior to the occurrence of any Event of Default, Trustor shall have a license to prosecute and enforce the Insurance Claims, Condemnation Claims, and Property Claims (collectively, the "**Claims**"). Lender shall at all times have the right to appear in, defend, and prosecute any action or proceeding arising out of or relating to any or all of the Claims if Lender determines that such action is necessary or appropriate to protect Lender's interest in connection with the Obligations. Upon the occurrence and during the continuance of an Event of Default, Trustor's license to prosecute and enforce the Claims shall be revoked upon, and to the extent provided in, notice by Lender to Trustor. Following such revocation, Lender, at its option, shall have the exclusive right to prosecute and enforce any or all of the Claims to the extent provided in Lender's notice of revocation and to compromise, adjust, settle or dismiss any or all of the Claims, whether or not Lender has taken possession of the Property. Without Lender's prior written consent, Trustor shall not (a) sell, transfer, pledge, hypothecate or otherwise dispose of or abandon any or all of the Claims; or (b) compromise, adjust, settle, or dismiss any or all of the Claims. Upon the cure of any Event of Default, the license granted to Trustor pursuant to this Section 2.9 shall be automatically reinstated.

**2.10**    **Title Policy.**  Upon recordation of this Deed of Trust, Trustor shall cause the Lender to be furnished with an ALTA lender's policy of title insurance acceptable to Lender (a) written in an amount equal to the principal amount of the Loan; (b) issued by a title insurance company acceptable to the Lender; (c) showing title to the Property to be vested in a manner acceptable to the Lender; (d) containing a legal description of the Property satisfactory to the Lender; (e) insuring this Deed of Trust as a first lien on the Property, subject only to such exceptions as have been approved in writing by the Lender; (f) containing such title insurance endorsements as may be required by the Lender; and (g) otherwise acceptable to the Lender in form and substance, including the policy revision date. Within five (5) business days after the Lender's request from time to time, Trustor, at its expense, shall furnish the Lender with such additional title insurance endorsements as the Lender may require insuring the continuing first priority of this Deed of Trust. Trustor shall at all times cooperate with the Lender and its title insurer and provide the Lender's title insurer with such information as such title insurer may request or require in order to provide the Lender with the policies and endorsements described in this Section.

**2.11**    **Subordinate Mortgages.**  Trustor shall not grant or permit any other Lien on the Property ("**Subordinate Mortgage**") without Lender's prior written consent. To obtain Lender's written consent, which Lender may withhold for any reason in its discretion, Trustor must first deliver to Lender a written agreement, acceptable to Lender, executed by the holder of the Subordinate Mortgage which provides that (a) the Subordinate Mortgage is and shall at all times remain unconditionally subject and subordinate to this Deed of Trust; (b) if any action or proceeding is commenced to foreclose the Subordinate Mortgage, no Tenant under any Lease shall be

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.



named as a defendant in such action or proceeding, nor shall such action or proceeding terminate any Lease, without Lender's prior written consent; (c) all Rents and Profits, whether collected directly by the holder of the Subordinate Mortgage or through a receiver, shall be applied first to the Obligations, second to the payment of the Impositions, and thereafter to payment of maintenance and operating costs relating to the Property; and (d) the holder of the Subordinate Mortgage shall give written notice to Lender not later than ten (10) days prior to commencing any judicial or nonjudicial action or proceeding to foreclose the Subordinate Mortgage.

**2.12   Intentionally Omitted.**

**2.13   Attornment at Lender's Option.**  Any Tenant who enters into a Lease for the Property with the written consent of Lender (which consent may be withheld in Lender's full discretion) after the date of recordation of this Deed of Trust (each such Lease is referred to as a "**Subordinate Lease**") and who has not entered into a written subordination non-disturbance and attornment agreement with Lender shall be deemed to have agreed to attorn to Lender and accept Lender as the landlord under its Lease on the terms of this Section.  If Lender acquires title to the Property by judicial or nonjudicial foreclosure under this Deed of Trust or by deed in lieu of foreclosure under this Deed of Trust, Lender, at its option, shall have the right to require any or all Tenants under Subordinate Leases to attorn to and accept Lender as the landlord under such Tenant's Subordinate Lease (the "**Attornment Option**") by giving written notice to such Tenant within thirty (30) days after the date on which Lender acquires title to the Property (the "**Acquisition Date**").  If Lender exercises the Attornment Option with respect to any Subordinate Lease, such attornment shall be effective and self-operative as of the Acquisition Date without the execution of any further documents on the part of the Tenant, Lender, or any other party, and the Tenant under the Subordinate Lease shall be bound to Lender under all of the terms, covenants, and conditions of the Subordinate Lease for the remaining balance of the term thereof, with the same force and effect as if Lender were the landlord under such Lease.  Whether or not Lender exercises its Attornment Option with respect to any Subordinate Lease, Lender (a) shall not be liable for any act or omission of any prior landlord under any Subordinate Lease, including Trustor; (b) shall not be subject to any offset, defense, or claim which any Tenant may have against any prior landlord under any Subordinate Lease, including Trustor; (c) shall not be obligated (i) to return any security deposit now or hereafter paid by any Tenant; (ii) to return any prepaid rent or other amounts prepaid by any Tenant; or (iii) to grant any Tenant a credit for any such security deposit, prepaid rent or other prepaid amounts (excluding monthly rent and other charges which have not been prepaid for more than one month in advance), except to the extent, if any, that Lender has actually and unconditionally received such security deposit, prepaid rent or other prepaid amounts; and (d) shall not be obligated to complete the construction of any or all Improvements.  Without limiting the terms of this Section, upon Lender's request, each Tenant under a Subordinate Lease shall execute and deliver to Lender any document which Lender determines to be necessary or appropriate to evidence such Tenant's attornment to Lender on the terms of this Section, including a new lease with Lender on the same terms and conditions as the Subordinate Lease for a term equal to the unexpired term of the Subordinate Lease.  Nothing contained in this Section shall be deemed to obligate Lender to recognize any Subordinate Lease or accept an attornment by any Tenant upon Lender's acquisition of title to the Property.  If Lender elects not to exercise the Attornment Option within the time period specified in this Section with respect to any Subordinate Lease, such Subordinate Lease and all of the rights, privileges and powers of the Tenant thereunder shall automatically terminate and shall be of no further force or effect from and after the Acquisition Date.

**2.14   No Liability by Lender.**  Nothing contained in this Deed of Trust shall be deemed to obligate Lender to prosecute or enforce any or all of the Claims nor shall Lender have any liability or responsibility for any failure or delay by Lender in prosecuting or enforcing any or all of the Claims or to collect any or all of the Proceeds.  Trustor shall at all times have the right to determine and follow its own policies and practices in the conduct of its business, subject to the terms and conditions of the Loan Documents.

**2.15   Application of Proceeds.**  Lender, at its option, shall have the right (a) to apply any or all Proceeds received by Lender to any or all of the Obligations in such order and manner as Lender shall determine, whether or not such Obligations are then due and payable and without regard to the adequacy or impairment of the security for the Obligations; (b) to release any or all of the Proceeds received by Lender for payment of the costs of repair or reconstruction of the Property on such terms and conditions as may be acceptable to Lender; or (c) to

RECORDER MEMO: This COPY has not been QUALITY ASSURED.



RECORDER MEMO: This COPY has not been QUALITY ASSURED.

release any or all of the Proceeds received by Lender to Trustor on such terms and conditions as may be acceptable to Lender. To the extent it is determined that Lender has applied payments in any order prohibited by any Governmental Authority, Lender shall refund to Trustor any fees and/or interest associated with the misapplication of payments. Acceptance of such refund by Trustor shall be deemed sufficient remedy and Trustor will have no right to seek further claims or damages from Lender.

**2.16    Release of Proceeds for Reconstruction.** Without limiting the generality of Section 2.15 above, if Lender elects, at Lender's option, to release (or to the extent that applicable law requires the release of) any Proceeds for repair or reconstruction of the Property, such release shall be conditioned on Trustor's satisfaction of the following conditions within one hundred and twenty (120) days after the occurrence of the damage requiring the repair or reconstruction: (a) Trustor's deposit with Lender of such funds in addition to the Proceeds as Lender determines to be necessary to pay all direct and indirect costs relating to the repair or reconstruction of the Property; (b) the establishment of a procedure acceptable to Lender for Lender's disbursement of the Proceeds; (c) Lender's receipt and approval of final plans and specifications and a cost breakdown for the repair or reconstruction of the Property; (d) Lender's receipt and approval of (i) a general construction contract for the repair or reconstruction of the Property executed by Trustor and a contractor acceptable to Lender; and (ii) payment and performance bonds written on such general contractor issued by a surety acceptable to Lender; (e) evidence acceptable to Lender that (i) the repair and reconstruction of the Property can be completed and a final and unconditional certificate of occupancy for the Property can be issued not later than thirty (30) days before the maturity date of the Note; (ii) upon completion of the repair or reconstruction of the Property, the income from the Property will be sufficient to pay all Impositions, operating expenses of the Property and installment payments due in connection with the Loan; (iii) leases acceptable to Lender will be in effect or remain in effect upon completion of the repair or reconstruction of the Property; (iv) upon completion of the repair or reconstruction of the Property, the fair market value of the Property will be at least as great as it was prior to the date on which the damage or condemnation occurred as shown in an appraisal acceptable to Lender; (v) there has been no adverse change in the financial condition of Trustor or any Guarantors since the date of this Deed of Trust; and (vi) no Event of Default exists; and (f) such additional conditions as Lender may establish.

**2.17    Taxes and Impositions.** Trustor (a) shall pay all Taxes at least ten (10) days before delinquency; and (b) shall pay all other Impositions when due. Upon Lender's request, Trustor shall deliver to Lender receipts and such other substantiating documentation as may be required by Lender to evidence payment of all Impositions by Trustor in accordance with this Section. If an Event of Default occurs and is continuing under this Deed of Trust or the Guaranty or if there is a default under any of the Loan Documents, then Lender may at any subsequent time, at its option to be exercised on three (3) days' written notice to Trustor, require Trustor to deposit with Lender or its designee, at the time of each payment of an installment of interest or principal under the Note, an additional amount sufficient to discharge the obligations of Trustor under this paragraph as they become due. The calculation of the amount payable and of the fractional part of it to be deposited with Lender shall be made by Lender in its sole and absolute discretion. These amounts shall be held by Lender or its designee not in trust and not as agent of Trustor and shall not bear interest, and shall be applied to the payment of any of the Obligations under the Loan Documents in such order or priority as Lender shall determine.

**2.18    Absolute Assignment of Rents and Profits.**

**(a)    Absolute Assignment.** Trustor absolutely, irrevocably and unconditionally grants, transfers and assigns to Lender all Rents and Profits. Prior to the occurrence of an Event of Default, Trustor shall have a license to collect and retain on the terms of this Section 2.18 all Rents and Profits as they become due and payable. Upon the occurrence of an Event of Default, Trustor's license to collect the Rents and Profits shall automatically be revoked without notice to Trustor. Following such revocation, Lender shall be entitled to collect and retain all Rents and Profits, whether or not Lender has taken possession of the Property, and Trustor shall immediately pay, deliver or cause to be delivered to Lender any Rents and Profits then held or thereafter collected by Trustor. All Rents and Profits collected by or on behalf of Lender may be applied by Lender to the Obligations in such order and amounts as Lender may determine. If Lender elects to seek the appointment of a receiver following the occurrence of an Event of Default, Trustor irrevocably and unconditionally consents to the appointment of a receiver without regard to the adequacy of the security for any of the Obligations.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

Notwithstanding anything to the contrary contained in this Deed of Trust, the assignment of Rents and Profits contained in this Section is an absolute assignment and not an assignment as security. Neither the assignment of Rents and Profits contained in this Section nor any action taken by Lender to collect the Rents and Profits shall be deemed to make Lender a mortgagee-in-possession of the Property or shall be deemed to render Lender directly or indirectly liable or responsible for (i) the use, control, condition, care, operation, occupancy, management, repair, or leasing of the Property; (ii) the production of Rents and Profits from the Property; or (iii) to the extent permitted under applicable law, the performance or observance of any or all of Trustor's duties, obligations, representations, or warranties under any Leases or other agreements relating to the Rents and Profits. Lender shall have no responsibility or liability of any kind for any failure or delay by Lender in enforcing any of the terms or conditions of this Section 2.18. Upon the cure of any Event of Default, the license granted to Trustor pursuant to this Section 2.18(a) shall be automatically reinstated.

       **(b)**    <u>**Applications of Rents and Profits Prior to Revocation of License**</u>. Trustor shall apply the Rents and Profits to the payment of all reasonable and necessary operating costs and expenses of the Property, installment payments due in connection with the Loan, payment of Impositions, and a reasonable reserve for future reasonable and necessary expenses, repairs and replacements relating to the Property before using the Rents and Profits for any other purpose which does not directly benefit the Property.

       **(c)**    <u>**Notices to Tenants**</u>. Upon revocation of the license described in Section 2.18(a) above, Trustor irrevocably authorizes and directs all Tenants under the Leases to comply with any notice or demand by Lender for payment to Lender of any Rents and Profits or for the performance of any of the Tenant's other respective obligations under the Leases, regardless of any conflicting demand by Trustor or notice by Trustor to any Tenant that Lender's demand is invalid or wrongful. No Tenant shall have any duty to inquire as to whether any default by Trustor has occurred under the Loan Documents in connection with any notice or demand by Lender under this Section.

    **2.19**    <u>**Request for Lender's Consent to Transfers**</u>. All requests by Trustor for Lender's consent to transfers under Section 3.12 below (a) shall specifically describe the transaction with respect to which Lender's consent is requested; (b) shall be delivered to Lender not less than fifteen (15) days before Trustor proposes to take the action with respect to which Lender's consent is requested; and (c) shall be accompanied by complete and accurate copies of all documents relating to the transaction with respect to which Lender's consent is requested, including financial statements and other information regarding the proposed transferee. Trustor acknowledges and agrees that Lender's right to withhold its consent, in its sole and absolute discretion, to any or all of the events described in Section 3.12 below is based, in part, on the fact that Trustor's particular financial condition, credit history, character, experience, ability and expertise, as represented by Trustor to Lender, were material and important factors in Lender's decision to make the Loan, and that Lender will continue to rely on such matters to insure satisfactory compliance with the Loan Documents during the entire term of the Loan. If Lender, in its sole and absolute discretion, consents to any of the transfers described in Section 3.12 below, such consent shall not be deemed to release Trustor or any other Person liable for payment or performance of the Obligations, and Trustor and such Persons shall continue to remain liable for payment and performance of the Obligations in accordance with the terms of the Loan Documents, unless expressly released pursuant to a further written agreement signed by Lender.

    **2.20**    <u>**Fixtures**</u>. Notwithstanding Section 3.12 below, Trustor may from time to time replace any Fixtures constituting a part of the Property in the ordinary course of Trustor's business, provided that (a) the replacement property for such Fixtures is at least equivalent in value, character, and quality to the Fixtures being replaced; (b) Trustor has good and marketable title to such replacement property free and clear of all liens, claims, and interests other than the lien of this Deed of Trust; and (c) this Deed of Trust shall constitute a first lien on such replacement Property.

    **2.21**    <u>**Notice of Certain Matters**</u>. Trustor shall promptly notify Lender in writing of (i) any claim, demand, right, or Lien relating to the Property which may be adverse to the lien of this Deed of Trust; (ii) any material loss, depreciation, or adverse change in the value of the Property and any other occurrence which may materially and adversely affect Lender's lien on the Property; (iii) any material adverse change in Trustor's ability to

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

*16*

perform any or all of the Obligations; (iv) any event or condition which constitutes an Event of Default; and (v) any dispute between Trustor and any Governmental Authority relating to the Property which may have a material adverse effect on the Property.

**2.22    Inspection**. Lender shall have the right at all reasonable times (a) upon reasonable prior written or telephonic notice (except that no such notice shall be required in the case of an emergency) to enter upon and inspect the Property, including any entry which Lender determines is necessary or appropriate in connection with enforcing or exercising any right, remedy or power available to or conferred on Lender under the Loan Documents; (b) to contact any Person to verify any information provided or disclosed by Trustor to Lender; and (c) to release such information regarding the Property, Trustor, or the Obligations as Lender may determine to be necessary or appropriate in connection with enforcing or exercising any right, remedy or power available to or conferred on Lender under the Loan Documents. Lender shall have no obligation or duty to inspect the Property, and all such inspections by Lender shall be for Lender's sole benefit and not for the benefit of Trustor or any other Person.

**2.23    Defense of Actions and Protection of Security by Trustor**. Trustor shall appear in and defend any action or proceeding commenced by any Person other than Lender which affects or which Lender reasonably determines may affect any or all of the following: (a) the Property; (b) the Insurance Claims, Condemnation Claims, or Property Claims; (c) Lender's, Trustee's or Trustor's respective rights and obligations under the Guaranty and this Deed of Trust; (d) the Obligations; or (e) any other transaction or matter which affects Lender by reason of its interest in the Property. Trustor shall promptly commence and diligently prosecute all actions and proceedings which are necessary or appropriate or which Lender determines may be necessary or appropriate to do any or all of the following: (i) prevent any damage, destruction, or injury to the Property; (ii) enforce or recover upon the Insurance Claims, Condemnation Claims or Property Claims or collect the Insurance Proceeds, Condemnation Proceeds, or Property Proceeds; or (iii) to preserve, protect, maintain, and defend the Property and Lender's lien thereon.

**2.24    Enforcement of Covenants and Restrictions**. If any of the Covenants and Restrictions apply to Persons owning or occupying real property which is adjacent to or in the vicinity of the Property, Trustor shall diligently enforce the Covenants and Restrictions against such Persons if (a) such Persons have breached their obligations under the Covenants and Restrictions; and (b) such breach has not been cured by such Persons within ninety (90) days after a request by Lender to Trustor to enforce the Covenants and Restrictions.

**2.25    Deposit Accounts**. If any present or future Deposit Account on which Lender has, or shall have, a lien pursuant to this Deed of Trust are held by a financial institution other than Lender, Lender shall be provided with a Deposit Account Control Agreement in form and substance reasonably acceptable to Lender and reasonably adequate to satisfy the provisions of Section 9104 of the California Commercial Code to grant Lender irrevocable control of each such Deposit Account. Such Deposit Account Control Agreement shall be executed and delivered by the required parties prior to or concurrently with the execution and delivery of the Guaranty and this Deed of Trust unless Lender agrees in writing to a later date.

**2.26    Further Assurances**. Upon Lender's request, Trustor shall execute, acknowledge and deliver to Lender such further documents and agreements and take such further actions as Lender may reasonably require from time to time to effectuate or carry out the purposes of the Loan Documents or to evidence, perfect, maintain, preserve or protect Lender's lien on the Property, including Trustor's execution of security agreements, assignments, financing statements, and continuation financing statements. Upon Lender's request, Trustor shall execute, acknowledge and deliver to Lender an assignment acceptable to Lender of such additional rights, privileges, Governmental Permits, and documents relating to the Property as Lender may reasonably determine to be necessary or appropriate·in connection with the design, construction, improvement, development, use, ownership, operation, maintenance, repair or marketing of the Property.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

## ARTICLE 3

### EVENTS OF DEFAULT

Lender, at its option, shall have the right to declare Trustor to be in default under this Deed of Trust and the other Loan Documents upon the occurrence of any or all of the following events:

**3.1     Payment of Note and Other Monetary Obligations Under Loan Documents**. If Trustor fails to perform any of its monetary obligations under the Guaranty or this Deed of Trust within ten (10) days after the date on which such indebtedness or monetary obligation is due.

**3.2     Performance of Non-Monetary Obligations Under Loan Documents**. If Trustor breaches or otherwise fails to perform any of its non-monetary obligations to Lender or any third Person under the Guaranty or this Deed of Trust or any other document executed by Trustor in connection therewith when due and such failure, if capable of cure, is not cured within thirty (30) days after written notice is given to Trustor of such failure.

**3.3     Misrepresentation**. If any request, statement, information, certification, or representation, whether written or oral, submitted or made by Trustor to Lender in connection with the Guaranty or this Deed of Trust is false or misleading in any material respect.

**3.4     Insolvency**. If (a) a petition is filed by or against Trustor under the federal bankruptcy laws or any other applicable federal or state bankruptcy, insolvency or similar law; (b) a receiver, liquidator, trustee, custodian, sequestrator, or other similar official is appointed to take possession of Trustor or the Property, or Trustor consents to such appointment; (c) Trustor makes an assignment for the benefit of creditors; (d) Trustor takes any action in furtherance of any of the foregoing; or (e) there is a material adverse change in Trustor's financial condition as represented to Lender in connection with Lender's approval of the Loan and Lender reasonably determines that such change materially impairs Trustor's ability to perform any or all of the Obligations; provided, however, that Trustor shall have thirty (30) days within which to cause any involuntary bankruptcy proceeding to be dismissed or the involuntary appointment of any receiver, liquidator, trustee, custodian, or sequestrator to be discharged. The cure provision contained in this Section shall be in lieu of, and not in addition to, any and all other cure provisions contained in the Loan Documents. If any of the events specified in parts (a) through (e) above occurs with respect to (a) any General Partner of Trustor, if Trustor is a partnership; (b) any of the Guarantors; or (c) any Manager of Trustor, if Trustor is a limited liability company.

**3.5     Performance of Obligations to Senior Lien Holders or Third Persons**. If (i) Trustor fails to pay any of its indebtedness or to perform any of its obligations under any agreement between Trustor and any other Person who holds a Lien senior to this Deed of Trust when due; or (ii) Trustor fails to pay any of its indebtedness or to perform any of its obligations when due under any other material document between Trustor and any other Person.

**3.6     Attachment**. If all or any material part of the assets of Trustor are attached, seized, subjected to a writ or levied upon by any court process and Trustor fails to cause such attachment, seizure, writ or levy to be fully released or removed within sixty (60) days after the occurrence of such event. The cure provision contained in this Section shall be in lieu of, and not in addition to, any and all other cure periods contained in the Loan Documents.

**3.7     Injunctions**. If a court order is entered against Trustor enjoining the conduct of all or part of its business and Trustor fails to cause such injunction to be fully stayed, dissolved or removed within sixty (60) days after such order is entered. The cure provision contained in this Section shall be in lieu of, and not in addition to, any and all other cure periods contained in the Loan Documents.

**3.8     Dissolution**. The dissolution, liquidation, or termination of existence of Trustor or any of Trustor's General Partners or Managers.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

*18*

**3.9    Impairment of Priority**.  If (i) the priority of this Deed of Trust or Lender's security interest under any of the other agreements securing any or all of the Obligations is impaired for any reason; or (ii) the value of the Property has deteriorated, declined or depreciated as a result of any intentional tortious act or omission by Trustor.

**3.10    Condemnation**.  If all or any material part of the Property is transferred to any Governmental Authority as a result of any condemnation proceeding or action with respect to all or any material part of the Property.

**3.11    Failure to Repair Casualty**.  If there is an uninsured casualty with respect to the Property and Trustor (a) fails to commence repairs and reconstruction of the Property within ninety (90) days after such damage; or (b) thereafter fails to diligently prosecute such repairs and reconstruction to completion.

**3.12    Sales, Transfers and Further Encumbrances**.  If any one of the following events occurs without Lender's prior written consent, which may be withheld in Lender's sole and absolute discretion:

        **(a)**    the sale, conveyance, transfer, mortgage, encumbrance (except for the conveyance or transfer of any part or any interest in the Property to a revocable family trust affiliated with Trustor or other entity, provided that such conveyance or transfer is solely for estate planning purposes), or alienation of all or any part of the Property or any interest in the Property, whether voluntary or involuntary, or Trustor's grant of any option or agreement to effect any such transaction.

        **(b)**    if Trustor or any General Partner or Manager of Trustor is a partnership, the admission, withdrawal, retirement or removal of any General Partner of Trustor or any of Trustor's General Partners or Managers, or the sale or transfer of more than twenty-five percent (25%) of the beneficial interests in Trustor or any of Trustor's General Partners or Managers.

        **(c)**    if Trustor or any General Partner or Manager of Trustor is a corporation, the sale or transfer of an aggregate of more than twenty-five percent (25%) of any class of stock in such corporation or the issuance by such corporation of additional stock to any Person who is not a shareholder in such corporation as of the date of this Deed of Trust.

        **(d)**    if Trustor or any General Partner or Manager of Trustor is a limited liability company, the appointment, withdrawal, retirement or removal of any Manager of Trustor or any of Trustor's General Partners or Managers or the sale or transfer of more than twenty-five percent (25%) of the beneficial interests in Trustor or any of Trustor's General Partners or Managers.

        **(e)**    if Trustor or any General Partner or Manager of Trustor is an individual, the death or incompetency of such Person, except where applicable law limits or prohibits Lender's declaration of a default based on such occurrences; provided, however, that Lender shall not declare an Event of Default to exist based solely on the death or mental incompetence of any individual Trustor, General Partner, or Manager if, within ninety (90) days after the occurrence of such event, a substitute is appointed, and Lender determines that the financial condition, credit history, character, experience, ability and expertise of such substitute is otherwise acceptable.

**3.13    Death; Incompetency**.  If Trustor or any General Partner or Manager of Trustor is an individual, the death or incompetency of such Person, except where applicable law limits or prohibits Lender's declaration of a default based on such occurrences; provided, however, that Lender shall not declare an Event of Default to exist based solely on the death or mental incompetence of any General Partner, or Manager if, within ninety (90) days after the occurrence of such event, Trustor causes a substitute general partner or manager, as applicable, to be admitted to Trustor or appointed, and Lender in good faith determines that the financial condition, credit history, character, experience, ability and expertise of such substitute general partner or manager are comparable to the affected General Partner or Manager and that such substitute general partner or manager is otherwise acceptable to Lender.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

*19*

### ARTICLE 4

### REMEDIES

Upon Lender's election to declare Trustor to be in default under this Deed of Trust and the other Loan Documents pursuant to Article 3 above, Trustor shall be deemed to be in default under this Deed of Trust and the other Loan Documents, and Lender shall have the following rights and remedies:

**4.1    Acceleration**.   Lender shall have the right to declare any or all of the Obligations to be immediately due and payable.

**4.2    Entry by Lender**.   Lender shall have the right (a) upon five (5) days' notice to enter, take possession of, and manage, operate and lease the Property; (b) to take possession of any or all Books and Records; (c) to collect any or all Rents and Profits, whether or not Lender has taken possession of the Property; and (d) to take any or all actions which Lender determines to be necessary or appropriate in connection therewith or to preserve, protect, maintain and defend the Property and Lender's lien thereon, including (i) the exercise and enforcement of all of Trustor's rights under any or all of the Leases; (ii) the termination, acceptance of a surrender, modification or amendment of any or all of the Leases; (iii) the execution of new Leases on such terms and conditions as Lender determines to be appropriate; and (iv) the repair, alteration, improvement or completion of the Property in such manner and to such extent as Lender determines to be necessary or appropriate.  If Lender elects to take possession of the Property or to take any or all of the other actions described in this Section by court process, Trustor irrevocably and unconditionally agrees that a receiver may be appointed by a court for such purpose pursuant to Section 4.6 below.

**4.3    Judicial Action**.   Lender shall have the right to commence an action or proceeding to foreclose this Deed of Trust and to enforce any or all of the terms of the Loan Documents, including specific performance of the covenants of Trustor under this Deed of Trust.

**4.4    Foreclosure by Power of Sale**.

      **(a)    Declaration and Notice of Default**.   Lender shall have the right (i) to cause the Property to be sold under the power of sale contained in this Deed of Trust in any manner permitted by applicable law; and (ii) to deliver to Trustee a written declaration of default and demand for sale and a written notice of default and election to cause the Property to be sold, which notice the Trustee or Lender shall cause to be recorded as required by law.  Upon the expiration of such period of time after the recordation of such notice of default and election to sell and the giving of such notice of sale as may then be required by law, and without the necessity of any demand on Trustor, Trustee, at the time and place specified in the notice of sale, shall sell the Property at public auction to the highest bidder for cash in U.S. Dollars payable at the time of sale.  Lender or any obligee, creditor, or the holder or holders of the Note or Loan Documents may bid and purchase at such sale plus any other sum that Lender is part of the Obligations.

      **(b)    Postponements; Multiple Parcels**.   To the extent permitted by law, Trustee may, and upon request of Lender shall, from time to time, postpone any sale hereunder by public announcement at the time and place noticed for such sale or may, in its discretion, give a new notice of sale.  If the Property consists of several lots, parcels or items of property, Lender shall have the exclusive right (i) to designate the order in which such lots, parcels or items shall be offered for sale or sold; and (ii) to elect to sell such lots, parcels or items through a single sale, through two or more successive sales, or in any other manner Lender determines to be in its best interest.  Any Person, including Trustor, Trustee and Lender, may purchase at any sale under this Deed of Trust, and Lender shall have the right to purchase at any such sale by crediting upon the bid price the amount of all or any part of the Obligations.  If Lender determines to sell the Property in more than one sale, Lender may, at its option, cause such sales of the Property to be conducted simultaneously or successively, on the same day or on such different days or times and in such order as Lender may determine, and no such sale shall terminate or otherwise affect the lien of this Deed of Trust on any part of the Property that has not been sold until all Obligations have been paid in full.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.



RECORDER MEMO: This COPY has not been QUALITY ASSURED.

(c)   **Costs of Sale; Deed to Purchaser**. Trustor shall pay all costs, fees, and expenses of all sales of the Property under this Deed of Trust, including the costs, fees, and expenses (including attorneys' fees) of Trustee and Lender, together with interest thereon at the interest rate applicable to principal under the Note or, with respect to Trustee, the maximum rate permitted by law to be charged by Trustee. Upon any sale under the power of sale contained in this Deed of Trust, Trustee shall execute and deliver to the purchaser or purchasers a deed or deeds conveying the property so sold, but without any covenant or warranty whatsoever, express or implied. The recitals in any such deed or deeds of any matter or facts, including the existence of any default by Trustor, the giving of notice of default and notice of sale, and other facts affecting the regularity or validity of such sale or sales, shall be conclusive proof of the truth of such facts and matters, and any such deed or deeds shall be conclusive against all Persons as to such facts and matters recited therein. A sale of less than all of the Property or any defective or irregular sale under this Deed of Trust shall not exhaust, impair or otherwise affect the power of sale contained in this Deed of Trust, and subsequent sales of the Property may be made under this Deed of Trust until all Obligations have been satisfied or until the entire Property has been sold without defect or irregularity. If Lender elects to cause the Property to be sold under the power of sale contained in this Deed of Trust, Lender shall deposit with the Trustee this Deed of Trust, the Note, the Guaranty and such receipts and evidence of such other Obligations as Trustee may reasonably require.

**4.5   Application of Sale Proceeds**. Trustee shall apply the proceeds of the sale or sales conducted by Trustee in the following order of priority: (a) first, to payment of all expenses of such sale or sales and all costs, expenses, fees, and liabilities of Trustee and this trust, including attorneys' fees, costs of a trustee's sale guaranty, costs of other evidence of title, and Trustee's fees in connection with such sale or sales; (b) second, to all amounts advanced by Trustee or Lender under any of the terms of this Deed of Trust which have not then been repaid, together with interest thereon at the rate applicable to principal under the Note or, with respect to Trustee, the maximum rate permitted by law to be charged by Trustee; (c) third, to the payment of all other Obligations in such order and amounts as Lender determines; and (d) the remainder, if any, to the Person or Persons legally entitled thereto.

**4.6   Appointment of a Receiver**. Lender shall have the absolute and unconditional right to apply to any court having jurisdiction and obtain the appointment of a receiver or receivers of the Property, and Trustor irrevocably and unconditionally consents to such appointment and agrees that Lender shall have the right to obtain such appointment (a) without notice to Trustor or any other Person; (b) without regard to the value of the Property or any other collateral securing the Obligations; and (c) without acceleration of the Obligations or commencement of foreclosure proceedings under this Deed of Trust. Any such receiver or receivers shall have the usual powers and duties of receivers in similar cases and all powers and duties necessary or appropriate to exercise the rights of Lender as provided in this Deed of Trust.

**4.7   Protection of Lender's Security**. Lender or Trustee, without obligation to do so and without notice to or demand on Trustor, and without releasing Trustor from any of its Obligations or waiving Lender's rights under the Loan Documents, shall have the right to perform any Obligation which Trustor has breached in such manner, at such time, and to such extent as Lender or Trustee determines to be necessary or appropriate to preserve, protect, maintain and defend the Property and Lender's lien thereon.

**4.8   Assembly of Property**. Upon Lender's request, Trustor shall assemble and make available to Lender at the location of the Land all Property which has been removed from or which is not located on the Land.

**4.9   Rescission of Notice of Default**. Prior to the conduct of any sale under the power of sale contained in this Deed of Trust, Lender, at its option, shall have the right to rescind any notice of default and election to sell the Property by delivering to Trustee a written notice of rescission executed by Lender which, when recorded, shall cancel the foreclosure proceedings which have been commenced by the recordation of such notice of default and election to sell. Lender's rescission of any notice of default and election to sell pursuant to this Section or under applicable law shall not constitute or be construed as a waiver of any Event of Default or impair, prejudice or otherwise affect (a) Lender's right to record a new notice of default and election to sell the Property based on the same or any other Event of Default; or (b) Lender's rights and remedies in connection with the Obligations.

18

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

**4.10** **Exercise of Rights Under Other Loan Documents and Laws**. Lender shall have the right to exercise any or all rights and remedies which Lender may have under any or all of the other Loan Documents and all other applicable law, including without limitation the applicable Uniform Commercial Code as it relates to such personal property assets as are encumbered under this Agreement.

## ARTICLE 5

## WARRANTIES AND REPRESENTATIONS

**5.1** **Warranties and Representations**. As a material inducement to Lender's extension of credit to Trustor in connection with the Loan, Trustor warrants and represents to Lender as follows:

**(a)** **Qualifications**. Trustor is qualified to do business in the jurisdiction in which the Property is located.

**(b)** **Corporate Existence**. If Trustor is a corporation, Trustor is duly organized, validly existing and in good standing under the laws of the state of its incorporation, and Trustor is qualified to do business and is in good standing under the laws of the state in which the Property is located.

**(c)** **Partnership or Limited Liability Company Existence**. If Trustor is a partnership or limited liability company, Trustor is duly organized, validly existing and in good standing under the laws of the state in which Trustor is organized, and Trustor is qualified to do business and is in good standing under the laws of the state in which the Property is located.

**(d)** **Existence of Trust**. If Trustor is a trust, Trustor is duly organized and validly existing, and the trustees of Trustor are qualified to act in such capacity.

**(e)** **Authority**. Trustor has the full power and authority to carry on its business and to enter into and perform all of its obligations under the Loan Documents, and the Loan Documents, when executed by the Persons signing this Deed of Trust on behalf of Trustor, shall constitute legal, valid and binding obligations of Trustor enforceable in accordance with their respective terms. The Persons executing this Deed of Trust on behalf of Trustor are duly authorized to execute the Loan Documents and all other documents required by Lender in connection with the Loan on behalf of Trustor. No consent of any other Person and no consent, approval, authorization or other action by or filing with any Governmental Authorities is required in connection with the execution, delivery and performance of Trustor's obligations under the Loan Documents.

**(f)** **No Violations**. The consummation of the transactions contemplated by the Loan Documents and the performance of Trustor's obligations thereunder will not result in a breach or violation of (i) any Governmental Requirements of any Governmental Authorities or any judgment, writ, injunction, decree or order of any court relating to Trustor or the Property; (ii) any mortgage, agreement, commitment, restriction, or other document to which Trustor is a party or by which Trustor or the Property is bound; (iii) Trustor's agreement or certificate of limited partnership, if Trustor is a limited partnership; (iv) Trustor's agreement or statement of partnership, if Trustor is a general partnership; (v) Trustor's articles of incorporation or bylaws, if Trustor is a corporation; (vi) Trustor's trust agreement, if Trustor is a trust; or (vii) Trustor's articles of organization or operating agreement, if Trustor is a limited liability company.

**(g)** **Utilities**. All utility services necessary for the use and occupancy of the Property, including water, storm drains, sewers, gas, electric and telephone facilities, are either available at the boundaries of the Real Property or, if this Deed of Trust secures a construction loan, Trustor has taken all necessary steps to assure that all such utility services will be available upon completion of the Improvements.

**(h)** **Litigation**. To the best of Trustor's knowledge, there are no actions, suits, proceedings or investigations pending or threatened against or affecting Trustor or the Property in any court or before any other Governmental Authorities that could reasonably be expected to have a material adverse effect on Trustor's ability to

19

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.



repay the Loan or on the value of the Property, nor does Trustor know of any basis for any such action, suit, proceeding or investigation.

      **(i)**    **Ownership**. Upon recordation of this Deed of Trust, Trustor will be the sole legal and beneficial owner of, and will have good and marketable title to, the Property and all other collateral which is the subject of the Loan Documents.

      **(j)**    **Liens.** To the best of Trustor's knowledge, there are no Liens, claims, encroachments, Covenants and Restrictions, Leases, Easements, or other rights affecting the Property which would not be disclosed by a customary search of the records relating to the Land of the county recorder for the county in which the Property is located, except for such matters as have been specifically disclosed by Trustor to and approved in writing by Lender prior to the date of recordation of this Deed of Trust.

      **(k)**    **Condition**. The Property is in good condition and repair without any material defects known to Trustor.

      **(l)**    **Compliance**. Upon completion of the Project, the Property will be in compliance with applicable laws and regulations in all material respects.

      **(m)**    **Damage**. Except for any damage to be repaired by the Project, the Property is free from material casualty or termite damage.

      **(n)**    **Condemnation**. To the best of Trustor's knowledge, there is no condemnation, zoning change, or other proceeding or action pending, threatened or contemplated by any Governmental Authority which would in any way affect the Property.

      **(o)**    **No Permits Required**. Trustor has not obtained and is not required by any Environmental Laws to obtain any permits or licenses to construct or use the Property or the Improvements.

      **(p)**    **No Violation of Environmental Laws**. To the best of Trustor's knowledge the Property and Trustor are not in violation of any Environmental Laws or subject to any existing, pending, or threatened investigation by any Governmental Authority under any Environmental Laws.

      **(q)**    **No Notice of Violation**. Neither Trustor nor, to the best of Trustor's knowledge and belief, any tenant of any portion of the Property has received any notice from any Governmental Authority regarding any violation of any Environmental Laws.

      **(r)**    **No Hazardous Substances**. No part of the Property is being used or, to the knowledge of Trustor, has been used at any previous time, for the disposal, storage, treatment, processing, transporting, or other handling of Hazardous Substances in violation of Environmental Laws, nor is any part of the Property affected by any Hazardous Substance contamination in violation of Environmental Laws.

    **5.2**    **Continuing Warranties and Representations**. The warranties and representations contained in this Article 5 shall be true and correct as of the date of recordation of this Deed of Trust, shall survive the closing of the Loan and the execution and delivery of the Guaranty, and shall remain true and correct as of the date on which such warranties and representations are given.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

## ARTICLE 6

### UNIFORM COMMERCIAL CODE SECURITY AGREEMENT

**6.1    Uniform Commercial Code Security Agreement**. This Deed of Trust is intended to be and shall constitute a security agreement under the Uniform Commercial Code which is applicable for any of the personalty specified as part of the Property that, under Governmental Requirements, may be subject to a security interest under such Uniform Commercial Code (the "Code").  To secure payment and performance of the Obligations, Trustor grants Lender a security interest in all now owned and hereafter acquired personal property of Trustor obtained for or in connection with the design, planning, construction, development, use, operation, maintenance, or marketing of the Property (collectively, the "Collateral"), including the following: (a) all fixtures, machinery, machines, motor vehicles, tools, parts, equipment, pumps, engines, motors, boilers, incinerators, building materials, inventory, supplies, goods, systems for the supply or distribution of heat, air conditioning, electricity, gas, water, air or light, elevators and related machinery and equipment, fire prevention and extinguishing equipment, security and access control equipment, plumbing, showers, bath tubs, water heaters, toilets, sinks, stoves, ranges, refrigerators, dishwashers, disposals, laundry equipment, wall, window and floor coverings, partitions, doors, windows, hardware, waste and rubbish removal equipment, recreational equipment, signs, furniture, furnishings, appliances, telephone equipment, computer systems, office equipment and supplies, plants, carpets, rugs, sculptures, art work, mirrors, tables, lamps, beds, television sets, light fixtures, chandeliers, desks, cabinets, bookcases, chairs, sofas, benches, and janitorial and maintenance equipment and supplies, and all substitutions, accessories, accessions, replacements, improvements, and additions to any or all of the foregoing; (b) all deposits, advance payments, security deposits, and rental payments made by or on behalf of Trustor to others in connection with the Property and relating to any or all of the following: (i) management or operational services; (ii) marketing services; (iii) architectural, engineering, or design services; (iv) utility services; (v) cleaning, maintenance, security, or repair services; (vi) rubbish or refuse removal services; (vii) sewer services; (viii) rental of furnishings, fixtures or equipment; (ix) parking; or (x) any service similar to any or all of the foregoing; (c) all reports, appraisals, drawings, plans, blueprints, studies, specifications, certificates of occupancy, building permits, grading permits, and surveys relating to all or part of the Property, and all amendments, modifications, supplements, general conditions and addenda thereto; (d) all trade names, trademarks, trade styles, service marks, logos, letterheads, advertising symbols, goodwill, telephone numbers, advertising rights, negatives, prints, brochures, flyers, pamphlets and other media items used or intended to be used in connection with the Property; (e) all warranties and guaranties, whether written or oral, from any third Person which directly or indirectly relate to all or part of the Property or personal property described in parts (a) through (d) of this Section 6.1; (f) all legal and equitable claims, causes of action, and rights against architects, engineers, designers, contractors, subcontractors, suppliers, materialmen and any other Persons supplying labor, services, materials or equipment, directly or indirectly, in connection with the design, planning, construction, development, use, operation, maintenance, or marketing of all or part of the Property; (g) all Condemnation Claims, Condemnation Proceeds, Property Claims, Property Proceeds, Insurance Claims, and Insurance Proceeds (regardless of whether or not Lender required Trustor to obtain or maintain in effect the Insurance Policy or Insurance Policies under which the Insurance Claims arise or the Insurance Proceeds are payable); (h) all real property tax refund claims, general intangibles, accounts, deposit accounts, documents, instruments, chattel paper, and accounts receivable relating to the design, planning, construction, development, use, operation, maintenance or marketing of all or part of the Property, including any right to payment for goods sold or leased or to be sold or leased or for services rendered or to be rendered, however evidenced, including purchase orders, negotiable documents, notes, drafts, acceptances, claims, instruments, insurance policies, and all other forms of obligations and receivables; and (i) all products and proceeds of any or all of the foregoing personal property, including all money, deposit accounts, accounts, chattel paper, documents, notes, drafts, instruments, insurance proceeds, and all other tangible and intangible property resulting from the sale, lease, or other disposition of any or all of the foregoing personal property. However, notwithstanding anything to the contrary in this Deed of Trust, including without limitation, this Section 6.1, in the event that the Property is or will be located in an area designated by the Administrator of the Federal Emergency Management Agency, or any successor thereto, as being within a flood plain or special flood hazard area, the personal property Collateral or Fixtures securing this Deed of Trust shall be limited to only those items specifically covered (currently or hereafter) by Coverage A of the standard flood insurance policy issued in accordance with the National Flood Insurance Program or under equivalent coverage similarly issued by a private

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

insurer to satisfy the National Flood Insurance Act on 1968 (42 U.S.C. §4001), as amended, or any successor statutes. The foregoing provision may be waived in writing by Lender. The foregoing grant is in addition to any security interest and pledge granted by Trustor to Lender that relates to assets other than the Property.

**6.2** **Filing**. Trustor agrees that Lender may file this Deed of Trust, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items of Collateral specified in Section 6.1 above which is or may be part of the Property. Any reproduction of this Deed of Trust or of any other security agreement or financing statement shall be sufficient as a financing statement. Trustor agrees to execute and deliver to Lender, upon Lender's request, any financing statements, as well as extensions, renewals and amendments thereof, and reproductions to this Deed of Trust in such form as Lender may require to perfect a security interest with respect to all or part of the Collateral. Trustor shall pay all costs of filing of such financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all costs and expenses of any record searches for financing statements Lender may reasonably require.

**6.3** **Additional Covenants of Trustor**. Trustor, at its sole cost and expense, (a) shall give Lender at least thirty (30) days prior written notice of any change in Trustor's principal place of business and the acquisition or use of a trade name or style by Trustor; (b) shall promptly notify Lender in writing of any claim, lien, security interest, right, encumbrance or any other occurrence which may be adverse to Lender's security interest in the Collateral; (c) shall defend the Collateral from all claims, liens, security interests, rights, encumbrances and other matters which are adverse to Lender's security interest in the Collateral; (d) shall pay all costs and expenses relating to the purchase, ownership, or use of the Collateral, including all liens, taxes, assessments and charges of Governmental Authorities levied, assessed or imposed on all or part of the Collateral; (e) shall not sell, transfer, pledge, hypothecate, lease or otherwise dispose of or abandon all or part of the Collateral without Lender's prior written consent, except for the sale of inventory in the ordinary course of Trustor's business or the disposition of any Collateral which is replaced with new Collateral of substantially comparable value and utility; (f) shall not remove any material part of the Collateral which consists of tangible personal property from its location on the Property without Lender's prior written consent; (g) shall, upon Lender's request, give notice, in form and substance acceptable to Lender, to any or all account debtors designated by Lender of Trustor's grant of a security interest in any Collateral which consists of accounts, contract rights, instruments, documents, or general intangibles (referred to collectively as the "Accounts" and individually as an "Account"); (h) following the occurrence of any Event of Default, shall not compromise, settle, adjust, or grant any discount, credit, or allowance to any Account debtor without Lender's prior written consent; (i) shall undertake any and all other acts necessary or appropriate to maintain, preserve and protect the Collateral and Lender's security interest therein, including any actions requested by Lender; and (j) shall execute and deliver to Lender such other documents as Lender may request in order to evidence, effectuate, perfect, maintain, preserve or protect Lender's security interest in the Collateral, including financing statements, continuation financing statements, financing statement amendments, security agreements, and assignments. If Trustor fails to execute and deliver to Lender any document requested by Lender pursuant Section 6.3(j) within ten (10) days after such request, then Trustor irrevocably appoints Lender, with full power of substitution, as Trustor's attorney-in-fact, coupled with an interest, with full power, in its own name or in the name of Trustor, to execute such document on behalf of Trustor. Trustor has set forth above its full and correct name, and Trustor does not presently use any other names or tradenames, except for those tradenames specifically disclosed in writing by Trustor to Lender prior to the recordation of this Deed of Trust. Nothing contained in this Article 6 shall be construed to obligate Lender to act on behalf of Trustor as attorney-in-fact.

**6.4** **Remedies**. Without limiting Section 4 above, upon the occurrence and continuance of an Event of Default, Lender shall have the following additional rights and remedies with respect to the Collateral: (a) Lender shall have all the rights and remedies of a secured party under the Code and under any other applicable law, and, at Lender's option, shall also have the right to invoke any or all of the remedies provided in Article 4 of this Deed of Trust with respect to the Collateral, and in exercising any of such remedies, Lender may proceed against the items of real property and any items of Collateral separately or together and in any order whatsoever, without in any way affecting the availability of Lender's remedies under the Code or of the remedies provided in Article 4 of this Deed of Trust; (b) Lender, at its option, shall have the right (i) to direct any or all Account debtors to make payment directly to Lender; (ii) to demand, collect, receive and give receipts for any and all money and other property due or to become due in connection with all or part of the Collateral, including any of the Accounts; (iii) to take possession of and endorse and collect any or all notes, checks, drafts, money orders, or other instruments of payment relating to

22

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

all or part of the Collateral or proceeds of the Collateral, including any of the Accounts; and (iv) to file any claim and take any other action which Lender determines to be appropriate for the purpose of collecting any or all of the Accounts and to compromise, adjust or settle Accounts for less than face value thereof, and to execute all releases and other documents in connection therewith; provided, however, that Lender shall not be obligated in any manner to make any demand for or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any action to collect or enforce the payment of any or all of the Accounts; (c) should Lender seek to take possession of any or all of the Collateral by court process, Trustor irrevocably and unconditionally agrees that a receiver may be appointed by a court for such purpose without regard to the adequacy of the security for the Obligations; and (d) Trustor irrevocably appoints Lender, with full power of substitution, as Trustor's attorney-in-fact, coupled with an interest, with full power, in its own name or in the name of Trustor to take any or all of the actions described Section 6.4(b) after the occurrence of an Event of Default. Lender, at its option, and whether or not an Event of Default exists, shall at all times have the right [A] to take such actions as Lender determines to be necessary or appropriate to maintain, preserve and protect the Collateral and Lender's security interest therein; and [B] to give notice to any Account debtor containing such information and instructions concerning the existence of Lender's security interest and rights in the Collateral under this Deed of Trust as Lender determines to be necessary or appropriate to protect its interest.

**6.5**   **Fixture Filing**. The Collateral in which Lender has a security interest under this Section 6 includes goods which are or may become Fixtures on Property. This Deed of Trust constitutes a financing statement filed as a fixture filing under California Commercial Code §9502(c), as amended or recodified from time to time, covering any portion of the Property that now is or later may become a fixture attached to the Property or to any Improvement.

## ARTICLE 7

## MISCELLANEOUS

**7.1**   **Lender Statement; Certain Charges**. With respect to (a) any statement, accounting, or similar information requested by Trustor or any other Person; or (b) any other document furnished to Trustor or any other Person by Lender at Trustor's request, Lender shall have the right to charge the maximum amount then permitted by law or, if there is no such maximum, Lender's customary charge for providing such statement, accounting, or other information. Trustor shall pay Lender its customary charge for any other service rendered by Lender in connection with the Loan or the Property, including the issuance of a request for full or partial reconveyance of this Deed of Trust, transmitting Loan proceeds to an escrow holder and changing Lender's records relating to the Obligations.

**7.2**   **Reconveyance**. Upon (a) Lender's written request stating that all Obligations secured by this Deed of Trust have been paid or performed in full; (b) surrender to Trustee of this Deed of Trust, the Guaranty and all other documents evidencing the indebtedness secured by this Deed of Trust; and (c) payment of Trustee's fees and expenses of this trust, Trustee shall reconvey the Property then held under this Deed of Trust without warranty of any kind. The recitals in the reconveyance of any matters or facts shall be conclusive proof of their truthfulness. The grantee in such reconveyance may be described as the "person or persons legally entitled thereto". Such reconveyance shall operate as a reassignment of the Rents and Profits assigned to Lender under this Deed of Trust. Unless Trustee is directed by Lender to retain such documents for a longer period of time, Trustee may destroy this Deed of Trust and the Guaranty five (5) years after issuance of the full reconveyance; provided, however, that Trustee, in its sole discretion, may deliver this Deed of Trust and the Guaranty after full reconveyance to the Person or Persons legally entitled thereto.

**7.3**   **Substitution of Trustee**. Lender, at its option, shall have the right from time to time to appoint a successor trustee to any trustee appointed under this Deed of Trust by Lender's execution and acknowledgment of a written instrument which is recorded in the office of the recorder of each county in which the Property is located. The recordation of such an instrument in accordance with this Section shall constitute conclusive proof of the proper substitution of a successor trustee under this Deed of Trust. Upon recordation of such an instrument, the successor trustee shall succeed to all the title, power and duties granted to the Trustee under this Deed of Trust and by

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.



applicable law without conveyance of the Property. Such instrument shall contain the name of the original Lender, Trustee and Trustor named in this Deed of Trust, the book and page or other recording information for this Deed of Trust, and the name and address of the successor trustee. If a notice of default has been recorded prior to the recordation of a substitution of trustee, the power of substitution shall not be exercised by Lender until the costs, fees and expenses of the acting trustee have been paid in full and the acting trustee has endorsed acknowledgment of receipt of such amounts on the instrument substituting the successor trustee. Without limiting the terms of this Section, Lender shall have the right from time to time to substitute a successor to any trustee appointed under this Deed of Trust in accordance with any statutory or other procedure allowed by law for such substitution.

7.4     **Execution of Instruments by Lender and Trustee**. Without notice to or affecting the liability of Trustor or any other Person for the payment or performance of the Obligations, without affecting the lien or priority of this Deed of Trust or Lender's rights and remedies under the Guaranty and this Deed of Trust, and without liability to Trustor or any other Person, Lender and Trustee (if Trustee is so requested in writing by Lender) shall have the right, at any time and from time to time, to do any one or more of the following: (a) reconvey any part of the Property; (b) consent in writing to the making of any map or plat relating to the Property; (c) join in or consent to the granting of any Easement affecting the Property; and (d) execute any extension agreement relating to any or all of the Obligations, any document subordinating the lien of this Deed of Trust to any other Lien or document, or any other document relating to the Property, Obligations, or Loan Documents.

7.5     **Trust Irrevocable; Acceptance by Trustee**. The trust created by this Deed of Trust is irrevocable by Trustor. Trustee accepts this trust when this Deed of Trust, duly executed and acknowledged, is recorded in the county in which the Property is located as provided by law. Trustee is not obligated to notify any party of a pending sale under any other deed of trust or of any action or proceeding in which Trustor, Lender or the Trustee shall be a party unless brought by the Trustee.

7.6     **Late Charges**. If any payment under the Guaranty is not paid when due, Trustor shall pay a late charge in an amount equal to that provided for in the Note.

7.7     **Requests by Trustor for Approvals by Lender**. All requests by Trustor for Lender's consent to or approval of any transaction or matter requiring Lender's consent or approval under the Guaranty and this Deed of Trust (a) shall be made by Trustor in writing (inclusive of electronic delivery); (b) shall specifically describe the transaction or matter with respect to which Lender's consent or approval is requested; (c) shall be accompanied by such information and documentation as Lender may require in connection with such request; and (d) shall be delivered to Lender not less than fifteen (15) days before Trustor proposes to take the action or effect the transaction with respect to which Lender's consent or approval is requested.

7.8     **Approvals by Lender**. Whenever (a) the terms of the Guaranty, this Deed of Trust and the other Loan Documents grant Lender the right to consent to or approve any transaction or matter; (b) Lender is authorized or empowered under the of the Guaranty, this Deed of Trust and the other Loan Documents to make a determination with respect to any transaction or matter; or (c) the Guaranty, this Deed of Trust and the other Loan Documents provide that any document or other item must be approved by or acceptable to Lender, then except as otherwise expressly provided in the Guaranty, this Deed of Trust and the other Loan Documents, (i) Lender shall have the right to grant or withhold such approval or consent and make such determination in its sole and absolute discretion; and (ii) the form and substance of such document or other item must be satisfactory to Lender in its sole and absolute discretion. Whenever the terms of the Guaranty, this Deed of Trust and the other Loan Documents require Lender's consent to or approval of any transaction, matter, or document, such consent or approval shall not be deemed to be effective unless it is set forth in a written instrument executed by Lender.

7.9     **Transfers by Trustor Without Lender's Consent; No Release of Trustor**. The following provisions shall apply if Trustor sells the Property to a third Person either (i) without Lender's consent; or (ii) with Lender's consent in a transaction in which Trustor is not released from liability under the Loan Documents:

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

*27*

(a) **No Release of Trustor**. No such action by Trustor nor any assumption of any or all of the Obligations by any transferee of the Property ("Transferee") shall be deemed to release Trustor or any other Person, including Guarantor, from any liability under the terms of the Guaranty and this Deed of Trust, and Trustor and such Persons shall remain liable to Lender for the payment and performance of all of their respective obligations under the Guaranty and this Deed of Trust.

(b) **Actions Without Trustor's Consent**. Trustor agrees that Lender may do any one or all of the following without notice to or the consent of Trustor and without affecting Lender's rights or remedies against Trustor: (i) accelerate, accept partial payment of, compromise, settle, renew, extend the time for payment or performance of, or refuse to enforce any of Trustor's Obligations to Lender under or in connection with the Guaranty or this Deed of Trust; (ii) grant any indulgence or forbearance to the Transferee or any other Person under or in connection with the Guaranty, this Deed of Trust and any or all of the other Loan Documents; (iii) release, waive, substitute or add any or all collateral securing payment of any or all of the Obligations; (iv) release, substitute or add any one or more endorsers or guarantors of any or all of the Obligations; (v) amend, supplement, alter or change in any respect whatsoever any term or provision of the Guaranty, this Deed of Trust and any or all of the other Loan Documents or any other agreement relating to the Obligations; and (vi) exercise any right or remedy with respect to the Obligations or any collateral securing the Obligations, notwithstanding any effect on or impairment of Trustor's subrogation, reimbursement or other rights against the Transferee.

(c) **Waivers**. Trustor waives all rights which it may have (i) to require Lender to exhaust its rights and remedies against the Transferee, any other Person, or any collateral securing any or all of the Obligations before pursuing its rights and remedies against Trustor; (ii) to require Lender to exercise any right or power or to pursue any remedy which Lender may have under the Guaranty, this Deed of Trust and any or all of the other Loan Documents or applicable law before pursuing its rights and remedies against Trustor; and (iii) to assert any defense to Lender's enforcement of its rights and remedies against Trustor based on an election of remedies by Lender or the manner in which Lender exercises any remedy which destroys, diminishes or interferes with any or all of Trustor's subrogation, reimbursement or other rights against the Transferee.

7.10    **Defense of Actions and Protection of Security by Lender**. Whether or not an Event of Default has occurred, Lender and Trustee shall each have the right, but not the obligation, to appear in and defend any action or proceeding, whether commenced by or against Trustor, or any other Person, which affects or which Lender or Trustee determines may affect any or all of the following: (a) the Property; (b) the Insurance Claims, Condemnation Claims, or Property Claims; (c) Lender's, Trustee's, or Trustor's respective rights and obligations under the Guaranty, this Deed of Trust and any or all of the other Loan Documents; (d) the Obligations; or (e) any other transaction or matter which affects Lender by reason of its interest in the Property. Lender and Trustee shall each have the right, but not the obligation, to commence and prosecute any action or proceeding which Lender or Trustee determines to be necessary or appropriate to do any or all of the following: (i) prevent any damage, destruction, or injury to the Property; (ii) enforce or recover upon the Insurance Claims, Condemnation Claims, or Property Claims or collect the Insurance Proceeds, Condemnation Proceeds, or Property Proceeds pursuant to this Deed of Trust; (iii) preserve, protect, maintain, and defend the Property and Lender's lien thereon; or (iv) enforce or exercise any right, remedy or power available to or conferred on Lender or Trustee under the Guaranty, this Deed of Trust and any or all of the other Loan Documents or applicable law. Lender and Trustee shall each have the right to discontinue, suspend or dismiss any such action or proceeding which has been commenced by Lender or Trustee at any time.

7.11    **Expenses**. Lender shall have the right to incur and pay all costs, fees, expenses, and liabilities that Lender determines to be necessary or appropriate in connection with any or all of the following matters (the "**Reimbursable Costs**"): (a) the exercise of any or all of Lender's rights and remedies under the Guaranty, this Deed of Trust and any or all of the other Loan Documents, (b) the enforcement of any or all of the Obligations or any other obligation of any Person liable to Lender in connection with the Loan, whether or not any legal action or proceeding is commenced by Lender; (c) the preservation, protection, maintenance, or defense of the Property or Lender's lien thereon; (d) the sale or disposition of the Property or any other collateral securing any or all of the Obligations; (e) the defense of any action or proceeding commenced by Trustor; or (f) the commencement and

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

prosecution of any action or proceeding by Lender or Trustee with respect to any or all of the matters described in this Section or in Section 7.10 above, including an action for relief from any stay, injunction, or similar order or enactment arising under any federal or state bankruptcy, insolvency or similar law. Without limiting the terms of this Section, Lender shall have the right to do any or all of the following in connection with any of the matters described in this Section, and all costs, fees, expenses, and liabilities incurred or paid in connection therewith shall constitute Reimbursable Costs: (1) select, retain, and consult with attorneys, accountants, appraisers, contractors, brokers, architects, engineers and such other experts, consultants, advisors and third Persons as Lender determines to be necessary or appropriate; (2) settle, purchase, compromise or pay any or all claims, demands, and Liens; and (3) obtain any trustee's sale guaranty or other title insurance coverage relating to the Property which Lender determines to be necessary or appropriate.

7.12    **Taxes Imposed on Lender**. If, after the date of this Deed of Trust, any Governmental Requirements are enacted for the purpose of taxing any lien on the Property or changing in any way the laws for the taxation of deeds of trust or debts secured by deeds of trust, so as to impose on Lender payment of all or part of any Taxes assessed against the Property, then prior to the due date of such Taxes, Trustor shall pay all such Taxes and agree to pay such Taxes when levied or assessed against the Property or Lender.

7.13    **Payment of Advances by Trustor**. All Reimbursable Costs and all other costs, fees, expenses and liabilities incurred or paid by Lender under any other provision of the Loan Documents or under applicable law in connection with the Obligations or the Property (a) shall be payable by Trustor to Lender on Lender's demand; (b) shall constitute additional indebtedness of Trustor to Lender; (c) shall be secured by this Deed of Trust; and (d) shall bear interest from the date of expenditure at the rate of interest applicable to principal under the Note. Nothing contained in this Deed of Trust shall be deemed to obligate Lender (i) to incur any costs, fees, expenses, or liabilities; (ii) to make any appearances in or defend any action or proceeding; or (iii) to commence or prosecute any action or proceeding relating to any matter.

7.14    **No Third Party Beneficiaries**. The Loan Documents are entered into for the sole protection and benefit of Lender, Trustor and Trustee and their respective permitted successors and assigns. No other Person shall have any rights or causes of action under the Guaranty or this Deed of Trust.

7.15    **Notices**. All notices and demands by Lender to Trustor under this Deed of Trust and the Guaranty shall be in writing and shall be effective on the earliest of (a) personal delivery to Trustor; (b) electronic delivery to Trustor addressed to Trustor at the e-mail address set forth in this Deed of Trust (c) two (2) days after deposit in first-class or certified United States mail, postage prepaid, addressed to Trustor at the address set forth in this Deed of Trust; and (d) one (1) business day after deposit with a reputable nationally recognized overnight delivery service, delivery charges prepaid, addressed to Trustor at the address set forth in this Deed of Trust; provided, however, that notwithstanding anything to the contrary contained in this Section, service of any notice of default or notice of sale provided or required by law shall, if mailed, be deemed effective on the date of mailing. All notices and demands by Trustor to Lender under this Deed of Trust shall be in writing and shall be effective on actual receipt by Lender at Lender's address set forth in this Deed of Trust; provided, however, that nonreceipt of any such notice or demand by Lender as a result of Trustor's refusal to accept delivery or Trustor's failure to notify Lender of Trustor's change of address shall be deemed receipt by Trustor. Trustor's and Lender's respective addresses set forth in this Deed of Trust may be changed by written notice given to the other party in accordance with this Section. If Trustor consists of more than one Person, service of any notice or demand on any one of such Persons by Lender shall be effective service on Trustor for all purposes.

7.16    **Performance of Covenants**. Trustor shall perform and comply with all of its obligations under this Deed of Trust at Trustor's sole cost and expense.

7.17    **Severability; Savings Clause**. If any provision of the Loan Documents shall be held by any court of competent jurisdiction to be unlawful, voidable, void, or unenforceable for any reason, such provision shall be deemed to be severable from and shall in no way affect the validity or enforceability of the remaining provisions of the Loan Documents. Notwithstanding anything to the contrary contained in the Note or any of the other Loan

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

Documents, the interest and other amounts paid or agreed to be paid to the Lender in consideration of the Loan evidenced by the Note (such interest and other amounts are referred to collectively as "Interest") shall not exceed the maximum rate permitted under applicable usury laws. If, for any reason, the Interest exceeds the maximum rate permitted under applicable usury laws, then (a) all excess Interest amounts previously collected by the Lender shall be credited against the principal balance of the Note or, at the Lender's option, to any other principal indebtedness of Trustor to Lender arising out of the Loan evidenced by the Note; (b) if the Note and all such other indebtedness have been paid in full, such excess amounts shall be refunded by the Lender to Trustor; and (c) the provisions of the Note shall automatically be deemed to be reformed and the amount of Interest payable hereunder shall automatically be deemed to be reduced, without the execution of any further documents by Trustor or Lender, so as to provide for the payment of Interest in an amount equal to, but not exceeding, the maximum rate permitted under applicable usury laws. All consideration paid to Lender which constitutes Interest under applicable usury laws shall be amortized, prorated, allocated, or otherwise apportioned throughout the term of the Note so that, to the extent possible, the rate of interest on the principal amount of the Note does not exceed the maximum rate permitted under applicable usury laws.

       **7.18**    **Interpretation**. Whenever the context of the Guaranty or this Deed of Trust reasonably requires, all words used in the singular shall be deemed to have been used in the plural, and the neuter gender shall be deemed to include the masculine and feminine gender, and vice versa. For purposes of this Deed of Trust, all references to the Property or Improvements shall be deemed to refer to all or any part of the Property or Improvements, respectively. The headings to sections of this Deed of Trust are for convenient reference only, and they do not in any way define or limit any of the terms of this Deed of Trust and shall not be used in interpreting this Deed of Trust.

       **7.19**    **Time of the Essence**. Time is of the essence in the performance of each provision of the Loan Documents by Trustor.

       **7.20**    **Amendments**. The Guaranty and this Deed of Trust may be modified only by written agreement signed by Lender and Trustor.

       **7.21**    **Entire Agreement**. The Guaranty and this Deed of Trust contain the entire agreement concerning the subject matter therein and supersede all prior and contemporaneous negotiations, agreements, statements, understandings, terms, conditions, representations and warranties, whether oral or written, between Lender and Trustor concerning the Loan which are the subject matter of the Guaranty and this Deed of Trust.

       **7.22**    **No Waiver by Lender**. No waiver by Lender of any of its rights or remedies in connection with the Obligations or of any of the terms or conditions of the Loan Documents shall be effective unless such waiver is in writing and signed by Lender. Without limiting the generality of this Section, (a) no delay or omission by Lender in exercising any of its rights or remedies in connection with the Obligations shall constitute or be construed as a waiver of such rights or remedies; (b) no waiver by Lender of any default by Trustor under the Guaranty and this Deed of Trust or consent by Lender to any act or omission by Trustor shall constitute or be construed as a waiver of or consent to any other or subsequent default, act or omission by Trustor; (c) no acceptance by Lender of any late payment or late or defective performance of any of the Obligations by Trustor shall constitute a waiver by Lender of the right to require prompt payment and performance strictly in accordance with the Guaranty and this Deed of Trust with respect to any other payment or performance of any of the Obligations; (d) no acceptance by Lender of any payment or performance following any notice of default which has been given or recorded by Lender shall constitute a waiver of Lender's right to proceed with the exercise of its remedies with respect to any Obligations which have not been paid or performed in full; (e) no acceptance by Lender of any partial payment or performance shall constitute a waiver by Lender of any of its rights or remedies relating to any Obligations which have not been paid or performed in full; and (f) no application of Rents and Profits, Insurance Proceeds, Condemnation Proceeds or Property Proceeds to any of the Obligations shall constitute or be construed as a waiver by Lender or cure of any Event of Default or impair, prejudice, invalidate or otherwise affect any action by Lender or Trustee in response to such default.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

**7.23** **Waivers by Trustor**. Trustor waives presentment, demand for payment, protest, notice of demand, dishonor, protest and non-payment, and all other notices and demands in connection with the delivery, acceptance, performance, default under, and enforcement of the Guaranty, this Deed of Trust and any other Loan Documents. Trustor waives the right to assert any statute of limitations as a defense to the enforcement of any or all of the Loan Documents to the fullest extent permitted by law. Without limiting the generality of the immediately preceding sentence, in the event of Trustor's payment in partial satisfaction of any or all of the Obligations, Lender shall have the sole and exclusive right and authority to designate the portion of the Obligations that is to be satisfied.

**7.24** **Waiver of Marshalling**. Trustor and all Persons holding a Lien affecting the Property who have actual or constructive notice of this Deed of Trust waive (a) all rights to require marshalling of assets or liens in the event of Lender's exercise of any of its rights and remedies under this Deed of Trust, including any judicial or nonjudicial foreclosure sale of the Property; (b) all rights to require Lender to exhaust its rights and remedies against any other collateral securing any or all of the Obligations before pursuing its rights and remedies under this Deed of Trust; and (c) all rights to require Lender to exercise any other right or power or to pursue any other remedy which Lender may have under any document or applicable law before pursuing its rights and remedies under this Deed of Trust.

**7.25** **Waiver of Subrogation**. Trustor waives all rights to recover against Lender for any loss or damage incurred by Trustor from any cause which is insured under any of the Insurance Policies, except that the foregoing waiver of subrogation shall not be effective with respect to any Insurance Policy if the coverage under such policy would be materially reduced or impaired as a result of such waiver. Trustor shall use its best efforts to obtain Insurance Policies which permit the waiver of subrogation contained in this Section.

**7.26** **Cumulative Remedies**. No right or remedy of Lender or Trustee under this Deed of Trust or the Guaranty shall be exclusive of any other right or remedy under the other Loan Documents or to which Lender or Trustee may be entitled. Lender's rights and remedies under the Guaranty, this Deed of Trust and the other Loan Documents are cumulative and in addition to all other rights and remedies which Lender may have under any other document with Trustor and under applicable law. Lender shall have the right to exercise any one or more of its rights and remedies in connection with the Obligations at Lender's option and in its sole and absolute discretion, without notice to Trustor or any other Person (except as otherwise expressly required by law or under the Guaranty, this Deed of Trust or the other Loan Documents), and in such order as Lender may determine in its sole and absolute discretion. If Lender holds any collateral in addition to the Property for any of the Obligations, Lender, at its option, shall have the right to pursue its rights or remedies with respect to such other collateral either before, contemporaneously with, or after Lender's exercise of its rights or remedies with respect to the Property. Upon the occurrence of an Event of Default, Lender, at its option, shall have the right to offset against any debt or monies due from Lender to Trustor against all or part of the Obligations.

**7.27** **Subrogation to Lien Rights**. If Lender pays or discharges any Lien pursuant to any of the terms of the Guaranty, this Deed of Trust or under applicable law, Lender shall be subrogated to all rights and liens held by the holder of such Lien, regardless of whether such Lien is reconveyed.

**7.28** **Joint and Several Liability**. Each Person signing this Deed of Trust as Trustor shall be jointly and severally liable to Lender for the performance of Trustor's obligations under the Guaranty and this Deed of Trust. If Trustor consists of more than one Person, the occurrence of any Event of Default with respect to any one or more of such Persons shall constitute an Event of Default and entitle Lender to exercise its rights and remedies under Article 4 of this Deed of Trust.

**7.29** **Sale of Loan Documents**. Lender shall have the right to do any or all of the following at any time without prior notice to or the consent of Trustor or any other Person: (a) to sell, transfer, pledge or assign any or all of Loan Documents, or any or all servicing rights with respect thereto; (b) to sell, transfer, pledge or assign participations in the Loan Documents ("**Participations**"); and (c) to issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "**Securities**"). Lender is authorized to forward or disclose to each purchaser, transferee, pledgee, assignee, servicer,

28

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

participant, or investor in such Participations or Securities (collectively, the "**Investor**") or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Loan and to Trustor or any Guarantor as Lender determines to be necessary or desirable. Upon Lender's request, Trustor shall reasonably cooperate with Lender in connection with any of the transactions contemplated by this Section.

7.30  **Applicable Law; Jurisdiction; Venue**. The Guaranty and this Deed of Trust shall be governed by and construed in accordance with the laws of the state in which the Property is located without giving effect to the conflicts of laws principles thereof. Trustor agrees that the courts of the State of California and Federal District Courts located in Los Angeles County, California, shall have exclusive jurisdiction and venue of any action or proceeding directly or indirectly arising out of or related to the negotiation, execution, delivery, performance, breach, enforcement or interpretation of this Deed of Trust and all of the other Loan Documents or any of the transactions contemplated by or related to any or all of the Loan Documents (except for foreclosure proceedings, which shall proceed in the state in which the Property is located and according to the laws of that state), regardless of whether or not any claim, counterclaim or defense in any such action or proceeding is characterized as arising out of fraud, negligence, intentional misconduct, breach of contract or fiduciary duty, or violation of any Governmental Requirements. Trustor irrevocably consents to the personal jurisdiction of such courts, to such venue, and to the service of process in the manner provided for the giving of notices in this Deed of Trust. Trustor waives all objections to such jurisdiction and venue, including all objections that are based upon inconvenience or the nature of the forum.

7.31  **Successors**. Subject to the restrictions contained in the Guaranty and this Deed of Trust shall be binding upon and inure to the benefit of Lender and Trustor and their respective permitted successors and assigns.

7.32  **Power of Attorney**. Trustor irrevocably appoints Lender, with full power of substitution, as Trustor's attorney-in-fact, coupled with an interest, with full power, in Lender's own name or in the name of Trustor to take any or all of the actions specified in Article 4 above with respect to the Property. Lender shall have the right to exercise the power of attorney granted in this Section directly or to delegate all or part of such power to one or more agents of Lender. Nothing contained in this Deed of Trust shall be construed to obligate Lender to act on behalf of Trustor as attorney-in-fact.

7.33  **Indemnification**. Trustor shall indemnify and hold Lender and its officers, directors, agents, employees, representatives, shareholders, affiliates, successors and assigns (collectively, the "Indemnified Parties") harmless from and against any and all claims, demands, damages, liabilities, actions, causes of action, suits, costs, and expenses, including attorneys' fees and costs, arising directly or indirectly out of or relating to any or all of the following: (a) Trustor's breach of any of its Obligations or warranties under the Guaranty and this Deed of Trust; (b) any act or omission by Trustor; (c) any act or omission by a contractor, architect or any other Person providing labor, services, materials or equipment in connection with the design, construction, improvement, development, use, ownership, operation, maintenance, repair or marketing of the Property; (d) Trustor's use and occupancy of the Property or any other activity or thing allowed or suffered by Trustor to be done on or about the Property; (e) any claims for commissions, finder's fees or brokerage fees arising out of the Loan or the transactions contemplated by the Loan Documents; and (f) Lender's exercise of any or all of Lender's rights or remedies under the Loan Documents in accordance with the terms thereof, except in the case of negligence or intentional tortious conduct of such Indemnified Party which such Indemnified Party is determined by the final judgment of a court of competent jurisdiction to have committed.

**[SIGNATURE PAGE FOLLOWS]**

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

*32*

IN WITNESS WHEREOF, Trustor has caused this Deed of Trust to be executed as of the day and year first written above.

**TRUSTOR:**

**Temerity Trust Management, LLC**, a Delaware limited liability company

By: _William K. Sadleir_

Name:   William Sadleir
Title:   Sole Manager

**NOTE: ALL SIGNATURES ON THIS DEED OF TRUST MUST BE NOTARIZED**

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

33

## DEED OF TRUST, ASSIGNMENT OF RENTS, FIXTURE FILING, SECURITY AGREEMENT AND ENVIRONMENTAL INDEMNITY

### EXHIBIT A

### LEGAL DESCRIPTION OF PROPERTY

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 7 OF TRACT NO. 11261, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 221 PAGES 34 THROUGH 43 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL MINERALS AND OIL RIGHTS UNDERLYING OR APPURTENANT TO SAID LAND, AS RESERVED IN THE DEED FROM H.C. FRYMAN TO WILMER L. HEATER AND MARTHA ANN HEATER, RECORDED IN BOOK 14290 PAGE 349, OFFICIAL RECORDS.

**APN:** 4388-020-009

**Property commonly known as:** 9135 Hazen Drive, Los Angeles, California  90210

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

34

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**
**County of** _LOS ANGELES_ } SS.

On _OCTOBER 8_, 2018, before me, _MICHAEL PARK_, a Notary Public, personally appeared _WILLIAM SADLER_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____                                      (Seal)
[Notary Signature]

```
MICHAEL PARK
Notary Public - California
Los Angeles County
Commission # 2252861
My Comm. Expires Aug 5, 2022
```

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

RECORDER MEMO: This COPY has not been QUALITY ASSURED.

# KUFRIN DECLARATION

# EXHIBIT "D"

CAIRN CAPITAL INVESTMENT FUNDS ICAV
c/o Cairn Capital Limited
27 Knightsbridge
London SW1X 7LY

February 14, 2019

**BY EMAIL AND OVERNIGHT DELIVERY**

Aviron 1703, LLC
c/o Aviron Finance, LLC
9100 Wilshire Blvd. Suite 800E
Beverly Hills, CA  90212
Attention:  William Sadleir
Email: wsadleir@aviron.com

Re:      **NOTICE OF DEFAULTS AND RESERVATION OF RIGHTS**

Mr. Sadleir:

Reference is hereby made to that certain Credit, Security, Guaranty and Pledge Agreement dated as of October 1, 2018 (the "*Credit Agreement*"), among Aviron 1703, LLC (the "*Borrower*"), the other credit parties referred to therein, and Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund (the "*Lender*").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement.

We continue to be concerned that, despite numerous attempts by us and our counsel, you continue to be unable, or unwilling, to supply the necessary and reasonable information that has been requested, several of which requests date back to over a month ago or longer.  The non-exhaustive list of things you continue to fail to provide us with includes:

1.  A fully executed copy of each Exhibitor Agreement, together with any amendments, restatements, modifications, supplements, renewals, replacements, and waivers related thereto;[1]

2.  All invoices (including, without limitation, those in connection with media placement) or any other statements or documentation or communications of any kind (including, without limitation, pre-payment requests) delivered by MediaStorm to the Borrower or any its affiliates in connection with services

---

[1]      As you have noted in correspondence, there exists a "form of" Exhibitor Agreement, a copy of which we have seen.  We have, on several occasions, requested the fully executed versions of such agreements.  To date, no such agreements have been supplied.

rendered for the Borrower or any of its affiliates, in each case, related specifically to the Film;[2]

3. Any instruction of the Borrower or any of its affiliates delivered to MediaStorm on the intended uses or applications of monies disbursed by the Borrower to MediaStorm;

4. A detailed accounting of all of MediaStorm's media purchase and commissions, fees, costs and expenses incurred in connection with its services and deliverables, in each case, related specifically to the Film; and

5. Detailed account statements showing disbursements from the deposit account of the Borrower at JPMorgan Chase Bank, N.A. (bank account no. ending -6559) from November 7, 2018 to the date of this letter.

The failure to provide this information constitutes Defaults under Section 13.1(d) of the Credit Agreement as a result of your failure to comply with one or more covenants under Sections 5.3 (and paragraph 3 of Schedule 5.3), 9.2(e) and 9.2(f) of the Credit Agreement (the "*Covenant Defaults*").

Moreover, based upon statements from you and your counsel, we have reason to believe that you have, effectively, made or permitted to be made substantial changes, modifications or revisions to the P & A Budget without the express written authorization of the Lender, which constitutes a Default under Section 6.2(b) of the Credit Agreement (together with the Covenant Defaults, the "*Defaults*").

Upon the passage of 10 Business Days from the date hereof,[3] such Defaults shall constitute Events of Default under the Credit Agreement and, as applicable, the other Fundamental Documents.

Also, we have become concerned with the veracity of the NRG reports you delivered in connection with a condition precedent to a Lender Advance that was funded by us, upon reliance on the NRG reports and a purported satisfaction of the applicable Tracking Standard, such deliveries occurring on or about each of January 3, January 7, and January 8, in each case, in 2019. As you know, the simple arithmetic average of the applicable three (3) distinct observations of NRG's "Total Awareness" rating metric in the purported NRG reports you delivered evidence an amount of such tracking metric equaling 49.7. After directly receiving from NRG its actual report for the same period, however, the amount of this tracking metric appears to have been materially less. We continue to investigate this discrepancy and reserve all rights, including as they may exist against you personally, in connection with this matter.

---

[2]    Pursuant to the Master Services Agreement, MediaStorm agreed to provide invoices and reconciliations. Such undertakings are contrary to your prior assertions that it would be burdensome to expect that such information be supplied.

[3]    Given that your failure to spend in accordance with the P&A Budget is not susceptible to cure, and since you had knowledge of such breach for more than 10 Business Days, we reserve the right to assert that such Default presently constitutes an Event of Default and do not concede that any further grace period applies.

Be advised that we intend to commence exercising our remedies in accordance with our rights under the Fundamental Documents and applicable law.  The Lender hereby expressly reserves any and all of the rights, powers, privileges and remedies available to it under the Credit Agreement and the other Fundamental Documents and applicable law that have arisen, or may arise, as a result of the Defaults or any Events of Default that have, or may, occur.

In no event and under no circumstance shall this letter, any past or future discussions with the Lender and/or its representatives, or any delay or purported forbearance from exercising any of its rights or remedies under the Fundamental Documents: (i) cause a modification of the Fundamental Documents; (ii) establish a custom with respect to any of the Fundamental Documents; (iii) operate as a waiver of or admission regarding any existing or future Default or Event of Default, including the Defaults or any other Defaults or Events of Default that may exist but are not identified herein; (iv) entitle the Borrower or any other Person to any other or further notice or demand whatsoever; (v) in any way modify, change, impair, affect, diminish or release any of the Borrower's or any other Person's obligations or liabilities under or pursuant to the Fundamental Documents or any other liability the Borrower or any other Person may have to the Lender; or (vi) waive, limit, impair or condition the Lender's rights, powers, privileges and remedies under the Fundamental Documents or applicable law, all of which rights, powers, privileges and remedies are expressly reserved.  This letter shall in no way be deemed to obligate the Lender to give you or anyone else any notices of any kind in connection with the Fundamental Documents or otherwise.

*[Signature page follows.]*

Very truly yours,

CAIRN CAPITAL INVESTMENT FUNDS ICAV,
for its sub-fund Cairn Capstone Special Opportunities
Fund, by Cairn Capital Limited, as investment manager

By: _____

Name:     JAMES STARKY
Title:    CHIEF LEGAL OFFICER

cc:    Paul Hastings LLP (Mickey Mayerson and Nigel Pearson)
       Willkie Farr & Gallagher LLP (Leonard Klingbaum and Jeff Korn)

- 4 -

# KUFRIN DECLARATION

# EXHIBIT "E"

CAIRN CAPITAL INVESTMENT FUNDS ICAV
c/o Cairn Capital Limited
27 Knightsbridge
London SW1X 7LY

April 2, 2019

**BY EMAIL**

Aviron 1703, LLC
c/o Aviron Finance, LLC
9100 Wilshire Blvd. Suite 800E
Beverly Hills, CA 90212
Attention: William Sadleir
Email: wsadleir@aviron.com

Re:   **ACCELERATION AND DEMAND NOTICE**

Mr. Sadleir:

Reference is made to (i) that certain Credit, Security, Guaranty and Pledge Agreement dated as of October 1, 2018 (the "*Credit Agreement*"), among Aviron 1703, LLC (the "*Borrower*"), the other credit parties referred to therein, and Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund (the "*Lender*"), and (ii) that certain Notice of Defaults and Reservation of Rights delivered on February 14, 2019 (the "*Default Notice*"), from Lender to Borrower. Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement. A copy of the Default Notice is attached hereto as Exhibit A and incorporated herein by reference.

As a result of the Borrower's failure to cure the existing Covenant Defaults (as defined in the Default Notice), among other Events of Default, within any applicable grace period, THE LENDER HEREBY NOTIFIES THE BORROWER THAT, PURSUANT TO SECTION 13.2 OF THE CREDIT AGREEMENT, AS A RESULT OF THE OCCURRENCE AND CONTINUATION OF EVENTS OF DEFAULT, THE LENDER HEREBY DECLARES ALL OUTSTANDING LOAN OBLIGATIONS, INCLUDING, BUT NOT LIMITED TO, ALL OUTSTANDING PRINCIPAL, TOGETHER WITH ALL ACCRUED INTEREST THEREON AND ALL CHARGES, EXPENSES, FEES, OUTSIDE ATTORNEYS' FEES, FILING FEES AND OTHER OBLIGATIONS OF THE CREDIT PARTIES ACCRUED UNDER THE CREDIT AGREEMENT OR UNDER THE OTHER FUNDAMENTAL DOCUMENTS, TO BE DUE AND PAYABLE IMMEDIATELY IN WHOLE, INCLUDING WITHOUT LIMITATION ALL OBLIGATIONS EVIDENCED BY THE FUNDAMENTAL DOCUMENTS OR EVIDENCED OR SECURED BY THE SECURITY DOCUMENTS (ALL SUCH INDEBTEDNESS AND OBLIGATIONS BEING HEREIN COLLECTIVELY CALLED THE "*OUTSTANDING INDEBTEDNESS*"), AND THE LENDER HEREBY DEMANDS IMMEDIATE PAYMENT OF

ALL OUTSTANDING INDEBTEDNESS. THIS NOTICE SHALL NOT LIMIT FUTURE OBLIGATIONS OF THE CREDIT PARTIES TO ACCRUE AND/OR PAY INTEREST AFTER THE DATE OF THIS NOTICE.

The Lender expressly reserves all rights, claims, causes of action and remedies that it has, or may have, under the Credit Agreement, any other Fundamental Document or other related documents and applicable law, whether against the Credit Parties, their affiliates or any of the collateral securing payment of the Outstanding Indebtedness, or any other person or entity that is now, or which may become, liable for payment of any portion thereof. The Lender further reserves all rights, claims, causes of action and remedies that it has, or may have, against William Sadleir in connection with certain false and misleading statements made by William Sadleir the result of which was, among other things, to induce Lender to provide financial accommodations to the Borrower. All such rights, claims, causes of action and remedies are cumulative and are not exclusive of any other rights, claims, causes of action or remedies provided at law or in equity. Without limiting the generality of the foregoing, the Lender specifically reserves the right to recover all reasonable attorney's fees and legal expenses incurred in connection with liabilities arising in connection with actual or alleged breaches and/or enforcement of its rights and remedies and the recovery of the Outstanding Indebtedness.

If you have any questions regarding this notice, please contact our counsel, Leonard Klingbaum (212-728-8290) and Jeff Korn (212-728-8842) of Willkie Farr & Gallagher LLP.

Very truly yours,

CAIRN CAPITAL INVESTMENT FUNDS ICAV, for its sub-fund Cairn Capstone Special Opportunities Fund, by Cairn Capital Limited, as investment Manager

By: _____
Name: _____ JAMES STARKY
Title: _____ CHIEF LEGAL OFFICER

cc:    Paul Hastings LLP (Mickey Mayerson and Nigel Pearson)

<u>Exhibit A</u>

<u>Default Notice</u>

CAIRN CAPITAL INVESTMENT FUNDS ICAV
c/o Cairn Capital Limited
27 Knightsbridge
London SW1X 7LY

February 14, 2019

**BY EMAIL AND OVERNIGHT DELIVERY**

Aviron 1703, LLC
c/o Aviron Finance, LLC
9100 Wilshire Blvd. Suite 800E
Beverly Hills, CA 90212
Attention: William Sadleir
Email: wsadleir@aviron.com

Re:    **NOTICE OF DEFAULTS AND RESERVATION OF RIGHTS**

Mr. Sadleir:

Reference is hereby made to that certain Credit, Security, Guaranty and Pledge Agreement dated as of October 1, 2018 (the "*Credit Agreement*"), among Aviron 1703, LLC (the "*Borrower*"), the other credit parties referred to therein, and Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund (the "*Lender*"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement.

We continue to be concerned that, despite numerous attempts by us and our counsel, you continue to be unable, or unwilling, to supply the necessary and reasonable information that has been requested, several of which requests date back to over a month ago or longer. The non-exhaustive list of things you continue to fail to provide us with includes:

1. A fully executed copy of each Exhibitor Agreement, together with any amendments, restatements, modifications, supplements, renewals, replacements, and waivers related thereto;[1]

2. All invoices (including, without limitation, those in connection with media placement) or any other statements or documentation or communications of any kind (including, without limitation, pre-payment requests) delivered by MediaStorm to the Borrower or any its affiliates in connection with services

---

[1]    As you have noted in correspondence, there exists a "form of" Exhibitor Agreement, a copy of which we have seen. We have, on several occasions, requested the fully executed versions of such agreements. To date, no such agreements have been supplied.

rendered for the Borrower or any of its affiliates, in each case, related specifically to the Film;[2]

3. Any instruction of the Borrower or any of its affiliates delivered to MediaStorm on the intended uses or applications of monies disbursed by the Borrower to MediaStorm;

4. A detailed accounting of all of MediaStorm's media purchase and commissions, fees, costs and expenses incurred in connection with its services and deliverables, in each case, related specifically to the Film; and

5. Detailed account statements showing disbursements from the deposit account of the Borrower at JPMorgan Chase Bank, N.A. (bank account no. ending -6559) from November 7, 2018 to the date of this letter.

The failure to provide this information constitutes Defaults under Section 13.1(d) of the Credit Agreement as a result of your failure to comply with one or more covenants under Sections 5.3 (and paragraph 3 of Schedule 5.3), 9.2(e) and 9.2(f) of the Credit Agreement (the "*Covenant Defaults*").

Moreover, based upon statements from you and your counsel, we have reason to believe that you have, effectively, made or permitted to be made substantial changes, modifications or revisions to the P & A Budget without the express written authorization of the Lender, which constitutes a Default under Section 6.2(b) of the Credit Agreement (together with the Covenant Defaults, the "*Defaults*").

Upon the passage of 10 Business Days from the date hereof,[3] such Defaults shall constitute Events of Default under the Credit Agreement and, as applicable, the other Fundamental Documents.

Also, we have become concerned with the veracity of the NRG reports you delivered in connection with a condition precedent to a Lender Advance that was funded by us, upon reliance on the NRG reports and a purported satisfaction of the applicable Tracking Standard, such deliveries occurring on or about each of January 3, January 7, and January 8, in each case, in 2019. As you know, the simple arithmetic average of the applicable three (3) distinct observations of NRG's "Total Awareness" rating metric in the purported NRG reports you delivered evidence an amount of such tracking metric equaling 49.7. After directly receiving from NRG its actual report for the same period, however, the amount of this tracking metric appears to have been materially less. We continue to investigate this discrepancy and reserve all rights, including as they may exist against you personally, in connection with this matter.

---

[2]     Pursuant to the Master Services Agreement, MediaStorm agreed to provide invoices and reconciliations. Such undertakings are contrary to your prior assertions that it would be burdensome to expect that such information be supplied.

[3]     Given that your failure to spend in accordance with the P&A Budget is not susceptible to cure, and since you had knowledge of such breach for more than 10 Business Days, we reserve the right to assert that such Default presently constitutes an Event of Default and do not concede that any further grace period applies.

Be advised that we intend to commence exercising our remedies in accordance with our rights under the Fundamental Documents and applicable law. The Lender hereby expressly reserves any and all of the rights, powers, privileges and remedies available to it under the Credit Agreement and the other Fundamental Documents and applicable law that have arisen, or may arise, as a result of the Defaults or any Events of Default that have, or may, occur.

In no event and under no circumstance shall this letter, any past or future discussions with the Lender and/or its representatives, or any delay or purported forbearance from exercising any of its rights or remedies under the Fundamental Documents: (i) cause a modification of the Fundamental Documents; (ii) establish a custom with respect to any of the Fundamental Documents; (iii) operate as a waiver of or admission regarding any existing or future Default or Event of Default, including the Defaults or any other Defaults or Events of Default that may exist but are not identified herein; (iv) entitle the Borrower or any other Person to any other or further notice or demand whatsoever; (v) in any way modify, change, impair, affect, diminish or release any of the Borrower's or any other Person's obligations or liabilities under or pursuant to the Fundamental Documents or any other liability the Borrower or any other Person may have to the Lender; or (vi) waive, limit, impair or condition the Lender's rights, powers, privileges and remedies under the Fundamental Documents or applicable law, all of which rights, powers, privileges and remedies are expressly reserved. This letter shall in no way be deemed to obligate the Lender to give you or anyone else any notices of any kind in connection with the Fundamental Documents or otherwise.

*[Signature page follows.]*

Very truly yours,

CAIRN CAPITAL INVESTMENT FUNDS ICAV,
for its sub-fund Cairn Capstone Special Opportunities
Fund, by Cairn Capital Limited, as investment manager

By: _____
    Name:        JAMES STARKY
    Title:       CHIEF LEGAL OFFICER

cc:    Paul Hastings LLP (Mickey Mayerson and Nigel Pearson)
       Willkie Farr & Gallagher LLP (Leonard Klingbaum and Jeff Korn)

# KUFRIN DECLARATION

# EXHIBIT "F"

**Naznen Rahman**

| | |
|---|---|
| **From:** | William Sadleir <wsadleir@aviron.com> |
| **Sent:** | Friday, April 26, 2019 2:52 PM |
| **To:** | Brandon Kufrin |
| **Cc:** | Chris Cottrell; Klingbaum, Leonard; Korn, Jeffrey |
| **Subject:** | Serenity - Theatrical Receipts Reconcilliations |
| **Attachments:** | Film Rental Deductions [1].xlsx |

Brandon:

Aviron has consistently demonstrated throughout the theatrical receipts collection process, complete transparent with Cairn—providing all reports and giving you unrestricted viewing access to the respective bank accounts.

I was puzzled by the differential in the box office sales and the ultimate collections to our account from several of the major theater chains. Typically, the major chains like Regal, AMC, and Cinemark wait until about 60-days from the initial release date before paying. But, when they do pay, it's usually in one lump sum. That has not been the case so far with *Serenity*, which to me was unusual.

So, I was just informed by our head of collections in our distribution group that she had authorized several of the exhibitors to simply deduct from their respective payments, amounts that Aviron owed on trailer placement, special screenings, and exhibitor convention fees. This, apparently, is standard industry practice since most studio distributors don't have different lenders associated with different pictures, as we do here in the case of Serenity. So, exhibitors net receivables against payables in settling out each picture.

Consequently, consistent with our assurance that not a penny of leakage between what has been earned in theatrical rentals and what is paid on Aviron's Cairn loan, we need to make several reconciliations, the details of which are set forth below.

| Deductions | AMC | Marcus | Harkins | Cinemark | Regal | Laemmle | TOTALS |
|---|---|---|---|---|---|---|---|
| Trailer Placement - Serenity | $ 105,295.00 | $ 20,000.00 | $ 82,500.00 | $ 45,030.00 | $ 199,500.00 | | $ 452,325.00 |
| Trailer Placement - A Private War | $ 77,925.00 | | $ 19,000.00 | $ 24,000.00 | $ 145,850.00 | $ 18,500.00 | $ 285,275.00 |
| Trailer Placement - The Strangers | | | | | $ 30,000.00 | | $ 30,000.00 |
| Trailer Placement - Destination Wedding | $ 1,780.00 | | | | | | $ 1,780.00 |
| Trailer Placement - After | | | | | $ 140,000.00 | | $ 140,000.00 |
| Special Screenings | $ 4,476.83 | | $ 1,880.00 | | $ 5,971.70 | | $ 12,328.53 |
| Trade Show & Convention Booth Charges | $ 7,500.00 | | | $ 5,000.00 | $ 5,000.00 | | $ 17,500.00 |
| TOTAL | $ 196,976.83 | $ 20,000.00 | $ 103,380.00 | $ 74,030.00 | $ 526,321.70 | $ 18,500.00 | $ 939,208.53 |

Aviron will reconcile these exhibitor deductions by paying to the Serenity collection account reimbursements from the other film-related SPVs.

- $285,275 from Aviron 1706, LLC (A Private War)
- $30,000 from Aviron 1702, LLC (The Strangers)
- $1,780 from Aviron 1705, LLC (Destination Wedding)
- $140,000 from Aviron 1801, LLC (After)
- $14,914.27 from Aviron Pictures, LLC for operation-related deductions

The $452,325 that was deducted for Serenity trailer placement is a P&A expense of Aviron 1703, LLC and will be paid as part of the Cairn loan repayment.

The Cairn loan will be repaid in full, and we will continue to accurately report all collections, reconciliations, and progress on our $105m funding effort, which we expect to close in late May or early June.

Have a pleasant weekend.

Will

**William Sadleir**
*Chairman & CEO*

9100 Wilshire Blvd, 800E
Beverly Hills, CA, 90212
310-622-9900 | **Main**
310-622-9911 | **Direct**
310-382-6969 | **Mobile**



This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

# KUFRIN DECLARATION

# EXHIBIT "G"

EXECUTION VERSION

Aviron Finance LLC
9100 Wilshire Boulevard, Suite 800E
Beverly Hills, CA 90212

May 24, 2019

Cairn Capital Investment Funds ICAV
c/o Cairn Capital Limited
27 Knightsbridge
London SW1X 7LY
United Kingdom
Attention:      James Starky

RE:    **Credit Facility**

Dear Mr. Starky:

This letter agreement (this "***Agreement***") is being provided to you in connection with that certain Credit, Security, Guaranty and Pledge Agreement and other Fundamental Documents dated as of October 1, 2018 (the "***Credit Agreement***") among Aviron 1703, LLC (the "***Borrower***"), Aviron Finance, LLC ("***Finance***"), Aviron Licensing, LLC ("***Licensing***" and together with, Finance, and the Borrower, the "***Credit Parties***"), Temerity Trust Management, LLC ("***Guarantor***") and Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund (the "***Lender***" or "***you***"), including the Deed of Trust and the Temerity Guaranty (as defined in the Deed of Trust) provided by the Guarantor.

This Agreement is, in part, in response to your counsel's e-mail of May 14, 2019 attached to which was a draft Complaint (the "***Complaint***") asserting certain claims against defendants William Sadleir, Aviron Pictures, LLC, Aviron 1706, LLC, Aviron 1702, LLC, Aviron 1705, LLC and Aviron 1801, LLC (the defendants are collectively referred to herein as the "***Defendants***" and together with the Credit Parties and Guarantor, the "***Sadleir Parties***"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto as set forth in the Credit Agreement.

Section 1.        Each of the specified parties below acknowledges and agrees as follows:

(a) On or before 5:00 p.m. Pacific time on May 30, 2019, Guarantor shall deliver to Willkie Farr & Gallagher ("***Willkie***") (i) a fully executed and acknowledged, valid, effective and notarized Deed in Lieu of Foreclosure, in form appropriate for recordation in the relevant governmental office (the "***Deed in Lieu***"), in the form attached hereto as Exhibit A, relating to the real property Collateral pledged by Guarantor pursuant to the terms of the Deed of Trust (as defined in the Temerity Guaranty), and (ii) evidence reasonably satisfactory to Lender of the due authorization by all necessary organizational action of the execution and delivery of the Deed in Lieu and the authority of the person or persons executing the Deed in Lieu on behalf of the Guarantor. Additionally, within five (5) business days after request, Guarantor shall

deliver to Willkie such additional documentation (but not including any indemnity agreement) as the title company selected by Lender (the "**Title Company**") may reasonably require (at no material cost to Borrower, the Credit Parties or Guarantor) in order to issue to Lender an owner's policy of title insurance upon the recordation of the Deed in Lieu insuring Lender's title in the real property subject to the Deed in Lieu (the "**Title Policy**"). The Deed in Lieu shall be held in escrow by Willkie and returned to the Guarantor within two (2) business days after the timely satisfaction of the obligations set forth in Section 1(c) of this Agreement. In the event that the obligations set forth in Section 1(c) of this Agreement are not satisfied when due, Willkie shall release the Deed in Lieu from escrow, and the Deed in Lieu may thereafter be used by the Lender (or any of its Affiliates) for any purpose, including but not limited to recording the Deed in Lieu at any time after the failure by the Guarantor or Credit Parties timely to comply with Section 1(c) of this Agreement.

If the Deed in Lieu is recorded pursuant to the immediately preceding paragraph, the Lender thereafter shall use commercially reasonable efforts promptly to sell the real property that is the subject of the Deed in Lieu on an arms-length (i.e., not a distressed) basis. The Lender shall instruct a reputable real estate broker to conduct such sale, which broker shall be reasonably acceptable to the Guarantor (and in the event of disagreement, the Lender and the Guarantor shall each nominate a reputable broker who shall together nominate a third broker to conduct such sale). The Guarantor agrees that each of James Harris of The Agency is a reasonable broker. If the Deed in Lieu is recorded pursuant to the immediately preceding paragraph, Lender shall take the real property that is the subject of the Deed in Lieu in its "as is/where is and with all faults" condition, except for any intentional waste.

Notwithstanding anything to the contrary in the Deed in Lieu, but subject to the last sentence of this paragraph, the Guarantor hereby agrees that the amount of the Guaranteed Obligations (as defined in the Temerity Guaranty) shall not be decreased by virtue of the Lender's recordation of the Deed in Lieu. If the net proceeds of the sale of the property subject to the Deed in Lieu (including net of the costs and expenses to effectuate such sale and enforce the rights of Lender) are less than the remaining outstanding balance of the Guaranteed Obligations, such proceeds shall be applied immediately on receipt thereof in repayment of such amount of the Guaranteed Obligations. To the extent that the net proceeds of the sale of the property subject to the Deed in Lieu (including net of the costs and expenses to effectuate such sale and enforce the rights of Lender) are in excess of the remaining outstanding balance of the Guaranteed Obligations, such excess promptly shall be paid to the Guarantor (or as the Guarantor directs in writing).

(b) On or before 5:00 p.m. Pacific time on May 28, 2019, the Sadleir Parties shall cause to be paid to Willkie $100,000 to be applied against the Lender's costs

and expenses of counsel. Such payment shall be made by wire transfer to the account identified in Exhibit B attached hereto.

(c) On or before 5:00 p.m. Pacific time on July 15, 2019, the Sadleir Parties shall cause to be paid to the Lender by wire transfer to the account identified on Exhibit C attached hereto the amount of $3,000,000 from proceeds that do not constitute Collateral, which proceeds shall be applied immediately on receipt thereof in part repayment of the Loan Obligations and the Guaranteed Obligations; provided, however, that, to the extent that there shall be less than $3,000,000 of Loan Obligations and Guaranteed Obligations outstanding on or before July 15, 2019, then the Credit Parties shall instead pay the full amount of the then outstanding Loan Obligations and Guaranteed Obligations, if any.

(d) The Sadleir Parties agree that (i) each of the agreements set forth in this Section 1 is binding immediately upon the execution of this Agreement, (ii) each of the agreements set forth in this Section 1 is supported by adequate consideration, (iii) time is of the essence, (iv) Lender shall be irreparably harmed in the event that each of the obligations set forth in Section 1(a) of this Agreement is not satisfied by the times specified therein for such obligation; (iv) in the event each of the obligations set forth in Section 1(a) of this Agreement is not satisfied by the times specified therein for such obligation, Lender shall be entitled to obtain specific performance from any court of competent jurisdiction without the requirement of the posting of a bond of the obligations set forth in Section 1(a), and (v) notwithstanding anything to the contrary in Section 2 of this Agreement, in the event any of the obligations set forth in Section 1 of this Agreement (except this Section 1(d)) is not satisfied by the times specified herein, Lender shall have no further obligations under Section 2 of this Agreement and, for the avoidance of doubt, shall be free to file the Complaint and/or record the Deed in Lieu at any time.

(e) Neither Guarantor nor the Credit Parties shall permit any additional encumbrances on the real property Collateral that is the subject of the Deed in Lieu in the form of a mortgage or other lien secured indebtedness, or permit the premises to be subject to any leasehold interests.

(f) Guarantor and the Credit Parties shall maintain the real property Collateral that is the subject of the Deed in Lieu in its current condition and repair, subject to normal wear and tear, shall not intentionally commit any waste with respect thereto, and shall keep all real property taxes and assessments on the real property Collateral that is the subject of the Deed in Lieu non-delinquent.

The foregoing covenants and contingencies by Guarantor and the Credit Parties are for Lender's benefit only, and not for the benefit of Guarantor, the Credit Parties or the Sadleir Parties. The foregoing covenants and contingencies may be waived by Lender, but such waiver shall not be effective unless in writing. Furthermore, the Guarantor acknowledges and agrees that if any of Guarantor or the Credit Parties breach any provision under this Agreement or any condition

herein is not satisfied, the Lender shall have the right to terminate this Agreement and shall have no obligation to record or take any other action with respect to the Deed in Lieu, and that the Lender reserves the right to not record the Deed in Lieu and, instead, pursue other remedies, including a foreclosure of the Deed of Trust.

Section 2.    Subject to the acknowledgements and agreements of the Sadleir Parties as set forth in Section 1 of this Agreement, and as consideration for such acknowledgements and agreements (including timely performance) by the Sadleir Parties, the Lender hereby agrees as follows:

(a) Lender shall not file the Complaint (or any similar proceedings) against the Defendants unless the Credit Parties fail to comply with their obligations in Section 1 of this Agreement. Lender agrees to negotiate in good faith and no later than June 1, 2019 execute a settlement agreement with Defendants containing customary settlement terms and conditions, including a release of the claims against Defendants alleged in the Complaint. The foregoing release shall cover only the claims against Defendants in the Complaint and shall not affect in any way any claims under the Credit Agreement or other Fundamental Documents against any of the Credit Parties arising from any alleged Event of Default or otherwise. The Settlement Agreement is not intended to be a renegotiation of the terms set forth in this Agreement or the Deed in Lieu. Neither the Guarantor, the Credit Parties nor Lender shall be deemed to have breached their duty to negotiate the Settlement Agreement in good faith to the extent Lender, Guarantor or the Credit Parties refuses to agree to terms modifying or superseding those terms set forth in either this Agreement or the Deed in Lieu.

(b) Lender shall accept payment in full of all (but not less than all) of the Loan Obligations and Guaranteed Obligations, including Lender's outside legal fees and expenses, on or before 5:00 p.m. Pacific time on July 31, 2019 computed without regard to the rate set forth in Section 3.3 of the Credit Agreement, but only with regard to the rate set forth in Section 3.1 of the Credit Agreement. Repayment in full of the Loan Obligations and Guaranteed Obligations shall constitute full and final settlement of all claims by Lender against all Credit Parties and of all Credit Parties and their Affiliates against Lender, its Affiliates, managers, and advisors.

(c) This Agreement shall not constitute an admission by the Credit Parties of any Events of Default as of the date hereof.

(d) Lender agrees that it shall refrain from taking any further enforcement action of its rights under the Credit Agreement or other Fundamental Documents until 5:00 p.m. Pacific time on July 31, 2019 or, if earlier, but after the date of this Agreement, on the date that (v) any of the Credit Parties (including the Guarantor) fail timely to comply with any of their obligations under Section 1 of this Agreement, (w) any of the Sadleir Parties (including the Guarantor) divert any Collateral or the proceeds thereof to any person other than a Credit

Party or to an account other than an account owned solely by a Credit Party (other than to the Collection Account and the Chase account ending in 6559), (x) any Event of Default occurs other than the alleged Events of Default in the Lender's prior correspondence to the Credit Parties (including the Guarantor) and in the Lender's draft Complaint, (y) any of the Credit Parties (including Guarantor) commences any action against the Lender, or (z) any of the Credit Parties fail to cause any transfer of deposits forming part of the Collateral in excess of $25,000 in the Exhibitor Account or in the account ending in 6559 held at Chase Bank to the Collection Account within three (3) Business Days after written notice from the Lender or its advisors to the Credit Parties.

This Agreement constitutes a Fundamental Document for all purposes, and the Guarantor's and the Credit Parties' obligations hereunder shall constitute covenants and agreements required to be performed without any grace period, except as expressly set forth herein. Failure by the Guarantor or Credit Parties timely to perform hereunder shall constitute an immediate Event of Default and the Lender shall have no obligation to provide the Credit Parties with written or other notice of such failure.

For the avoidance of doubt, except as expressly stated herein, the Guarantor and Credit Parties understand and agree that nothing set forth in this Agreement shall alter or otherwise affect in any way any of their obligations, or the rights of Lender, under the Credit Agreement or other Fundamental Documents, and Lender reserves all rights and remedies Lender has against Guarantor and the Credit Parties under the Fundamental Documents, at law and in equity.

Further, Guarantor hereby affirms the Temerity Guaranty and agrees that, in the event Lender seeks to record the Deed in Lieu or takes any actions in connection therewith or related thereto, Guarantor (A) absolutely, unconditionally, knowingly, and expressly waives until Lender is paid in full: (i) any right of subrogation Guarantor has or may have as against any Credit Party or any other person with respect to the Guaranteed Obligations; (ii) any right to proceed against any Credit Party or any other person, now or hereafter, for contribution, indemnity, reimbursement, or any other suretyship rights and claims, whether direct or indirect, liquidated or contingent, whether arising under express or implied contract or by operation of law, which Guarantor may now have or hereafter have as against any Credit Party or any other person with respect to the Guaranteed Obligations; and (iii) any right to proceed or seek recourse against or with respect to any property or asset of any Credit Party included in the Collateral; and (B) waives any and all benefits, rights and/or defenses which might otherwise be available to Guarantor under California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2848, 2849, 2850, 2899, 2953 and 3433 or California Code of Civil Procedure Sections 580a, 580b, 580d and 726.

Each signatory below hereby represents and warrants that he or she has full and complete authority to execute this Agreement and each of the other documents referred to herein on behalf of his or her respective party and to bind such party to the terms of this Agreement and each of the other documents referred to herein.

This Amendment may be executed in two or more faxed or .pdf counterparts, each of which shall be an original, but all of which shall constitute one and the same agreement.

William Sadleir

Aviron Pictures, LLC

By
Name: William Sadleir
Title: Manager

Aviron 1706, LLC

By
Name: William Sadleir
Title: Manager

Aviron 1702, LLC

By
Name: William Sadleir
Title: Manager

Aviron 1705, LLC

By
Name: William Sadleir
Title: Manager

Aviron 1801, LLC

By
Name: William Sadleir
Title: Manager

Aviron 1703, LLC

By
Name: William Sadleir
Title: Manager

Aviron Finance, LLC

By
Name: William Sadleir
Title: Manager

*Signature Page to Letter Agreement*

Aviron Licensing, LLC

By ~William F. Sadleir~

Name: William Sadleir
Title: Manager

Temerity Trust Management, LLC

By ~William F. Sadleir~

Name: William Sadleir
Title:   Manager

Accepted and Agreed to by:

Cairn Capital Investment Funds ICAV
for its sub-fund Cairn Capstone Special Opportunities Fund,
by Cairn Capital Limited

By:   _____
Name:
Title:
            **James Starky**
            **Chief Legal Officer**
        Cairn Capital Limited as Investment Manager

*Signature Page to Letter Agreement*

Exhibit  A
Form of Deed in Lieu

[Attached]

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO
AND MAIL TAX STATEMENTS TO:

_____

_____

_____

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## DEED IN LIEU OF FORECLOSURE

The undersigned declares:

(1)    The grantee herein was not the foreclosing beneficiary.

(2)    The amount of the unpaid debt together with costs is $_____.

(3)    The amount paid by the grantee over and above the unpaid
debt was: Zero.

(4)    The documentary transfer tax is: Zero. No documentary transfer tax is due as the value of
the Property in this conveyance is less than the value of all liens and encumbrances on the
Property and there is no additional consideration received by the grantor; R & T 11911.

(5)    Said property is in City of: Los Angeles, California.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
TEMERITY TRUST MANAGEMENT, LLC, a Delaware limited liability company
("**Grantor**"), hereby GRANTS to _____, a _____
("**Grantee**"), the nominee of the Beneficiary (as defined below), all of that real property located
in Los Angeles County, State of California more particularly described in Exhibit "A" attached
hereto and made a part hereof (the "**Property**").

I.    Grantor hereby acknowledges and declares and agrees that:

(a)    this Deed in Lieu of Foreclosure is intended to be and is an absolute conveyance of title
to the property described herein to Grantee and is not intended as a mortgage, trust conveyance,
or security of any kind;

(b)    it is the intention of Grantor to convey, and by this Deed in Lieu of Foreclosure does
convey, to Grantee all of the herein described property and that possession of said property is
hereby surrendered to Grantee;

(c)    in execution and delivery of this Deed in Lieu of Foreclosure, Grantor is not acting under
misapprehension as to the effect hereof and acts freely and voluntarily and not under coercion or
duress;

(d)      Grantor has conveyed the Property to Grantee for fair and adequate consideration, such consideration being reasonably equivalent value and being specifically (i) the agreement by CAIRN CAPITAL INVESTMENT FUNDS ICAV, an Irish Collective Asset-management Vehicle, for its sub-fund CAIRN CAPSTONE SPECIAL OPPORTUNITIES FUND ("**Beneficiary**"), an affiliate of Grantee and the beneficiary under that certain Deed of Trust, Assignment of Rents, Fixture Filing, Security Agreement and Environmental Indemnity recorded in the Official Records of Los Angeles County, California on October 9, 2018, as Instrument No. 20181025433 (the "**Deed of Trust**"), to not foreclose on such Deed of Trust, and (ii) the agreement by Beneficiary to accept this Deed in Lieu of Foreclosure in satisfaction of a portion of the obligations of Grantor secured by the Deed of Trust in accordance with a separate, unrecorded agreement of even date herewith;

(e)      the execution, delivery and performance of this Deed in Lieu of Foreclosure have been duly authorized by all necessary organizational action;

(f)       this conveyance is freely and fairly made and that there are no agreements, oral or written, other than this Deed in Lieu of Foreclosure and the Estoppel Affidavit, attached as Exhibit B hereto, between Grantor and Grantee with respect to the Property; and

(g)      this conveyance is made and accepted in partial satisfaction of the obligations secured by the Deed of Trust, <u>not in full satisfaction thereof</u>, and the beneficial interest of Beneficiary in the Property pursuant to the Deed of Trust shall not merge with the fee interest of Grantee in the Property pursuant to this Deed in Lieu of Foreclosure and that such interests shall be and remain at all times separate and distinct.

The individual signing this Deed in Lieu of Foreclosure on behalf of Grantor hereby represents and warrants that he has the capacity set forth on the signature page hereof and has full power and authority to bind Grantor to the terms hereof.

[Signature Page Follows]

IN WITNESS WHEREOF, Grantor has executed and delivered this Deed in Lieu of Foreclosure as of the date set forth below.

Dated: _____, 2019                    GRANTOR:

                                                 TEMERITY TRUST MANAGEMENT, LLC,
                                                 a Delaware limited liability company

                                                 By: _____
                                                 Name:    William Sadlier
                                                 Title:    Sole Manager

## NOTARY ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                    )
County of _____          )


On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature   _____

Exhibit A to Deed in Lieu of Foreclosure

Property Description

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS
ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS
DESCRIBED AS FOLLOWS:

LOT 7 OF TRACT NO. 11261, IN THE CITY OF LOS ANGELES, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 221 PAGES 34
THROUGH 43 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF
SAID COUNTY.

EXCEPT ALL MINERALS AND OIL RIGHTS UNDERLYING OR APPURTENANT TO
SAID LAND, AS RESERVED IN THE DEED FROM H.C. FRYMAN TO WILMER L.
HEATER AND MARTHA ANN HEATER, RECORDED IN BOOK 14290 PAGE 349,
OFFICIAL RECORDS.

**APN:** 4388-020-009

**Property commonly known as:** 9135 Hazen Drive, Los Angeles, California 90210

<u>Exhibit B to Deed in Lieu of Foreclosure</u>

Estoppel Affidavit

STATE OF CALIFORNIA
COUNTY OF _____


_____ ("**Affiant**"), being first duly sworn, for himself, deposes and says:

That he is the _____ of TEMERITY TRUST MANAGEMENT, LLC, a Delaware limited liability company ("**Grantor**"), which made, executed, and delivered that certain Deed in Lieu of Foreclosure, on _____, 2019 (the "**Deed**"), conveying the real property in the County of Los Angeles, State of California described as (the "**Property**"):

See Legal Description Attached hereto as Schedule 1

That the aforesaid Deed is intended to be and is an absolute conveyance of the title to the Property to the grantee named therein, and was not and is not now intended as a mortgage, trust conveyance, or security of any kind;

That it was the intention of Grantor, as grantor in the Deed, to convey, and the Deed did convey, to Grantee all its right, title and interest absolutely in and to the Property;

That possession of the Property has been surrendered to Grantee;

That in execution and delivery of the Deed, Grantor was not acting under misapprehension as to the effect of the Deed, acted freely and voluntarily, and was not acting under coercion or duress;

That the consideration for the Deed was (i) the agreement by CAIRN CAPITAL INVESTMENT FUNDS ICAV, an Irish Collective Asset-management Vehicle, for its sub-fund CAIRN CAPSTONE SPECIAL OPPORTUNITIES FUND ("**Beneficiary**"), an affiliate of the grantee under said Deed and the beneficiary under that certain Deed of Trust, Assignment of Rents, Fixture Filing, Security Agreement and Environmental Indemnity recorded in the Official Records of Los Angeles County, California on October 9, 2018, as Instrument No. 20181025433 (the "**Deed of Trust**"), to not foreclose on such Deed of Trust, and (ii) the agreement by Beneficiary to accept said Deed in satisfaction of a portion of the obligations of Grantor secured by the Deed of Trust in accordance with a separate, unrecorded agreement of even date herewith;

That at the time of the execution and delivery of the Deed, Affiant, as an officer of Grantor, believed, and now believes, that the Consideration represents the fair value of the Property;

That this Estoppel Affidavit is made for the protection and benefit of the grantee in said Deed, its successors and assigns, and all other parties hereafter dealing with or who may acquire

an interest in the Property, and particularly for the benefit of _____ Title Company which is about to insure the title to said Property in reliance thereon, and any other title company which may hereafter insure the title to said Property;

     That Affiant will testify, declare, depose, or certify before any competent tribunal, office, or person, in any case now pending or that may hereafter be instituted, to the truth of the particular facts set forth in this Estoppel Affidavit; and

     That Affiant has executed this Estoppel Affidavit as an individual and also for and on behalf of Grantor.

     AFFIANT:

     Date:  _____, 2019

                             _____
                             Name:  _____
                             Title:  _____

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California                     )
County of _____      )

On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature     _____

Schedule 1 to Estoppel Affidavit

Property Description

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS
ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS
DESCRIBED AS FOLLOWS:

LOT 7 OF TRACT NO. 11261, IN THE CITY OF LOS ANGELES, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 221 PAGES 34
THROUGH 43 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF
SAID COUNTY.

EXCEPT ALL MINERALS AND OIL RIGHTS UNDERLYING OR APPURTENANT TO
SAID LAND, AS RESERVED IN THE DEED FROM H.C. FRYMAN TO WILMER L.
HEATER AND MARTHA ANN HEATER, RECORDED IN BOOK 14290 PAGE 349,
OFFICIAL RECORDS.

**APN:** 4388-020-009

**Property commonly known as:** 9135 Hazen Drive, Los Angeles, California 90210

CCIF\55899\2111773.3

Exhibit B
Willkie Wire Instructions

| | |
|---|---|
| BANK NAME: | Citibank, N.A. |
| BANK ADDRESS: | 153 East 53rd Street, New York, NY 10022 |
| ABA Routing #: | 021000089 |
| INTERNATIONAL SWIFT # | CITIUS33 |
| ACCOUNT NUMBER: | 09257961 |
| ACCOUNT NAME: | Willkie Farr & Gallagher LLP |
| REFERENCE: | 126150.00003 |
| ATTENTION: | Gladys Vanterpool, Phone 212-559-9430 |

Exhibit C
Lender Wire Instructions

| Currency | USD |
|---|---|
| A/C Name | **BANA LONDON GCAS CASH** |
| IBAN (Swift field 58D) | **6550660591** |
| SWIFT code (Swift field 57A) | **BOFAUS3N** |
| Client A/C Name | **Cairn Capstone Special Opportunities Fund** |
| Client A/C No. (Swift field 72) | **671850400001** |
| ABA No. | **026-009-593** |

# KUFRIN DECLARATION

# EXHIBIT "H"

EXECUTION VERSION

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "*Agreement*") is made as of June 1, 2019, by and between Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund ("*Cairn*"), on the one hand, and William Sadleir, Aviron Pictures, LLC, Aviron 1706, LLC, Aviron 1702, LLC, Aviron 1705, LLC and Aviron 1801, LLC (collectively "*Defendants*"), on the other hand. Each of Cairn and the Defendants shall be referred to herein as a "*Party*," and collectively, the "*Parties*."

### Recitals

WHEREAS, Cairn entered into a Credit, Security, Guaranty and Pledge Agreement, dated October 1, 2018 (the "*Credit Agreement*"), with Aviron 1703, LLC ("*Borrower*"), Aviron Licensing, LLC ("*Licensing*"), and Aviron Finance, LLC ("*Finance*") pursuant to which Cairn agreed to loan up to $20 million to Borrower for the purpose of financing the acquisition of distribution rights in, and the cost of releasing in movie theaters, a motion picture entitled *Serenity*. The loan was to be made in three advances, i.e., an advance of $12 million, an advance of $5 million, and a Final Advance of $3 million. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Credit Agreement.

WHEREAS, on May 15, 2019, counsel to Cairn sent a draft Complaint (the "*Complaint*") to counsel to the Defendants asserting certain claims against Defendants arising from (a) allegations that information and documents concerning certain NRG data were misrepresented in order to obtain the Final Advance of $3 million (the "*NRG Claims*"), and (b) certain funds that allegedly constitute collateral under the Credit Agreement were allegedly diverted to certain Defendants in or prior to April 2019 (the "*Diversion Claims*").

WHEREAS, Defendants dispute each and every one of the NRG Claims and the Diversion Claims.

WHEREAS, after extensive and good faith negotiations, on May 24, 2019, Cairn, Defendants and other Sadlier Parties (as defined therein) entered into a Letter Agreement (the "*Letter Agreement*") to settle and resolve the claims asserted in the Complaint pursuant to the terms stated in the Letter Agreement, including the entry into this Settlement Agreement.

### Agreement

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    **Release of Claims.**

(a)    In consideration of the mutual promises and covenants herein and in the Letter Agreement, upon receipt by Cairn of the payment set forth in paragraph 1(c) of the Letter Agreement, Cairn releases, acquits, and forever discharges Defendants of and from any and all claims, causes of action, suits, complaints, and demands against Defendants that are asserted in the Complaint or that arise from the NRG Claims or the Diversion Claims.

(b)    Notwithstanding the foregoing, nothing herein shall be construed to waive, release, or have any effect whatsoever on any claims: (i) under the Credit Agreement or other Fundamental Documents against any of the Credit Parties arising from any alleged Event of Default; (ii) arising out of or relating to this Agreement or the enforcement of the Parties' obligations hereunder; or (iii) that arise after the date the Parties execute this Agreement. For the avoidance of doubt, the Parties agree that nothing set forth in this Agreement shall alter or otherwise affect in any way any of their obligations, or the rights of Lender, under the Credit Agreement or other Fundamental Documents, including but not limited to the Letter Agreement.

2.    **No Admission.**  This Agreement is entered into by the Parties for settlement purposes only and without prejudice to their respective positions on any legal or factual matter. This Agreement shall not in any way be construed as an admission by any Party of any fact or liability or of any fact or conclusion of law or the value of the claims alleged.

3.    **Beneficiaries and Assigns.**  The terms of this Agreement shall be binding upon the Parties hereto and shall inure to the benefit of their respective successors, assigns, executors, administrators, heirs, and legal representatives. Neither this Agreement, nor any of the rights and obligations set forth herein, shall be assignable by any Party without the advance, express written consent of all other Parties to this Agreement, and any assignment in violation of this provision shall be null and void and of no effect.

4.    **Construction.**  The Parties participated jointly in the negotiation and preparation of this Agreement, and each Party has had the opportunity to obtain the advice of an attorney and to review, comment upon, and redraft this Agreement. Therefore, the Parties agree that the Agreement shall be construed as if the Parties jointly prepared it. Any uncertainty or ambiguity shall not be interpreted strictly for or against any Party, regardless of who drafted (or was principally responsible for drafting) the Agreement or any specific term or condition thereof.

5.    **Severability.**  In the event that any one or more of the provisions of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not be affected or impaired thereby. This Agreement shall survive the performance of the specific arrangements contained herein.

6.    **Modification.**  This Agreement may be modified or amended only upon a written agreement executed by the signatories hereto.

7.    **Governing Law.**  The validity, interpretation, construction, and performance of the obligations created under this Agreement will be governed by California law without regard to conflicts of law principles.

8.    **Captions.**  Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

9.    **Counterparts.**  This Agreement may be executed in counterparts, including by signature transmitted by facsimile or other electronic transmission (*e.g.*, by portable document format (pdf)). Each counterpart when so executed shall be deemed to be an original, and all such counterparts together shall constitute the same instrument. This Agreement shall become effective

only upon the execution and delivery of the Agreement by every Party to the Agreement and Release.

**IN WITNESS WHEREOF**, the Parties have each executed this Agreement, signed as a sealed instrument, as of the last date written below.

Dated: _May 31_, 2019

Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund

By: _____ **James Starky**
Printed Name: _____ **Chief Legal Officer**
Cairn Capital Limited as Investment Manager

Dated: _____, 2019

William Sadleir

By: _____

Dated: _____, 2019

Aviron Pictures, LLC

By: _____
    Name:
    Title:

Dated: _____, 2019

Aviron 1706, LLC

By: _____
    Name:
    Title:

Dated: _____, 2019

Aviron 1702, LLC

By: _____
    Name:
    Title:

3

only upon the execution and delivery of the Agreement by every Party to the Agreement and Release.

**IN WITNESS WHEREOF**, the Parties have each executed this Agreement, signed as a sealed instrument, as of the last date written below.

Dated:_____, 2019

Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund

By:_____

    Printed Name:

Dated:_____ May 31, 2019

William Sadleir

By _William F. Sadleir_

Dated:_____ May 31, 2019

Aviron Pictures, LLC

By _William F. Sadleir_

Name:   William K. Sadleir
Title:    Manager

Dated:_____ May 31, 2019

Aviron 1706, LLC

By _William F. Sadleir_

Name:   William K. Sadleir
Title:    Manager

Dated:_____ May 31, 2019

Aviron 1702, LLC

By _William F. Sadleir_

Name: William K. Sadleir
Title:  Manager

3

Dated:_____ May 31, 2019                    Aviron 1705, LLC

                                                By:
                                                   Name:    William K. Sadleir
                                                   Title:    Manager


Dated:_____ May 31, 2019                    Aviron 1801, LLC

                                                By:
                                                   Name:    William K. Sadleir
                                                   Title:    Manager

# KUFRIN DECLARATION

# EXHIBIT "I"

CAIRN CAPITAL INVESTMENT FUNDS ICAV
c/o Cairn Capital Limited
27 Knightsbridge
London SW1X 7LY

December 18, 2019

**BY EMAIL AND OVERNIGHT DELIVERY**

Aviron 1703, LLC
Aviron Finance, LLC
Aviron Licensing, LLC
9100 Wilshire Blvd. Suite 800E
Beverly Hills, CA 90212
Attention: William Sadleir
Email: wsadleir@aviron.com

Re:    **DEMAND FOR PAYMENT**

Mr. Sadleir:

Reference is hereby made to (a) that certain Credit, Security, Guaranty and Pledge Agreement dated as of October 1, 2018 (the "***Credit Agreement***"), among Aviron 1703, LLC (the "***Borrower***"), Aviron Licensing, LLC, Aviron Finance, LLC (together, the "***Credit Parties***"), the other parties referred to therein, and Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund (the "***Lender***"), (b) that certain Acceleration and Demand Notice delivered on April 2, 2019 (the "***Acceleration and Demand Notice***"), and (c) the Lender's and its counsel's prior correspondence to the Borrower, the Credit Parties and their counsel relating to the foregoing. Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement.

Despite delivery of the Acceleration and Demand Notice, whereby we declared the Loan Obligations fully due and payable, you failed to repay such obligations in full. Moreover, you failed on December 15, 2019, the scheduled maturity date under the Credit Agreement, to repay the Loan Obligations in full in accordance with the terms of the Credit Agreement. Such Loan Obligations are not less than $16,230,747.68, with default interest and other amounts of indemnified liabilities continuing to accrue (collectively, the "***Amounts Due***").

The Borrower's failure to repay the Amounts Due constitutes further Events of Default under Sections 13.1(a) and (b) of the Credit Agreement, and are in addition to other Events of Default of which you were notified by the Lender and its representatives. The Lender hereby again demands that the Borrower and Credit Parties immediately pay the Amounts Due to the Lender pursuant to the Credit Agreement.

The Lender hereby expressly reserves any and all of the rights, powers, privileges and remedies available to it under the Credit Agreement and the other Fundamental Documents

79236207_2

and applicable law that have arisen, or may arise, as a result of the Borrower's and Credit Parties' failure to repay the Amounts Due, and the other Defaults and Events of Default that have, or may, occur.

      In no event and under no circumstance shall this letter, any past or future discussions with the Lender and/or its representatives, or any delay or purported forbearance from exercising any of its rights or remedies under the Fundamental Documents: (i) cause a modification of the Fundamental Documents; (ii) establish a custom with respect to any of the Fundamental Documents; (iii) operate as a waiver of or admission regarding any existing or future Default or Event of Default, including the Defaults or any other Defaults or Events of Default that may exist but are not identified herein; (iv) entitle the Borrower, Credit Parties or any other Person to any other or further notice or demand whatsoever; (v) in any way modify, change, impair, affect, diminish or release any of the Borrower's, Credit Parties' or any other Person's obligations or liabilities under or pursuant to the Fundamental Documents or any other liability the Borrower, the Credit Parties or any other Person may have to the Lender; (vi) waive, limit, impair or condition the Lender's rights, powers, privileges and remedies under the Fundamental Documents or applicable law, all of which rights, powers, privileges and remedies are expressly reserved; or (vii) operate as a waiver of the Lender's collection of the Loan Default Interest Rate to which it is entitled.  This letter shall in no way be deemed to obligate the Lender to give you or anyone else any notices of any kind in connection with the Fundamental Documents or otherwise.

*[Signature page follows.]*

- 2 -

79236207_2

Very truly yours,

CAIRN CAPITAL INVESTMENT FUNDS ICAV, for
its sub-fund Cairn Capstone Special Opportunities
Fund, by Cairn Capital Limited, as investment manager

By: _____
Name:
Title:

Shaun Wood
Chief Legal Officer

c:    Paul Hastings LLP (Mickey Mayerson and Nigel Pearson)
      Kasowitz Benson Torres LLP (Andrew K. Glenn and Shai Schmidt)
      Ropes & Gray LLP (Leonard Klingbaum)

# KUFRIN DECLARATION

# EXHIBIT "J"

CAIRN CAPITAL INVESTMENT FUNDS ICAV
c/o Cairn Capital Limited
27 Knightsbridge
London SWIX 7LY

May 1, 2019

**VIA ELECTRONIC MAIL AT wsadleir@avironpictures.com; wsadleir@aviron.com**

Temerity Trust Management, LLC
9100 Wilshire Boulevard
Suite 800 - East Tower
Beverly Hills, CA  90212
Attention: William Sadleir & Hannah Kadadu
Email: wsadleir@avironpictures.com
        wsadleir@aviron.com

Re:    <u>Lender Demand Notice: Guaranty for Aviron 1703, LLC</u>

Dear Mr. Sadleir and Ms. Kadadu:

This letter concerns that Guaranty dated October 1, 2018 (the "Guaranty") you executed on behalf of Temerity Trust Management, LLC ("TTM") in favor of Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund ("Lender") for purposes of securing repayment of the loan made to Aviron 1703, LLC ("Borrower") in the original principal amount of $22,400,000 (the "Loan").  As you know, Borrower is presently in default of its obligations under the loan documents for the Loan (the "Loan Documents"), which include that Credit, Security, Guaranty and Pledge Agreement, dated October 1, 2018 and that Promissory Note dated October 1, 2018.  The Guaranty is secured by that certain Deed of Trust and Assignment of Rents, Fixture Filing, Security Agreement and Environmental Indemnity dated as of October 8, 2019, which encumbers the property commonly known and addressed at 9135 Hazen Drive, Los Angeles, CA 90210.

***Non-Payment of Principal and Interest***.

The Loan is delinquent and in default.  The total amount due and payable on the Loan as of April 29, 2019 is $ 20,811,381.57, with default interest and other amounts of indemnified liabilities continuing to accrue.

Per the terms of the Guaranty, TTM unconditionally and irrevocably guaranteed the full and punctual payment of the Guaranteed Obligations (as defined in the Guaranty), including payment of the sums referenced above.

**If the total payment demanded above is not made in immediately available funds to Lender by 5:00 PM PST on Wednesday May 8, 2019, then Lender will exercise its rights under the Guaranty and Deed of Trust to the full extent necessary**.  TTM, as guarantor, is liable for all sums owed under the Loan Documents separate and independent from Borrower's obligations and Lender can file suit against TTM personally.  In addition, TTM may be required

Temerity Trust Management, LLC.
May 1, 2019
Page 2

to pay attorneys' fees, legal expenses and other charges incurred by Lender, as provided for in the Guaranty.

Notice is further given that Lender reserves all of its rights and remedies under the Guaranty and Loan Documents and as allowed under applicable law and in equity. Nothing herein shall be construed as a waiver of Lender's right to exercise any and all remedies it has under the Guaranty, the Loan Documents, applicable law or in equity.

If you have any questions regarding this notice, please contact our counsel, Giselle Roohparvar (415-638-4800) of Miller Starr Regalia.

Very truly yours,

CAIRN CAPITAL INVESTMENT FUNDS ICAV,
for its sub-fund Cairn Capstone Special Opportunities
Fund, by Cairn Capital Limited, as investment Manager


By: _____
Name: Paul Campbell
Title:   Director

cc:    Paul Hastings LLP (Mickey Mayerson and Nigel Pearson)
       Miller Starr Regalia (Giselle Roohparvar)
       Willkie Farr & Gallagher LLP (Leonard Klingbaum and Jeffrey B. Korn)
       Quinn Emanuel Urquhart & Sullivan LLP (William Price)

- 2 -

# KUFRIN DECLARATION

# EXHIBIT "K"

CAIRN CAPITAL INVESTMENT FUNDS ICAV
c/o Cairn Capital Limited
27 Knightsbridge
London SWIX 7LY

May 9, 2019

**VIA ELECTRONIC MAIL AT wsadleir@avironpictures.com; wsadleir@aviron.com**

Temerity Trust Management, LLC
9100 Wilshire Boulevard
Suite 800 - East Tower
Beverly Hills, CA  90212
Attention: William Sadleir & Hannah Kadadu
Email: wsadleir@avironpictures.com
        wsadleir@aviron.com

Re:    Lender Default Notice: Guaranty for Aviron 1703, LLC

Dear Mr. Sadleir and Ms. Kadadu:

This default notice concerns that Guaranty dated October 1, 2018 (the "**Guaranty**") you executed on behalf of Temerity Trust Management, LLC ("**TTM**") in favor of Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund ("**Lender**") for purposes of securing repayment of the loan made by Lender to Aviron 1703, LLC ("**Borrower**") in the original principal amount of $22,400,000 (the "**Loan**").  As you know, Borrower is in default of its obligations under the Credit, Security, Guaranty and Pledge Agreement dated October 1, 2018 (the "**Credit Agreement**"), among Borrower, Lender and the other parties party thereto and the Note (as defined in the Credit Agreement).

On May 1, 2019, Lender sent a Demand Notice to TTM for payment of the outstanding sums due and owing on the Loan.  TTM had until May 8, 2019 to make payment per its obligations under the Guaranty.  It failed to do so.  TTM now has 10 days from the date of this notice (May 9, 2019), to cure its default and make payment.   If TTM does not make such payment on or before May 20, 2019, there will be a TTM Event of Default (as defined in the Guaranty), Lender shall have the right to declare an Event of Default under the DoT (as defined in the Guaranty) and (among other things) cause the Property (as defined in the DoT) to be sold.[1]  The total principal and accrued interest due and payable on the Loan as of the date of this notice (May 9, 2019) is not less than $ 20,594,631.57, with default interest and other amounts of indemnified liabilities continuing to accrue.

---

[1] The 10-day cure period for TTM's default under the Guaranty runs from the earlier of TTM's knowledge of the default or any written notice given by Lender of the default (Guaranty § 1.1.).  We reserve the right to assert that TTM had knowledge of the default under the Guaranty since at least May 1, 2019, such that the cure period will expire on May 11, 2019 at the latest, and thereafter constitute an Event of Default under the DoT.

Temerity Trust Management, LLC.
May 9, 2019
Page 2

**If TTM does not cure its default by paying the total amount demanded above to Lender by 5:00 PM PST on Monday May 20, 2019, Lender will exercise its rights under the DoT to the full extent necessary**.

Notice is further given that Lender reserves all of its rights and remedies under the DoT, the Guaranty, the other Fundamental Documents (as defined in the Credit Agreement) and as allowed under applicable law and in equity.  Nothing herein shall be construed as a waiver of Lender's right to exercise any and all remedies it has under the DoT, the other Fundamental Documents, applicable law or in equity.

If you have any questions regarding this notice, please contact our counsel, Giselle Roohparvar (415-638-4800) of Miller Starr Regalia.

Very truly yours,

CAIRN CAPITAL INVESTMENT FUNDS ICAV,
for its sub-fund Cairn Capstone Special Opportunities
Fund, by Cairn Capital Limited, as investment Manager

By: _____
    Name:  James Starky
    Title:    Chief Legal Officer

cc:    Paul Hastings LLP (Mickey Mayerson and Nigel Pearson)
       Miller Starr Regalia (Giselle Roohparvar)
       Willkie Farr & Gallagher LLP (Leonard Klingbaum and Jeffrey B. Korn)
       Quinn Emanuel Urquhart & Sullivan LLP (William Price)

# KUFRIN DECLARATION

# EXHIBIT "L"

CAIRN CAPITAL INVESTMENT FUNDS ICAV
c/o Cairn Capital Limited
27 Knightsbridge
London SW1X 7LY


January 6, 2020


**BY EMAIL AND OVERNIGHT DELIVERY**


Temerity Trust Management, LLC
9100 Wilshire Boulevard
Suite 800 - East Tower
Beverly Hills, CA 90212
Attention: William Sadleir &
Hannah Kadadu
Email: wsadleir@aviron.com
wsadleir@avironpictures.com


Re:     **LENDER SECOND DEMAND NOTICE**

Mr. Sadleir and Ms. Kadadu:

        Reference is hereby made to (a) that certain Credit, Security, Guaranty and Pledge Agreement dated as of October 1, 2018 (the "***Credit Agreement***"), among Aviron 1703, LLC ("***Borrower***"), the other parties referred to therein, and Cairn Capital Investment Funds ICAV for its sub-fund Cairn Capstone Special Opportunities Fund ("***Lender***"), (b) that Promissory Note dated October 1, 2018 executed by Borrower (together with the Credit Agreement, the "***Loan Documents***"), (c) that Guaranty dated October 1, 2018 (the "***Guaranty***") you executed on behalf of Temerity Trust Management, LLC ("***TTM***") in favor of Lender for purposes of securing repayment of the loan under the Credit Agreement, (d) that certain Notice of Defaults and Reservation of Rights delivered to Borrower on February 14, 2019, (e) that certain Acceleration and Demand Notice delivered to Borrower on April 2, 2019, (f) that certain Lender Demand Notice delivered to you on May 1, 2019 (the "***First Demand Notice***"), (g) that certain Lender Default Notice delivered to you on May 9, 2019 (the "***First Default Notice***"), (h) that certain Demand for Payment delivered to Borrower on December 18, 2019, and (i) Lender's and its counsel's prior correspondence to TTM, Borrower and their counsel relating to the foregoing.  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement.

        The Guaranty is secured by that certain Deed of Trust, Assignment of Rents, Fixture Filing, Security Agreement and Environmental Indemnity dated as of October 8, 2018, which encumbers the property commonly known and addressed at 9135 Hazen Drive, Los Angeles, CA 90210 (the "***DoT***").

        On May 1, 2019, Lender sent the First Demand Notice to TTM for payment of the outstanding sums due and owing on the Loans.  TTM had until May 8, 2019 to make payment per its obligations under the Guaranty.  It failed to do so.  As Lender notified TTM in the First Default

Notice dated May 9, 2019, TTM had ten (10) days from that date to cure its default and make payment. TTM's failure to do so has given rise to a TTM Event of Default (as defined in the Guaranty), and Lender has gained the right to declare an Event of Default under the DoT and (among other things) cause the Property (as defined in the DoT) to be sold.

### *Non-Payment of Principal and Interest*

Despite the delivery of the First Demand Notice and First Default Notice, you have continued to fail to repay the Guaranteed Obligations (as defined in the Guaranty) in full. Moreover, Borrower failed on December 15, 2019, the scheduled maturity date under the Credit Agreement, to repay the Loan Obligations in full. Despite delivery of the Demand for Payment on December 18, 2019, Borrower has failed to repay such obligations in full.

The Guaranteed Obligations are not less than $16,230,747.68, with default interest and other amounts of indemnified liabilities continuing to accrue (the "***Amounts Due***").

Per the terms of the Guaranty, TTM unconditionally and irrevocably guaranteed the full and punctual payment of the Guaranteed Obligations, including payment of the Amounts Due.

**If the total payment of the Amounts Due is not made in immediately available funds to Lender by January 13, 2020, then Lender will exercise its rights under the Guaranty and DoT to the full extent necessary including (among other things) causing the Property to be sold.** TTM, as guarantor, is liable for all Amounts Due separate and independent from Borrower's obligations and Lender can file suit against TTM personally. In addition, TTM may be required to pay attorneys' fees, legal expenses and other charges incurred by Lender, as provided for in the Guaranty.

Lender hereby expressly reserves any and all of the rights, powers, privileges and remedies available to it under the Guaranty, the Loan Documents and applicable law that have arisen, or may arise, as a result of TTM's failure to repay the Amounts Due, and the other defaults that have, or may, occur.

In no event and under no circumstance shall this letter, any past or future discussions with Lender and/or its representatives, or any delay or purported forbearance from exercising any of its rights or remedies under the Fundamental Documents: (i) cause a modification of the Fundamental Documents; (ii) establish a custom with respect to any of the Fundamental Documents; (iii) operate as a waiver of or admission regarding any existing or future Default, Event of Default or TTM Event of Default, including any Defaults, Events of Default or TTM Events of Default that may exist but are not identified herein; (iv) entitle TTM or any other Person to any other or further notice or demand whatsoever; (v) in any way modify, change, impair, affect, diminish or release any of TTM's or any other Person's obligations or liabilities under or pursuant to the Fundamental Documents or any other liability TTM or any other Person may have to Lender; (vi) waive, limit, impair or condition Lender's rights, powers, privileges and remedies under the Fundamental Documents or applicable law, all of which rights, powers, privileges and remedies are expressly reserved; or (vii) operate as a waiver of Lender's collection of the Loan Default Interest Rate to which it is entitled. This letter shall in no way be deemed to obligate Lender to give you or anyone else any notices of any kind in connection with the Fundamental Documents or otherwise.

- 2 -

Very truly yours,

CAIRN CAPITAL INVESTMENT FUNDS ICAV, for
its sub-fund Cairn Capstone Special Opportunities
Fund, by Cairn Capital Limited, as investment manager

By: _____
Name:
Title:          Shaun Wood
                Chief Legal Officer

c:      Paul Hastings LLP (Mickey Mayerson and Nigel Pearson)
        Kasowitz Benson Torres LLP (Andrew K. Glenn and Shai Schmidt)
        Ropes & Gray LLP (Leonard Klingbaum)

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Kasowitz Benson Torres LLP<br>Andrew R.J. Muir (CA Bar # 284817)<br>101 California Street, Suite 300<br>San Francisco, California 94111<br>Telephone: (415) 421-6140<br>Facsimile: (415) 398-5030<br>Email: AMuir@kasowitz.com<br>Andrew K. Glenn (pro hac vice application pending)<br>Shai Schmidt (pro hac vice application pending)<br>1633 Broadway<br>New York, New York 10019<br>Telephone: (212) 506-1700<br>Facsimile: (212) 506-1800<br>Email: AGlenn@kasowitz.com<br>　　　　 SSchmidt@kasowitz.com<br><br>☐ *Movant appearing without an attorney*<br>☒ *Attorney for Movant* | |

| UNITED STATES BANKRUPTCY COURT<br>CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION | |
|---|---|
| In re:<br><br>TEMERITY TRUST MANAGEMENT, LLC,<br><br><br><br><br><br><br><br><br><br>　　　　　　　　　　　　　　　　　Debtor(s). | CASE NO.: 2:20-bk-15015-BR<br>CHAPTER: 11 |
| | **NOTICE OF MOTION AND MOTION<br>FOR RELIEF FROM THE AUTOMATIC<br>STAY UNDER 11 U.S.C. § 362<br>(with supporting declarations)<br>(REAL PROPERTY)** |
| | DATE: 07/21/2020<br>TIME:  10:00 a.m.<br>COURTROOM: 1668 |

| **Movant:**　Cairn Capital Investment Funds ICAV for its sub fund Cairn Capstone Special Opportunities Fund |
|---|

1. **Hearing Location**:

   ☒ 255 East Temple Street, Los Angeles, CA 90012　　☐ 411 West Fourth Street, Santa Ana, CA 92701

   ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367　☐ 1415 State Street, Santa Barbara, CA 93101

   ☐ 3420 Twelfth Street, Riverside, CA 92501

2. Notice is given to the Debtor and trustee (*if any*)(Responding Parties), their attorneys (*if any*), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached Motion.

3. To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1.RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

4.  When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5.  If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6.  ☒  This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d).  If you wish to oppose this motion, you must file and serve a written response to this motion no later than 14 days before the hearing and appear at the hearing.

7.  ☐  This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b).  If you wish to oppose this motion, you must file and serve a response no later than (*date*) _____ and (*time*) _____; and, you may appear at the hearing.

    a.  ☐  An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

    b.  ☐  An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

    c.  ☐  An application for order setting hearing on shortened notice was filed and remains pending.  After the court rules on that application, you will be served with another notice or an order that specifies the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.

Date: 06/19/2020

Kasowitz Benson Torres LLP
_____
Printed name of law firm (if applicable)

Andrew R.J. Muir
_____
Printed name of individual Movant or attorney for Movant


/s/ Andrew R.J. Muir
_____
Signature of individual Movant or attorney for Movant

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                          Page 2                          **F 4001-1.RFS.RP.MOTION**

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO REAL PROPERTY

1. **Movant is the:**

   ☒ Holder: Movant has physical possession of a promissory note that either (1) names Movant as the payee under the promissory note or (2) is indorsed to Movant, or indorsed in blank, or payable to bearer.

   ☒ Beneficiary: Movant is either (1) named as beneficiary in the security instrument on the subject property (e.g., mortgage or deed of trust) or (2) is the assignee of the beneficiary.

   ☐ Servicing agent authorized to act on behalf of the Holder or Beneficiary.

   ☒ Other (*specify*):

   See memorandum and declarations filed concurrently herewith.

2. **The Property at Issue (Property):**

   a. Address:

   *Street address*: 9135 Hazen Drive
   *Unit/suite number*:
   *City, state, zip code*: Los Angeles, CA, 90210

   b. Legal description, or document recording number (including county of recording), as set forth in Movant's deed of trust (attached as Exhibit <u>hereto</u>):

3. **Bankruptcy Case History:**

   a. A ☒ voluntary ☐ involuntary   bankruptcy petition under chapter   ☐ 7   ☒ 11   ☐ 12   ☐ 13
   was filed on (*date*)  <u>06/01/2020</u>.

   b. ☐ An order to convert this case to chapter   ☐ 7   ☐ 11   ☐ 12   ☐ 13   was entered on (*date*) _____.

   c. ☐ A plan, if any, was confirmed on (*date*) _____.

4. **Grounds for Relief from Stay:**

   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists to grant Movant relief from stay as follows:

   (1) ☒ Movant's interest in the Property is not adequately protected.

      (A) ☒ Movant's interest in the Property is not protected by an adequate equity cushion.

      (B) ☐ The fair market value of the Property is declining and payments are not being made to Movant sufficient to protect Movant's interest against that decline.

      (C) ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with the Debtor.

   (2) ☒ The bankruptcy case was filed in bad faith.

      (A) ☒ Movant is the only creditor, or one of very few creditors, listed or scheduled in the Debtor's case commencement documents.

      (B) ☐ The Property was transferred to the Debtor either just before the bankruptcy filing or after the filing.

      (C) ☐ A non-individual entity was created just prior to the bankruptcy petition date for the sole purpose of filing this bankruptcy case.

      (D) ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

      (E) ☐ The Debtor filed only a few case commencement documents with the bankruptcy petition. Schedules and the statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

      (F) ☒ Other (*see attached continuation page*).

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                               Page 3                               **F 4001-1.RFS.RP.MOTION**

(3) ☐ (*Chapter 12 or 13 cases only*)

    (A) ☐ All payments on account of the Property are being made through the plan.
☐ Preconfirmation ☐ Postconfirmation  plan payments have not been made to the chapter 12 trustee or chapter 13 trustee.

    (B) ☐ Postpetition mortgage payments due on the note secured by a deed of trust on the Property have not been made to Movant.

(4) ☐ The Debtor filed a Statement of Intentions that indicates the Debtor intends to surrender the Property.

(5) ☐ The Movant regained possession of the Property on (*date*) _____,
which is ☐ prepetition ☐ postpetition.

(6) ☒ For other cause for relief from stay, see attached continuation page.

b. ☒ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and, pursuant to § 362(d)(2)(B), the Property is not necessary to an effective reorganization.

c. ☐ Pursuant to 11 U.S.C. § 362(d)(3), the Debtor has failed, within the later of 90 days after the order for relief or 30 days after the court determined that the Property qualifies as "single asset real estate" as defined in 11 U.S.C. § 101(51B) to file a reasonable plan of reorganization or to commence monthly payments.

d. ☐ Pursuant to 11 U.S.C. § 362(d)(4), the Debtor's filing of the bankruptcy petition was part of a scheme to delay, hinder, or defraud creditors that involved:

(1) ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval; or

(2) ☐ Multiple bankruptcy cases affecting the Property.

**5.** ☐ **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor.

a. ☐ These actions were taken before Movant knew the bankruptcy case had been filed, and Movant would have been entitled to relief from the stay to proceed with these actions.

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

c. ☐ Other (*specify*):

**6. Evidence in Support of Motion:  (D***eclaration(s) MUST be signed under penalty of perjury and attached to this motion*)

a. The REAL PROPERTY DECLARATION on page 6 of this motion.

b. ☒ Supplemental declaration(s).

c. ☐ The statements made by Debtor under penalty of perjury concerning Movant's claims and the Property as set forth in Debtor's case commencement documents.  Authenticated copies of the relevant portions of the case commencement documents are attached as Exhibit _____.

d. ☐ Other:

**7.** ☒ **An optional Memorandum of Points and Authorities is attached to this motion.**

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                     Page 4                                     **F 4001-1.RFS.RP.MOTION**

**Movant requests the following relief:**

1. Relief from the stay is granted under:  ☒ 11 U.S.C. § 362(d)(1)  ☒ 11 U.S.C. § 362(d)(2)  ☐ 11 U.S.C. § 362(d)(3).

2. ☒ Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property.

3. ☐ Movant, or its agents, may, at its option, offer, provide and enter into a potential forebearance agreement, loan modification, refinance agreement or other loan workout or loss mitigation agreement.  Movant, through its servicing agent, may contact the Debtor by telephone or written correspondence to offer such an agreement.

4. ☐ Confirmation that there is no stay in effect.

5. ☐ The stay is annulled retroactive to the bankruptcy petition date.  Any postpetition actions taken by Movant to enforce its remedies regarding the Property shall not constitute a violation of the stay.

6. ☐ The co-debtor stay of 11 U.S.C. §1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

7. ☐ The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

8. ☐ A designated law enforcement officer may evict the Debtor and any other occupant from the Property regardless of any future bankruptcy filing concerning the Property for a period of 180 days from the hearing on this Motion:
   ☐ without further notice, or  ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

9. ☐ Relief from the stay is granted under 11 U.S.C. § 362(d)(4):  If recorded in compliance with applicable state laws governing notices of interests or liens in real property, the order is binding in any other case under this title purporting to affect the Property filed not later than 2 years after the date of the entry of the order by the court, except that a debtor in a subsequent case under this title may move for relief from the order based upon changed circumstances or for good cause shown, after notice and hearing.

10. ☐ The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days from the hearing of this Motion:
   ☐ without further notice, or  ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

11. ☐ The order is binding and effective in any future bankruptcy case, no matter who the debtor may be:

   ☐ without further notice, or  ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

12. ☐ Upon entry of the order, for purposes of Cal. Civ. Code § 2923.5, the Debtor is a borrower as defined in Cal. Civ. Code § 2920.5(c)(2)(C).

13. ☐ If relief from stay is not granted, adequate protection shall be ordered.

14. ☒ See attached continuation page for other relief requested.

Date:  06/19/2020

Kasowitz Benson Torres LLP
_____
Printed name of law firm (*if applicable*)
Andrew R.J. Muir
_____
Printed name of individual Movant or attorney for Movant

/s/ Andrew R.J. Muir
_____
Signature of individual Movant or attorney for Movant

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# REAL PROPERTY DECLARATION

I, (*print name of Declarant*) _Brandon Kufrin_____ , declare:

1.  I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age. I have knowledge regarding Movant's interest in the real property that is the subject of this Motion (Property) because (*specify*):

    a.  ☐  I am the Movant.

    b.  ☒  I am employed by Movant as (*state title and capacity*): a senior portfolio manager at Cairn Capital Limited

    c.  ☐  Other (*specify*):

2.  a.  ☐  I am one of the custodians of the books, records and files of Movant that pertain to loans and extensions of credit given to Debtor concerning the Property. I have personally worked on the books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant. These books, records and files were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the actions, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the court if required.

    b.  ☒  Other (*see attached*):

        See memorandum and declarations filed concurrently herewith.

3.  The Movant is:

    a.  ☒  Holder: Movant has physical possession of a promissory note that (1) names Movant as the payee under the promissory note or (2) is indorsed to Movant, or indorsed in blank, or payable to bearer. A true and correct copy of the note, with affixed allonges/indorsements, is attached as Exhibit <u>hereto</u>.

    b.  ☒  Beneficiary: Movant is either (1) named as beneficiary in the security instrument on the subject property (e.g.,mortgage or deed of trust) or (2) is the assignee of the beneficiary. True and correct copies of the recorded security instrument and assignments are attached as Exhibit <u>hereto</u>.

    c.  ☐  Servicing agent authorized to act on behalf of the:

        ☐  Holder.
        ☐  Beneficiary.

    d.  ☒  Other (*specify*): See memorandum and declarations filed concurrently herewith.

4.  a.  The address of the Property is:

        *Street address*: 9135 Hazen Drive
        *Unit/suite no.*:
        *City, state, zip code*: Los Angeles, CA, 90210

    b.  The legal description of the Property or document recording number (including county of recording) set forth in the Movant's deed of trust is:

        See memorandum and declarations filed concurrently herewith.

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2017                                         Page 6                                  **F 4001-1.RFS.RP.MOTION**

5. Type of property (*check all applicable boxes*):

   a. ☐ Debtor's principal residence      b. ☒ Other residence
   c. ☐ Multi-unit residential            d. ☐ Commercial
   e. ☐ Industrial                        f. ☐ Vacant land
   g. ☐ Other (*specify*):

6. Nature of the Debtor's interest in the Property:

   a. ☒ Sole owner

   b. ☐ Co-owner(s) (*specify*):

   c. ☐ Lienholder (*specify*):

   d. ☐ Other (*specify*):

   e. ☐ The Debtor  ☐ did  ☐ did not  list the Property in the Debtor's schedules.

   f. ☐ The Debtor acquired the interest in the Property by ☐ grant deed ☐ quitclaim deed ☐ trust deed.

      The deed was recorded on (*date*) _____.

7. Movant holds a  ☐ deed of trust  ☐ judgment lien  ☐ other (*specify*) _____
   that encumbers the Property.

   a. ☒ A true and correct copy of the document as recorded is attached as Exhibit <u>hereto</u>.

   b. ☒ A true and correct copy of the promissory note or other document that evidences the Movant's claim is
      attached as Exhibit <u>hereto</u>.

   c. ☐ A true and correct copy of the assignment(s) transferring the beneficial interest under the note and deed of
      trust to Movant is attached as Exhibit _____.

8. Amount of Movant's claim with respect to the Property:

|   |   | PREPETITION | POSTPETITION | TOTAL |
|---|---|---|---|---|
| a. | Principal: | $ | $ | $ |
| b. | Accrued interest: | $ | $ | $ |
| c. | Late charges | $ | $ | $ |
| d. | Costs (attorney's fees, foreclosure fees, other costs): | $ | $ | $ |
| e. | Advances (property taxes, insurance): | $ | $ | $ |
| f. | Less suspense account or partial balance paid: | $[          ] | $[          ] | $[          ] |
| g. | TOTAL CLAIM as of (*date*): June 18, 2020 | $ | $ | $ 14,724,332 |

   h. ☒ Loan is all due and payable because it matured on (*date*) <u>See memorand</u>um and declarations filed concurrently
      herewith.

9. Status of Movant's foreclosure actions relating to the Property (*fill the date or check the box confirming no such action
   has occurred*):

   a. Notice of default recorded on (*date*) <u>01/30/2020</u> or ☐ none recorded.

   b. Notice of sale recorded on (*date*) <u>05/04/2020</u> or ☐ none recorded.

   c. Foreclosure sale originally scheduled for (*date*) <u>06/02/2020</u> or ☐ none scheduled.

   d. Foreclosure sale currently scheduled for (*date*) <u>06/30/2020</u> or ☐ none scheduled.

   e. Foreclosure sale already held on (*date*) _____ or ☒ none held.

   f. Trustee's deed upon sale already recorded on (*date*) _____ or ☒ none recorded.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

10. Attached (*optional*) as Exhibit _____ is a true and correct copy of a POSTPETITION statement of account that accurately reflects the dates and amounts of all charges assessed to and payments made by the Debtor since the bankruptcy petition date.

11. ☒ (*chapter 7 and 11 cases only*) Status of Movant's loan:

    a. Amount of current monthly payment as of the date of this declaration: $_____ for the month of _____ 20___.

    b. Number of payments that have come due and were not made: _____. Total amount: $_____

    c. Future payments due by time of anticipated hearing date (*if applicable*):

        An additional payment of $_____ will come due on (*date*) _____, and on the _____ day of each month thereafter. If the payment is not received within _____ days of said due date, a late charge of $_____ will be charged to the loan.

    d. The fair market value of the Property is $_____, established by:

        (1) ☐ An appraiser's declaration with appraisal is attached as Exhibit _____.

        (2) ☐ A real estate broker or other expert's declaration regarding value is attached as Exhibit _____.

        (3) ☐ A true and correct copy of relevant portion(s) of the Debtor's schedules is attached as Exhibit _____.

        (4) ☒ Other (*specify*):

            See memorandum and declarations filed concurrently herewith.

    **e. Calculation of equity/equity cushion in Property:**

        Based upon ☐ a preliminary title report ☒ the Debtor's admissions in the schedules filed in this case, the Property is subject to the following deed(s) of trust or lien(s) in the amounts specified securing the debt against the Property:

| | Name of Holder | Amount as Scheduled by Debtor (*if any*) | Amount known to Declarant and Source |
|---|---|---|---|
| 1st deed of trust: | Cairn Capital Investment Funds ICAV | $ 14,341,996.00 | $ |
| 2nd deed of trust: | | $ | $ |
| 3rd deed of trust: | | $ | $ |
| Judgment liens: | | $ | $ |
| Taxes: | Los Angeles County Tax Collector | $ 188,979.95 | $ |
| Other: | | $ | $ |
| **TOTAL DEBT: $ 14,530,975.95** | | | |

    f. Evidence establishing the existence of these deed(s) of trust and lien(s) is attached as Exhibit _____ and consists of:

        (1) ☐ Preliminary title report.

        (2) ☐ Relevant portions of the Debtor's schedules.

        (3) ☒ Other (*specify*): See memorandum and declarations filed concurrently herewith.

    g. ☐ **11 U.S.C. § 362(d)(1) - Equity Cushion:**
        I calculate that the value of the "equity cushion" in the Property exceeding Movant's debt and any lien(s) senior to Movant's debt is $_____ and is _____% of the fair market value of the Property.

    h. ☒ **11 U.S.C. § 362(d)(2)(A) - Equity:**
        By subtracting the total amount of all liens on the Property from the value of the Property as set forth in Paragraph 11(e) above, I calculate that the Debtor's equity in the Property is $ 0_____.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                      Page 8                                      **F 4001-1.RFS.RP.MOTION**

i. ☐ Estimated costs of sale: $ __TBD_____ (estimate based upon _____% of estimated gross sales price)

j. ☐ The fair market value of the Property is declining because:

12. ☐ (*Chapter 12 and 13 cases only*) Status of Movant's loan and other bankruptcy case information:

a. A 341(a) meeting of creditors is currently scheduled for (*or concluded on*) the following date: _____.
A plan confirmation hearing currently scheduled for (for concluded on) the following date:_____.
A plan was confirmed on the following date (*if applicable*): _____.

b. Postpetition preconfirmation payments due BUT REMAINING UNPAID since the filing of the case:

| Number of Payments | Number of Late Charges | Amount of Each Payment or Late Charge | Total |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

(See attachment for additional breakdown of information attached as Exhibit _____.)

c. Postpetition postconfirmation payments due BUT REMAINING UNPAID since the filing of the case:

| Number of Payments | Number of Late Charges | Amount of each Payment or Late Charge | Total |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

d. Postpetition advances or other charges due but unpaid:                          $
(*For details of type and amount, see Exhibit _____*)

e. Attorneys' fees and costs:                          $
(*For details of type and amount, see Exhibit _____*)

f. Less suspense account or partial paid balance:          $[                          ]

TOTAL POSTPETITION DELINQUENCY:          $

g. Future payments due by time of anticipated hearing date (*if applicable*): _____.
An additional payment of $_____ will come due on _____, and on
the _____ day of each month thereafter. If the payment is not received by the _____ day of the month, a late charge of $_____ will be charged to the loan.

h. Amount and date of the last 3 postpetition payments received from the Debtor in good funds, regardless of how applied (if applicable):
$_____ received on (*date*) _____
$_____ received on (*date*) _____
$_____ received on (*date*) _____

i. ☐ The entire claim is provided for in the chapter 12 or 13 plan and postpetition plan payments are delinquent. A plan payment history is attached as Exhibit _____. See attached declaration(s) of chapter 12 trustee or 13 trustee regarding receipt of payments under the plan (*attach LBR form F 4001-1.DEC.AGENT.TRUSTEE*).

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                          Page 9                          **F 4001-1.RFS.RP.MOTION**

13. ☐  Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with the Debtor.

14. ☐  The court determined on (*date*) _____ that the Property qualifies as "single asset real estate" as defined in 11 U.S.C. § 101(51B).  More than 90 days have passed since the filing of the bankruptcy petition; more than 30 days have passed since the court determined that the Property qualifies as single asset real estate; the Debtor has not filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or the Debtor has not commenced monthly payments to Movant as required by 11 U.S.C. § 362(d)(3).

15. ☐  The Debtor's intent is to surrender the Property.  A true and correct copy of the Debtor's statement of intentions is attached as Exhibit _____.

16. ☐  Movant regained possession of the Property on (*date*) _____, which is  ☐ prepetition  ☐ postpetition.

17. ☒  The bankruptcy case was filed in bad faith:

    a.  ☐  Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

    b.  ☐  Other bankruptcy cases have been filed in which an interest in the Property was asserted.

    c.  ☐  The Debtor filed only a few case commencement documents.  Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

    d.  ☒  Other (*specify*):

        See memorandum and declarations filed concurrently herewith.

18. ☐  The filing of the bankruptcy petition was part of a scheme to delay, hinder, or defraud creditors that involved:

    a.  ☐  The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval. See attached continuation page for facts establishing the scheme.

    b.  ☐  Multiple bankruptcy cases affecting the Property include:

        1.  Case name: _____
            Chapter: _____  Case number: _____
            Date dismissed: _____  Date discharged: _____  Date filed: _____
            Relief from stay regarding the Property ☐ was  ☐ was not  granted.

        2.  Case name: _____
            Chapter: _____  Case number: _____
            Date dismissed: _____  Date discharged: _____  Date filed: _____
            Relief from stay regarding the Property ☐ was  ☐ was not  granted.

        3.  Case name: _____
            Chapter: _____  Case number: _____
            Date dismissed: _____  Date discharged: _____  Date filed: _____
            Relief from stay regarding the Property  ☐ was  ☐ was not  granted.

    ☐  See attached continuation page for information about other bankruptcy cases affecting the Property.

    ☐  See attached continuation page for facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, or defraud creditors.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

19. ☐ Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

   a. ☐ These actions were taken before Movant knew the bankruptcy petition had been filed, and Movant would have been entitled to relief from stay to proceed with these actions.

   b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

   c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

**DocuSigned by:**

| 6/19/2020 | Brandon Kufrin | 3901D2CD65ED4C3... |
|---|---|---|
| *Date* | *Printed name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2017*                                      Page 11                              **F 4001-1.RFS.RP.MOTION**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
101 California Street, Suite 3000, San Francisco, CA 94111

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (REAL PROPERTY)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _06/19/2020_, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

David B Golubchik – dbg@lnbyb.com
Ron Maroko – ron.maroko@usdoj.gov
Kurt Ramlo – kr@lnbyb.com
United States Trustee (L.A.) – ustpregion16.la.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 06/19/2020 | Andrew R.J. Muir | /s/ Andrew R.J. Muir |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
101 California Street, Suite 3000, San Francisco, CA 94111

A true and correct copy of the foregoing document entitled (*specify*): Notice of Motion and Motion for Order
Appointing Trustee Pursuant to 11 U.S.C. § 1104(a); Memorandum of Points and Authorities; Declarations of
Brandon Kufrin and Andrew K. Glenn in Support Thereof

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
06/19/2020           , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:
  David B Golubchik – dbg@lnbyb.com
  Ron Maroko – ron.maroko@usdoj.gov
  Kurt Ramlo – kr@lnbyb.com
  United States Trustee (L.A.) – ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*)                   , I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)                   , I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 06/19/2020 | Andrew R.J. Muir | /s/ Andrew R.J. Muir |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**