1

**KASOWITZ BENSON TORRES LLP**

2

*Attorneys for Cairn Capital*
*Investment Funds ICAV*

3

*for its sub fund Cairn Capstone*
*Special Opportunities Fund*

4

5

6

7

8

**UNITED STATES BANKRUPTCY COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

**LOS ANGELES DIVISION**

11

12

In re:

Bankruptcy Case No.: 2:20-bk-15015-BR

13

TEMERITY TRUST MANAGEMENT, LLC,

Chapter 11

14

Debtor.

**REPLY IN FURTHER SUPPORT**
**OF MOTION FOR (I) ORDER**

15

**APPOINTING TRUSTEE PURSUANT**
**TO 11 U.S.C. § 1104(A), OR,**

16

**ALTERNATIVELY, (II) ORDER**
**GRANTING RELIEF FROM**

17

**AUTOMATIC STAY PURSUANT**
**TO 11 U.S.C. § 362(D)**

18

Hearing Date: July 21, 2020

19

20

Time: 10:00 a.m.

21

Courtroom: 1668

22

23

24

25

26

27

28

Case 2:20-bk-15015-BR    Doc 39-1    Filed 07/14/20    Entered 07/14/20 20:24:20    Desc
Complete PDF    Page 2 of 83

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

REPLY ............................................................................................................................ 3

I.     THE COURT SHOULD GRANT THE MOTION BECAUSE THE DEBTOR
       FAILED TO FILE THE OPPOSITION IN A TIMELY MANNER ................... 3

II.    THE COURT SHOULD APPOINT A TRUSTEE PURSUANT TO SECTION
       1104(A) OF THE BANKRUPTCY CODE ........................................................ 4

       A.    The Debtor Has Not Cured Sadleir's Tainted Management ..................... 4

       B.    The Alleged Appointment of Kadadu as Manager Does Not Eliminate
             the Cause for Appointing a Trustee ........................................................ 6

       C.    Sadleir and Kadadu Have Repeatedly Breached Their Fiduciary Duties
             to the Debtor ........................................................................................... 9

       D.    Appointment of a Trustee Is in the Best Interests of Creditors ............... 11

III.   ALTERNATIVELY, THE COURT SHOULD LIFT THE AUTOMATIC
       STAY .............................................................................................................. 12

       A.    Cairn Has Shown "Cause" for Lifting the Automatic Stay Under Section
             362(d)(1) ................................................................................................ 12

       B.    Relief from Stay Is Also Justified Under Section 362(d)(2) .................... 15

IV.    CAIRN PROVIDED PROPER NOTICE OF THE MOTION ........................... 15

CONCLUSION ............................................................................................................... 17

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

- i -

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*In re Am. Res., Ltd.*,
   54 B.R. 245 (Bankr. D. Haw. 1985)........................................................................5

5

*In re Big3D, Inc.*,
6   Case No. 08-16768, 2009 WL 9085556 (Bankr. E.D. Cal. Aug. 28, 2009),
   *aff'd*, 438 B.R. 214 (B.A.P. 9th Cir. 2010) ...............................................................13

7

*In re BLX Grp., Inc.*,
8   419 B.R. 457 (Bankr. D. Mont. 2009) ...............................................................9, 11

9

*In re Century Inv. Fund VIII Ltd. P'ship*,
   155 B.R. 1002 (Bankr. E.D. Wis. 1989) ...............................................................15

10

*In re Clinton Centrifuge, Inc.*,
11   85 B.R. 980 (Bankr. E.D. Pa. 1988)......................................................................11

12

*Dardarian v. La Sherene, Inc. (In re La Sherene, Inc.)*,
   3 B.R. 169 (Bankr. N.D. Ga. 1980) ........................................................................7

13

*In re DB Capital Holdings, LLC*,
14   454 B.R. 804 (Bankr. D. Colo. 2011) ....................................................................12

15

*In re Hatch*,
   Case No. 17-23829, 2017 WL 8738241 (Bankr. E.D. Cal. Aug. 30, 2017) ...........13

16

*In re Intercat, Inc.*,
17   247 B.R. 911 (Bankr. S.D. Ga. 2000) ....................................................................11

18

*Kassabian v. Dobos (In re Dobos)*,
   Case No. 18-1001-BR (Bankr. C.D. Cal. Oct. 30, 2018), *aff'd*, 603 B.R. 31
19   (B.A.P. 9th Cir. 2019)..............................................................................................4

20

*In re McFadden*,
   471 B.R. 136 (Bankr. D.S.C. 2012) .......................................................................14

21

*Meadowbrook Inv'rs' Grp. v. Thirtieth Place, Inc. (In re Thirtieth Place, Inc.)*,
22   30 B.R. 503 (B.A.P. 9th Cir. 1983).........................................................................14

23

*In re Okla. Ref. Co.*,
   838 F.2d 1133 (10th Cir. 1988)................................................................................6

24

*Pinnacle Rest. at Big Sky, LLC v. CH SP Acquisitions, LLC (In re Spanish Peaks*
25   *Holdings II, LLC)*,
   872 F.3d 892 (9th Cir. 2017)....................................................................................2

26

*In re Real Estate Partners, Inc.*,
27   Case No. 07-13239, 2007 WL 7025114 (Bankr. C.D. Cal. Nov. 20, 2007),
   *aff'd*, Case No. 07-1440, 2009 WL 3246619 (C.D. Cal. Oct. 5, 2009) ................7, 8

28

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

*In re Tel-Net Haw., Inc.*,
  105 B.R. 594 (Bankr. D. Haw. 1989)...................................................................................9

*In re The 1031 Tax Grp., LLC*,
  374 B.R. 78 (Bankr. S.D.N.Y. 2007) ...................................................................................7

*Tradex Corp. v. Morse*,
  339 B.R. 823 (D. Mass. 2006) .............................................................................................6

**Statutes**

11 U.S.C. 1104(a)(2) ...............................................................................................................11

11 U.S.C. § 362(d) ...................................................................................................................17

11 U.S.C. § 362(d)(1)..............................................................................................12, 13, 14, 15

11 U.S.C. § 362(d)(2)...............................................................................................................15

11 U.S.C. § 362(g) ...................................................................................................................13

11 U.S.C. § 363 ..........................................................................................................................2

11 U.S.C. § 1104(a) ......................................................................................................... *passim*

11 U.S.C. § 1104(a)(1)...................................................................................................5, 6, 7, 8

11 U.S.C. § 1104(a)(2)........................................................................................................11, 12

**Other Authorities**

Barry Russell, Bankruptcy Evidence Manual, Vol. II, § 701.2, pp. 784-85 (2012-13) .................13

Fed. R. Bankr. P. 4001(a)........................................................................................................16

Fed. R. Evid. 701 .....................................................................................................................13

Fed. R. Evid. 702 .....................................................................................................................13

Fed. R. Evid. 803(6).................................................................................................................14

https://www.justice.gov/usao-cdca/pr/hollywood-executive-arrested-federal-fraud-
  charges-allege-he-pocketed-money-covid-19 .......................................................................5

Local R. 9013-1(d)....................................................................................................................15

Local R. 9013-1(f)(1)..................................................................................................................3

Local R. 9013-1(h).....................................................................................................................3

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Cairn Capital Investment Funds ICAV, for its sub fund Cairn Capstone Special

2    Opportunities Fund ("Cairn"),[1] hereby respectfully submits this Reply in further support of its

3    *Motion for (I) Order Appointing Trustee Pursuant to 11 U.S.C. § 1104(a), or, Alternatively, (II)*

4    *Order Granting Relief From Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Docket No. 25] (the

5    "Motion") and in response to the Debtor's opposition to the Motion [Docket No. 37] (the

6    "Opposition" or "Opp.").[2]

7                                **PRELIMINARY STATEMENT**

8            The Debtor does not dispute that William Sadleir – who has been charged in two

9    jurisdictions for fraud and other financial crimes – is unfit to serve as a fiduciary for the Debtor's

10   estate.  Recognizing that Sadleir's continued service as the Debtor's manager constitutes "cause"

11   for appointing a trustee under Section 1104(a) of the Bankruptcy Code, the Debtor has sought to

12   implement a purported quick fix:  replacing Sadleir with his wife, Ms. Hanan Kadadu.  This

13   blatant attempt to circumvent Section 1104(a) fails as a matter of law.

14           Where, as here, cause exists to replace the debtor's management under Section 1104(a), the

15   only way a debtor can avoid the appointment of a trustee is by moving the court to appoint a

16   "responsible person" who is not beholden to prior management or influenced by it, is free from the

17   taint of its wrongdoing and is fit to serve as a fiduciary.  The Debtor has not even attempted to

18   show that Kadadu meets this criteria or can be trusted to manage the Debtor.  Indeed, the record is

19   clear that Kadadu – who appointed Sadleir as the Debtor's authorized agent *following his arrest in*

20   *connection with the PPP Criminal Complaint* – is beholden to Sadleir and purports to serve as the

21   Debtor's manager for the sole purpose of defeating the Motion.

22           Nor does the illusory ouster of Sadleir in favor of Kadadu cure the irreconcilable conflict of

23   interest between the Debtor and its management, which stems from the fact that Kadadu and

24   Sadleir live in the Property – which the Debtor owns – pursuant to a purported "arrangement" that

25   Kadadu and Sadleir negotiated *with themselves*.  Worse still, Kadadu's own testimony shows that

26   she and Sadleir engaged in blatant self-dealing to the detriment of Cairn and other creditors.  Most

27   

28   

---

[1]      All references in this Motion to Cairn shall be deemed to include, as the context may require, its investment manager, Cairn Capital Limited.

[2]      Capitalized terms used but not defined in this Reply shall have the meanings ascribed to them in the Motion.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1    glaringly, Kadadu and Sadleir allowed the Debtor's subsidiaries to use the Property to entertain

2    their employees and business executives **for no consideration**.  Moreover, Sadleir and Kadadu

3    claim to have paid "rent" for the Property in the form of an agreement to reduce Sadleir's salary

4    **from one of the Debtor's subsidiaries – not the Debtor**.  Kadadu and Sadleir have shown

5    through their actions that they cannot be trusted to manage the Debtor in the Chapter 11 Case.  A

6    trustee must be appointed to protect creditors from further wrongdoing.

7         To ensure that the Debtor's unsecured creditors reap a monetary benefit from the

8    appointment of a trustee – and notwithstanding the fact that Cairn's secured claim is larger than

9    the value of the Property – Cairn would be willing to set aside funds (*e.g.*, from proceeds of a sale

10    of the Property), in a reasonable amount to be determined following consultation and negotiation

11    with the trustee, to (i) pay the fees and costs of the trustee; and (ii) provide a recovery to the

12    Debtor's unsecured creditors.  Cairn therefore believes that unsecured creditors may receive

13    higher distributions if a trustee is appointed than if Cairn were able to proceed with the

14    foreclosure on the Property outside of bankruptcy.

15         If the stay is lifted or this bankruptcy case is dismissed, Sadleir may succeed in further

16    eroding the value of the Property to the detriment of all creditors.  Outside of bankruptcy, Sadleir

17    will likely try to delay a value-maximizing sale of the Property after a foreclosure by taking

18    advantage of the moratorium on eviction proceedings in Los Angeles County, which could allow

19    him to remain in the Property for months, if not years.  Thus, if this case were dismissed, Sadleir

20    may still emerge victorious in his goal of hindering Cairn and other creditors and causing them

21    delay, and continuing his improper extraction of value from the Debtor without giving any

22    consideration.  Sadleir should not be permitted to use the moratorium on evictions – which is

23    meant to protect those affected by the COVID-19 pandemic – as a sword against innocent

24    creditors.  A Chapter 11 trustee would be able to conduct a rigorous marketing process for the

25    Property and sell it pursuant to Section 363 of the Bankruptcy Code free and clear of Sadleir's

26    purported possessory interest in the Property, for the benefit of all creditors.[3]  Thus, Cairn

27

28

---

[3]     *See generally Pinnacle Rest. at Big Sky, LLC v. CH SP Acquisitions, LLC (In re Spanish Peaks Holdings II, LLC)*, 872 F.3d 892 (9th Cir. 2017).

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

strongly prefers the appointment of a Chapter 11 trustee to all other potential remedies.  And such an appointment will still provide Sadleir with an opportunity to refinance Cairn's loans pending the trustee's disposition of the Property.

Finally, the Opposition fails to refute that cause exists to lift the automatic stay – which Cairn seeks as an alternative relief – and allow Cairn to complete the foreclosure on the Property. The rapid erosion of the value of Cairn's collateral, caused among other things by the Debtor's failure to pay taxes on the Property, is beyond cavil.  Nor has the Debtor carried its burden of showing that Cairn's secured position is adequately protected by the existence of an equity cushion.  Therefore, if the Court does not appoint a trustee, it should grant Cairn relief from the automatic stay.

## **REPLY**

## I.    **THE COURT SHOULD GRANT THE MOTION BECAUSE THE DEBTOR FAILED TO FILE THE OPPOSITION IN A TIMELY MANNER**

1.    The Debtor was required to file its Opposition by July 7, 2020 (14 days before the hearing on the Motion) pursuant to Local Rule 9013-1(f)(1).  On July 7, 2020, the Debtor's proposed counsel contacted Cairn's counsel by telephone to request a 24-hour extension to submit the Opposition due to personal issues.  As a professional courtesy, Cairn's counsel agreed to a 24-hour extension.[4]

2.    The Debtor filed the Opposition, without the Kadadu Declaration (as defined below), at 7:17 a.m. on July 9, 2020, *i.e.*, more than **seven hours** after the extended deadline.  *See* Docket No. 34.  A "corrected" Opposition, which included the Kadadu Declaration, was filed later that day at 1:56 p.m., *i.e.*, almost **14 hours** after the extended deadline.  *See* Docket No. 37.

3.    The Debtor's tardy filing has materially disadvantaged Cairn by curtailing the time allotted to it to prepare and file this Reply.  The Court should therefore grant the Motion pursuant to Local Rule 9013-1(h), which instructs that "if a party does not timely file and serve documents,

---

[4]    A true and correct copy of the correspondence between the Debtor's proposed counsel and Cairn's counsel confirming the 24-hour extension is attached as Exhibit A to the *Supplemental Declaration of Andrew K. Glenn in Support of Cairn's Motion for (I) Order Appointing Trustee Pursuant to 11 U.S.C. § 1104(a), or, Alternatively, (II) Order Granting Relief From Automatic Stay Pursuant to 11 U.S.C. § 362(d)* ("Glenn Supp. Decl."), which is filed concurrently herewith.

1    the court may deem this to be consent to granting or denial of the motion, as the case may be."

2    *See also Kassabian v. Dobos (In re Dobos)*, Case No. 18-1001-BR, July 31, 2018 Hr'g Tr. at 2

3    (Bankr. C.D. Cal. Oct. 30, 2018) [Docket No. 28], *aff'd*, 603 B.R. 31 (B.A.P. 9th Cir. 2019)

4    (granting a motion to dismiss a complaint and refusing to consider an opposition thereto where

5    the opposition was tardy and included no explanation for the delay).[5]

6        4.    Even if the Court were to consider the Opposition, however, the Motion should be

7    granted for the reasons stated therein and as further explained below.

8    **II.    THE COURT SHOULD APPOINT A TRUSTEE PURSUANT TO
9        SECTION 1104(A) OF THE BANKRUPTCY CODE**

10        **A.    <u>The Debtor Has Not Cured Sadleir's Tainted Management</u>**

11        5.    On June 15, 2020 – fourteen days after Sadleir signed and filed the Chapter 11

12    petition as the Debtor's manager – the Debtor filed with the Court a *Consent and Agreement of*

13    *the Sole Member of Temerity Trust Management, LLC to Commence Chapter 11 Bankruptcy*

14    *Proceeding* (the "<u>Consent and Agreement</u>").  *See* Docket No. 17 at 31-32.  The Consent and

15    Agreement, a document signed by Kadadu as "Sole Member" and Sadleir as "Manager,"

16    empowers, directs and authorizes Sadleir without further action to (i) "direct the Bankruptcy

17    Case"; (ii) act as a "Responsible Individual" or "Authorized Agent" for the Company in the

18    Chapter 11 Case; and (iii) "take all actions necessary or appropriate to successfully prosecute a

19    Chapter 11 case, including . . . the using of Company assets . . . act on Company's behalf . . .

20    and/or execute all agreements . . . and to do all things, as shall be necessary and [appropriate] in

21    his best judgment to effect the foregoing."  *See id.* at 31.

22        6.    The Debtor asserts, however, that "immediately after" the filing of the Chapter 11

23    Case on June 1, 2020 (the "<u>Petition Date</u>"), Kadadu allegedly "asked for and accepted the

24    resignation of [Sadleir] as manager," and on June 2, 2020 "appointed [herself] as sole manager."

25    *See* Kadadu Decl. ¶¶ 1, 14.[6]

26        7.    That explanation defies credulity.  *First*, the Consent and Agreement is the only

27

28

---

[5]    A true and correct copy of the Court's bench ruling in *In re Dobos* is attached hereto.

[6]    The Declaration of Hanan Kadadu (the "<u>Kadadu Declaration</u>" or "<u>Kadadu Decl.</u>") was filed concurrently with the "corrected" Opposition [Docket No. 37].

operative document before the Court concerning the governance of the Debtor during the Chapter 11 Case.  While the Debtor argues that the Consent and Agreement was purportedly revoked by Kadadu on June 2, 2020, the Debtor has failed to put forth any documentation evidencing this alleged revocation of Sadleir's corporate authority.

8.    *Second*, the Debtor does not explain (because it cannot) why Kadadu would authorize Sadleir to commence the Chapter 11 Case and appoint him as the Debtor's sole "Authorized Agent" in the Chapter 11 Case, only to revoke that authority and demand his resignation immediately thereafter.  Indeed, because Kadadu lives with Sadleir (Kadadu Decl. ¶ 15), she learned of the criminal complaints against Sadleir no later than May 22, 2020 – *ten days before the Petition Date* – when Sadleir was arrested.[7]  The Debtor does not point to any new information concerning Sadleir's acts of fraud that came to light in the first 24 hours of the Chapter 11 Case – or any other change in circumstances during that period – that would explain Kadadu's alleged decision to remove Sadleir from management on June 2, 2020.

9.    *Third*, while the Debtor admits that Kadadu transferred her membership interest in the Debtor to the *William K. Sadleir and Hannah K. Sadleir Trust* in 2017, it alleges that "[s]hortly after the Petition Date, the Sadleirs agreed to amend the trust to provide that **notwithstanding anything to the contrary in the trust**, Mr. Sadleir has no right to manage the Debtor or any of its subsidiaries." *See* Opp. at 8-9; Kadadu Decl. ¶ 23 (emphasis added).  Again, the Debtor has presented no documentation evidencing this alleged amendment of the trust agreement.

10.    As highlighted by its attempt to distance itself from Sadleir, the Debtor does not seriously dispute that cause exists to remove Sadleir from management in light of the criminal proceedings pending against him.  Nor does the Debtor dispute (because it cannot) that courts in this Circuit and others have uniformly "[taken] into evidence" pending criminal charges and ongoing investigations by governmental authorities against the debtor's management when considering motions to appoint a trustee pursuant to Section 1104(a)(1).  Opp. at 13 n.1.  *See In re*

---

[7]    *See* https://www.justice.gov/usao-cdca/pr/hollywood-executive-arrested-federal-fraud-charges-allege-he-pocketed-money-covid-19.

KASOWITZ BENSON TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1    *Am. Res., Ltd.*, 54 B.R. 245, 247 (Bankr. D. Haw. 1985) ("[I]ndependent inquiry by the federal

2    grand jury [among other bodies] has . . . found substantial basis in the facts to support the

3    concerns expressed by the creditors who seek appointment of a trustee."); *In re Okla. Ref. Co.*,

4    838 F.2d 1133, 1136 n.2 (10th Cir. 1988) (affirming bankruptcy court's decision to appoint a

5    trustee, reasoning that "[c]ase law . . . supports lenders' claims that debtor's effort to manage the

6    company was impeded by the existence of at least four criminal cases pending against either the

7    debtor's president . . . or some of the affiliated companies."); *Tradex Corp. v. Morse*, 339 B.R.

8    823, 834-35 (D. Mass. 2006) (affirming bankruptcy court's decision to appoint a trustee in light

9    of "[t]he existence of a grand jury investigation and civil suits pursuing allegations relating to [the

10   debtor's president and sole shareholder's] business actions[.]").[8]

11          11.    Furthermore, the Debtor has not cited *any* authority to support its argument that

12   the Criminal Complaint, the PPP Criminal Complaint, the SEC Complaint and the BlackRock

13   Complaint are "inadmissible hearsay."  *See* Opp. at 12 n.1.  As the foregoing cases show, they are

14   admissible and, in this case, highly probative.  Nor has the Debtor put forth any evidence to refute

15   the criminal allegations against Sadleir, which, as the Debtor acknowledges, are "of serious

16   concern."  *See id.* 13 n.1.  The Court should remove Sadleir from management and appoint a

17   trustee for this reason alone.

18          **B.    The Alleged Appointment of Kadadu as Manager Does
19          Not Eliminate the Cause for Appointing a Trustee**

20          12.    Recognizing that Sadleir's fraudulent acts constitute "cause" for appointing a

21   trustee under Section 1104(a) of the Bankruptcy Code, the Debtor has attempted a cynical and

22   ineffectual fix:  replacing Sadleir with his wife Kadadu as the Debtor's manager.  The Debtor

23   argues that because Kadadu "is not the subject of allegations made against [Debtor's] prior

24   management" there is no longer cause to appoint a trustee.  Opp. at 2.  The Debtor is wrong, and

25   its blatant attempt to eviscerate Section 1104(a) must fail.

26   ───────────────

[8]       The Debtor argues that *American Resources* and *Oklahoma Refining* are distinguishable because in both
27   cases there was additional evidence that supported a finding of "cause" under Section 1104(a)(1).  Opp. at 13 n.1.
Nothing in those cases, however, implies that the pendency of a criminal complaint against debtor's management –
28   let alone *two* criminal complaints *and* an SEC complaint – is insufficient to independently warrant the appointment of
a trustee, as it does here.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

- 6 -

13.     This Court has proscribed attempts to circumvent Section 1104(a) by installing as "new management" cronies of the managers subject to allegations of fraud or other misconduct. *In re Real Estate Partners, Inc.*, Case No. 07-13239, 2007 WL 7025114 (Bankr. C.D. Cal. Nov. 20, 2007), *aff'd*, Case No. 07-1440, 2009 WL 3246619 (C.D. Cal. Oct. 5, 2009).[9]  Where, as here, "new management was appointed shortly before or after a petition is filed" to replace a management whose acts constituted "cause" to appoint a trustee under Section 1104(a), the Court must undertake "heightened scrutiny" to ensure that the current management is not "'tainted' by association with prior bad management." *Id.* at *4.  While there is no *per se* rule that the court must appoint a trustee where the acts of former management amount to "cause" under Section 1104(a), the only way a debtor may avoid the appointment of a trustee in such a case is "by the expedient of a 'responsible person' or similar motion to the Court to appoint such a fiduciary other than a trustee." *Id.* at *2.  The debtor must put forth evidence that former management will "have absolutely no further role in the case." *Id.* at *1.  Further, the debtor must show that new management has "absolutely no connection to prior management, is in no way [beholden] to them and can serve as the kind of fiduciary that the case needs." *Id.* at *4.  The court then evaluates "whether prior management still has vestiges of control, whether the designated fiduciary is a known or an unknown and whether the designated fiduciary has the reputation and competence needed for the engagement." *Id.*

14.     Courts in other jurisdictions have similarly held that a debtor cannot avoid the appointment of a trustee under Section 1104 simply by appointing "new management" without showing that it is truly independent from, and not tainted by the acts of, prior management.  *See In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007) ("[T]he fact that the debtor's prior management might have been guilty of fraud, dishonesty, incompetence, or gross mismanagement does not necessarily provide grounds for the appointment of a trustee under § 1104(a)(1), **as long as a court is satisfied that the current management is free from the taint of prior management**.") (emphasis added); *Dardarian v. La Sherene, Inc. (In re La Sherene, Inc.)*, 3 B.R. 169, 175 (Bankr. N.D. Ga. 1980) ("Future plans, revealed by current

---

[9]     A Westlaw copy of the Court's decision in *Real Estate Partners* is attached hereto.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

management through testimony or much harder evidence, will not condone past management frauds, dishonesty, gross mismanagement, or incompetence so as to overcome the statutory requirement of Section 1104(a)(1) for the appointment of a trustee.").

15.    The Debtor has not moved the Court for permission to appoint Kadadu as a "responsible person" in lieu of a trustee.  Nor has it presented (because it cannot) *any* evidence that Sadleir will have "no further role" in the Chapter 11 Case, or that Kadadu has "absolutely no connection to [Sadleir], is in no way [beholden] to [Sadleir] and can serve as the kind of fiduciary that the case needs." *Real Estate Partners*, 2007 WL 7025114, at *1, *4.  The Court should grant the Motion for this reason alone.

16.    Moreover, *even if* the Debtor had properly sought the Court's permission to appoint Kadadu as a fiduciary, the record is clear that Kadadu is unfit to serve as a "responsible person" for the Debtor.

17.    *First*, far from having "absolutely no connection" to Sadleir, Kadadu is married to Sadleir and lives with him.  *See* Kadadu Decl. ¶ 15.  Kadadu is also Sadleir's business partner and his joint beneficiary in the *William K. Sadleir and Hannah K. Sadleir Trust*, which holds Kadadu's membership interest in the Debtor.  *See id.* ¶ 23.  It would therefore be impossible for Kadadu to manage the Debtor without any influence from Sadleir.

18.    *Second*, Kadadu's own actions prove that she is beholden to Sadleir and cannot be trusted to serve as a fiduciary for the Debtor's estate.  As described above, Kadadu appointed Sadleir as the Debtor's "Authorized Agent" in the Chapter 11 Case notwithstanding the fact that he had been criminally charged in two jurisdictions and arrested in connection with the PPP Criminal Complaint, which the Debtor now acknowledges is a matter of "serious concern."  *See* Opp. at 13 n.1.  Furthermore, the Debtor's naked assertion that Kadadu was not implicated in Sadleir's fraudulent schemes is belied by the evidence.  As shown in the Motion, Kadadu was implicated in the PPP Criminal Complaint, which alleged that Sadleir had used some of the illicitly obtained funds to repay a $40,114.94 debt on Kadadu's American Express card.  *See* Glenn Decl., Ex. F at 13.  Moreover, the Debtor recently admitted that the $10,000 payment made to the Debtor's proposed counsel – which, according to the Debtor's schedules, was a "capital contribution" that

- 8 -

1   Kadadu had "borrowed from American Express" [Docket No. 17 at 20] – was in fact made with

2   the American Express account into which, according to the PPP Criminal Complaint, Sadleir had

3   transferred illicit PPP funds.  *See id.*; Glenn Supp. Decl., Ex. B.[10]  Additionally, the Debtor's

4   attempt to distance Kadadu from Sadleir's fraud on BlackRock is undercut by the recent addition

5   of Kadadu as a defendant in the BlackRock Complaint.[11]

6          19.    *Third*, the undisputed fact the Sadleir's American Express card was used to pay the

7   Debtor's proposed counsel shows that Sadleir is still "playing a role" in the Chapter 11 Case.

8          20.    In light of the foregoing, the Court should reject the Debtor's attempt to evade the

9   appointment of a trustee under Section 1104(a) by purporting to install Kadadu as the Debtor's

10  new manager.

11       **C.     Sadleir and Kadadu Have Repeatedly Breached**
                 **Their Fiduciary Duties to the Debtor**
12

13         21.    The Court should appoint a trustee because Kadadu's testimony unequivocally

14  demonstrates that Sadleir and Kadadu have breached their fiduciary duties to the Debtor on

15  numerous occasions to benefit themselves.

16         22.    It is undisputed that Sadleir and Kadadu live in the Property, which the Debtor

17  owns.  *See* Kadadu Decl. ¶ 15.  The Debtor claims that Sadleir and Kadadu's tenancy is governed

18  by an "arrangement" *that they negotiated with themselves* on behalf of the Debtor.  *See id.* ¶ 31;

19  Opp. at 10.  This inherent conflict of interest between the Debtor and the Sadleirs independently

20  constitutes "cause" for appointing a trustee.  *In re BLX Grp., Inc.*, 419 B.R. 457, 472 (Bankr. D.

21  Mont. 2009) ("putting [the insider] in charge of any debtor-in-possession financing at [this]

22  juncture would be ill-advised" because the insider should not be allowed to control any spending

23  related to the property in which she lived); *In re Tel-Net Haw., Inc.*, 105 B.R. 594, 595 (Bankr. D.

24  Haw. 1989) ("[C]onflicting interests preclude the proper and effective operations of [the] Debtor

25  and dictate the appointment of an impartial trustee.").

26  _____

27  [10]    A true and correct copy of the correspondence between the Debtor's proposed counsel and Cairn's counsel, dated July 10, 2020, is attached as Exhibit B to the Glenn Supp. Decl.

28  [11]    A true and correct copy of the BlackRock Complaint, as amended, is attached as Exhibit C to the Glenn Supp. Decl.

23.     The Debtor argues that "Kadadu and her family have provided rental consideration to the Debtor significantly in excess of the current fair value rent of the premises." *See* Opp. at 13.[12]  It is clear, however, that any "rental consideration" allegedly provided by Sadleir and Kadadu – for which the Debtor has submitted no supporting documentation – is illusory at best and fraudulent at worst.

24.     *First*, Kadadu has testified that she and Sadleir provided the Debtor "with rent in the form of . . . a significant portion of [Sadleir's] salary[,]" which was "reduced from $450,000 to $100,000." *See* Kadadu Decl. ¶¶ 31-33.  The Debtor, however, has no gross revenue from business and no cash.  *See* Statement of Financial Affairs [Docket No. 17 at 18] (listing gross revenue from business as "none"); Schedule A/B: Assets – Real and Personal Property [Docket No. 17 at 9] (cash, cash equivalents and financial assets valued at $0).  **Any concession Sadleir made as "rental consideration" was therefore not for the benefit of the Debtor, but apparently for the benefit of one of the Aviron Entities**.

25.     This diversion of profits to a third party may also constitute an illegal conversion of Cairn's collateral, which includes "all existing and future rents . . . profits, proceeds, revenues, income . . . and all other benefits paid or payable for using, leasing . . . or otherwise enjoying the Property for any length of time." *See* Kufrin Decl., Ex. C at 7 (definition of "Rents and Profits" under the Deed of Trust).[13]

26.     *Second*, Kadadu has testified that, as part of the "arrangement" with the Debtor, she and Sadleir agreed to reimburse the Debtor for property taxes due on the Property.  *See* Kadadu Decl. ¶ 31.  Sadleir and Kadadu, however, breached that arrangement when they failed to pay approximately $81,000 in property tax due in December 2019 and April 2020.  *See id.* ¶ 34.  Yet the Debtor's schedules, signed by Kadadu under penalty of perjury, list the Debtor's claims against Kadadu and Sadleir for "right of reimbursement arising from use of debtor's property" at **$0.00**.  *See* Docket 17 at 8.  Evidently, Kadadu has no intention of pursuing the Debtor's

---

[12]     As discussed in Cairn's evidentiary objection to the Kadadu Declaration, filed concurrently herewith, Kadadu's purported testimony concerning the rental value of the Property is inadmissible.

[13]     Cairn reserves all rights in connection with the illegal conversion of its collateral, including against Sadleir and Kadadu in their personal capacity.

1    *undisputed* rent claim against herself and Sadleir.

2        27.    Equally glaring is the Debtor's concession that the Property was used "to entertain

3    employees of its subsidiaries" **for no apparent consideration**. *See* Kadadu Decl. ¶ 15.  That the

4    Debtor received no consideration for this use of the Property is evidenced by the fact that, as

5    described, the Debtor has **no cash** from business activities or otherwise.  This egregious breach of

6    management's fiduciary duties to the Debtor constitutes cause to appoint a trustee.  *See In re*

7    *Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988) ("There are a [plethora] of

8    decisions justifying the appointment of a trustee, pursuant to 11 U.S.C. § 1104(a)(1), because of

9    questionable business dealings between a debtor corporation and a related, nondebtor entity.").[14]

10    Furthermore, Kadadu's cavalier admission that she and Sadleir caused the Debtor to allow the

11    free use of the Property by other entities demonstrates that, at best, she does not understand her

12    responsibilities as a fiduciary for the Debtor.  At worst, she has blatantly ignored them.  In any

13    event, Kadadu is not fit to serve as a fiduciary of the Debtor's estate.

14        28.    As Cairn showed in its Motion, a trustee must be appointed where management

15    "has not suggested that he is or will be capable of pursuing the aggressive, independent

16    investigation of all the transactions in issue, or that he will prosecute litigation to recover assets,

17    or sue for the damages sustained by the debtor." *In re Intercat, Inc.*, 247 B.R. 911, 923 (Bankr.

18    S.D. Ga. 2000).  Here, this is no longer a hypothetical concern.  Kadadu and Sadleir have

19    repeatedly breached their fiduciary duties to the Debtor – both pre- and post-petition – and shown

20    through their actions that they cannot be trusted to manage the Debtor in the Chapter 11 Case.

21    The Court should appoint a trustee for this additional, independent reason.

22        **D.**    **Appointment of a Trustee Is in the Best Interests of Creditors**

23        29.    Kadadu's and Sadleir's repeated breaches of their fiduciary duties to the Debtor are

24    of grave concern to the Debtor's creditors, which must rely on the Debtor's management to protect

25    their interests in the Chapter 11 Case.  Because the appointment of a trustee is "in the interests of

26    creditors" pursuant to Section 1104(a)(2), the Court should appoint a trustee for this additional,

27    independent reason. *See* 11 U.S.C. § 1104(a)(2); *BLX Grp.*, 419 B.R. at 472 (appointing a trustee

28

---

[14]    The free use of the Property by third parties may also constitute an illegal conversion of Cairn's collateral.

where it was "in the best interests of all creditors to eliminate the insider circumstances and conflicts of interest created as a result of [insider's] interest in [the relevant property.]").

30.    The Debtor's only argument in response is that "Kadadu can insure" that the value of the Property be monetized for the benefit of all parties and interest. *See* Opp. at 14. A trustee, however, will protect the interests of creditors better than Sadleir and Kadadu, who are inherently conflicted and, as described above, have repeatedly flouted their fiduciary duties to the Debtor. The Court should therefore appoint a trustee pursuant to Section 1104(a)(2) of the Bankruptcy Code.

III.    **ALTERNATIVELY, THE COURT SHOULD LIFT THE AUTOMATIC STAY**

A.    **Cairn Has Shown "Cause" for Lifting the Automatic Stay Under Section 362(d)(1)**

31.    The Debtor argues that Cairn "failed to make a prima facie case of cause," citing *In re DB Capital Holdings, LLC*, 454 B.R. 804, 816-17 (Bankr. D. Colo. 2011). *See* Opp. at 14. The *DB Capital* court held, however, that a secured creditor must only prove a "decline in value [of the collateral]—or the threat of a decline—in order to establish a *prima facie* case." *Id.* at 817 (internal quotation marks omitted).

32.    Here, Kadadu's own testimony shows that Cairn's collateral is declining in value. Kadadu alleges that approximately $81,000 in property taxes are owed on the Property due to Sadleir's inability to pay the taxes in December 2019 and April 2020 purportedly as a result of his ouster from certain Aviron Entities in the BlackRock Litigation (which is in its early stages). *See* Kadadu Decl. ¶ 34. Kadadu does not (because she cannot) testify when – if at all – the Debtor will repay the property tax that is owed and continues to accrue. Significantly, the amount owed is likely much higher, as evidenced by the proof of claim filed by Los Angeles County Treasurer & Tax Collector, which asserts a secured claim of $370,694.05. *See* Claim 1-1 at 2.

33.    Moreover, the value of Cairn's collateral has declined by virtue of Sadleir and Kadadu's impermissible diversion of Rents and Profits – which are part of Cairn's collateral under the Deed of Trust – by (i) allowing the Debtor's subsidiaries to use the Property free of charge (Kadadu Decl. ¶ 15); and (ii) paying purported rent on the Property *to a third party* by reducing

1    Sadleir's salary that is not owed by the Debtor (*id.* ¶ 33).

2    　　　34.    Because Cairn has easily shown a *prima facie* case of cause under Section

3    362(d)(1), the Debtor has the burden of showing adequate protection. *See* 11 U.S.C. § 362(g); *In*

4    *re Big3D, Inc.*, Case No. 08-16768, 2009 WL 9085556, at *2 (Bankr. E.D. Cal. Aug. 28, 2009),

5    *aff'd*, 438 B.R. 214 (B.A.P. 9th Cir. 2010) ("Ordinarily in a motion for relief from stay, the debtor

6    has the burden of proof regarding the issue of adequate protection."). The Debtor has utterly

7    failed to carry this burden.

8    　　　35.    The Debtor argues that Cairn's claim against the Debtor is secured by the Property

9    *and* personal property owned by other Aviron Entities. *See* Opp. at 15. That is incorrect. As

10    explained in the Motion, under the Guaranty the Debtor "irrevocably and unconditionally"

11    guaranteed the "full and punctual payment" of the Loan made to the Borrower. *See* Kufrin Decl.,

12    Ex. B at 1. Cairn need not look to any collateral other than the Property to collect on its claim

13    against the Debtor. In any event, the Debtor has put forth no admissible evidence concerning the

14    value of the personal property securing Cairn's claim against the Borrower.

15    　　　36.    The Debtor argues that the Property's value is "at least $17.5 million." *See* Opp. at

16    10. The only basis for this assertion, however, is Kadadu's inadmissible lay testimony. *See*

17    Kadadu Decl. ¶ 28. It is well settled that, pursuant to Rules 701 and 702 of the Federal Rules of

18    Evidence, a "debtor-homeowner who testifies in opposition to a motion for relief from the § 362

19    automatic stay, should be limited to giving his opinion as to the value of his home, **but should not**

20    **be allowed to testify concerning what others have told him concerning the value of his or**

21    **comparable properties**, unless the debtor truly qualifies as an expert under Rule 702 such as

22    being a real estate broker, etc." *In re Hatch*, Case No. 17-23829, 2017 WL 8738241, at *2 (Bankr.

23    E.D. Cal. Aug. 30, 2017) (quoting Barry Russell, Bankruptcy Evidence Manual, Vol. II, § 701.2,

24    pp. 784-85 (2012-13)) (emphasis added).[15]

25    　　　37.    Kadadu's testimony is based exclusively on (i) her purported analysis of

26    "comparable properties" that she fails to describe or list; (ii) her conversations with "two real

27    estate brokers"; and (iii) her alleged "real estate experience" and the "research [she has] conducted

28    ─────────────────
[15]    A Westlaw copy of *In re Hatch* is attached hereto.

into the value of the [Property]". *See* Kadadu Decl. ¶¶ 28-29.  None of the foregoing can serve as a foundation for testimony by a non-expert such as Kadadu, and, thus, the Court should strike them as hearsay.

38.     The Debtor further argues that Cairn's claim is "disputed and inflated" because the Borrower's events of default in February 2019 "did not occur as alleged." *See* Opp. at 17.  The only purported evidentiary basis for this assertion, however, is Kadadu's inadmissible testimony concerning events as to which Kadadu – who "took an indefinite leave from Aviron Pictures" **in 2018** – has no personal knowledge.  *See* Kadadu Decl. ¶¶ 12, 18.

39.     Contrary to the Debtor's argument (Opp. at 15), Mr. Kufrin's testimony concerning the Borrower's events of default is based exclusively on Mr. Kufrin's "personal knowledge," and his "review of Cairn's books and records, relevant documents and other information prepared or collected by Cairn's employees, agents and/or advisors[.]" *See* Kufrin Decl. ¶ 2.  Testimony based on Cairn's business records is admissible under Rule 803(6) of the Federal Rules of Evidence.  *See In re McFadden*, 471 B.R. 136, 160 (Bankr. D.S.C. 2012) ("[F]or documents to be admissible under the business records exception, they do not have to be actually created by the witness testifying to authenticate them . . . .  Rule 803(6) merely requires, for records to be admissible as business records, the witness must be familiar with the company's record keeping system.").[16]

40.     The Debtor's argument that there is no "cause" under Section 362(d)(1) because "[t]he Debtor was a successful business until late last year and . . . can be successful again" is particularly baffling.  *See* Opp. at 17.  A "successful business" can surely boast more than **zero** gross revenue from business and **zero** cash.  *See* Docket No. 17 at 9, 18.  The Debtor is clearly not an operating business, let alone a successful one.  Indeed, the only conceivable motivation Sadleir and Kadadu had in commencing the Chapter 11 Case was to prevent Cairn from selling the Property.  That is not an appropriate reason for filing a bankruptcy petition.  *See Meadowbrook Inv'rs' Grp. v. Thirtieth Place, Inc. (In re Thirtieth Place, Inc.)*, 30 B.R. 503, 506 (B.A.P. 9th Cir. 1983) ("Where a petition is filed to subvert the legitimate rights of creditors in the absence of any

---

[16]     Cairn reserves the right to supplement its responses to the Debtor's evidentiary objections to the Kufrin Declaration and the Glenn Declaration, to the extent not addressed in this Reply.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1  reasonable expectations that the debtor can successfully reorganize, there is no basis for access to

2  Chapter 11 and the protective machinery of the automatic stay.").  In light of the foregoing, cause

3  exists to lift the automatic stay under Section 362(d)(1).

4  **B.**       **Relief From Stay Is Also Justified Under Section 362(d)(2)**

5         41.    As shown above, the Debtor has not put forth any admissible evidence concerning

6  the value of the Property.  As such, the Debtor cannot show that it has "significant equity" in the

7  Property, as required to defeat a motion to lift the stay under Section 362(d)(2).  *See* Opp. at 17.

8  If necessary, Cairn will submit to the Court the third-party appraisal it has obtained, which shows

9  that the Property's value is much lower than the total indebtedness owed to Cairn and secured by

10  the Deed of Trust.  *See* Kufrin Decl. ¶ 25.

11         42.    Furthermore, the Court should not heed the Debtor's exhortation to allow it more

12  time to "develop an exit/reorganization strategy from bankruptcy."  *See* Opp. at 18.  The Property

13  will never be "necessary to an effective reorganization," as Section 362(d)(2) requires, because

14  the Debtor is not operating any business and does not have any funds to administer a Chapter 11

15  to completion.  Cairn should not be forced to wait while the value of its collateral is eroding.  *See*

16  *In re Century Inv. Fund VIII Ltd. P'ship*, 155 B.R. 1002, 1006 (Bankr. E.D. Wis. 1989) ("It is

17  insufficient for the debtor to show merely that reorganization is impossible without the property[.]

18  When effective reorganization is impossible, the purpose of Chapter 11 and the automatic stay

19  cannot be fulfilled.").  Relief from the automatic stay is therefore independently justified under

20  Section 362(d)(2).

21  **IV.**    **CAIRN PROVIDED PROPER NOTICE OF THE MOTION**

22         43.    Cairn properly served the Motion on the Debtor and its proposed counsel, the

23  United States Trustee and all parties that have made an appearance in the Chapter 11 Case.  In an

24  apparent attempt to distract the Court from the merits of the Motion, the Debtor argues that

25  "although the statute and rules do not specify the recipients" of the notice of a motion to appoint a

26  trustee, notice was required for all creditors.  The Debtor is wrong.  Local Rule 9013-1(d)

27  expressly requires service of motions only upon the "debtor and the debtor's attorney, if any"

28  (where the adverse party is the debtor).  Cairn complied with this Local Rule.

44.    Furthermore, to comply with Rule 4001(a) of the Federal Rules of Bankruptcy Procedure, which requires service of motions to lift the stay on the 20 largest creditors, Cairn relied on the Debtor's Official Form 204 – *which the Debtor never amended* – listing as "none" the 20 largest creditors of the Debtor.  In an abundance of caution, however, Cairn has served the Motion on the purported creditors included in the service list that the Debtor has used during the Chapter 11 Case.  *See* Docket No. 38.  Notice of the Motion is therefore sufficient and proper.

[*Remainder of page intentionally left blank*]

## CONCLUSION

For all the reasons set forth above and in the Motion, Cairn requests that the Court (i)
enter an order appointing a trustee pursuant to 11 U.S.C. § 1104(a); or, alternatively, if the Court
does not appoint a trustee, (ii) enter an order granting Cairn relief from automatic stay pursuant to
11 U.S.C. § 362(d) to complete the sale of the Property in accordance with Cairn's rights under
state law; and (iii) grant such other and further relief as the Court deems necessary and
appropriate.

Dated: July 14, 2020

KASOWITZ BENSON TORRES LLP

/s/ *Andrew R.J. Muir*
Andrew R.J. Muir
101 California Street, Suite 3000
San Francisco, California  94111
Telephone: (415) 421-6140
Facsimile:   (415) 398-5030
Email: amuir@kasowitz.com

Andrew K. Glenn (admitted *pro hac vice*)
Shai Schmidt (admitted *pro hac vice*)
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:   (212) 506-1800
Email: aglenn@kasowitz.com
          sschmidt@kasowitz.com

*Attorneys for Cairn Capital Investment Funds ICAV,*
*for its sub fund Cairn Capstone Special*
*Opportunities Fund*

**SUPPLEMENTAL DECLARATION OF ANDREW K. GLENN IN SUPPORT OF
CAIRN'S MOTION FOR (I) ORDER APPOINTING TRUSTEE PURSUANT TO 11
U.S.C. § 1104(A), OR, ALTERNATIVELY, (II) ORDER GRANTING RELIEF FROM
AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D)**

I, Andrew K. Glenn, being duly sworn, state the following:

1.      I am a partner at the law firm of Kasowitz Benson Torres LLP, counsel for Cairn
Capital Investment Funds ICAV ("Cairn") in the Chapter 11 Case.

2.      I make this declaration to present the Court with the attached documents in
connection with Cairn's Reply in further support of its *Motion for (I) Order Appointing Trustee
Pursuant to 11 U.S.C. § 1104(a), or, Alternatively, (II) Order Granting Relief From Automatic
Stay Pursuant to 11 U.S.C. § 362(d)* [Docket No. 25], and in response to the Debtor's opposition
thereto [Docket No. 37] (the "Opposition").

3.      Attached hereto as **Exhibit A** is a true and correct copy of the correspondence
between the Debtor's proposed counsel and myself, dated July 7, 2020, confirming the one-day
extension to submit the Opposition.

4.      Attached hereto as **Exhibit B** is a true and correct copy of the correspondence
between the Debtor's proposed counsel and myself, dated July 10, 2020, regarding the $10,000
payment made to Levene, Neale, Bender, Yoo & Brill LLP from the American Express Platinum
Card ending in 2000.

5.      Attached hereto as **Exhibit C** is a true and correct copy of the BlackRock
Complaint as amended, dated June 26, 2020, and filed with the Supreme Court of the State of
New York, County of New York.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that, to the best of my
knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 14th day of July in New York, New York.

/s/ *Andrew K. Glenn*
Andrew K. Glenn

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

# GLENN SUPPLEMENTAL DECLARATION

# EXHIBIT "A"

## Naznen Rahman

| | |
|---|---|
| **From:** | Shai Schmidt |
| **Sent:** | Tuesday, July 14, 2020 12:40 PM |
| **To:** | Naznen Rahman |
| **Subject:** | FW: Temerity |

Shai Schmidt
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019
Tel.  (212) 506-1949
Fax. (212) 500-3462
SSchmidt@kasowitz.com

**From:** Kurt Ramlo [mailto:KR@lnbyb.com]
**Sent:** Tuesday, July 7, 2020 6:46 PM
**To:** Andrew K. Glenn <AGlenn@kasowitz.com>
**Cc:** Shai Schmidt <SSchmidt@kasowitz.com>; David B. Golubchik <DBG@lnbyb.com>
**Subject:** RE: Temerity

**\*\*EXTERNAL EMAIL\*\***

Andrew,

We're looking into the issue and will get back to you.

Thanks for extending our time to tomorrow.

Kurt

**Kurt Ramlo**
**LEVENE, NEALE, BENDER, YOO & BRILL  L.L.P.**
Direct  310 229  3378   |   Cell 310 880 9208 (no voicemail)   |   Main  310 229 1234
The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill  L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

**From:** Andrew K. Glenn <AGlenn@kasowitz.com>
**Sent:** Tuesday, July 7, 2020 12:57 PM
**To:** Kurt Ramlo <KR@lnbyb.com>
**Cc:** Shai Schmidt <SSchmidt@kasowitz.com>
**Subject:** Temerity

Kurt,

Please advise whether Ms. Kadadu will produce her Amex bills so we can verify whether the account(s) (i) received the
payments listed in the DOJ indictment and (ii) funded your firm's retainer.

Thank you.

Andrew K. Glenn
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Tel.  (212) 506-1747
Fax. (212) 835-5047
AGlenn@kasowitz.com

This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.

# GLENN SUPPLEMENTAL DECLARATION

# EXHIBIT "B"

## Naznen Rahman

| | |
|---|---|
| **From:** | Shai Schmidt |
| **Sent:** | Tuesday, July 14, 2020 12:40 PM |
| **To:** | Naznen Rahman |
| **Subject:** | FW: Temerity |

Shai Schmidt
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019
Tel.  (212) 506-1949
Fax. (212) 500-3462
SSchmidt@kasowitz.com

**From:** Kurt Ramlo [mailto:KR@lnbyb.com]
**Sent:** Friday, July 10, 2020 10:22 PM
**To:** Andrew K. Glenn <AGlenn@kasowitz.com>
**Cc:** Shai Schmidt <SSchmidt@kasowitz.com>; David B. Golubchik <DBG@lnbyb.com>
**Subject:** RE: Temerity

**\*\*EXTERNAL EMAIL\*\***

Andrew,

The $10,000 payment to LNBYB on or about May 26, 2020 came from an American Express Platinum Card ending in -2000.  Ms. Kadadu informs me that William Sadlier is the account holder and that she was an authorized user under a different account number.  Ms. Kadadu also informs me that the -2000 account is the account alleged in paragraph 27(a) of the Los Angeles criminal complaint to have received a $26,180.31 payment.

Kurt

**Kurt Ramlo**
**LEVENE, NEALE, BENDER, YOO & BRILL  L.L.P.**
Direct  310 229  3378  |  Cell 310 880 9208 (no voicemail)  |  Main  310 229 1234
The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill  L.L.P.'s
email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

**From:** Andrew K. Glenn <AGlenn@kasowitz.com>
**Sent:** Friday, July 10, 2020 2:15 PM
**To:** Kurt Ramlo <KR@lnbyb.com>
**Cc:** Shai Schmidt <SSchmidt@kasowitz.com>
**Subject:** Temerity

Please advise whether you are providing the information about the Amex accounts.

Thanks.

Andrew K. Glenn

Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Tel.  (212) 506-1747
Fax. (212) 835-5047
AGlenn@kasowitz.com

This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.

# GLENN SUPPLEMENTAL DECLARATION

# EXHIBIT "C"

Case 2:20-bk-15015-BR    Doc 39-1    Filed 07/14/20    Entered 07/14/20 20:24:20    Desc
Complete PDF    Page 30 of 83

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------- x

BLACKROCK MULTI-SECTOR INCOME
TRUST,

                  Plaintiff,

        - against -

AVIRON GROUP, LLC, AVIRON CAPITAL,
LLC, AVIRON PICTURES, LLC, AVIRON 1701,
LLC, AVIRON 1702, LLC, AVIRON 1705, LLC,
AVIRON 1706, LLC, AVIRON 1801, LLC, MAA
RELEASING, LLC, AVIRON RELEASING, LLC,
GROUPM MEDIA SERVICES, LLC, HANNAH
KADADU SADLEIR, AKA HANAN KADADU,
and WILLIAM SADLEIR,

                Defendants.

--------------------------------------------------------- x

**COMMERCIAL DIVISION**

Index No. 657496/2019

**FIRST AMENDED COMPLAINT**

       Plaintiff BlackRock Multi-Sector Income Trust, by and through its attorneys, Sidley Austin LLP, as and for its First Amended Complaint in this action, alleges as follows based upon its personal knowledge as to its own actions and upon information and belief as to all other matters:

**NATURE OF THE ACTION**

       1.     This action arises out of Defendant William Sadleir's admitted forgeries and brazen fraud—including his apparent creation of a non-existent person to perpetuate his scheme—through which he has stolen millions of dollars properly belonging to Plaintiff BlackRock Multi-Sector Income Trust, a publicly traded, closed-end mutual fund (the "Fund"). Through this action

the Fund seeks to recover its losses arising from Sadleir's fraudulent conduct, which is now at the heart of parallel federal criminal and civil proceedings against Sadleir.

2.    Indeed, after the filing of the initial Complaint in this action in December 2019 and the Court's issuance of the Preliminary Injunction Order (as defined below), Sadleir was arrested in connection with two federal criminal complaints filed against him, and was named in an action by the Securities and Exchange Commission ("SEC").  The SEC action and the first criminal complaint provide additional support for the Fund's allegations, while the second criminal complaint reflects Sadleir's flouting of this Court's Preliminary Injunction Order.  As detailed below, Sadleir has orchestrated at least two fraudulent schemes, through which he has apparently absconded with the Fund's assets: one related to fraudulent UCC filings, and another related to a fraudulent entity Sadleir and his wife apparently created to enrich themselves.

3.    The Fund's relationship with Sadleir and the Aviron Entities (defined below) began in 2015, when the Fund agreed to extend credit to the Aviron Entities to finance the distribution of motion pictures.  The Aviron Entities, in return, were to repay the amount loaned, plus interest.  In 2017, the Fund agreed to increase the credit facility to $75,000,000, and in March 2019, the Fund agreed to disburse $10 million under the $75,000,000 facility to finance the distribution of another motion picture.  As collateral for the Fund's investments, Aviron Capital pledged to the Fund its "right, title, and interest in and to," among other things, its control of revenue streams from motion pictures it distributed.  The Fund filed UCC-1 financing statements with the Delaware Secretary of State relating to that collateral.

4.    In late 2019, the Fund discovered the Aviron Entities had filed UCC-3 amendments that purported to delete the Fund's interest in certain of its collateral (the "Fraudulent Amendments"), and then went on to sell or refinance that collateral.  Although the Fraudulent

Amendments represent that the Fund consented and agreed to those filings, the Fund did not do so.

5.      In response to several inquiries, the Aviron Entities' counsel provided five alleged releases, all purporting to date from July 2019 (the "Fraudulent Releases") and allegedly authorizing the Fraudulent Amendments.  These documents are forgeries.  Sadleir copied and pasted a Fund representative's signature from prior agreements with the Fund onto the Fraudulent Releases to create the appearance that the Fund had approved those filings.

6.      Sadleir has since confirmed this misconduct.  When confronted, he told a Fund representative he had "f----d up" and had reused signature pages—a remarkable admission of fraud.  Sadleir doubled down on this admission in a recent discussion with the *Wall Street Journal*, saying when asked about these allegations: "I should not have done it.  It was bad judgment on my part.  I know better."[1]

7.      As a result of this brazen fraud, the Fund sought a preliminary injunction so that Sadleir could not continue to loot the Aviron Entities for his personal benefit.  On December 20, 2019, this Court entered an order preliminarily enjoining Sadleir from, among other things, controlling or purporting to control the day-to-day conduct, operation, and management of certain of the Aviron Entities (the "Preliminary Injunction Order," Dkt. 82), and ordering that the Fund could install a Replacement Manager[2] to control and direct those entities.

---

[1] *See* Jason Zweig, *The Hollywood Drama That Cost a BlackRock Fund $75 Million*, The Wall Street Journal (Feb. 28, 2020 2:19 PM), available at https://www.wsj.com/articles/the-hollywood-drama-that-cost-a-blackrock-fund-75-million-11582917564.

[2] On December 16, 2019, the Fund appointed Amir Agam of FTI Consulting as Replacement Manager of Aviron Capital and Aviron Pictures.  On January 13, 2020, Mr. Agam resigned as Replacement Manager and named John Farrace of SierraConstellation Partners as the new Replacement Manager.  Mr. Farrace later resigned as Replacement Manager and named Tom Lynch, also of SierraConstellation Partners, as the new Replacement Manager.  To avoid

3

8.      Unbeknownst to the Fund, the Fraudulent Amendments were only the tip of the iceberg of Sadleir's wrongdoing.

9.      Following issuance of the Preliminary Injunction Order, the Fund's adviser began investigating the value of so-called "prepaid media credits."  Sadleir represented that these credits: (i) were being purchased at a discount to market rates on behalf of the Aviron Entities using the Fund's money; (ii) could be used for future advertising of any film at a beneficial discount; and (iii) were fully refundable at the Fund's request.  Sadleir indicated that roughly $26 million of the Fund's money was used to purchase these credits from GroupM **Worldwide**, Inc. ("GroupM Worldwide"), an affiliate of MediaCom Worldwide Inc. ("MediaCom") and a reputable player in the media advertising space.

10.     In late 2019, in response to the Fund's inquiries about refunding those credits, Sadleir directed the Fund's advisors to an "Amanda Stevens" at Defendant GroupM **Media Services** LLC (the "Sham GroupM").  Stevens indicated that, among other things, approximately $27 million in prepaid media credits remained unused.

11.     Upon information and belief, despite her email correspondence and voicemail recording, Amanda Stevens does not exist, and was an alias created by Sadleir and his wife, Defendant Hannah Kadadu Sadleir, to hide their theft of the funds Plaintiff provided for the purchase of prepaid media credits.

12.     Indeed, as set forth in more detail below, it appears that Sadleir and Kadadu formed the Sham GroupM in 2016 to divert funds to themselves that were intended for the legitimate GroupM Worldwide.  The Fund has since learned that Sadleir and Kadadu's Sham

---

unnecessary confusion, those three individuals are collectively referred to here as the "Replacement Manager."

4

GroupM has no affiliation with the legitimate GroupM Worldwide (and the latter has confirmed

that it has never employed an "Amanda Stevens").

13.     Through this brazen fraud Sadleir transferred large portions of the Fund's

investment to the illegitimate Sham GroupM to line his own pockets (the "GroupM Fraud").  In

October 2017, for example, Sadleir transferred approximately $13.5 million from an Aviron bank

account to an account for *his* Sham GroupM entity.  Within days, Sadleir and his wife, Kadadu,

through their private investment entity, Temerity Trust Management LLC ("Temerity"), closed on

an approximately $13.5 million home in Beverly Hills, apparently using those funds.

14.     On May 18, 2020 the United States Department of Justice ("DOJ") filed a

criminal complaint against Sadleir in the Southern District of New York (the "SDNY

Complaint"),[3] alleging two counts of Wire Fraud in connection with the GroupM Fraud and the

Fraudulent Amendments, and aggravated identity theft based on Sadleir's forgery.  The SEC has

filed an action against Sadleir in the Southern District of New York (the "SEC Complaint")[4]

alleging violations of Rule 17(a) of the Securities Act as well as violations of Rule 10(b) and Rule

10(b)-5 of the Exchange Act in connection with these same fraudulent acts.

15.     On May 21, 2020, the DOJ filed a separate criminal action against Sadleir

in the Central District of California (the "CDCA Complaint"),[5] which alleges an additional

fraudulent scheme orchestrated by Sadleir in plain disregard of this Court's Preliminary Injunction

Order.

---

[3]*See* Compl., *United States v. William Sadleir*, No. 20-MAG-5114 (S.D.N.Y. May 18, 2020).
[4]*See* Compl., *Securities and Exchange Commission v. William Sadleir*, No. 20-civ.-3997
(S.D.N.Y. May 22, 2020).
[5]*See* Compl., *United States v. William Sadleir*, No. 2:20-mj-02326 (C.D. Cal. May 21, 2020).

16.     As disclosed in the CDCA Complaint, in or around April 2020, Sadleir applied for federal government-sponsored loans designed to help small businesses in the wake of the COVID-19 crisis, using information from one of the entities subject to this Court's Preliminary Injunction Order.  It appears Sadleir likewise diverted a significant portion of these funds (approximately $1 million) to his and Defendant Kadadu's own account for personal use – an act that transgresses this Court's Preliminary Injunction Order and defrauds a public program designed to support businesses that are suffering as a result of the COVID-19 crisis.

17.     The Fund seeks to recover the roughly $30 million it has lost by virtue of Defendants' fraudulent—and allegedly criminal—conduct.

## THE PARTIES AND RELEVANT NON-PARTIES

18.     Plaintiff is a Delaware statutory trust which operates as a closed-end mutual fund and which trades on the New York Stock Exchange.  Non-party BlackRock Advisors, LLC ("the Advisor") acts as the Trust's investment advisor.  The Advisor has its principal place of business in New York, New York and is responsible for, among other things, the management of the Fund's portfolio.  The Advisor has retained non-parties BlackRock Financial Management, Inc. and BlackRock Investment Management, LLC to serve as the Trust's sub-advisers (the "Sub-advisers").  The Sub-advisers have their principal places of business in New York, New York, and perform the day-to-day investment management of the Fund.

19.     Defendant Aviron Group, LLC, is a Delaware limited liability company with its principal place of business in Los Angeles, California.

20.     Defendant Aviron Capital, LLC, is a Delaware limited liability company with its principal place of business in Los Angeles, California.

21.     Defendant Aviron Pictures, LLC, is a Delaware limited liability company with its principal place of business in Los Angeles, California.

6

22.     Defendant Aviron Releasing, LLC, is a Delaware limited liability company with its principal place of business in Los Angeles, California.

23.     Defendant Aviron 1701, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

24.     Defendant Aviron 1702, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

25.     Defendant Aviron 1705, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

26.     Defendant Aviron 1706, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

27.     Defendant Aviron 1801, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

28.     Defendant MAA Releasing, LLC, is a Delaware limited liability company with its principal place of business in Los Angeles, California (together with the Defendants named in Paragraphs 19-27, the "Aviron Entities.").

29.     Defendant GroupM Media Services, LLC ("GroupM Media Services" or, as defined above, the "Sham GroupM") is or was a Delaware limited liability company also registered with the California Secretary of State, with its principal place of business in Beverly Hills, California.  Defendant William Sadleir is listed as Manager of GroupM Media Services, and Defendant Hannah Kadadu is listed as the California agent for GroupM Media Services.

30.     Defendant Hannah Kadadu Sadleir, also known as Hanan Kadadu, is a domiciliary of Beverly Hills, California and William Sadleir's spouse, and is listed as the

7

California agent for GroupM Media Services.  The SDNY Complaint alleges that Kadadu is or was listed as the sole member of Temerity.

31.      Defendant William Sadleir is a domiciliary of Beverly Hills, California. Sadleir also was or purports to be: (i) President of Aviron Group; (ii) Manager, Chairman, and Chief Executive Officer of Aviron Capital; (iii) Manager of Aviron Pictures; and (iv) Manager of each of the Special Purpose Entities (defined below).  Sadleir is also listed as the California agent for Temerity and holds himself out as Temerity's Manager and the Manager of GroupM Media Services.

32.      Sadleir largely operated the Aviron Entities as a single business out of a single office in Beverly Hills, California.  Sadleir is the direct or indirect owner of the entities (either individually or though his family investment vehicle), and was previously the designated "Manager" of each.  Sadleir thus exercised domination and control over these purportedly separate entities, which he in fact treats and/or treated as one, and has used them as part of his scheme to defraud the Fund.

**<u>JURISDICTION AND VENUE</u>**

33.      Jurisdiction is proper in this Court as to the Aviron Entities because (i) Aviron Group, LLC consented to the jurisdiction of this Court pursuant to Section 23(b) of the Pledge Agreement (as defined below) it entered with Plaintiff on October 20, 2015 and (ii) Aviron Capital did the same pursuant to Section 9.08 of the NPA (as defined below) it entered with Plaintiff on July 17, 2017.  Each of the Pledge Agreement and the NPA provide that Aviron Group and Aviron Capital, respectively, "irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of . . . the Supreme Court of the State of New York sitting in New York county . . . in any action or proceeding arising out of or relating to this Pledge

8

Agreement or any other Loan Document or the transactions contemplated hereby . . . ." (the "New York Forum Provisions").

34.     Jurisdiction is also proper in this Court pursuant to CPLR 302(a)(1) because the Aviron Entities, Kadadu, Sadleir, and GroupM Media Services each transact business within New York and this action arises out of such business.

35.     Jurisdiction is also proper in this Court as to Sadleir because he waived any jurisdictional defense by participating in this litigation.

36.     Jurisdiction is also proper as to the Aviron Entities, Kadadu, Sadleir, and GroupM Media Services pursuant to CPLR 302(a)(3)(i) and 302(a)(3)(ii) because they have committed a tortious act within the state causing injury to Plaintiff within New York, and upon information and belief (i) regularly do or solicit business in New York and derive substantial revenue from services rendered in New York, and (ii) expect or reasonably should have expected the act to have consequences in the state and derive substantial revenue from interstate or international commerce.

37.     Venue is proper in this Court pursuant to CPLR 501, because of the New York Forum Provisions.

38.     Venue is also proper in this Court pursuant to CPLR 503.

## FACTUAL BACKGROUND

### *Temerity And The Aviron Entities*

39.     Sadleir formed the Aviron Entities purportedly to acquire, market, and distribute theatrical films in North America.

40.     Upon information and belief, Aviron Group is (i) the parent company of the Aviron Entities and (ii) the legal and beneficial owner of 100% of the equity of Aviron Capital,

9

Aviron Pictures, and Aviron Releasing (and is thus the "Sole Member" of each).  Aviron Group,

Aviron Capital, and Aviron Pictures, in turn (whether directly or indirectly) own 100% of the

equity of the several special purpose entities, purportedly formed in tandem with each planned or

purported film in which the Aviron Entities invest.  Plaintiff understands that these include

(i) Aviron 1601, (ii) Aviron 1701, (iii) Aviron 1702, (iv) Aviron 1705, (v) Aviron 1706,

(vi) Aviron 1801, and (vii) MAA (collectively the "Special Purpose Entities").

      41.     As alleged in the SDNY Complaint, Sadlier formed Temerity Trust

Management LLC ("Temerity") in Delaware on or about October 14, 2015.  At or around this

time, and as further alleged in the SDNY Complaint, Kadadu was listed as the sole member.  The

SDNY Complaint also alleges that Sadleir holds himself out as Temerity's Managing Member.

Sadleir further registered Temerity with the State of California under the alternate name of

Temerity Management, LLC, with a principal place of business in Beverly Hills, California.

      42.     Sadleir and Temerity collectively own 100% of the equity of the Aviron

Entities' parent, Aviron Group.

10

43.    Upon information and belief, at a high level, the historic ownership structure of the Aviron Entities and Temerity is as follows:



***2015:  The Fund First Loans Money to the Aviron Entities; Sadleir Engages MediaCom***

44.    On August 1, 2015, Aviron Pictures entered into a Master Services Agreement with MediaCom Worldwide for "media planning and buying" (the "MediaCom MSA").  Sadleir signed the MediaCom MSA on behalf of Aviron Pictures, and Mark Piazza signed on behalf of MediaCom.  The MediaCom MSA listed "GroupM **Worldwide**, Inc." as an affiliate which could "provide additional opportunities to purchase certain media discounted from the then-current standard rates."

11

45.     On October 20, 2015, Aviron Capital and the Fund entered into the Credit and Security Agreement (as amended, the "Credit Agreement"), pursuant to which the Fund made available to Aviron Capital a senior secured credit facility to assist its funding of prints, advertising, marketing and promotion for certain feature-length motion pictures.

46.     On October 20, 2015, Aviron Group and the Fund also entered into the Equity Pledge Agreement (as amended, the "Pledge Agreement").  Sadleir signed the Pledge Agreement on behalf of Aviron Group.  The Fund extended approximately $38 million of funding to the Aviron Entities by virtue of these agreements, which were secured by UCC-1 financing statements.

47.     Specifically, Aviron Group pledged its ownership of certain collateral to the Fund, including 100% of the "equity interests issued by" each of Aviron Capital and Aviron Pictures.  This pledge was made to "induce [the Fund] to . . . extend credit to" Aviron Group.

48.     The Fund filed a UCC-1 financing statement against the pledged collateral that same day.

### October 2016-June 2017: Sadleir Creates The Sham GroupM And Diverts $12.5 Million Of The Fund's Monies To The Sham GroupM Chase Account

49.     On October 7, 2016, Sadleir caused the filing of the Certificate of Formation for GroupM **Media Services** (referred to herein as the "Sham GroupM")—distinct from the legitimate GroupM **Worldwide**—with the Delaware Secretary of State.  Other public filings indicate that Sadleir is the Sham GroupM Manager, and Kadadu serves as one of its agents.

50.     As noted above, the Sham GroupM has no relation or affiliation to the legitimate MediaCom or GroupM Worldwide.

51.     Rather, the Sham GroupM was created by Sadleir and/or Kadadu to steal monies from the Fund.

12

52.     Indeed, as the SDNY Complaint alleges, Sadleir "created [the Sham GroupM] and designed [it] to appear as if it was the legitimate entity, GroupM Worldwide," and used the stolen monies "for his personal benefit."

53.     Soon thereafter, and as alleged in the SDNY Complaint, on or around October 18, 2016, Sadleir opened a bank account in New York at J.P. Morgan Chase in the name of Sham GroupM (the "Sham GroupM Chase Account").

54.     The SDNY Complaint further alleges that the bank account statements for the Sham GroupM were mailed to the same addresses as the Aviron Entities.

55.     On or around October 18, 2016 Sadleir wired approximately $2.56 million from an Aviron 1601 account to the Sham GroupM Chase Account.

56.     On or around October 20, 2016, a Statement of Information for the Sham GroupM was filed with the California Secretary of State, listing Sadleir as its Manager and Kadadu as its agent for service of process.

57.     In December 2016, Sadleir requested that approximately $460,000 of the Fund's monies be sent to GroupM Worldwide for the purchase of prepaid media credits to support the release of the motion picture *Drunk Parents*.  The Fund, however, wished to ensure that any such credits were refundable in the event they were not used.

58.     To that end, on January 12, 2017, Sadleir arranged for the Fund, Aviron Pictures, and MediaCom to enter into an agreement confirming that MediaCom could directly refund unused prepaid media credits to the Fund, at the Fund's request.  Sadleir signed on behalf of Aviron Pictures.

59.     The next day, and as also alleged in the SEC Complaint, on January 13, 2017, Sadleir wired $460,000 of the Fund's monies to the Sham GroupM Chase Account, not the

13

legitimate GroupM Worldwide account, to which Sadleir conveyed to the Fund that the monies were being wired.

60.    On February 27, 2017, and as also alleged in the SDNY Complaint, Sadleir wired an additional $12.1 million of the Fund's monies held in a bank account for Aviron 1601 to the Sham GroupM Chase Account rather than to the legitimate GroupM Worldwide.  As with the previous payment, and as alleged in the SEC Complaint, Sadleir again conveyed to the Fund that the monies were being wired to the legitimate GroupM Worldwide account.

61.    As alleged in the SDNY Complaint, on or about June 21, 2017, Sadleir wired $420,000 from the Sham GroupM Chase Account, through Temerity, to an escrow company for a down payment on a residence in Beverly Hills.

### *July-August 2017:  The Fund Increases The Aviron Entities' Loan Facility To $75 Million And Sadleir Moves The Fund's Monies Between Different Aviron Capital Bank Accounts*

62.    On July 17, 2017, Aviron Capital and the Fund entered into a Note Purchase and Security Agreement (as amended, the "NPA").  This agreement increased the total loan facility available to the Aviron Entities to $75,000,000.  In return, among other things, Aviron Capital simultaneously provided a broadly defined "security interest" in each funded motion picture it distributed and the corresponding LLC interests in additional subsidiaries created to hold the rights to subsequent films.

63.    The NPA contained a number of additional requirements regarding pledged collateral.  These included informing the Fund as necessary so that the Fund could "take steps to perfect its security interest" in those equity positions as appropriate (*e.g.*, as films were funded and new subsidiaries were formed).

64.    Consequently, and consistent with the NPA, the Fund filed UCC-1 financing statements to secure its collateral.

14

65.     On or about July 18, 2017, and as alleged in the SDNY Complaint, the Fund wired approximately $40.6 million to a bank account for Aviron Capital ("Aviron Capital Bank Account 1").  On or about that same day, Sadleir sent an email to Aviron's bank representatives notifying them of an incoming wire from the Fund in the amount of $40.6 million and providing instructions for the transfer of some of those funds.

66.     As alleged in the SDNY Complaint, on or about August 10, 2017, approximately $9.4 million was wired from Aviron Capital Bank Account 1 to a different account at a different bank associated with Aviron Capital ("Aviron Capital Bank Account 2").

### *October 2017:  Sadleir Transfers $13.5 Million To The Sham GroupM Chase Account And Purchases A Beverly Hills Home For The Same Amount*

67.     Two months later, on or about October 11, 2017, the SDNY Complaint alleges that approximately $4.2 million was wired from Aviron Capital Bank Account 1 to Aviron Capital Bank Account 2, resulting in a total of roughly $13.5 million of the Fund's monies in Aviron Capital Bank Account 2.

68.     On October 16, 2017, and as further alleged in the SDNY Complaint, Sadleir transferred approximately $13.5 million of the Fund's monies from Aviron Capital Bank Account 2 to his Sham GroupM Chase Account.

69.     Upon information and belief, Sadleir personally went to EastWest Bank to conduct the transfer to the Sham GroupM Chase Account rather than having an employee of Aviron Pictures oversee the transaction.

70.     On or about October 17, 2017, and as also alleged in the SDNY Complaint, approximately $13.5 million was wired from the Sham GroupM Chase Account to an escrow company.  This wire was to complete payment for the home in Beverly Hills that Sadleir and Kadadu purchased through Temerity (the down payment for which Sadleir likewise made by

15

misappropriation of the Fund's assets just months earlier). As alleged in the SDNY Complaint, Sadleir executed the purchase and escrow documents for the residence as the managing member of, and authorized signer for, Temerity, and interfaced directly with the escrow company as the property's purchaser.

71. On or around October 20, 2017, Sadleir and Kadadu, via Temerity, closed on their new Beverly Hills home – an approximately $14 million purchase apparently made with the Fund's assets.

72. In addition to the approximately $14 million of the Fund's monies Sadleir and Kadadu used to purchase their Beverly Hills home, the SDNY Complaint and SEC Complaint allege that Sadleir diverted resources to the Sham GroupM Chase Account that were subsequently used for:

- A wire transfer to a private jet charter company;

- Interior design, home furnishings, and remodeling in connection with the Beverly Hills home;

- A $127,000 Tesla Model X;

- Paying himself and Kadadu $350,000; and

- Settling a legal dispute for $254,000.

### *March 2019: The Fund Disburses An Additional $10 Million*

73. In and around March 2019, Sadleir requested that the Fund provide additional funding for the distribution of a motion picture titled *AFTER*.

74. On or about March 15, 2019, the Fund's sub-adviser sent an email to Sadleir asking if they could use $10 million of Aviron Capital's prepaid media credits as collateral for the loans associated with *AFTER*.

16

75.    On or about March 19, 2019, Sadleir responded stating that he had confirmation from GroupM that the credits remained available to Aviron Pictures to use on future Aviron films, regardless of the fact that MediaCom was no longer the advertising agency for Aviron Pictures.  The Fund replied asking for something in writing from GroupM to confirm Sadleir's statements or a contact they could speak with.  Sadleir responded the same day stating that GroupM would not take direction from the Fund because the contract was exclusively with Aviron Pictures, but that "we'd take direction for you."

76.    On or about March 22, 2019 and on or about March 25, 2019, the Fund, Sadleir, Aviron Capital, and Temerity signed agreements to extend $10 million under the NPA to fund distribution of *AFTER*.

77.    As collateral, Sadleir pledged LLC interests in Aviron Group and ten other Aviron subsidiaries as well as the unused prepaid media credits with GroupM.  On or about March 25, 2019, as also alleged in the SDNY Complaint, the Fund wired a total of approximately $10 million to a third Aviron Capital bank account.

78.    The Aviron Entities, through Sadleir, represented and promised to "promptly follow and observe instructions and directions made in writing by [the Fund] to Aviron for Aviron to sell off" the prepaid media "as may be necessary to fully repay" the additional $10 million loan.  The Aviron Entities nevertheless failed to repay this amount when due in June 2019.

79.    In a letter dated July 1, 2019, the Fund notified Aviron Capital that it was in default on its loan payments and other obligations.

17

### *Late 2019: The Fund Discovers Sadleir's UCC-Related Fraud And Investigates the Prepaid Media Credits*

80.     Sadleir's fraud began to unravel in late 2019.

81.     As outlined above, the Fund had previously filed numerous UCC-1 financing statements pertaining to the collateral securing its loan to the Aviron Entities.

82.     In late 2019, the Fund learned that certain of the Aviron Entities purported to sell or finance several of the motion picture rights that were collateralized to the Fund.  These actions were only made possible by the Aviron Entities' (or their agents') filing of fourteen fraudulent UCC-3 amendments with the Delaware Secretary of State, starting in July 2019, that operated to delete the purportedly sold or financed collateral from the Fund's documented list of collateral.

83.     Under the Credit Agreement and NPA, the Aviron Entities and Sadleir could not unilaterally release the liens, but rather required the Fund to consent to such releases.  Any such UCC-3 amendment releasing said liens could only be filed with the authorization of the secured party: the Fund.  Such authorization is typically documented through a signed, executed release.

84.     The Fraudulent Amendments each identify the Fund as the "Secured Party of Record authorizing" their filing.  The Fund, however, did not authorize the amendments, rendering them fraudulent.

85.     The Fund has likewise never consented to these purported sales or financings of its collateral.  Upon information and belief, Sadleir filed the Fraudulent Amendments, or caused them to be filed, to effectuate these changes and create the appearance that the Fund's collateral could be sold or financed.

18

86.     The Fund understands, and the SDNY Complaint alleges in substance, that Sadleir resorted to outright fraud to achieve these objectives.

87.     Plaintiff's counsel contacted the Aviron Entities' transaction counsel and requested copies of the purported releases that would ordinarily have been procured before filing any UCC-3 amendment.

88.     The Aviron Entities' transaction counsel provided five such documents— the Fraudulent Releases—which all purport to date from July 2019 and reflect signatures of the Fund's advisers authorizing a release of the Fund's lien on certain perfected collateral.

89.     As outlined in the Affidavits of Randy Robertson and Mark Volosov, and as alleged in the SDNY Complaint, those documents are forgeries.  *See* ECF Nos. 4, 59.  None of the Fraudulent Releases were executed by Mr. Robertson in July 2019.

90.     It appears that to create the Fraudulent Releases, Sadleir and/or his agents copied and pasted Mr. Robertson's signature from prior agreements between the Fund and the Aviron Entities onto the Fraudulent Releases.

91.     To date, the Fund has identified what appear to be three such copied and pasted signatures, as outlined below.

19

92.    For example, Mr. Robertson's purported signature for the Fund's partial release of its security interest in the motion picture *The Strangers: Prey at Night*, purportedly dated July 12, 2019 appears below on the left.  That signature appears to have been copied from Mr. Robertson's authentic signature from the February 21, 2019 Amendment Five to the Note Purchase Agreement which appears below on the right.

**Forged (Copied) Signature**            **Source Authentic Signature**



93.    Similarly, Mr. Robertson's purported signature for the Fund's partial release of its security interest in the motion picture *My All American*, purportedly dated July 12, 2019 appears below on the left.  That signature appears to have been copied from Mr. Robertson's authentic signature from the 2015 Credit Agreement, which appears below on the right.

**Forged (Copied) Signature**            **Source Authentic Signature**



94.    Finally, Mr. Robertson's purported signature for the Fund's partial release of its security interest in the HBO licensing agreement for the motion picture *The Strangers: Prey at Night*, purportedly dated July 17, 2019 appears below on the left.  That signature appears to

20

have been copied from Mr. Robertson's authentic signature from the October 19, 2016 Amendment One to the Credit and Security Agreement, which appears below on the right.

**Forged (Copied) Signature**                    **Source Authentic Signature**



95.    Upon information and belief, Sadleir and/or others working with him provided the Fraudulent Releases to the filers of the Fraudulent Amendments in order to create the appearance that the Fund had authorized the filing of UCC-3 amendments.

96.    Upon information and belief, Sadleir engaged in this fraudulent activity to benefit himself.

97.    For example, on July 15, 2019—the same day that many of the Fraudulent Amendments were filed—Sadleir stipulated to a $2.7 million judgment in a different litigation.

98.    In late October 2019, the Fund discovered the Fraudulent Amendments. In response to the Fund's counsel's inquiries, on October 24, 2019, Louis Spoto, Aviron Capital's General Counsel, asserted that he had "not reviewed the individual UCC-3s" but that "for sure Blackrock [sic] knew what it was doing and why." Sadleir responded on October 25, 2019 that he was the "best contact for now to discuss the license sales," and that he would "pull together funds flow you asked for" and that "[w]e'll get this cleaned up."

99.    Those statements reflect an effort to prevent the Fund from discovering the Fraudulent Amendments.

21

100.    Sadleir and Spoto then declined to respond to repeated requests for (i) evidence that the Fund consented to the releases, (ii) information as to where the funds flowed from any purported sales of the collateral, and (iii) who they believed had consented to the Fraudulent Amendments on the Fund's behalf, given that that the Fraudulent Amendments indicate that the Fund approved their filing.

101.    Concurrently with investigating Sadleir's UCC-related fraud, the Fund investigated its ability to recover on the prepaid media credits, which the Fund understood were refundable to the Fund at the Fund's request.

102.    Initially, the Fund's Sub-advisers began to pressure Sadleir to provide more concrete evidence of the current prepaid media balance, ostensibly held by MediaCom and the legitimate GroupM Worldwide.  On November 12, 2019, a Fund sub-adviser demanded that Sadleir provide contact information for a GroupM representative.  Sadleir replied that he would provide contact information "within the next 3 hours."

103.    That same day, on November 12, 2019, the Groupm-ms.com domain was registered through GoDaddy.com.  The SDNY Complaint alleges that GoDaddy.com's records list the administrator of the account as William Sadleir residing at Sadleir's address in Beverly Hills, and lists Sadleir's cell phone number.  Upon information and belief, and as alleged in the SDNY Complaint, Sadleir, through an Aviron IT employee (the "Aviron IT Employee"), created the Groupm-ms.com domain to provide a veneer of legitimacy to the Sham GroupM and to further mislead the Fund.  Copied below are screen shots of the Sham GroupM website and the legitimate

GroupM Worldwide website; the Sham GroupM website has since been taken down, but is available at a website that preserves archives of webpages.[6]

**Sham GroupM**



**The Legitimate GroupM Worldwide**



---

[6] Internet Archive, WayBack Machine, (captured February 25, 2020), *available at* https://web.archive.org/web/20200225160601/http://groupm-ms.com/.

23

104.    On or about November 13, 2019 Sadleir purported to send an email to an "Amanda Stevens" at the email address a.stevens@groupm-ms.com (the "Stevens Email Account") – connected to the domain formed just the prior day – requesting an accounting of the media balance on Aviron's account.  "Amanda Stevens" promised a report summary by November 15, 2019; Sadleir then copied in the Fund's sub-adviser on their correspondence.

105.    The SDNY Complaint alleges that based on the FBI's "review of IP records, it appears that Sadleir was actually the user of the Stevens Email Account after it was established by the Aviron IT Employee," and that "Sadleir himself posed as Amanda Stevens when engaging in email exchanges with a representative from the Fund."

106.    On November 15, 2019, "Amanda Stevens" provided a summary report purporting to show a balance of $27.65 million in unused prepaid media being held at the Sham GroupM.

107.    Upon information and belief, this summary report was created by Sadleir to mislead the Fund and prevent it from discovering his and Kadadu's theft of the prepaid media credit funding.

108.    Throughout November, the Fund's sub-advisers attempted to call Stevens' phone, only to receive "her" voicemail.  Over email, Stevens continually delayed in responding to the Fund's sub-adviser's requests.

109.    As alleged in the SDNY Complaint, the phone number for "Amanda Stevens" was created by the Aviron IT Employee at the behest of Sadleir, and the billing contact information for the Stevens phone number was listed as "William Sadleir" at the address for his Beverly Hills property.

INDEX NO. 657496/2019

NYSCEF DOC. NO. 123    Case 2:20-bk-15015-BR    Doc 39-1    Filed 07/14/20    Entered 07/14/20 20:24:20    Desc
Complete PDF    Page 54 of 83                    RECEIVED NYSCEF: 06/26/2020

110.    On November 25, 2019, Sadleir spoke with Mark Volosov, a representative from the Fund's Sub-advisers.  As outlined in Mr. Volosov's affidavit, *see* ECF No. 4, during their phone call, Sadleir admitted that he "f----d up," conceding that he engaged in fraudulent activity in connection with the Fraudulent Releases and Fraudulent Amendments.  The Wall Street *Journal* later reported that Sadleir, when asked about this allegation, stated that "I should not have done it.  It was bad judgment on my part.  I know better."

111.    Later on November 25, 2019, a representative from the Fund's Sub-advisers sent Sadleir an email that asked him to "share as promptly as possible the documents utilized to facilitate the sale of assets. . . and the detailed funds received and the allocation of the same."  Sadleir never directly responded to those requests.

112.    Sadleir later responded by email, instead sharing plans to further sell the Fund's pledged collateral to repay certain of Sadleir's attorneys' fees (and thereafter, allegedly, to pay the Fund).

113.    On December 16, 2019, the Fund sent Aviron Group, Aviron Capital, Aviron Pictures, and Sadleir a letter at 9:45 A.M. Pacific Time notifying them that, among other things, the Fund was exercising its right to remove Sadleir as Manager of Aviron Pictures, Aviron Capital, and appoint a Replacement Manager at each entity.  The December 16 Letter requested a response by 5 P.M. Pacific Time on December 16, 2019.

114.    Defendants' transaction counsel responded shortly after the close of business on December 16, 2019 merely to confirm receipt.

### The Fund Commences This Action And Learns Of The Prepaid Media Fraud

115.    On December 17, 2019, the Fund commenced this action.  On December 17, 2019, the Court entered an *ex parte* temporary restraining order; on December 20, 2019, the Court preliminarily enjoined Sadleir and Aviron Group from, among other things, contesting the

25

Replacement Manager's right to control and direct the management and operations of Aviron Capital and Aviron Pictures, and their respective subsidiaries.

116.    Thereafter, the Fund and counsel for the Replacement Manager each investigated the availability and refundability of the roughly $26 million Sadleir purportedly invested in prepaid media credits.  Sadleir also directed the Replacement Manager to Amanda Stevens, who continued to be evasive and non-responsive.

117.    After roughly a month of no substantive clarification regarding the inquiries into the prepaid media credits, on February 7, 2020 counsel retained by the Replacement Manager sent a formal demand letter to GroupM Worldwide's General Counsel, requesting a refund of the prepaid media credit funds.

118.    On February 24, 2020, GroupM Worldwide's General Counsel responded, and has since also confirmed by telephone, that: (i) GroupM Worldwide, MediaCom, and their affiliate portfolio companies have never employed anyone by the name of "Amanda Stevens"; (ii) the domain name used by "Amanda Stevens" does not belong to GroupM Worldwide; and (iii) neither GroupM Worldwide nor MediaCom hold any prepaid media credits on behalf of any Aviron entity.

119.    As alleged in the SDNY Complaint, on or about February 28, 2020, the Aviron IT Employee deleted the mailbox for the Stevens Email Account.  On the same day, Sadleir and the Aviron IT Employee exchanged a series of four calls, after which the Aviron IT Employee contacted the phone company for the Stevens phone number and asked the company to cancel the Stevens phone number and to "just let it be a dead end."

120.    On or about March 2, 2020, the SDNY Complaint alleges that the Aviron IT Employee spoke with Sadleir for roughly 10 minutes.  Subsequent to this call, the GoDaddy

26

Account Administrator cancelled the account registration and hosting of the groupm-ms.com domain. The Aviron IT Employee then placed a call to the customer service line for the phone company that serviced the Stevens phone number in an attempt to see if it could trace the names associated with the numbers that had placed calls to the Stevens phone number. The phone company representative informed the Aviron IT Employee that they no longer had the ability to trace such calls.

121.    The SDNY Complaint further alleges that around March 4, 2020 to March 7, 2020, the Aviron IT Employee placed numerous calls to the GoDaddy customer service line, identifying himself as "William" and complaining that the account information, which included the name William Sadleir, was still accessible on a GoDaddy internet domain registration database. The Aviron IT Employee was informed that it takes time for the user information to be removed and that it would disappear within days. On March 7, 2020, a GoDaddy customer service representative informed the Aviron IT Employee that the account information would be removed that day.

122.    These actions evince further efforts by Defendants to hide their theft from the Fund.

123.    As outlined above, Sadleir directed the creation of, or created, the Sham GroupM, "Amanda Stevens" and the corresponding Stevens email address and phone number, and further posed as Stevens to divert the Fund's investment to himself, and used the Sham GroupM and Amanda Stevens to perpetuate that fraud. Sadleir's misappropriation of investor funds as a result of this fraud is perhaps best evidenced by Sadleir and Kadadu's use of the Fund's investment to purchase, through Temerity, a $13.5 million home in Beverly Hills.

*April 2020: Sadleir Violates The Preliminary Injunction Order*

124.    Sadleir's fraud did not end there.  The CDCA Complaint alleges that in or around April 2020, Sadleir submitted loan applications to J.P. Morgan Chase in the names of Aviron Licensing, Aviron Releasing, and Aviron Group to obtain federal loans designed for small businesses under the Paycheck Protection Program ("PPP"), a program established under the Coronavirus Aid, Relief, and Economic Security Act, to assist small businesses suffering as a result of COVID-19.

125.    Despite the fact that the Preliminary Injunction Order issued by this Court on December 20, 2019 prevented Sadleir from holding himself out as Manager or otherwise as controlling the day-to-day conduct, operation and management of the Aviron Entities, the CDCA Complaint alleges that Sadleir used the 2019 IRS Form W-3 for Aviron Pictures in support of his claim for payroll expenses, and also submitted a list of employees at Aviron Pictures.

126.    The CDCA Complaint alleges that the PPP funds, once disbursed, were then used to pay for Sadleir and Kadadu's various personal expenses, including roughly $154,000 of Sadleir and Kadadu's personal credit card debt, a $40,000 car loan, and $69,117.10 for legal services to Antoni Albus LLP, counsel for Sadleir in this action.

## COUNT I – FRAUD AS TO THE FRAUDULENT AMENDMENTS
### (AGAINST WILLIAM SADLEIR AND THE AVIRON ENTITIES)

127.    Plaintiff repeats each of the allegations above as if fully set forth herein.

128.    Upon information and belief, Sadleir and the Aviron Entities caused the filing of the Fraudulent Amendments, and created the Fraudulent Releases, which themselves were false statements.  The Aviron Entities, Sadleir and/or their agents/employees also made false statements to the Fund's attorneys on October 24, 2019 and October 25, 2019 as to its fraudulent UCC-3 amendments and its sale of the collateral, including that "for sure Blackrock [sic] knew

28

what it was doing and why," that Sadleir would "pull together funds flow you asked for" and that "[w]e'll get this cleaned up."

129.    Sadleir and the Aviron Entities knew those statements to be false, and intended for the Fund to rely on those statements so as to perpetuate and further their fraud.

130.    Sadleir and the Aviron Entities continued to omit material information as to its fraudulent conduct by refusing to respond to repeated inquiries from the Fund's counsel.

131.    The Fund justifiably relied on Sadleir's and the Aviron Entities' non-disclosures and misrepresentations to its substantial detriment.

132.    In the alternative, Sadleir committed his fraud by virtue of his domination and control over the Aviron Entities, which operate as one, and which Sadleir has used to defraud Plaintiff by, among other things, filing the Fraudulent Amendments and disposing certain of the Fund's perfected collateral.

133.    As a direct and proximate result of the Aviron Entities' and Sadleir's fraud, the Fund has been harmed in an amount to be determined at trial, but estimated to exceed $3 million.

## COUNT II – FRAUD AS TO THE SHAM GROUPM
### (AGAINST ALL DEFENDANTS)

134.    Plaintiff repeats each of the allegations above as if fully set forth herein.

135.    Defendants falsely assured the Fund that the prepaid media credit balance was available and refundable.  Defendants knew those statements to be false, because, among other things, they knew those funds had been diverted to the Sham GroupM (Defendant GroupM Media Services), and, upon information and belief, also to Sadleir and Kadadu, via Temerity.  Defendants,

however, intended for the Fund to rely on their false statements so as to perpetuate and further their fraud.

136.    Defendants also created or otherwise had created at their direction a fictional person, Amanda Stevens, to further disguise their fraud.

137.    The Fund justifiably relied on Defendants' misrepresentations to its substantial detriment.

138.    In the alternative, Defendants perpetuated their fraud through Sadleir's domination and control over the Aviron Entities, which operated as one, and which Sadleir, Kadadu, and GroupM Media Services used to defraud Plaintiff.

139.    As a direct and proximate result of Defendants' fraud, the Fund has been harmed in an amount to be determined at trial, but estimated to exceed $26 million.

### COUNT III – FRAUDULENT CONCEALMENT
### AS TO THE FRAUDULENT AMENDMENTS
### (AGAINST WILLIAM SADLEIR AND THE AVIRON ENTITIES)

140.    Plaintiff repeats each of the allegations above as if fully set forth herein.

141.    The Fund learned in October 2019 that Defendants Sadleir and the Aviron Entities filed fourteen Fraudulent UCC-3 Amendments with the Delaware Department of State that deleted the purportedly sold or financed collateral from the Fund's documented list of collateral, in direct contravention of the NPA.  Defendants could have only effectuated this filing by creation of the Fraudulent Releases.

142.    Sadleir and the Aviron Entities and/or their agents did not disclose this material information to the Fund at any time.

143.    Sadleir and the Aviron Entities and/or their agents otherwise omitted material information in their discussions with the Fund's attorneys on October 24, 2019 and October 25, 2019, including that "for sure Blackrock [sic] knew what it was doing and why," that

30

Sadleir would "pull together funds flow you asked for" and that "[w]e'll get this cleaned up." Sadleir and/or his agents intended for the Fund to rely on those statements.

144.     Sadleir and the Aviron Entities continued to omit material information as to his fraudulent conduct by refusing to respond to repeated inquiries from the Fund's counsel.

145.     The Fund justifiably relied on the Aviron Entities' and Sadleir's non-disclosures to its substantial detriment.

146.     Sadleir and the Aviron Entities had a duty to disclose their fraudulent actions related to the Fund's perfected security interest in the collateral, compounded by their otherwise partial, ambiguous, and/or misleading statements, which required additional disclosure to avoid misleading the Fund, especially given that their fraudulent actions were particularly within their knowledge and given that Sadleir and the Aviron Entities took action to delay the Fund's discovery of the fraud.

147.     In the alternative, Sadleir committed his fraud by virtue of his domination and control over the Aviron Entities, which operated as one, and which Sadleir has used to defraud Plaintiff by, among other things, filing the Fraudulent Amendments and disposing certain of the Fund's perfected collateral.

148.     As a direct and proximate result of the Aviron Entities and Sadleir's fraudulent concealment, the Fund has been harmed in an amount to be determined at trial, but estimated to exceed $3 million.

## COUNT IV – FRAUDULENT CONCEALMENT
## AS TO THE SHAM GROUPM
## (AGAINST ALL DEFENDANTS)

149.    Plaintiff repeats each of the allegations above as if fully set forth herein.

150.    The Fund learned in February 2019 that Defendants had unlawfully misappropriated the Fund's investments by sending the Fund's monies to the Sham GroupM, rather than the legitimate GroupM Worldwide.

151.    Defendants and/or their agents/employees did not disclose this material information to the Fund at any time, despite that their actions were particularly within their knowledge.

152.    Instead, Defendants and/or their agents/employees repeatedly and falsely assured the Fund that the prepaid media balance remained at GroupM Worldwide and was refundable or could be used on future projects.  Defendants and/or their agents/employees intended for the Fund to rely on those statements.

153.    Defendants also created or otherwise had created at their direction a fictional person, Amanda Stevens, to disguise their fraud.

154.    The Fund justifiably relied on Defendants' non-disclosures to their substantial detriment.

155.    Defendants had a duty to disclose their fraudulent actions related to their theft of the prepaid media monies, compounded by their otherwise partial, ambiguous, and/or misleading statements required additional disclosure to avoid misleading the Fund, especially given that Defendants' fraudulent actions were particularly within the knowledge of the Defendants and given that Defendants took action to delay the Fund's discovery of the fraud.

32

156.    In the alternative, the Defendants perpetuated their fraud through Sadleir's domination and control over the Aviron Entities, which operated as one, and which Sadleir, Kadadu, and GroupM Media Services used to defraud Plaintiff.

157.    As a direct and proximate result of Defendants' fraudulent concealment, the Fund has been harmed in an amount to be determined at trial, but estimated to exceed $26 million.

## COUNT V – CONVERSION
## (AGAINST ALL DEFENDANTS)

158.    Plaintiff repeats each of the allegations above as if fully set forth herein.

159.    Defendants transferred approximately $3 million of the Fund's monies via the Fraudulent Amendments and $26 million of the Fund's monies via the GroupM fraud wrongfully for their own personal interest, and without authorization by the Fund.

160.    In so doing, Defendants assumed and exercised right of ownership of approximately $29 million of the Fund's monies without authorization.

161.    Defendants wrongfully exercised dominion over those funds to the exclusion of the Fund's rights.

## COUNT VI – CIVIL CONSPIRACY
## AS TO THE SHAM GROUPM
## (AGAINST WILLIAM SADLEIR, HANNAH (HANAN) KADADU,
## AND GROUPM MEDIA SERVICES)

162.    Plaintiff repeats each of the allegations above as if fully set forth herein.

163.    Plaintiff has adequately pled the underlying torts of fraud, conversion, and fraudulent concealment as to Defendants Sadleir, Kadadu, and the Sham GroupM.

164.    Defendants Sadleir and Kadadu, on behalf of themselves and the Sham GroupM, engaged and intended to engage in agreements to misappropriate monies from the Fund for their own personal gain.  Such agreements include, but are not limited to, the creation and formation of the Sham GroupM, for which Sadleir serves as its Manager and Kadadu serves or

33

INDEX NO. 657496/2019

NYSCEF DOC. NO. 123    Case 2:20-bk-15015-BR    Doc 39-1    Filed 07/14/20    Entered 07/14/20 20:24:20    Desc    RECEIVED NYSCEF: 06/26/2020
Complete PDF    Page 63 of 83

served as its member and/or as its agent. Sadleir and Kadadu used the funds resulting from said agreements and held in the Sham GroupM Chase Account to purchase their $13.5 million home in Beverly Hills through their personal investment vehicle, Temerity, and to further pay off their personal debts and expenses.

165.    Defendants Sadleir and Kadadu, on behalf of themselves and the Sham GroupM, committed and intended to commit overt acts in facilitation of the GroupM Fraud by filing a certificate of incorporation as to the Sham GroupM, registering the domain for the Sham GroupM website, the creation of Amanda Stevens and the related correspondence between Stevens and the Fund, the establishment of the Sham GroupM Chase Account, the wiring of the Fund's monies into the Sham GroupM Chase account, and the use of those monies to fund the purchase of their $13.5 million home in Beverly Hills and for other personal uses.

166.    As a direct and proximate result of Defendants' fraudulent concealment, the Fund has been harmed in an amount to be determined at trial, but estimated to exceed $26 million.

34

Case 2:20-bk-15015-BR    Doc 39-1    Filed 07/14/20    Entered 07/14/20 20:24:20    Desc
Complete PDF    Page 64 of 83

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

1.    An order in favor of Plaintiff as to its fraudulent concealment, fraud, conversion, and civil conspiracy claims;

2.    Monetary damages in an amount to be determined at trial, but estimated to exceed $29,000,000;

3.    Punitive damages in an amount to be determined at trial;

4.    That Plaintiff be awarded all pre-judgment interest allowable by law;

5.    That Plaintiff be awarded its costs and attorneys' fees as allowable by law; and

6.    Granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        June 26, 2020

Respectfully submitted,

SIDLEY AUSTIN LLP

By:    */s/ Nicholas P. Crowell*
       Nicholas P. Crowell
       ncrowell@sidley.com
       Charlotte K. Newell
       cnewell@sidley.com
       Alexander B. Porter
       alex.porter@sidley.com
       787 Seventh Avenue
       New York, New York 10019
       (212) 839-5300
       (212) 839-5599 (fax)

       *Attorneys for Plaintiff*
       *BlackRock Multi-Sector Income Trust*

35

**July 31, 2018 Hr'g Tr., *Kassabian v. Dobos* (*In re Dobos*), Case No. 18-1001-BR (Bankr. C.D. Cal. Oct. 30, 2018) [Docket No. 28], *aff'd*, 603 B.R. 31 (B.A.P. 9th Cir. 2019)**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

IN RE                          .    Case No. 2:13-35978-BR
                               .
AGNETA DOBOS,                  .
            Debtor.            .
. . . . . . . . . . . . . . ..
HARRY KASSABIAN and            .    Adv. No. 2:18-ap-01001-BR
PEOPLE'S BAIL BONDS,           .
                               .
        Plaintiffs,            .
                               .    Los Angeles, California
                               .    Tuesday, July 31, 2018
AGNETA DOBOS,                  .    10:29 a.m.
                               .
                               .
        Defendant.             .
. . . . . . . . . . . . . .

            TRANSCRIPT OF CONTINUED STATUS CONFERENCE
               BEFORE HONORABLE BARRY RUSSELL
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plaintiffs:        Law Offices of Michael D. Kwasigroch
                           By: MICHAEL D. KWASIGROCH, ESQ.
                           1975 Royal Avenue, Suite Number 4
                           Simi Valley, CA 93065
                           (805) 231-4248

For the Defendant:         Smyth Law Office
                           By: ANDREW EDWARD SMYTH, ESQ.
                           4929 Wilshire Blvd Ste 690
                           Los Angeles, CA 90010
                           (323) 933-8401

Court Recorder:            Dawnette Francis
                           U.S. Bankruptcy Court
                           255 East Temple Street, Room 940
                           Los Angeles, CA 90012
                           (855) 460-9641


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

1          COURTROOM DEPUTY:  Number 10 and 11, Agneta Dobos.

2          MR. SMYTH:  Good morning, Your Honor.  Andrew Smith

3   for moving party on the motion to dismiss under Ms. Dobos.

4          MR. KWASIGROCH:  Good morning, Your Honor.  Michael

5   Kwasigroch on behalf of plaintiff.

6          THE COURT:  Okay.  Now, you filed an opposition a bit

7   late, did you not?

8          MR. KWASIGROCH:  Well, yes, Your Honor.  Actually, it

9   was --

10          THE COURT:  No, no.  It is yes, and there is no

11   explanation as to why.

12          MR. KWASIGROCH:  Well, I respectfully would like to

13   just tell the Court the reason.

14          THE COURT:  Well, you should have done that in

15   writing under penalty of perjury, and you didn't.  So, I'm not

16   going to consider your opposition, obviously.  That's what the

17   rules are.  You understand that?

18          MR. KWASIGROCH:  Well, given this is a <u>Vale</u> motion

19   for summary judgment --

20          THE COURT:  No, no, you're arguing the -- it is not a

21   <u>Vale</u> motion.  So you can sit down, counsel.  You did not timely

22   file an opposition.  But I want to say something more than

23   that.  Just have a seat.

24          The -- a couple of things you did border on being

25   frivolous.  The red -- and just so you know, I did read your

1  pleading.  I'm not asking for any response.  But the -- a lot

2  of the arguments are just -- it's like you picked -- like the

3  idea this is a summary judgment is just frivolous.  This is not

4  a summary judgment, it's -- and it's not an affirmative

5  defense.  It is an actual statutory thing.

6          You have made arguments, lack of due process.  You've

7  thrown -- it's like you've got a whole list of things and you

8  just threw them all together.  And by the way, just to review

9  what this was, in the original, even equally frivolous is that

10  somehow this is collateral estoppel.  You filed the motion to

11  reopen and the reason you wanted to -- and by the way, there

12  was no declaration in that motion to reopen, just so you

13  understand it.  There was none.  Unless -- we didn't have one.

14          But you know when there's no opposition, it's almost

15  a ministerial act to allow a motion to reopen.  You did want to

16  file the complaint and question it, but I figured at that

17  point, there's no opposition.  But that was -- I was not

18  determining anything.  It would be that claim would be timely.

19  You wanted to file a complaint, you can file anything you want.

20          And so there was no -- just so you understand, there

21  is zero evidence before me of anything that you've argued that

22  somehow that the notice was improper.  In the original motion

23  to reopen, there is no declaration.  And in your declaration,

24  by the way, that's kind of a lazy way of doing it, but just as

25  a counsel, to simply say you know in a brief declaration saying

1   everything in there that I can testify to, that is worthless.

2   If there's anything you can actually testify to, you have to

3   state it.

4          So, the fact of the matter in this case, the only

5   evidence I have is the motion.  And the motion is that the

6   declarant was properly served and therefore -- and the filing

7   of the complaint is not timely.  And again, you did not file in

8   a timely -- you know I think it was filed yesterday.

9          So, I'm going to grant the motion to dismiss.  This

10  is a very simple case.  And again, the arguments you made are

11  all over the place.  They have no bearing whatsoever.

12         Mr. Smyth, do you understand what I've said?  Any

13  questions about it?

14         MR. SMYTH:  No questions, Your Honor.

15         THE COURT:  No, no, I've stated on the record.  I

16  don't need any -- this is not an adversary proceeding in the

17  sense of the motion.

18         MR. SMYTH:  Yes.

19         THE COURT:  I've stated on the record, it's a very

20  simple case.  There was the motion -- there is evidence in the

21  motion itself, clearly, that it was properly serviced.  There

22  is absolutely no evidence in any way that anything other than

23  that, and I'm not considering the opposition in any case.

24         But even if I were to consider it, as I've explained

25  to you, the idea that this is somehow a summary judgment is

1  frivolous.  And the other argument's equally without merit.

2        So, I'm going to grant the motion to dismiss.

3        MR. SMYTH:  And I should submit an order, Your Honor?

4        THE COURT:  Just some order that I'm granting it for

5  the reasons stated on the record.  And I laid it out -- and

6  again, there was zero -- I'm repeating myself.  Have you seen

7  any evidence?  Any evidence of the fact it was not properly

8  serviced?

9              (No audible response)

10        THE COURT:  Argument.  I've seen it.  There was -- in

11  the motion to reopen, but there was no declaration attached.

12  And zero evidence before me.  So I'm going to grant the motion.

13        MR. SMYTH:  Thank you, Your Honor.

14        THE COURT:  It may or may not end it, but that's not

15  for me to say.  So, I'll see you.  That ends this matter.

16                    * * * * *

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

        I, VIDHYA VEERAPPAN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Vidhya Veerappan

VIDHYA VEERAPPAN

J&J COURT TRANSCRIBERS, INC.     DATE:  October 30, 2018

*In re Real Estate Partners, Inc.*, Case No. 07-13239, 2007 WL 7025114 (Bankr. C.D. Cal. Nov. 20, 2007)

2007 WL 7025114
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
C.D. California.

In re REAL ESTATE PARTNERS,
INC., Affects all Debtors, Debtors.

Nos. SA 07–13239 TA, SA 07–13246 TA.
|
Nov. 20, 2007.

## AMENDED ORDER DENYING MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE IN ALL EIGHT JOINTLY ADMINISTERED CASES AND APPOINTING RESPONSIBLE PERSON

THEODOR C. ALBERT, United States Bankruptcy Judge.

**\*1** The Court has considered the oral arguments of all parties in interest as well as the briefs. The Court took the matter under submission for further reflection. The Court incorporates herein by reference its tentative decision marked as Exhibit "1" and adopts that decision as the basis of its order.

The Court is not persuaded by the U.S. Trustee's argument. While in the very few days between the filing of the petition on October 8, 2007, a holiday, and the entry of the Court's initial order on October 12, one could argue that "old management" retained some vestiges of control, this rather picayune argument elevates form over substance. The reality is that one of the very first acts performed by the debtor in this case immediately upon the filing of the petition was its emergency motion to appoint a responsible person. Moreover, by the time the motion was actually heard November 12, through the terms of the moving papers it became abundantly clear that former management would have absolutely no further role in the case. The Court's interim order indeed reflected that the former management would have no continuing role and that Mr. Kipperman as responsible person would only be answerable to the Court. The fact that this all occurred in the first week of the case as opposed to immediately before the petition was filed is of no consequence. The SEC's oral motion for a trustee in the middle of the hearing on November 12 cannot and should not serve to trump the policy reflected in the statutory language of 11 U.S.C. § 1104(a)(1), which suggests that a debtor should be given a reasonable opportunity to clean its own house by installing "new management" as an alternative to appointment of a trustee based on cause outlined in § 1104(a)(1).

Moreover, the attempts to show some taint on Mr, Kipperman by sole reason of his introduction to the case by Mr. Speier of the Squar firm, is similarly not persuasive. The points raised may be more appropriately directed to whether that firm should be employed in the case. But it is quite a different thing to argue that the mere introduction of Mr. Kipperman by that firm taints him as well with the sins of former management. It deserves re-emphasis that these motions must be considered on a case by case basis, and that only the slightest change in the mix could lead to a different result. The fact that the change in management was obviously motivated by the imminent appointment of a receiver in district court, is just one such factor for the Court to consider. In sum, the Court believes the language of the statute and the preponderance of the case law indicate that the standard for appointment of a Chapter 11 trustee in this case is directed to the Court's discretion as to what is in the general interest of creditors under 11 U.S.C. § 1104(a)(2), not the "for cause" standard in (a)(1). The real parties in interest who filed comments seem supportive of the role of Mr, Kipperman as responsible person in the case and this was an additional factor. While it is mindful of the policy issue, the Court concludes on balance that an appointment is not in the best interest of creditors at this time.

**\*2** The motion for appointment of a trustee is **denied** and the alternative motion to install responsible person is **granted**.

### EXHIBIT 1

### United States Bankruptcy Court

### Central District of California

### Santa Ana

### Judge Theodor Albert, Presiding

### Courtroom 5B Calendar

**Monday, November 19, 2007**

**Hearing Room SB**

10:00 am

**07–13239 Real Estate Partners, Inc. Chapter 11**

**# 1.00** U.S. Trustee's Motion to Appoint Chapter 11 Trustee
in alt eight jointly administrative cases

Docket # : 33

**Tentative Ruling:**
This is the hearing on the United States Trustee's motion
to appoint a Chapter 11 trustee under 11 U.S.C. § 1104,
and the continued hearing on the Debtor's motion to appoint
a "responsible person" as selected by the Debtors' Board
of Directors. The Debtors' motion was originally heard on
shortened time October 9, 2007. At the earlier hearing the
Court granted the Debtors' motion on a provisional basis
pending further briefing and the U.S. Trustee's motion. The
Securities & Exchange Commission joins in the U.S. Trustee's
motion. Two groups of investors have filed comments; while
neither of the comments directly oppose the U.S. Trustee's
motion, they can be read as not opposing Mr. Kipperman's
continued role as "responsible person" either, and generally
plead for the most efficient use of resources and for a
continuance pending an early appointment of a committee.

Much continued effort is made on the U.S. Trustee's part to
demonstrate "cause" for appointment of a trustee based on
the highly questionable activities of prior management. Even
more evidence is produced showing that of the more than
$50 million raised by Debtors almost four fifths was spent
on marketing, commissions or is unaccounted for. As the
Court stated last time, this further evidence was unnecessary.
But for the intervening displacement of old management by
Mr. Kipperman as "responsible person," there would clearly
have already been an appointment of a Chapter 11 trustee.
Rather, the narrower question presented is whether the Court
can or should appoint a fiduciary, or accept designation of
an alternative fiduciary, to govern the affairs of the Debtors
other than appointment of a trustee or examiner under §
1104. However, even this somewhat mischaracterizes what
is before the Court. Debtors' management as of the filing
of the petition on October 8 *had already been replaced
in substantial part* by Mr. Kipperman through agreement.
The Court was merely asked on shortened time to confirm
what had already been done, obviously as Debtors' last ditch
effort to avoid either appointment of a trustee or appointment
of a receiver by the District Court. As part of the Court's
order giving the provisional relief the last vestiges of former

management's control were also dissolved and the entire
board and management have since resigned.

The questions before the Court, more properly framed, are:
(1) whether the Court *must* appoint a trustee where the acts
of former management amount to "cause" or would otherwise
indicate that a fiduciary is needed and/or (2) as a matter of
policy, should debtors under any circumstances be allowed
to circumvent appointment of a trustee by the expedient of
a "responsible person" or similar motion to the Court to
appoint such a fiduciary other than a trustee. The U.S. Trustee
argues for a *per se* rule. The U.S. Trustee argues that it
is unseemly for fraudsters to "hand pick" their successors
and that "responsible persons" are really quasi trustees but
lacking statutory grounding. The U.S. Trustee further argues
that allowing management to designate its fiduciary successor
upsets the careful balance created under the Code by turning
the question of "what" i.e. *whether* a trustee should be
appointed into a question of "who," i.e. is the designated
successor fit to be a fiduciary.

**\*3** Although the U.S. Trustee argues for a strict construction
of the statutes rather than a more "holistic" approach, such
a construction does not in the end support the U.S. Trustee's
argument. First, we must examine the statute. Section 1104(a)
provides:

(a) At any time after the commencement of the case but before
confirmation of a plan, on request of any party in interest or
the United States trustee, and after notice and a hearing, the
court *shall* order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or
gross mismanagement of the affairs of the debtor *by current
management,* either before or after the commencement of the
case....." (Emphasis added)

The U.S. Trustee never adequately addresses this language
highlighted, choosing instead to focus only on the word
"shall." Moreover, despite his heavy reliance on other policy
arguments, the U.S. Trustee never addresses the implication
of such a *per se* rule. Taken to its logical conclusion, the U.S.
Trustee's *per se* rule would mean that neither the board nor
management of troubled companies could ever/would ever
clean their own house as an alternative to the appointment of
a trustee. The bad acts of former management would remain
forever as an anchor around the debtor and would serve as
a huge disincentive to either taking corrective action in the
first place or to filing a reorganization proceeding at all.

Even if a proceeding were inevitable, there would necessarily be additional legal fees expended in resisting appointment motions when, if given a graceful alternative, many corporate debtors might do "the right thing" with little or no prompting.

The Court must construe statutes according to their "plain meaning" whenever doing so would not involve an absurdity. *Lamie v. U.S. Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023 (2004) citing *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U .S. 1, 6, 120 S.Ct. 1942 (2000 (*in turn quoting* *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026 (1989), Further, the legislature is presumed to have used no superfluous words and every word in a statute must be accorded a meaning. *Handy & Harmon v. Burnet, Comm. of Internal Revenue,* 284 U.S. 136, 137, 52 S.Ct. 51 (1931). Consequently, some meaning must be afforded to the words "current management" within section 1104(a). The Court believes that inclusion of this language must mean that a different standard will govern when management has *already been replaced* by the time an appointment motion is filed. If the fraud, dishonesty or gross incompetence can be attributed to past management only, then the Court is not compelled to appoint a trustee. *In re Microwave Products of America,* 102 B.R. 666, 671 (Bankr.W.D. Term 1989); *In re Associated Air Services, Inc.,* 75 B.R. 47, 50 (Bankr.S.D.Fla.1987); *In re The 1031 Tax Group, LLC,* 374 B.R. 78, 86 (Bankr.S.D.N.Y.2007); 7 *Collier on Bankruptcy,* ¶ 104.02[3][b][ii] (15th Ed Rev.2006). Rather, the Court in such instances is governed by the more general and discretionary standard of whether the appointment of a trustee "is in the interests of creditors" found at § 1104(a)(2).

**\*4** Rather than a *per se* rule as urged by the U.S. trustee, the Court favors the kind of case-by-case factual determination adopted by the court in *In re The 1031 Tax Group. In Tax Group* that court focused on whether the designated fiduciary is "tainted" by association with prior bad management. *Tax Group* suggests a shifting burden of proof once a *prima facie* case is established by the U.S. Trustee to the party opposing appointment to show that the designated fiduciary is not tainted. Clearly there should be "heightened scrutiny" where new management was appointed shortly before or after a petition is filed. *Tax Group,* 374 B.R.at88. But in the case at bar, the Debtors have presented evidence that Mr. Kipperman is a long-standing panel trustee in the Southern

District and enjoys the highest reputation for integrity and competence, particularly in finance and real estate matters. A vague suggestion is made by the SEC that there might be some reason for concern about Squar Milner's role with prior management, and hence a taint might exist because it was Steven Speier of that firm (another panel trustee serving in the Riverside division of the Central District) who made the first introduction. The Court is not convinced on that meager showing that there is any reason to question the integrity or motivation of either Messrs. Speier or Kipperman. Instead the Court accepts Mr. Kipperman's declaration to the effect that he has absolutely no connection to prior management, is in no way beholding to them and can serve as the kind of fiduciary that the case needs. Further, the conditions of Mr. Kipperman's employment provide further comfort. As made clear in the previous order, Mr. Kipperman cannot be replaced except upon this Court's order. The Court has also received Mr. Kipperman's assurance in open court that he will have no hesitation in pursuing litigation if that is in the interest of creditors and the estate. His offer to restrict his fees under the provisions of § 326 and to deputize a committee with authority to pursue litigation against former principals, are all additional factors providing comfort to the Court. Lastly, there is the important factor of the stated preferences of the creditor body. While the comments filed herein by the two groups are not exactly ringing endorsements, neither are they oppositions to Mr. Kipperman's role. If there were any legitimate concern about "taint" the Court would have expected it to have been expressed by these groups.

In a case by case approach the Court can evaluate the crucial factors of whether there is a taint, whether prior management still has vestiges of control, whether the designated fiduciary is a known or an unknown and whether the designated fiduciary has the reputation and competence needed for the engagement. So the U.S. Trustee should take comfort that whatever precedent the Court sets by this decision, it is strictly limited by the need to examine *each situation on its own merits.*

**\*5** The authorities cited by the U.S. Trustee are not persuasive. *In re Sharon Steel Corp.,* 871 F.2d 1217, 1224 (3d Cir1989) is factually distinguishable in that the tentative stipulation offered between the Committee and the debtor was never finalized and the committee ended up urging the court to go forward with the appointment motion. Ironically, the *Sharon Steel* court observes that the sins of present management are the determinative factor and there is always a question of whether current management

In re Real Estate Partners, Inc., Not Reported in B.R. (2007)
2007 WL 7025114

is free of the "taint" of prior management. *Id.* at 1227. In *Microwave Products,* the board of directors instigated repeated management changes, but the board itself retained ultimate control. The *Microwave* court concluded that it was the self-dealing board that was the main problem and so appointed a trustee. *In re Microwave Products,* 102 B.R. at 675–76. Nor is *In re Adelphia Communications,* 336 B.R. 610 (Bankr.S.D.N.Y.2006) supportive of the U.S. Trustee's argument. The *Adelphia* court never squarely answered the question of "the outer limits" of its power to appoint designated fiduciaries under § 1107(a) or whether in the right case a bankruptcy court could appoint a fiduciary except through § 1104, it simply determined that the case presented to it was not one of those extraordinary instances where such an appointment might be appropriate and that § 105 was not in itself sufficient appointment authority. *Id.* at 666–69. Moreover, at page 666, footnote 146, the *Adelphia* court cited to *In re Gaslight Club, Inc,* 782 F.2d 767 (7th Cir1986), noting that *consent* by prior management was a main factor justifying such an appointment by the court in that case.

Lastly, the U.S. Trustee raises an argument that an appointment of Mr. Kipperman not only lacks authority under bankruptcy law, it is also in derogation of California corporate law because, unlike usual corporate governance, Mr. Kipperman answers to no board of directors and so can't be fired except upon order of this Court. While the Court is not sure whether Nevada law or California law applies, it will assume for this discussion that California law governs as argued in Debtors' brief. But this argument need not detain us long because it is perfectly obvious that in federal bankruptcy proceedings the authority of the board of directors is sharply curtailed not only by the provisions of Title 11 but by the orders of the bankruptcy court as well. Indeed, under 11 U.S.C. § 1107(a) the corporate debtor in possession has all of the powers and duties of a trustee *subject to such limitations or conditions as the court prescribes.* In effect, not only the assets of the estate but its governance as well are in *custodia legis.* Moreover, the Court agrees that California Corporations Code § 1400 has some bearing, although not necessarily to the degree urged by Debtors. It provides, in effect, that any order of the bankruptcy court, including a stipulated order which was in essence what was ordered in the responsible person motion, has the same power and effect over the corporation *as if it were so resolved by the board of directors.* This is *some* authority beyond that appearing in 11 U.S.C. § 105, and as an alternative to 11 U.S.C. §§ 1104 and 1107, that corporate governance may in limited circumstances be determined by the bankruptcy court. Such additional state statutory authority was cited by the court as important in *In re Gaslight Club, Inc., supra,* 782 F.2d at 771–72 and *In re FSC Corp.,* 38 B.R. 346, 349–50 (Bankr.W.D.Pa.1983). Both *Gaslight* and *FSC* properly stand for the proposition that where there is corporate debtor consent, as there is in the case at bar, the bankruptcy court may issue an order that appoints a responsible officer in lieu of or short-circuiting the usual resolution process of a board of directors.

**\*6** Understood in its proper perspective, then, there is nothing so dangerous or revolutionary about the appointment of Mr. Kipperman in this case as the U.S. Trustee's arguments might suggest. There was a complete change of management by the corporate debtors in possession *at the threshold of the case.* The designated successor is free of the taint of former management. He is otherwise competent and trustworthy and former management has no continuing control or means of reentry. The order designating him responsible officer was by consent of the Debtors. At the time of the U.S. Trustee's motion, there was no longer *present* management guilty of fraud, dishonesty, incompetence or gross mismanagement. Therefore, the Court is governed by the more discretionary standard of "interests of creditors" found at § 1104(a)(2), not by (a)(1). Although there is clearly an important policy issue here, the Court is confident that a careful, case by case determination of the propriety of such designated responsible officers by the Court in future cases will guard against misuse. If any or all of the combination of factors that were here present were to be absent, or the Court were otherwise concerned that such a change of management were not in the best interests of creditors, this Court would not hesitate to appoint a trustee *sua sponte.*

Lastly, the Court cannot omit to mention a most unfortunate argument advanced by the debtor in its papers. The suggestion was made that if the Court were to adopt a *per se* policy against appointment of responsible officers, Chapter 11s might get filed in some alternative, friendlier venue. The Court's integrity and its interpretation of law is not for sale. The Court expects that no judge of the United States Bankruptcy Court would ever shade his or her interpretation of law for some advantage, real or imagined, in attracting "big cases." Any suggestion to the contrary is most inappropriate.

*The motion for appointment of a trustee is denied.*

In re Real Estate Partners, Inc., Not Reported in B.R. (2007)
2007 WL 7025114

| Party Information | **SERVICE LIST** |
|---|---|
| | |

*Debtor(s):* Real Estate Partners, Inc.

*Movant(s):* United States Trustee (SA)

Represented By Marc J Winthrop

### NOTE TO USERS OF THIS FORM:

*Physically attach this form as the last page
of the proposed Order or Judgment. Do
**not file this form as a separate document.***

In re REAL ESTATE PARTNERS, INC., Debtor.

CHAPTER 11

CASE NUMBER SA 07–13239 TA

### NOTICE OF ENTRY OF JUDGMENT OR
### ORDER AND CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST ON THE ATTACHED
SERVICE LIST:

1. You are hereby notified, pursuant to Local Bankruptcy
Rule 9021–1(a)(1)(E), that a judgment or order entitled
(*specify* ): AMENDED ORDER DENYING MOTION FOR
THE APPOINTMENT OF A CHAPTER 11 TRUSTEE IN
ALL EIGHT JOINTLY ADMINISTERED CASES AND
APPOINTING RESPONSIBLE PERSON

was entered on (*specify date* ): NOV 20 2007
2. I hereby certify that I mailed a copy of this notice and a true
copy of the order or judgment to the persons and entities on
the attached service list on (*specify date* ): NOV 21 2007

**\*7**  Dated: NOV 20 2007

**JON D. CERETTO**

**Clerk of the Bankruptcy Court**

**By:**

*Deputy Clerk*

Michael J. Hauser

Office of the U.S. Trustee

411 West Fourth Street, Suite 9041

Santa Ana, CA 92701

Real Estate Partners, Inc.

Attn: Richard Kipperman

2569 McCabe Way, Second Floor

Irvine, CA 92614

Marc J. Winthrop

Winthrop Couchot

660 Newport Center Dr., # 400

Newport Beach, CA 92660

Karen Matteson

Marc J. Blau

Securities and Exchange Commission

5670 Wilshire Blvd., 11th Floor

Los Angeles, CA 90036

Jeffrey H. Davidson

Eve H. Karasik

Eric D. Goldberg

Stutment, Treister & Glatt

1901 Avenue of the Stars, 12th Floor

Los Angeles, CA 90067

Richard W. Brunette

Alan H. Martin

Aaron J. Malo

Sheppard, Mullin, Richter & Hampton

**In re Real Estate Partners, Inc., Not Reported in B.R. (2007)**
2007 WL 7025114

650 Town Center Drive, 4th Floor

Costa Mesa, CA 92626

**All Citations**

Not Reported in B.R., 2007 WL 7025114

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

***In re Hatch*, Case No. 17-23829, 2017 WL 8738241
(Bankr. E.D. Cal. Aug. 30, 2017)**

Case 2:20-bk-15015-BR    Doc 39-1    Filed 07/14/20    Entered 07/14/20 20:24:20    Desc
Complete PDF    Page 80 of 83

In re Hatch, Not Reported in B.R. Rptr. (2017)

2017 WL 3738241
Only the Westlaw citation is currently available.
United States Bankruptcy Court, E.D. California,
Sacramento Division.

IN RE Edwin and Susan HATCH, Debtors.

Case No. 17–23829–A–13J
|
Filed August 28, 2017
|
Signed August 30, 2017

**Attorneys and Law Firms**

John R. Hughes, Placerville, CA, for Debtors.

**MEMORANDUM**

Michael S. McManus, Judge United States Bankruptcy Court

 **\*1**  In connection with the debtors' attempt to confirm a chapter 13 plan, on June 16, 2017, the debtors filed a motion to value their home in El Dorado County. The motion is supported by the debtors' declaration which establishes their ownership of the property and that the property is encumbered by two deeds of trust. The senior lien, held by U.S. Bank, etc., secures a claim of approximately $188,179.84. The junior lien also is held by U.S. Bank. It secures a claim of approximately $45,541.

In the debtors' opinions, their home has a value of $160,000. Based on this value and the amount owed to U.S. Bank on its senior claim, U.S. Bank's junior lien is "out of the money" and the application of 11 U.S.C. § 506(a), as interpreted by the Ninth Circuit in In re Zimmer, 313 F.3d 1220 (9th Cir. 2002) and In re Lam, 211 B.R. 36 (B.A.P. 9th Cir. 1997), means that its lien can be "stripped off" the debtors' home. Its claim can be treated as an unsecured claim.

However, U.S. Bank opposed the valuation motion, contending that the home had a value of between $220,000. At this value, there is equity in the property after deducting the amount owed to the senior lien. In this circumstance, the debtors cannot utilize section 506(a) to eliminate or reduce U.S. Bank's junior secured claim by virtue of the anti-modification provision of 11 U.S.C. § 1325(b)(2). See Nobelman v. American Savings Bank, 508 U.S. 324 (1993).

The $220,000 value is based on the expert opinion of an appraiser, Neal E. Proctor.

Given the conflict in the evidence concerning the value of the home, an evidentiary hearing was necessary to determine that dispute material fact. See Fed. R. Bankr. P. 9014(d); Local Bankruptcy Rule 9014–1(g). Therefore, at the preliminary hearing on the valuation motion on August 14, 2017, and after determining the availability of the respondent, the court set an evidentiary hearing on August 28 at 1:30 p.m. The minutes of the August 14 hearing recite:

> There is a material disputed fact, the value of the subject property. The parties shall appear on August 28 at 2:30 p.m. with their witnesses for a evidentiary hearing. The witnesses who may be called are those persons for whom declarations have previously been filed. Their declarations will be considered as their direct testimony. They will be cross-examined at the hearing. Each side will be given 45 minutes for argument and the examination of witnesses.

In this court, a moving party is given the option of setting a hearing on a motion with 14 or 28 days of notice. See Local Bankruptcy Rule 9014–1(f). If 14 days of notice of the hearing is given, the respondent is not required to file a written response to the motion. Instead, the respondent may appear at the hearing, raise opposition orally, and if the court concludes that the opposition warrants further briefing, a schedule is set for filing evidence and briefs and a final hearing calendared. See Local Bankruptcy Rule 9014–1(f)(2).

If the moving party gives at least 28 days of notice of the hearing on the motion, the respondent is required to file written opposition to the motion 14 days prior to the hearing and the debtor must file any reply 7 days prior to the hearing. See Local Bankruptcy Rule 9014–1(f)(2).

In re Hatch, Not Reported in B.R. Rptr. (2017)

**\*2**  In this case, the debtors gave more than 28 days of notice of the August 14 hearing on their valuation motion. This meant that the respondent's written opposition was due no later than July 31. It was timely filed.

Because the written opposition included an appraisal that disputed the debtors' valuation, there was a material disputed issue of fact. This dispute had to be resolved at an evidentiary hearing. See Fed. R. Bankr. P. 9014(d).

Therefore, at the evidentiary hearing, both the debtors and the respondent had to call their witnesses on the issue of value. And, while the court would consider their previously filed declarations as their direct testimony, each witness had to be produced for cross-examination. If not produced, their direct testimony would not be considered by the court.

While both debtors appeared and were cross-examined by counsel for the respondent, the respondent failed to produce Mr. Proctor. Therefore, the only evidence concerning value that will be entertained by the court is the testimony of the debtors. In their opinions, the property has a value of approximately $160,000.

The respondent objected to their opinions because their declarations were not supported by "evidence" that corroborated a value of $160,000. This objection was without merit.

As the owners of the home in El Dorado county, the debtors were competent to offer a lay opinion as to its value. See Fed. R. Evid. 701; So. Central Livestock Dealers, Inc., v. Security State Bank, 614 F.2d 1056, 1061 (5th Cir. 1980). Neither debtor, however, was not qualified as an expert and so could not testify as to the types of information that an appraiser would reply upon to determine value. See Fed. R. Evid. 701, 702. "For example, the average debtor-homeowner who testifies in opposition to a motion for relief from the § 362 automatic stay, should be limited to giving his opinion as to the value of his home, but should not be allowed to testify concerning what others have told him concerning the value of his or comparable properties, unless the debtor truly qualifies as an expert under Rule 702 such as being a real estate broker, etc." Barry Russell, Bankruptcy Evidence Manual, Vol. II, § 701.2, p. 784–85 (2012–13).

Therefore, the foundation for the debtors' opinions was their status as the owner of the home, not other "evidence". Because only an expert qualified under Fed. R. Evid. 702 may

rely on and testify as to facts "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...", the lay opinion of value by a debtor is based only on the ownership of the property. See Fed. R. Evid. 703. See e.g., In re Wilson, 378 B.R. 862 (Bankr. D. Mont. 2007).

The court hastens to add that even if the written appraisal attached to Mr. Proctor's declaration could be considered by the court, it does not persuade the court that the home has a value of $220,000.

First, his methodology was suspect. It is based in part on "comparable listings" not just comparable sales. In the court's experience, a seller frequently is willing to accept less than the asking price.

Second, the subject property is a manufactured home. The appraisal report admits that the local market for such properties has been adversely affected by many foreclosures of manufactured homes. Indeed, one of the three comparable sales is a "short sale" and all of the comparable listings are for "REO" properties held by foreclosing lenders (a fact that casts further doubt on the use of these listings to predict the value of the subject property).

**\*3**  Third, the appraisal report overstates the condition of the property as average. The debtors' declarations suggest that this 21 year old manufactured home may be in less than average condition. When the case was filed, one of the two bathrooms was not operable, its siding was showing signs of rot, it was not on a permanent foundation, windows in two rooms were broken, a sliding door was inoperable, there was a crack in the ceiling, and there was a spill of raw sewage under the home. None of these conditions were noted in the appraisal.

Therefore, the court finds and concludes that the fair market value of debtor's residence is $160,000. It is encumbered by a first deed of trust held by U.S. Bank. The first deed of trust secures a loan with a balance of approximately $188,000. As a result, U.S. Bank's second claim secured by a junior deed of trust is completely under-collateralized. No portion of this claim will be allowed as a secured claim. See 11 U.S.C. § 506(a). Its deed of trust will remain of record until the plan is completed. This is required by 11 U.S.C. § 1325(a)(5)(B)(i). Once the plan is completed, if the respondent will not

reconvey its deed of trust, the court will entertain an adversary proceeding.

**All Citations**

Not Reported in B.R. Rptr., 2017 WL 3738241

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
101 California Street, Suite 3000, San Francisco, CA 94111

A true and correct copy of the foregoing document entitled (*specify*): Reply in Further Support of Motion for
(I) Order Appointing Trustee Pursuant to 11 U.S.C. § 1104(a), or, Alternatively, (II) Order Granting Relief
From Automatic Stay Pursuant to 11 U.S.C. § 362(d); Declaration of Andrew K. Glenn in Support Thereof

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
07/14/2020          , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

  David B Golubchik – dbg@lnbyb.com
  Kurt Ramlo – kr@lnbyb.com
  Ron Maroko – ron.maroko@usdoj.gov
  United States Trustee (L.A.) – ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*)                    , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)   07/14/2020          , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
David B Golubchik – dbg@lnbyb.com
Kurt Ramlo – kr@lnbyb.com
Ron Maroko – ron.maroko@usdoj.gov
United States Trustee (L.A.) – ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 07/14/2020 | Andrew R.J. Muir | /s/ Andrew R.J. Muir |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**