**KASOWITZ BENSON TORRES LLP**

*Attorneys for Cairn Capital*
*Investment Funds ICAV*
*for its sub fund Cairn Capstone*
*Special Opportunities Fund*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No.: 2:20-bk-15015-BR |
| TEMERITY TRUST MANAGEMENT, LLC, | Chapter 11 |
| Debtor. | **NOTICE OF MOTION AND MOTION FOR ORDER GRANTING RELIEF FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF BRANDON KUFRIN, ANDREW K. GLENN AND ROBERT DIETRICH IN SUPPORT THEREOF** |
| | Hearing Date: October 27, 2020 |
| | Time: 10:00 a.m. |
| | **The hearing will be conducted remotely, using ZoomGov video and audio (see instructions below)** |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, DEBTOR AND ITS COUNSEL, THE UNITED STATES TRUSTEE, AND OTHER INTERESTED PARTIES:**

    **PLEASE TAKE NOTICE THAT** on October 27, 2020 at 10:00 a.m., Cairn Capital

Investment Funds ICAV, for its sub fund Cairn Capstone Special Opportunities Fund ("Cairn"),

will move the Court for an order granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d) (the "Motion").

PLEASE TAKE FURTHER NOTICE that the Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declarations of Andrew K. Glenn, Brandon Kufrin and Robert Dietrich, supporting statements, arguments and representations of counsel who will appear at the hearing on the Motion, the record in this case, and any other evidence properly brought before the Court in all other matters of which this Court may properly take judicial notice.

PLEASE TAKE FURTHER NOTICE that pursuant to Rule 9013-1(f) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "Local Bankruptcy Rules"), a party opposing or responding to the Motion must file and serve the response (the "Response") on Cairn and the United States Trustee not later than fourteen (14) days before the date designated for hearing.  The Response must be a complete written statement of all reasons in opposition to the Motion or in support thereof, declarations and copies of all evidence on which the responding party intends to rely, and any responding memorandum of points and authorities.

PLEASE TAKE FURTHER NOTICE that pursuant to Local Bankruptcy Rule 9013-1(h), failure to file and serve a timely objection to the Motion may be deemed by the Court to be consent to the relief requested herein.

### Hearing Participation Instructions

Individuals may participate by ZoomGov video and audio using a personal computer (equipped with camera, microphone and speaker), or a handheld mobile device (such as an iPhone and/or Android phone).  Alternatively, you may participate by ZoomGov via audio only by using a telephone (standard telephone charges may apply).  Neither a Zoom nor a ZoomGov account is necessary to participate and no pre-registration is required.

**Check in 20 minutes before the hearing time.**

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

1     **Video/audio web address:** zoomgov.com

2     **ZoomGov meeting number:** 1603083580

3     **Password:** 123456

4

5     **Telephone conference lines (for audio only):**

6     1 (669) 254 5252 US (San Jose) or 1 (646) 828 7666 US (New York)

7     **ZoomGov meeting number:** 1603083580

8     **Password:** 123456

9

10

11    Dated: September 25, 2020

12
                                        **KASOWITZ BENSON TORRES LLP**
13

14
                                        /s/ *Andrew R.J. Muir*
15                                      Andrew R.J. Muir
                                        101 California Street, Suite 3000
16                                      San Francisco, California  94111
                                        Telephone: (415) 421-6140
17                                      Facsimile:  (415) 398-5030
                                        Email:  amuir@kasowitz.com
18
                                        Andrew K. Glenn (admitted *pro hac vice*)
19                                      Shai Schmidt (admitted *pro hac vice*)
                                        1633 Broadway
20                                      New York, New York 10019
                                        Telephone:  (212) 506-1700
21                                      Facsimile:  (212) 506-1800
                                        Email:  aglenn@kasowitz.com
22                                                sschmidt@kasowitz.com

23

24                                      *Attorneys for Cairn Capital Investment Funds ICAV,*
                                        *for its sub fund Cairn Capstone Special*
25                                      *Opportunities Fund*

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

PRELIMINARY STATEMENT.................................................................................................1

BACKGROUND .......................................................................................................................3

I.  THE PARTIES.................................................................................................................3

II. CAIRN'S CLAIMS AGAINST THE DEBTOR AND LIEN ON THE
    PROPERTY ....................................................................................................................3

    A.  The Credit Agreement and Promissory Note .....................................................3

    B.  The Guaranty and Deed of Trust........................................................................4

    C.  The Borrower Breaches the Credit Agreement....................................................5

    D.  The Debtor Defaults on the Guaranty and Cairn Commences a
        Foreclosure Action ...........................................................................................7

III. THE CRIMINAL FORFEITURE ACTION INVOLVING THE PROPERTY .................8

IV. THE CHAPTER 11 CASE .............................................................................................10

V.  SADLEIR AND KADADU'S USE OF THE PROPERTY ...........................................10

VI. CAIRN'S APPRAISAL OF THE PROPERTY..............................................................11

RELIEF REQUESTED .............................................................................................................12

JURISDICTION.......................................................................................................................12

ARGUMENT ...........................................................................................................................12

    THE COURT SHOULD LIFT THE AUTOMATIC STAY TO ALLOW
    CAIRN TO COMPLETE THE FORECLOSURE............................................................12

    A.  The Court Should Lift the Automatic Stay for "Cause" Under Section
        362(d)(1) .........................................................................................................12

    B.  Relief from Stay Is Also Justified Under § 362(d)(2)........................................16

CONCLUSION ........................................................................................................................18

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Ariz. v. Rodriguez (In re Rodriguez)*,
 Case No. 08-1028, 2008 WL 8448043 (B.A.P. 9th Cir. July 10, 2008) ...................................18

*In re Auld*,
 Case No.14-20424, 2014 WL 2780302 (Bankr. D. Kan. June 11, 2014) ................................17

*In re Avila*,
 311 B.R. 81 (Bankr. N.D. Cal. 2004)....................................................................................13

*Baldino v. Wilson (In re Wilson)*,
 116 F.3d 87 (3d Cir. 1997)....................................................................................................13

*In re Big3D, Inc.*,
 Case No. 08-16768, 2009 WL 9085556 (Bankr. E.D. Cal. Aug. 28, 2009),
 *aff'd*, 438 B.R. 214 (B.A.P. 9th Cir. 2010) ...............................................................................13

*In re Brotman Med. Ctr., Inc.*,
 2008 WL 8444797 (B.A.P. 9th Cir. Aug. 15, 2008) ...............................................................13

*In re Conejo Enters., Inc.*,
 96 F.3d 346 (9th Cir. 1996)....................................................................................................13

*In re DB Capital Holdings, LLC*,
 454 B.R. 804 (Bankr. D. Colo. 2011) ....................................................................................14

*In re Duvar Apt., Inc.*,
 205 B.R. 196 (B.A.P. 9th Cir. 1996)......................................................................................15

*In re Edwards*,
 454 B.R. 100 (B.A.P. 9th Cir. 2011)......................................................................................13

*Jordan v. Kroneberger (In re Jordan)*,
 392 B.R. 428 (Bankr. D. Idaho 2008) ....................................................................................14

*In re Kennedy*,
 165 B.R. 488 (Bankr. W.D. Wash. 1994) ..............................................................................13

*La Jolla Mortg. Fund v. Rancho El Cajon Assocs.*,
 18 B.R. 283 (Bankr. S.D. Cal. 1982) .....................................................................................16

*In re Lindbergh Plaza Assocs.*,
 115 B.R. 202 (Bankr. E.D. Mo. 1990) ...................................................................................17

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

*Martens v. Countrywide Home Loans (In re Martens),*
    331 B.R. 395 (B.A.P. 8th Cir. 2005).......................................................................17

*Meadowbrook Inv'rs' Grp. v. Thirtieth Place, Inc. (In re Thirtieth Place, Inc.),*
    30 B.R. 503 (B.A.P. 9th Cir. 1983).......................................................................15

*In re Medpoint Mgmt., LLC,*
    528 B.R. 178 (Bankr. D. Ariz. 2015), *vacated in part on other grounds*, 2016
    WL 3251581 (B.A.P. 9th Cir. June 3, 2016)...........................................................14

*In re Rent-Rite Super Kegs W. Ltd.,*
    484 B.R. 799 (Bankr. D. Colo. 2012) ....................................................................14

*Ripon Self Storage, LLC v. Exchange Bank (In re Ripon Self Storage, LLC),*
    Case No. 10-1325, 2011 WL 3300087 (B.A.P. 9th Cir. Apr. 1, 2011)......................16

*Stewart v. Gurley,*
    745 F.2d 1194 (9th Cir. 1984)...............................................................................16

*Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers,
    Inc.),*
    171 B.R. 71 (B.A.P. 9th Cir. 1994).......................................................................16

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forrest Assocs., Ltd.,*
    484 U.S. 365 (1988) ............................................................................................16

*In re Walter,*
    108 B.R. 244 (Bankr. C.D. Cal. 1989) ..................................................................15

**Statutes**

11 U.S.C. § 362(b)(1)..........................................................................................................18

11 U.S.C. § 362(d)(1)............................................................................................... *passim*

11 U.S.C. § 362(d)(2).........................................................................................2, 16, 17, 18

11 U.S.C. § 362(g) ........................................................................................................13, 16

11 U.S.C. § 1104 .................................................................................................................10

28 U.S.C. § 157 ...................................................................................................................12

28 U.S.C. § 1334 .................................................................................................................12

28 U.S.C. § 1408 .................................................................................................................12

28 U.S.C. § 1409 .................................................................................................................12

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

## MEMORANDUM OF POINTS AND AUTHORITIES

Cairn Capital Investment Funds ICAV, for its sub fund Cairn Capstone Special Opportunities Fund ("Cairn"),[1] a secured creditor of the Debtor, hereby respectfully submits its Memorandum of Points and Authorities in support of its *Motion for Order Granting Relief From Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Motion").[2]

## PRELIMINARY STATEMENT

William Sadleir caused the Debtor to commence this case with the intent of hindering Cairn from exercising its right as a secured lender to foreclose on its collateral – the Beverly Hills house located at 9135 Hazen Drive (the "Property") in which Mr. Sadleir and his spouse, Hanan Kadadu, live rent-free – following the maturity of a loan extended by Cairn and continuing events of default.

In recent months, criminal and civil complaints filed in New York by the U.S. Attorney and the Securities and Exchange Commission have alleged egregious acts of fraud by Mr. Sadleir. As part of these proceedings, a grand jury returned an indictment against Mr. Sadleir specifically seeking the forfeiture of the Property, which, unbeknownst to Cairn, had allegedly been bought with illicitly-transferred funds before Mr. Sadleir caused the Debtor to pledge the Property to Cairn as collateral for its loan.

The Property, however, is the purported centerpiece of the Debtor's proposed plan. The Debtor claims that it will seek to refinance the loan encumbering the Property or to sell the Property. Nearly four months into this case, and over nine months since Cairn's loan guaranteed by the Debtor matured, the Debtor has been unable to secure financing. This is not a complicated loan at all, and the loan matured before the global pandemic. The inescapable conclusion is that the Debtor – which has no business or meaningful ongoing operations – cannot obtain sufficient

---

[1]    All references in this Motion to Cairn shall be deemed to include, as the context may require, its investment manager, Cairn Capital Limited.

[2]    The *Declaration of Brandon Kufrin in Support of Cairn's Motion for Order Granting Relief From Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Kufrin Declaration" or "Kufrin Decl."), the *Declaration of Andrew K. Glenn in Support of Cairn's Motion for Order Granting Relief From Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Glenn Declaration" or "Glenn Decl."), and the *Declaration of Robert Dietrich in Support of Cairn's Motion for Order Granting Relief From Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Dietrich Declaration") are being filed concurrently herewith. Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them below.

1  financing to repay Cairn's loan.

2      Cause exists to grant Cairn relief from the stay under Section 362(d)(1) of the Bankruptcy

3  Code and allow it to foreclose on its collateral because – as an appraisal prepared by Cairn's

4  expert establishes – the market value of the Property is **$290,000**: a fraction of the Debtor's

5  outstanding obligations to Cairn.  The reason for this is clear:  because the Property is subject to

6  forfeiture by the U.S. Department of Justice, no rational buyer would pay anything close to fair

7  market value for it.  Because a federal criminal forfeiture is subject only to the rights of a bona

8  fide purchaser for value *without notice*, no purchaser or lender would take the risk that its interest

9  in the Property could be forfeited to the Government now that the Government's proposed

10 forfeiture has been publicly disclosed.  And even assuming a buyer would ignore the forfeiture

11 risk (which would be absurd), the appraised value of the Property is still worth less than Cairn's

12 debt.

13     There is therefore no equity cushion to protect Cairn against the erosion of its secured

14 position as default interest and other charges and penalties with respect to overdue property taxes

15 that continue to accrue.  Worse still, the Debtor has *actively and willingly impaired* Cairn's

16 collateral by allowing the Debtor's subsidiaries to use it free of charge, and by diverting purported

17 rent on the property – which is also part of Cairn's collateral – to third parties.

18     Alternatively, the Court should grant Cairn relief from the automatic stay under Section

19 362(d)(2) of the Bankruptcy Code because the Debtor does not have equity in Cairn's collateral

20 and the collateral is not necessary to an effective reorganization.  The Debtor has *no business* to

21 reorganize and, even if it did, the property would not be necessary to a reorganization for the

22 simple reason that it *generates no cash*.  It is therefore not surprising that, almost four months into

23 the case, the Debtor has been unable to secure the exit financing upon which its proposed plan is

24 predicated.  The only alternative proposed by the Debtor to this illusory financing – a sale of the

25 Property – does not satisfy Section 362(d)(2) because that is a *liquidation*, not an "effective

26 *reorganization*."  And even a liquidation would not be possible here because, under Section 362

27 of the Bankruptcy Code, the Debtor's assets are expressly subject to the Government's right to

28 prosecute criminal cases and remedies upon a criminal conviction, including its forfeiture claim.

1  In short, there is no viable plan that the Debtor can propose.  Cairn should not be held in abeyance

2  while the Debtor continues to pursue this unconfirmable, unfeasible plan.

3      Therefore, and as further explained below, relief from the stay is warranted.

4                          **BACKGROUND**

5  **I.    THE PARTIES**

6      The debtor in this chapter 11 case (the "Chapter 11 Case"), Temerity Trust Management,

7  LLC (the "Debtor"), was formed in 2015 and is currently owned by Hanan Kadadu ("Kadadu"),

8  who is the sole member of the Debtor.  *See Disclosure Statement Describing Second Amended*

9  *Chapter 11 Plan of Reorganization* ("Disclosure Statement") [Docket No. 61 at 5].

10     The Debtor is not operating any business and has no funds.  *See* Statement of Financial

11  Affairs [Docket No. 17 at 18] (listing gross revenue from business as "none"); Schedule A/B:

12  Assets – Real and Personal Property [Docket No. 17 at 9] (cash, cash equivalents and financial

13  assets valued at $0).  The Debtor has no accounts receivable, inventory of any kind, equipment,

14  intangible assets or intellectual property.  *See id.*; *see also* Disclosure Statement at 35 (cash on

15  hand and accounts receivable valued at $0).

16     Kadadu's husband, Mr. William Sadleir ("Sadleir") was the chairman and chief executive

17  officer of the Debtor's indirect subsidiary Aviron Pictures LLC, a film production and distribution

18  company based in Los Angeles, California ("Aviron Pictures"), and oversaw its operations from

19  circa 2015 until circa December 2019.  *See generally* Disclosure Statement at 5-6.  Sadleir and

20  Aviron Pictures operated through multiple related legal entities (collectively, the "Aviron

21  Entities").  *See id.*

22     As described in detail below, Cairn is a secured creditor of the Debtor by virtue of a loan

23  Cairn extended to one of the Aviron Entities, which the Debtor unconditionally and irrevocably

24  guaranteed on a secured basis.

25  **II.    CAIRN'S CLAIMS AGAINST THE DEBTOR AND LIEN ON THE PROPERTY**

26      **A.    The Credit Agreement and Promissory Note**

27      Cairn extended a loan to one of the Aviron Entities, Aviron 1703, LLC (the "Borrower")

28  pursuant to a Credit, Security, Guaranty and Pledge Agreement, dated October 1, 2018 (the

1  "Credit Agreement"), and a Promissory Note, dated October 1, 2018 (the "Note").[3]  *See* Kufrin

2  Decl. ¶ 3.  Pursuant to these documents, Cairn loaned the Borrower up to $22,400,000 in aggregate

3  principal balance of loan obligations for purposes of financing of certain distribution activities in

4  respect of the motion picture entitled "Serenity" and certain other limited uses in connection

5  therewith (the "Loan").  *See id.* ¶ 4.  The Credit Agreement is secured by the Credit Party

6  Collateral (as that term is defined in the Credit Agreement), consisting of certain personal property

7  of the Borrower and certain personal property of certain other Aviron Entities.  *See id.* ¶ 5.  The

8  Note is likewise secured by personal property, consisting of certain personal property of the

9  Borrower.  *See id.*  The scheduled maturity date of the Loan was December 15, 2019 (the

10  "Scheduled Maturity Date").  *See id.*

11  **B.    The Guaranty and Deed of Trust**

12      Cairn also entered into a Guaranty, dated October 1, 2018 (the "Guaranty"), with the

13  Debtor.[4]  *See* Kufrin Decl. ¶ 6.  Pursuant to this Guaranty, the Debtor "irrevocably and

14  unconditionally" guaranteed the "full and punctual payment" of the Loan made to the Borrower.

15  *See id.*  In addition to Sadleir's execution of the Guaranty as the Debtor's sole manager, Kadadu

16  also endorsed the Guaranty by signing as a "Confirmed by" party.  The Guaranty is secured by a

17  Deed of Trust and Assignment of Rents, Fixture Filing, Security Agreement and Environmental

18  Indemnity (the "Deed of Trust"), dated as of October 8, 2019, which encumbers the Property,

19  including rents and profits derived therefrom.[5]  *See id.* ¶ 7.  The Debtor apparently purchased the

20  Property for $13,500,000 on August 18, 2017.  *See* Disclosure Statement at 8.  Cairn would not

21  have extended the Loan without the Guaranty or the inclusion of the Property in the collateral

22  securing the Guaranty.  *See* Kufrin Decl. ¶ 8.

23

24

25

26

27  [3]    True and correct copies of the Credit Agreement and Note are attached as **Exhibit A** to the Kufrin Declaration.

28  [4]    A true and correct copy of the Guaranty is attached as **Exhibit B** to the Kufrin Declaration.
   [5]    A true and correct copy of the Deed of Trust is attached as **Exhibit C** to the Kufrin Declaration.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

### C.  The Borrower Breaches the Credit Agreement

On February 14, 2019, Cairn sent the Borrower a Notice of Defaults and Reservation of Rights, identifying a number of non-monetary defaults under the Credit Agreement, including, among others, at least one default not capable of cure.[6]  The Borrower failed to cure all of the defaults that were capable of cure.  *See* Kufrin Decl. ¶¶ 9-10.  On April 2, 2019, Cairn sent the Borrower an Acceleration and Demand Notice accelerating the Loan and declaring all outstanding loan obligations due and immediately payable (the outstanding payment obligations under the Credit Agreement from time to time, as of the applicable determination date, the "Outstanding Loan Obligations").[7]  The Borrower still failed to cure all of the defaults that were capable of cure.  *See id.* ¶¶ 10-11.  Moreover, on or around the same time as Cairn's delivery of the Notice of Defaults and Reservation of Rights and the Acceleration and Demand Notice, Cairn learned of additional defaults under the Credit Agreement (including at least one default not capable of cure) occurring as early as January 2019, including the impermissible diversion of certain proceeds of Cairn's collateral for payment of expenses related to certain other Aviron Entities' films (as per Sadleir's own written admission) (the "Diversion of Proceeds") and the Borrower's alteration and manipulation (which the Borrower attempted to conceal) of purported third-party reporting that it provided to Cairn to induce a credit extension under the Loan (the "Reporting Manipulation).[8]  *See id.* ¶ 11.

Furthermore, the Debtor's pledge of its equity interests in Aviron Group, LLC to BlackRock (as defined below) in March 2019, which only became known to Cairn after the Scheduled Maturity Date, and which the Debtor has confirmed by disclosure in this bankruptcy proceeding, constituted a default under the Credit Agreement, which prohibited the Debtor (among other Credit Parties (as defined in the Credit Agreement)) from incurring any Indebtedness (as

---

[6]   A true and correct copy of the February 14, 2019 Notice of Defaults is attached as **Exhibit D** to the Kufrin Declaration.

[7]   A true and correct copy of the April 2, 2019 Acceleration and Demand Notice is attached as **Exhibit E** to the Kufrin Declaration.

[8]   A true and correct copy of Sadleir's e-mail to Cairn acknowledging the impermissible diversion of certain proceeds of Cairn's collateral for payment of expenses related to certain other Aviron Entities' films is attached as **Exhibit F** to the Kufrin Declaration.

defined in the Credit Agreement), including granting a lien on the Debtor's assets. *See id.* ¶ 12; Disclosure Statement at 8.

On May 24, 2019, Cairn entered into a letter agreement (the "Letter Agreement") with Sadleir, the Debtor, the Borrower and certain other Aviron Entities (collectively, the "Sadleir Letter Agreement Parties"), pursuant to which Cairn agreed to refrain until July 31, 2019 (if certain conditions were met) from enforcing certain of its rights under the Credit Agreement and the Guaranty if the Sadleir Letter Agreement Parties paid $3,000,000 to Cairn by July 15, 2019 as partial repayment of the Loan. *See* Kufrin Decl., Exhibit G ¶¶ 1(c), 2(d).[9] Cairn received the payment as provided under the Letter Agreement. *See* Kufrin Decl. ¶ 14. On May 31, 2019, Cairn entered into a settlement agreement (the "Settlement Agreement") with Sadleir and certain Aviron Entities (not including the Borrower or the Debtor among others) (the "Sadleir Settlement Parties"), pursuant to which Cairn agreed to waive certain claims against the Sadleir Settlement Parties in connection with the Diversion of Proceeds and the Reporting Manipulation.[10] Cairn did not waive or release any claims related to the Diversion of Proceeds and Reporting Manipulation, or any other claims under the Credit Agreement and the Guaranty, against the Borrower, the Debtor and certain other Aviron Entities. *See* Kufrin Decl., Exhibit H ¶ 1(b).

Although the Letter Agreement permitted Cairn to enforce the full extent of its rights under the Credit Agreement starting on August 1, 2019, it generally refrained from doing so for an additional period of approximately four-and-a-half months, which gave the Borrower ample opportunity to repay the Outstanding Loan Obligations by the Scheduled Maturity Date following representations by Sadleir and his agents that a repayment of the Loan would occur. *See* Kufrin Decl. ¶ 16. The Borrower, however, failed to repay in full the Outstanding Loan Obligations by the Scheduled Maturity Date. *See id.* On December 18, 2019, Cairn sent the Borrower a Demand for Payment, noting that, despite the acceleration of the Loan on April 2, 2019, the Borrower had further failed to repay the Outstanding Loan Obligations by the Scheduled Maturity Date.[11] Cairn

---

[9]    A true and correct copy of the Letter Agreement is attached as **Exhibit G** to the Kufrin Declaration.
[10]    A true and correct copy of the Settlement Agreement is attached as **Exhibit H** to the Kufrin Declaration.
[11]    A true and correct copy of the December 18, 2019 Demand for Payment is attached as **Exhibit I** to the Kufrin Declaration.

1    apprised the Borrower that the Outstanding Loan Obligations at the time were not less than

2    $16,230,747.68, with default interest and other amounts of indemnified liabilities continuing to

3    accrue.  *See id.*  As of the date hereof, the Borrower owes Outstanding Loan Obligations in an

4    amount not less than $15,381,127, with default interest and other indemnified expenses

5    continuing to accrue.  *See id.* ¶ 17.[12]  Without regard to default interest accruing prior to the

6    Scheduled Maturity Date (or, put differently, with any interest accruing prior to the Scheduled

7    Maturity Date merely at the non-default rate), the Outstanding Loan Obligations would be

8    $13,363,727.  *See id.*[13]

9          **D.**      **The Debtor Defaults on the Guaranty and Cairn Commences**
10                 **a Foreclosure Action**

11          The Borrower's continuing events of default under the Credit Agreement and continuing

12   failure to repay in full the Outstanding Loan Obligations triggered the Debtor's repayment

13   obligation under the Guaranty.  *See* Kufrin Decl. ¶ 18.  On May 1, 2019, Cairn sent the Debtor a

14   Demand Notice for payment of the Outstanding Loan Obligations in accordance with the

15   Guaranty.[14]  The Debtor failed to pay the Outstanding Loan Obligations.  *See id.* ¶¶ 18-19.  On

16   May 9, 2019, Cairn sent the Debtor a Default Notice for failure to pay the Outstanding Loan

17   Obligations pursuant to its demand.[15]  The Debtor failed to cure its default within ten days, which

18   gave rise to an Event of Default (as defined in the Guaranty) and permitted Cairn to declare an

19   Event of Default under the Deed of Trust and (among other things) cause the Property to be sold.

20   *See id.* ¶¶ 19-20.

21          On January 6, 2020, Cairn sent the Debtor a Second Demand Notice, informing the

22   Debtor of the Borrower's continued failure to repay the Outstanding Loan Obligations on the

---

[12]    The Debtor's Disclosure Statement indicates that the Debtor owes Cairn $14,341,996.  *See* Disclosure Statement at 17-18.  That statement is incorrect.

[13]    Based on the Appraisal (as defined below), the amount of default interest that Cairn may claim in connection with the existence of any disputed defaults is irrelevant to this Motion because the appraised value is substantially less than the outstanding principal balance of the loan.  Cairn reserves the right to litigate the allowance of default interest as part of its claim if any appraisal proffered by the Debtor makes default interest in connection with the existence of any disputed defaults relevant to the outcome.

[14]    A true and correct copy of the May 1, 2019 Demand Notice is attached as **Exhibit J** to the Kufrin Declaration.

[15]    A true and correct copy of the May 9, 2019 Default Notice is attached as **Exhibit K** to the Kufrin Declaration.

1    Scheduled Maturity Date and once again demanding the payment thereof by the Debtor.[16]  Cairn

2    further apprised the Debtor that if total payment of the Outstanding Loan Obligations was not

3    made by January 13, 2020, then Cairn would exercise its rights under the Guaranty and Deed of

4    Trust to the full extent necessary including (among other things) causing the Property to be sold.

5    *See id.* ¶ 21.

6        In light of the Debtor's continuing default under the Guaranty, Cairn initiated a non-

7    judicial foreclosure sale, with a sale of the Property by a trustee scheduled for June 2, 2020.  *See*

8    *id.* ¶ 22.  On June 1, 2020, however, Sadleir caused the Debtor to commence the Chapter 11 Case,

9    which has prevented Cairn from completing the sale of the Property.  *See id.*; Voluntary Petition

10   for Non-Individuals Filing for Bankruptcy [Docket No. 1 at 4] (William Sadleir authorizing the

11   Chapter 11 petition as the "authorized representative" of the Debtor).

12   **III.**    **THE CRIMINAL FORFEITURE ACTION INVOLVING THE PROPERTY**

13       The U.S. Attorney in the Southern District of New York filed a criminal complaint against

14   Sadleir on May 18, 2020 (the "Criminal Complaint" and "Criminal Case").  The Criminal

15   Complaint includes three counts:  (i) wire fraud – advertising scheme; (ii) wire fraud – UCC

16   scheme; and (iii) aggravated identity theft – UCC scheme.[17]  *See* Glenn Decl., Exhibit A at 1-2.

17   As described in the Criminal Complaint, Sadleir participated in two long-running fraudulent

18   schemes relating to an approximately $75 million investment made by BlackRock Multi-Sector

19   Income Trust ("BlackRock") in certain Aviron Entities.  *See id.* at 4-5.

20       In one of the alleged schemes, Sadleir allegedly misappropriated millions of dollars in

21   funds from Aviron Entities that had been invested by BlackRock.  *See id.*  Sadleir represented to

22   BlackRock that this money had been invested by Aviron Entities in pre-paid media credits with

23   the advertising placement company MediaCom Worldwide, LLC ("MediaCom"), which is a

24   subsidiary of the advertising and media agency GroupM Worldwide Inc. ("GroupM Worldwide").

25   *See id.*  Instead, Sadleir, using the bank account for a sham entity he had created, illicitly

26   transferred out of Aviron Entities over $25 million of those funds.  *See id.*  Specifically, according

27

28

---

[16]    A true and correct copy of the January 6, 2020 Second Demand Notice is attached as **Exhibit L** to the
Kufrin Declaration.
[17]    A true and correct copy of the Criminal Complaint is attached as **Exhibit A** to the Glenn Declaration.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1    to the Criminal Complaint, Sadleir created a sham company called GroupM Media Services, LLC

2    (the "Sham GroupM LLC") designed to appear as if it were the legitimate entity, GroupM

3    Worldwide, and a corresponding bank account in the name of that sham entity.  *See id.*  Kadadu

4    was listed with the California Secretary of State as Sham GroupM LLC's agent for service of

5    process.  *See id.* at 7.  Sadleir allegedly used a significant portion of those illicitly transferred

6    funds for his personal benefit, including to purchase the Property.  *See id.* at 5.

7        Sadleir then falsely represented to BlackRock that the Aviron Entities had purchased an

8    approximately $27 million balance in pre-paid media credits with MediaCom that were available

9    to promote future Aviron films, and pledged a portion of those credits to BlackRock as collateral

10   for additional loans, when in fact the claimed credits did not exist due to Sadleir's

11   misappropriation.  *See id.*  As part of these false representations, Sadleir also allegedly created a

12   fake identity of a purported New York-based female employee of the Sham GroupM LLC named

13   "Amanda Stevens" who corresponded with a representative of BlackRock, ensuring BlackRock

14   that the Aviron Entities had an approximately $27 million balance in pre-paid media credits with

15   the Sham GroupM LLC.  *See id.*  Sadleir himself allegedly posed as Amanda Stevens when

16   engaging in email exchanges with a representative from BlackRock.  *See id.*

17       In another fraudulent scheme, Sadleir allegedly engineered the illicit and fraudulent sale

18   of assets worth an estimated $3 million that secured BlackRock's loans to Aviron Entities.  *See

19   id.*  BlackRock had secured its investment in Aviron Entities by, among other means, obtaining

20   UCC liens in 2017 and 2018 on certain intellectual property and other assets relating to Aviron

21   Entities' films.  *See id.*  In 2019, Sadleir allegedly used the forged signatures of at least one of

22   BlackRock's portfolio managers on forms UCC-3 to release BlackRock's UCC liens on certain of

23   these secured assets in order to sell or obtain financing against them without BlackRock's

24   consent, thus depriving BlackRock of its collateral on outstanding loans, on which Aviron

25   Entities ultimately defaulted.  *See id.*[18]

26

27

28

---

[18]    On May 22, 2020, the SEC filed a complaint against Sadleir in the United States District Court for the Southern District of New York for alleged violations of the anti-fraud provisions of the Securities Act and the Exchange Act, largely based on the same facts depicted in the Criminal Complaint (the "SEC Complaint").  The SEC investigation is continuing and may reveal additional acts of fraud.  A true and correct copy of the SEC Complaint and press release in connection therewith are attached as **Exhibit B** to the Glenn Declaration.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1    On June 23, 2020, a grand jury returned an indictment (the "<u>Indictment</u>") against Sadleir,

2    which included the foregoing counts and a forfeiture claim (the "<u>Forfeiture Claim</u>"), which seeks

3    forfeiture "to the United States . . . [of] any and all property, real and personal, that constitutes or

4    is derived from proceeds traceable to the commission of said offenses, **including but not limited**

5    **to . . . the real property located at 9135 Hazen Drive, Beverly Hills, California**[.]" (*i.e.*, the

6    Property).[19]  *See* Glenn Decl., Exhibit C at 3-4 (emphasis added).

7    **IV.    THE CHAPTER 11 CASE**

8    Sadleir caused the Debtor to commence the Chapter 11 Case on June 1, 2020.  On June

9    19, 2020, Cairn filed a motion seeking an order appointing a trustee pursuant to Section 1104 of

10    the Bankruptcy Code or, in the alternative, lifting the automatic stay to allow Cairn to foreclose

11    on the Property ("<u>Cairn's Trustee Motion</u>").  *See* Docket No. 25.  On July 21, 2020, after a

12    hearing, the Court denied Cairn's Trustee Motion without prejudice.  *See* Docket No. 55.

13    On September 15, 2020, the Debtor filed its proposed *Second Amended Plan* [Docket No.

14    60] (the "<u>Proposed Plan</u>") and the Disclosure Statement in connection therewith.  Pursuant to the

15    Proposed Plan, the Debtor would attempt to secure exit financing to fund distributions to satisfy

16    all claims against the Debtor, including Cairn's claim, whose amount is to be determined.  *See*

17    Proposed Plan at 4-5, 8.  If the Debtor fails to secure exit financing, it would attempt to sell the

18    Property to fund the foregoing distributions.  *See id.* at 8.  The hearing on the adequacy of the

19    Disclosure Statement has been scheduled for October 27, 2020.

20    **V.    SADLEIR AND KADADU'S USE OF THE PROPERTY**

21    Sadleir and Kadadu live in the Property, which the Debtor owns.  *See* Disclosure

22    Statement at 12.  The Debtor claims that Sadleir and Kadadu's tenancy is governed by a

23    purported unwritten "arrangement" that they negotiated with themselves on behalf of the Debtor.

24    *See id.*

25    The Debtor alleges that "Ms. Kadadu and Mr. Sadleir have provided the Debtor [with]

26    consideration of a value significantly more [than the monthly rental value of the Property

27    (purportedly $25,000 to $30,000)] since they moved into the property."  *See id.*  As part of this

28

---

[19]    A true and correct copy of the Indictment is attached as **<u>Exhibit C</u>** to the Glenn Declaration.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1    alleged "rent," Sadler purportedly "was paid just $100,000 of his annual $500,000 salary," **which

2    was owed by "the Debtor's subsidiaries."**  *See id.* (emphasis added).  The Debtor further claims

3    that "[t]he Sadleir family funded numerous upgrades to the residence" and provided the Debtor

4    with "rent in the form of maintaining, repairing, and improving" the Property, none of which have

5    been catalogued.  *See id.*  According to the Debtor's operating report for the month of June 2020,

6    however, there were no disbursements made by third parties (including Sadleir and Kadadu) to

7    maintain the Property during that month.  *See* Docket No. 44.  According to the Debtor's

8    operating report for the month of July 2020, Sadleir and Kadadu purportedly made disbursements

9    to maintain the Property in the total amount of only **$5,804**.[20]  There is no evidence that the Debtor

10    has paid post-petition property taxes, and its schedules show that it still has unpaid pre-petition

11    property taxes of $370,694.05.  *See* Disclosure Statement at 17.

12    In addition to serving as Sadleir and Kadadu's residence, "[t]he Debtor has used the

13    [Property] to entertain employees of its subsidiaries and to entertain business executives and

14    talent in the film industry" **for no consideration**.  *See id.* at 9; *see also id.* at 35 (cash on hand

15    and accounts receivable valued at $0).

16    The Debtor's monthly operating reports show that it has generated no meaningful revenue

17    during this case, and it has utterly failed to provide any accounting of the purported "rent" that

18    Sadleir and Kadadu have allegedly provided for their use of the Property.  [Docket Nos. 44, 57].

19    **VI.    CAIRN'S APPRAISAL OF THE PROPERTY**

20    Cairn retained Robert Dietrich of Kidder Matthews Valuation & Advisory Services to

21    provide an expert opinion regarding the Property's value (the "Appraisal").[21]  As explained in the

22    Appraisal, because the Forfeiture Claim (as well as the Criminal Complaint and the SEC

23    Complaint) is a matter of public record, any potential buyer of the Property would learn of its

24    existence as part of their due diligence into the Property.  *See* Appraisal at 2.  The marketability

25    of the Property is therefore significantly impaired by the existence of the Forfeiture Claim, which

26

27    [20]    According to the operating report, Kadadu paid $3,315 for "interior home maintenance," $480 for
"landscaping maintenance," $800 for an "alarm system," and $1,209 for "home insurance premium."  [Docket 57
at 5].

28    [21]    The Appraisal is attached as **Exhibit A** to the Dietrich Declaration.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

- 11 -

1   puts any potential buyer at risk of having to surrender the Property to the federal authorities if

2   they prevail in the Criminal Case.  *See id.* at 12.  In light of the foregoing, and as further

3   explained in the Appraisal, the market value of the Property is **$290,000**.[22]  The market monthly

4   rental value of the property is **$45,000**.  *See id.* at 1, 13, 15.

5                                      **RELIEF REQUESTED**

6          By this Motion, Cairn seeks entry of an order granting it relief from the automatic stay

7   pursuant to Section 362(d) of the Bankruptcy Code to allow it to proceed with the foreclosure on

8   the Property.

9                                        **JURISDICTION**

10         The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue

11  is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The matter is a core proceeding pursuant to

12  28 U.S.C. § 157(b)(2)(A), and this Court has subject matter jurisdiction to enter findings of fact and

13  conclusions of law and a final judgment.  The statutory predicate for the relief sought herein is

14  Section 362(d) of the Bankruptcy Code.

15                                         **ARGUMENT**

16  **THE COURT SHOULD LIFT THE AUTOMATIC STAY
    TO ALLOW CAIRN TO COMPLETE THE FORECLOSURE**

17

18  **A.    The Court Should Lift the Automatic Stay for "Cause"
            Under Section 362(d)(1)**

19         Section 362(d)(1) of the Bankruptcy Code provides that the automatic stay shall be lifted

20  for cause, including the lack of adequate protection, after notice and a hearing.  11 U.S.C.

21  § 362(d)(1).  Section 362(d)(1) provides in relevant part:

22              On request of a party in interest and after notice and a hearing, the
                court shall grant relief from the stay provided under subsection (a) of
23              this section, such as by terminating, annulling, modifying, or
                conditioning such stay –
24

25              (1) for cause, **including the lack of adequate protection of an
                interest in property of such party in interest** . . .
26

27  11 U.S.C. § 362(d)(1) (emphasis added).

28  _____

[22]    If the Property were unencumbered by the Forfeiture Claim, its value would be $ 12,750,000.  Appraisal at
1, 10.

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Section 362(g) of the Bankruptcy Code provides that in a hearing on relief from the stay,

2    the party opposing relief has the burden on all issues (other than the question of the debtor's

3    equity in property), *including the issue of adequate protection*.  11 U.S.C. § 362(g).  *See In re*

4    *Big3D, Inc.*, Case No. 08-16768, 2009 WL 9085556, at *2 (Bankr. E.D. Cal. Aug. 28, 2009),

5    *aff'd*, 438 B.R. 214 (B.A.P. 9th Cir. 2010) ("Ordinarily in a motion for relief from stay, the debtor

6    has the burden of proof regarding the issue of adequate protection.").

7    The term "cause" reflects a flexible standard, taking into account the particular facts and

8    circumstances of the particular issue before the court.  *See In re Conejo Enters., Inc.*, 96 F.3d 346,

9    352 (9th Cir. 1996) (noting that "[c]ause has no clear definition and is determined on a case-by-

10    case basis") (internal citations and quotations omitted); *In re Brotman Med. Ctr., Inc.*, 2008 WL

11    8444797, at *5 (B.A.P. 9th Cir. Aug. 15, 2008) (same); *Baldino v. Wilson (In re Wilson)*, 116

12    F.3d 87, 90 (3d Cir. 1997) (noting that Section 362(d)(1) "does not define 'cause,' leaving courts

13    to consider what constitutes cause based on the totality of the circumstances in each particular

14    case.").

15    "The bankruptcy court generally has broad discretion in granting relief from stay for cause

16    under § 362(d)."  *In re Edwards*, 454 B.R. 100, 107 (B.A.P. 9th Cir. 2011).  "Exercising

17    discretion in determining cause for stay relief requires the balancing of hardships and

18    consideration of totality of the circumstances."  *In re Avila*, 311 B.R. 81, 83-84 (Bankr. N.D. Cal.

19    2004) (citing *In re Kennedy*, 165 B.R. 488, 490 (Bankr. W.D. Wash. 1994)).

20    With respect to secured creditors, the purpose of providing adequate protection under

21    Section 362(d)(1) is to:

22    > insure that a creditor receives the value for which it bargained
> prebankruptcy. **Adequate protection is, essentially, protection for**

23    > **the creditor to assure its collateral is not depreciating or**
> **diminishing in value** and is evaluated on a case-by-case basis . . . .

24    > The erosion, or threatened erosion, of a secured creditor's position
> "may be shown through evidence of declining property values, the

25    > increasing amount of the secured debt through interest accruals or

26    > otherwise, the nonpayment of taxes or other senior liens, failure to
> insure the property, failure to maintain the property, or other factors

27    > that may jeopardize the creditor's present position."

28

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

1   *In re DB Capital Holdings, LLC*, 454 B.R. 804, 816-17 (Bankr. D. Colo. 2011) (granting relief

2   from stay) (citations omitted) (emphasis added).

3       In the instant case, good "cause" exists to lift the automatic stay under Section 362(d)(1)

4   because the Debtor has not provided Cairn with adequate protection "to assure its collateral is not

5   depreciating or diminishing in value." *Id.*

6       *First*, because the market value of the Property is **$290,000** – a fraction of the Outstanding

7   Loan Obligations severely past due and owing to Cairn – there is no "equity cushion" to protect

8   Cairn (most especially in the complete absence of any ongoing payments from the Debtor to

9   Cairn). *See Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 450 (Bankr. D. Idaho 2008)

10  (granting relief from automatic stay where there was no "'equity cushion' providing adequate

11  protection in the absence of [post-default] payments."). Moreover, there would be no equity

12  cushion *even if* the Forfeiture Claim did not exist – which would increase the Property's value to

13  $12,750,000 (Appraisal at 1, 10) – because even without regard to default interest accruing prior

14  to the Scheduled Maturity Date the Outstanding Loan Obligations are $13,363,727. *See* Kufrin

15  Decl. ¶ 17.

16      *Second*, the Debtor cannot protect Cairn from the risk of the Forfeiture Claim, which, if

17  the government prevails in the Criminal Case, would compromise Cairn's collateral under the

18  Deed of Trust. The Court should not allow the Debtor to use the bankruptcy process to hinder

19  Cairn's rights as a secured creditor while leaving it exposed to this significant risk. *See In re

20  Rent-Rite Super Kegs W. Ltd.*, 484 B.R. 799, 806 (Bankr. D. Colo. 2012) ("[T]he Court cannot

21  use the adjudicative authority granted to it by Congress to force [the secured creditor] to bear

22  even a highly improbable risk of total loss of its collateral" resulting from a criminal forfeiture

23  claim); *In re Medpoint Mgmt., LLC*, 528 B.R. 178, 185 (Bankr. D. Ariz. 2015), *vacated in part on

24  other grounds*, 2016 WL 3251581 (B.A.P. 9th Cir. June 3, 2016) ("[T]he prospects of a possible

25  forfeiture or seizure of [debtor's] assets poses an unacceptable risk" to the estate).

26      *Third*, the value of Cairn's collateral has declined by virtue of Sadleir and Kadadu's

27  impermissible diversion of rents and profits – which are part of Cairn's collateral under the Deed

28  of Trust – by (i) allowing the Debtor's subsidiaries to use the Property free of charge (Disclosure

KASOWITZ BENSON
TORRES LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

1  Statement at 8, 35); and (ii) paying purported rent on the Property *to a third party* by reducing

2  Sadleir's salary that is not owed by the Debtor (*id.* at 12-13).

3      *Fourth*, the Debtor's assertion that Sadleir and Kadadu "have provided the Debtor [with]

4  consideration of a value significantly more" than the monthly rental value of the Property (which

5  the Debtor claims is $25,000 to $30,000), "in the form of maintaining, repairing, and improving"

6  the Property," is belied by the Debtor's own operating reports, according to which Sadleir and

7  Kadadu paid a total of only **$5,804** in June and July to maintain the Property.  *See* Docket Nos.

8  44, 57.  This failure to pay the Debtor the fair market rental value for living in the Property –

9  which is in fact $45,000 (Appraisal at 13) – has further eroded Cairn's collateral, which includes

10  rents and profits derived from the Property.

11      *Fifth*, Cairn's interests in the Property are at risk of immediate, additional diminution in

12  value, including erosion of Cairn's secured position, by the continued accrual of default interest,

13  other charges and penalties with respect to overdue property taxes, which have already given rise

14  to statutory liens and which the Debtor has no funds to pay.  *See* Disclosure Statement at 17.

15  Notably, while the Debtor alleges that approximately $81,000 in property taxes are owed on the

16  Property due to Sadleir's inability to pay the taxes in December 2019 and April 2020, the Debtor

17  does not say when – if at all – it will repay the property tax that is owed and continues to accrue

18  because the Debtor has failed to repay it.  *See id.* at 13.  Significantly, the amount owed is likely

19  much higher, as evidenced by the proof of claim filed by Los Angeles County Treasurer & Tax

20  Collector, which asserts a secured claim of $370,694.05.  *See* Claim 1-1 at 2.

21      Cause exists to lift the automatic stay for the additional reason that the Debtor filed its

22  bankruptcy case (in essence, a two-party dispute) to improperly frustrate Cairn's exercise of its

23  foreclosure rights and remedies and improperly exert leverage over Cairn – and not to properly

24  rehabilitate and reorganize.  As such, the bankruptcy case was filed in bad faith and the automatic

25  stay should be lifted for such other cause as well.  *See In re Duvar Apt., Inc.*, 205 B.R. 196, 200

26  (B.A.P. 9th Cir. 1996) (citing *In re Walter*, 108 B.R. 244, 247 (Bankr. C.D. Cal. 1989) ("The

27  existence of bad faith in commencing a bankruptcy case constitutes cause for granting relief from

28  the stay pursuant to § 362(d)."); *Meadowbrook Inv'rs' Grp. v. Thirtieth Place, Inc. (In re*

1     *Thirtieth Place, Inc.)*, 30 B.R. 503, 506 (B.A.P. 9th Cir. 1983) ("Where a petition is filed to

2     subvert the legitimate rights of creditors in the absence of any reasonable expectations that the

3     debtor can successfully reorganize, there is no basis for access to Chapter 11 and the protective

4     machinery of the automatic stay.").

5         Accordingly, Cairn is entitled to relief from the stay under Section 362(d)(1) of the

6     Bankruptcy Code.

7         **B.**     **Relief from Stay Is Also Justified Under § 362(d)(2)**

8         Section 362(d)(2) of the Bankruptcy Code provides that the automatic stay may be

9     terminated, annulled, modified or conditioned upon a finding that the debtor does not have equity

10    in the subject property and such property is not necessary to an effective reorganization.

11        An "equity analysis" pursuant to Section 362(d)(2) requires a determination of whether a

12    debtor has any interest above the value of all liens. *Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th

13    Cir. 1984); *La Jolla Mortg. Fund v. Rancho El Cajon Assocs.*, 18 B.R. 283, 289-90 (Bankr. S.D.

14    Cal. 1982). Here, the market value of the Property is **$290,000**, *i.e.*, approximately **2%** of

15    $13,363,727 (the Outstanding Loan Obligations *even without adding default interest in relation*

16    *to any disputed defaults occurring prior to the Scheduled Maturity Date*).[23] Cairn is therefore

17    significantly undersecured and the Debtor has no equity in the Property.

18        Once the Debtor's lack of equity in the Property is demonstrated, the burden shifts to the

19    Debtor to prove that the Property is necessary for an effective reorganization. *See* 11 U.S.C.

20    § 362(g)(2). In determining whether the Property is necessary to the Debtor's reorganization, the

21    Court must look to whether the Debtor has a reasonable probability of successfully reorganizing

22    within a reasonable time. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forrest Assocs.*,

23    *Ltd.*, 484 U.S. 365, 375-76 (1988); *Ripon Self Storage, LLC v. Exchange Bank (In re Ripon Self*

24    *Storage, LLC)*, Case No. 10-1325, 2011 WL 3300087, at *5 (B.A.P. 9th Cir. Apr. 1, 2011) ("A

25    debtor must do more than merely assert that it can reorganize if only given the opportunity to do

26    so."); *Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers, Inc.)*,

27

---

28    [23]     Even without the Forfeiture Claim, the market value of the Property – $12,750,000 – would be lower than the Outstanding Loan Obligations.

171 B.R. 71, 75 (B.A.P. 9th Cir. 1994) (debtor must prove that a proposed plan "is not patently unconfirmable and has a realistic chance of being confirmed").

Here, the Debtor cannot meet its burden because the Property has no relationship to any continuing business activity for the Debtor.  Indeed, the Debtor *is a holding company* – not an operating business – and the Property is therefore not necessary to the reorganization of a business.  *See In re Auld*, Case No.14-20424, 2014 WL 2780302, at *12 (Bankr. D. Kan. June 11, 2014) (granting relief from automatic stay where "there is no reasonable likelihood of an effective reorganization, *since there is no business which needs to reorganize or could benefit from reorganization*.") (emphasis added).

Furthermore, even if there were a business to reorganize, it is undisputed that the Property is generating **no cash**.  As such, it is definitionally "not necessary to an effective reorganization" as Section 362(d)(2) requires.  *See In re Lindbergh Plaza Assoc.*, 115 B.R. 202, 207 (Bankr. E.D. Mo. 1990) (granting relief from automatic stay where "[d]ebtor's recent business history indicates that its principal asset, the [secured creditor's collateral], has suffered a significant negative cash flow for at least the last four years.")

Moreover, there is no reasonable prospect that the Debtor will be able to propose a viable plan in this case.  The only so-called "plan" is for the Debtor to secure exit financing, which, almost four months into this Chapter 11 Case, the Debtor has been unable to secure.  Nor does the Debtor explain (because it cannot) why any third party would provide financing to a holding company that has no cash and no business that would ever generate cash.  *See id.* (granting relief under Section 362(d)(2) where "[t]he plan does not realistically provide for new funding or outside financing."). The only alternative to this illusory exit financing, pursuant to the Proposed Plan, would be the sale of the Property.  But that is a *liquidation* – not an "effective reorganization" as Section 362(d)(2) requires.  *See Martens v. Countrywide Home Loans (In re Martens)*, 331 B.R. 395, 398 (B.A.P. 8th Cir. 2005) (in a "liquidating bankruptcy case . . . by definition, the property is not necessary for an effective reorganization, which satisfies § 362(d)(2)(B).").

1       Finally, *even if* Section 362(d)(2) permitted the Debtor to pursue a liquidation despite not

2  having any equity in the Property, a liquidation would not be possible here because Section

3  362(b)(1) of the Bankruptcy Code allows the "commencement or continuation of a criminal

4  action or proceeding against the debtor" notwithstanding the automatic stay.  11 U.S.C.

5  § 362(b)(1).  The Debtor therefore cannot thwart the Government's right to pursue its forfeiture

6  claim on the Property by way of a Section 363 sale.  *Ariz. v. Rodriguez (In re Rodriguez)*, Case

7  No. 08-1028, 2008 WL 8448043, at *4 (B.A.P. 9th Cir. July 10, 2008) ("Criminal forfeiture

8  actions are excepted from the automatic stay under the plain language of § 362(b)(1) which

9  specifically excepts criminal proceedings 'against the debtor.'").

10       In short, there is no viable plan that the Debtor can propose.  Nor is there any justification

11  under Section 362(d)(2) to allow the Debtor to pursue an unconfirmable plan that would only

12  delay the inevitable foreclosure of the Property.  The Court should allow Cairn to complete the

13  sale of the Property without delay.

14       Accordingly, Cairn is entitled to relief from the stay under Section 362(d)(2) of the

15  Bankruptcy Code.

16  **<u>CONCLUSION</u>**

17       For all the reasons set forth above, Cairn requests that the Court (i) enter an order granting

18  Cairn relief from automatic stay pursuant to 11 U.S.C. § 362(d) to complete the sale of the

19  Property in accordance with Cairn's rights under state law; and (ii) grant such other and further

20  relief as the Court deems necessary and appropriate.

21

22

23

24

25

26

27

28

1    Dated:  September 25, 2020

2

3                                                KASOWITZ BENSON TORRES LLP

4                                                /s/ *Andrew R.J. Muir*
                                                 Andrew R.J. Muir
5                                                101 California Street, Suite 3000
                                                 San Francisco, California  94111
6                                                Telephone:     (415) 421-6140
                                                 Facsimile:     (415) 398-5030
7                                                Email: amuir@kasowitz.com

8                                                Andrew K. Glenn (admitted *pro hac vice*)
                                                 Shai Schmidt (admitted *pro hac vice*)
9                                                1633 Broadway
                                                 New York, New York 10019
10                                               Telephone:     (212) 506-1700
                                                 Facsimile:     (212) 506-1800
11                                               Email: aglenn@kasowitz.com
                                                            sschmidt@kasowitz.com
12

13                                               *Attorneys for Cairn Capital Investment Funds ICAV,*
                                                 *for its sub fund Cairn Capstone Special*
14                                               *Opportunities Fund*

15

16

17

18

19

20

21

22

23

24

25

26

27

28