**DECLARATION OF ANDREW K. GLENN IN SUPPORT OF
CAIRN'S MOTION FOR ORDER GRANTING RELIEF
FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D)**

I, Andrew K. Glenn, being duly sworn, state the following:

1.       I am a partner at the law firm of Kasowitz Benson Torres LLP, counsel for Cairn

Capital Investment Funds ICAV ("Cairn") in the Chapter 11 Case.[1]

2.       I make this declaration to present the Court with the attached documents in

connection with Cairn's *Motion for Order Granting Relief From Automatic Stay Pursuant to

11 U.S.C. § 362(d)* (the "Motion").

3.       Attached hereto as **Exhibit A** is a true and correct copy of the Criminal Complaint,

filed in the United States District Court for the Southern District of New York on May 18, 2020.

4.       Attached hereto as **Exhibit B** is a true and correct copy of the SEC Complaint,

filed with the United States District Court for the Southern District of New York on May 22,

2020, and the press release in connection therewith.

5.       Attached hereto as **Exhibit C** is a true and correct copy of the Indictment, returned

by the grand jury on June 23, 2020.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that, to the best of my

knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 24th day of September 2020 in New York, New York.

/s/  *Andrew K. Glenn*
Andrew K. Glenn

Kasowitz Benson
Torres LLP
Attorneys at Law
Los Angeles

---

[1]       Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion (as defined below).

# GLENN DECLARATION


# EXHIBIT A

Approved: _____
JARED LENOW
Assistant United States Attorney

Before: HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

# 20 MAG 5114

| |
|---|
| UNITED STATES OF AMERICA <br><br>     – v. – <br><br> WILLIAM SADLEIR, <br><br>           Defendant. |

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§
2, 1028A, and 1343

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

DANIEL MARDAKHAYEV, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

**COUNT ONE**
**(Wire Fraud – Advertising Scheme)**

1. From at least in or about 2016, up to and including in or about March 2020, in the Southern District of New York and elsewhere, WILLIAM SADLEIR, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SADLEIR, who was the chairman and chief executive officer of Aviron Pictures, LLC (together with its affiliated entities, "Aviron"), misappropriated millions of dollars in investor funds from Aviron for his own personal use through fraud and deceit, including through the use of a sham company he created to carry out the scheme.

(Title 18, United States Code, Sections 1343 & 2.)

## COUNT TWO
### (Wire Fraud – UCC Scheme)

2.    In or about 2019, in the Southern District of New York
and elsewhere, WILLIAM SADLEIR, the defendant, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by means
of false and fraudulent pretenses, representations and promises,
and attempting to do so, transmitted and caused to be transmitted
by means of wire, radio, and television communication in interstate
and foreign commerce, writings, signs, signals, pictures, and
sounds for the purpose of executing such scheme and artifice, to
wit, SADLEIR caused the forging of the signature of one of the
managers of an investment fund (the "Fund") that invested in Aviron
on documents used to remove liens on Aviron assets that secured
loans made by the Fund to Aviron, and SADLEIR then sold the Aviron
assets without the Fund's consent.

(Title 18, United States Code, Sections 1343 & 2.)

## COUNT THREE
### (Aggravated Identity Theft – UCC Scheme)

3.    In or about 2019, in the Southern District of New York
and elsewhere, WILLIAM SADLEIR, the defendant, willfully and
knowingly did transfer, possess, and use, without lawful
authority, a means of identification of another person, during and
in relation to a felony violation enumerated in Title 18, United
States Code, Section 1028A(c), to wit, SADLEIR possessed, used,
and transferred the name of another person in connection with the
wire fraud scheme charged in Count Two of this Complaint.

(Title 18, United States Code, Section 1028A.)

The bases for my knowledge and for the foregoing charge are,
in part and among other things, as follows:

4.    I have been a Special Agent with the FBI since 2019.  I
am currently assigned to a squad within the New York Division
responsible for investigating violations of federal securities
laws and related offenses.  I am familiar with the facts and
circumstances set forth below from my personal participation in
the investigation, including my examination of reports and
records, interviews I have conducted, and conversations with other
law enforcement officers and other individuals.  Because this
affidavit is being submitted for the limited purpose of

2

establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## RELEVANT ENTITIES AND INDIVIDUALS

5.   From my review of documents from the Fund, financial institutions, the State of Delaware, and an escrow company, as well as public filings and other publicly-available information, and from speaking with one of the individuals currently responsible for managing Aviron Pictures, LLC, I have learned the following, in substance and in part:

a.   The Fund is a publicly-traded, closed-end investment fund. Shares in the Fund trade on the New York Stock Exchange. As of in or about December 2019, the Fund had approximately $649.1 million in assets. The Fund was managed by an investment adviser (the "Investment Adviser") whose principal place of business is New York, New York. The Investment Adviser is registered as such with the United States Securities and Exchange Commission (the "SEC"). The Investment Adviser in turn utilized several other SEC-registered investment advisers (the "Sub-Advisers"), which also have their principal places of business in New York, New York, to perform the day-to-day management of the Fund's investments, including investments relating to Aviron.

b.   WILLIAM SADLEIR, the defendant, was the chairman and chief executive officer of Aviron Pictures, LLC, and oversaw its operations, from in or about 2015 until in or about December 2019.

c.   At all times relevant to this Complaint, Aviron Pictures, LLC, was a film production and distribution company based in Los Angeles, California and formed under the laws of Delaware. Aviron Pictures, LLC was founded in or about 2015, and participated in the distribution of a number of films in the United States, including *My All American* (2015), *Kidnap* (2017), *The Strangers: Prey at Night* (2018), *A Private War* (2018), *Destination Wedding* (2018), *Serenity* (2019), and *After* (2019). SADLEIR and Aviron Pictures, LLC operated through multiple related legal entities also based in Los Angeles, California, and formed under the laws of Delaware, including Aviron Capital, LLC, Aviron Releasing, LLC, Aviron 1601, LLC, MAA Releasing, LLC, and Aviron Group, LLC, among

other entities (collectively referred to herein as "Aviron").[1]
Aviron Group formally operated as a holding company for Aviron
Pictures, Aviron Capital, and Aviron Releasing.

       d.   Temerity Trust Management, LLC ("Temerity Trust")
was an entity controlled and used by SADLEIR to hold his ownership
interests in Aviron Group, among other things.  SADLEIR also used
Temerity Trust to establish a sham entity used in furtherance of
the fraudulent scheme charged in Count One, and to purchase real
estate using the proceeds of that scheme.  According to the Limited
Liability Company Agreement for Temerity Trust, SADLEIR's spouse
(the "Spouse") formed Temerity Trust under the laws of the State
of Delaware on or about October 14, 2015, and at or about the time
of its formation the Spouse was its sole member.[2]  As of at least
in or about 2017, SADLEIR held himself out as the Managing Member
of Temerity Trust.

       e.   An individual referred to herein as the "Aviron IT
Employee" was an information technology specialist employed by
Aviron from at least in or about 2017 through in or about April
2020.

## OVERVIEW OF THE FRAUDULENT SCHEMES

    6.   As set forth below, WILLIAM SADLEIR, the defendant,
participated in two fraudulent schemes (together, the "Schemes")
relating to an approximately $75 million investment made by the
Fund in Aviron.

    7.   In one of the schemes (the "Advertising Scheme"),
WILLIAM SADLEIR, the defendant, misappropriated millions of
dollars in funds from Aviron that had been invested in Aviron by
the Fund.  SADLEIR represented to the Fund that this money had
been invested by Aviron in pre-paid media credits[3] with the
advertising placement company MediaCom Worldwide, LLC
("MediaCom"), which is a subsidiary of the advertising and media
agency GroupM Worldwide Inc. ("GroupM Worldwide").  Instead,
SADLEIR, using the bank account for a sham entity he had created,
illicitly transferred out of Aviron over $25 million of those
funds.  Specifically, SADLEIR created a sham New York-based company

---

[1] When discussed individually herein, each of these entities is
referred to without the "LLC" aspect of its legal title.

[2] The Spouse was also employed by Aviron.

[3] Pre-paid media credits, also referred to as "up fronts," are
advance payments for media advertising that can be redeemed for
specific media advertising at a later time.

called GroupM Media Services, LLC (the "Sham GroupM LLC") designed
to appear as if it was the legitimate entity, GroupM Worldwide,
and a corresponding bank account in the name of that sham entity.
SADLEIR then used a significant portion of those illicitly
transferred funds for his personal benefit, including to purchase
a private residence in Beverly Hills for approximately $14 million.
SADLEIR then falsely represented to the Fund that Aviron had
purchased an approximately $27 million balance in pre-paid media
credits with MediaCom that were available to promote future Aviron
films, and pledged a portion of those credits to the Fund as
collateral for additional loans, when in fact the claimed credits
did not exist due to SADLEIR's misappropriation. As part of these
false representations, SADLEIR also created a fake identity of a
purported New York-based female employee of the Sham GroupM LLC
named "Amanda Stevens" who corresponded with a representative of
the Fund, ensuring the Fund that Aviron had an approximately $27
million balance in pre-paid media credits with the Sham GroupM
LLC. In fact, SADLEIR himself posed as Amanda Stevens when
engaging in email exchanges with a representative from the Fund.

8.    In the other scheme (the "UCC Scheme"), WILLIAM SADLEIR,
the defendant, engineered the illicit and fraudulent sale and
refinancing of assets worth an estimated $3 million that secured
the Fund's loans to Aviron. The Fund had secured its investment
in Aviron by, among other means, obtaining UCC liens in 2017 and
2018 on certain intellectual property and other assets relating to
Aviron's films. In 2019, SADLEIR used the forged signature of one
of the Fund's portfolio managers ("Manager-1")[4] on releases to
remove the Fund's UCC liens on certain of these secured assets in
order to sell or refinance them without the Fund's consent, thus
depriving the Fund of its collateral on outstanding loans, loans
on which Aviron ultimately defaulted.

## THE ADVERTISING SCHEME

### Background

9.    From reviewing documents provided by the Fund, a bank
headquartered in New York, New York ("Bank-A"), a bank
headquartered in Pasadena, California ("Bank-B"), GroupM Worldwide
and MediaCom, and an escrow company that assisted WILLIAM SADLEIR,
the defendant, in his purchase of residential property (the "Escrow
Company"), I have learned the following, in substance and in part:

---

[4] Manager-1 was a Managing Director at one of the Sub-Advisers.

a. Aviron Pictures and MediaCom entered into a Master Services Agreement made effective as of on or about August 1, 2015 (the "2015 MediaCom Agreement"), which included a provision providing for the pre-purchase of discounted media by Aviron Pictures from MediaCom and its affiliate GroupM Worldwide. MediaCom and GroupM Worldwide are both based in New York, New York.

b. On or about October 20, 2015, the Fund agreed to extend credit to Aviron Capital, a financing affiliate of Aviron Pictures, to finance prints, advertising, marketing, and promotion of feature-length motion pictures pursuant to a credit and security agreement (the "Credit Agreement"). The Credit Agreement provided for an initial loan of $12 million to finance the distribution of the film *My All American*, among other things, and further provided that the Fund may provide subsequent loans to finance additional films. The Credit Agreement also gave the Fund a security interest in intellectual property and other assets relating to *My All American*. SADLEIR signed the Credit Agreement in his capacity as the Manager of Aviron Capital. On the same date, October 20, 2015, Aviron Group, which owned all equity in Aviron Capital and Aviron Pictures, separately agreed to pledge its equity interests in those wholly owned subsidiaries as collateral for the Fund's extension of credit to Aviron Capital (the "Equity Pledge Agreement"). SADLEIR signed that agreement in his capacity as President of Aviron Group.

c. Also on or about October 20, 2015, the Fund wired approximately $12 million to an Aviron Capital account at Bank-B with account number ending in 5748 ("Aviron Capital Bank Account-1"). At the time, SADLEIR was one of the individuals with signatory authority over Aviron Capital Account-1.

d. On or about October 7, 2016, a certificate of formation for the Sham GroupM LLC was filed in Delaware. According to the Limited Liability Company Agreement for the Sham GroupM LLC, its Manager was SADLEIR and its sole member was Temerity Trust (whose Manager was listed as the Spouse).

e. On or about October 18, 2016, SADLEIR opened an account at Bank-A in the name of the Sham GroupM LLC with account number ending in 8082 (the "Sham GroupM Bank Account"). Statements for the Sham GroupM Bank Account were mailed to the same address on Wilshire Boulevard in Los Angeles, California as account statements for Aviron.

f. On or about October 19, 2016, the Credit Agreement was amended to provide for, among other things, the financing of

6

an additional film, *Drunk Parents*.[5] The amendment provided that
the entity Aviron 1601, LLC could serve as the direct borrower for
certain funds provided by the Fund in connection with *Drunk
Parents*. SADLEIR signed the amendment in his capacity as the
Manager of Aviron Capital and the Manager of Aviron 1601.

g. On or about October 20, 2016, a Statement of
Information for the Sham GroupM LLC was filed with the California
Secretary of State, listing the entity's place of organization as
Delaware, its Manager as "William K. Sadleir," and its agent for
service of process as the Spouse.

h. On or about January 12, 2017, Aviron Pictures, the
Fund, and MediaCom entered into a letter agreement providing, in
substance and in part, that, upon request, unused funds from media
pre-purchases would be refunded to the Fund (or to Aviron, with
the Fund's consent). SADLEIR signed the agreement in his capacity
as Manager of Aviron Pictures.

### SADLEIR's Use of the Sham GroupM LLC to Misappropriate Investor Funds

10. From reviewing materials provided by the Fund, Bank-A,
Bank-B, GroupM Worldwide and MediaCom, and the Escrow Company, I
have learned the following, in substance and in part:

a. On or about February 24, 2017, the Fund wired
approximately $21 million to an account in the name of Aviron 1601,
LLC, at Bank-B, with account number ending in 8642 (the "Aviron
1601 Bank Account"), pursuant to the Credit Agreement. At the
time, WILLIAM SADLEIR, the defendant, was one of the individuals
with signatory authority over the Aviron 1601 Bank Account. Per
agreement with the Investment Adviser, monthly statements for the
Aviron 1601 Bank Account were sent to both Aviron and the
Investment Adviser. Three days later, on or about February 27,
2017, SADLEIR caused $12,134,000 to be wired from the Aviron 1601
Bank Account to the Sham GroupM Bank Account. From reviewing bank
statements for the Sham GroupM Bank Account, the only expenditure
I was able to locate that appeared to relate to media or
advertising purchases or expenses was one $150,000 cashier's check
drawn on the account on or about March 20, 2017 that was made out
to "MEDIACOM" from "Aviron Pictures" for the film *Drunk Parents*.[6]

---

[5] Aviron Pictures ultimately did not serve as the distributor for
*Drunk Parents*.

[6] It does not appear that the Sham GroupM LLC's name would have

Many of the other expenditures reflected in that account include what appear to be personal expenditures by SADLEIR, such as the following:

  i. A $420,000 wire transfer on or about June 21, 2017 to the Escrow Company for a down payment on a residence in Beverly Hills (the "Beverly Hills Residence") that SADLEIR agreed to purchase on or about June 16, 2017 through Temerity Trust for approximately $14 million.

  ii. Thousands of dollars in other expenditures in connection with SADLEIR's purchase of the Beverly Hills Residence, such as a wire of approximately $35,000 on or about September 21, 2016 to an interior design firm and checks totaling approximately $1,776 for chimney inspectors in or about the summer of 2017.

  iii. An approximately $27,000 wire transfer on or about September 19, 2017 to a private jet charter company.

  iv. An approximately $127,000 payment to Tesla Motors on or about October 11, 2017. From reviewing SADLEIR's Department of Motor Vehicles records, I have learned that he currently owns a 2017 Tesla Model X.

  b. On or about July 17, 2017, the Fund and Aviron Capital entered into a note purchase and security agreement (the "2017 Note Purchase Agreement") to refinance the credit arrangements under their earlier agreements and to provide capacity to finance the distribution of additional movies by Aviron, including *Kidnap*. The 2017 Note Purchase Agreement increased the amount of credit extended by the Fund to $75 million. The agreement also gave the Fund a security interest in certain intellectual property and other assets relating to the films *My All American*, *Drunk Parents*, *Kidnap*, and potential future Aviron films. SADLEIR signed the agreement in his capacity as Manager of Aviron Capital. Also on or about July 17, 2017, the Fund entered into an omnibus amendment agreement with Aviron Group, Aviron Pictures, and MAA Releasing, providing, among other things, and in substance and in part, that all references to the Credit Agreement in the Equity Pledge Agreement would be replaced by references to the 2017 Note Purchase Agreement, and affirming that the Equity Pledge Agreement would remain in effect. SADLEIR signed the

---

been printed on this cashier's check. Rather, the bank records indicate that it would have appeared to have been a check from Aviron Pictures.

amendment in his capacity as Manager of Aviron Group, Aviron Pictures, and MAA Releasing.

      c.   On or about July 18, 2017, the Fund wired $40,629,615.63 to Aviron Capital Bank Account-1. Also on or about July 18, 2017, SADLEIR sent an email from a particular Aviron email address ("Sadleir Aviron Email Account-1") to a representative of Bank-B, stating, in substance and in part, that "Aviron Capital should be receiving an incoming wire from [the Fund] today in the amount of 40,696,615.63 to its collection account, number ending in 5748," and providing instructions for the transfer of some of those funds. A portfolio manager for the Fund ("Manager-2")[7], and others, were copied on the email. A portion of those funds appears to have been misappropriated by SADLEIR to pay for the purchase of the Beverly Hills Residence through the following series of transfers:

      i.   On or about August 10, 2017, approximately $9,475,000 was wired from Aviron Capital Bank Account-1 to an Aviron Capital account at Bank-A with account number ending in 3036 ("Aviron Capital Bank Account-2"). At the time, SADLEIR was one of the individuals with signatory authority over Aviron Capital Bank Account-2. Approximately two months later, on or about October 11, 2017, an additional approximately $4,250,642 was wired from Aviron Capital Bank Account-1 to Aviron Capital Bank Account-2.

      ii.   On or about October 16, 2017, approximately $13,525,000 was transferred from Aviron Capital Bank Account-2 to the Sham GroupM Bank Account.

      iii.   On or about October 17, 2017, approximately $13,515,156.60 was wired from the Sham GroupM Bank Account to the Escrow Company to pay for the Beverly Hills Residence. The nominal purchaser of the Beverly Hills Residence was Temerity Trust, but SADLEIR executed the purchase and escrow documents for the Beverly Hills Residence as the Managing Member of, and Authorized Signor for, Temerity Trust, and the Escrow Company that facilitated the purchase dealt directly with SADLEIR as a representative of Temerity Trust. For example, in a June 21, 2017 email, a representative of the Escrow Company emailed SADLEIR at Sadleir Aviron Email Account-1, and said, in substance and in part, "Hello Mr. Sadleir: Attached please find opening escrow paperwork for your purchase [of the Beverly Hills Residence]."

---

[7] Manager-2 was a Director at one of the Sub-Advisers.

**SADLEIR's Continued Misrepresentations Concerning
the Sham GroupM LLC to Secure Additional Investment Funds**

11.  From reviewing materials provided by the Fund, including emails, an audio recording, and other materials; documents provided by Bank-A; and documents from GroupM Worldwide and MediaCom, as well as from speaking with a representative of GroupM Worldwide, I have learned the following, in substance and in part:

a.  On or about March 12, 2019, WILLIAM SADLEIR, the defendant, sent an email to Manager-2 purporting to detail the substantial pre-paid media credit assets held by Aviron Pictures' financing affiliate, Aviron Capital.  The email attached the 2015 MediaCom Agreement and documents "reflecting the payments to GroupM Media Services," and stated:

> Some of the payments were wired from other banks, and the payments Aviron Capital made were bank account transfers since GroupM banks at [Bank-A], as do we. . . . I'll track down and forward the emails that detail how to have our own media planning company coordinate with GroupM's media traffic desk to apply our banked national television media towards specific television campaigns for films being released by Aviron Pictures.

The signature block for SADLEIR's email included a cellphone number ending in 6969 (the "Sadleir Cellphone Number").  One of the attached documents was an accounting spreadsheet that purports to reflect a total of $28,597,000 in pre-paid media credits purchased by Aviron Capital between in or about November 2016 and in or about January 2018.

b.  On or about March 15, 2019, Manager-2 sent an email to SADLEIR at another Aviron email address ("Sadleir Aviron Email Account-2"), copying Manager-1, and stating, in substance and in part, that the Fund needed resolution about whether $10 million of Aviron Capital's unused pre-paid media credits could be relied on as collateral for potential additional loans from the Fund.  On or about March 18, 2019, SADLEIR responded to Manager-2 from Sadleir Aviron Email Account-2, copying Manager-1, stating, in substance and in part, "we have confirmation from GroupM that the national television media that was banked remains available to Aviron Pictures to use on future Aviron films, regardless of the fact that we no longer use MediaCom (a GroupM company) as our advertising agency."  Manager-2 in turn responded to SADLEIR at Sadleir Aviron Email Account-2, copying Manager-1, stating, in substance and in part, "[w]ithout receiving something in writing from Group M, we have little certainty that they would take

10

direction from us.  Perhaps, you could share a contact at the comp[any [sic] and we would be glad to speak to them."  SADLEIR replied to Manager-2 from Sadleir Aviron Email Account-2, copying Manager-1, stating, in substance and in part, "GroupM wouldn't take direction from you because the contract is exclusively with Aviron Pictures.  But, we'd take direction for you."

     c.  On or about March 22, 2019 and on or about March 25, 2019, the Fund, SADLEIR, Aviron Capital, and Temerity Trust signed agreements providing for the extension of an additional $10 million in loan funds for use in connection with the film *After*. Under these agreements, SADLEIR and Temerity Trust pledged their entire membership interests in Aviron Group to secure the loans from the Fund, with the entities owned by Aviron Group listed as including Aviron Pictures; Aviron Releasing; and Aviron Capital and its wholly owned subsidiaries, including MAA Releasing, LLC, Aviron 1601, LLC, Aviron 1701, LLC, Aviron 1702, LLC, Aviron 1704, LLC, Aviron 1705, LLC, Aviron 1706, LLC, and Aviron 1801, LLC. Aviron Capital agreed to use unused pre-paid media credits with "Group M, the parent of Mediacom" as collateral for the $10 million in loans.  SADLEIR was a signatory to those agreements on his own behalf, and also in his capacity as Manager of both Aviron Capital and Temerity Trust.

     d.  Between on or about March 25 and on or about March 26, 2019, the Fund wired a total of approximately $10 million to an Aviron Capital account at Bank-A with account number ending in 0956 ("Aviron Capital Account-3").  At the time, SADLEIR was one of the individuals with signatory authority over Aviron Capital Account-3.

     e.  In a letter dated July 1, 2019 (but actually sent on or about July 9, 2019), the Fund notified Aviron Capital, in substance and in part, that Aviron Capital was in default on its loan payments and other obligations.

     f.  On or about September 16, 2019, an individual in the finance and accounting department at Aviron Pictures sent an email to Manager-2, copying SADLEIR at Sadleir Aviron Email Account-2, stating, in substance and in part, that the email was attaching documents constituting the "backup given to the CPAs for the $28,522,000 in Prepaid Media."  Those documents included, among other things, purported MediaCom forms showing the pre-purchase of approximately $27 million in media for Aviron, with instructions that funds for the pre-purchase of media be wired to the Sham GroupM Bank Account.  Four separate such forms, each bearing SADLEIR's signature, memorialize the following approximate purported purchase amounts on or about the following dates:

    i.        October 18, 2016: $2,557,800

    ii.      December 13, 2016: $460,000

    iii.     February 17, 2017: $12,134,200

    iv.     October 10, 2017: $13,525,000[8]

12. Based on my discussion with a representative of MediaCom, I have learned that these purchases never took place, and that in or about September 2019 Aviron did not have a pre-paid media balance with MediaCom or GroupM Worldwide.

### SADLEIR's Use of the Fake "Amanda Stevens" Identity to Deceive the Fund into Continuing its Support of Aviron

*Sadleir Directs the Establishment of the Sham Company's Web Presence and the "Amanda Stevens" Email Account*

13. From reviewing materials provided by the Fund, GroupM Worldwide and MediaCom, telephone service providers T-Mobile, Axion Communications ("Axion"), and Bandwidth.com, and internet domain name registrar and website hosting and email service provider GoDaddy.com, LLC ("GoDaddy"), as well as from speaking with a representative of Axion and reviewing publicly available content on the internet, I have learned the following, in substance and in part:

    a. The domain name "groupm-ms.com" was registered with GoDaddy using a GoDaddy customer account (the "GoDaddy Account") on or about November 12, 2019. The administrator of the GoDaddy Account (the "GoDaddy Account Administrator") identified themselves to GoDaddy as "William Sadleir," residing at the Beverly Hills Residence, and having the email address groupmms212@gmail.com (the "GroupM Gmail Address") and the Sadleir Cellphone Number. The name "William Sadleir" was also provided as the technical, administrative, and billing contact for the GoDaddy Account, and the domain and email hosting fees for groupm-ms.com were paid for with an American Express card in the name of "William Sadleir" with account number ending in 2000. However, as discussed below, based on my review of customer service audio recordings and phone records, it appears that the GoDaddy Account Administrator was actually the Aviron IT Employee, who established and

---

[8] No bank wiring information was listed on the October 10, 2017 form.

Case 1:20-mj-05114-UA   Document 1   Filed 09/18/20   Page 13 of 27

administered the GoDaddy Account for WILLIAM SADLEIR, the defendant.

b. The email address "a.stevens@groupm-ms.com" (the "Stevens Email Account") was also established through the GoDaddy Account on or about November 12, 2019. The purported user of the Stevens Email Account was listed as "Amanda Stevens" and as being located in the United States. However, as discussed in greater detail below, based on my review of IP records, it appears that SADLEIR was actually the user of the Stevens Email Account after it was established by the Aviron IT Employee.

c. There is currently no website content hosted at the internet URL www.groupm-ms.com. However, from reviewing historical internet content available at a website that preserves archives of webpages, I was able to review content for that website, and a screen capture of that content is posted below:



Case 2:20-bk-15015-BR   Doc 68-2   Filed 09/25/20   Entered 09/25/20 17:42:53   Desc
Declaration Of Andrew K. Glenn   Page 16 of 54

Case 2:20-mj-05114-DUTY   Document 1   Filed 03/18/20   Page 14 of 27

d.   For the sake of contrast, a screen capture[9] of the legitimate website for GroupM Worldwide, located at the URL www.groupm.com, is depicted below:



e.   Also on or about November 12, 2019, the same day the Stevens Email Account was established, the Aviron IT Employee contacted a representative of Axion ("Axion Representative-1") both by telephone (with a number ending in 2155, hereinafter the "Aviron IT Employee Cellphone Number")[10] and through email (using the GroupM Gmail Address) about establishing a voicemail account on Axion's network that would have a 212 area code.  As discussed above, both MediaCom and its parent company GroupM Worldwide are based in New York, New York, and the 212 area code is associated with that area.  Axion's customer service system automatically recorded a series of telephone calls from the Aviron IT Employee on or about November 12, 2019.  During one of those calls, in substance and in part, the Aviron IT Employee stated that he had a "dilemma" for which he needed a "solution," that he needed to set up a number with a 212 area code and a voicemail box, and that he did not need the 212 number to be capable of placing outgoing calls.  Axion Representative-1 noted that he did not have any 212 numbers available for purchase, but that the Aviron IT Employee could try purchasing a 212 number from another provider and

---

[9] This screen capture was taken on or about March 8, 2020.
[10] In T-Mobile records, the subscriber for the Aviron IT Employee Cellphone Number is listed as the Aviron IT Employee, although with a different spelling of his first name.

14

transferring it to Axion to set up a voicemail box. The Aviron IT Employee replied, in substance and in part, "I got to talk to my boss about this and then I will, I will hit you back up." In a subsequent call on the same day, the Aviron IT Employee informed Axion Representative-1, in substance and in part, that the Aviron IT Employee was able to purchase a 212 number from another service provider, and began arranging to have that number "ported" (*i.e.*, transferred) to the Axion network. Toll records show that the Sadleir Cellphone Number and the Aviron IT Employee Cellphone Number exchanged calls on or about November 12, 2019 after the Aviron IT Employee Cellphone Number contacted Axion and stated that he needed "to talk to my boss about this," as reflected in the table below:

| Time[11] | Caller | Recipient | Duration |
|---|---|---|---|
| 10:57 a.m. | Aviron IT Employee | Axion[12] | 5:29 |
| 1:35 p.m. | Aviron IT Employee | Axion | 1:20 |
| 3:33 p.m. | Aviron IT Employee | Axion | 3:25 |
| 3:39 p.m. | Aviron IT Employee | Axion | 3:33 |
| 4:23 p.m. | SADLEIR | Aviron IT Employee | 3:02 |
| 4:26 p.m. | Aviron IT Employee | SADLEIR | 1:15 |

f. On or about November 13, 2019, the Aviron IT Employee emailed Axion Representative-1 from the GroupM Gmail Address, in substance and in part, "can you setup the email [for the account] to the following and make the name Amanda instead of Eddie please. a.stevens@groupm-ms.com". Axion Representative-1 replied to the GroupM Gmail Address, in substance and in part, "Email address updated. The name on the extension isn't used for anything, so I just left it as Eddie so if you call in the guys can find it easier." On or about the same day, the GoDaddy Account Administrator set up a two-factor authentication protocol for the GoDaddy Account with a cellphone number ending in 2155 (the "2155 Authentication Number"), pursuant to which the user of the account would be required to provide an authentication number texted to that cellphone number in addition to using a standard password to make certain changes to the account. GoDaddy account records do not list the first six digits of the 2155 Authentication Number, but, as noted above, the Aviron IT Employee Cellphone Number also ends in 2155, and thus they appear to be the same phone number. Further, I have compared Axion customer service audio recordings of the Aviron IT Employee with GoDaddy customer service audio

---

[11] All times listed in this Complaint are in Pacific Standard Time unless otherwise noted.

[12] From reviewing documents provided by Axion, I learned Axion's office telephone number, which ends in 1414.

recordings of the GoDaddy Account Administrator, and based on that comparison the Aviron IT Employee appears to be the GoDaddy Account Administrator.  Thus, it appears that SADLEIR enlisted the Aviron IT Employee in establishing a website for the Sham GroupM LLC and an email account and voicemail box for "Amanda Stevens."

*Sadleir Uses the "Amanda Stevens" Email Account to Deceive the Portfolio Manager*

g.   On or about November 13, 2019, SADLEIR, using Sadleir Aviron Email Account-2, sent an email to the Stevens Email Account, copying Manager-2, and stating, in substance and in part, "Dear Ms. Stevens: I understand you are likely the person who can validate the available media balance on account for Aviron Pictures.  Aviron participated in the up-fronts in late 2016 and again in 2017, but has not yet applied the media towards marketing campaigns for our films.  Can you please send me an accounting of the Aviron Pictures media balance, along with information about how it can be used, including possible refunds, and the equivalent gross rating points associated with the purchased media?"  The Stevens Email Account responded to SADLEIR at Sadleir Aviron Email Account-2, copying Manager-2, on or about November 14, 2019, and stating, in substance and in part, "Mr. Sadleir: We changed our tracking systems earlier this year.  To facilitate my search and provide the information that you're requesting, please tell me who is (or was) Aviron Picture's media agency of record when the media purchases were made?  Sincerely, Amanda."  The signature block for that email is reproduced below:



The phone number listed in that signature block, (212) 299-4768, is hereinafter referred to as the Stevens Phone Number.

h. On or about November 14, 2019, the Aviron IT Employee sent an email from his gmail account (the "Aviron IT Employee Gmail Address") to Axion Representative-1 with paperwork for transferring the Stevens Phone Number from another service provider to the Axion network. That document identified the existing billing contact information for the Stevens Phone Number as "William Sadleir" at the Beverly Hills Residence.[13]

i. On or about November 15, 2019, the Stevens Email Account sent an email to SADLEIR at Sadleir Aviron Email Account-2, copying Manager-2, stating the following, in substance and in part:

> The summary balance report for Aviron is attached. There remains a credit of $27,650,000 in total unused media purchases. Except for $250,000 for print in 2017, all of the media was purchased through the Up-front process for years 2017 and 2018. Unused media purchased in conjunction with broadcast Up-fronts is refundable only the participation year, and then only with a 90-day advance notice. . . . Finally, although the media credits are generally not transferable to other clients, we have worked creatively in past situations to help recover value for a client when their media requirements change.

SADLEIR responded to the Stevens Email Account on or about November 22, 2019 from Sadleir Aviron Email Account-2, copying Manager-2, stating, in substance and in part, "can you please provide some times you might be available for a call with me and my colleague, [Manager-2], to review the possible options that you mention in your last paragraph in the email below?" The Stevens Email Account responded to SADLEIR at Sadleir Aviron Email Account-2, copying Manager-2, "I'm away for the Thanksgiving holiday until December 2 but can speak with you and [Manager-2] upon my return, if necessary." Manager-2 replied to the Stevens Email Account, also including SADLEIR at Sadleir Aviron Email Account-2, "Hi Amanda, Thank you for the response. Can we proceed with setting up a time to discuss upon your return."

j. Also on or about November 15, 2019, the Aviron IT Employee sent an email from the Aviron IT Employee Gmail Address

---

[13] From reviewing documents provided by Google, I have learned, in substance and in part, that the account holder for the Aviron IT Employee Gmail Address is the Aviron IT Employee and that the phone number provided by that account holder for account authentication and recovery purposes is the Aviron IT Employee Cellphone Number.

Case 2:20-mp-05119-VA Document 2 Filed 09/28/20 Page 18 of 21

to Axion Representative-1 stating, in substance and in part, "Can you please change the VM e-mail name to Amanda. Please....." Axion Representative-1 responded, in substance and in part, "It's already set to a.stevens@groupm-ms.com. Do you need me to change something else?" The Aviron IT Employee replied, in substance and in part, "Just the name that show's up when a VM message is e-mailed to that address. It say[s] Eddie."

k.    The Stevens Phone Number was assigned to the Axion telephone network between on or about November 15, 2019 and on or about March 6, 2020. During that time frame, the Stevens Phone Number did not place any outgoing calls.

l.    On or about December 3, 2019, the Stevens Email Account emailed Manager-2 and SADLEIR at Sadlier Aviron Email Account-2, in substance and in part, "[Manager-2]: I followed up yesterday with my colleague who is pulling together the media details that Mr. Sadlier [sic] requested. He should have it completed by tomorrow. It's our busiest time of year, so please excuse the delay."

m.    On or about December 16, 2019, the Fund sent a letter to SADLEIR, Aviron Pictures, Aviron Capital, and Aviron Group, asserting that the Fund would exercise its rights to collateral under the loan and security agreements between the Fund and those entities to take ownership of Aviron Pictures and Aviron Capital and replace SADLEIR as Manager of those entities.

n.    On or about December 17, 2019, the Fund filed a lawsuit against SADLEIR and Aviron in New York Supreme Court, seeking, among other things, to have SADLEIR removed from his positions at Aviron Pictures and Aviron Capital. The lawsuit was initially filed on an *ex parte* basis, and sought a temporary restraining order, which was granted on the same day the lawsuit was filed.

o.    The next day, on or about December 18, 2019, the Fund served a copy of the temporary restraining order on SADLEIR and Aviron.

p.    On or about December 19, 2019, the Fund's request for a preliminary injunction removing SADLEIR from his position at Aviron Pictures and Aviron Capital was granted, and the Fund was permitted to select a replacement Manager for those entities.

q.    On or about January 6, 2020, GoDaddy records show a login to the Stevens Email Account from an IP Address registered to SADLEIR at the Beverly Hills Residence (the "Sadlier IP

Address").[14] The Sadleir IP Address also logged in to the Stevens Email Account on or about January 20, 21, 22, 23, 24, 27, 28, 29, 30, and February 17.

r. On or about January 16, 2020, the replacement Manager for Aviron Pictures and Aviron Capital selected by the Fund (the "Replacement Manager"), sent an email to the Stevens Email Account, stating, in substance and in part, "Hi Amanda, I just left you a voice mail. I'm the new manager of Aviron Pictures. . . . I'd like to talk to you about the pre-paid media contract summary, attached." The Stevens Email Account responded, in substance and in part, "My authorized contact at Aviron is Mr. Sadleir [sic]. Can you either have him confirm by email that you are now the authorized representative of Aviron Pictures or provide some other evidence upon which I can rely in responding to you. Also, I'm on maternity leave, but working from home. If you can please email the questions you have, I'll do my best to provide answers as quickly as possible."

s. On or about January 22, 2020, the Stevens Email Account sent an email to the Replacement Manager, stating, in substance and in part, "I received your voicemail message. Please send me an email with any questions, and I'll do my best to respond as quickly as possible. Thank you, Amanda". The Replacement Manager responded, in substance and in part, "We're requesting full refund of the unused portion of the pre-paid media. It's likely best to talk to you directly to discuss the process and timing." The Stevens Email Account replied, in substance and in part, "We have already discussed this subject with Mr. Sadleir [sic] at considerable length. I suggest you confer with him. . . . I provided a general accounting to Mr. Sadleir [sic] of the possible 'credits' that may be available at the various networks."

t. On or about January 29, 2020, SADLEIR, using Sadleir Aviron Email Account-2, sent an email to the Stevens Email Account asking, in substance and in part, for an updated pre-paid media credits report. On or about January 30, the Stevens Email Account responded to SADLEIR at Sadleir Aviron Email Account-2, adding the Replacement Manager as a recipient for the email and attaching a list of media credits purportedly belonging to Aviron that totaled approximately $27,650,000, and stating, in substance and in part, "[w]hen you're ready to use the credits, simply have your Agency of Record contact me, preferably with a media plan, and we'll notify the various media companies." The Replacement Manager responded on or about February 4, 2020, dropped SADLEIR from the email chain and added others, and asked, in substance and

---

[14] GoDaddy does not possess IP login data for earlier dates.

19

in part, for additional documentation concerning Aviron's pre-paid
media credits.  The Replacement Manager also noted that "neither
Mr. Sadleir nor any other person or entity has the authority to
direct you how to use those credits except for me/Aviron Pictures
LLC."

      u.  On or about January 30, 2020, counsel for Aviron
Pictures sent a letter to the Stevens Email Account, stating, in
substance and in part, "demand is hereby made for a refund to
Aviron for unused Pre-Paid Media in an amount of at least $27.65
million."

      v.  On or about February 6, 2020, the Stevens Email
Account sent an email to the Replacement Manager, copying others,
and stating, in substance and in part, "I will be sending a reply
later today to the letter we received from Aviron's attorney."
The Replacement Manager responded the next day, on or about
February 7, stating, in substance and in part, that he had not yet
received the reply letter, and asking for confirmation of the email
address of GroupM Worldwide's general counsel (the "GroupM
Worldwide General Counsel").

      w.  On or about February 7, 2020, outside counsel for
Aviron Pictures sent a letter to the GroupM Worldwide General
Counsel, copying "Amanda Stevens" and others, and, in substance
and in part, reiterating a demand for a refund of Aviron Pictures'
pre-paid media credits.  The letter also noted that "[a] copy of
our letter, dated January 30, 2020, to your colleague Amanda
Stevens on this matter is attached hereto."

      x.  On or about February 8, 2020, the Stevens Email
Account sent an email to the Replacement Manager, copying SADLEIR
at Sadleir Aviron Email Account-2, counsel for Aviron, an associate
of the Replacement Manager, and Manager-2, and stating, in
substance and in part, "This is in response to the demand for a
refund notice that we received from Aviron Picture's attorney,
dated January 30, 2020. We are not aware of any previous requests
by Aviron for a refund, as claimed in [Aviron's counsel]'s letter.
Nonetheless, it is our position that no refunds will be made by
GroupM Media Services or any of the associated media companies and
that only media credits remain available to Aviron."

      y.  On or about February 24, 2020, the GroupM Worldwide
General Counsel sent an email from her email address, ending in
"@groupm.com," to outside counsel for Aviron Pictures, stating, in
substance and in part, "I acknowledge receipt of your letter dated
7 February 2020. Please note my correct contact details.  I note
that you have sent the letter to an Amanda Stevens, I have no

20

Case 2:20-mp-05114-UA Document 1 Filed 09/28/20 Page 21 of 2

record of such a person so please do let me know if you have received any response. I will look into this matter with the agency concerned and revert to you as soon as possible."

z. On or about February 25, 2020, a call placed to the Stevens Phone Number was directed to a voicemail box, which played the following recorded message, in substance and in part, in what appears to be a woman's voice: "Hi, this is Amanda Stevens at GroupM Media Services. I'm either on a call or away from my desk. Please leave your name, number, and a brief message, and I'll get back to you. Thank you."

aa. On or about February 28, 2020, the GoDaddy Account Administrator (who, as discussed above, appears to be the Aviron IT Employee) deleted the mailbox for the Stevens Email Account. Also on that date, SADLEIR and the Aviron IT Employee exchanged a series of calls, and shortly thereafter the Aviron IT Employee called Axion, as detailed in the table below:

| Date/Time | Caller | Recipient | Duration |
|-----------|--------|-----------|----------|
| 1:55 p.m. | SADLEIR | Aviron IT Employee | No connect. |
| 1:55 p.m. | Aviron IT Employee | SADLEIR | 0:03 |
| 1:57 p.m. | Aviron IT Employee | SADLEIR | 5:37 |
| 2:11 p.m. | Aviron IT Employee | SADLEIR | 1:09 |
| 2:33 p.m. | Aviron IT Employee | Axion | 2:44 |

Axion's customer service system automatically recorded the telephone conversation between the Aviron IT Employee and an Axion representative ("Axion Representative-2") on or about February 28, 2020. During that call, the Aviron IT Employee requested, in substance and in part, that Axion "cancel" the Stevens Phone Number and "just let it be a dead end."

bb. On or about March 2, 2020, at approximately 10:23 a.m., the Aviron IT Employee Cellphone Number placed an approximately 10-minute phone call to the Sadleir Cellphone Number. Approximately one hour after that call, between 11:22 a.m. and 11:29 a.m., GoDaddy records show that the GoDaddy Account Administrator cancelled his account registration and hosting of the domain groupm-ms.com. Less than one hour later, at approximately 12:09 p.m., the Aviron IT Employee Cellphone Number placed a call to a GoDaddy customer service line. The Aviron IT Employee Cellphone Number then placed two calls to Axion over the

course of the next several hours.  The following table details
this series of phone calls:

| Date/Time | Caller | Recipient | Duration |
|-----------|--------|-----------|----------|
| 10:23 a.m. | Aviron IT Employee | SADLEIR | 10:08 |
| 12:09 p.m. | Aviron IT Employee | GoDaddy[15] | 8:22 |
| 12:58 p.m. | Aviron IT Employee | Axion | 0:25 |
| 1:34 p.m. | Aviron IT Employee | Axion | 4:54 |

From my review of Axion customer service recordings from on or
about March 2, 2020, I learned, in substance and in part, that in
the first phone call to Axion listed in the table above, the Aviron
IT Employee asked to speak with Axion Representative-1, but was
informed by Axion Representative-2 that Axion Representative-1 was
not in the office at the time.  In the second phone call, the
Aviron IT Employee asked Axion Representative-2, in substance and
in part, whether Axion had a means of looking up information about
a particular phone number to "see where it goes to," and claimed
that his question related to a call the Aviron IT Employee had
received from someone trying to serve legal documents on one of
his relatives regarding a debt.  Axion Representative-2 responded
that Axion previously used a particular website to look up
information about phone numbers, but that website was taken down.

    cc.    On or about March 4, 2020, the Aviron IT Employee
contacted the GoDaddy customer service line about the GoDaddy
Account, with customer service notes being made in the account's
electronic file between approximately 12:54 p.m. and 1:07 p.m.
Phone records show an approximately 28 minute call from the Aviron
IT Employee Cellphone Number to GoDaddy at or about 12:38 p.m. on
the same day.  The latter half of the ensuing call between the
Aviron IT Employee and a GoDaddy customer service representative
was recorded by GoDaddy.  In the beginning of the call, according
to GoDaddy customer service notes, the Aviron IT Employee stated,
in substance and in part, that the Aviron IT Employee had deleted
his domain with GoDaddy but that the Aviron IT Employee's account
information was still accessible on a GoDaddy internet domain
registration database.  As discussed above, that user account
information would have included the name "William Sadleir."[16]  A

---

[15] According to GoDaddy's website, (480) 463-8390 is one of the
numbers for its sales and support team.

[16] From reviewing documents provided by GoDaddy, I know that the
GoDaddy Account's user contact information was shielded by a
privacy service from on or about November 12, 2019 to on or about
March 2, 2020.  However, that information became visible on public

22

GoDaddy representative informed the Aviron IT Employee, who the GoDaddy representative referred to as "William," in substance and in part, that it takes time for user information to be removed completely from GoDaddy's domain registration database, and "it is true that your name is still there, but don't you worry. Like I said, we will be able to make it disappear within this day."

dd.     The next day, on or about March 5, 2020, the Aviron IT Employee Cellphone Number placed a call to the Sadleir Cellphone Number that lasted for approximately two minutes and 17 seconds.

ee.     On or about March 7, 2020, the Aviron IT Employee contacted the GoDaddy customer service line again about the GoDaddy Account, with customer service notes being made in the customer file between approximately 3:03 p.m. and 3:25 p.m.  Phone records show an approximately 31 minute call from the Aviron IT Employee Cellphone Number to GoDaddy at or about 2:53 p.m. on the same day. The ensuing call between the Aviron IT Employee and a GoDaddy customer service representative was recorded by GoDaddy.  On that call, the Aviron IT Employee identified himself as "William," and provided a customer number, PIN number, and a separate number texted to the Aviron IT Employee(at the 2155 Authentication Number, which as discussed above appears to be the Aviron IT Employee Cellphone Number) during the call as part of a two-factor authentication process.   The Aviron IT Employee stated, in substance and in part, that his account information was still accessible on a GoDaddy internet domain registration database despite multiple requests to remove it, and that "I'm a very private person and this was a venture I was going to do that I decided not to and I'd like for it to be removed."  The GoDaddy customer service representative responded, in substance and in part, that the account information would be removed from GoDaddy's internet domain registration database that day.

ff.     Three days later, on or about March 10, 2020, the Aviron IT Employee Cellphone Number placed a call to the Sadleir Cellphone Number that lasted for approximately two minutes and seventeen seconds.

14.  From speaking with a representative of GroupM Worldwide (the "Legitimate GroupM Representative"), I have learned, in substance and in part, that the Sham GroupM LLC is not associated in any way with GroupM Worldwide, and that neither the Stevens

_____

internet domain registration databases when the GoDaddy Account Administrator cancelled various account features, including a privacy feature, when he deleted his domain registration on or about March 2, 2020.

Email Account nor the Stevens Phone Number have ever been used by a GroupM Worldwide employee. Further, based on a review of records for employees in the United States, the Legitimate GroupM Representative has found no record of any GroupM Worldwide employee named "Amanda Stevens."

15. Based on the foregoing, it appears that the Sham GroupM LLC was created by WILLIAM SADLEIR, the defendant, to misappropriate funds that SADLEIR claimed were provided to GroupM Worldwide, that "Amanda Stevens" is a fake identity created at SADLEIR's direction, that the "Amanda Stevens" identity as well as the Stevens Email Account and domain groupm-ms.com were created at SADLEIR's direction to conceal and further SADLEIR's efforts to misappropriate investor funds, and that SADLEIR himself posed as Amanda Stevens when engaging in email exchanges with a representative from the Fund.

### THE UCC SCHEME

16. From reviewing documents provided by the Fund, including emails, contracts, affidavits and other documents filed in court by the Fund, and other materials, and documents provided by the Delaware Secretary of State, I have learned the following, in substance and in part:

    a. In or about 2017 and 2018, certain UCC filings were made in Delaware to secure the Fund's loans to Aviron. Specifically, those UCC filings secured the Fund's loan with certain intellectual property and other assets relating to the films *My All American*, *Drunk Parents*, *Kidnap*, *The Strangers: Prey at Night*, *Destination Wedding*, and potential future Aviron films.

    b. As discussed above, at least as early as on or about July 9, 2019, the Fund notified Aviron that it had defaulted on its loan payment obligations to the Fund.

    c. On or about July 15, 2019 and on or about September 16, 2019, a law firm representing Aviron arranged for the electronic filing of a total of approximately fourteen UCC amendments with the Delaware Secretary of State representing that the Fund consented to the deletion of its security interest in certain intellectual property and other assets that served as collateral for the Fund's loans to Aviron (the "Fraudulent UCC Filings"). Specifically, on or about July 15, 2019, an individual in the law firm's Los Angeles office filed a total of eleven UCC amendments relating to the Fund's secured interests in *My All American*, *Kidnap*, *The Strangers: Prey at Night*, and *Destination Wedding*, and on or about September 16, 2019, an individual in the

law firm's Manhattan office filed a total of three UCC amendments
relating to the Fund's secured interests in *The Strangers: Prey at
Night*. These UCC amendments allowed Aviron to sell or refinance
several of the movie rights that served as collateral for the
Fund's loans to Aviron. However, the Fund never in fact consented
to the Fraudulent UCC Filings or to the deletion of UCC liens on
the collateral set forth in those filings, and the representations
made to that effect in the filings were false. As set forth below,
the Fraudulent UCC filings appear to have been made based on
releases that contained forged signatures from a representative of
the Fund.[17]

d. The Fund has estimated that the assets sold or
refinanced by WILLIAM SADLEIR, the defendant, and Aviron as a
result of the Fraudulent UCC Filings were worth approximately $3
million.

e. On or about October 22, 2019, outside counsel for
the Fund sent an email to Aviron's general counsel at the time
(the "Former Aviron General Counsel"), copying several other
lawyers for the Fund, stating, in substance and in part, that lien
searches on behalf of the Fund had revealed several UCC filings
"releasing collateral" and that "We're trying to piece this all
together. We're familiar with the release for Strangers and
Destination Wedding (attached) but not the others or when/how [the
Fund] authorized the amendments. Can you give me a call to walk
me through this or let me know who I can contact at [Aviron's
outside counsel]?" The Former Aviron General Counsel responded on
or about October 24, 2019, copying, among others, SADLEIR, and
stated, in substance and in part, that he had "not reviewed" the
Fraudulent UCC filings but that counsel for the Fund were "fully
involved" and "may even have commented on the very UCCs about which
you are inquiring – so for sure [the Fund] knew what it was doing
and why."

f. On or about October 25, 2019, outside counsel for
the Fund sent another email to the Former Aviron General Counsel,
copying several other lawyers at the Fund, again inquiring about
the Fraudulent UCC filings and asking, in substance and in part,
"[w]ho is the best contact to discuss this with? Do you know who
at or on behalf of [the Fund] approved the UCC-3s?" SADLEIR
responded to that email (for which SADLEIR was not a recipient)
using Sadleir Aviron Email Account-2, without copying anyone else,

---

[17] The releases themselves do not appear to have been filed with
the Secretary of State's Office, but rather provided to counsel
for Aviron, who then filed the UCC amendments based on the
releases.

stating, in substance and in part, "I'm probably the best contact for now to discuss the license sales," and, in a later email sent the same day, that SADLEIR would "pull together funds flow you asked for" and that "[w]e'll get this cleaned up."

g.      On or about November 25, 2019, Manager-2 spoke with SADLEIR by phone.  During that call, SADLEIR stated, in substance and in part, that SADLEIR sold certain motion picture rights—to which the Fund had perfected security interests pursuant to the 2017 Note Agreement—to a third party (the "Third Party Buyer"), and that SADLEIR had done so to pay the outstanding liabilities of Aviron.  When Manager-2 informed SADLEIR that SADLEIR needed the Fund's approval to do so, SADLEIR admitted that he had "f----d up" and had taken the Fund's signature pages from an unrelated transaction to effectuate the fraudulent sale.  After this phone call, also on or about November 25, 2019, Manager-2 sent SADLEIR an email asking him, in substance and in part, to "share as promptly as possible the documents utilized to facilitate the sale of assets to the Third Party Buyer and the detailed funds received and the allocation of the same."  SADLEIR never responded to this email.

h.      On or about December 12, 2019, Los Angeles-based outside counsel for Aviron sent an email to Chicago-based outside counsel for the Fund attaching five purported signed releases from the Fund that supported the filing of the Fraudulent UCC Filings (the "Fraudulent Releases").  The Fraudulent Releases were dated between on or about July 12, 2019 and on or about July 17, 2019, related to interests in the films *My All American*, *Kidnap*, *The Strangers: Prey at Night*, and *Destination Wedding*.  Each of those releases bears the purported signature of Manager-1.

i.      As discussed above, on or about December 16, 2019, the Fund sent a letter to SADLEIR, Aviron Pictures, Aviron Capital, and Aviron Group, asserting that the Fund would exercise its rights to collateral under the loan and security agreements between the Fund and those entities to take ownership of Aviron Pictures and Aviron Capital and replace SADLEIR as Manager of those entities. The following day, on or about December 17, 2019, the Fund filed a lawsuit against SADLEIR and Aviron in New York Supreme Court, seeking, among other things, to have SADLEIR removed from his positions at Aviron Pictures and Aviron Capital.

j.      I have reviewed an affidavit signed by Manager-1, and filed in New York Supreme Court in connection with the Fund's lawsuit against SADLEIR and Aviron, in which Manager-1 stated, in substance and in part, that he did not sign the Fraudulent Releases or authorize them.  Manager-1's signatures on those documents

26

Case 2:20-bk-15015-BR Doc 68-2 Filed 09/25/20 Entered 09/25/20 17:42:53 Desc
Declaration Of Andrew K. Glenn Page 29 of 54

Case 1:20-mj-05114-UA Document 1 Filed 05/18/20 Page 27 of 27

appear to have been created by copying Manager-1's signature from
other documents and pasting it on the Fraudulent Releases.

        WHEREFORE, deponent prays that an arrest warrant be
issued for WILLIAM SADLEIR, the defendant, and that SADLEIR be
imprisoned or bailed, as the case may be.


                    s/ Daniel Mardakhayev
                    ByKNF,USMJ

                    _____
                    DANIEL MARDAKHAYEV
                    SPECIAL AGENT
                    FEDERAL BUREAU OF INVESTIGATION

Attested to before me by reliable electronic means this
18th day of May, 2020

_____
HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# GLENN DECLARATION


# EXHIBIT B

Press Release

# SEC Charges Owner of Film Distribution Company with Defrauding Publicly Traded Fund

**FOR IMMEDIATE RELEASE**
**2020-122**

*Washington D.C., May 22, 2020* — The Securities and Exchange Commission today announced charges against William Sadleir, the owner of a film distribution company, for defrauding a publicly traded fund of at least $13.8 million.

The SEC alleges that BlackRock Multi-Sector Income Trust (BIT), a registered closed-end management investment company, invested approximately $75 million in Aviron Group LLC, a film distribution company founded, owned, and operated by Sadleir. The complaint alleges that Sadleir represented that the investments would be used to support the company's distribution of films. Contrary to these representations, Sadleir allegedly used a sham company as a vehicle to fraudulently divert and misappropriate BIT funds and issued fake invoices seeking BIT funds for services that were never provided. Sadleir allegedly used the funds to pay personal expenses, including his purchase, furnishing, and renovation of a Beverly Hills mansion.

"When private companies and individuals solicit or accept investments, including from investment companies, they must comply with the federal securities laws," said Adam S. Aderton, Co-Chief of the Enforcement Division's Asset Management Unit. "We allege that Sadleir raided millions from BIT and its investors, and rather than using those funds for investment purposes he spent them lavishly on himself."

The SEC's complaint, filed in federal court in Manhattan, charges Sadleir with violating the antifraud provisions of the federal securities laws and seeks disgorgement of ill-gotten gains, civil penalties, and permanent injunctive relief.

In a parallel action, the U.S. Attorney's Office for the Southern District of New York today filed criminal charges against Sadleir.

The SEC's investigation, which is continuing, is being conducted by Salvatore Massa, Vincent T. Hull, and Brian Fitzpatrick of the Asset Management Unit, and Dugan Bliss and Kerri L. Palen of the New York Regional Office. The case was supervised by Andrew Dean of the Asset Management Unit. The SEC's litigation will be led by Mr. Bliss and Mr. Massa. The SEC appreciates the assistance of the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation.

###

## Related Materials

- SEC Complaint

Case 2:20-bk-15015-BR  Doc 63-2  Filed 09/25/20  Entered 09/25/20 17:42:53  Desc
Declaration Of Andrew K. Glenn    Page 33 of 54

Case 1:20-cv-03997-JGK   Document 1   Filed 05/22/20   Page 1 of 15

Andrew Dean
Dugan Bliss
Salvatore Massa
Vincent Hull
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**212-336-0971 (Bliss)**
**blissd@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | <u>**COMPLAINT**</u> |
| **Plaintiff,** | **20 Civ. 3997** |
| **-against-** | |
| **WILLIAM SADLEIR,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant William Sadleir ("Defendant" or "Sadleir"), alleges as follows:

**SUMMARY**

1.      This is a securities fraud case in which Sadleir engaged in a longstanding scheme to misappropriate millions of dollars from a publicly traded investment company known as BlackRock Multi-Sector Income Trust ("BIT"), using a sham company and forged signatures.

2.      Sadleir was the owner and founder of Aviron Group, LLC, which was the parent of several film distribution and related companies (collectively with parent, "Aviron").  BIT invested approximately $75 million net in Aviron's film distribution business through two notes, which were securities, issued in 2015 and 2017, respectively.  In 2017, Sadleir fraudulently

diverted over approximately $25 million to a sham company he owned and operated. Sadleir falsely represented to BIT that the sham company was affiliated with a legitimate media company performing work to market and promote Aviron's business. Sadleir also misappropriated for his personal use at least approximately $13.8 million of BIT's invested funds. Sadleir used the misappropriated money to support his lavish lifestyle, including cash withdrawals and the purchases of a luxury car and a mansion in Beverly Hills. Then, in 2019, Sadleir forged BIT personnel signatures to authorize the release of collateral BIT valued at approximately $3 million that it had secured to protect its interest in the notes.

## VIOLATIONS

3.    By virtue of the foregoing conduct and as alleged further herein, Defendant has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

4.    Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5.    The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

6.    The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Defendant to disgorge all ill-gotten gains he received as a result of the violations

alleged here and to pay prejudgment interest thereon; (c) ordering Defendant to pay civil money

penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section

21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendant from directly or

indirectly, including, but not limited to through any entity he owns or controls, participating in

the issuance, offer, or sale of any security, provided, however, that such injunction shall not

prevent Defendant from purchasing or selling securities for his own personal account; and

(e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Securities Act Section

22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

8.      Defendants, directly and indirectly, have made use of the means or

instrumentalities of interstate commerce or of the mails in connection with the transactions, acts,

practices, and courses of business alleged herein.

9.      Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)]

and Exchange Act Section 27 [15 U.S.C. § 78aa].  BIT conducts business operations in this

District, is advised by BlackRock Advisors, LLC in this District, is traded on the New York

Stock Exchange in this District, and many of the acts, practices, transactions, and courses of

business involving BIT's investments in Sadleir's company Aviron occurred in this District.

## DEFENDANT

10.     **Sadleir**, age 66, a resident of Beverly Hills, California, was the founder of Aviron

Group, LLC, a holding company engaged in the film distribution business.  Sadleir owned and

controlled Aviron Group, LLC and its subsidiaries until December 19, 2019, when he was

removed from most of the subsidiaries for defaulting on a BIT note.

### OTHER RELEVANT ENTITIES

11.      **BIT** is a Delaware statutory trust traded on the New York Stock Exchange that operates as a registered closed-end management investment company and is advised by BlackRock Advisors, LLC and related entities.  BIT invests in loans and other debt instruments to generate income.  BIT's shares are publicly traded and may be purchased by retail investors.

12.      **Aviron Group, LLC** is a Delaware limited liability company based in Beverly Hills, California that is owned and was founded by Sadleir.  Aviron Group, LLC is a holding company with several subsidiaries engaged in the business of film distribution that were solely owned and controlled by Sadleir, and in some cases by a trust controlled by Sadleir.  In approximately December 19, 2019, Sadleir lost control of many of Aviron Group LLC's subsidiaries.

13.      **GroupM Media Services, LLC** is a Delaware limited liability company established by Sadleir in October 2016 that served as a vehicle for Sadleir to misappropriate BIT funds.  The entity's name bears a close resemblance to one of the world's largest advertising media companies.

### FACTS

### I.      BIT INVESTS IN SADLEIR'S COMPANY AVIRON

14.      From October 2015 until April 2019, BIT invested approximately $75 million net in Sadleir's company Aviron through two notes and related agreements.  For Aviron, the purpose of the notes and related agreements was to raise money to finance Aviron's efforts to distribute specific films.  Generally, a film distributor markets films to get them into theaters and onto streaming services and receives revenue from those sources.  For BIT, the purpose of its investment was to profit in the form of interest payments and capital appreciation from Aviron

warrants.

### A.    The First Note

15.    On October 20, 2015 Aviron and BIT entered into the first note, also known as

the credit and security agreement (the "First Note").  The First Note operated as a secured credit

facility to provide funding to support Aviron's efforts to distribute specific films and provided

BIT warrants in Aviron.  The First Note had a 15% interest rate.  Under the terms of the First

Note, all principal and interest were due in one year, and Aviron was required to make quarterly

interest payments.  The First Note contained a number of restrictions on Aviron's use of the BIT

proceeds including a prohibition against engaging in affiliate transactions.  The First Note

provided BIT the option to extend the maturity of the note for an additional four years.  An

extension would have the effect of extending the due date for Aviron to repay the principal.

Aviron's revenue streams and associated rights to, or property of, the films acted as collateral

under the First Note.  Aviron and Sadleir also could not use the investments for activities

unrelated to film distribution.  The First Note defined any funding provided by BIT as an

"investment."  As part of the agreement, BIT also obtained warrants it could exercise for LLC

interests in Aviron.  The terms of the warrants allowed BIT to acquire a specified share class of

LLC interests in Aviron.  BIT could acquire the LLC interests for $1,000 per unit.  The number

of units available for exercise was determined by a formula that was derived in part on how

much money BIT invested in Aviron and did not have an expiration.

16.    In addition to the collateral identified in the First Note, Sadleir agreed – in a

separate agreement executed the same day as the First Note – to pledge Aviron's LLC interests

in two subsidiaries "to induce [BIT] to . . . extend credit" to Aviron (the "Pledge").  In the event

of a default, the First Note and Pledge permitted BIT to acquire Aviron's interest in the two

subsidiaries.  Consistent with the First Note and the Pledge, and to protect its interest, BIT filed

UCC liens on all of the collateral from both agreements: the film distribution rights and

properties, as well as the LLC interests of the two Aviron subsidiaries.

17.     The First Note provided for an initial investment by BIT of $12 million, which

occurred in October 2015, after which Aviron was required under the First Note to make

additional written representations for any additional investment.  Those representations included

an assurance that the funds would be used in connection with a specified film project and that

Aviron had not defaulted on any of the terms of the First Note.

18.     BIT extended the one-year term of the First Note on October 19, 2016 and

ultimately provided $21 million in additional funding for film distribution projects pursuant to

the First Note as extended.  The extension also kept the terms of the Pledge in place.

**B.     The Second Note**

19.     On July 17, 2017 Aviron and BIT entered into the second note, which replaced

the First Note, and was also known as the note purchase and security agreement (the "Second

Note").  The Second Note increased the total investment amount that BIT made available to

Aviron, up to $75 million.  The Second Note had a term of three years, but provided that BIT

could enter into one or two one-year extensions.  Aviron's outstanding debt under the First Note

was rolled into the Second Note.  As a result, the $75 million in funding available under the

Second Note included the outstanding balance of the First Note.  The interest rate of the Second

Note varied:  Aviron was required to pay 15% interest on pre-existing debt from the investments

under the First Note, which at that that time totaled approximately $11.6 million.  For new

investments, the interest rate was 5%.  The agreement required Aviron to make quarterly interest

payments and the principal was due by the maturity of the note.  BIT eventually invested

approximately $50.6 million in new money under the Second Note.

20. The Second Note reiterated that its purpose was to fund Aviron's efforts to distribute films. As additional collateral for its investments, Aviron granted rights to LLC interests in additional subsidiaries that were to be established to hold the rights to subsequent films. Contemporaneous with the Second Note, BIT and Sadleir amended the Pledge so that it remained in effect with respect to the Second Note. In addition, BIT maintained its rights to the Aviron warrants from the First Note and extension, and increased the number of Aviron units available to BIT under the warrants.

21. The Second Note also required Sadleir and Aviron to comply with certain conditions in order to receive investments unless BIT expressly waived that provision. For example, Aviron and Sadleir could not sell collateralized assets for which BIT had effected a lien pursuant to the First Note, Second Note, and Pledge. Aviron and Sadleir also could not enter into affiliated transactions or use the investments for activities unrelated to film distribution.

22. The Second Note, like the First Note, allowed BIT to transfer its interest in the note to others. The Second Note incorporated additional language on transferability that acknowledged that the Second Note was a security under the Securities Act. In particular, the Second Note states that it is not registered and that BIT meets the requirements of the "accredited investor" definition in Rule 501 of Regulation D of the Securities Act for purposes of the transaction with Aviron.

23. In April 2019, BIT invested $10 million in Aviron under the Second Note to fund its distribution efforts for a specified film, which was memorialized in two letter agreements (the "Letter Agreements") that were executed the prior month. The Letter Agreements did not change the terms of the Second Note, but rather supplemented them. The Letter Agreements

required repayment of the $10 million in investments within sixty days after the specified film's

release.  As collateral for the Letter Agreements, Sadleir pledged LLC interests in 11 Aviron

entities: Aviron Group, LLC and ten subsidiaries.

## II.    SADLEIR MISAPPROPRIATES BIT ASSETS USING A SHAM COMPANY

24.    By no later than October 2016, Sadleir began a scheme to defraud BIT by

fraudulently diverting and misappropriating a portion of its investments.  Sadleir used a

substantial portion of the diverted funds for himself and to support his lavish lifestyle.

### A.    Sadleir Uses GroupM Media Services, LLC to Misappropriate Funds

25.    In October 2016, Sadleir formed GroupM Media Services, LLC which he used as

a vehicle to misappropriate BIT funds.  The entity's name bears a close resemblance to GroupM,

which describes itself as one of the world's leading media investment companies.  An affiliate

company of GroupM had an ongoing business relationship with Aviron to provide media

services.  Sadleir, either directly or through others at his direction, established a corporate

website for his sham entity purporting to provide media services, obtained a New York phone

number, and obtained an email address for a fictitious individual named Amanda Stevens

purporting to work for the entity.  Through this deceptive conduct and numerous

misrepresentations to BIT, Sadleir intentionally sought to deceive BIT into thinking that GroupM

Media Services, LLC was affiliated with the legitimate company with a similar name and that at

one point had provided similar services to Aviron.

26.    Sadleir created fake documents dated as of December 2016, February 2017, and

October 2017, purporting to be invoices directed to his company Aviron, and requesting payment

be made to his sham company GroupM Media Services, LLC for purported marketing credits or

services from a legitimate company affiliated with the real GroupM.  Those purported invoices

diverted more than $25 million to Sadleir's sham company and were fraudulent: Sadleir's

GroupM Media Services, LLC did not provide any marketing credits or services to Aviron. And

the invoices, which Sadleir signed, falsely represented that they were from "a GroupM

company," when in fact the fake documents were from Sadleir and directed payment to his sham

company's bank account.

27.     Relying on the fake December 2016 and February 2017 invoices, BIT authorized

Aviron to release funds to GroupM Media Services, LLC. Aviron appears to have released the

funds reflected in the fake October 2017 invoice without BIT's prior knowledge or authorization.

Specifically, Sadleir's fraudulent invoices claimed to support the following payments to GroupM

Media Services, LLC, as described in Table 1:

**Table 1: Fraudulent Payments to GroupM Media Services, LLC
As Reflected In Fake Invoices**

| Invoice Date | Invoice Paid Date | Invoice Amount (Stated and Paid) |
|---|---|---|
| December 13, 2016 | January 13, 2017 | **$460,000** |
| February 17, 2017 | February 27, 2017 | **$12.1 million** |
| October 10, 2017 | October 16, 2017 | **$13.5 million** |

28.     The payment BIT authorized in connection with the fake December 2016 invoice

had been previously released from the account of another third party who provided Aviron with

financing. BIT funds reimbursed Aviron for the payment. The payment BIT authorized in

connection with the fake February 2017 invoice was paid from an Aviron entity account to

Sadleir's GroupM Media Services, LLC after receiving proceeds from BIT. And the payment in

connection with the fake October 2017 invoice was paid to GroupM Media Services, LLC from

an Aviron entity account using at least $9 million from BIT proceeds.

29.     In an effort to further perpetrate and conceal his fraud, Sadleir made several

misrepresentations to BIT concerning his sham company GroupM Media Services, LLC and

these fake invoices.  After Sadleir shared the first GroupM Media Services, LLC invoice with

BIT, on December 22, 2016 Sadleir e-mailed BIT's portfolio manager, asked him to authorize

payment, and falsely conveyed that the fake invoice was, in fact, from the real GroupM, which

he described as "the largest advertising media company in the world[.]"  On January 5 and 11,

2017 Sadleir twice again asked BIT's portfolio manager by e-mail to authorize payment of the

first fake invoice and again conveyed that the payment would go to the real GroupM for media

services work.  These representations were false: the fake invoice fraudulently directed payment

to Sadleir's GroupM Media Services, LLC, not the real GroupM.  Rather, Sadleir diverted or

misappropriated the funds.

30.     Sadleir made similar misrepresentations concerning the February 17, 2017

invoice.  On February 17 and 23, 2017 Sadleir e-mailed BIT personnel requesting payment of the

second fake invoice and again conveyed that the payment would go to the real GroupM for

media services work.  These representations were false for the same reasons: the fake invoice

fraudulently directed payment to Sadleir's GroupM Media Services, LLC, not the real GroupM.

Rather, Sadleir diverted or misappropriated the funds.

31.     Months after the payments were made pursuant to the fake invoices, Sadleir

continued his efforts to conceal his fraud.  On several occasions including on at least June 19,

2018, March 12, 2019, and September 16, 2019, Sadleir or Aviron personnel acting at his

direction e-mailed BIT personnel and conveyed that the payments were made to the real GroupM

and that the real GroupM had provided or would provide in the future certain media services

work to Aviron.  And from at least November 2019 through February 2020, this concealment

continued with e-mails from the fictitious Amanda Stevens (created by Sadleir) at GroupM

Media Services, LLC, which were sent to BIT or agents of BIT. These e-mails also falsely

claimed that Aviron had over $27 million in media credits with GroupM. In fact, the real

GroupM did not have a relationship with Aviron during the time of any of these e-mails and

Aviron did not have any pending credits or services owed from the real GroupM.

32.    Sadlier misappropriated at least the majority of funds obtained through his sham

company and used the proceeds for purposes unrelated to film distribution. Instead, he used

them to fund his lavish lifestyle. Among other things, Sadleir used the misappropriated funds to:

purchase a $14 million mansion in Beverly Hills (approximately $4 million of the purchase

amount may have been sourced from Aviron-related revenue); spend nearly $3 million to

remodel Aviron's offices; pay himself and his wife over $350,000; pay $254,000 to settle a legal

dispute; buy a $127,000 Tesla; and spend about $109,000 on home furnishings and remodeling.

33.    Sadlier's deceptive conduct, misrepresentations, and omissions, including as

described herein, were material: a reasonable investor would have wanted to know that his or her

investment and related collateral was being fraudulently diverted and misappropriated.

## II.    SADLEIR MISAPPROPRIATES BIT COLLATERAL

34.    As described above, Sadlier's fraudulent diversion and misappropriation of funds

that were intended to benefit the Aviron entities, some of which served as collateral to BIT,

meant that Sadlier was also devaluing BIT's collateral. In addition, in approximately July 2019,

Sadlier continued his scheme to misappropriate BIT assets, this time using a new strategy:

forging BIT personnel signatures to fraudulently release liens on Aviron assets, and reselling

those assets to third parties.

35.    In March 2019 Sadlier had requested additional funding from BIT for a new film

distribution project. Pursuant to the Second Note, Sadleir and BIT entered into the Letter

Agreements that totaled $10 million in proceeds to be made available for such purposes under

that note. Shortly after the agreements were executed, BIT transferred $10 million to Aviron in

April 2019.

36. To protect its interests in that collateral, BIT filed liens on the specified assets in

Delaware under the Uniform Commercial Code ("UCC"). BIT filed multiple liens with each one

defining a set of distinct assets—such as the revenue streams and rights to distribute a particular

film. Under the First Note and Second Note, Aviron and Sadleir could not unilaterally release

the liens, but rather required BIT to consent to such a release.

37. During July 2019, Sadleir drafted at least five fake agreements between BIT and

Aviron for which he forged the signatures of the BIT portfolio manager. These forged

agreements enabled Sadleir to have fourteen UCC amendments filed to remove BIT's liens on

Aviron's film distribution revenue streams. These amendments further enabled Sadleir to

misappropriate collateral valued by BIT at approximately $3 million that he may have re-sold or

attempted to re-sell to third parties.

38. By October 2019, BIT learned about the unauthorized UCC amendments to the

liens, which led to a confrontation with Sadleir. In a phone call on November 25, 2019 with BIT

personnel, when confronted about the unauthorized amendments and forgeries, Sadleir admitted

he had "fucked up."

39. Sadleir's deceptive conduct, misrepresentations, and omissions, including as

described herein, were material: a reasonable investor would have wanted to know that his or her

investment and related collateral was being fraudulently diverted and misappropriated.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

40.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 39.

41.    Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

42.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

43.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 39.

44.    Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one

or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

45.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

## III.

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## IV.

Permanently prohibiting Defendant from directly or indirectly, including, but not limited

Case 2:20-bk-15015-BR Doc 63-2 Filed 09/25/20 Entered 09/25/20 17:42:53 Desc
Declaration Of Andrew K. Glenn Page 47 of 54

Case 1:20-cv-03997-GK Document 45 Filed 05/22/20 Page 15 of 15

to through any entity he owns or controls, participating in the issuance, offer, or sale of any

security, provided, however, that such injunction shall not prevent Defendant from purchasing or

selling securities for his own personal account; and

### V.

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
        May 22, 2020

                            s/Dugan Bliss
                            _____
                            Andrew Dean
                            Dugan Bliss
                            Salvatore Massa
                            Vincent Hull
                            Attorneys for Plaintiff
                            SECURITIES AND EXCHANGE COMMISSION
                            New York Regional Office
                            Brookfield Place
                            200 Vesey Street, Suite 400
                            New York, New York 10281-1022
                            212-336-0971 (Bliss)
                            blissd@sec.gov

# GLENN DECLARATION


# EXHIBIT C

JUDGE ENGELMAYER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA            :

   - v. -                           :     **INDICTMENT**

WILLIAM SADLEIR,                    :     20 Cr. ___ (___)

          Defendant.              :     **20 CRIM 320**

- - - - - - - - - - - - - - - - - - - - X

## COUNT ONE
### (Wire Fraud – Advertising Scheme)

The Grand Jury charges:

1.   From at least in or about 2016, up to and including
in or about March 2020, in the Southern District of New York and
elsewhere, WILLIAM SADLEIR, the defendant, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by means
of false and fraudulent pretenses, representations, and promises,
transmitted and caused to be transmitted by means of wire, radio,
and television communication in interstate and foreign commerce,
writings, signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, to wit, SADLEIR, who was the
chairman and chief executive officer of Aviron Pictures, LLC
(together with its affiliated entities, "Aviron"), misappropriated
millions of dollars in investor funds from Aviron for his own

personal use through fraud and deceit, including through the use

of a sham advertising company he created to carry out the scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
### (Wire Fraud – UCC Scheme)

The Grand Jury further charges:

2.    In or about 2019, in the Southern District of New

York and elsewhere, WILLIAM SADLEIR, the defendant, willfully and

knowingly, having devised and intending to devise a scheme and

artifice to defraud, and for obtaining money and property by means

of false and fraudulent pretenses, representations, and promises,

transmitted and caused to be transmitted by means of wire, radio,

and television communication in interstate and foreign commerce,

writings, signs, signals, pictures, and sounds for the purpose of

executing such scheme and artifice, to wit, SADLEIR caused the

forging of the signature of one of the managers of an investment

fund (the "Fund") that invested in Aviron on documents used to

remove Uniform Commercial Code liens on Aviron assets that secured

loans made by the Fund to Aviron, and SADLEIR then sold the Aviron

assets without the Fund's consent.

(Title 18, United States Code, Sections 1343 and 2.)

2

## COUNT THREE
### (Aggravated Identity Theft - UCC Scheme)

The Grand Jury further charges:

3.    In or about 2019, in the Southern District of New York and elsewhere, WILLIAM SADLEIR, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, SADLEIR possessed, used, and transferred the name of another person in connection with the wire fraud scheme charged in Count Two of this Indictment.

(Title 18, United States Code, Sections 1028A and 2.)

### FORFEITURE ALLEGATION

4.    As a result of committing the offenses alleged in Counts One and Two of this Indictment, WILLIAM SADLEIR, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the

3

following specific property:

      a.    the real property located at 9135 Hazen Drive, Beverly Hills, California; and

      b.    a 2017 Tesla Model X vehicle with VIN number 5YJXCAE29HF069465.

### Substitute Asset Provision

5.    If any of the above described forfeitable property, as a result of any act or omission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third person;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section

4

2461(c), to seek forfeiture of any other property of the defendant

up to the value of the above forfeitable property.

      (Title 18, United States Code, Section 981,
    Title 21, United States Code, Section 853, and
      Title 28, United States Code, Section 2461.)

FOREPERSON

AUDREY STRAUSS
Acting United States Attorney

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

WILLIAM SADLEIR,

Defendant.

INDICTMENT

20 Cr. ___  (___)

(Title 18, United States Code, Sections
1028A, 1343, & 2)

AUDREY STRAUSS
Acting United States Attorney.

A TRUE BILL

Foreperson.